# Exhibit A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| TEDDY J. SAYE, Individually and On Behalf of All Others Similarly Situated, <br><br>           Plaintiff, <br><br>       v. <br><br> NIO INC., BIN LI, and WEI FENG, <br><br>           Defendants. | Case 1:22-cv-07252 <br><br> <u>CLASS ACTION</u> |
| TARAS CEGLIA BOHONOK, Individually and On Behalf of All Others Similarly Situated, <br><br>           Plaintiff, <br><br>       v. <br><br> NIO INC., BIN LI, and WEI FENG, <br><br>           Defendants. | Case 1:22-cv-07666 |

<u>**AMENDED CLASS ACTION COMPLAINT**</u>

**TABLE OF CONTENTS**

**Page**

I. NATURE OF THE ACTION ........................................................................ 1

II. JURISDICTION AND VENUE ................................................................. 9

III. PARTIES .................................................................................................... 9

IV. GAAP PROVISIONS RELEVANT TO NIO'S REVENUE RECOGNITION .............. 11

    A. GAAP Requires Companies To Consolidate Their VIEs' Financials With Their Own .............................................................. 12

    B. Under GAAP, It Also Must Be Probable That Revenue Is Collectible Before Companies Can Recognize It On Their Books ....................................................... 14

V. SUBSTANTIVE ALLEGATIONS ........................................................... 15

    A. NIO and Its Expensive Business Model ............................................ 15

    B. NIO's Battery Swap Model Led To A Capital Crisis .......................... 17

    C. The Class Period Begins: Defendants Address NIO's Liquidity Crisis By Creating Weineng So That NIO Could Circumvent GAAP And Unlawfully Recognize Years of Battery Lease Revenue Immediately ............... 20

        1. Weineng Was Not Independent But a Branch of NIO's Business............ 24

        2. Defendants' Plan Had Its Desired Effect: After Creating Off Weineng, NIO Began to Report Steadily Increasing Revenues, While Weineng (With NIO's Help) Scrambled For Cash To Fund NIO's Revenue Recognition Scheme ............................................. 30

    D. GAAP Required NIO To Consolidate Weineng's Financials Into NIO's Because Weineng Was a NIO VIE, But Defendants Did Not Do So .................. 34

        1. NIO Held a Variable Interest in Weineng During the Class Period ......... 34

        2. Weineng Is a NIO VIE................................................................. 35

        3. NIO Was Weineng's Primary Beneficiary and Therefore Had To Be Consolidated................................................................. 37

    E. GAAP Further Required NIO To Only Recognize Revenue from Weineng That Was Probable of Collection, But Defendants Caused NIO To Recognize Millions of Weineng Revenue That Was Uncollectible Under GAAP Anyway.................................................. 38

    F. The Truth Is Slowly Revealed: Grizzly Releases Its Report ............... 39

    G. NIO Is Forced to Acknowledge the Seriousness of the Report's Allegations And Creates An "Independent" Committee to Investigate; NIO Stock Falls Almost 9% ...................................................... 41

H.     NIO's Internal Investigation Into The Grizzly Report's Allegations Was Tainted From The Start ................................................................ 41

I.     Post-Class Period Developments ............................................................ 43

    1.    NIO Announces That the Committee's Investigation Is Nearly Complete And Claims That Grizzly's Allegations Were Not Substantiated – Again Without Providing One Fact In Rebuttal ............. 43

J.     After NIO Superficially Denied the Grizzly Report's Detailed Allegations, the SEC Asked NIO For An Explanation of its Accounting ............................................................................................. 43

K.     NIO Responds to the SEC – Skimming the Surface And Not Providing a Full Picture of the VIE Accounting Issues .......................... 44

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 45

A.     August 11, 2020 Q2 2020 Financial Results and Conference Call ....................... 45

B.     August 31, 2020 Prospectus .................................................................. 47

C.     November 17, 2020 Q3 2020 Financial Results and November 18, 2020 Conference Call ...................................................................................... 48

D.     December 14, 2020 Prospectus .............................................................. 50

E.     March 1, 2021 Q4 2020 Financial Results and March 2, 2021 Conference Call ...................................................................................... 51

F.     April 6, 2021 2020 Form 20-F .............................................................. 52

G.     April 29, 2021 Q1 2021 Financial Results and April 30, 2021 Conference Call ...................................................................................... 60

H.     August 11, 2021 Q2 2021 Financial Results and August 12, 2021 Conference Call ...................................................................................... 61

I.     September 7, 2021 Prospectus ............................................................... 62

J.     November 9, 2021 Q3 2021 Financial Results and November 10, 2021 Conference Call ...................................................................................... 65

K.     February 28, 2022 6-K Supplemental and Updated Disclosures .......................... 66

L.     March 24, 2022 FY2021 Financial Results and Conference Call ........................ 67

M.     April 29, 2022 2021 Form 20-F ............................................................ 68

N.     June 9, 2022 Q1 2022 Financial Results and Conference Call ............................ 75

VII.   THE TRUTH IS SLOWLY DISCLOSED: GRIZZLY REVEALS THAT NIO SIGNIFICANTLY CONTROLLED WEINENG AND USED IT TO UNLAWFULLY PULL-FORWARD BATTERY LEASING REVENUE ..................... 76

VIII.  POST-CLASS PERIOD DEVELOPMENTS ................................................................. 78

IX.    ADDITIONAL MATERIALITY ALLEGATIONS ....................................................... 79

ii

| | | | |
|---|---|---|---|
| | A. | Weineng Accounted For A Material Amount of NIO's Revenue | 79 |
| X. | | ADDITIONAL SCIENTER ALLEGATIONS | 79 |
| | A. | Defendants Knew Their Statements Were Materially False And Misleading | 80 |
| | | 1. Defendants Purposefully Created Weineng As An End-Run Around GAAP So NIO Could Dig Out Of A Liquidity Crisis And Recognize More Revenue Immediately | 80 |
| | | 2. Defendants Were Well Aware of VIE Reporting Requirements | 80 |
| | | 3. Defendants Purposefully Set NIO's Equity Interest in Weineng at 19.84% in August 2021 To Remain A Fraction Below the 20% Figure – Which Creates a Presumption of Control | 82 |
| | B. | Defendants Were Motivated to Commit Fraud | 82 |
| | | 1. Defendants Were Motivated to Commit Fraud to Address NIO's Liquidity Crisis and Fund the Highly Capital-Intensive Battery Swap Business Model | 82 |
| | | 2. Defendants Were Motivated to Commit Fraud to Make Offerings of Inflated NIO Stock | 82 |
| XI. | | LOSS CAUSATION | 83 |
| XII. | | CLASS ACTION ALLEGATIONS | 84 |
| XIII. | | APPLICABILITY OF PRESUMPTION OF RELIANCE | 86 |
| XIV. | | NO SAFE HARBOR | 88 |
| XV. | | CAUSES OF ACTION | 89 |
| XVI. | | PRAYER FOR RELIEF | 93 |
| | | JURY TRIAL DEMANDED | 93 |

Lead Plaintiff Dr. Mohammad Siddiqui ("Lead Plaintiff") and additional named plaintiff Barry King (together, "Plaintiffs") bring this amended complaint on behalf of themselves and all persons or entities who purchased NIO, Inc. securities from August 11, 2020 through July 11, 2022, inclusive (the "Class Period"), against Defendants NIO, Inc. ("NIO" or the "Company"), Bin Li, and Wei Feng (collectively, the "Individual Defendants" and with NIO, "Defendants") for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

Plaintiffs, individually and on behalf of all other persons similarly situated, by and through their attorneys, allege the following upon information and belief, except as to the allegations concerning Plaintiffs, which are based upon their personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation, review and analysis of: (a) regulatory filings made with the Securities and Exchange Commission ("SEC"), as well as Chinese regulatory filings; (b) press releases, analyst reports, news articles, and other publications; (c) NIO's earnings and other investor conference calls; (d) other public statements by Defendants; and (e) consultation with an accounting expert. Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein and will be revealed through continued investigation and discovery.

## I. NATURE OF THE ACTION

1. NIO is a Chinese electric vehicle ("EV") company. The Company offers consumers the option to pay a discounted price for its EVs, minus the EV battery, if they enter a five-to-six-and-a-half-year subscription agreement for the battery (the "Lease Term"). NIO initially provided this popular battery leasing service in-house, and, pursuant to Generally Accepted Accounting Principles ("GAAP"), recognized revenue for the leased batteries in monthly installments as they were paid down over the Lease Term.

1

2.      In early 2020, NIO faced a severe liquidity crisis due, in part, to its expensive business model of offering battery swapping as a service (as detailed *infra*).  In addition to raising money from investors, which was only a temporary solution, the Individual Defendants, NIO's top brass, determined to dig out of the liquidity crisis by orchestrating an unlawful end-run around GAAP.  In August 2020, Defendants, with aid from NIO cronies, created a superficially independent company called the Weineng Battery Asset Company ("Weineng" or the "Battery Asset Company").  Weineng was set up as a privately held Chinese-based entity that only reports its financial results to Chinese regulators.[1]  Unbeknownst to NIO investors, Weineng's chief purpose was to "take over" NIO's battery subscription business and allow NIO to unlawfully pull-forward the revenue from the leased batteries immediately.

3.      Starting in August 2020, Defendants directed Weineng to buy all the leased batteries from NIO, and, in turn, caused NIO to immediately book the full revenue from those battery sales.  In FY2021 alone, Defendants caused NIO to unlawfully recognize over $600 million of leased battery revenue through Weineng.  Defendants' conduct violated GAAP in several ways.  First, NIO held a controlling financial interest in Weineng and was Weineng's primary beneficiary.  Accordingly, under GAAP, NIO was required to disclose Weineng as a Variable Interest Entity ("VIE") and to consolidate Weineng's financial results with the Company's (which it did not do).  This meant NIO could not pull-forward the leased battery revenue and was required to book the revenue as payments were made over the Lease Term.  Second, GAAP also requires that companies only recognize revenue that is likely collectible.  Here, Defendants caused NIO to recognize hundreds of millions of dollars in revenue from Weineng that was not likely collectible.

---

[1] Translations of Weineng's prospectus, Credit Report, and various Chinese news articles have been made into English.

As detailed herein, Weineng had an abysmal asset-to-liability ratio of approximately .36 as of December 31, 2021, demonstrating that Weineng's current liabilities (due within one year) were three times its current assets (usable or consumable within one year). While Weineng (in hindsight) was able to secure financing to continue its operations a staggering six times in approximately one year since its formation (with NIO's help), Weineng's ability to continue to secure financing – let alone on reasonable terms – was far from certain. Accordingly, under GAAP, regardless of Weineng's status as a VIE, NIO still could not pull-forward revenue for the full Lease Term and could only recognize revenue on the leased batteries as they were paid in installments over time.

4. Throughout the Class Period, Defendants issued materially false and misleading statements and omissions that misrepresented NIO's relationship to Weineng and the Company's true revenue and earnings figures. Defendants' statements artificially inflated the value of NIO securities. When the market learned the truth about NIO's accounting shenanigans, NIO securities plunged in value, causing investors to suffer tremendous losses.

5. Founded in 2014, NIO is a Chinese company that designs, develops, manufactures, and sells EVs. The Company went public in the U.S. in 2018. Batteries are the most expensive part of an EV, accounting for 30-40% of the total cost of the EV. NIO offers its customers a battery swapping service that allows them to swap their EV batteries at stations rather than wait many hours for their batteries to recharge. This service, which requires NIO to have an inventory of batteries on hand and ample battery swap stations, is expensive to operate.

6. Before the Class Period, NIO's customers could either buy an EV at full cost with the battery, or they could buy an EV at a lower cost, minus the battery, and separately lease the battery from NIO, spreading the cost of the battery over a Lease Term. According to Defendant

Li, about 40% of consumers opted to lease the battery from NIO while the Company ran its own battery subscription service. *See* BaaS Launch Event at 23:05.[2] Analysts, however, believe the number to be greater than 90%. *See* https://cleantechnica.com/2018/12/16/nio-officially-launches-nio-es8-battery-at-nio-day-2018/ ("Around 95% of ES8 owners lease their batteries, which drops the upfront price of their vehicles by 100,000 RMB ($14,476)."). Under GAAP, while NIO leased these batteries to consumers, the Company could only, and did only, recognize revenue from the monthly installment payments NIO received from subscribers over the Lease Term.

7. By early 2020, however, NIO faced a serious liquidity crisis due, in part, to its costly battery swapping business model. For FY2019, NIO's net income was a staggering negative $1.6 billion. Moreover, NIO announced in February 2020 that it did not have enough cash to last another year. To dig out of this crisis, Defendants raised money from outside investors, but they knew a one-time cash infusion would only be a temporary fix. Defendants also sought a long-term solution that would have an immediate impact on NIO's balance sheet. Their answer was to create Weineng to take over NIO's "Battery as a Service" or "BaaS". Under this new BaaS model, consumers would still be able to purchase EVs at a discount and subscribe for the usage of the batteries – but now Weineng would buy the leased batteries from NIO, and consumers would (superficially) lease the batteries from Weineng. Unbeknownst to investors, this enabled NIO to pull-forward years of subscription battery revenue while eliminating highly depreciating battery assets from its books, both in violation of GAAP.

8. In August 2020, Defendants founded Weineng with three investors that they hand-selected and that were all closely related to NIO: (1) Contemporary Amperex Technology Co., Limited ("CATL") – NIO's battery supplier; (2) Hubei Science Technology Investment Group

---

[2] There is apparently no transcript of this launch event. Thus, cites are to the time on the video.

Co., Ltd. ("Hubei") – a pre-IPO NIO investor, as well as co-founder and, as of April 2021, 49% owner, of NIO subsidiary Wuhan Weilai Energy Services Co. ("Wuhan Weilai");[3] and (3) a subsidiary of investment bank Guotai Junan International Holdings Limited, ("Guotai") – another NIO IPO investor. Although each investor started with a 25% voting/equity interest in Weineng, at all times relevant, NIO had a disproportionately larger economic interest in Weineng and controlled Weineng as Weineng's only revenue stream. Unbeknownst to investors, Weineng was a mere facet of NIO's business.

9.     In August 2020, NIO hosted the Weineng launch event and press conference; and it was Defendant Li who introduced the battery asset company to the market. During the launch event, Defendant Li claimed that Weineng was an "independent" company, but as discussed *infra* Weineng was anything but independent. In fact, Defendants completely controlled Weineng, including by directing nearly every facet of Weineng's operations for NIO's benefit and by installing several overlapping senior managers to oversee Weineng.

10.     As detailed *infra*, unlike any other Weineng investor, NIO set the terms of the contracts with Weineng, maintained the batteries and services connected with them, guaranteed Weineng's contracts, was liable for defaults by subscribers up to a certain amount, and collected revenue for Weineng. Additionally, there was no distinction between NIO-owned batteries and Weineng-owned batteries – the two were routinely interchanged and intermingled at the various swapping stations, all of which were run by NIO.

11.     Significantly, NIO also helped Weineng secure the financing necessary to continue purchasing Company batteries, without which NIO would face the same liquidity crisis that it had

---

[3] "Weilai" is another word for "NIO" or "blue sky coming" in Chinese.

before. Defendants directed Weineng to purchase all of the leased batteries from NIO, but Weineng only received monthly payments from lease customers (which were paid directly to Wuhan Weilai, a NIO subsidiary, and then reverted to Weineng). This model was not economically sustainable. Accordingly, Weineng had to borrow money a staggering six times during the Class Period to pay NIO – with NIO itself facilitating and/or securing financing for Weineng on several occasions. Relatedly and further demonstrating NIO's disproportionate influence over Weineng, Defendant Li boasted that other investors who were interested in investing in Weineng came to him as the gatekeeper in the supposedly independent company. *See infra* ¶ 83.

12. In light of the foregoing, and as detailed more fully herein, Weineng exhibited the characteristics of a NIO VIE. Therefore, NIO should have consolidated Weineng's revenues into the Company's financial statements under GAAP. NIO held a controlling financial interest in Weineng – far greater than the other three Weineng investors. At its peak during the Class Period, NIO's actual economic interest in Weineng reached 55% because in addition to its equity interest, NIO was also owed a whopping RMB 1.5 billion from Weineng – approximately $225,000,000. NIO was also Weineng's primary beneficiary, and unlike any other investor, NIO needed Weineng to further its revenue recognition scheme, and practically ran Weineng's business. Because Weineng was a NIO VIE whose financials had to be consolidated with NIO's, NIO could not recognize the full revenues from the battery sales as it did, but instead had to recognize revenue in installments as it was paid during the Lease Term.

13. Even if Defendants did not have to consolidate Weineng as a VIE, Defendants caused NIO to violate GAAP's revenue recognition provision. NIO recognized hundreds of millions of dollars in revenue from Weineng that was not likely collectible. As detailed herein,

Weineng had an abysmal asset-to-liability ratio of approximately .36 as of December 31, 2021, demonstrating that Weineng's current liabilities (due within one year) were three times its current assets (usable or consumable within one year).

14.     Weineng made an immediate and material difference to NIO's balance sheet as NIO's financials dramatically improved and its revenues skyrocketed during the Class Period. NIO more than doubled its revenue in 4Q2020. NIO reported 4Q2020 revenue of RMB 6.64 billion, compared with RMB 2.85 billion in 4Q2019 (when it was leasing the batteries itself). Likewise, for FY2021, NIO reported revenue of RMB 26.13 billion, in comparison with RMB 16.25 billion for FY2020, during eight months of which NIO leased the batteries itself. During 2021 alone, NIO recognized over RMB 4 billion, or approximately $600,000,000, in revenue from Weineng which it could not have recognized during this period if Weineng was consolidated. For the nine months ended September 30, 2022, NIO had revenue of RMB 13 billion, compared to revenues of RMB 9.8 billion for the nine months ended September 30, 2021.

15.     NIO's battery swapping stations also grew meteorically during the Class Period. At the beginning of the Class Period, in August 2020, NIO had 143 battery swap stations. By the end of the Class Period, in July 2022, NIO had almost ten times as many – nearly 1,100. The number of customers opting for battery leasing also grew during the Class Period. In November 2020, the percentage of customers choosing to lease EV batteries through Weineng was 35%. By early 2021, it was 55%. By November 2021, it had risen to 92%. The rosy but materially misleading picture that Defendants presented to investors by using Weineng as its pawn caused NIO's stock price to reach a Class Period high of $66.99 on January 11, 2021.

16.     On June 28, 2022, however, NIO's charade began to unravel. On that date, investment analyst Grizzly Research LLC ("Grizzly") published a research report entitled, "We

7

Believe NIO Plays Valeant-esque Accounting Games to Inflate Revenue and Boost Net Income Margins to Meet Targets" (the "Report"). The Report detailed how NIO extensively controlled Weineng, which was little more than a front for NIO, and was created to (fraudulently) allow NIO to recognize battery leasing revenue immediately. On June 28, 2022, NIO stock closed at $22.36, down 2.5% from its June 27, 2022 closing price of $22.95.

17. Defendants were quick to dismiss the Report on the date it was issued, which helped mitigate the investor response. Defendants' conclusory dismissal, however, did not provide any reasoning as to why they believed the Report to be meritless.

18. On July 11, 2022, the last day of the Class Period, the market realized the seriousness of the Report's allegations against NIO. On that date, in contrast to NIO's conclusory claim that the Report was meritless, the Company announced that it was forming a purportedly independent committee (the "Committee") comprised of NIO directors Denny Ting Bun Lee, Hai Wu, and Yu Long to oversee an investigation regarding the Report's allegations. As set forth *infra*, the Committee was far from independent. NIO also announced that it was appointing an undisclosed law firm and undisclosed accounting firm to review Grizzly's allegations. After these disclosures, underscoring the seriousness of the Report's allegations, NIO's stock fell almost 9%, from a July 8, 2022 closing price of $22.60 to close on July 11, 2022 at $20.57 per share. The effect on NIO investors was huge as NIO lost $2.6 billion in market capitalization in one day.

19. On August 26, 2022, after the close of the Class Period, NIO issued a four-sentence press release stating the Committee's supposedly independent investigation was almost done and that Grizzly's claims were thus far unsubstantiated. NIO, however, did not provide a single fact supporting its supposed claim that Grizzly's allegations were unfounded. The market was not convinced as NIO stock continued to drop that day. To date, the Committee still has not issued a

8

final report on the results of its investigation. The SEC also made an inquiry into NIO's accounting after the Company's unsatisfactory responses to the Report, but it too has not yet taken further action against the Company.

20. All told, investors suffered massive losses due to Defendants' misstatements and omissions of fact.

## II. JURISDICTION AND VENUE

21. The claims asserted herein arise under and pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and certain rules promulgated by the SEC. Specifically, this Complaint asserts claims under: (1) Section 10(b) of the Exchange Act ("§10(b)") and Rule 10b-5 promulgated thereunder by the SEC, see 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; and (2) Section 20(a) of the Exchange Act ("§20(a)"), see 15 U.S.C. § 78t(a)).

22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) because NIO's stock trades on the NYSE, including in this District.

24. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

25. Lead Plaintiff Dr. Mohammad Siddiqui purchased NIO securities at artificially inflated prices during the Class Period. *See* Exhibit A.

9

26. Additional named plaintiff Barry King purchased NIO securities at artificially inflated prices during the Class Period. *See* Exhibit B.

27. Defendant NIO is incorporated under the laws of the Cayman Islands with its principal executive offices located in Shanghai, China. NIO's ADSs trade on the New York Stock Exchange ("NYSE") under the symbol "NIO."

28. Defendant Bin Li ("Li") was NIO's Chief Executive Officer ("CEO") at all relevant times.

29. Defendant Wei Feng ("Feng") was NIO's Chief Financial Officer ("CFO") at all relevant times.

30. Defendants Li and Feng (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants, who were also responsible for supplying NIO's auditor with complete and accurate information (including about VIEs), were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that Defendants were misrepresenting NIO's relationship with Weineng, that NIO had reported and falsely inflated revenues and earnings, and that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public. The Individual Defendants are liable for the misleading statements pleaded herein.

## IV. GAAP PROVISIONS RELEVANT TO NIO'S REVENUE RECOGNITION

31.     GAAP is established in recognition of the numerous financial reporting objectives, including providing "financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity" *See* Statement of Financial Accounting Concepts No. 8, Conceptual Framework for Financial Reporting – Chapter 1, The Objective of General Purpose Financial Reporting, and Chapter 3, Qualitative Characteristics of Useful Financial Information, Financial Accounting Standards Board (Sept. 2010) at ¶¶OB2, QB12, BC1.24, QC6.  GAAP further provides that, if financial information is to be useful, it must be relevant and faithfully represent what it purports to represent.  SEC Regulation S-X (17 C.F.R. § 210.4 01) provides that: "Financial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).

32.     As an SEC registrant, NIO, and the Individual Defendants specifically, are responsible for issuing and fairly presenting the Company's consolidated financial statements in accordance with GAAP and SEC Rules.  The professional standards adopted by the Public Company Accounting Oversight Board ("PCAOB"), PCAOB Auditing Standards ("AS") provide, in pertinent part:

> Management is…responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management…. The fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

33.     NIO management's responsibility included, but was not limited to, ensuring that the Company properly recognized revenue, disclosed its VIEs, and filed consolidated financials

11

including all VIEs.  NIO management likewise was responsible for providing complete and accurate information to the Company's auditors to ensure the accuracy of its financial audits and reports.  In fact, management is routinely required to certify to the auditor that it has provided complete and accurate information to the auditor as part of the auditor's engagement.

34.      At all times relevant, NIO asserted that its consolidated financial statements were prepared in accordance with US GAAP.[4]

### A.      GAAP Requires Companies To Consolidate Their VIEs' Financials With Their Own

35.      GAAP generally requires companies to consolidate any entity in which it holds a controlling financial interest.  Controlling financial interests may be held through variable interests or voting interests. As such, the two primary consolidation models under GAAP are the variable interest model and the voting interest model  After the infamous Enron scandal, use of the variable interest model became critical for determining whether a controlling financial interest exists because of the increasing use of variable interest entities, and because it analyzes beyond voting rights, the underlying financial realities.  *See* Anthony H. Catanach Jr. & Shelley Rhoades-Catanach, Enron: A Financial Reporting Failure, 48 Vill. L. Rev.1057 (2003) (available at https://digitalcommons.law.villanova.edu/cgi/viewcontent.cgi?article=1339&context=vlr). Indeed, consolidation evaluations always begin with the variable interest model, which applies to all entities, with certain limited exceptions.  Here, as set forth *infra*, NIO should have consolidated Weineng into the Company's financial statements because NIO held a controlling financial interest in Weineng under GAAP's variable interest model.

---

[4] *See*, *e.g.*, NIO 2021 20-F at 10, 41.

36.     GAAP contains several criteria under ASC 810 to determine whether an entity requires consolidation under the variable interest model, including the following three steps.  First, a company must hold a variable interest – such as an investment – in an entity.  *See*, *e.g.*, ASC 810-10-05-06; ASC 810-10-55-16 through 55-41.[5]    Second, to qualify as a VIE, an entity must (a) lack sufficient equity at risk to finance its activities without additional subordinated financial support, (b) the equity holders, as a group, must lack the characteristics of a controlling financial interest, or (c) the entity must be structured with non-substantive voting rights (*i.e.*, an anti-abuse clause).  *See*, *e.g.*, ASC 810-10-05-06; ASC 810-10-15-14.  Third, the company holding the variable interest in the VIE must be the VIE's "primary beneficiary" under GAAP, meaning it has both (a) the power to direct the entity's activities that most significantly impact its economic performance, and (b) the obligation to absorb potentially significant losses of the entity, or the right to receive potentially significant benefits from the entity.  *See*, *e.g.*, ASC 810-10-05-06; ASC 810-10-25-38A through 38J; ASC 810-10-25-42.

37.     As to the non-substantive voting rights prong, GAAP clarifies that voting rights are non-substantive if (1) they are not proportional to their economic interest, *i.e.*, not proportional to the entity's expected losses and rights to expected residual returns, and (2) when substantially all of the entity's activities either involve, or are conducted on behalf of, the investor(s) with disproportionately fewer voting rights, *e.g.*, when an entity's major activities include purchasing substantially all of its purchased products from the reporting entity and the principal purpose of the entity is to conduct a business that is uniquely complementary to a significant business operation of the reporting entity.  *See*, *e.g.*, ASC 810-10-15-14(c).  As described below, this was precisely the relationship between NIO and Weineng – during the Class Period, Weineng bought

---

[5] The full text of the cited portions of ASC 810 are attached as Exhibit C.

13

all of its assets (EV batteries) from NIO and conducted its business through NIO subsidiary Wuhan Weilai, which was "uniquely complementary" to NIO's business.

38. The non-substantive voting rights prong is intended to identify entities that are structured to avoid consolidation under the voting interest model by providing non-substantive voting rights to another party. It is also meant to catch attempts by companies to avoid consolidating their financial statements with its VIE's financial statements where the voting rights held by the entity's investors are not useful in identifying which party has a controlling financial interest. *See*, *e.g.*, ASC 810-25-38A through 25-44. If a company is a VIE, then it must determine if it is the primary beneficiary of that VIE. *See*, *e.g.*, ASC 810-10-05-06; ASC 810-10-25-38A through 38J; ASC 810-10-25-42. If so, the company must consolidate the VIE's financials with its own.

**B.      Under GAAP, It Must Be Probable That Revenue Is Collectible Before Companies Can Recognize It On Their Books**

39. GAAP sets general rules for revenue recognition, including that revenue must likely be collectible from a customer before a company recognizes it as revenue. ASC 606-10-05-4 permits the recognition of revenue only when (or as) the entity satisfies a performance obligation. In context here, NIO had to evaluate its customer contracts – here, with Weineng – for revenue recognition and analyze whether it was "probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods." ASC 606-10-25-1(e). In addition, in evaluating whether collectability of an amount of consideration is probable, an entity shall consider only the customer's ability and intention to pay that amount of consideration when

14

it is due. *Id.*[6] Here, collectability was unlikely given Weineng's low asset-liability ratio and uncertainty in securing financing. *See infra* ¶¶ 108-113.

40. GAAP further clarifies that companies may recognize revenue "only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved." That is, to the extent NIO was unable to conclude that it was probable that a significant reversal in the amount of cumulative revenue recognized would not occur, NIO was precluded from recognizing revenue.

## V. SUBSTANTIVE ALLEGATIONS

### A. NIO and Its Expensive Business Model

41. NIO, founded by Defendant Li in 2014, designs, develops, and sells EVs. In September 2018, NIO went public in the United States through an initial public offering, raising $1.095 billion from United States investors.[7]

42. NIO gives consumers the option to purchase an EV at a discounted rate, minus the battery, if they agree to lease the EV battery over a specified Lease Term. Since NIO's inception, all its EVs have been equipped with vehicle-battery separation technology that allows for battery swapping in addition to conventional charging. To accommodate this technology, NIO maintains

---

[6] ASC 606-10-25-1(e). *See also* ASC 606-10-55-3A and ASC 606-10-55-3B (Implementation Guidance) ("The objective of this assessment is to evaluate whether there is a substantive transaction between the entity and the customer, which is a necessary condition for the contract to be accounted for under the revenue model" and "[i]t requires an entity to use judgment and consider all of the facts and circumstances, including the entity's customary business practices and its knowledge of the customer, in determining whether it is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods…").

[7] NIO is currently facing a class action lawsuit related to allegedly false and misleading statements made in connection with NIO's IPO. Judge Garaufis denied defendants' motion to dismiss this case in August 2021. The Court has not yet ruled on plaintiffs' motion to certify a class. *See In re NIO, Inc. Sec. Litig.,* 1:19-cv-01424, E.D.N.Y. (Dkt Nos. 79, 121).

a series of stations where a NIO vehicle owner can swap the vehicle's depleted battery for a charged battery without having to wait for their own battery to recharge. NIO's battery swapping service requires NIO to have, *inter alia*, an adequate inventory of batteries and service stations to operate effectively. Accordingly, while the battery leasing option is popular with consumers who wish to pay less up front for an EV, it is a costly operation for NIO to maintain.

43. Before the Class Period, NIO offered a "Battery Payment Arrangement" directly to consumers who entered a (five-to-six-and-a-half year) subscription agreement for the EV battery. *See, e.g.* https://www.businesswire.com/news/home/20171218005356/en/NIO-Launches-ES8-SUV-New-User-Experience ("[a] battery rental plan is available to NIO users, which provides a RMB 100,000 discount on the purchase price of the ES8" and that the "battery rental subscription [is] RMB 1,280 per month").

44. Under this Battery Payment Arrangement, when NIO sold the vehicle and leased the battery, it would recognize revenue from the battery rental on a monthly basis as NIO received payment from the renter. To account for these transactions, NIO allocated the battery transaction price to two components: (i) the value relating to the amount initially paid for the battery; and (ii) the value relating to the unpaid financing component of the transaction. While the amount allocated to the paid amount would be recognized into revenue immediately, the financing amount would be deferred as "unrealized finance income" and recognized over the financing period. Because NIO still owned the leased battery packs, NIO also had to write-down the value of the rapidly depreciating batteries on its balance sheet by approximately 10%-20% per year.

45. In August 2020, Defendant Li estimated that 40% of consumers opted for the battery payment arrangement. However, analysts have estimated the actual percentage of

consumers opting to lease the battery could have been as high as 95% during the same period. *See* https://cleantechnica.com/2018/12/16/nio-officially-launches-nio-es8-battery-at-nio-day-2018/.

**B.     NIO's Battery Swap Model Led To A Capital Crisis**

46.     NIO's battery swap model requires substantial upfront investment and yields minimal monthly payments in return.  Accordingly, when NIO ran its battery subscription service in-house, it was unable to generate a profit because the swap model was so capital intensive.

47.     NIO's battery swapping model was capital intensive for several reasons, including that: (i) the batteries themselves are very expensive;[8] (ii) NIO had to have more batteries in circulation than vehicles so fully charged batteries were available when drivers with a depleted battery arrived at a swap station; (iii) EV batteries last only five to six and a half years, degrading rapidly and depreciating in value by approximately 10-20% per year; and (iv) NIO had to build a network of battery swap stations, each of which requires automated technology that performs the battery swap in 3-5 minutes, holds a maximum of 14 batteries, and necessarily requires substantial electricity    to    charge    the    depleted    batteries    on    an    ongoing    basis. (https://insideevs.com/news/570403/nio-battery-swap-station-china/); (https://cnevpost.com/2021/10/08/analyst-says-battery-swap-stations-wont-put-big-financial-strain-on-nio/).[9]

---

[8] In October 2018, an analyst report published by Deutsche Bank estimated that the battery pack for NIO's model ES8 accounted for 30% of the total vehicle cost.  This is consistent with the industry as a whole. *See*  (https://www.instituteforenergyresearch.org/renewable/electric-vehicle-battery-costs-soar/#:~:text=Along%20with%20battery%20materials %20costs,and%20copper%20have%20also%20increased.&text=Batteries%20account%20for%2 0about%2030,price%20of%20an%20electric%20vehicle ("[B]atteries account for about 30 to 40 percent of the price of an electric vehicle.").

[9] The first generation of battery swap stations held fewer batteries.").

48.     Like other EV companies, including the Better Place company and Tesla, that tried and failed to employ a similarly capital-intense battery swap business model, NIO quickly ran into liquidity issues in 2019.[10]  For FY2019, NIO's net income was a staggering ***negative $1.6 billion***. As such, by February 2020 NIO was facing a serious liquidity crisis.

49.     A February 7, 2020 article by Jill Shen stated that "[c]ash-strapped electric vehicle maker Nio has raised $100 million in convertible bonds, relieving immediate cash flow concerns, but now faces delivery delays for its February shipment amid a viral outbreak that has brought much of the country to a standstill."  Jill Shen, *Nio raises $100 million but faces delivery delays*, available at https://technode.com/2020/02/07/nio-100-million-convertible/.  The article continued as follows:

> The cash infusion may temporarily alleviate financial pressures for the troubled EV maker, which had just RMB 2.55 billion ($357.3 million) in cash and equivalents as of the third quarter of last year.  However, given the company's difficulty raising financing, there has been growing concern among investors about whether it will be able to pay for its ambitious growth plans in its competition with Tesla.

50.     A February 25, 2020 article, also by Jill Shen, reported that NIO needed to be bailed out by a "strategic investment" from the investment arm of a Chinese provincial level governmental authority – to the tune of over $1 billion:

> Cash-strapped electric vehicle maker Nio on Tuesday announced that it has reached an agreement with officials in the eastern Chinese city of Hefei, where the company's joint manufacturing plant with JAC Motors is located.
>
> Why it matters: ***The long-awaited funding deal is expected to provide relief for the Tesla challenger from a liquidity crisis***, and allow for the launch of its third electric SUV model scheduled for delivery in September.

---

[10]     *See*     https://www.fastcompany.com/3028159/a-broken-place-better-place).     *See     also* https://en.wikipedia.org/wiki/Better_Place_(company) ("The company's financial difficulties were caused by the high investment required to develop the charging and swapping infrastructure"); *see also* https://www.powersystemsdesign.com/articles/why-did-tesla-give-up-on-battery-swapping/145/18891( "Despite several companies … clinging to the idea, battery swapping is dead, and Tesla caught wind of that before it was too late.").

Details: Nio and the government of Hefei, the capital of eastern Anhui province, signed a framework agreement on Tuesday morning at a plant jointly owned by the company and JAC, according to an announcement released by the government on its official Weibo account (in Chinese).

Nio has yet to reveal the details of the funding agreement, but the government expects the investment will exceed RMB 10 billion ($1.4 billion), making the company "an EV major" and enabling annual output of RMB 100 billion in revenue over the next five years.

Nio will relocate its China headquarters to Hefei, including its research and development, sales and marketing, and manufacturing facilities, company president Qin Lihong confirmed on Tuesday in a WeChat Moments post.

Jill Shen, *Nio reaches strategic investment deal with Hefei government*, Feb. 25, 2020, *available at* https://technode.com/2020/02/25/nio-reaches-strategic-investment-deal-with-hefei-government/. As of December 31, 2019, NIO's current liabilities exceeded its current assets in the amount of RMB 4.6 billion (*see* NIO 2019 20-F at 108). Accordingly, this capital infusion would temporarily help but not solve NIO's fundamentally capital-intensive business model in the long term. Defendants realized that they still had to figure out a more sustainable solution to this liquidity crisis that would allow them to recognize revenue from leased battery assets much faster.

51. A February 25, 2020 Credit Suisse analyst report by Bin Wang, Nick Li and Carrie Jiang noted that "[w]e expected share price to react positively to this new framework, as this big-ticket cash inflow should relieve some ***investors' concerns about NIO's cash flow position***."

52. A February 27, 2020 article further reported that NIO was "struggl[ing]" to survive and that the Company had lost $6 billion since it was founded in 2014 and had announced that without securing additional financing, ***it did not have enough cash to last another year***:

Leading Chinese electric vehicle startup Nio has struggled over the last year or so, and ***recently warned shareholders that it needs new outside investment in order to make it through 2020***. This week, the Tencent-backed company announced a potential $1.4 billion deal with a local government that just might fit that bill. And with the coronavirus cratering car sales in China, it couldn't have come at a better time — if the deal closes….

19

Nio, which became a publicly traded company in the US in 2018 *and has lost more than $6 billion since it was founded in 2014*, didn't mince words about this either. At the end of 2019, Nio announced that its "cash balance is not adequate to provide the required working capital and liquidity for continuous operation in the next 12 months," and admitted that its "continuous operation ... depends on the Company's capability to obtain sufficient external equity or debt financing."

Sean O'Kane, *Nio inks a $1.4 billion bailout as coronavirus sinks sales/ The company was struggling even before the outbreak*, Feb. 27, 2020, *available at* https://www.theverge.com/2020/2/27/21155949/nio-hefei-investment-ec6-bailout-coronavirus-china.

### C. The Class Period Begins: Defendants Address NIO's Liquidity Crisis By Creating Weineng So That NIO Could Circumvent GAAP And Unlawfully Recognize Years of Battery Lease Revenue Immediately

53. On August 11, 2020, NIO held a conference call with analysts in which they discussed the formation of Weineng – the long-term solution Defendants devised to address NIO's liquidity crisis. Shortly thereafter, on August 18, 2020, Defendants formed Weineng with three other investors. At all times relevant, however, Weineng's chief purpose was to serve NIO's interests. Specifically, Weineng was designed to purchase the leased batteries from NIO – its only customer – and gave the Company a pretext to wrongfully circumvent GAAP by recognizing the full revenue from the leased batteries immediately, while simultaneously offloading the rapid depreciation of those assets to Weineng.

54. Defendants repeatedly misrepresented to investors that Weineng was an independent company from NIO. In fact, every facet of Weineng's business was designed by NIO to serve NIO, and the entity itself was owned and controlled by NIO, and several of its cronies, to ensure it would only further NIO's interests.

55. For starters, Defendants cherry-picked each of the three other initial equity investors in Weineng, all of which had close ties to NIO. These investors included:

1) **CATL.** CATL manufactures all of NIO's batteries, and NIO is consistently one of CATL's largest customers.

20

2) **Hubei**.  Hubei is a pre-IPO investor in NIO.  Hubei also co-founded NIO subsidiary Wuhan Weilai in May 2017 (https://www.sohu.com/a/316926885_100044558), and owned 49% of Wuhan Weilai as of April 2021.  *See* NIO's Hong Kong Prospectus at 198 (https://portalvhds1fxb0jchzgjph.blob.core.windows.net/press-releases-attachments/1416980/HKEX-EPS_20220513_10260181_0.PDF).  Hubei is also affiliated with the Wuhan East Lake New Technology Development Zone Management Committee – the location of NIO's headquarters and the governmental entity backing the construction of NIO's industrial park.

3) **Guotai.**  Guotai serves as NIO's "compliance advisor to provide advice and guidance to [NIO] in respect of compliance with the applicable laws and regulations."  Specifically, Guotai's role as NIO's compliance advisor required it to advise NIO regarding "transactions in which any beneficiary of weighted voting rights in [NIO] has an interest; and where there is a potential conflict of interest between [NIO], its subsidiary and/or Shareholders (considered as a group) on one hand and any beneficiary of weighted voting rights in [NIO] on the other." And, according to Defendant Li, Guotai was brought in to "help us [(NIO and Weineng)] issue ABS", *i.e.*, to underwrite asset backed financing offerings so that the battery asset company can purchase NIO's batteries on NIO's command.

56.     Each of the initial investors started with a 25% voting/equity interest in Weineng, but this percentage was meaningless: NIO's true economic interest was always disproportionately greater than that of the other investors (*see infra* ¶¶ 101-106).  Tellingly, Defendants calculatingly changed NIO's voting/equity interests in Weineng during the Class Period to further its fraudulent accounting scheme without losing any control over Weineng.  For example, NIO's equity/voting interest in Weineng was 25% from August 2020 through December 2020.  However, in December 2020, a mere three months after Weineng was founded, Defendants authorized NIO's equity/voting interests to decline to 13.89% so that the Company could help facilitate Weineng's capital raise of RMB 640 million.  Defendants were willing to superficially lower NIO's 25% equity interest to 13.89% at this time because Weineng badly need money to continue to buy batteries from NIO.  Despite reducing its equity interest, NIO continued to completely control Weineng's business.  *See* ¶¶ 63-70.  In furtherance of the Company's revenue recognition scheme,

21

when the time was right, NIO would had no problem increasing its equity interest again – and it did just that in August 2021.

57. On August 16, 2021, NIO's equity/voting interest rose again – this time higher than any other investor to 19.84%. Notably, NIO's calculated 19.84% voting interest in Weineng was a hairsbreadth under the 20% equity/voting figure that Defendants knew would provide a presumption under GAAP that NIO significantly controlled Weineng – a factor militating strongly in favor of finding Weineng to be a VIE requiring consolidation with NIO's financial statements. *See* ASC 323-10 ("[a]n investment (direct or indirect) of 20 percent or more of the voting stock of an investee shall lead to a presumption that in the absence of predominant evidence to the contrary an investor has the ability to exercise significant influence over an investee").

58. As noted *supra*, NIO's interests in Weineng were substantially different from any other investor in the battery asset company. NIO, unlike the other Weineng investors, needed Weineng to buy its leased battery assets so that NIO could immediately recognize all the revenue from those sales. This would transform NIO's balance sheet and stave off the Company's liquidity crisis. Additionally, NIO was Weineng's only source of revenue during the Class Period. This relationship ensured that NIO had disproportionate control over Weineng.

59. On August 20, 2020, NIO held an official launch event for Weineng. During that event, Defendant Li (as opposed to a Weineng founder, director, or employee) introduced Weineng and spoke about its purpose, *i.e.*, to serve NIO. Defendant Li explained that a "prerequisite" to NIO's battery-swap model was "establish[ing] an independent battery asset company". The event was held at NIO House in China. Weineng's Chairman and Legal Representative Shen Fei – who is also Vice President of NIO's subsidiary Wuhan Weilai – sat in the front row.

22

60.     Defendant Li openly acknowledged at the BaaS launch event that for NIO's sake "[t]here must be someone to hold the battery assets. Otherwise we have to hold them by ourselves. ***But that will be too much a financial burden....What to do? So an independent battery asset company is needed***." BaaS Launch Event Video at 10:13. Defendant Li also noted at that time that "NIO takes responsibility for the whole system including the battery asset management". *Id* at 23:00. Defendant Li then displayed two separate invoices on a video screen, one for the vehicle, one for the battery. The battery invoice was not from Weineng but from a NIO subsidiary in Wuhan. *Id.* at 26:00.

61.     During the launch event, Defendant Li also underscored how Weineng singularly created value for NIO. Specifically, Defendant Li explained that Weineng would "strengthen NIO's bargaining power in the supply chain, further improve NIO's system efficiency, and push up corporate gross profit".

62.     Following the launch event, on August 25, 2020, securities analyst Phate Zhang reported, *inter alia*, that NIO "established" Weineng as "important support" to address the Company's liquidity crisis, in relevant part, as follows:

> [O]n August 18, ***Weineng battery assets launched by NIO and partners such as Contemporary Amperex Technology (CATL), China's largest automotive lithium-ion battery maker Weineng will be an important support for NIO's BaaS operations, solving the problem of funding battery operations….fundamentally, battery swap is still a kind of asset-heavy operation, the high cost of battery, and the construction of battery swap station is still a problem to be faced***. Tesla once gave up the battery swap mode, under the BaaS model, NIO can succeed? How to generate more business value in the future is the next question NIO needs to think about…. William Li Bin said that after the BaaS model closed loop is formed, the goal of building 1100 battery swap stations will definitely be achieved in the future. The slower than expected construction of battery swap stations is due to multiple factors…. ***On the one hand, the battery swap station construction needs to invest a lot of money, and NIO's capital chain is not very rich***…. On the other hand, although NIO had already launched a battery rental business, the battery still belonged to the user, so only the technical separation of the body and the battery was achieved, but not the separation of the body and the battery in terms of property rights…. ***Also, at that time, NIO had to bear the heavy cost of batteries***. ***To a***

23

*certain extent, NIO had to reduce its burden in order to run the battery swap mode smoothly. Otherwise, NIO will not have enough capital to push the battery swap business model forward….* Wuhan Weineng Battery Assets Company, a battery asset company ***established by*** and in cooperation with NIO, was incorporated on August 18 with a registered capital of RMB 800 million, jointly sponsored by CATL New Energy Technology Co.

https://cntechpost.com/2020/08/25/is-nios-battery-swap-mode-commercially-viable/.

### 1. Weineng Was Not Independent But a Branch of NIO's Business

63. Throughout the Class Period, Weineng was a mere facet of NIO's business. NIO supplied Weineng with all of its customers (which during the Class Period were all NIO customers), singularly controlled the relationship with those customers (even potentially to Weineng's detriment), and even installed its own loyal senior managers at Weineng to oversee operations. No other investor in Weineng was similarly situated. In fact, the other investors were at NIO's mercy vis a vis Weineng because Weieneng's only revenue source came from NIO.

64. NIO explained in its 2020 20-F, filed with the SEC on April 6, 2021, and its 2021 20-F, filed with the SEC on April 29, 2022, that Weineng was "***dedicated*** to purchasing [from NIO] and owning the assets of battery packs which are subscribed by users under BaaS." NIO further explained that it set the prices for its EVs, for the EV batteries, for the battery swap network, and for the BaaS program. *See* BaaS Launch Event (https://www.nio.com/news/nio-launches-battery-service); *see also* https://cntechpost.com/2020/08/20/nio-launches-baas-battery-rental-service/.[11]

---

[11] In May 2022, NIO exercised its unilateral decision-making power to increase BaaS battery rental prices. *See* Phate Zhang, *Nio to hike prices on May 10, including vehicle prices and battery rental fees*, CnEVPost, Apr. 10, 2022, *available at* https://cnevpost.com/2022/04/10/nio-to-hike-prices-on-may-10/ ("The BaaS battery rental price will be adjusted from RMB 1,480/month to RMB 1,680/month for the long-range battery pack. The standard range battery pack rental service fee will remain unchanged at RMB 980/month. Customers who have already purchased a vehicle are not affected by this adjustment.").

65.     In fact, NIO could opt to discontinue or alter the BaaS program at any time. *See* BaaS Launch Event Video at 23:00 (Defendant Li stating that "NIO takes responsibility for the whole system including the battery asset management").[12]  According to Weineng's April 2022 prospectus for an ABS offering, NIO's subsidiary even collected the monthly subscription payments from customers on behalf of Weineng. *See* Weineng Prospectus at 35, 92 ("According to transaction arrangement [between Weineng and NIO], NIO Finance [was] responsible for … deducting rental fees from subscribers' designated accounts and transferring the fees to an account of Wuhan Weineng on each payment due date on a monthly basis.").  *See also* BaaS Launch Event at 26:00 (displaying invoice for BaaS subscription from NIO Finance).

66.     Furthermore, unlike the other three Weineng investors, NIO was uniquely responsible for part of Weineng's losses in the event of customer defaults.  If a BaaS subscriber failed to make the monthly payments, only NIO would have to compensate Weineng for a portion of the default.  NIO 2020 20-F at 104.  NIO explained in its 2020 20-F that "in furtherance of the BaaS, we agreed to provide guarantee to the Battery Asset Company for the default in payment of monthly subscription fees from users." *Id.*

67.     NIO also controlled other key aspects of Weineng's operations.  NIO's 2021 20-F states that Weineng does not maintain, service, control, or possess the battery assets it purchases form the Company.  Specifically, NIO stated that with respect to the BaaS model, NIO "provide[d] services to the Battery Asset Company including battery packs monitoring, maintenance, upgrade, replacement, IT system support, etc." 2021 20-F at F-21.  During Weineng's launch event, Defendant Li further explained that Weineng would "purchase battery packs and entrust NIO to

---

[12] NIO apparently did not release a transcript of this event.

25

provide battery rental and operation services to its customers." *See* BaaS Launch Event at 33:25; *see also* (https://cntechpost.com/2020/08/21/what-the-four-investors-involved-in-investing-in-nio-battery-asset-firm-might-be-thinking-about/).

68.     Even more fundamentally, Weineng does not get to choose which battery assets or how many battery assets it should purchase from NIO for its inventory. This is all driven by NIO customer demand.  *See* NIO Hong Kong Prospectus at 222 (Weineng made "payment to NIO on a monthly basis based on the number of battery packs purchased during the month"); NIO 2021 20-F at F-20 (NIO sold "battery packs to Wuhan Weineng Battery Asset Co. … on a back-to-back basis when the Group sells the vehicle to the BaaS users and the BaaS users subscribe for the usage of the battery packs.").[13]   Thus, NIO could overextend Weineng against Weineng's own best interests if it benefited the Company.   Furthermore, during the Class Period, Weineng did not produce any products or intellectual property; nor did it maintain its own independent sales force to sell batteries to potential customers. This too was all done by NIO.   *See* (https://cnevpost.com/2020/08/21/what-the-four-investors-involved-in-investing-in-nio-battery-asset-firm-might-be-thinking-about/) ("[a]s an asset management company whose main business is batteries, Wuhan Weineng will not only be limited to a physical business but more like a 'finance-like' company"); *see also* https://cntechpost.com/2020/08/25/is-nios-battery-swap-mode-commercially-viable/.

---

[13] NIO reiterated this in its letter to the SEC in October 2022.  *See* https://ir.nio.com/static-files/7d5b261f-a18b-4055-ae75-c5e5a50d495b ("The Company respectfully submits that the Group only sells battery packs to Wuhan Weineng Battery Assets Co. Ltd….on a back-to-back basis when the Group sells the vehicle (without battery pack) to the BaaS users. Therefore, there has been no sales of battery packs to the Battery Asset Company outside of the individual sale of a vehicle (without battery pack)."

69. As noted *supra*, NIO also maintains physical control of the batteries Weineng purchased by retaining responsibility for storage, maintenance, servicing, charging, and distributing the batteries alongside NIO owned batteries. *See* NIO Hong Kong Prospectus at 221 ("Both BaaS users and non-BaaS users [were] able to enjoy battery swapping services at the Power Swap stations. The 'depleted' batteries swapped out of users' vehicles will be kept physically in the Power Swap station to be charged until they are swapped on to another vehicle. ***During the period when this particular battery pack remains in the Power Swap station as part of our spare batteries pool, its title is deemed to be held by our Company***. After completing battery swaps, the charged batteries swapped on to BaaS users' vehicles are deemed to be owned by the Battery Asset Company, while those swapped on to non-BaaS users' vehicles are deemed to be owned by the respective users themselves.").

70. Indeed, NIO-owned batteries and Weineng-owned batteries are co-mingled and NIO does not differentiate between them. All the batteries are accessible to NIO vehicle and battery owners, including those who have no relationship with Weineng. NIO and Weineng treat the "Weineng-owned" batteries exactly the same as the NIO-owned batteries, further demonstrating how inextricably linked NIO and Weineng were and how NIO was running Weineng. Thus, the very core of Weineng's business, including pricing, customer relationships and inventory management, was completely under NIO's control, undermining any claim that Weineng was truly independent from NIO.

71. To ensure that Weineng maintained its singular focus on serving NIO's interests, Defendants also installed at Weineng several senior managers who also worked at NIO and/or Wuhan Weilai, NIO's subsidiary. These overlapping senior managers included, but were not

27

limited to, Ronghua Lu, Fei Shen, Xue Tingting and Lihong Qin – about 10% of Weineng's 40-person workforce.

72.     Lu served as both Weineng's General Manager and Director, a director at Wuhan Weilai,[14] and as Battery Operation Supervisor at NIO's subsidiary "Shanghai NIO."  Lu, who was responsible for the battery business in both companies, would later reiterate in a March 20, 2022 interview with "ESCI KSP" that NIO always had designs to form a battery asset company like Weineng to support the Company's business model.  Lu further acknowledged that NIO was behind the founding of Weineng and hand selected the other investors in the entity:

> Lu: The BaaS that everyone sees today originated from the idea of vehicle-electric separation and battery rental at the beginning of NIO's birth. ***It took NIO five years from its establishment to the official launch of BaaS.  I joined Weilai in 2016 and was mainly responsible for this part.***
>
> ***During the whole process of launching BaaS, we found that we needed to establish a battery asset company independent of NIO. Therefore, NIO, as a very important shareholder, has also introduced other strategic investors, so I will naturally have new ideas***… ***Although I am responsible for the battery business in both companies, they are actually different***. As an asset company, Weineng focuses more on asset operation. Our mission is to manage batteries efficiently and make them play more asset value.
>
> Q: Why did it fail to conduct business through financial institutions at that time?
>
> Lu: As far as equity investment institutions are more willing to try new things, institutions tend to be conservative. There was no such model on the market at the time, so organizations had great concerns about developing this business. ***By 2020, we will adjust our way of thinking, and simply set up an organization to hold and manage battery assets, and then use it to connect organizations to get money***.[15]

73.     The Weineng Prospectus states that Lu was "in charge of" "battery, data operations and strategy development" at Weilai Energy.  Weineng Prospectus at 78.  In February 2021, Lu also incorporated a consulting entity that appears to be an affiliate of Weineng, Wuhan Qianlong

---

[14] *See* https://finance.sina.com.cn/tech/csj/2022-07-07/doc-imizmscv0422812.shtml.

[15] As previously noted, "Weilai" is another word for NIO.

28

Wuyong Management Consulting Co Ltd ("Wuhan Qianlong").[16]  Lu remains a director and shareholder of Wuhan Qianlong alongside Weineng's reported current Chief Operating Officer, Xue Tingting.  In addition, "Qianlong Wuyong is controlled by NIO" and "the executor is Lu Ronghua."  *See* https://www.eet-china.com/mp/a187169.html.  Tingting Xue "serv[es] as a shareholder" of Qianlong Wuyong.  *See* https://wx.qixin007.com/shareholder/e8969be5a9b7e5bbb7/2df19b63-7a4f-4059-8933-79b35295d4ff/.

74.     Shen served as Weineng's Chairman and Legal Representative while also serving as Vice President of Wuhan Weilai – a position he held since November 2015.  *See Shen Fei, vice president of Weilai, was appointed as the chairman of Wuhan Weineng Battery Assets Co., Ltd,* Business Express, Aug. 20, 2020, *available at* m.jiemian.com/article/4860207_ttkx.html. *See also* Weineng Prospectus at 78.

75.     Xue Tingting is Weineng's Chief Operating Officer.  Weineng's Prospectus describes Xue as a former manager with Lu in the data, operations and strategy departments of Wuhan Weilai, the entity that reportedly oversees Weineng's day-to-day operations on behalf of NIO.  See Weineng Prospectus at 79 (Xue worked in the "battery, data operations and strategy developments"). Xue also "serv[es] as a shareholder" of Qianlong Wuyong.  *See* ¶73.

76.     Lihong Qin, a director and President of NIO, is also the legal representative of Weilai Energy.  *See* Xian Ling Shuo, *Nio wholly-owned Wuhan Nio Energy Company*, NetEase (Jan. 10, 2023), *available at* https://www.163.com/dy/article/HQNP6UUN05118IR2.html.

---

[16] Wuhan Qianlong is apparently a Weineng affiliate company as it is co-located with Weineng in the Donghu New Technology Development Zone in Wuhan and shares a service email address with Weineng.

**2. Defendants' Plan Had Its Desired Effect: After Creating Weineng, NIO Began to Report Steadily Increasing Revenues, While Weineng (With NIO's Help) Scrambled For Cash To Fund NIO's Revenue Recognition Scheme**

77. Defendants' plan to use Weineng as a pawn to dig out of NIO's liquidity crisis worked. After Defendants formed Weineng, NIO's balance sheet saw transformational change that painted an artificially rosy picture of the Company's revenue and business.

78. Specifically, NIO more than doubled its revenue in 4Q20. NIO reported 4Q20 revenue of RMB 6.64 billion, compared with RMB 2.85 billion in 4Q19, when it was leasing the batteries itself. *See* NIO Q4 2020 Financial Results at 2 (https://ir.nio.com/static-files/72b2a3c4-24c7-492f-8a4e-c4ea9c103350). Likewise, for FY2021, NIO reported revenue of RMB 26.13 billion, in comparison with RMB 16.25 billion for FY2020, during eight months of which NIO leased the batteries itself. *See* NIO 2021 20-F at 125. For the nine months ended September 30, 2022, NIO had revenue of RMB 13 billion, compared to revenues of RMB 9.8 billion for the nine months ended September 30, 2021. *See* NIO Q3 2021 Financial Results at 2 (https://ir.nio.com/static-files/f44a7373-aa0d-4b5d-842c-7021f400dd8c). In 2021 alone, Weineng's first full year of operation, NIO recognized over RMB 4 billion, or $600,000,000, in revenue from Weineng alone.

79. NIO's battery swap stations also grew meteorically after spinning off Weineng. In August 2020 NIO had 143 battery swap stations. *See* NIO BaaS Launch Press Release (https://www.nio.com/news/nio-launches-battery-service). By July 2022, NIO had almost ten times as many – nearly 1,100 – battery swap stations. *See* NIO Blog (https://www.nio.com/blog/first-nio-power-swap-station-germany-officially-opens). The combination of fundings and revenues that NIO pulled forward via Weineng made this growth possible.

30

80.     At all times relevant, however, Defendants knew that this rosy façade for NIO would only endure if Weineng had the necessary capital to purchase the leased batteries from NIO. Defendants likewise knew that the only way for Weineng to secure the necessary capital to fund operations was through financings, and that if Weineng failed to find the necessary capital, NIO would again be faced with a profound liquidity crisis.  Accordingly, Defendants took an active role in helping Weineng secure financing, while also continuing to serve as the gatekeeper of Weineng's investors to ensure Weineng maintained its chief focus on NIO.

81.     From August 2020 through December 31, 2020, Weineng bought RMB 290 million worth of EV batteries from NIO.  On November 17, 2020, NIO reported total revenues of RMB4,526.0 million ($666.6 million) in 3Q20 and gross profit of RMB585.8 million ($86.3 million).

82.     In December 2020, mere months after receiving RMB 800 million at the time of its creation, Weineng had to raise an additional RMB 640 million from new investors, one of which was NIO's battery swap station supplier, Shandong Weida Machinery Co., Ltd., to keep pace with purchasing leased batteries from NIO.  As noted *supra*, NIO was willing to temporarily and superficially reduce its equity/voting interest to facilitate this round of financing for Weineng while maintaining control over Weineng and ensuring that Weineng's investors had close ties to the Company.

83.     On a March 2, 2021 conference call, Defendant Li stated that NIO secured additional financing for Weineng, and that potential investors in Weineng approached him – not Weineng – to invest in the battery asset company during Weineng's rounds of financing:

> Regarding the battery asset management company, we have already finished 2 rounds of financing. Right now, we have 8 shareholders, including NIO. We have already raised around RMB 1.44 billion. ***Right now, many new investors have approached me and asked whether it's possible for them to invest in the battery asset management company***.

31

At the same time, we also secured sufficient credit facilities from the bank for the battery asset management company. As a very important player or a very important role in the Battery as a Service business model, the battery asset company has already secured sufficient cash to support this business model operation.

84. For FY 2021, Weineng bought RMB 4.1 billion worth of EV batteries from NIO.[17]

85. On March 1, 2021, NIO reported total revenues of RMB6,641.1 million ($1,017.8 million or $1 billion) in 4Q20 and gross profit of RMB1,141.9 million ($175.0 million).

86. On April 6, 2021, NIO reported FY2020 total revenues of RMB 16,257.9 million ($2,322 million or $2.3 billion), with total revenues from vehicle sales of RMB 15,182.5 ($2.168 million or $2.1 billion) and total revenues from other sales of RMB 1,075.4 million ($357 million).

87. On April 29, 2021, NIO reported total revenues of RMB7,982.3 million ($1,218.3 million or $1.2 billion) in 1Q21, representing a huge increase of *481.8%* from 1Q20 and an increase of 20.2% from 4Q20. NIO also reported gross profit of RMB1,554.8 million ($237.3 million) in 1Q21, representing another huge increase of RMB1,722.3 million (or $2.46 billion) from a gross loss of RMB167.5 million in 1Q20 and an increase of 36.2% from 4Q20.

88. In April 2021, Weineng's thirst for cash to fund the purchase of batteries from NIO continued as it raised an additional RMB 72 billion—over $10 billion—in equity.

89. On August 11, 2021, NIO reported total revenues of RMB8,448.0 million ($1,308.4 million or $1.3 billion) in 2Q21, representing an increase of *127.2%* from 2Q20, and gross profit of RMB1,573.9 million ($243.8 million) in 2Q21, representing an increase of *402.7%* from 2Q20.

90. In August 2021, for the fourth time in its first year of operations, Weineng again needed financing to fund the purchase of NIO batteries. This time, Weineng raised RMB 530 million – with over half this amount (RMB 270 million) coming from NIO itself. According to

---

[17] NIO does not break down by quarter the revenue from batteries sold to Weineng.

NIO, "A few more financial investors invested in the Battery Asset Company, and Guotai …

exited." NIO Hong Kong Prospectus at 237. After the August 2021 round of financing, NIO

separated itself from the original co-investors and became the sole largest shareholder of Weineng,

increasing its equity stake in Weineng to 19.84% – a carefully calculated fraction under the 20%

threshold for a presumption that NIO significantly controlled Weineng, which is a factor militating

strongly in favor of finding Weineng to be a VIE. *See supra* at ¶¶57, 228.

91.     On November 9, 2021, NIO reported total revenues of RMB9,805.3 million

($1,521.8 million or $1.5 billion) in 3Q21, representing an increase of **116.6%** from 3Q20 and an

increase of 16.1% from 2Q21. NIO also reported gross profit of RMB1,993.2 million ($309.3

million) in 3Q21, representing an increase of **240.3%** from 3Q20 and an increase of 26.6% from

2Q21.

92.     On April 19, 2022, Weineng issued RMB 400 million ($62.62 million) in ABNs

(Asset Backed Medium-term Notes) in China's interbank market, raising money to fund operations

for the fifth time. In this note offering, Weineng put up 19,000 of its NIO BaaS contracts as

collateral, further demonstrating that Weineng's only business was with NIO. *See* Phate Zhang,

*NIO's battery asset operator raises $62.62 million through ABN offering*, CnEVPost, Apr. 19,

2022, https://cnevpost.com/2022/04/19/nios-battery-asset-operator-raises-62-62-million-through-

abn-offering.

93.     In the prospectus for this April 2022 offering, NIO was appointed through Wuhan

Weilai as "asset service organization 2". *See* Weineng Prospectus at 209 ("[i]n order to facilitate

the realization of the trust purpose, the trustee entrusts Wuhan Weineng and Weilai Finance to

jointly serve as the asset service provider"). *See also id*. at 42 ("the trustee signed the 'Service

Contract' with Wuhan Weineng and Weilai Finance, and appointed Wuhan Weineng and Weilai

Financial … as the service agency of the issuance carrier, providing management services related to the underlying assets").

94. News articles highlighted that Weineng's April 2022 offering utilized NIO's battery contracts as collateral. *See* https://www.ifre.com/story/3697417/asian-bank-of-the-year-cicc-mc5bxjj2vr ("[t]he Mirattery [Weineng] 2022-1 Green Battery ABN raised Rmb400m in the first ABS transaction to use NEV batteries as the underlying assets").

95. On March 24, 2022, NIO reported total revenue of RMB36,136.4 million ($5,670.6 million or $5.6 billion) for FY21, representing an increase of *122.3%* from the previous year. NIO also reported gross profit of RMB6,821.4 million ($1,070.4 million or $1 billion) for FY2021 representing an increase of *264.1%* from the previous year. Thus, during the first full year of pulling in all battery sale revenue through Weineng, NIO had more than doubled its revenues and increased its earnings by a multiple of more than 2.5.

96. In May 2022, in its sixth offering, Weineng raised another RMB 635 million ($95 million) in asset backed securities to fund operations, *i.e.,* the purchase of NIO batteries. https://cnevpost.com/2022/05/31/nios-battery-asset-operator-raises-about-95-million-through-abs-offering-in-china/.

97. On June 9, 2022, NIO reported total revenues were RMB9,910.6 million ($1,563.4 million or $1.5 billion) in 1Q22, representing an increase of 24.2% from 1Q21. NIO also reported gross profit was RMB1,446.8 million ($228.2 million) in 1Q22.

**D. GAAP Required NIO To Consolidate Weineng's Financials Into NIO's Because Weineng Was a NIO VIE, But Defendants Did Not Do So**

**1. NIO Held a Variable Interest in Weineng During the Class Period**

98. NIO, as well the other three initial Weineng investors, started with a variable interest (or investment) of 25% of Weineng's equity, NIO's equity interest fell to 13.9% in

34

December 2020 and raised back up to 19.84% in August 2021. Regardless, at all relevant times, NIO's true economic interest was always disproportionately greater than the other investors.

99. NIO concedes the Company had a variable interest in Weineng as it reported its Weineng interest under the equity method of accounting:

(i) Equity method investments

In August 2020, the Group and three other third party investors jointly established the Battery Asset Company. The Group invested RMB200,000 in the Battery Asset Company and held 25% of the Battery Asset Company's equity interests. In December 2020, the Battery Asset Company entered into an agreement with the other third-party investors for a total additional investment of RMB640,000 by those investors. In 2021, the Group further invested RMB270,000 in the Battery Asset Company and upon the consummation of the investment, the Group owns approximately 19.8% equity interests of the Battery Asset Company. ***The Group, as a major shareholder of the Battery Asset Company, is entitled to appoint one out of nine directors in the Battery Asset Company's board of directors and can exercise significant influence over the Battery Asset Company.*** Therefore, the investment in the Battery Asset Company is accounted for using the equity method of accounting.

NIO 2021 20-F at F-32.

100. At all times relevant, although NIO characterized Weineng as a related party, it did not disclose that Weineng was a VIE requiring consolidation of its financials with NIO.

### 2. Weineng Is a NIO VIE

101. Weineng was a VIE throughout the Class Period.

102. Weineng had non-substantive voting interests. In this regard: (1) NIO's economic interests significantly exceeded its voting rights in Weineng, and (2) substantially all of Weineng's activities involved or were conducted on behalf of NIO, including but not limited to the providing, servicing and when applicable, swapping, of NIO batteries. Weineng also lacked sufficient equity at risk to finance its activities without additional subordinated financial support.

103. During the Class Period, it became evident that NIO's economic interests would, and significantly did, exceed its voting rights in Weineng. For example, as of the end of 2021,

35

after considering amounts due to NIO by Weineng (and not even including NIO's guarantees for the default of monthly fee subscription fees payable due to Weineng), NIO's indicated relative economic interest in Weineng as compared to other Weineng investors approximated 55%. This percentage significantly exceeded NIO's equity voting interest of less than 20%:

| RMB amounts in thousands | | 12/31/2021 |
|---|---|---|
| Receivables Due to NIO from Weineng | | 1,563,757 |
| Weineng Reported Shareholders' Equity | 2,030,668 | |
| NIO Disclosed Ownership Percentage | 19.8% | |
| Estimated Equity Interest in Weineng attributable to NIO | | 402,072 |
| Estimated NIO Economic Interest In Weineng[18] | | 1,965,829 |
| Total Indicated Interests Held by Equity Interest Holders | | 3,594,425 |
| NIO's Indicated Relative Economic Interest | | 54.7% |

NIO 2021 20-F at F-52 through F-54; January 19, 2023 Weineng Credit Report at 4, 9.

104. Moreover, as detailed *supra*, substantially all of Weineng's activities involved or were conducted on behalf of NIO. NIO orchestrated Weineng to benefit NIO, NIO substantially ran Weineng's business through Wuhan Weilai – with several overlapping senior managers and directors, and Weineng's one revenue stream, the BaaS subscription revenue, was from NIO. NIO also helped raise money for Weineng and guaranteed to Weining the default in monthly payments from any user of the BaaS subscriptions – Weining's one revenue stream.

105. Weineng was also a VIE because it was thinly capitalized. Weineng lacked sufficient equity at risk to finance its activities without additional subordinated financial support, which generally refers to variable interest that absorb some or all of an entity's expected losses (*e.g.*, guarantees, equity interests, commitments to fund losses). With NIO's help, Weineng raised

---

[18] This figure excludes NIO's guarantee to Weineng. The 54.7% figure includes NIO's equity investment and RMB 1.5 billion in accounts receivable, and is compared to the economic interest of the other equity interest holders in Weineng.

money six times during the Class Period.[19] *See supra* ¶¶ 92-93. In addition, Weineng had a .36 asset to liability ratio as of December 31, 2021 – indicating an inability to pay its current debts when due and an urgent need for cash. *See* ¶¶ 108-113.

106. NIO also guaranteed portions of Weineng's customer payment obligations and was intricately involved through contractual terms and conditions in the servicing of batteries purportedly sold to Weineng. This is important considering that certain of Weineng's debt arrangements were, in part, collateralized by the underlying customer contracts being serviced and fulfilled by NIO.

### 3. NIO Was Weineng's Primary Beneficiary and Therefore Had To Be Consolidated

107. NIO was the primary beneficiary of Weineng. First, through its variable interests, NIO had the obligation to absorb potentially significant losses of the entity, or the right to receive potentially significant benefits from the entity. *See supra* ¶¶ 101-106. Second, as reflected in significant part above through NIO's close involvement in both the VIE's operations and financing activities – including running Weineng's businesses, installing numerous overlapping senior managers, and assisting Weineng in securing financing – NIO had the power to direct the entity's activities that most significantly impact Weineng's economic performance. *See supra* ¶¶ 63-70, 71-75, 92-93. Accordingly, GAAP required NIO to consolidate Weineng – NIO, however, did not.

---

[19] While it appears that Weineng was able to obtain financing as of September 30, 2022 and December 31, 2021, Weineng's ability to obtain additional financing on reasonable terms was highly uncertain, absent NIO, given that one of Weineng's primary collateralizing assets was BaaS contracts underlying NIO batteries, as fulfilled by NIO. *See* ¶¶92-93. The April 2022 Weineng prospectus is apparently the only one publicly available.

**E.    GAAP Required NIO To Only Recognize Revenue from Weineng That Was Probable of Collection, But Defendants Caused NIO To Recognize Millions of Weineng Revenue That Was Uncollectible Under GAAP Anyway**

108.    Even if one were to improperly conclude that consolidation of Weineng as a VIE was not necessary, NIO still recognized millions of dollars of revenue from battery sales contracts with Weineng that were not probable of collection in violation of GAAP.

109.    In NIO's 2021 Form 20-F, the Company stated that it recognized all the revenue from selling batteries to Weineng upon delivery of the vehicle: "[NIO] recognizes revenue from the sales of battery packs to the Battery Asset Company *when the vehicles (together with the battery packs) are delivered to the BaaS users* which is the point considered then the control of the battery packs is transferred to the Battery Asset Company." 2021 Form 20-F at F-20.

110.    NIO disclosed the following amounts due from Weineng in the Company's 2021 20-F:

|  | Year Ended December 31, | |
| --- | --- | --- |
| *Amounts in RMB and thousands* | **2021** | **2020** |
| Sales of goods | 4,138,187 | 290,135 |
| Service income | 56,095 | 38 |
| Sale of raw material, property and equip. | - | 120 |
| Amount due from Weineng | 1,563,757 | 118,779 |

NIO 2021 20-F at F-51, 52.

111.    NIO's reported revenue from asserted battery sales to Weineng were not probable of collection to support recognition under ASC 606 because Weineng's financial condition raised significant doubts about Weineng's ability to pay amounts due NIO as of December 31, 2021. Weineng reported working capital of *negative RMB1.658 billion* as of December 31, 2021. *See* Weineng Credit Report at 4. Weineng's financial information as of December 31, 2021 reflected current assets totaling RMB929.7 million. *Id.* Only RMB 380.3 million of this amount pertained

38

to cash and other financial assets held for trading. *Id.* at 20. Conversely, including amounts due to NIO, Weineng reported current liabilities of RMB 2.59 billion in current liabilities. *See id.* at 21.

112. Thus, Weineng had an asset to liability, or current, ratio of only **_0.36_** as of December 31, 2021. The current ratio compares all of a company's current assets to its current liabilities. *See generally* https://www.investopedia.com/terms/c/currentratio.asp#toc-formula-and-calculation-for-the-current-ratio ("The current ratio measures a company's ability to pay current, or short-term, liabilities (debts and payables) with its current, or short-term, assets, such as cash, inventory, and receivables. In many cases, a company with a current ratio of less than 1.00 does not have the capital on hand to meet its short-term obligations if they were all due at once, while a current ratio greater than 1.00 indicates that the company has the financial resources to remain solvent in the short term." As of September 30, 2022, Weineng's current ratio worsened slightly to **_0.34_**. This means for every $34 in assets (cash, receivables, inventory, etc.) Weineng had, it also had $100 in liabilities (accounts payable, debt, wages, etc.), reflecting its inability to pay current debts due within one year, including those amounts due to NIO (without obtaining additional financial support). *Id.*

113. Weineng's lack of working capital, insufficient available cash balance, and low credit rating do not support NIO's implied assertion that amounts receivable from Weining were probable of collection.

F.     **The Truth Is Slowly Revealed: Grizzly Releases Its Report**

114. On June 28, 2022, Grizzly Research, LLC published a securities research report entitled "We Believe NIO Plays Valeant-esque Accounting Games to Inflate Revenue and Boost Net Income Margins to Meet Targets". The Report revealed to investors that Weineng was largely

a NIO front that NIO used to artificially boost its revenues and income.  The Report stated, in

relevant part, as follows:

> We have discovered that NIO has used Wuhan Weineng, an unconsolidated related party entity, to inflate its revenues and boost margins… ***We define revenue that has been "pulled-forward" as any revenue beyond what NIO would have received in the first year of subscriptions had it consolidated Weineng as a subsidiary***….  NIO's financials have been overstated through a scheme using an unconsolidated, related party….  Since Weineng Battery was formed in August 2020, NIO has found it to be a reliable and growing stream of revenue. In just four months of operating in 2020, NIO generated 290 million RMB from sales to Weineng. Despite this quick start, revenue attributable to the entity ballooned even further in 2021 to 4.14 billion RMB representing ~11% of overall 2021 revenue. The arrangement between Weineng and NIO has…[p]ull[ed] forward several years of revenue to help meet ambitious estimates [and] [s]hift[ed] depreciation costs off [NIO's] financial statements.

115.    After this news, NIO stock closed at $22.36, down 2.5% from the previous day's

close of $22.95.  Defendants mitigated the harm caused by the Report by quickly calling the Report

meritless in a statement issued at 8:00 PM EST[20] that same day:

> The report is without merit and contains numerous errors, unsupported speculations and misleading conclusions and interpretations regarding information relating to the Company. The Company's board of directors, including the audit committee, is reviewing the allegations and considering the appropriate course of action to protect the interests of all shareholders. The Company will make additional disclosures in due course consistent with the requirements of applicable rules and regulations of the Securities and Exchange Commission, the New York Stock Exchange, The Stock Exchange of Hong Kong Limited (the "SEHK") and the Singapore Exchange Securities Trading Limited (the "SGX-ST"). The Company emphasizes its continued and unwavering commitment to maintaining high standards of corporate governance and internal control, as well as transparent and timely disclosure in compliance with applicable rules and regulations.

116.    Four hours later, at approximately 12:30 AM on June 29, 2022, NIO issued a press

release again denying Report's allegations in conclusory fashion.  Again, there was no substantive

rebuttal of the Report.  On this news, in pre-market/post-market trading between 8:00 PM on June

28, 2022 and 6:00 AM on June 29, 2022, NIO's stock price fell from $22.33 to $20.38.  NIO stock

closed on June 29, 2022 at $21.86 per share.

---

[20] All times are given in Eastern time.

117.     Additionally, between market close on June 27, 2022 and market close on June 28, 2022, the price of the Company's shares on the Hong Kong stock exchange fell $21.20, or 11%, to close at $165.50 per share on June 28, 2022.

**G.     NIO Is Forced to Acknowledge the Seriousness of the Report's Allegations And Creates An "Independent" Committee to Investigate; NIO Stock Falls Almost 9%**

118.     On July 11, 2022, NIO shocked the market by announcing that it had formed a special committee to oversee an investigation into the Report's allegations – which NIO hastily claimed were all meritless on the date the Report was issued:

> Following its previous statement in response to the allegations made in a report issued by…Grizzly Research LLC on June 28, 2022…  the Company's board of directors (the "Board"), including the audit committee of the Board, after having reviewed the allegations, at the recommendation of the management of the Company and in order to protect the interests of all shareholders, has decided to form an independent committee (the "Independent Committee"), consisting of independent directors Mr. Denny Ting Bun Lee, Mr. Hai Wu, and Ms. Yu Long, to oversee an independent investigation regarding the allegations made in the…Report (the "Independent Investigation"). The Independent Committee has retained independent professional advisors to assist with the Independent Investigation, including an international law firm and a well-regarded forensic accounting firm. The Company will provide updates on the Independent Investigation in due course consistent with the requirements of applicable rules and regulations of the Securities and Exchange Commission, the New York Stock Exchange, The Stock Exchange of Hong Kong Limited (the "SEHK") and the Singapore Exchange Securities Trading Limited (the "SGX-ST"). The Company reiterates its continued and unwavering commitment to maintaining high standards of corporate governance and internal control, as well as transparent and timely disclosure in compliance with applicable rules and regulations.

119.     On this news, the Company's shares fell $2.03, or 8.9%, to close at $20.57 per share on July 11, 2022, on unusually heavy trading volume.

**H.     NIO's Internal Investigation Into The Grizzly Report's Allegations Was Tainted From The Start**

120.     The Committee tasked with investigating the allegations made in the Report was supposed to be independent but it was not.  In fact, the majority of the Committee members, Wu and Long, had pre-existing and close personal relationships with Defendant Li.

41

121.     According to NIO's website, Wu served as an executive director of China at Temasek Holdings Advisors (Beijing) Co., Ltd before joining NIO's Board in July 2016. (https://ir.nio.com/governance/board-of-directors).  During his tenure at Temasek, Wu's company was the lead investor in the then-private company, NIO, helping it raise $316M in funding in July 2016.                    (https://www.crunchbase.com/funding_round/nextev-series-b--87560d64); (https://tech.sina.com.cn/it/2018-12-14/doc-ihqackac8088086.shtml).

122.     Likewise, Defendant Li and Yu Long both sit on the board of Shenzhen Zhiling Technology Co. Ltd.  *See* https://www.qcc.com/firm/fa98e98e432b5ecb265e4dd836e408e1.html. Defendant Li is the actual controller of the company.  Additionally, Defendant Li registered a NIO car (number: 0003) for Yu Long's 11-year-old daughter in June 2017 (Li Qin, *Careerist Li Bin: A 100-billion trader in the electric vehicle industry and a left-behind boy*, Titanium Media, Dec. 18, 2017,      *available      at*      http://finance.sina.com.cn/chanjing/gsnews/2017-12-18/doc-ifyptkyk5132159.shtml). Yu Long also rang the opening bell with Defendant Li to celebrate the listing of NIO on the NYSE (Captain Jack, *What's it like to ring the bell at the NYSE? Hear what these  12  ES8  owners  have  to  say*,  Sept.  12,  2018,  *available  at* https://app.nio.com/app/web/v2/content/1964808082?
_viewBeginTop=true&load_js_bridge=true&show_navigator=false&content_type=article&content_id=1964808082).

123.     Given that two of the three Committee members had long-standing relationships with Defendant Li, the Committee was conflicted from the start and its findings (which were, regardless, wholly conclusory and incomplete, *see infra* ¶¶ 124-126) was meaningless.  If anything, the conflicted Committee and the complete lack of explanation as to why Grizzly was wrong only further highlight Defendants' misconduct.

42

I.       **Post-Class Period Developments**

1.       **NIO Announces That the Committee's Investigation Is Nearly Complete And Claims That Grizzly's Allegations Were Not Substantiated – Again Without Providing One Fact In Rebuttal**

124.    On August 26, 2022, before the market opened, NIO filed a press release explaining that the supposedly independent Committee's investigation into the Grizzly Report was nearly (but not entirely) completed:

> [A]n update on the status of the previously announced independent internal review. As previously disclosed, shortly after the publication of a report issued by…Grizzly Research LLC…an independent committee…was formed to oversee an independent internal review regarding the key allegations made in the [Grizzly Report]. The Internal Review was performed by the Independent Committee with the assistance of third-party professional advisors including an international law firm and forensic accounting experts from a well-regarded forensic accounting firm that is not the Company's auditor. The Internal Review is now substantially complete. Based on findings of the Internal Review, the Independent Committee has concluded that these allegations were not substantiated.

125.    After announcing that the investigation was "substantially complete," NIO has not since announced that it was complete.

126.    The market was unconvinced by the reported results of the Committee's purportedly nearly-complete investigation. After the August 26, 2022 press release, NIO stock fell from a $20.77 opening price to $19.92, a drop of over 4%.

127.    This was the third time NIO nonchalantly addressed Grizzly's findings without even attempting to debunk any specific factual allegations in the Report. It is telling that NIO repeated this tactic – on June 28, on July 11, and again on August 26, 2022.

J.       **After NIO Superficially Denied the Grizzly Report's Detailed Allegations, the SEC Asked NIO For An Explanation of its Accounting**

128.    On September 22, 2022, less than one month after its conclusory announcement that the Report was unsubstantiated, the SEC wrote to Defendant Feng requesting more information relating to NIO's VIE analysis for Weineng:

We note your 19.8% equity interest in the Battery Asset Company which you account for under the equity method. Please provide us your analysis as to whether Battery Asset Company is a variable interest entity (VIE), pursuant to ASC 810-10-15-14. Include in your response the following: 1. An explanation of the design and purpose of Battery Asset Company; 2. The identity of the other shareholders of Battery Asset Company, and a description of the related party relationships; 3. Your consideration as to whether your guarantee for the default of monthly fee subscription fees or other implicit guarantee was designed to protect equityholders from absorbing expected losses; and 4. To the extent Battery Asset Company is a VIE, provide us your analysis as to the determination of the primary beneficiary (ASC 810-10-25-38A) and consideration for disclosures (ASC 810-10-50).

129.    The September 22, 2022 SEC letter also noted that "we remind you that the company and its management are responsible for the accuracy and adequacy of their disclosures, notwithstanding any review, comments, action or absence of action by the staff."

**K.    NIO Responds to the SEC – Skimming the Surface And Not Providing a Full Picture of the VIE Accounting Issues**

130.    On October 21, 2022, Defendant Feng responded to the SEC. NIO parroted the VIE GAAP regulation (ASC 810) and conclusorily stated that "[a]ccording to the articles of incorporation of the Battery Asset Company, each shareholder's obligation to absorb the expected losses and rights to expected residual returns of the Battery Asset Company are in proportion to the respective shareholder's equity interest."

131.    NIO, however, was careful not to mention to the SEC that Weineng owed NIO $225 million, or approximately RMB 1.5 billion, as of December 31, 2021 – when NIO's equity interest in Weineng was worth only $75 million, or approximately RMB 500 million.  Nor did NIO mention that the Company's economic stake in Weineng was 55% when its equity/voting rights were only 19.84% – a highly relevant fact in applying ASC 810.  NIO also stated that "based on the design of purpose of [Weineng's] business, [its] activities are self-driven instead of being conducted on behalf of any investor."  In sum, NIO did not provide the SEC with the full story,

44

omitting that NIO was the only Weineng investor with an entire segment of its business dependent on Weineng.

132.  Feng's response to the SEC also stated that Weineng had, as of December 31, 2021, "received equity investment from its shareholders totaling RMB1.97 billion, which accounts for a significant portion of the total assets of the Battery Asset Company", but this figure only referred to Weineng as of *December 31, 2021* – ignoring the fact that Weineng was thinly capitalized from during FY2021.  In addition, the very fact that Weineng had to go seek financing four times in one year –at times with NIO's help, using NIO's BaaS contracts as collateral (*see supra* ¶¶ 92-93), and two more times (*see* ¶¶ 92, 96) after December 31, 2021 – underscores the precariousness of Weineng's financial situation and its ability to pay its current debts.

133.  The SEC has not yet taken further action against NIO.[21]

## VI.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.  August 11, 2020 Q2 2020 Financial Results and Conference Call

134.  On August 11, 2020, the first day of the Class Period, NIO held a conference call with analysts in which they discussed the formation of Weineng.  During the conference call, an analyst asked Defendant Li about whether Weineng would "ease [] pressure on [NIO's] balance

---

[21] The SEC's failure to take further action against NIO is not significant.  The SEC has limited resources and has often not taken further action where fraud was later revealed.  The case of Bernard Madoff is an infamous example.  *See also In re* G.K. Scott & Co., 51 S.E.C. 961, 966 n.21 (1994) ("A regulatory authority's failure to take early action neither operates as an estoppel against later action nor cures a violation") (internal quotation omitted); *Union Pac. R.R. Co. v. Chi. & N.W. Ry. Co.*, 226 F. Supp 400, 406 (D.C. Ill. 1964) ("[I]f private suits were barred in cases where the SEC chose not to sue, the private right would have an exceedingly limited utility…. The practicalities of administration in a government agency forbid giving conclusive significance to SEC inaction.  A lack of information or limitations of time, manpower, and resources will often dictate the decision not to sue. The fact that an interested and capable private party stands ready to commence judicial proceedings may itself diminish the need for public action").

sheet". Defendant Li obfuscated the issue, but ultimately misrepresented that Weineng would not affect NIO's balance sheet:

> Ming-Hsun Lee – BofA Merrill Lynch, Research Division – Research Analyst:
>
> First of, I would like – I want to know that right now, how much of battery assets on your book? And once you set up a new factory management – asset management company, around how much asset you can reduce from your balance sheet? This can ease your pressure on balance sheet going forward. And also, the second question is that once the BaaS business model is confirmed, then I believe you can start over an auto finance program for both the vehicle as well as the battery. So I think that the down payment for consumers will be much lower compared to the previous stages. So how much more new demand do you think you can create through Battery-as-a-Service, right? So that's my first question.
>
> Defendant Li:
>
> I would like to explain a little bit about the difference. Right now, if the user wants to do the financing for the batteries, then it means that at the beginning of the vehicle purchase, they can pay less money, that is around RMB 100,000 less. Then they will have the monthly payment, but for that monthly payment, they cannot get the loan. So it means that we can use the ES6 as an example. The price is around RMB 358,000. Then it means that the users can pay RMB 258,000 at the beginning, but for this, they cannot get the loan from the bank because of the government policy restrictions.
>
> But if we can go with the BaaS solution, then it means that with the new product homologation policy and the certification policy, the users can have less payment at the beginning, but they can still enjoy the loan for their monthly payment, which, just like you mentioned, should be able to lower the down payment as well as the monthly payment for the users…. We are now at the final commercial preparation stage. A very important task for us is to prepare the setup of the battery asset management company. ***We are 1 party out of this endeavor, but we are not the main stakeholder. So it means that it's not going to affect our balance sheet. But we would like to set up this company around August. This asset company is going to own the battery assets and then lease it to the users.***

135. The bolded statements were materially false and misleading and omitted material facts when made because Defendant Li knew but did not disclose to investors that:

    (a) The chief purpose for which NIO created Weineng was to materially "affect" NIO's balance sheet, *i.e.*, by creating an end-run around GAAP that would improperly allow NIO to recognize the full sale price of leased batteries immediately and to remove the depreciation of leased batteries from NIO's books. *See* ¶¶ 53, 54, 58, 60-62, 77.

46

(b) NIO was not merely "1 party of this endeavor" – it was the driving force behind Weineng, and Weineng's only source of revenue. NIO orchestrated Weineng to benefit itself and materially pull-forward revenue. The success of Weineng was dependent on NIO and vice versa. No other Weineng investor was similarly situated. *See* ¶¶ 53-58, 60-62.

(c) Weineng was set up with NIO as its primary beneficiary. *See* ¶¶ 53-62, 63, 107.

(d) Weineng was set up with NIO having the controlling financial interest. *See* ¶¶ 63-76, 101-106.

(e) Weineng was designed as a NIO VIE. *See* ¶¶ 53-56, 98, 101-106.

## B. August 31, 2020 Prospectus

136. On August 31, 2020, NIO filed with the SEC a prospectus pursuant to Rule 424(b)(5). The prospectus was filed in connection with the issuance of 88,500,000 ADSs of NIO, each representing one Class A ordinary share of NIO, at $17 per ADS. The prospectus was filed pursuant to a June 9, 2020 Registration Statement signed by Defendants Li, Feng, as well as NIO directors Qin, Wu, Lee, and Mitchell. That prospectus provided, in relevant part, that:

> Under the BaaS model, we sell a battery pack to the Battery Asset Company, and the user leases the battery from the Battery Asset Company. The service we provide to our users under the BaaS model relies, in part, on the smooth operation of and stability and quality of service delivered by the Battery Asset Company, which we cannot guarantee. ***We invested in the Battery Asset Company together with three BaaS Partners, and we only have limited control over its business operations***. ***If the Battery Asset Company fails in providing high-quality services to our users, we will suffer from negative customer reviews and even returns of products or services***. ***If the Battery Asset Company is unable to obtain future financings from the BaaS Partners or other third parties to meet its operational needs, it may not be able to continue purchasing batteries from us and leasing them to our users, or otherwise maintain its healthy and sustainable operations***. On the other hand, if the Battery Asset Company bears a significant rate of customer default on its payment obligations, its results of operations and financial performance may be materially impacted, which will in turn reduce the value of our and the BaaS Partners' investments in the Battery Asset Company. (424B5 at S-18).

137. The bolded statements were materially false and misleading and omitted material facts when made because Defendants knew but did not disclose to investors that:

(a) NIO was not on equal footing with the "three Baas Partners" involved in Weineng. NIO was the driving force behind Weineng, and Weineng's only source of revenue

47

during the Class Period. NIO orchestrated Weineng to benefit itself by materially pulling-forward its revenue. Weineng's success was dependent on NIO, and vice versa. No other Weineng investor was similarly situated. *See* ¶¶ 53-58, 60-61, 78-80.

(b)     NIO did not merely have "limited control" over Weineng. NIO had singular and significant control over the entity. NIO ran Weineng's business from top to bottom (¶¶ 63-70), installed overlapping senior managers and directors at Weineng (¶¶ 71-75), actively assisted Weineng in obtaining financing to fund its operations, *i.e.* the purchase of leased batteries from NIO (¶¶ 80, 82-84, 93), and even provided a guarantee to Weineng for the default in payment of monthly subscription fees (¶¶ 66, 104, 106). Weineng's business was completely dependent on NIO (¶¶ 63-70). No other Weineng investor was similarly situated. *See* ¶¶ 53-61.

(c)     Weineng did not actually provide meaningful "services" to NIO's users. NIO controlled the relationship with the users, including pricing the batteries, running the battery swapping stations, and billing users for their monthly subscriptions through its subsidiary Wuhan Weilai. *See* ¶¶ 63-70.

(d)     Weineng was severely undercapitalized and would necessarily have to continually raise money to stay in business. Given that Weineng was needed to support NIO's revenue recognition scheme during the Class Period, NIO was uniquely responsible for helping to secure financing for Weineng. NIO even bore the risk of user defaults in monthly payments. *See* ¶ 66, 80-84, 88, 90, 92, 93, 104-106.

(e)     There was a serious risk relating to NIO not disclosing Weineng as a VIE under GAAP, as it should have, and wrongfully recognizing all of Weineng's battery sales revenue immediately. *See* ¶¶ 78, 85-87, 89, 91, 95, 97.

(f)     NIO was Weineng's primary beneficiary. *See* ¶¶ 53-70, 101-104, 107.

(g)     NIO had a controlling financial interest in Weineng. *See* ¶¶ 101-106.

(h)     Weineng was a NIO VIE. *See* ¶¶ 99-106.

**C.      November 17, 2020 Q3 2020 Financial Results and November 18, 2020 Conference Call**

138.    On November 17, 2020, NIO issued a press release with its Q320 financial results

and held its third quarter conference call. In the press release, which was also filed as a Form 6-K

and signed by Defendant Feng, NIO reported as follows:

Total revenues were RMB 4,526.0 million ($666.6 million) in the third quarter of 2020, representing an increase of 146.4% from the third quarter of 2019 and an increase of 21.7% from the second quarter of 2020.

48

Gross profit was RMB585.8 million ($86.3 million) in the third quarter of 2020, representing an increase of RMB807.4 million from a gross loss of RMB221.6 million in the third quarter of 2019 and an increase of RMB272.7 million from the second quarter of 2020.

139. These statements were materially false and misleading and omitted material facts when made because Defendants knew that:

(a) NIO was Weineng's primary beneficiary. *See* ¶¶ 53-70, 101-104, 107.

(b) NIO had a controlling financial interest in Weineng. *See* ¶¶ 101-106.

(c) Weineng was a NIO VIE. *See* ¶¶ 99-106.

(d) NIO improperly included in its financial figures the full price for leased batteries sold to Weineng during 3Q20. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as payments were made on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.* five to six and a half years of revenue, upon the sale of the batteries to Weineng. *See* ¶¶ 53, 57-58, 77, 78, 79, 81, 98-107.

(e) NIO's substantial year-over-year revenue percentage increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id*.

(f) NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances because Weineng's financials should have been consolidated with NIO's. *See* ¶¶ 53, 54, 60-62, 80, 81, 98-107.

140. On the November 18, 2020 conference call, in which Defendant Li participated, Defendant Fang reiterated the same reported revenues as ¶ 138. These statements were materially false and misleading and omitted material facts when made for the reasons given in ¶ 139.

141. On December 10, 2020, NIO filed a Form 6-K with the SEC, signed by Defendant Feng. This document reported NIO's unaudited financial results for the nine months ending September 3, 2020. This report disclosed numerous entities that were VIEs to NIO:

49

| VIE and VIE's subsidiaries | Economic interest held | Place and Date of incorporation or date of acquisition |
|---|---|---|
| Prime Hubs Limited ("Prime Hubs") | 100% | BVI, October 2014 |
| NIO Technology Co., Ltd. ("NIO SHTECH") (formerly known as Shanghai NextEV Technology Co., Ltd.) | 100% | Shanghai, PRC, November 2014 |
| Beijing NIO Network Technology Co., Ltd. ("NIO BJTECH") | 100% | Beijing, PRC, July 2017 |
| Shanghai Anbin Technology Co., Ltd. ("NIO ABTECH") | 100% | Shanghai, PRC, April 2018 |

142. These statements were materially false and misleading and omitted material facts when made because they misrepresented that this list was a complete list of NIO's VIEs, they failed to disclose that Weineng was a NIO VIE, and they gave the false impression to NIO investors that Weineng was not a VIE. *See* ¶¶ 101-106.

**D. December 14, 2020 Prospectus**

143. On December 14, 2020, NIO filed with the SEC a prospectus pursuant to Rule 424(b)(5). The prospectus was filed in connection with the issuance of 68,000,000 ADSs of NIO, each representing one Class A ordinary share of NIO, at $39.00 per ADS. The prospectus was filed pursuant to a June 9, 2020 Registration Statement signed by Defendants Li and Feng, as well as directors Qin, Wu, Lee, and Mitchell. That prospectus provided, in pertinent part:

> Under the BaaS model, we sell a battery pack to the Battery Asset Company, and the user subscribes to the usage of the battery pack from the Battery Asset Company. ***The service we provide to our users under the BaaS model relies, in part, on the smooth operation of and stability and quality of service delivered by the Battery Asset Company, which we cannot guarantee. We invested in the Battery Asset Company together with three BaaS Partners, and we only have limited control over its business operations. If the Battery Asset Company fails in providing high-quality services to our users, we will suffer from negative customer reviews and even returns of products or services. If the Battery Asset parties to meet its operational needs, it may not be able to continue purchasing batteries from us and leasing them to our users***, or otherwise maintain its healthy and sustainable operations….(424B5 at S-19 – S-20)

144. The bolded statements were materially false and misleading and omitted material facts when made because Defendants knew but did not disclose to investors that:

> (a) NIO was not on equal footing with the "three Baas Partners" involved in Weineng. NIO was the driving force behind Weineng, and Weineng's only source of revenue during the Class Period. NIO orchestrated Weineng to benefit itself by materially pulling-forward its revenue. Weineng's success was dependent on NIO, and vice

50

versa. No other Weineng investor was similarly situated. *See* ¶¶ 53-58, 60-61, 78-80.

(b) Weineng did not actually provide meaningful "services" to NIO's users. NIO controlled the relationship with the users, including pricing the batteries, running the battery swapping stations, and billing users for their monthly subscriptions through its subsidiary Wuhan Weilai. *See* ¶¶ 63-70.

(c) NIO did not merely have "limited control" over Weineng. NIO had singular and significant control over the entity. NIO ran Weineng's business (¶¶ 63-70), had overlapping senior managers and directors (¶¶ 71-75), assisted Weineng in obtaining financing to fund its operations, *i.e.* the purchase of batteries from NIO (¶¶ 80, 82-84, 93), and even provided a guarantee to Weineng for the default in payment of monthly subscription fees (¶¶ 66, 104, 106). Weineng's business was completely dependent on NIO (¶¶ 63-70). No other Weineng investor was similarly situated. *See* ¶¶ 53-61.

(d) Weineng was undercapitalized and would necessarily have to raise money to stay in business. Given that Weineng was needed to support NIO's revenue recognition scheme during the Class Period, NIO was uniquely responsible to secure financing for Weineng. NIO even bore the risk of user defaults in monthly payments. *See* ¶¶ 66, 80-84, 88, 90, 92, 93, 104-106.

(e) NIO was Weineng's primary beneficiary. *See* ¶¶ 53-70, 101-104, 107.

(f) NIO had a controlling financial interest in Weineng. *See* ¶¶ 101-106.

(g) Weineng was a NIO VIE. *See* ¶¶ 99-106

(h) There was a serious risk relating to NIO not disclosing Weineng as a VIE under GAAP, as it should have, and wrongfully recognizing all of Weineng's battery sales revenue immediately. *See* ¶¶ 78, 85-87, 89, 91, 95, 97.

**E.     March 1, 2021 Q4 2020 Financial Results and March 2, 2021 Conference Call**

145.    On March 1, 2021, NIO issued its Q42020 financial results. In its press release, which was also issued on Form 6-K and signed by Defendant Feng, NIO stated:

Total revenues were RMB6,641.1 million ($1,017.8 million) in the fourth quarter of 2020, representing an increase of 133.2% from the fourth quarter of 2019 and an increase of 46.7% from the third quarter of 2020.

Gross profit was RMB1,141.9 million ($175.0 million) in the fourth quarter of 2020, representing an increase of RMB1,395.7 million from a gross loss of RMB253.8 million in the fourth quarter of 2019 and an increase of RMB556.1 million from the third quarter of 2020.

51

146.    These statements were materially false and misleading and omitted material facts when made because:

(a)    NIO was Weineng's primary beneficiary.  *See* ¶¶ 53-70, 101-104, 107.

(b)    NIO had a controlling financial interest in Weineng.  *See* ¶¶ 101-106.

(c)    Weineng was a NIO VIE.  *See* ¶¶ 99-106.

(d)    NIO improperly included in its financial figures the full price for leased batteries sold to Weineng during 4Q20. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE.  Accordingly, NIO could only properly recognize revenues on leased batteries as payments were made on the battery subscriptions.  NIO could not recognize the full revenue for the battery sales, *i.e.* five to six and a half years of revenue, upon the sale of the batteries to Weineng. *See* ¶¶ 53, 57-58, 77, 79, 83-85.

(e)    NIO's substantial year-over-year revenue percentage increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id*.

(f)    NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances because Weineng's financials should have been consolidated with NIO's.  *See* ¶¶ 53, 54, 60-62, 80, 83-85, 98-107.

147.    During NIO's March 2, 2021 conference call, Defendant Feng reiterated the same revenue and gross profit figures as in paragraph 146.  These statements were materially false and misleading and omitted material facts when made for the reasons given in paragraph 148.

**F.    April 6, 2021 2020 Form 20-F**

148.    On April 6, 2021, NIO filed its annual report for 2020 on Form 20-F, signed by Defendant Li.  That report provided, in pertinent part, as follows:

For the full year 2020, NIO's total revenues were RMB 16,257.9 million. Of this, NIO's total revenues from vehicle sales were RMB 15,182.5 million and total revenues from other sales was RMB 1,075.4 million…..  (20-F at 99-100, 109)

Gross profit was RMB1,873.4 million (US$287.1 million) for the full year 2020, representing an increase of RMB3,072.2 million from a gross loss of RMB1,198.8 million from the previous year. *Id*.

52

149. These statements were materially false and misleading when made because Defendants knew but did not disclose to investors that:

(a) NIO was Weineng's primary beneficiary. *See* ¶¶ 53-70, 101-104, 107.

(b) NIO had a controlling financial interest in Weineng. *See* ¶¶ 101-106.

(c) Weineng was a NIO VIE. *See* ¶¶ 99-106.

(d) NIO improperly included in its financial figures the full price for batteries sold to Weineng during FY2020. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as monthly payments were made to Weineng on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.* five to six and a half years of revenue, immediately upon the sale of the batteries to Weineng. *See* ¶¶ 53, 57-58, 77-79, 86, 98-107.

(e) NIO's substantial year-over-year profit increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id*.

(f) NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances because Weineng's financials should have been consolidated with NIO's. *See* ¶¶ 53, 54, 60-62, 80, 86, 98-107.

150. This 20-F also provided the following charts reporting NIO's revenues, amounts due from Weineng, and gross profits:[22]

---

[22] NIO defines "other sales" as follows: "Other Sales mainly consist of revenues from sales of our service package and energy package, battery upgrade service, automotive regulatory credits, accessories, and a number of embedded products and services offered together with vehicle sales. Embedded products and services include home chargers, vehicle connectivity service, extended warranty and battery swapping service."

53

| | Year Ended December 31, | | | |
| | 2018 | 2019 | 2020 | |
| | RMB | RMB | RMB | US$ |
| | | (in thousands) | | |
|---|---|---|---|---|
| **Revenues:** [1] | | | | |
| Vehicle sales | 4,852,470 | 7,367,113 | 15,182,522 | 2,326,823 |
| Other sales | 98,701 | 457,791 | 1,075,411 | 164,814 |
| **Total revenues** | 4,951,171 | 7,824,904 | 16,257,933 | 2,491,637 |
| **Cost of sales:** [2] | | | | |
| Vehicle sales | (4,930,135) | (8,096,035) | (13,255,770) | (2,031,536) |
| Other sales | (276,912) | (927,691) | (1,128,744) | (172,988) |
| **Total cost of sales** | (5,207,047) | (9,023,726) | (14,384,514) | (2,204,524) |
| Gross (loss)/profit | (255,876) | (1,198,822) | 1,873,419 | 287,113 |
| Operating expenses: [2] | | | | |
| Research and development [2] | (3,997,942) | (4,428,580) | (2,487,770) | (381,267) |
| Selling, general and administrative [2] | (5,341,790) | (5,451,787) | (3,932,271) | (602,647) |
| Other operating loss | — | — | (61,023) | (9,352) |
| **Total operating expenses** | (9,339,732) | (9,880,367) | (6,481,064) | (993,266) |
| **Loss from operations** | (9,595,608) | (11,079,189) | (4,607,645) | (706,153) |
| Interest income | 133,384 | 160,279 | 166,904 | 25,579 |
| Interest expenses | (123,643) | (370,536) | (426,015) | (65,290) |
| Share of losses of equity investee | (9,722) | (64,478) | (66,030) | (10,120) |
| Other income/(loss), net | (21,346) | 66,160 | (364,928) | (55,928) |
| **Loss before income tax expenses** | (9,616,935) | (11,287,764) | (5,297,714) | (811,912) |
| Income tax expense | (22,044) | (7,888) | (6,368) | (976) |
| **Net loss** | (9,638,979) | (11,295,652) | (5,304,082) | (812,888) |

*Revenues*

The following table presents our revenue components by amount and as a percentage of the total revenues for the years indicated.

| | Year Ended December 31, | | | | | | |
| | 2018 | | 2019 | | 2020 | | |
| | RMB | % | RMB | % | RMB | US$ | % |
| | | | (in thousands) | | | | |
|---|---|---|---|---|---|---|---|
| **Revenues:** | | | | | | | |
| Vehicle sales | 4,852,470 | 98.0 | 7,367,113 | 94.1 | 15,182,522 | 2,326,823 | 93.4 |
| Other sales | 98,701 | 2.0 | 457,791 | 5.9 | 1,075,411 | 164,814 | 6.6 |
| **Total revenues** | 4,951,171 | 100.0 | 7,824,904 | 100.0 | 16,257,933 | 2,491,637 | 100.0 |

(20-F at 100).

**(b) The Group had the following significant related party balances:**

*(i) Amounts due from related parties*

| | As of December 31 | |
| | 2019 | 2020 |
|---|---|---|
| Wuhan Weineng Battery Assets Co. Ltd. | — | 118,779 |
| Ningbo Meishan Bonded Port Area Weilan Investment Co., Ltd. | 50,000 | 50,000 |
| Kunshan Siwopu Intelligent Equipment Co., Ltd. | — | 617 |
| Nanjing Weibang Transmission Technology Co., Ltd. | 674 | 509 |
| Wistron Info Comm (Kunshan) Co., Ltd. | 109 | — |
| Total | 50,783 | 169,905 |

*(xii) Sales of goods*

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2018 | 2019 | 2020 |
| Wuhan Weineng Battery Assets Co., Ltd. | — | — | 290,135 |
| Beijing Bit Ep Information Technology Co., Ltd. | — | — | 4,402 |
| Beijing Bitauto Interactive Technology Co., Ltd. | — | — | 1,974 |
| Beijing Yiche Interactive Advertising Co., Ltd. | — | — | 1,453 |
| Beijing Yiche Information Science and Technology Co., Ltd. | — | — | 525 |
| | — | — | 298,489 |

(20-F at F-53).

151. The revenue and profit figures, as well as those relating to Weineng, were materially false and misleading and omitted material facts when made because:

(a) NIO was Weineng's primary beneficiary. See ¶¶ 53-70, 101-104, 107.

(b) NIO had a controlling financial interest in Weineng. *See* ¶¶101-106.

(c) Weineng was a NIO VIE. *See* ¶ 99-106.

(d) NIO improperly included in its financial figures the full price for batteries sold to Weineng during FY2020. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as monthly payments were made to Weineng on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.* five to six and a half years of revenue, immediately upon the sale of the batteries to Weineng. *See* ¶¶ 53, 57-58, 77, 79, 85-87.

(e) NIO's substantial year-over-year revenue increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id.*

(f) NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances because Weineng's financials should have been consolidated with NIO's. *See* ¶¶ 53, 54, 60-62, 80, 86, 98-107.

152. The 2020 Form 20-F also reported "depreciation and amortization of RMB 1,046.5 million (US$160.4 million)."

153. The depreciation and amortization figure was materially false and misleading and omitted material facts when made because it did not include depreciation of the electric batteries NIO sold to Weineng, which should have been on NIO's books because:

55

(a)     NIO was Weineng's primary beneficiary.  *See* ¶¶ 53-70, 101-104, 107.

(b)     NIO had a controlling financial interest in Weineng.  *See* ¶¶ 101-106.

(c)     Weineng was a NIO VIE.  *See* ¶¶ 99-106.

154.    The 2020 Form 20-F also mischaracterized NIO's control over Weineng and mischaracterized the risks relating to Weineng, in relevant part, as follows:

Under the BaaS, we sell a battery pack to the Battery Asset Company, and the user subscribes to the usage of the battery pack from the Battery Asset Company. *The service we provide to our users under the BaaS relies, in part, on the smooth operation of and stability and quality of service delivered by the Battery Asset Company, which we cannot guarantee. We invested in the Battery Asset Company with Contemporary Amperex Technology Co., Limited, or CATL, Hubei Science Technology Investment Group Co., Ltd. And a subsidiary of Guotai Junan International Holdings Limited, which we refer to as the Battery Asset Company Investors in this annual report. As a result, we only have limited control over the business operations of the Battery Asset Company.* If it fails in providing high quality services to our users, we will suffer from negative customer reviews and even returns of products or services.

*If the Battery Asset Company is unable to obtain future financings from the Battery Asset Company Investors or other third parties to meet its operational needs, it may not be able to continue purchasing batteries from us and leasing them to our users, or otherwise maintain its healthy and sustainable operations.* On the other hand, if the Battery Asset Company bears a significant rate of customer default on its payment obligations, its results of operations and financial performance may be materially impacted, which will in turn reduce the value of our and the Battery Asset Company Investors' investments in the Battery Asset Company. *In addition, in furtherance of the BaaS, we agreed to provide guarantee to the Battery Asset Company for the default in payment of monthly subscription fees from users, while the maximum amount of guarantee that can be claimed shall not be higher than the accumulated service fees we receive from the Battery Asset Company.* As the BaaS user base is expanding, if an increased number of default occurs, our results of operations and financial performance will be negatively affected. (20-F at 12).

155.    The bolded statements were materially false and misleading and omitted material facts when made because Defendants knew but did not disclose to investors that:

(a)     NIO was not on equal footing with the three Baas Partners involved in Weineng. NIO was the driving force behind Weineng, and Weineng's only customer and source of revenue during the Class Period.  NIO orchestrated Weineng to benefit itself, including by materially pulling-forward its revenues.   The success of Weineng likewise was dependent on NIO.   No other Weineng investor was similarly situated.  *See* ¶¶ 53-58, 60-61, 78-80.

56

(b)     NIO did not merely have "limited control" over Weineng. NIO had singular and significant control over the entity. NIO ran Weineng's business (¶¶ 63-70), had overlapping senior managers and directors (¶¶ 71-75), assisted Weineng in obtaining financing to fund its operations, i.e. the purchase of batteries from NIO (¶¶ 80, 82-84, 93) and even provided a guarantee to Weineng for the default in payment of monthly subscription fees (¶¶ 66, 104, 106). Weineng's business was completely dependent on NIO (¶¶ 63-70), No other Weineng investor was similarly situated. ¶¶ 53-61.

(c)     Weineng did not actually provide meaningful "services" to NIO's users. NIO controlled the relationship with the users, including pricing the batteries, running the battery swapping stations, and billing users for their monthly subscriptions through its subsidiary Wuhan Weilai. *See* ¶¶ 63-70.

(d)     Weineng was undercapitalized and would necessarily have to raise money to stay in business. Given that Weineng was needed to support NIO's revenue recognition scheme during the Class Period NIO was uniquely responsible to secure financing for Weineng and even bore the risk of user defaults in monthly payments. *See* ¶¶ 66, 80-84, 88, 90, 92, 93, 104-106.

(e)     There was a serious undisclosed risk relating to NIO not characterizing Weineng as a VIE under GAAP, as it should have, and wrongfully recognizing all of Weineng's battery sales revenue immediately.

(f)     NIO was Weineng's primary beneficiary. *See* ¶¶ 53-70, 101-104, 107.

(g)     NIO had a controlling financial interest in Weineng. *See* ¶¶ 101-106.

(h)     Weineng was a NIO VIE. *See* ¶¶ 99-106.

156.    This 20-F also provided the following lists disclosing NIO's principal subsidiaries and VIEs:

57

| Subsidiaries | Equity interest held | Place and date of incorporation or date of acquisition | Principal activities |
|---|---|---|---|
| NIO NextEV Limited ("NIO HK") (formerly known as NextEV Limited) | 100% | Hong Kong, February 2015 | Investment holding |
| NIO GmbH (formerly known as NextEV GmbH) | 100% | Germany, May 2015 | Design and technology development |
| NIO Holding Co., Ltd. ("NIO Holding") (formerly named NIO (Anhui) Holding Co., Ltd.) | 100% | Anhui, PRC, November 2017 | Headquarter and technology development |
| NIO Co., Ltd. ("NIO SH") (formerly known as NextEV Co., Ltd.) | 100% | Shanghai, PRC, May 2015 | Headquarter and technology development |
| NIO USA, Inc. ("NIO US") (formerly known as NextEV USA, Inc.) | 100% | United States, November 2015 | Technology development |
| XPT Limited ("XPT") | 100% | Hong Kong, December 2015 | Investment holding |
| NIO Performance Engineering Limited ("NPE") | 100% | United Kingdom, July 2019 | Marketing and technology development |
| NIO Sport Limited ("NIO Sport") (formerly known as NextEV NIO Sport Limited) | 100% | Hong Kong, April 2016 | Racing management |
| XPT Technology Limited ("XPT Technology") | 100% | Hong Kong, April 2016 | Investment holding |
| XPT Inc. ("XPT US") | 100% | United States, April 2016 | Technology development |
| XPT (Jiangsu) Investment Co., Ltd. ("XPT Jiangsu") | 100% | Jiangsu, PRC, May 2016 | Investment holding |
| Shanghai XPT Technology Limited | 100% | Shanghai, PRC, May 2016 | Technology development |
| XPT (Nanjing) E-Powertrain Technology Co., Ltd. ("XPT NJEP") | 100% | Nanjing, PRC, July 2016 | Manufacturing of E-Powertrain |
| XPT (Nanjing) Energy Storage System Co., Ltd. ("XPT NJES") | 100% | Nanjing, PRC, October 2016 | Manufacturing of battery pack |
| NIO Power Express Limited ("PE HK") | 100% | Hong Kong, January 2017 | Investment holding |
| NextEV User Enterprise Limited ("UE HK") | 100% | Hong Kong, February 2017 | Investment holding |
| Shanghai NIO Sales and Services Co., Ltd. ("UE CNHC") | 100% | Shanghai, PRC, March 2017 | Investment holding and sales and after sales management |
| NIO Energy Investment (Hubei) Co., Ltd. ("PE CNHC") | 100% | Wuhan PRC, April 2017 | Investment holding |
| Wuhan NIO Energy Co., Ltd. ("PE WHJV") | 100% | Wuhan, PRC, May 2017 | Investment holding |
| XTRONICS (Nanjing) Automotive Intelligent Technologies Co. Ltd. ("XPT NJWL") | 50% | Nanjing, PRC, June 2017 | Manufacturing of components |
| XPT (Jiangsu) Automotive Technology Co., Ltd. ("XPT AUTO") | 100% | Nanjing, PRC, May 2018 | Investment holding |

| VIE and VIE's subsidiaries | Economic interest held | Place and Date of incorporation or date of acquisition |
|---|---|---|
| Prime Hubs Limited ("Prime Hubs") | 100% | BVI, October 2014 |
| NIO Technology Co., Ltd. ("NIO SHTECH") (formerly known as Shanghai NextEV Technology Co., Ltd.) | 100% | Shanghai, PRC, November 2014 |
| Beijing NIO Network Technology Co., Ltd. ("NIO BJTECH") | 100% | Beijing, PRC, July 2017 |
| Shanghai Anbin Technology Co., Ltd. ("NIO ABTECH") | 100% | Shanghai, PRC, April 2018 |

(20-F at F-11).

157.    These statements were materially false and misleading and omitted material facts when made because Defendants knew but did not disclose to investors that Weineng was also a NIO VIE.  Failing to disclose Weineng as a NIO VIE misrepresented to investors that the list of VIEs provided in the Form 20-F was complete and that Weineng was not a VIE.  *See* ¶¶ 99-106.

158.    This 20-F also falsely represented that NIO prepared its financial statements in "conformity with GAAP":

We will furnish Deutsche Bank Trust Company Americas, the depositary of our ADSs, with our annual reports, which will include a review of operations and annual audited consolidated financial statements prepared in conformity with U.S. GAAP. (20-F at 143).

159.    This statement was materially false and misleading when made because NIO violated GAAP for the following reasons:

(a)    NIO was Weineng's primary beneficiary.  *See* ¶¶ 53-70, 101-104, 107.

(b)    NIO had a controlling financial interest in Weineng.  *See* ¶¶ 101-106.

(c)    Weineng was a NIO VIE.  *See* ¶¶ 99-106.

58

(d)     NIO improperly included in its financial figures the full price for batteries sold to Weineng during FY2020. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as monthly payments were made to Weineng on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, i.e. five to six and a half years of revenue, immediately upon the sale of the batteries to Weineng. *See* ¶¶ 53, 57-58, 77, 79, 85-87.

160.     The 2021 Form 20-F also contained misleading Certifications by Defendants Li and

Feng. Those certifications stated as follows:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;…(20-F at Exhibits 12.1 and 12.2).

161.     These certifications were materially false and misleading when made because the

2021 Form 20-F contained untrue statements of material fact, omitted material facts and did not

fairly present NIO's financial condition because Defendants knew or recklessly disregarded that:

(a)     Under GAAP, the financial statements of a company, including disclosure of VIEs and revenue recognition, are management's responsibility. *See* ¶ 32.

(b)     NIO was Weineng's primary beneficiary. See ¶¶ 53-70, 101-104, 107.

(c)     NIO had a controlling financial interest in Weineng. *See* ¶¶ 101-106.

(d)     Weineng was a NIO VIE. *See* ¶¶ 99-106.

(e)     NIO improperly included in its financial figures the full price for batteries sold to Weineng during FY2020. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as monthly payments were made to Weineng on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.* five to six and a half years of revenue, immediately upon the sale of the batteries to Weineng. *See* ¶¶ 53, 57-58, 77, 79, 85-87.

## G. April 29, 2021 Q1 2021 Financial Results and April 30, 2021 Conference Call

162. On April 29, 2021, NIO issued a press release with its 1Q21 financial results. The press release, which was signed by Defendant Feng stated in part that:

Total revenues were RMB7,982.3 million ($1,218.3 million) in the first quarter of 2021, representing an increase of 481.8% from the first quarter of 2020 and an increase of 20.2% from the fourth quarter of 2020.

Gross profit was RMB1,554.8 million ($237.3 million) in the first quarter of 2021, representing an increase of RMB1,722.3 million from a gross loss of RMB167.5 million in the first quarter of 2020 and an increase of 36.2% from the fourth quarter of 2020.

163. The statements were materially false and misleading and omitted material facts when made because:

(a) NIO was Weineng's primary beneficiary. *See* ¶¶ 53-70, 101-104, 107.

(b) NIO had a controlling financial interest in Weineng. *See* ¶¶ 101-106.

(c) Weineng was a NIO VIE. *See* ¶¶99-106.

(d) NIO improperly included in its financial figures the full price for batteries sold to Weineng during 1Q21. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as monthly payments were made to Weineng on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.* five to six and a half years of revenue, immediately upon the sale of the batteries to Weineng. *See* ¶¶ 53, 57-58, 77, 79, 87.

(e) NIO's substantial year-over-year revenue percentage increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id.*

(f) NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances because Weineng's financials should have been consolidated with NIO's. *See* ¶¶ 53, 54, 60-62, 80, 87, 98-107.

(g) NIO separately could not recognize the full revenue for the batteries sold to Weineng under GAAP because it was not likely that NIO would collect monies Weineng owed to it within a year because Weineng's asset to liability ratio was so low. *See* ¶¶ 108-113.

60

164. On April 30, 2021, NIO held a conference call with analysts. During that call, in which Defendant Li participated, Defendant Feng reiterated NIO's Q121 revenues and profit.

165. These statements were materially false and misleading and omitted material facts when made for the reasons given in paragraph 163.

**H. August 11, 2021 Q2 2021 Financial Results and August 12, 2021 Conference Call**

166. On August 11, 2021, NIO issued a press release with its 2Q21 financial results. That press release, which was also issued on a Form 6-K signed by Defendant Feng, provided in relevant part that:

> Total revenues were RMB8,448.0 million ($1,308.4 million) in the second quarter of 2021, representing an increase of 127.2% from the second quarter of 2020 and an increase of 5.8% from the first quarter of 2021.
>
> Gross profit was RMB1,573.9 million ($243.8 million) in the second quarter of 2021, representing an increase of 402.7% from the second quarter of 2020 and an increase of 1.2% from the first quarter of 2021.

167. These statements were materially false and misleading and omitted material facts when made because:

(a) NIO was Weineng's primary beneficiary. See ¶¶ 53-70, 101-104, 107.

(b) NIO had a controlling financial interest in Weineng. *See* ¶¶ 101-106.

(c) Weineng was a NIO VIE. *See* ¶¶ 99-106.

(d) NIO improperly included in its financial figures the full price for batteries sold to Weineng during 2Q21. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as monthly payments were made on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.* five to six and a half years of revenue, immediately upon the sale of the batteries to Weineng. *See* ¶¶ 53, 57-58, 77, 79, 89.

(e) NIO's substantial year-over-year revenue percentage increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id.*

61

(f)  NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances because Weineng's financials should have been consolidated with NIO's.  *See* ¶¶ 53, 54, 60-62, 80, 89, 98-107.

(g)  NIO separately could not recognize the full revenue for the batteries sold to Weineng under GAAP because it was unlikely that NIO would collect monies Weineng owed to it within a year because Weineng's asset to liability ratio was so low and its ability to repeatedly secure financing was highly uncertain.  *See* ¶¶ 108-113.

168.  On August 12, 2021, NIO held a conference call to discuss its 2Q21 financial results.  During that call, in which Defendant Li participated, Defendant Feng reiterated NIO's 2Q21 revenues and profits.

169.  The statements were materially false and misleading and omitted material facts when made for the reasons given in paragraph 167.

170.  During this conference call, Defendant Li also discussed the depreciation of NIO's battery assets:

> For the conservative perspective, we shortened our depreciation and amortizing period for our existing products. So that will lead to the D&A increase, so for the second half year of 2021, this impact to gross profit margin will be like 2% per vehicle.

171.  These statements were materially false and misleading and omitted material facts when made because NIO underreported its battery asset depreciation by wrongfully off-loading the battery assets on to Weineng's books.  *See* ¶¶ 53, 54, 60-62, 80, 87, 98-107.

**I.  September 7, 2021 Prospectus**

172.  On September 7, 2021, NIO filed with the SEC a prospectus pursuant to Rule 424(b)(5).  The prospectus was filed in connection with the NIO's offering of up to $2,000,000,000 of ADSs, each representing one Class A ordinary share of NIO, with an assumed offering price of $40.37 per ADS, which was the last reported closing price of NIO's ADSs on September 3, 2021.

The prospectus was filed pursuant to a June 9, 2020 Registration Statement signed by Defendants

Li, Feng, Qin, Wu, Lee, and Mitchell.  The prospectus provided, in relevant part, that:

> ***We invested in the Battery Asset Company together with the Battery Asset Company Investors. As a result, we only have limited control over the business operations of the Battery Asset Company. If it fails in delivering smooth and stable operations, we will suffer from negative customer reviews and even returns of products or services and our reputation may be materially and adversely affected. Additionally, given that we generate a portion of our total revenues from receiving payment for purchase batteries*** and service fees from the Battery Asset Company, our results of operations and financial performance will be negatively affected if the Battery Asset Company fails to operate smoothly….

> ***The promise to transfer the control of the battery packs to Battery Asset Company is the only performance obligation in the contract with Battery Asset Company for the sales of battery packs and revenue is recognized at a point in time when the control is transferred….***

> Together with the launch of the BaaS, the Group entered into service agreements with Weineng, pursuant to which the Group provides services to Weineng including battery packs monitoring, maintenance, upgrade, replacement, IT system support, etc., with monthly service charges. In case of any default in payment of monthly rental fees from users, Weineng also has right to request the Group to track and lock down the battery subscribed by the users to limit its usage. In addition, in furtherance of the BaaS, the Group agreed to provide guarantee to Weineng for the default in payment of monthly subscription fees from users. The maximum amount of guarantee that can be claimed by Weineng for the users' payment default shall not be higher than the accumulated service fees the Group receives from Weineng.

> For services provided to Weineng, revenue is recognized over the period when services are rendered. As for financial guarantee liabilities, the provision of guarantee is linked to and associated with services rendered to Weineng and the payment of guarantee amount is therefore accounted for as the reduction to the revenue from Weineng.   The fair value of the guarantee liabilities is determined by taking considerations of the default pattern of the Group's existing battery installment programs provided to users. At each period end, the financial liabilities are remeasured with the corresponding changes recorded as the reduction to the revenue.   As of June 30, 2021, both service revenue and guarantee liability were immaterial.  (424B5 at S-22).

173.    The statements were materially false and misleading when made because

Defendants knew but did not disclose to investors that:

(a)     NIO was not on equal footing with the "Battery Asset Company Investors".  NIO was the driving force behind Weineng, and Weineng's only customer and source of revenue during the Class Period.  NIO orchestrated Weineng to benefit itself,

including by pulling-forward its revenues. The success of Weineng likewise was dependent on NIO. No other Weineng investor was similarly situated. *See* ¶¶ 53-58, 60-61, 78-80.

(b)     NIO did not merely have "limited control" over Weineng. NIO had singular and significant control over the entity. NIO ran Weineng's business (¶¶ 63-70), had overlapping senior managers and directors (¶¶ 71-75), assisted Weineng in obtaining financing to fund its operations, i.e. the purchase of batteries from NIO (¶¶ 80, 82-84, 93) and even provided a guarantee to Weineng for the default in payment of monthly subscription fees (¶¶ 66, 104, 106). Weineng's business was completely dependent on NIO (¶¶ 63-70), No other Weineng investor was similarly situated. ¶¶ 53-61.

(c)     Weineng's operations were completely controlled by NIO. NIO controlled the relationship with the users, including pricing the batteries, running the battery swapping stations, and billing users for their monthly subscriptions through its subsidiary Wuhan Weilai. *See* ¶¶ 63-70, 84, 92, 93.

(d)     Weineng did not actually provide meaningful "services" to NIO's users. NIO controlled the relationship with the users, including pricing the batteries, running the battery swapping stations, and billing users for their monthly subscriptions through its subsidiary Wuhan Weilai. *See* ¶¶ 63-70, 84, 92, 93.

(e)     Weineng was undercapitalized and would necessarily have to raise money to stay in business. Given that Weineng was needed to support NIO's revenue recognition scheme during the Class Period NIO was uniquely responsible to secure financing for Weineng and even bore the risk of user defaults in monthly payments. *See* ¶¶ 66, 80-84, 88, 90, 92, 93, 104-106.

(f)     There was a serious risk relating to NIO not disclosing Weineng as a VIE under GAAP, as it should have, and wrongfully recognizing all of Weineng's battery sales revenue immediately. *See* ¶¶ 78, 85-87, 89, 91, 95, 97.

(g)     NIO was Weineng's primary beneficiary. *See* ¶¶ 53-70, 101-104, 107.

(h)     NIO had a controlling financial interest in Weineng. *See* ¶¶ 101-106.

(i)     Weineng was a NIO VIE. *See* ¶¶ 99-106.

(j)     NIO improperly included in its financial figures the full price for batteries sold to Weineng upon transfer of the battery packs. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as monthly payments were made to Weineng on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.* five to six and a half years of revenue, immediately upon the sale of the batteries to Weineng. *See* ¶¶ 53, 57-58, 77, 90.

64

(k)      NIO separately could not recognize the full revenue for the batteries sold to Weineng under GAAP because it was not likely that NIO would collect monies Weineng owed to it within a year because Weineng's asset to liability ratio was so low. *See* ¶¶ 108-113.

**J.      November 9, 2021 Q3 2021 Financial Results and November 10, 2021 Conference Call**

174.      On November 9, 2021, NIO issued a press release with its 3Q21 financial results.

The press release, which was signed by Defendant Feng stated:

Total revenues were RMB9,805.3 million ($1,521.8 million) in the third quarter of 2021, representing an increase of 116.6% from the third quarter of 2020 and an increase of 16.1% from the second quarter of 2021.

Gross profit was RMB1,993.2 million ($309.3 million) in the third quarter of 2021, representing an increase of 240.3% from the third quarter of 2020 and an increase of 26.6% from the second quarter of 2021.

175.      These statements were materially false and misleading and omitted material facts when made because:

(a)      NIO was Weineng's primary beneficiary. *See* ¶¶ 53-70, 101-104, 107.

(b)      NIO had a controlling financial interest in Weineng. *See* ¶¶ 101-106.

(c)      Weineng was a NIO VIE. *See* ¶¶ 99-106.

(d)      NIO improperly included in its financial figures the full price for batteries sold to Weineng during 3Q21. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as monthly payments were made on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.* five to six and a half years of revenue, immediately upon the sale of the batteries to Weineng. *See* ¶¶ 53, 57-58, 77, 79, 91.

(e)      NIO's substantial year-over-year revenue percentage increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id.*

(f)      NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances because Weineng's financials should have been consolidated with NIO's. *See* ¶¶ 53, 54, 60-62, 80, 91, 98-107.

(g)     NIO separately could not recognize the full revenue for the batteries sold to Weineng under GAAP because it was not likely that NIO would collect monies Weineng owed to it within a year because Weineng's asset to liability ratio was so low and its ability to repeatedly secure financing was highly uncertain. *See* ¶¶ 108-113.

176.    During the November 10, 2021 call, in which Defendant Li participated, Defendant Feng reiterated NIO's 3Q 2021 results and supposedly tremendous revenue growth.

177.    These statements were materially false and misleading and omitted material facts when made for the reasons given in paragraph 175.

### K.    February 28, 2022 6-K Supplemental and Updated Disclosures

178.    On February 28, 2022, NIO filed a Form 6-K updating disclosures about the Company's listing on the Hong Kong stock exchange.  Defendant Feng signed the Form 6-K.  The Form 6-K provided, in relevant part, that:

> For the year ended December 31, 2021, over half of the users that we delivered vehicles to chose BaaS subscription….  For the nine months period ended September 30, 2021, the Battery Asset Company generated revenue of RMB191.7 million and net profit of RMB37.0 million….  For the year ended December 31, 2020, the Battery Asset Company generated revenue of RMB5.1 million and net profit of RMB4.2 million. For the nine months period ended September 30, 2021, the Battery Asset Company generated revenue of RMB191.7 million and net profit of RMB37.0 million…
>
> Our gross profit increased significantly from RMB731.5 million in the nine months ended September 30, 2020 to RMB5,121.9 million (US$794.9 million) in the nine months ended September 30, 2021. The increase of gross profit compared to the nine months ended September 30, 2020 was mainly driven by the increase of vehicle delivery volume and vehicle margin.

179.    These statements were materially false and misleading when made because Defendants knew but did not disclose to investors that:

(a)     NIO was Weineng's primary beneficiary.  See ¶¶ 53-70, 101-104, 107.

(b)     NIO had a controlling financial interest in Weineng.  *See* ¶¶101-106.

(c)     Weineng was a NIO VIE.  *See* ¶¶ 99-106.

66

(d)     NIO improperly included in its financial figures the full price for batteries sold to Weineng during the first nine months of 2021. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as payments were made on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, i.e. five to six and a half years of revenue, upon the sale of the batteries to Weineng. *See* ¶¶ 98-107.

(e)     NIO's substantial revenue increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id*.

(f)     NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances because Weineng's financials should have been consolidated with NIO's. *See* ¶¶ 53, 54, 60-62, 80, 95, 98-107.

(g)     NIO separately could not recognize the full revenue for the batteries sold to Weineng under GAAP because it was unlikely that NIO would collect monies Weineng owed to it within a year because Weineng's asset to liability ratio was so low and its ability to repeatedly secure financing was highly uncertain. *See* ¶¶ 108-113.

**L.       March 24, 2022 FY2021 Financial Results and Conference Call**

180.     On March 24, 2022, NIO issued a press release with its FY21 financial results and held a conference call discussing those results with analysts. The press release, which was also filed as a 6-K and signed by Defendant Feng reported 4Q21 and FY21 results as follows:

Total revenues were RMB9,900.7 million (US$1,553.6 million) in the fourth quarter of 2021, representing an increase of 49.1% from the fourth quarter of 2020 and an increase of 1.0% from the third quarter of 2021.

Gross profit was RMB1,699.5 million (US$266.7 million) in the fourth quarter of 2021, representing an increase of 48.8% from the fourth quarter of 2020 and a decrease of 14.7% from the third quarter of 2021.

Total revenues were RMB36,136.4 million ($5,670.6 million) for the full year of 2021, representing an increase of 122.3% from the previous year.

Gross profit was RMB6,821.4 million ($1,070.4 million) for the full year of 2021, representing an increase of 264.1% from the previous year.

181.     These statements were materially false and misleading when made because Defendants knew but did not disclose to investors that:

(a) NIO was Weineng's primary beneficiary. *See* ¶¶ 53-70, 101-104, 107.

(b) NIO had a controlling financial interest in Weineng. *See* ¶¶ 101-106.

(c) Weineng was a NIO VIE. *See* ¶¶ 99-106.

(d) NIO improperly included in its financial figures the full price for batteries sold to Weineng during FY21 and 4Q21. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as payments were made on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, i.e. five to six and a half years of revenue, upon the sale of the batteries to Weineng. *See* ¶¶ 98-107.

(e) NIO's substantial revenue increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id*.

(f) NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances because Weineng's financials should have been consolidated with NIO's. *See* ¶¶ 53, 54, 60-62, 80, 95, 98-107.

(g) NIO separately could not recognize the full revenue for the batteries sold to Weineng under GAAP it was unlikely that NIO would collect monies Weineng owed to it within a year because Weineng's asset to liability ratio was so low and its ability to repeatedly secure financing was highly uncertain. *See* ¶¶ 108-113.

182. During the March 24, 2022 conference call, in which Defendant Li participated, Defendant Feng reiterated NIO's 4Q21 and FY21 results and revenue growth.

183. These statements were materially false and misleading and omitted material facts when made for the reasons given in paragraph 181.

**M. April 29, 2022 2021 Form 20-F**

184. On April 29, 2022, NIO filed its annual report on Form 20-F with the SEC, signed by Defendant Li. The 20-F reported NIO's FY2021 revenues:

For the full year 2021, NIO's total revenues were RMB 36,136.4 million….

Our gross profit increased significantly from RMB1,873.4 million in 2020 to RMB6,821.4 million (US$1,070.4 million) in 2021. The increase of gross profit compared to 2020 was mainly driven by the increase of vehicle delivery volume and vehicle margin. (20-F at 11, 126).

68

185. These statements were materially false and misleading and omitted material facts when made for the reasons given in paragraph 181.

186. Charts in the 2021 Form 20-F reported total revenue of $5.2 billion, as well as sales to Weineng of $4.1 billion RMB (approximately $650,000,000) and account receivables from Weineng of approximately $1.5 billion RMB (approximately $250,000,000):

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2020 | 2021 | |
| | RMB | RMB | RMB | US$ |
| | | (in thousands) | | |
| **Revenues:**[1] | | | | |
| Vehicle sales | 7,367,113 | 15,182,522 | 33,169,740 | 5,205,056 |
| Other sales [3] | 457,791 | 1,075,411 | 2,966,683 | 465,537 |
| **Total revenues** | 7,824,904 | 16,257,933 | 36,136,423 | 5,670,593 |
| **Cost of sales:**[2] | | | | |
| Vehicle sales | (8,096,035) | (13,255,770) | (26,516,643) | (4,161,040) |
| Other sales | (927,691) | (1,128,744) | (2,798,347) | (439,122) |
| **Total cost of sales** | (9,023,726) | (14,384,514) | (29,314,990) | (4,600,162) |
| Gross (loss)/profit [2] | (1,198,822) | 1,873,419 | 6,821,433 | 1,070,431 |
| Operating expenses:[2] | | | | |
| Research and development[2] | (4,428,580) | (2,487,770) | (4,591,852) | (720,562) |
| Selling, general and administrative[2] | (5,451,787) | (3,932,271) | (6,878,132) | (1,079,329) |
| Other operating (loss)/income, net | — | (61,023) | 152,248 | 23,891 |
| **Total operating expenses** | (9,880,367) | (6,481,064) | (11,317,736) | (1,776,000) |
| **Loss from operations** | (11,079,189) | (4,607,645) | (4,496,303) | (705,569) |
| Interest and investment income | 160,279 | 166,904 | 911,833 | 143,086 |
| Interest expenses | (370,536) | (426,015) | (637,410) | (100,024) |
| Share of (loss)/income of equity investees | (64,478) | (66,030) | 62,510 | 9,809 |
| Other income/(losses), net | 66,160 | (364,928) | 184,686 | 28,981 |
| **Loss before income tax expenses** | (11,287,764) | (5,297,714) | (3,974,684) | (623,717) |
| Income tax expense | (7,888) | (6,368) | (42,265) | (6,632) |
| **Net loss** | (11,295,652) | (5,304,082) | (4,016,949) | (630,349) |

*(v) Sales of goods*

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2020 | 2021 |
| Wuhan Weineng Battery Assets Co., Ltd. | — | 290,135 | 4,138,187 |
| Beijing Yiche Interactive Advertising Co.,Ltd. | — | 1,453 | 485 |
| Kunshan Siwopu Intelligent Equipment Co., Ltd. | — | — | 370 |
| Shanghai Weishang Business Consulting Co., Ltd. | — | — | 157 |
| Beijing Bit Ep Information Technology Co., Ltd | — | 4,402 | — |
| Beijing Bitauto Interactive Technology Co., Ltd. | — | 1,974 | — |
| Beijing Yiche Information Science and Technology Co., Ltd. | — | 525 | — |
| Total | — | 298,489 | 4,139,199 |

**(b) The Group had the following significant related party balances:**

*(i) Amounts due from related parties*

| | As of December 31, | |
|---|---|---|
| | 2020 | 2021 |
| Wuhan Weineng Battery Assets Co., Ltd. | 118,779 | 1,563,757 |
| Nanjing Weibang Transmission Technology Co., Ltd. | 509 | 268 |
| Weilan (Note 10) | 50,000 | — |
| Kunshan Siwopu Intelligent Equipment Co., Ltd. | 617 | — |
| Total | 169,905 | 1,564,025 |

Charts at 121, F-52 and F-54.

187. These revenue, sale of goods, and accounts receivable figures were materially false and misleading because they were artificially inflated since they included the full price for batteries sold to Weineng during FY21, which violated GAAP because:

(a) NIO was Weineng's primary beneficiary. See ¶¶ 53-70, 101-104, 107.

(b) NIO had a controlling financial interest in Weineng. *See* ¶¶101-106.

(c)     Weineng was a NIO VIE.  *See* ¶¶99-106.

(d)     NIO improperly included in its financial figures the full price for batteries sold to Weineng during FY2021.  GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE.  Accordingly, NIO could only properly recognize revenues on leased batteries as payments were made on the battery subscriptions.  NIO could not recognize the full revenue for the battery sales, i.e. five to six and a half years of revenue, upon the sale of the batteries to Weineng. *See* ¶¶98-107.

(e)     NIO's substantial revenue increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id*.

(f)     NIO separately could not recognize the full revenue for the batteries sold to Weineng under GAAP because it was not likely that NIO would collect monies Weineng owed to it within a year because Weineng's asset to liability ratio was so low. *See* ¶¶ 108-113.

188.    This 20-F also reported the following depreciation and amortization of RMB1,708.0 million (US$268.0 million).  *See* 2021 20-F at 131 and F-10.

189.    This figure was materially false and misleading because it failed to disclose that NIO underreported its battery asset depreciation by wrongfully off-loading the battery assets on to Weineng's books.  GAAP accounting required NIO to include the battery asset depreciation because, as a VIE, Weineng's financials should have been consolidated with NIO's.  Defendants should have included these batteries in the depreciation figure because:

(a)     NIO was Weineng's primary beneficiary.  See ¶¶ 53-70, 101-104, 107.

(b)     NIO had a controlling financial interest in Weineng.  *See* ¶¶ 101-106.

(c)     Weineng was a NIO VIE and, thus, its assets, including depreciating assets, should have been consolidated with NIO's.  *See* ¶¶99-106.

190.    This 20-F (at F-11) also provided the following lists disclosing NIO's principal subsidiaries and VIEs:

70

| Subsidiaries | Equity interest held | Place and Date of incorporation or date of acquisition | Principal activities |
|---|---|---|---|
| NIO Nextev Limited ("NIO HK") (formerly known as Nextev Limited) | 100% | Hong Kong, February 2015 | Investment holding |
| NIO GmbH (formerly known as NextEV GmbH) | 100% | Germany, May 2015 | Design and technology development |
| NIO Holding Co., Ltd. ("NIO Holding") (formerly known as NIO (Anhui) Holding Co., Ltd.) | 100% | Anhui, PRC, November 2017 | Headquarter and technology development |
| NIO Co., Ltd. ("NIO SH") (formerly known as NextEV Co., Ltd.) | 100% | Shanghai, PRC, May 2015 | Headquarter and technology development |
| NIO Automobile (Anhui) Co., Ltd. ("NIO AH") | 100% | Anhui, PRC, August 2020 | Industrialization and technology development |
| NIO Automobile Technology (Anhui) Co., Ltd. ("NIO R&D") | 100% | Anhui, PRC, August 2020 | Design and technology development |
| NIO Financial Leasing Co., Ltd. ("NIO Leasing") | 100% | Shanghai, PRC, August 2018 | Financial Leasing |
| NIO USA, Inc. ("NIO US") (formerly known as NextEV USA, Inc.) | 100% | United States, November 2015 | Technology development |
| XPT Limited ("XPT") | 100% | Hong Kong, December 2015 | Investment holding |
| XPT Technology Limited ("XPT Technology") | 100% | Hong Kong, April 2016 | Investment holding |
| XPT Inc. ("XPT US") | 100% | United States, April 2016 | Technology development |
| XPT (Jiangsu) Investment Co., Ltd. ("XPT Jiangsu") | 100% | Jiangsu, PRC, May 2016 | Investment holding |
| NIO Norway AS ("NIO NO") | 100% | Norway, January 2021 | Investment holding and sales and after sales management |
| NEU Battery Asset Co., Ltd. ("BAC Cayman") | 100% | Cayman Islands, May 2021 | Investment holding |
| NEU Battery Asset (Hong Kong) Co.Limited ("BAC HK") | 100% | Hong Kong, July 2021 | Investment holding |
| Instant Power Europe B.V. ("BAC NL") Co., Limited | 100% | Netherlands, June 2021 | Battery Subscription Service |
| NIO Nextev Europe Holding B.V.("NIO NL") | 100% | Netherlands, December 2020 | Investment holding |
| Shanghai XPT Technology Limited | 100% | Shanghai, PRC, May 2016 | Technology development |
| XPT (Nanjing) E-Powertrain Technology Co., Ltd. ("XPT NJEP") | 100% | Nanjing, PRC, July 2016 | Manufacturing of E-Powertrain |
| XPT (Nanjing) Energy Storage System Co., Ltd. ("XPT NJES") | 100% | Nanjing, PRC, October 2016 | Manufacturing of battery pack |
| NIO Power Express Limited ("PE HK") | 100% | Hong Kong, January 2017 | Investment holding |
| NIO User Enterprise Limited ("UE HK") | 100% | Hong Kong, February 2017 | Investment holding |
| NIO Sales and Services Co., Ltd. ("UE CNHC") (formerly known as Shanghai NIO Sales and Service Co., Ltd. ) | 100% | Shanghai, PRC, March 2017 | Investment holding and sales and after sales management |
| NIO Energy Investment (Hubei) Co., Ltd. ("PE CNHC") | 100% | Wuhan PRC, April 2017 | Investment holding |
| Wuhan NIO Energy Co., Ltd. ("PE WHJV") | 100% | Wuhan, PRC, May 2017 | Investment holding |
| XTRONICS (Nanjing) Automotive Intelligent Technologies Co. Ltd. ("XPT NJWL") | 50% | Nanjing, PRC, June 2017 | Manufacturing of components |
| XPT (Jiangsu) Automotive Technology Co., Ltd. ("XPT AUTO") | 100% | Nanjing, PRC, May 2018 | Investment holding |

| VIE and VIE's subsidiaries | Place and Date of incorporation or date of acquisition |
|---|---|
| Prime Hubs Limited ("Prime Hubs") | BVI, October 2014 |
| Beijing NIO Network Technology Co., Ltd. ("Beijing NIO") | Beijing, PRC, July 2017 |

### List of Principal Subsidiaries and Consolidated Variable Interest Entities

| Subsidiaries: | Place of incorporation |
|---|---|
| NIO Nextev Limited | Hong Kong |
| XPT Limited | Hong Kong |
| XPT Technology Limited | Hong Kong |
| NEU Battery Asset (Hong Kong) Co., Limited | Hong Kong |
| NIO Power Express Limited | Hong Kong |
| NIO User Enterprise Limited | Hong Kong |
| NIO USA, Inc. | California, United States |
| XPT Inc. | Delaware, United States |
| Instant Power Europe B.V. | Netherlands |
| NIO Nextev Europe Holding B.V. | Netherlands |
| NEU Battery Asset Co., Ltd. | Cayman Islands |
| NIO Norway AS | Norway |
| NIO GmbH | Germany |
| NIO Holding Co., Ltd. | PRC |
| NIO Co., Ltd. | PRC |
| NIO Automobile (Anhui) Co., Ltd. | PRC |
| NIO Automobile Technology (Anhui) Co., Ltd. | PRC |
| NIO Financial Leasing Co., Ltd. | PRC |
| XPT (Jiangsu) Investment Co., Ltd. | PRC |
| Shanghai XPT Technology Limited | PRC |
| XPT (Nanjing) E-Powertrain Technology Co., Ltd. | PRC |
| XPT (Nanjing) Energy Storage System Co., Ltd. | PRC |
| NIO Sales and Services Co., Ltd. | PRC |
| NIO Energy Investment (Hubei) Co., Ltd. | PRC |
| Wuhan NIO Energy Co., Ltd. | PRC |
| XTRONICS (Nanjing) Automotive Intelligent Technologies Co. Ltd. | PRC |
| XPT (Jiangsu) Automotive Technology Co., Ltd. | PRC |

| Consolidated variable interest entity: | Place of incorporation |
|---|---|
| Beijing NIO Network Technology Co., Ltd. | PRC |

20-F at Ex. 8.1.

71

191.   The lists of NIO's principal subsidiaries and VIEs was materially false and misleading and omitted material facts when made because it misrepresented that NIO's list of VIEs in the Form 20-F was complete, failed to disclose that Weineng was a NIO VIE, and gave the false impression that Weineng was not a NIO VIE.

192.   The Form 20-F also represented, in pertinent part:

As a result of the several rounds of financings of the Battery Asset Company, we currently beneficially own approximately 19.8% of the equity interests in the Battery Asset Company. We refer to the Initial BaaS Investors together with the other investors of the Battery Asset Company that subsequently joined as the Battery Asset Company Investors. As a result, we only have limited control over the business operations of the Battery Asset Company. If it fails in delivering smooth and stable operations, we will suffer from negative customer reviews and even returns of products or services and our reputation may be materially and adversely affected.

Additionally, given that we generate a portion of our total revenues from sales of battery purchases and provision of service to the Battery Asset Company, our results of operations and financial performance will be negatively affected if the Battery Asset Company fails to operate smoothly. The Battery Asset Company may finance the purchase of batteries through issuance of equity and debt or bank borrowing. If the Battery Asset Company is unable to obtain future financings from the Battery Asset Company Investors or other third parties to meet its operational needs, it may not be able to continue purchasing batteries from us and providing them to our users through battery subscription, or otherwise maintain its healthy and sustainable operations….(20-F at 21)

193.   The statements were materially false and misleading and omitted material facts when made because Defendants failed to disclose:

(a)   NIO's disproportionately large economic interest in Weineng. *See* ¶¶ 53-58, 60-61, 78-80, 101-106.

(b)   NIO was not on equal footing with the "three Baas Partners" involved in Weineng. NIO was the driving force behind Weineng, and Weineng's only source of revenue during the Class Period. NIO orchestrated Weineng to benefit itself by materially pulling-forward its revenue. Weineng's success was dependent on NIO, and vice versa. No other Weineng investor was similarly situated. *See* ¶¶ 53-58, 60-61, 78-80, 101-106.

(c)   NIO did not merely have "limited control" over Weineng. NIO had singular and significant control over the entity. NIO ran Weineng's business (¶¶ 63-70), had overlapping senior managers and directors (¶¶ 71-75), assisted Weineng in obtaining financing to fund its operations, *i.e.*, the purchase of batteries from NIO

72

(¶¶ 80, 82-84, 93) and even provided a guarantee to Weineng for the default in payment of monthly subscription fees (¶¶ 66, 104, 106). Weineng's business was completely dependent on NIO (¶¶ 63-70), No other Weineng investor was similarly situated. ¶¶ 53-61.

(d)     Weineng's operations were completely controlled by NIO. NIO controlled the relationship with the users, including pricing the batteries, running the battery swapping stations, and billing users for their monthly subscriptions through its subsidiary Wuhan Weilai. *See* ¶¶ 63-76.

(e)     Weineng did not actually provide meaningful "services" to NIO's users. NIO controlled the relationship with the users, including pricing the batteries, running the battery swapping stations, and billing users for their monthly subscriptions through its subsidiary Wuhan Weilai. *See* ¶¶ 63-70.

(f)     Weineng was undercapitalized and would necessarily have to raise money to stay in business. Given that Weineng was needed to support NIO's revenue recognition scheme during the Class Period NIO was uniquely responsible to secure financing for Weineng and even bore the risk of user defaults in monthly payments. *See* ¶¶ 66, 80-84, 88, 90, 92, 93, 104-106.

(g)     There was a serious risk relating to NIO not disclosing Weineng as a VIE under GAAP, as it should have, and wrongfully recognizing all of Weineng's battery sales revenue immediately. *See* ¶¶ 78, 85-87, 89, 91, 95, 97.

(h)     NIO was Weineng's primary beneficiary. See ¶¶ 53-70, 101-104, 107.

(i)     NIO had a controlling financial interest in Weineng. *See* ¶¶101-106.

(j)     Weineng was a NIO VIE. *See* ¶¶ 99-104.

194.    The 20-F also falsely represented that NIO prepared its financial statements in

"conformity with GAAP":

> We will furnish Deutsche Bank Trust Company Americas, the depositary of our ADSs, with our annual reports, which will include a review of operations and annual audited consolidated financial statements prepared in conformity with U.S. GAAP. (20-F at 163).

195.    This statement was materially false and misleading when made because NIO

violated GAAP because:

(a)     NIO was Weineng's primary beneficiary. *See* ¶¶ 53-70, 101-104, 107.

(b)     NIO had a controlling financial interest in Weineng. *See* ¶¶101-106.

(c)     Weineng was a NIO VIE. *See* ¶¶ 99-106.

73

(d)      NIO improperly included in its financial figures the full price for batteries sold to Weineng during FY2021. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as payments were made on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, *i.e.* five to six and a half years of revenue, upon the sale of the batteries to Weineng. *See* ¶¶ 98-107.

196.      The 2022 Form 20-F also contained Certifications signed by Defendants Li and Feng. Those certifications stated as follows:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;…(20-F at Exhibits 12.1 and 12.2)

197.      These certifications were materially false and misleading when made because the 2021 Form 20-F contained untrue statements of material fact, omitted material facts and did not fairly present NIO's financial condition because:

(a)      Under GAAP, the accuracy of financial statements, including the disclosure of VIEs and revenue recognition, are management's responsibility. *See* ¶¶ 32.

(b)      NIO was Weineng's primary beneficiary. See ¶¶ 53-70, 101-104, 107.

(c)      NIO had a controlling financial interest in Weineng. *See* ¶¶ 101-106.

(d)      Weineng was a NIO VIE. *See* ¶¶ 99-106.

(e)      NIO improperly included in its financial figures the full price for batteries sold to Weineng during FY2021. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as payments were made on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, i.e. five to six and a half years of revenue, upon the sale of the batteries to Weineng. *See* ¶¶ 98-107.

(f)      NIO's substantial year-over-year revenue percentage increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id.*

74

(g)     NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances because Weineng's financials should have been consolidated with NIO's. *See* ¶¶ 53, 54, 60-62, 80, 95, 98-107.

(h)     NIO separately could not recognize the full revenue for the batteries sold to Weineng under GAAP because it was not likely that NIO would collect monies Weineng owed to it within a year because Weineng's asset to liability ratio was so low and its ability to repeatedly secure financing was highly uncertain. *See* ¶¶ 108-113.

**N.      June 9, 2022 Q1 2022 Financial Results and Conference Call**

198.    On June 9, 2022, NIO issued a press release and held a conference call with analysts discussing the Company's 1Q22 financial results. The press release, which was also filed as a Form 6-K and signed by Defendant Feng, stated:

> Total revenues were RMB9,910.6 million ($1,563.4 million) in the first quarter of 2022, representing an increase of 24.2% from the first quarter of 2021 and an increase of 0.1% from the fourth quarter of 2021.

> Gross profit was RMB1,446.8 million ($228.2 million) in the first quarter of 2022, representing a decrease of 6.9% from the first quarter of 2021 and a decrease of 14.9% from the fourth quarter of 2021.

199.    The statements were materially false and misleading when made because Defendants knew but did not disclose to investors that:

(a)     NIO was Weineng's primary beneficiary. *See* ¶¶ 53-70, 101-104, 107.

(b)     NIO had a controlling financial interest in Weineng. *See* ¶¶ 101-106.

(c)     Weineng was a NIO VIE. *See* ¶¶ 99-106.

(d)     NIO improperly included in its financial figures the full price for batteries sold to Weineng during 1Q22. GAAP required NIO to consolidate Weineng's financials into NIO's because it was a VIE. Accordingly, NIO could only properly recognize revenues on leased batteries as payments were made on the battery subscriptions. NIO could not recognize the full revenue for the battery sales, i.e. five to six and a half years of revenue, upon the sale of the batteries to Weineng. *See* ¶¶ 53, 57-58, 77, 79, 97.

(e)     NIO's substantial year-over-year revenue percentage increase was due in part to the Company's recognition of the full sale of leased batteries to Weineng immediately in violation of GAAP. *See id.*

75

(f)    NIO's gross profit statements failed to account for the depreciation of the leased batteries, which GAAP accounting required under these circumstances because Weineng's financials should have been consolidated with NIO's. *See* ¶¶ 53, 54, 60-62, 80, 97, 98-107.

(g)    NIO separately could not recognize the full revenue for the batteries sold to Weineng under GAAP because it was not likely that NIO would collect monies Weineng owed to it within a year because Weineng's asset to liability ratio was so low and its ability to repeatedly secure financing was highly uncertain. *See* ¶¶ 108-113.

200.    Also on June 9, 2022, NIO held a conference call with analysts discussing the Company's 1Q22 financial results.  During that call, in which Defendant Li participated, Defendant Feng reiterated NIO's 1Q22 revenues.

201.    These statements were materially false and misleading and omitted material facts for the reasons given in paragraph 199.

**VII.    THE TRUTH IS SLOWLY DISCLOSED: GRIZZLY REVEALS THAT NIO SIGNIFICANTLY CONTROLLED WEINENG AND USED IT TO UNLAWFULLY PULL-FORWARD BATTERY LEASING REVENUE**

202.    On June 28, 2022, Grizzly revealed that NIO largely controlled Weineng, which it used a way to radically accelerate its revenues and earnings by keeping Weineng as an unconsolidated, off-balance sheet entity. The Grizzly Report stated in relevant part:

> We have discovered that NIO has used Wuhan Weineng, an unconsolidated related party entity, to inflate its revenues and boost margins… ***We define revenue that has been "pulled-forward" as any revenue beyond what NIO would have received in the first year of subscriptions had it consolidated Weineng as a subsidiary***….  NIO's financials have been overstated through a scheme using an unconsolidated, related party….  Since Weineng Battery was formed in August 2020, NIO has found it to be a reliable and growing stream of revenue. In just four months of operating in 2020, NIO generated 290 million RMB from sales to Weineng. Despite this quick start, revenue attributable to the entity ballooned even further in 2021 to 4.14 billion RMB representing ~11% of overall 2021 revenue. The arrangement between Weineng and NIO has…[p]ull[ed] forward several years of revenue to help meet ambitious estimates [and] [s]hift[ed] depreciation costs off [NIO's] financial statements.

203.    On June 29, 2022, after the Grizzly Report was released, NIO, without any analysis, denied the allegations wholesale without providing any explanation or reasoning:

76

The report is without merit and contains numerous errors, unsupported speculations and misleading conclusions and interpretations regarding information relating to the Company. The Company's board of directors, including the audit committee, is reviewing the allegations and considering the appropriate course of action to protect the interests of all shareholders. The Company will make additional disclosures in due course consistent with the requirements of applicable rules and regulations of the Securities and Exchange Commission, the New York Stock Exchange, The Stock Exchange of Hong Kong Limited (the "SEHK") and the Singapore Exchange Securities Trading Limited (the "SGX-ST"). The Company emphasizes its continued and unwavering commitment to maintaining high standards of corporate governance and internal control, as well as transparent and timely disclosure in compliance with applicable rules and regulations.

204.    On June 28, 2022, NIO stock closed at $22.36, down 2.5% from its June 27, 2022 close of $22.95.

205.    Later on June 28, 2022, at approximately 8:00 p.m., NIO issued its first response, denying the allegations in the Report.  Then, a little over four hours later, at approximately 12:30 a.m. on June 29, 2022, NIO issued a press release again denying Report's allegations.  On this news, in pre-market/post-market trading between 8:00 p.m. on June 28, 2022 and 6:00 a.m. on June 29, 2022, NIO's stock price fell approximately 8.7% from $22.33 to $20.38.  NIO closed on June 29, 2022 at $21.86 per share, down 2.24% from the June 28, 2022 close of $22.36. Stock drop.

206.    On July 11, 2022, the market learned of the seriousness of the Report's allegations as NIO announced that it would appoint a purportedly independent committee to investigate the Report's merits:

NIO Inc. (NYSE: NIO; HKEX: 9866; SGX: NIO) ("NIO" or the "Company"), a pioneer and a leading company in the premium smart electric vehicle market, today announced that following its previous statement in response to the allegations made in a report issued by the short-seller firm Grizzly Research LLC on June 28, 2022 (the "Short Seller Report"), the Company's board of directors (the "Board"), including the audit committee of the Board, after having reviewed the allegations, at the recommendation of the management of the Company and in order to protect the interests of all shareholders, has decided to form an independent committee (the "Independent Committee"), consisting of independent directors Mr. Denny Ting Bun Lee, Mr. Hai Wu, and Ms. Yu Long, to oversee an independent investigation regarding the allegations made in the Short Seller Report (the "Independent Investigation"). The Independent Committee has retained independent

77

professional advisors to assist with the Independent Investigation, including an international law firm and a well-regarded forensic accounting firm. The Company will provide updates on the Independent Investigation in due course consistent with the requirements of applicable rules and regulations of the Securities and Exchange Commission, the New York Stock Exchange, The Stock Exchange of Hong Kong Limited (the "SEHK") and the Singapore Exchange Securities Trading Limited (the "SGX-ST"). The Company reiterates its continued and unwavering commitment to maintaining high standards of corporate governance and internal control, as well as transparent and timely disclosure in compliance with applicable rules and regulations.

207. After NIO's July 11, 2022 statements, the market realized that Grizzly's allegations were significant.  NIO stock fell almost 9%.

## VIII.  POST-CLASS PERIOD DEVELOPMENTS

208. On August 26, 2022, NIO issued a press release announcing that the Committee's investigation was substantially complete and that the allegations in the Grizzly Report were not substantiated. NIO did not provide one fact supporting its claim that Grizzly's analysis was inaccurate:

> NIO Inc. (NYSE: NIO; HKEX: 9866; SGX: NIO) ("NIO" or the "Company"), a pioneer and a leading company in the premium smart electric vehicle market, today provided an update on the status of the previously announced independent internal review. As previously disclosed, shortly after the publication of a report issued by the short-seller firm Grizzly Research LLC on June 28, 2022 (the "Short Seller Report"), an independent committee of the board of directors (the "Independent Committee"), consisting of independent directors Mr. Denny Ting Bun Lee, Mr. Hai Wu, and Ms. Yu Long, was formed to oversee an independent internal review regarding the key allegations made in the Short Seller Report (the "Internal Review"). The Internal Review was performed by the Independent Committee with the assistance of third-party professional advisors including an international law firm and forensic accounting experts from a well-regarded forensic accounting firm that is not the Company's auditor. The Internal Review is now substantially complete. Based on findings of the Internal Review, the Independent Committee has concluded that these allegations were not substantiated.

209. Nor did NIO reveal the forensic accounting firm or international law firm who supposedly assisted the conflicted Committee in their "investigation".

78

## IX. ADDITIONAL MATERIALITY ALLEGATIONS

### A. Weineng Accounted For A Material Amount of NIO's Revenue

210. The SEC's Staff Accounting Bulletin ("SAB") No. 99 (available at https://www.sec.gov/interps/account/sab99.htm) provides a non-exhaustive list of qualitative and quantitative factors a court should consider, including whether the misstatement "affects the registrant's compliance with regulatory requirements".  SAB 99.

211. One of those factors is when a reported item comprises 5% or more of a company's earning SAB No. 99 (available at https://www.sec.gov/interps/account/sab99.htm) provides a non-exhaustive list of qualitative and quantitative factors a court should consider, including whether the misstatement "affects the registrant's compliance with regulatory requirements".  SAB 99.

212. One of those factors is when a reported item comprises 5% or more of a company's earnings:

> The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that – without considering all relevant circumstances – a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material.

See SAB 99 at 1.

213. Revenue attributable to Weineng in FY2021 alone was 4.14 billion RMB, or approximately $600, representing approximately 11% of NIO's $5.6 billion 2021 revenue alone. Accordingly, it was clearly material to NIO.

## X. ADDITIONAL SCIENTER ALLEGATIONS

214. As alleged herein, Defendants acted with scienter since they knew that the public documents and statements issued or disseminated in the name of NIO were materially false and/or misleading when made; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance

79

or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding NIO, their control over, and/or receipt and/or modification of NIO allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning NIO, participated in the fraudulent scheme alleged herein.

### A. Defendants Knew Their Statements Were Materially False And Misleading When Made

#### 1. Defendants Purposefully Created Weineng As An End-Run Around GAAP So NIO Could Dig Out Of A Liquidity Crisis And Recognize More Revenue Immediately

215. As NIO's liquidity crisis escalated, in August 2020, Defendants set up Weineng to wrongfully pull forward years of battery lease revenue.

216. Prior to forming Weineng, NIO ran its own battery lease program. During this period, when a consumer purchased a vehicle and leased the battery, NIO only recognized revenue from battery leases when it received the cash payments on a monthly basis.

217. After creating Weineng, NIO began recognizing the full sale price of the electric batteries NIO sold to Weineng – although Weineng would not (like NIO pre-Class Period) receive that revenue for five to six and a half years.

218. By creating Weineng and artificially pulling forward years of revenues, Defendants were able to dig NIO out of its liquidity crunch – which was so serious that NIO stated it could only last one more year as things were. *See* NIO 2019 20-F at 108.

#### 2. Defendants, Who Disclosed Other VIEs, Were Well Aware of VIE Reporting Requirements

219. As NIO's management, it was the Individual Defendants' responsibility to list Weineng as a VIE to the auditor and disclose Weineng as a VIE to investors. Defendants knew

Weineng was a VIE and thus should have been consolidated with NIO because, during the Class Period, NIO identified several other related entities as VIEs and consolidated their financial results, eliminating intra-company transactions.

220.    Thus, Defendants knew how to determine whether an entity is a VIE or not, and if an entity is a VIE, whether NIO was the VIE's primary beneficiary.

221.    On December 10, 2020, NIO filed a Form 6-K with the SEC, signed by Defendant Feng.  This document reported NIO's unaudited financial results for the nine months ending September 3, 2020.  This report listed numerous entities that were VIEs to NIO:

| VIE and VIE's subsidiaries | Economic interest held | Place and Date of incorporation or date of acquisition |
|---|---|---|
| Prime Hubs Limited ("Prime Hubs") | 100% | BVI, October 2014 |
| NIO Technology Co., Ltd. ("NIO SHTECH") (formerly known as Shanghai NextEV Technology Co., Ltd.) | 100% | Shanghai, PRC, November 2014 |
| Beijing NIO Network Technology Co., Ltd. ("NIO BJTECH") | 100% | Beijing, PRC, July 2017 |
| Shanghai Anbin Technology Co., Ltd. ("NIO ABTECH") | 100% | Shanghai, PRC, April 2018 |

222.    Additionally, NIO's 2021 Form 20-F, which was signed by Defendant Li, discussed VIEs and principles of consolidation at length:

> A VIE is an entity in which the Company, or its subsidiary, through contractual arrangements, bears the risks of, and enjoys the rewards normally associated with, ownership of the entity, and therefore the Company or its subsidiary is the primary beneficiary of the entity.

> All significant transactions and balances between the Company, its subsidiaries and the VIE have been eliminated upon consolidation. The non-controlling interests in consolidated subsidiaries are shown separately in the consolidated financial statements.

*Id*. at F-12-13.

223.    These statements show Defendants knew what characteristics necessitated VIE treatment.

224.    Defendant Li particularly knew what characteristics qualify an entity as a VIE because he established another entity that is a VIE of NIO.  *See* NIO 2020 20-F at F-12.

81

225.     Accordingly, Defendants knew their statements about Weineng were misleading and that NIO's listing of VIEs was incomplete when made. *See supra* ¶¶ 156, 157, 190, 191.

### 3. Defendants Purposefully Set NIO's Equity Interest in Weineng at 19.84% in August 2021 To Remain A Fraction Below the 20% Figure – Which Creates a Presumption of Control

226.     On August 16, 2021, NIO invested more money in Weineng – putting its equity interest at a carefully chosen 19.84%. NIO's 19.84% voting interest fell a hairsbreadth under the 20% equity/voting figure that Defendants knew would provide a presumption that NIO significantly controlled Weineng and thus was a VIE requiring consolidation of its financial statements. *See* ASC 323-10 ("[a]n investment (direct or indirect) of 20 percent or more of the voting stock of an investee shall lead to a presumption that in the absence of predominant evidence to the contrary an investor has the ability to exercise significant influence over an investee").

### B. Defendants Were Motivated to Commit Fraud

### 1. Defendants Were Motivated to Commit Fraud to Address NIO's Liquidity Crisis and Fund the Highly Capital-Intensive Battery Swap Business Model

227.     NIO had a liquidity crisis in early 2020. *See supra* ¶¶ 46-52. On February 27, 2020, it was reported that NIO stated that it could be out of business in one year. *See supra* ¶52. Defendants were motivated to create Weineng to address this urgent crisis because Weineng would significantly accelerate revenue recognition for NIO's battery rentals and, thus, solve the liquidity crisis. NIO's creation of Weineng allowed NIO to wrongfully recognize at least RMB 1.1 billion in revenue during the Class Period – a material amount. *See* Grizzly Report at 7.

### 2. Defendants Were Motivated to Commit Fraud to Make Offerings of Inflated NIO Stock

228.     NIO had numerous stock offerings during the Class Period, including secondary listings on both the Main Board of the Stock Exchange of Hong Kong on March 9, 2022, and the

82

Main Board of the Singapore Exchange Securities Trading Limited on May 20, 2022. Additionally, NIO did a secondary stock offering of ADS's in August/September 202, raising about $1.5 billion.  In September 2021, NIO offered to sell up to $2 billion in ADSs in an at-the-market secondary offering.

229.    Defendants were motivated to commit fraud to artificially inflate NIO's stock price and then offer artificially inflated NIO shares to the public.

## XI.    LOSS CAUSATION

230.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of NIO securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about NIO's business, operations, and prospects as alleged herein.

231.    During the Class Period, as detailed herein, NIO's securities were artificially inflated due to Defendants' misleading statements and omissions. When Defendants' misrepresentations and omissions were disclosed and became apparent to the market, the price of NIO securities fell as the prior artificial inflation came out.

232.    As a result of purchases of NIO securities during the Class Period, Plaintiffs and the other Class members suffered economic loss, i.e., damages, under the securities laws. The decline in the price of NIO securities after the corrective disclosures on June 28, 2022 and July 11, 2022 was a direct result of Defendants' misrepresentations being revealed to investors and the market.

233.    The decline in the price of NIO securities was also the result of the materialization of the concealed investment risks concerning NIO.

83

234. Defendants' materially false and misleading statements and omissions relate to NIO's significant control of, and wrongful accounting for, Weineng's purchase of EV batteries from NIO.

235. The first corrective disclosure on June 28, 2022 revealed for the first time that NIO effectively controlled Weineng and had used Weineng to accelerate revenues and earnings relating to its sales of EV batteries to Weineng.

236. After this disclosure, NIO stock dropped from $22.95 to $22.36, approximately 2.5%.

237. The final corrective disclosure on July 11, 2022 revealed the full truth. On July 11, 2022, NIO disclosed that it was forming the Committee to review Grizzly's claims – showing the market that Grizzly's allegations were serious.

238. After the July 11, 2022 disclosure, NIO securities fell from a July 8, 2022 closing price of $22.60 to close on July 11, 2022 at $20.57 per share, almost 9%.

239. The timing and magnitude of the price declines in NIO securities negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' statements. The economic loss, i.e., damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' misstatements and omissions and the subsequent significant decline in the value of NIO securities when Defendants' misrepresentations were revealed.

## XII. CLASS ACTION ALLEGATIONS

240. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired NIO securities between August 11, 2020 and July 11, 2022, inclusive, and

who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

241. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NIO's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of NIO shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by NIO or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

242. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

243. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. 38. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether the federal securities laws were violated by Defendants' acts as alleged herein; (b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of NIO;

85

and (c) to what extent the members of the Class have sustained damages and the proper measure of damages.

244.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII.    APPLICABILITY OF PRESUMPTION OF RELIANCE

245.    The market for NIO's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, NIO's securities traded at artificially inflated prices during the Class Period. On June 30, 2021, the Company's share price closed at a Class Period high of $66.99 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of NIO's securities and market information relating to NIO, and have been damaged thereby.

246.    During the Class Period, the artificial inflation of NIO's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about NIO's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of NIO and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in

86

Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

247. At all relevant times, the market for NIO's securities was an efficient market for the following reasons, among others: (a) NIO shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market; (b) As a regulated issuer, NIO filed periodic public reports with the SEC and/or the NYSE; (c) NIO regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or (d) NIO was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

248. As a result of the foregoing, the market for NIO's securities promptly digested current information regarding NIO from all publicly available sources and reflected such information in NIO's share price. Under these circumstances, all purchasers of NIO's securities during the Class Period suffered similar injury through their purchase of NIO's securities at artificially inflated prices and a presumption of reliance applies.

249. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information

87

that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XIV.   NO SAFE HARBOR

250.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of NIO who knew that the statement was false when made.

## XV. CAUSES OF ACTION

### <u>FIRST CLAIM</u>

**Violation of Section 10(b) of The Exchange Act
and Rule 10b-5 Promulgated Thereunder Against All Defendants**

251. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

252. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase NIO's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

253. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for NIO's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

254. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about NIO, as specified herein.

255. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of NIO's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about NIO, its relationship to Weineng, and its reported financial results, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

256. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financials; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances and business operations with Weineng at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

257. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing NIO's significant control of Weineng and the misstated financial statements discussed herein, from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements of the Company's relationship with Weineng, and NIO's reported revenues and earnings during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

258. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of NIO's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired NIO's securities during the Class Period at artificially high prices and were damaged thereby.

259. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems

91

that NIO was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their NIO securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

260. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

261. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

262. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

263. The Individual Defendants acted as controlling persons of NIO within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the misstatements and omissions of material fact, including false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading

92

prior to and/or shortly after these statements were issued and had the ability to prevent the issuance

of the statements or cause the statements to be corrected.

264.    In particular, Individual Defendants had direct and supervisory involvement in the

day-to-day operations of the Company and, therefore, had the power to control or influence the

particular transactions giving rise to the securities violations as alleged herein, and exercised the

same.

265.    As set forth above, NIO and Individual Defendants each violated Section 10(b) and

Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as

controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange

Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other

members of the Class suffered damages in connection with their purchases of the Company's

securities during the Class Period.

## XVI.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal
       Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class
       members against all defendants for all damages sustained as a result of Defendants'
       wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in
       this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: February 28, 2023

Respectfully submitted,

**BERNSTEIN LIEBHARD LLP**

/s/ Laurence J. Hasson

_____
Laurence J. Hasson
Joseph R. Seidman, Jr.
Jeffrey R. McEachern
Hairong Basil
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
Email:  lhasson@bernlieb.com
       seidman@bernlieb.com
       jmceachern@bernlieb.com
       hbasil@bernlieb.com

*Lead Counsel for Lead Plaintiff Dr. Mohammad
Siddiqui, Additional Named Plaintiff Barry King,
and the Proposed Class*

CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2023, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

/s/ Laurence J. Hasson

DocuSign Envelope ID: 2B40C1C5-933B-46F9-BBD3-4024CEF0E7AD

# CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

DR. MOHAMMAD SIDDIQUI ("Plaintiff"), declares the following as to the claims asserted under the federal securities laws:

1.      Plaintiff has reviewed a copy of the Amended Complaint in this matter and authorizes the filing of the Amended Complaint. Plaintiff retains Bernstein Liebhard LLP and such counsel they deem appropriate to associate with to pursue such action.

2.      Plaintiff did not purchase or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff, individually or as part of a group, is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial. Plaintiff understands that the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon the execution of this Certification.

4.      Plaintiff's transactions in NIO Inc. securities during the relevant period as specified in the complaint are set forth in "Attachment A" to this Certification.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except as ordered and approved by the court, any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: 02/26/2023

DocuSigned by:

*Dr. Mohammad Siddiqui*
F8A873B7CDA64F0

DR. MOHAMMAD SIDDIQUI

DocuSign Envelope ID: 2B40C1C5-933B-46E9-BBD3-4924CEF0E7AD

## SCHEDULE A

| Date | Transaction Type | Quantity | Price Per Share |
|---|---|---|---|
| 11/12/20 | SELL | 18,750 | $48.53 |
| 11/13/20 | PURCHASE | 21,000 | $43.31 |
| 2/23/21 | PURCHASE | 2,500 | $43.21 |
| 10/4/21 | PURCHASE | 4,100 | $33.95 |
| 12/30/21 | SELL | 2,500 | $28.03 |
| 1/24/22 | PURCHASE | 5,000 | $25.79 |

00730826;V1

DocuSign Envelope ID: 05259C45-B56D-4B6B-8020-8D65ECBEA3FC

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

BARRY KING ("Plaintiff"), declares the following as to the claims asserted under the federal securities laws:

1. Plaintiff has reviewed a copy of the Amended Complaint in this matter and authorizes the filing of the Amended Complaint. Plaintiff retains Bernstein Liebhard LLP and such counsel they deem appropriate to associate with to pursue such action.

2. Plaintiff did not purchase or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff, individually or as part of a group, is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial. Plaintiff understands that the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon the execution of this Certification.

4. Plaintiff's transactions in NIO Inc. securities during the relevant period as specified in the complaint are set forth in "Attachment A" to this Certification.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification.

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except as ordered and approved by the court, any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: 02/26/2023

DocuSigned by:

*Barry King*
C65680B6D98D4D2

BARRY KING

00727920;V1

DocuSign Envelope ID: 05259C45-B56D-4B6B-8920-8D65ECBEA3FC

## SCHEDULE A

| Date | Transaction Type | Quantity | Price Per Share |
|---|---|---|---|
| 7/1/21 | PURCHASE | 0.142671 | $54.0050 |
| 7/1/21 | PURCHASE | 1,258.650499 | $54.0200 |
| 2/3/22 | PURCHASE | 212.857441 | $23.9550 |

00727920;V1

ARM > Accounting > FASB - Financial Accounting Standards Board > FASB Codification > Broad Transactions > 810 - Consolidation > 10 - Overall > 05 - Overview and Background

**FASB**
Authoritative

## 810-10-05 Overview and Background - General

[Click to open document in a browser](#)

# General

**05-1** The Consolidation Topic provides guidance on entities subject to consolidation as well as on how to consolidate. Paragraph 810-10-10-1 : ⬜ discusses the objectives of consolidation.

**05-2** This Topic includes the following Subtopics:

    a. Overall

    b. Subparagraph superseded by Accounting Standards Update No. 2015-02 : ⬜

    c. Research and Development Arrangements.

**05-3** Throughout this Subtopic, any reference to a **limited partnership** ⬜ includes limited partnerships and similar **legal entities** ⬜ . A *similar legal entity* is an entity (such as a limited liability company) that has governing provisions that are the functional equivalent of a limited partnership. In such entities, a managing member is the functional equivalent of a general partner, and a nonmanaging member is the functional equivalent of a limited partner.

**05-4** The guidance in this Subtopic is presented in the following three Subsections:

    a. General

    b. Variable Interest Entities

    c. Consolidation of Entities Controlled by Contract

**05-5** Paragraph superseded by Accounting Standards Update No. 2015-02 : ⬜

**05-6** The following flowchart provides an overview of the guidance in this Subtopic for evaluating whether a reporting entity should consolidate another legal entity. The flowchart does not include all of the guidance in this Subtopic and is not intended as a substitute for the guidance in this Subtopic. For example, the flowchart does not illustrate the consolidation analysis for entities controlled by contract.

***Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.***
***©2023 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***
***https://www.accountingresearchmanager.com/q/1msnh***

## Consolidation Analysis in Subtopic 810-10



[1]Consolidation not required; however, evaluation of other generally accepted accounting principles (GAAP) may be relevant to determine recognition, measurement, or disclosure.

[2]A legal entity is a VIE if any of the following conditions exist:
a. The equity investment at risk is not sufficient to finance the activities of the entity without additional subordinated financial support provided by any parties.
b. As a group, the holders of the equity investment at risk lack any of the following characteristics of a controlling financial interest:
   1. The power to direct the activities that most significantly impact the entity's economic performance:
      i. For legal entities other than limited partnerships, investors lack that power through voting rights or similar rights if no owners hold voting rights or similar rights (such as those of a common shareholder in a corporation).
      ii. For limited partnerships, partners lack that power if neither (01) nor (02) below exists:
         01. A simple majority or lower threshold of limited partners (including a single limited partner) with equity at risk is able to exercise substantive kick-out rights through voting interests over the general partner(s).
         02. Limited partners with equity at risk are able to exercise substantive participating rights over the general partner(s).
   2. The obligation to absorb expected losses.
   3. The right to receive expected residual returns.
c. The equity investors' voting rights are not proportional to the economics, and substantially all of the activities of the entity either involve or are conducted on behalf of an investor that has disproportionately few voting rights.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1msnh*



[3] Power is defined as the power to direct the activities of a VIE that most significantly impact the VIE's economic performance.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1msnh*



**05-7** Paragraph Not Used :

Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1msnh*

*ARM > Accounting > FASB - Financial Accounting Standards Board > FASB Codification > Broad Transactions > 810 - Consolidation > 10 - Overall > 05 - Overview and Background - Variable Interest Entities*

**FASB**
Authoritative

## 810-10-05 Overview and Background - Variable Interest Entities

[Click to open document in a browser](#)

# Variable Interest Entities

### > Consolidation of VIEs

**05-8** The Variable Interest Entities Subsections clarify the application of the General Subsections to certain **legal entities** in which equity investors do not have sufficient equity at risk for the legal entity to finance its activities without additional **subordinated financial support** or, as a group, the holders of the equity investment at risk lack any one of the following three characteristics:

a. The power, through voting rights or similar rights, to direct the activities of a legal entity that most significantly impact the entity's economic performance

b. The obligation to absorb the **expected losses** of the legal entity

c. The right to receive the **expected residual returns** of the legal entity.

Paragraph 810-10-10-1 : states that consolidated financial statements are usually necessary for a fair presentation if one of the entities in the **consolidated group** directly or indirectly has a controlling financial interest in the other entities.For legal entities other than limited partnerships,paragraph 810-10-15-8 : states that the usual condition for a controlling financial interest is ownership of a majority voting interest.For limited partnerships, paragraph 810-10-15-8A : states that the usual condition for a controlling financial interest is ownership of a majority of the limited partnership's **kick-out rights** through voting interests.However, application of the majority voting interest and kick-out rights requirements in the General Subsections of this Subtopic to certain types of entities may not identify the party with a controlling financial interest because the controlling financial interest may be achieved through arrangements that do not involve voting interests or kick-out rights.

**05-8A** The reporting entity with a variable interest or interests that provide the reporting entity with a controlling financial interest in a **variable interest entity** (VIE) will have both of the following characteristics:

a. The power to direct the activities of a VIE that most significantly impact the VIE's economic performance

b. The obligation to absorb losses of the VIE that could potentially be significant to the VIE or the right to receive benefits from the VIE that could potentially be significant to the VIE.

**05-9** The Variable Interest Entities Subsections explain how to identify VIEs and how to determine when a reporting entity should include the assets, liabilities, **noncontrolling interests** , and results of activities of a

***Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.***
***©2023 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions:*** [***http://researchhelp.cch.com/License_Agreement.htm***](http://researchhelp.cch.com/License_Agreement.htm)
[***https://www.accountingresearchmanager.com/q/1msnh***](https://www.accountingresearchmanager.com/q/1msnh)

VIE in its consolidated financial statements. Transactions involving VIEs are common. Some reporting entities have entered into arrangements using VIEs that appear to be designed to avoid reporting assets and liabilities for which they are responsible, to delay reporting losses that have already been incurred, or to report gains that are illusory. At the same time, many reporting entities have used VIEs for valid business purposes and have properly accounted for those VIEs based on guidance and accepted practice.

**05-10** Some relationships between reporting entities and VIEs are similar to relationships established by majority voting interests, but VIEs often are arranged without a governing board or with a governing board that has limited ability to make decisions that affect the VIE's activities. A VIE's activities may be limited or predetermined by the articles of incorporation, bylaws, partnership agreements, trust agreements, other establishing documents, or contractual agreements between the parties involved with the VIE. A reporting entity implicitly chooses at the time of its investment to accept the activities in which the VIE is permitted to engage. That reporting entity may not need the ability to make decisions if the activities are predetermined or limited in ways the reporting entity chooses to accept. Alternatively, the reporting entity may obtain an ability to make decisions that affect a VIE's activities through contracts or the VIE's governing documents. There may be other techniques for protecting a reporting entity's interests. In any case, the reporting entity may receive benefits similar to those received from a controlling financial interest and be exposed to risks similar to those received from a controlling financial interest without holding a majority voting interest (or without holding any voting interest).The power to direct the activities of a VIE that most significantly impact the entity's economic performance and the reporting entity's exposure to the entity's losses or benefitsare determinants of consolidation in the Variable Interest Entities Subsections.The Variable Interest Entities Subsections also provide guidance on determining whether fees paid to a **decision**

**maker** or service provider should be considered a variable interest in a VIE.

**05-11** VIEs often are created for a single specified purpose, for example, to facilitate securitization, leasing,

hedging, research and development, **reinsurance** , or other transactions or arrangements. The activities may be predetermined by the documents that establish the VIEs or by contracts or other arrangements between the parties involved. However, those characteristics do not define the scope of the Variable Interest Entities Subsections because other entities may have those same characteristics. The distinction between VIEs and other entities is based on the nature and amount of the equity investment and the rights and obligations of the equity investors.

**05-12**Because the equity investors in an entity other than a VIE generally absorb losses first, they can be expected to resist arrangements that give other parties the ability to significantly increase their risk or reduce their benefits. Other parties can be expected to align their interests with those of the equity investors, protect their interests contractually, or avoid any involvement with the entity.

**05-13**In contrast, either a VIE does not issue voting interests (or other interests with similar rights) or the total equity investment at risk is not sufficient to permit the legal entity to finance its activities without additional subordinated financial support. If a legal entity does not issue voting or similar interests or if the equity investment is insufficient, that legal entity's activities may be predetermined or decision-making ability is determined contractually. If the total equity investment at risk is not sufficient to permit the legal entity to finance its activities, the parties providing the necessary additional subordinated financial support most likely will not permit an equity investor to make decisions that may be counter to their interests. That means that the usual condition for establishing a controlling financial interest as a majority voting interest does not apply to VIEs. Consequently, a consolidation analysis that focuses on ownership of voting stock is not appropriate for such entities.

Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1msnh*

Broad Transactions  ▪  810 Consolidation  ▪  10 Overall

# 15 Scope and Scope Exceptions

**ℹ General Note:** The Scope and Scope Exceptions Section outlines the items (for example, the entities, transactions, instruments, or events) to which the guidance in the Subtopic does or does not apply. In some cases, the Section may contain definitional or other text to frame the scope.

## General

⚒ Related Proposed ASUs

### > Overall Guidance

**810-10-15-1**  The Scope Section of the Overall Subtopic establishes the pervasive scope for all Subtopics of the Consolidation Topic. Unless explicitly addressed within specific Subtopics, the following scope guidance applies to all Subtopics of the Consolidation Topic.

**810-10-15-2**  The General Subsection of this Section establishes the pervasive scope for this Subtopic, with specific exceptions noted in the other Subsections of this Section.

### > Entities

**810-10-15-3**  All reporting entities shall apply the guidance in the Consolidation Topic to determine whether and how to consolidate another entity and apply the applicable Subsection as follows:

a. If the reporting entity has an interest in an entity, it must determine whether that entity is within the scope of the Variable Interest Entities Subsections in accordance with paragraph 810-10-15-14. If that entity is within the scope of the Variable Interest Entities Subsections, the reporting entity should first apply the guidance in those Subsections. Paragraph 810-10-15-17 provides specific exceptions to applying the guidance in the Variable Interest Entities Subsections.

b. If the reporting entity has an interest in an entity that is not within the scope of the Variable Interest Entities Subsections and is not within the scope of the Subsections mentioned in paragraph 810-10-15-3(c), the reporting entity should use only the guidance in the General Subsections to determine whether that interest constitutes a controlling financial interest.

c. If the reporting entity has a contractual management relationship with another entity that is not within the scope of the Variable Interest Entities Subsections, the reporting entity should use the guidance in the Consolidation of Entities Controlled by Contract Subsections to determine whether the arrangement constitutes a controlling financial interest.

**810-10-15-4**  All legal entities are subject to this Topic's evaluation guidance for consolidation by a reporting entity, with specific qualifications and exceptions noted below.

**810-10-15-5**  The application of this Topic by not-for-profit entities (NFPs) as defined in Topic 958 is subject to additional guidance in Subtopic 958-810.

**810-10-15-6**  The guidance in this Topic applies to all reporting entities, with specific qualifications and exceptions noted below.

**810-10-15-7**  Paragraph not used.

**810-10-15-8**  For legal entities other than limited partnerships, the usual condition for a controlling financial interest is ownership of a majority voting interest, and, therefore, as a general rule ownership by one reporting entity, directly or indirectly, of more than 50 percent of the outstanding voting shares of another entity is a condition pointing toward consolidation. The power to control may also exist with a lesser percentage of ownership, for example, by contract, lease, agreement with other stockholders, or by court decree.

**810-10-15-8A**  Given the purpose and design of limited partnerships, kick-out rights through voting interests are analogous to voting rights held by shareholders of a corporation. For limited partnerships, the usual condition for a controlling financial interest, as a general rule, is ownership by one limited partner, directly or indirectly, of more than 50 percent of the limited partnership's kick-out rights through voting interests. The power to control also may exist with a lesser percentage of ownership, for example, by contract, lease, agreement with partners, or by court decree.

**810-10-15-9**  A majority-owned subsidiary is an entity separate from its parent and may be a variable interest entity (VIE) that is subject to consolidation in accordance with the Variable Interest Entities Subsections of this Subtopic. Therefore, a reporting entity with an explicit or implicit interest in a

**810-10-15-10**    A reporting entity shall apply consolidation guidance for entities that are not in the scope of the Variable Interest Entities Subsections (see the Variable Interest Entities Subsection of this Section) as follows:

a. All majority-owned subsidiaries—all entities in which a parent has a controlling financial interest—shall be consolidated. However, there are exceptions to this general rule.

1. A majority-owned subsidiary shall not be consolidated if control does not rest with the majority owner—for instance, if any of the following are present:

i. The subsidiary is in legal reorganization

ii. The subsidiary is in bankruptcy

iii. The subsidiary operates under foreign exchange restrictions, controls, or other governmentally imposed uncertainties so severe that they cast significant doubt on the parent's ability to control the subsidiary.

iv. In some instances, the powers of a shareholder with a majority voting interest or limited partner with a majority of kick-out rights through voting interests to control the operations or assets of the investee are restricted in certain respects by approval or veto rights granted to the noncontrolling shareholder or limited partner (hereafter referred to as noncontrolling rights). In paragraphs 810-10-25-2 through 25-14 , the term *noncontrolling shareholder* refers to one or more noncontrolling shareholders and the terms *limited partner* and *general partner* refer to one or more limited or general partners. Those noncontrolling rights may have little or no impact on the ability of a shareholder with a majority voting interest or limited partner with a majority of kick-out rights through voting interests to control the investee's operations or assets, or, alternatively, those rights may be so restrictive as to call into question whether control rests with the majority owner.

v. Control exists through means other than through ownership of a majority voting interest or a majority of kick-out rights through voting interests, for example as described in (c) through (e).

2. A majority-owned subsidiary in which a parent has a controlling financial interest shall not be consolidated if the parent is a broker-dealer within the scope of Topic 940 and control is likely to be temporary.

3. Subparagraph superseded by Accounting Standards Update No. 2013-08 .

b. Subparagraph superseded by Accounting Standards Update No. 2015-02 .

c. Subtopic 810-30 shall be applied to determine the consolidation status of a research and development arrangement.

d. The Consolidation of Entities Controlled by Contract Subsections of this Subtopic shall be applied to determine whether a contractual management relationship represents a controlling financial interest.

e. Paragraph 710-10-45-1 addresses the circumstances in which the accounts of a rabbi trust that is not a VIE (see the Variable Interest Entities Subsections for guidance on VIEs) shall be consolidated with the accounts of the employer in the financial statements of the employer.

**810-10-15-11**    A difference in fiscal periods of a parent and a subsidiary does not justify the exclusion of the subsidiary from consolidation.

**810-10-15-12**    The guidance in this Topic does not apply in any of the following circumstances:

a. An employer shall not consolidate an employee benefit plan subject to the provisions of Topic 712 or 715 .

b. Subparagraph superseded by Accounting Standards Update No. 2009-16 .

c. Subparagraph superseded by Accounting Standards Update No. 2009-16 .

d. Except as discussed in paragraph 946-810-45-3 , an investment company within the scope of Topic 946 shall not consolidate an investee that is not an investment company.

e. A reporting entity shall not consolidate a governmental organization and shall not consolidate a financing entity established by a governmental organization unless the financing entity meets both of the following conditions:

1. Is not a governmental organization

2. Is used by the business entity in a manner similar to a VIE in an effort to circumvent the provisions of the Variable Interest Entities Subsections.

f. A reporting entity shall not consolidate a legal entity that is required to comply with or operate in accordance with requirements that are similar to those included in Rule 2a-7 of the Investment Company Act of 1940 for registered money market funds.

1. A legal entity that is not required to comply with Rule 2a-7 of the Investment Company Act of 1940 qualifies for this exception if it is similar in its purpose and design, including the risks that the legal entity was designed to create and pass through to its investors, as compared with a legal entity required to comply with Rule 2a-7.

2. A reporting entity subject to this scope exception shall disclose any explicit arrangements to provide financial support to legal entities that are required to comply with or operate in accordance with requirements that are similar to those included in Rule 2a-7, as well as any instances of such support provided for the periods presented in the performance statement. For purposes of applying this disclosure requirement, the types of support that should be considered include, but are not limited to, any of the following:

i. Capital contributions (except pari passu investments)

ii. Standby letters of credit

iii. Guarantees of principal and interest on debt investments held by the legal entity

iv. Agreements to purchase financial assets for amounts greater than fair value (for instance, at amortized cost or par value when the financial assets experience significant credit deterioration)

v. Waivers of fees, including management fees.

# Variable Interest Entities

## > Overall Guidance

**810-10-15-13**   The Variable Interest Entities Subsections follow the same Scope and Scope Exceptions as outlined in the General Subsection of this Subtopic (see paragraph 810-10-15-1), with specific transaction qualifications and exceptions noted below.

**810-10-15-13A**   For purposes of applying the Variable Interest Entities Subsections, only substantive terms, transactions, and arrangements, whether contractual or noncontractual, shall be considered. Any term, transaction, or arrangement shall be disregarded when applying the provisions of the Variable Interest Entities Subsections if the term, transaction, or arrangement does not have a substantive effect on any of the following:

   a. A legal entity's status as a variable interest entity (VIE)

   b. A reporting entity's power over a VIE

   c. A reporting entity's obligation to absorb losses or its right to receive benefits of the legal entity.

**810-10-15-13B**   Judgment, based on consideration of all the facts and circumstances, is needed to distinguish substantive terms, transactions, and arrangements from nonsubstantive terms, transactions, and arrangements. The purpose and design of legal entities shall be considered when performing this assessment.

## > Entities

**810-10-15-14**   A legal entity shall be subject to consolidation under the guidance in the Variable Interest Entities Subsections if, by design, any of the following conditions exist. (The phrase *by design* refers to legal entities that meet the conditions in this paragraph because of the way they are structured. For example, a legal entity under the control of its equity investors that originally was not a VIE does not become one because of operating losses. The design of the legal entity is important in the application of these provisions.)

   a. The total equity investment (equity investments in a legal entity are interests that are required to be reported as equity in that entity's financial statements) at risk is not sufficient to permit the legal entity to finance its activities without additional subordinated financial support provided by any parties, including equity holders. For this purpose, the total equity investment at risk has all of the following characteristics:

      1. Includes only equity investments in the legal entity that participate significantly in profits and losses even if those investments do not carry voting rights

      2. Does not include equity interests that the legal entity issued in exchange for subordinated interests in other VIEs

      3. Does not include amounts provided to the equity investor directly or indirectly by the legal entity or by other parties involved with the legal entity (for example, by fees, charitable contributions, or other payments), unless the provider is a parent, subsidiary, or affiliate of the investor that is required to be included in the same set of consolidated financial statements as the investor

      4. Does not include amounts financed for the equity investor (for example, by loans or guarantees of loans) directly by the legal entity or by other parties involved with the legal entity, unless that party is a parent, subsidiary, or affiliate of the investor that is required to be included in the same set of consolidated financial statements as the investor.

   Paragraphs 810-10-25-45 through 25-47 discuss the amount of the total equity investment at risk that is necessary to permit a legal entity to finance its activities without additional subordinated financial support.

   b. As a group the holders of the equity investment at risk lack any one of the following three characteristics:

      1. The power, through voting rights or similar rights, to direct the activities of a legal entity that most significantly impact the entity's economic performance.

         i. For legal entities other than limited partnerships, investors lack that power through voting rights or similar rights if no owners hold voting rights or similar rights (such as those of a common shareholder in a corporation). Legal entities that are not controlled by the holder of a majority voting interest because of noncontrolling shareholder veto rights (participating rights) as discussed in paragraphs 810-10-25-2 through 25-14 are not VIEs if the holders of the equity investment at risk as a group have the power to control the entity and the equity investment meets the other requirements of the Variable Interest Entities Subsections.

            01. If no owners hold voting rights or similar rights (such as those of a common shareholder in a corporation) over the activities of a legal entity that most significantly impact the entity's economic performance, kick-out rights or participating rights (according to their VIE definitions) held by the holders of the equity investment at risk shall not prevent interests other than the equity investment from having this characteristic unless a single equity holder (including its related parties and de facto agents) has the unilateral ability to exercise such rights. Alternatively, interests other than equity investment at risk that provide the holders of those interests with kick-out rights or participating rights shall not prevent the equity holders from having this characteristic unless a single reporting entity (including its related parties and de facto agents) has the unilateral ability to exercise those rights. A decision maker also shall not prevent the equity holders from having this characteristic unless the fees paid to the decision maker represent a variable interest based on paragraphs 810-10-55-37 through 55-38.

         ii. For limited partnerships, partners lack that power if neither (01) nor (02) below exists. The guidance in this subparagraph does not apply to entities in industries (see paragraphs 910-810-45-1 and 932-810-45-1) in which it is appropriate for a general partner to use the pro rata method of consolidation for its investment in a limited partnership (see paragraph 810-10-45-14).

            01. A simple majority or lower threshold of limited partners (including a single limited partner) with equity at risk is able to exercise substantive kick-out rights (according to their voting interest entity definition) through voting interests over the general partner(s).

               A. For purposes of evaluating the threshold in (01) above, a general partner's kick-out rights held through voting interests shall not be included. Kick-out rights through voting interests held by entities under common control with the general partner or other parties acting on behalf of the general partner also shall not be included.

02. Limited partners with equity at risk are able to exercise substantive participating rights (according to their voting interest entity definition) over the general partner(s).

03. For purposes of (01) and (02) above, evaluation of the substantiveness of participating rights and kick-out rights shall be based on the guidance included in paragraphs 810-10-25-2 through 25-14C .

2. The obligation to absorb the expected losses of the legal entity. The investor or investors do not have that obligation if they are directly or indirectly protected from the expected losses or are guaranteed a return by the legal entity itself or by other parties involved with the legal entity. See paragraphs 810-10-25-55 through 25-56 and Example 1 (see paragraph 810-10-55-42 ) for a discussion of expected losses.

3. The right to receive the expected residual returns of the legal entity. The investors do not have that right if their return is capped by the legal entity's governing documents or arrangements with other variable interest holders or the legal entity. For this purpose, the return to equity investors is not considered to be capped by the existence of outstanding stock options, convertible debt, or similar interests because if the options in those instruments are exercised, the holders will become additional equity investors.

If interests other than the equity investment at risk provide the holders of that investment with these characteristics or if interests other than the equity investment at risk prevent the equity holders from having these characteristics, the entity is a VIE.

c. The equity investors as a group also are considered to lack the characteristic in (b)(1) if both of the following conditions are present:

1. The voting rights of some investors are not proportional to their obligations to absorb the expected losses of the legal entity, their rights to receive the expected residual returns of the legal entity, or both.

2. Substantially all of the legal entity's activities (for example, providing financing or buying assets) either involve or are conducted on behalf of an investor that has disproportionately few voting rights. This provision is necessary to prevent a primary beneficiary from avoiding consolidation of a VIE by organizing the legal entity with nonsubstantive voting interests. Activities that involve or are conducted on behalf of the related parties of an investor with disproportionately few voting rights shall be treated as if they involve or are conducted on behalf of that investor. The term *related parties* in this paragraph refers to all parties identified in paragraph 810-10-25-43 , except for de facto agents under paragraph 810-10-25-43(d) .

For purposes of applying this requirement, reporting entities shall consider each party's obligations to absorb expected losses and rights to

**810-10-15-15** Portions of legal entities or aggregations of assets within a legal entity shall not be treated as separate entities for purposes of applying the Variable Interest Entities Subsections unless the entire entity is a VIE. Some examples are divisions, departments, branches, and pools of assets subject to liabilities that give the creditor no recourse to other assets of the entity. Majority-owned subsidiaries are legal entities separate from their parents that are subject to the Variable Interest Entities Subsections and may be VIEs.

**810-10-15-16** Paragraph superseded by Accounting Standards Update No. 2014-10.

**810-10-15-17** The following exceptions to the Variable Interest Entities Subsections apply to all legal entities in addition to the exceptions listed in paragraph 810-10-15-12 :

a. Not-for-profit entities (NFPs) are not subject to the Variable Interest Entities Subsections, except that they may be related parties for purposes of applying paragraphs 810-10-25-42 through 25-44 . In addition, if an NFP is used by business reporting entities in a manner similar to a VIE in an effort to circumvent the provisions of the Variable Interest Entities Subsections, that NFP shall be subject to the guidance in the Variable Interest Entities Subsections.

b. Separate accounts of life insurance entities as described in Topic 944 are not subject to consolidation according to the requirements of the Variable Interest Entities Subsections.

c. A reporting entity with an interest in a VIE or potential VIE created before December 31, 2003, is not required to apply the guidance in the Variable Interest Entities Subsections to that VIE or legal entity if the reporting entity, after making an exhaustive effort, is unable to obtain the information necessary to do any one of the following:

1. Determine whether the legal entity is a VIE

2. Determine whether the reporting entity is the VIE's primary beneficiary

3. Perform the accounting required to consolidate the VIE for which it is determined to be the primary beneficiary.

This inability to obtain the necessary information is expected to be infrequent, especially if the reporting entity participated significantly in the design or redesign of the legal entity. The scope exception in this provision applies only as long as the reporting entity continues to be unable to obtain the necessary information. Paragraph 810-10-50-6 requires certain disclosures to be made about interests in VIEs subject to this provision. Paragraphs 810-10-30-7 through 30-9 provide transition guidance for a reporting entity that subsequently obtains the information necessary to apply the Variable Interest Entities Subsections to a VIE subject to this exception.

d. A legal entity that is deemed to be a business need not be evaluated by a reporting entity to determine if the legal entity is a VIE under the requirements of the Variable Interest Entities Subsections unless any of the following conditions exist (however, for legal entities that are excluded by this provision, other generally accepted accounting principles [GAAP] should be applied):

1. The reporting entity, its related parties (all parties identified in paragraph 810-10-25-43 , except for de facto agents under paragraph 810-10-25-43(d) ), or both participated significantly in the design or redesign of the legal entity. However, this condition does not apply if the legal entity is an operating joint venture under joint control of the reporting entity and one or more independent parties or a franchisee.

2. The legal entity is designed so that substantially all of its activities either involve or are conducted on behalf of the reporting entity and its related parties.

3. The reporting entity and its related parties provide more than half of the total of the equity, subordinated debt, and other forms of subordinated financial support to the legal entity based on an analysis of the fair values of the interests in the legal entity.

4. The activities of the legal entity are primarily related to securitizations or other forms of asset-backed financings or single-lessee leasing arrangements.

A legal entity that previously was not evaluated to determine if it was a VIE because of this provision need not be evaluated in future periods as long as the legal entity continues to meet the conditions in (d).

**810-10-15-17A** Paragraph superseded by Accounting Standards Update No. 2016-03.

**810-10-15-17AA** Paragraph superseded by Accounting Standards Update No. 2018-17.

**810-10-15-17AB** Paragraph superseded by Accounting Standards Update No. 2018-17.

> ## Accounting Alternative for Entities under Common Control

**810-10-15-17AC** Paragraphs 810-10-15-17AD through 15-17AF, 810-10-50-2AG through 50-2AI, and 810-10-55-205AU through 55-205BF provide guidance for a private company electing the accounting alternative for entities under common control in this Subtopic.

**810-10-15-17AD** A legal entity need not be evaluated by a private company (reporting entity) under the guidance in the Variable Interest Entities Subsections if all of the following criteria are met:

    a. The reporting entity and the legal entity are under common control.

    b. The reporting entity and the legal entity are not under common control of a public business entity.

    c. The legal entity under common control is not a public business entity.

    d. The reporting entity does not directly or indirectly have a controlling financial interest in the legal entity when considering the General Subsections of this Topic. The Variable Interest Entities Subsections shall not be applied when making this determination.

Applying this accounting alternative is an accounting policy election. If a private company elects to apply this accounting alternative, it shall apply this alternative to all legal entities if criteria (a) through (d) are met. A reporting entity that elects the accounting alternative and, thus, does not apply the guidance in the Variable Interest Entities Subsections shall continue to apply other accounting guidance (including guidance in the General Subsections of this Subtopic) unless another scope exception from this Topic applies. A reporting entity applying this alternative shall disclose the required information specified in paragraphs 810-10-50-2AG through 50-2AI unless the legal entity is consolidated by the reporting entity through accounting guidance other than VIE guidance.

**810-10-15-17AE** To determine whether the private company (reporting entity) and the legal entity are under common control of a parent solely for the purpose of applying paragraph 810-10-15-17AD(a), the private company shall consider only the parent's direct and indirect voting interest in the private company and the legal entity. In other words, only the guidance in the General Subsections of this Topic shall be considered for determining whether a parent has a direct or indirect controlling financial interest in the private company and the legal entity as required in paragraph 810-10-15-17AD(a). The guidance in the Variable Interest Entities Subsections of this Topic shall not be applied for making this determination. See paragraphs 810-10-55-205AU through 55-205AZ for illustrative guidance.

**810-10-15-17AF** If any of the criteria in paragraph 810-10-15-17AD for applying the accounting alternative cease to be met, a private company shall apply the guidance in the Variable Interest Entities Subsections at the date of change on a prospective basis, except for situations in which a reporting entity becomes a public business entity. When a reporting entity becomes a public business entity, it shall apply the guidance in the Variable Interest Entities Subsections in accordance with Topic 250 on accounting changes and error corrections.

**810-10-15-17B** Paragraph superseded by Accounting Standards Update No. 2018-17.

**810-10-15-17C** Paragraph superseded by Accounting Standards Update No. 2018-17.

> ## Collateralized Financing Entities

**810-10-15-17D** The guidance on collateralized financing entities in this Topic provides a measurement alternative to Topic 820 on fair value measurement and applies to a reporting entity that consolidates a collateralized financing entity when both of the following conditions exist:

    a. All of the financial assets and the financial liabilities of the collateralized financing entity are measured at fair value in the consolidated financial statements under other applicable Topics, other than financial assets and financial liabilities that are incidental to the operations of the collateralized financing entity and have carrying values that approximate fair value (for example, cash, broker receivables, or broker payables).

    b. The changes in the fair values of those financial assets and financial liabilities are reflected in earnings.

# Consolidation of Entities Controlled by Contract

> ## Overall Guidance

**810-10-15-18** The Consolidation of Entities Controlled by Contract Subsections follow the same Scope and Scope Exceptions as outlined in the General Subsection of this Subtopic, see paragraph 810-10-15-1, with specific qualifications and exceptions noted below.

> Entities

**810-10-15-19**   The guidance in the Consolidation of Entities Controlled by Contract Subsections applies to all entities that are not determined to be variable interest entities (VIEs) (see the Variable Interest Entities Subsection of this Section) if the circumstances are similar to those described in the Consolidation of Entities Controlled by Contract Subsections. For example, there may be industries other than the health care industry in which a contractual management arrangement is established under circumstances similar to those addressed in the Consolidation of Entities Controlled by Contract Subsections.

> Transactions

**810-10-15-20**   The guidance in the Consolidation of Entities Controlled by Contract Subsections applies, in part, to contractual management arrangements with both of the following characteristics:

a. Relationships between entities that operate in the health care industry including the practices of medicine, dentistry, veterinary science, and chiropractic medicine (for convenience, entities engaging in these practices are collectively referred to as physician practices)

b. Relationships in which the physician practice management entity does not own the majority of the outstanding voting equity instruments of the physician practice, whether because the physician practice management entity is precluded by law from owning those equity instruments or because the physician practice management entity has elected not to own those equity instruments.

As stated in the preceding paragraph, there may be industries other than the health care industry in which a contractual management arrangement is established under circumstances similar to those addressed in the Consolidation of Entities Controlled by Contract Subsections.

**810-10-15-21**   A physician practice management entity can establish a controlling financial interest in a physician practice through contractual management arrangements. Specifically, a controlling financial interest exists if, for a requisite period of time, the physician practice management entity has control over the physician practice and has a financial interest in the physician practice that meets all six of the requirements listed in the following paragraph. That paragraph contains guidance that describes how those six requirements are to be applied. Paragraph 810-10-55-206 contains a decision tree illustrating the basic analysis called for by both the six requirements and the presumptive, but not the other, interpretive guidance.

**810-10-15-22**   If all of the following requirements are met, then the physician practice management entity has a controlling financial interest in the physician practice:

a. Term. The contractual arrangement between the physician practice management entity and the physician practice has both of the following characteristics:

1. Has a term that is either the entire remaining legal life of the physician practice entity or a period of 10 years or more

2. Is not terminable by the physician practice except in the case of gross negligence, fraud, or other illegal acts by the physician practice management entity, or bankruptcy of the physician practice management entity.

b. Control. The physician practice management entity has exclusive authority over all decision making related to both of the following:

1. Ongoing, major, or central operations of the physician practice, except for the dispensing of medical services. This must include exclusive decision-making authority over scope of services, patient acceptance policies and procedures, pricing of services, negotiation and execution of contracts, and establishment and approval of operating and capital budgets. This authority also must include exclusive decision-making authority over issuance of debt if debt financing is an ongoing, major, or central source of financing for the physician practice.

2. Total practice compensation of the licensed medical professionals as well as the ability to establish and implement guidelines for the selection, hiring, and firing of them.

c. Financial interest. The physician practice management entity must have a significant financial interest in the physician practice that meets both of the following criteria:

1. Is unilaterally saleable or transferable by the physician practice management entity

2. Provides the physician practice management entity with the right to receive income, both as ongoing fees and as proceeds from the sale of its interest in the physician practice, in an amount that fluctuates based on the performance of the operations of the physician practice and the change in the fair value thereof.

Term, control, financial interest, and so forth are further described in paragraphs 810-10-25-63 through 25-79.

Case 1:22-cv-07252-SBD   Document 51-3   Filed 05/28/23   Page 117 of 196

Broad Transactions ◼ 810 Consolidation ◼ 10 Overall ◼

# 25 Recognition

◼ **General Note:**The Recognition Section provides guidance on the required criteria, timing, and location (within the financial statements) for recording a particular item in the financial statements. Disclosure is not recognition.

## General

⚙ Related Proposed ASUs

**810-10-25-1**   For legal entities other than limited partnerships, consolidation is appropriate if a reporting entity has a controlling financial interest in another entity and a specific scope exception does not apply (see Section 810-10-15). The usual condition for a controlling financial interest is ownership of a majority voting interest, but in some circumstances control does not rest with the majority owner.

**810-10-25-1A**   Given the purpose and design of limited partnerships, kick-out rights through voting interests are analogous to voting rights held by shareholders of a corporation. Consolidation is appropriate if a reporting entity has a controlling financial interest in a limited partnership and a specific scope exception does not apply (see Section 810-10-15). The usual condition for a controlling financial interest in a limited partnership is ownership of a majority of the limited partnership's kick-out rights through voting interests, but, in some circumstances, control does not rest with the majority owner.

### > The Effect of Noncontrolling Rights on Consolidation

**810-10-25-2**   Paragraph 810-10-15-10(a)(1)(iv) explains that, in some instances, the powers of a shareholder with a majority voting interest or limited partner with a majority of kick-out rights through voting interests to control the operations or assets of the investee are restricted in certain respects by approval or veto rights granted to the noncontrolling shareholder or limited partner (referred to as noncontrolling rights). That paragraph also explains that, in paragraphs 810-10-25-2 through 25-14, the term *noncontrolling shareholder* refers to one or more noncontrolling shareholders and the terms *limited partner* and *general partner* refer to one or more limited or general partners. Paragraph 810-10-15-10(a)(1)(iv) explains that those noncontrolling rights may have little or no impact on the ability of a shareholder with a majority voting interest or limited partner with a majority of kick-out rights through voting interests to control the investee's operations or assets, or, alternatively, those rights may be so restrictive as to call into question whether control rests with the majority owner.

**810-10-25-3**   The guidance in paragraphs 810-10-25-1 through 25-14 shall be applied in assessing the impact on consolidation of noncontrolling shareholder or limited partner approval or veto rights in both of the following circumstances:

a. Investments in which the investor has a majority voting interest in investees that are corporations or analogous entities (such as limited liability companies that have governing provisions that are the functional equivalent of regular corporations), or investments in which a limited partner has a majority of kick-out rights through voting interests in a limited partnership

b. Other circumstances in which legal entities would be consolidated in accordance with generally accepted accounting principles (GAAP), absent the existence of certain approval or veto rights held by noncontrolling shareholders or limited partners.

**810-10-25-4**   The guidance in paragraphs 810-10-25-2 through 25-14 on noncontrolling rights does not apply in either of the following situations:

a. Entities that, in accordance with GAAP, carry substantially all of their assets, including investments in controlled entities, at fair value with changes in value reported in a statement of net income or financial performance

b. Investments in variable interest entities (VIEs) (see the Variable Interest Entities Subsection of Section 810-10-15).

**810-10-25-5**   The assessment of whether the rights of a noncontrolling shareholder or limited partner should overcome the presumption of consolidation by the investor with a majority voting interest or limited partner with a majority of kick-out rights through voting interests in its investee is a matter of judgment that depends on facts and circumstances. The framework in which such facts and circumstances are judged shall be based on whether the noncontrolling rights, individually or in the aggregate, allow the noncontrolling shareholder or limited partner to effectively participate in certain significant financial and operating decisions of the investee that are made in the ordinary course of business. Effective participation means the ability to block significant decisions proposed by the investor who has a majority voting interest or the general partner. That is, control does not rest with the majority owner because the investor with the majority voting interest cannot cause the investee to take an action that is significant in the ordinary course of business if it has been vetoed by the noncontrolling shareholder. Similarly, for limited partnerships, control does not rest with the limited partner with the majority of kick-out rights through voting interests if the limited partner cannot cause the general partner to take an action that is significant in the ordinary course of business if it has been vetoed by other limited partners. This assessment of noncontrolling rights shall be made at the time a majority voting interest or a majority of kick-out rights through voting interests is obtained and shall be reassessed if there is a significant change to the terms or in the exercisability of the rights of the noncontrolling shareholder or limited partner.

**810-10-25-6**   All noncontrolling rights could be described as protective of the noncontrolling shareholder's or limited partner's investment in the investee, but some noncontrolling rights also allow the noncontrolling shareholder or limited partner to participate in determining certain significant financial

and operating decisions of the investee that are made in the ordinary course of business (referred to as participating rights). Participation means the ability to block actions proposed by the investor that has a majority voting interest or the general partner. Thus, the investor with the majority voting interest or the general partner must have the agreement of the noncontrolling shareholder or limited partner to take certain actions. Participation does not mean the ability of the noncontrolling shareholder or limited partner to initiate actions.

**810-10-25-7**  Noncontrolling rights that are only protective in nature (referred to as protective rights) would not overcome the presumption that the owner of a majority voting interest or the limited partner with a majority of kick-out rights through voting interestsshall consolidate its investee. Substantive noncontrolling rights that allow the noncontrolling shareholder or limited partner to effectively participate in certain significant financial and operating decisions of the investee that are made in the investee's ordinary course of business, although also protective of the noncontrolling shareholder's or limited partner's investment, shall overcome the presumption that the investor with a majority voting interest or limited partner with a majority of kick-out rights through voting interests shall consolidate its investee.

**810-10-25-8**  For purposes of this Subsection, decisions made in the ordinary course of business are defined as decisions about matters of a type consistent with those normally expected to be addressed in directing and carrying out the entity's current business activities, regardless of whether the events or transactions that would necessitate such decisions are expected to occur in the near term. However, it must be at least reasonably possible that those events or transactions that would necessitate such decisions will occur. The ordinary course of business definition would not include self-dealing transactions with controlling shareholders or limited partners.

**810-10-25-9**  The following guidance addresses considerations of noncontrolling shareholder or limited partner rights, specifically:

  a. Protective rights

  b. Participating rights

  c. Factors to consider in evaluating whether noncontrolling rights are substantive participating rights.

#### · > Protective Rights

**810-10-25-10**  Noncontrolling rights (whether granted by contract or by law) that would allow the noncontrolling shareholder or limited partner to block corporate or partnership actions would be considered protective rights and would not overcome the presumption of consolidation by the investor with a majority voting interest or limited partner with a majority of kick-out rights through voting interests in its investee. The following list is illustrative of the protective rights that often are provided to the noncontrolling shareholder or limited partner but is not all-inclusive:

  a. Amendments to articles of incorporation or partnership agreements of the investee

  b. Pricing on transactions between the owner of a majority voting interest or limited partner with a majority of kick-out rights through voting interests and the investee and related self-dealing transactions

  c. Liquidation of the investee in the context of Topic 852 on reorganizations or a decision to cause the investee to enter bankruptcy or other receivership

  d. Acquisitions and dispositions of assets that are not expected to be undertaken in the ordinary course of business (noncontrolling rights relating to acquisitions and dispositions of assets that are expected to be made in the ordinary course of business are participating rights; determining whether such rights are substantive requires judgment in light of the relevant facts and circumstances [see paragraphs 810-10-25-13 and 810-10-55-1])

  e. Issuance or repurchase of equity interests.

#### · > Participating Rights

**810-10-25-11**  Noncontrolling rights (whether granted by contract or by law) that would allow the noncontrolling shareholder or limited partner to effectively participate in either of the following corporate or partnership actions shall be considered substantive participating rights and would overcome the presumption that the investor with a majority voting interest or limited partner with a majority of kick-out rights through voting interests shall consolidate its investee. The following list is illustrative of substantive participating rights, but is not necessarily all-inclusive:

  a. Selecting, terminating, and setting the compensation of management responsible for implementing the investee's policies and procedures

  b. Establishing operating and capital decisions of the investee, including budgets, in the ordinary course of business.

**810-10-25-12**  The rights noted in paragraph 810-10-25-11 are participating rights because, in the aggregate, the rights allow the noncontrolling shareholder or limited partner to effectively participate in certain significant financial and operating decisions that occur as part of the ordinary course of the investee's business and are significant factors in directing and carrying out the activities of the business. Individual rights, such as the right to veto the termination of management responsible for implementing the investee's policies and procedures, should be assessed based on the facts and circumstances to determine if they are substantive participating rights in and of themselves. However, noncontrolling rights that appear to be participating rights but that by themselves are not substantive (see paragraphs 810-10-25-13 and 810-10-55-1) would not overcome the presumption of consolidation by the investor with a majority voting interest or limited partner with a majority of kick-out rights through voting interests in its investee. The likelihood that the veto right will be exercised by the noncontrolling shareholder or limited partner should not be considered when assessing whether a noncontrolling right is a substantive participating right.

#### · > Factors to Consider in Evaluating Whether Noncontrolling Rights Are Substantive Participating Rights

**810-10-25-13**  The following factors shall be considered in evaluating whether noncontrolling rights that appear to be participating are substantive rights, that is, whether these factors provide for effective participation in certain significant financial and operating decisions that are made in the investee's ordinary course of business:

a. Consideration shall be given to situations in which a majority shareholder or limited partner with a majority of kick-out rights through voting interests owns such a significant portion of the investee that the noncontrolling shareholder or limited partner has a small economic interest. As the disparity between the ownership interest of majority and noncontrolling shareholders or between the limited partner with a majority of kick-out rights through voting interests and noncontrolling limited partners increases, the rights of the noncontrolling shareholder or limited partner are presumptively more likely to be protective rights and shall raise the level of skepticism about the substance of the right. Similarly, although a majority owner is presumed to control an investee, the level of skepticism about such ability shall increase as the investor's or limited partner's economic interest in the investee decreases.

b. The governing documents shall be considered to determine at what level decisions are made—at the shareholder or limited partner level or at the board level—and the rights at each level also shall be considered. In all situations, any matters that can be put to a vote of the shareholders or limited partners shall be considered to determine if other investors, individually or in the aggregate, have substantive participating rights by virtue of their ability to vote on matters submitted to a shareholder or limited partner vote.

c. Relationships between the majority and noncontrolling shareholders or partners (other than an investment in the common investee) that are of a related-party nature, as defined in Topic 850, shall be considered in determining whether the participating rights of the noncontrolling shareholder or limited partner are substantive. For example, if the noncontrolling shareholder or limited partner in an investee is a member of the immediate family of the majority shareholder, general partner, or limited partner with a majority of kick-out rights through voting interests of the investee, then the rights of the noncontrolling shareholder or limited partner likely would not overcome the presumption of consolidation by the investor with a majority voting interest or limited partner with a majority of kick-out rights through voting interests in its investee.

d. Certain noncontrolling rights may deal with operating or capital decisions that are not significant to the ordinary course of business of the investee. Noncontrolling rights related to decisions that are not considered significant for directing and carrying out the activities of the investee's business are not substantive participating rights and would not overcome the presumption of consolidation by the investor with a majority voting interest or limited partner with a majority of kick-out rights through voting interests in its investee. Examples of such noncontrolling rights include all of the following:

    1. Location of the investee's headquarters

    2. Name of the investee

    3. Selection of auditors

    4. Selection of accounting principles for purposes of separate reporting of the investee's operations.

e. Certain noncontrolling rights may provide for the noncontrolling shareholder or limited partner to participate in certain significant financial and operating decisions that are made in the investee's ordinary course of business; however, the existence of such noncontrolling rights shall not overcome the presumption that the majority owner shall consolidate, if it is remote that the event or transaction that requires noncontrolling shareholder or limited partner approval will occur. Remote is defined in Topic 450 as the chance of the future event or events occurring being slight.

f. An owner of a majority voting interest or limited partner with a majority of kick-out rights through voting interests who has a contractual right to buy out the interest of the noncontrolling shareholder or limited partner in the investee for fair value or less shall consider the feasibility of exercising that contractual right when determining if the participating rights of the noncontrolling shareholder or limited partner are substantive. If such a buyout is prudent, feasible, and substantially within the control of the majority owner, the contractual right to buy out the noncontrolling owner or limited partner demonstrates that the participating right of the noncontrolling shareholder or limited partner is not a substantive right. The existence of such call options, for purposes of the General Subsections, negates the participating rights of the noncontrolling shareholder or limited partner to veto an action of the majority shareholder or general partner, rather than create an additional ownership interest for that majority shareholder. It would not be prudent, feasible, and substantially within the control of the majority owner to buy out the noncontrolling shareholder or limited partner if, for example, either of the following conditions exists:

    1. The noncontrolling shareholder or limited partner controls technology that is critical to the investee.

**810-10-25-14** An entity that is not controlled by the holder of a majority voting interest or holder of a majority of kick-out rights through voting interests because of noncontrolling shareholder or limited partner veto rights described in paragraphs 810-10-25-2 through 25-13 and 810-10-55-1 is not a VIE if the shareholders or partners as a group (the holders of the equity investment at risk) have the power to control the entity and the equity investment meets the other requirements of paragraphs 810-10-15-14 and 810-10-25-45 through 25-47, as applicable.

## > Kick-Out Rights

**810-10-25-14A** For limited partnerships, the determination of whether kick-out rights are substantive shall be based on a consideration of all relevant facts and circumstances. For kick-out rights to be considered substantive, the limited partners holding the kick-out rights must have the ability to exercise those rights if they choose to do so; that is, there are no significant barriers to the exercise of the rights. Barriers include, but are not limited to, the following:

a. Kick-out rights subject to conditions that make it unlikely they will be exercisable, for example, conditions that narrowly limit the timing of the exercise

b. Financial penalties or operational barriers associated with dissolving (liquidating) the limited partnership or replacing the general partners that would act as a significant disincentive for dissolution (liquidation) or removal

c. The absence of an adequate number of qualified replacement general partners or the lack of adequate compensation to attract a qualified replacement

d. The absence of an explicit, reasonable mechanism in the limited partnership's governing documents or in the applicable laws or regulations, by which the limited partners holding the rights can call for and conduct a vote to exercise those rights

e. The inability of the limited partners holding the rights to obtain the information necessary to exercise them.

**810-10-25-14B** The limited partners' unilateral right to withdraw from the partnership in whole or in part (withdrawal right) that does not require dissolution or liquidation of the entire limited partnership would not be deemed a kick-out right. The requirement to dissolve or liquidate the entire limited partnership upon the withdrawal of a limited partner or partners shall not be required to be contractual for a withdrawal right to be considered as a potential kick-out right.

**810-10-25-14C** Rights held by the limited partners to remove the general partners from the partnership shall be evaluated as kick-out rights pursuant to paragraph 810-10-25-14A. Rights of the limited partners to participate in the termination of management (for example, management is outsourced to a party other than the general partner) or the individual members of management of the limited partnership may be substantive participating rights. Paragraphs 810-10-55-4N through 55-4W provide additional guidance on assessing kick-out rights.

## > Retention of Specialized Accounting for Investments in Consolidation

**810-10-25-15** For the purposes of consolidating a subsidiary subject to guidance in an industry-specific Topic, an entity shall retain the industry-specific guidance applied by that subsidiary.

## > Profits Resulting from Intercompany Transfers of LIFO Inventories

**810-10-25-16** See paragraphs 810-10-55-2 through 55-4 for guidance on accounting for profits resulting from intercompany transfers of last-in, first-out (LIFO) inventories.

**810-10-25-17** Paragraph not used.

**810-10-25-18** Paragraph not used.

**810-10-25-19** Paragraph not used.

# Variable Interest Entities

**810-10-25-20** This Subsection addresses various transactional considerations in determining whether a legal entity is a variable interest entity (VIE) and would need to be consolidated by the reporting entity, specifically:

    a. Determining the variability to be considered

        1. Terms of interests issued

        2. Subordination

        3. Certain interest rate risk

        4. Certain derivative instruments

    b. Initial involvement with a legal entity

    c. Consolidation based on variable interests

        1. The effect of related parties

        2. Sufficiency of equity at risk

        3. Implicit variable interests

        4. Variable interest and interests in specific assets of a VIE.

## > Determining the Variability to Be Considered

**810-10-25-21** The variability that is considered in applying the Variable Interest Entities Subsections affects the determination of all of the following:

    a. Whether the legal entity is a VIE

    b. Which interests are variable interests in the legal entity

    c. Which party, if any, is the primary beneficiary of the VIE.

That variability will affect any calculation of expected losses and expected residual returns, if such a calculation is necessary. Paragraph 810-10-25-38A provides guidance on the use of a quantitative approach associated with expected losses and expected residual returns in connection with determining which party is the primary beneficiary.

**810-10-25-22** The variability to be considered in applying the Variable Interest Entities Subsections shall be based on an analysis of the design of the legal entity as outlined in the following steps:

    a. Step 1: Analyze the nature of the risks in the legal entity (see paragraphs 810-10-25-24 through 25-25).

    b. Step 2: Determine the purpose(s) for which the legal entity was created and determine the variability (created by the risks identified in Step 1) the legal entity is designed to create and pass along to its interest holders (see paragraphs 810-10-25-26 through 25-36).

**810-10-25-23** For purposes of paragraphs 810-10-25-21 through 25-36, interest holders include all potential variable interest holders (including contractual, ownership, or other pecuniary interests in the legal entity). After determining the variability to consider, the reporting entity can determine which interests are designed to absorb that variability. The cash flow and fair value are methods that can be used to measure the amount of variability (that is, expected losses and expected residual returns) of a legal entity. However, a method that is used to measure the amount of variability

does not provide an appropriate basis for determining which variability should be considered in applying the Variable Interest Entities Subsections.

**810-10-25-24**   The risks to be considered in Step 1 that cause variability include, but are not limited to, the following:

a. Credit risk

b. Interest rate risk (including prepayment risk)

c. Foreign currency exchange risk

d. Commodity price risk

e. Equity price risk

f. Operations risk.

**810-10-25-25**   In determining the purpose for which the legal entity was created and the variability the legal entity was designed to create and pass along to its interest holders in Step 2, all relevant facts and circumstances shall be considered, including, but not limited to, the following factors:

a. The activities of the legal entity

b. The terms of the contracts the legal entity has entered into

c. The nature of the legal entity's interests issued

d. How the legal entity's interests were negotiated with or marketed to potential investors

e. Which parties participated significantly in the design or redesign of the legal entity.

**810-10-25-26**   Typically, assets and operations of the legal entity create the legal entity's variability (and thus, are not variable interests), and liabilities and equity interests absorb that variability (and thus, are variable interests). Other contracts or arrangements may appear to both create and absorb variability because at times they may represent assets of the legal entity and at other times liabilities (either recorded or unrecorded). The role of a contract or arrangement in the design of the legal entity, regardless of its legal form or accounting classification, shall dictate whether that interest should be treated as creating variability for the entity or absorbing variability.

**810-10-25-27**   A review of the terms of the contracts that the legal entity has entered into shall include an analysis of the original formation documents, governing documents, marketing materials, and other contractual arrangements entered into by the legal entity and provided to potential investors or other parties associated with the legal entity.

**810-10-25-28**   Example 3 (see paragraph 810-10-55-55) is intended to demonstrate how to apply the provisions of this guidance on determining the variability to be considered, including whether arrangements (such as derivative instruments or guarantees of value) create variability (and are therefore not variable interests) or absorb variability (and are therefore variable interests).

**810-10-25-29**   A qualitative analysis of the design of the legal entity, as performed in accordance with the guidance in the Variable Interest Entities Subsections, will often be conclusive in determining the variability to consider in applying the guidance in the Variable Interest Entities Subsections, determining which interests are variable interests, and ultimately determining which variable interest holder, if any, is the primary beneficiary.

**810-10-25-30**   The following addresses various considerations related to determination of variability, specifically:

a. Terms of interests issued

b. Subordination

c. Certain interest rate risk

d. Certain derivative instruments.

**· > Terms of Interests Issued**

**810-10-25-31**   An analysis of the nature of the legal entity's interests issued shall include consideration as to whether the terms of those interests, regardless of their legal form or accounting designation, transfer all or a portion of the risk or return (or both) of certain assets or operations of the legal entity to holders of those interests. The variability that is transferred to those interest holders strongly indicates a variability that the legal entity is designed to create and pass along to its interest holders.

**· > Subordination**

**810-10-25-32**   For legal entities that issue both senior interests and subordinated interests, the determination of which variability shall be considered often will be affected by whether the subordination (that is, the priority on claims to the legal entity's cash flows) is substantive. The subordinated interest(s) (as discussed in paragraph 810-10-55-23) generally will absorb expected losses prior to the senior interest(s). As a consequence, the senior interest generally has a higher credit rating and lower interest rate compared with the subordinated interest. The amount of a subordinated interest in relation to the overall expected losses and residual returns of the legal entity often is the primary factor in determining whether such subordination is substantive. The variability that is absorbed by an interest that is substantively subordinated strongly indicates a particular variability that the legal entity was designed to create and pass along to its interest holders. If the subordinated interest is considered equity-at-risk, as that term is used in paragraph 810-10-15-14, that equity can be considered substantive for the purpose of determining the variability to be considered, even if it is not deemed sufficient under paragraphs 810-10-15-14(a) and 810-10-25-45.

· > Certain Interest Rate Risk

**810-10-25-33**   Periodic interest receipts or payments shall be excluded from the variability to consider if the legal entity was not designed to create and pass along the interest rate risk associated with such interest receipts or payments to its interest holders. However, interest rate fluctuations also can result in variations in cash proceeds received upon anticipated sales of fixed-rate investments in an actively managed portfolio or those held in a static pool that, by design, will be required to be sold prior to maturity to satisfy obligations of the legal entity. That variability is strongly indicated as a variability that the legal entity was designed to create and pass along to its interest holders.

· > Certain Derivative Instruments

**810-10-25-34**   A legal entity may enter into an arrangement, such as a derivative instrument, to either reduce or eliminate the variability created by certain assets or operations of the legal entity or mismatches between the overall asset and liability profiles of the legal entity, thereby protecting certain liability and equity holders from exposure to such variability. During the life of the legal entity those arrangements can be in either an asset position or a liability position (recorded or unrecorded) from the perspective of the legal entity.

**810-10-25-35**   The following characteristics, if both are present, are strong indications that a derivative instrument is a creator of variability:

> a. Its underlying  is an observable market rate, price, index of prices or rates, or other market observable variable (including the occurrence or nonoccurrence of a specified market observable event).
>
> b. The derivative counterparty is senior in priority relative to other interest holders in the legal entity.

**810-10-25-36**   If the changes in the fair value or cash flows of the derivative instrument are expected to offset all, or essentially all, of the risk or return (or both) related to a majority of the assets (excluding the derivative instrument) or operations of the legal entity, the design of the legal entity will need to be analyzed further to determine whether that instrument should be considered a creator of variability or a variable interest. For example, if a written call or put option or a total return swap that has the characteristics in (a) and (b) in the preceding paragraph relates to the majority of the assets owned by a legal entity, the design of the legal entity will need to be analyzed further (see paragraphs 810-10-25-21 through 25-29) to determine whether that instrument should be considered a creator of variability or a variable interest.

## > Initial Involvement with a Legal Entity

**810-10-25-37**   The initial determination of whether a legal entity is a VIE shall be made on the date at which a reporting entity becomes involved with the legal entity. For purposes of the Variable Interest Entities Subsections, involvement with a legal entity refers to ownership, contractual, or other pecuniary interests that may be determined to be variable interests. That determination shall be based on the circumstances on that date including future changes that are required in existing governing documents and existing contractual arrangements.

## > Consolidation Based on Variable Interests

**810-10-25-38**   A reporting entity shall consolidate a VIE when that reporting entity has a variable interest (or combination of variable interests) that provides the reporting entity with a controlling financial interest on the basis of the provisions in paragraphs 810-10-25-38A through 25-38J. The reporting entity that consolidates a VIE is called the primary beneficiary of that VIE.

**810-10-25-38A**   A reporting entity with a variable interest in a VIE shall assess whether the reporting entity has a controlling financial interest in the VIE and, thus, is the VIE's primary beneficiary. This shall include an assessment of the characteristics of the reporting entity's variable interest(s) and other involvements (including involvement of related parties and de facto agents), if any, in the VIE, as well as the involvement of other variable interest holders. Paragraph 810-10-25-43  provides guidance on related parties and de facto agents. Additionally, the assessment shall consider the VIE's purpose and design, including the risks that the VIE was designed to create and pass through to its variable interest holders. A reporting entity shall be deemed to have a controlling financial interest in a VIE if it has both of the following characteristics:

> a. The power to direct the activities of a VIE that most significantly impact the VIE's economic performance
>
> b. The obligation to absorb losses of the VIE that could potentially be significant to the VIE or the right to receive benefits from the VIE that could potentially be significant to the VIE. The quantitative approach described in the definitions of the terms expected losses, expected residual returns, and expected variability  is not required and shall not be the sole determinant as to whether a reporting entity has these obligations or rights.

Only one reporting entity, if any, is expected to be identified as the primary beneficiary of a VIE. Although more than one reporting entity could have the characteristic in (b) of this paragraph, only one reporting entity if any, will have the power to direct the activities of a VIE that most significantly impact the VIE's economic performance.

**810-10-25-38B**   A reporting entity must identify which activities most significantly impact the VIE's economic performance and determine whether it has the power to direct those activities. A reporting entity's ability to direct the activities of an entity when circumstances arise or events happen constitutes power if that ability relates to the activities that most significantly impact the economic performance of the VIE. A reporting entity does not have to exercise its power in order to have power to direct the activities of a VIE.

**810-10-25-38C**   A reporting entity's determination of whether it has the power to direct the activities of a VIE that most significantly impact the VIE's economic performance shall not be affected by the existence of kick-out rights or participating rights  unless a single reporting entity (including its related parties and de facto agents) has the unilateral ability to exercise those kick-out rights or participating rights. A single reporting entity (including its related parties and de facto agents) that has the unilateral ability to exercise kick-out rights or participating rights may be the party with the power to direct the activities of a variable interest entity that most significantly impact the entity's economic performance.These requirements related to kick-out rights and participating rights are limited to this particular analysis and are not applicable to transactions accounted for under other

authoritative guidance. Protective rights held by other parties do not preclude a reporting entity from having the power to direct the activities of a variable interest entity that most significantly impact the entity's economic performance.

**810-10-25-38D** If a reporting entity determines that power is, in fact, shared among multiple unrelated parties such that no one party has the power to direct the activities of a VIE that most significantly impact the VIE's economic performance, then no party is the primary beneficiary. Power is shared if two or more unrelated parties together have the power to direct the activities of a VIE that most significantly impact the VIE's economic performance and if decisions about those activities require the consent of each of the parties sharing power. If a reporting entity concludes that power is not shared but the activities that most significantly impact the VIE's economic performance are directed by multiple unrelated parties and the nature of the activities that each party is directing is the same, then the party, if any, with the power over the majority of those activities shall be considered to have the characteristic in paragraph 810-10-25-38A(a).

**810-10-25-38E** If the activities that impact the VIE's economic performance are directed by multiple unrelated parties, and the nature of the activities that each party is directing is not the same, then a reporting entity shall identify which party has the power to direct the activities that most significantly impact the VIE's economic performance. One party will have this power, and that party shall be deemed to have the characteristic in paragraph 810-10-25-38A(a).

**810-10-25-38F** Although a reporting entity may be significantly involved with the design of a VIE, that involvement does not, in isolation, establish that reporting entity as the entity with the power to direct the activities that most significantly impact the economic performance of the VIE. However, that involvement may indicate that the reporting entity had the opportunity and the incentive to establish arrangements that result in the reporting entity being the variable interest holder with that power. For example, if a sponsor has an explicit or implicit financial responsibility to ensure that the VIE operates as designed, the sponsor may have established arrangements that result in the sponsor being the entity with the power to direct the activities that most significantly impact the economic performance of the VIE.

**810-10-25-38G** Consideration shall be given to situations in which a reporting entity's economic interest in a VIE, including its obligation to absorb losses or its right to receive benefits, is disproportionately greater than its stated power to direct the activities of a VIE that most significantly impact the VIE's economic performance. Although this factor is not intended to be determinative in identifying a primary beneficiary, the level of a reporting entity's economic interest may be indicative of the amount of power that reporting entity holds.

**810-10-25-38H** For purposes of evaluating the characteristic in paragraph 810-10-25-38A(b), fees paid to a reporting entity (other than those included in arrangements that expose a reporting entity to risk of loss as described in paragraph 810-10-25-38J) that meet both of the following conditions shall be excluded:

> a. The fees are compensation for services provided and are commensurate with the level of effort required to provide those services.

> b. The service arrangement includes only terms, conditions, or amounts that are customarily present in arrangements for similar services negotiated at arm's length.

**810-10-25-38I** Facts and circumstances shall be considered when assessing the conditions in paragraph 810-10-25-38H. An arrangement that is designed in a manner such that the fee is inconsistent with the reporting entity's role or the type of service would not meet those conditions. To assess whether a fee meets those conditions, a reporting entity may need to analyze similar arrangements among parties outside the relationship being evaluated. However, a fee would not presumptively fail those conditions if similar service arrangements did not exist in the following circumstances:

> a. The fee arrangement relates to a unique or new service.

> b. The fee arrangement reflects a change in what is considered customary for the services.

In addition, the magnitude of a fee, in isolation, would not cause an arrangement to fail those conditions.

**810-10-25-38J** Fees or payments in connection with agreements that expose a reporting entity (the decision maker or service provider) to risk of loss in the VIE shall not be eligible for the evaluation in paragraph 810-10-25-38H. Those fees include, but are not limited to, the following:

> a. Those related to guarantees of the value of the assets or liabilities of a VIE

> b. Obligations to fund operating losses

> c. Payments associated with written put options on the assets of the VIE

> d. Similar obligations such as some liquidity commitments or agreements (explicit or implicit) that protect holders of other interests from suffering losses in the VIE.

Therefore, those fees shall be considered for evaluating the characteristic in paragraph 810-10-25-38A(b). Examples of those variable interests are discussed in paragraphs 810-10-55-25 and 810-10-55-29.

**810-10-25-39** Paragraph superseded by Accounting Standards Update No. 2009-17.

**810-10-25-40** Paragraph superseded by Accounting Standards Update No. 2009-17.

**810-10-25-41** Paragraph superseded by Accounting Standards Update No. 2009-17.

· > The Effect of Related Parties

**810-10-25-42**    Single Decision Maker—The assessment in this paragraph shall be applied only by a single reporting entity that meets the characteristic in paragraph 810-10-25-38A(a). For purposes of determining whether that single reporting entity, which is a single decision maker, is the primary beneficiary of a VIE, the single decision maker shall include all of its direct variable interests in the entity and, on a proportionate basis, its indirect variable interests in the entity held through related parties (the term *related parties* in this paragraph refers to all parties as defined in paragraph 810-10-25-43). For example, if the single decision maker owns a 20 percent interest in a related party and that related party owns a 40 percent interest in the entity being evaluated, the single decision maker's indirect interest in the VIE held through the related party would be equivalent to an 8 percent direct interest in the VIE for purposes of evaluating the characteristic in paragraph 810-10-25-38A(b) (assuming it has no other relationships with the entity). Similarly, if an employee (or de facto agent) of the single decision maker owns an interest in the entity being evaluated and that employee's (or de facto agent's) interest has been financed by the single decision maker, the single decision maker would include that financing as its indirect interest in the evaluation. For example, if a single decision maker's employees have a 30 percent interest in the VIE and one third of that interest was financed by the single decision maker, then the single decision maker's indirect interest in the VIE through the financing would be equivalent to a 10 percent direct interest in the VIE.

**810-10-25-43**    For purposes of applying the guidance in the Variable Interest Entities Subsections, unless otherwise specified, the term *related parties* includes those parties identified in Topic 850 and certain other parties that are acting as de facto agents or de facto principals of the variable interest holder. All of the following are considered to be de facto agents of a reporting entity:

a. A party that cannot finance its operations without subordinated financial support from the reporting entity, for example, another VIE of which the reporting entity is the primary beneficiary

b. A party that received its interests as a contribution or a loan from the reporting entity

c. An officer, employee, or member of the governing board of the reporting entity

d. A party that has an agreement that it cannot sell, transfer, or encumber its interests in the VIE without the prior approval of the reporting entity. The right of prior approval creates a de facto agency relationship only if that right could constrain the other party's ability to manage the economic risks or realize the economic rewards from its interests in a VIE through the sale, transfer, or encumbrance of those interests. However, a de facto agency relationship does not exist if both the reporting entity and the party have right of prior approval and the rights are based on mutually agreed terms by willing, independent parties.

1. Subparagraph superseded by Accounting Standards Update No. 2009-17.

2. Subparagraph superseded by Accounting Standards Update No. 2009-17.

e. A party that has a close business relationship like the relationship between a professional service provider and one of its significant clients.

**810-10-25-44**    The guidance in this paragraph shall be applicable for situations in which the conditions in paragraph 810-10-25-44A have been met or when power is shared for a VIE. In situations in which a reporting entity concludes that neither it nor one of its related parties has the characteristics in paragraph 810-10-25-38A but, as a group, the reporting entity and its related parties (including the de facto agents described in paragraph 810-10-25-43) have those characteristics, then the party within the related party group that is most closely associated with the VIE is the primary beneficiary. The determination of which party within the related party group is most closely associated with the VIE requires judgment and shall be based on an analysis of all relevant facts and circumstances, including all of the following:

a. The existence of a principal-agency relationship between parties within the related party group

b. The relationship and significance of the activities of the VIE to the various parties within the related party group

c. A party's exposure to the variability associated with the anticipated economic performance of the VIE

d. The design of the VIE.

**810-10-25-44A**    In situations in which a single decision maker concludes, after performing the assessment in paragraph 810-10-25-42, that it does not have the characteristics in paragraph 810-10-25-38A, the single decision maker shall apply the guidance in paragraph 810-10-25-44 only when the single decision maker and one or more of its related parties are under common control and, as a group, the single decision maker and those related parties have the characteristics in paragraph 810-10-25-38A.

**810-10-25-44B**    This paragraph applies to a related party group that has the characteristics in paragraph 810-10-25-38A only when both of the following criteria are met. This paragraph is not applicable for legal entities that meet the conditions in paragraphs 323-740-15-3 and 323-740-25-1.

a. The conditions in paragraph 810-10-25-44A are not met by a single decision maker and its related parties.

b. Substantially all of the activities of the VIE either involve or are conducted on behalf of a single variable interest holder (excluding the single decision maker) in the single decision maker's related party group.

The single variable interest holder for which substantially all of the activities either involve or are conducted on its behalf would be the primary beneficiary. The evaluation in (b) above should be based on a qualitative assessment of all relevant facts and circumstances. In some cases, when performing that qualitative assessment, quantitative information may be considered. This assessment is consistent with the assessments in paragraphs 810-10-15-14(c)(2) and 810-10-15-17(d)(2).

· > Sufficiency of Equity Investment at Risk

**810-10-25-45**    An equity investment at risk of less than 10 percent of the legal entity's total assets shall not be considered sufficient to permit the legal entity to finance its activities without subordinated financial support in addition to the equity investment unless the equity investment can be demonstrated to be sufficient. The demonstration that equity is sufficient may be based on either qualitative analysis or quantitative analysis or a combination of both. Qualitative assessments, including, but not limited to, the qualitative assessments described in (a) and (b), will in some cases be conclusive in determining that the legal entity's equity at risk is sufficient. If, after diligent effort, a reasonable conclusion about the sufficiency of the legal entity's equity at risk cannot be reached based solely on qualitative considerations, the quantitative analyses implied by (c) shall be made. In instances in which neither a qualitative assessment nor a quantitative assessment, taken alone, is conclusive, the determination of whether the equity at risk is sufficient shall be based on a combination of qualitative and quantitative analyses.

a. The legal entity has demonstrated that it can finance its activities without additional subordinated financial support.

b. The legal entity has at least as much equity invested as other entities that hold only similar assets of similar quality in similar amounts and operate with no additional subordinated financial support.

c. The amount of equity invested in the legal entity exceeds the estimate of the legal entity's expected losses based on reasonable quantitative evidence.

**810-10-25-46** Some legal entities may require an equity investment at risk greater than 10 percent of their assets to finance their activities, especially if they engage in high-risk activities, hold high-risk assets, or have exposure to risks that are not reflected in the reported amounts of the legal entities' assets or liabilities. The presumption in the preceding paragraph does not relieve a reporting entity of its responsibility to determine whether a particular legal entity with which the reporting entity is involved needs an equity investment at risk greater than 10 percent of its assets in order to finance its activities without subordinated financial support in addition to the equity investment.

**810-10-25-47** The design of the legal entity (for example, its capital structure) and the apparent intentions of the parties that created the legal entity are important qualitative considerations, as are ratings of its outstanding debt (if any), the interest rates, and other terms of its financing arrangements. Often, no single factor will be conclusive and the determination will be based on the preponderance of evidence. For example, if a legal entity does not have a limited life and tightly constrained activities, if there are no unusual arrangements that appear designed to provide subordinated financial support, if its equity interests do not appear designed to require other subordinated financial support, and if the entity has been able to obtain commercial financing arrangements on customary terms, the equity would be expected to be sufficient. In contrast, if a legal entity has a very small equity investment relative to other entities with similar activities and has outstanding subordinated debt that obviously is effectively a replacement for an additional equity investment, the equity would not be expected to be sufficient.

· > Implicit Variable Interests

**810-10-25-48** Paragraph superseded by Accounting Standards Update No. 2014-07.

**810-10-25-49** The following guidance addresses whether a reporting entity should consider whether it holds an implicit variable interest in a VIE or potential VIE if specific conditions exist.

**810-10-25-50** The identification of variable interests (implicit and explicit) may affect the following:

a. The determination as to whether the potential VIE shall be considered a VIE

b. The calculation of expected losses and residual returns

c. The determination as to which party, if any, is the primary beneficiary of the VIE.

Thus, identifying whether a reporting entity holds a variable interest in a VIE or potential VIE is necessary to apply the provisions of the guidance in the Variable Interest Entities Subsections.

**810-10-25-51** An implicit variable interest is an implied pecuniary interest in a VIE that changes with changes in the fair value of the VIE's net assets exclusive of variable interests. Implicit variable interests may arise from transactions with related parties, as well as from transactions with unrelated parties.

**810-10-25-52** The identification of explicit variable interests involves determining which contractual, ownership, or other pecuniary interests in a legal entity directly absorb or receive the variability of the legal entity. An implicit variable interest acts the same as an explicit variable interest except it involves the absorbing and (or) receiving of variability indirectly from the legal entity, rather than directly from the legal entity. Therefore, the identification of an implicit variable interest involves determining whether a reporting entity may be indirectly absorbing or receiving the variability of the legal entity. The determination of whether an implicit variable interest exists is a matter of judgment that depends on the relevant facts and circumstances. For example, an implicit variable interest may exist if the reporting entity can be required to protect a variable interest holder in a legal entity from absorbing losses incurred by the legal entity.

**810-10-25-53** The significance of a reporting entity's involvement or interest shall not be considered in determining whether the reporting entity holds an implicit variable interest in the legal entity. There are transactions in which a reporting entity has an interest in, or other involvement with, a VIE or potential VIE that is not considered a variable interest, and the reporting entity's related party holds a variable interest in the same VIE or potential VIE. A reporting entity's interest in, or other pecuniary involvement with, a VIE may take many different forms such as a lessee under a leasing arrangement or a party to a supply contract, service contract, or derivative contract.

**810-10-25-54** The reporting entity shall consider whether it holds an implicit variable interest in the VIE or potential VIE. The determination of whether an implicit variable interest exists shall be based on all facts and circumstances in determining whether the reporting entity may absorb variability of the VIE or potential VIE. A reporting entity that holds an implicit variable interest in a VIE and is a related party to other variable interest holders shall apply the guidance in paragraphs 810-10-25-42 through 25-44B to determine whether it is the primary beneficiary of the VIE. The guidance in paragraphs 810-10-25-49 through 25-54 applies to related parties as defined in paragraph 810-10-25-43. For example, the guidance in paragraphs 810-10-25-49 through 25-54 applies to any of the following situations:

a. A reporting entity and a VIE are under common control.

b. A reporting entity has an interest in, or other involvement with, a VIE and an officer of that reporting entity has a variable interest in the same VIE.

c. A reporting entity enters into a contractual arrangement with an unrelated third party that has a variable interest in a VIE and that arrangement establishes a related party relationship.

· > Variable Interest and Interests in Specific Assets of a VIE

**810-10-25-55** A variable interest in specified assets of a VIE (such as a guarantee or subordinated residual interest) shall be deemed to be a variable interest in the VIE only if the fair value of the specified assets is more than half of the total fair value of the VIE's assets or if the holder has another variable interest in the VIE as a whole (except interests that are insignificant or have little or no variability). This exception is necessary to prevent a reporting entity that would otherwise be the primary beneficiary of a VIE from circumventing the requirement for consolidation simply by arranging for other parties with interests in certain assets to hold small or inconsequential interests in the VIE as a whole. The expected losses and expected residual returns applicable to variable interests in specified assets of a VIE shall be deemed to be expected losses and expected residual returns of the VIE only if that variable interest is deemed to be a variable interest in the VIE.

**810-10-25-56** Expected losses related to variable interests in specified assets are not considered part of the expected losses of the legal entity for purposes of determining the adequacy of the equity at risk in the legal entity or for identifying the primary beneficiary unless the specified assets constitute a majority of the assets of the legal entity. For example, expected losses absorbed by a guarantor of the residual value of leased property are not considered expected losses of a VIE if the fair value of the leased property is not a majority of the fair value of the VIE's total assets.

> ■ PENDING CONTENT
>
> **Transition Date:** Ⓟ December 16, 2018; Ⓝ December 16, 2021 | **Transition Guidance:** 842-10-65-1
> Expected losses related to variable interests in specified assets are not considered part of the expected losses of the legal entity for purposes of determining the adequacy of the equity at risk in the legal entity or for identifying the primary beneficiary unless the specified assets constitute a majority of the assets of the legal entity. For example, expected losses absorbed by a guarantor of the residual value of underlying asset are not considered expected losses of a VIE if the fair value of the underlying asset is not a majority of the fair value of the VIE's total assets.

**810-10-25-57** A reporting entity with a variable interest in specified assets of a VIE shall treat a portion of the VIE as a separate VIE if the specified assets (and related credit enhancements, if any) are essentially the only source of payment for specified liabilities or specified other interests. (The portions of a VIE referred to in this paragraph are sometimes called silos.) That requirement does not apply unless the legal entity has been determined to be a VIE. If one reporting entity is required to consolidate a discrete portion of a VIE, other variable interest holders shall not consider that portion to be part of the larger VIE.

**810-10-25-58** A specified asset (or group of assets) of a VIE and a related liability secured only by the specified asset or group shall not be treated as a separate VIE (as discussed in the preceding paragraph) if other parties have rights or obligations related to the specified asset or to residual cash flows from the specified asset. A separate VIE is deemed to exist for accounting purposes only if essentially all of the assets, liabilities, and equity of the deemed VIE are separate from the overall VIE and specifically identifiable. In other words, essentially none of the returns of the assets of the deemed VIE can be used by the remaining VIE, and essentially none of the liabilities of the deemed VIE are payable from the assets of the remaining VIE.

**810-10-25-59** Acquisition, development, and construction loan structures may be VIEs subject to the guidance in the Variable Interest Entities Subsections. Guidance on determining whether a lender should account for an acquisition, development, and construction arrangement as a loan or as an investment in real estate or a joint venture is presented in Subtopic 310-10.

# Consolidation of Entities Controlled by Contract

**810-10-25-60** This Subsection addresses various considerations related to whether an entity is controlled by contract that is not a variable interest entity (VIE) (see the Variable Interest Entities Subsection of Section 810-10-15), specifically:

> a. General guidance
>
> b. Term
>
> c. Control
>
> d. Financial interest
>
> e. Determining whether an employee is an employee of the consolidating entity
>
> f. Consideration recorded in the period consideration is provided.

## > General Guidance

**810-10-25-61** The information necessary to evaluate the requirements in paragraph 810-10-15-22 may or may not be documented in the contractual agreements that underlie the relationship between the physician practice management entity and the physician practice. If the information is documented in those agreements, then that documentation should be used to evaluate whether the requirements are met regardless of whether the respective parties are currently behaving in accordance with the documented provisions. To the extent that some of the information is not documented, then all of the requirements in that paragraph are still applicable; however, the facts and circumstances of the relationship should be evaluated to determine whether the requirements are met.

**810-10-25-62** Relevant facts and circumstances include the legal rights and obligations of each party absent the documentation and the reasons for any undocumented provisions. With respect to the latter, in a situation in which neither the physician practice management entity nor its nominee owns any of the outstanding voting equity interests of the physician practice, lack of documentation of a right of the physician practice

management entity may be caused by the fact that the physician practice shareholders have not transferred that right to the physician practice management entity. This same lack of documentation in a situation in which the physician practice management entity and its nominee collectively own all of the outstanding voting equity instruments of the physician practice may be caused by the fact that there is less discipline to document absent third-party physician practice owners.

## > Term

**810-10-25-63** The term of the arrangement is to be determined based on its substance as opposed to its form; thus, both the original stated contract term and renewal or cancellation provisions must be considered. For example, an arrangement with an initial stated term of 5 years that has a single 5-year renewal option that is unilaterally exercisable by the physician practice management entity is considered to have an adequate term because it is collectively a 10-year contract.

**810-10-25-64** In the circumstances that are the subject of the Consolidation of Entities Controlled by Contract Subsections, it is appropriate, in being explicit about the duration of the management arrangements, that the term be defined as a period of 10 years or more. Defining the term as a period of 10 years or more is only for purposes of the Consolidation of Entities Controlled by Contract Subsections. It is not intended that a term of 10 years or more be applied in other consolidation situations.

## > Control

**810-10-25-65** The following guidance applies to the evaluation of the control requirement in paragraph 810-10-15-22(b) for identifying a physician practice management arrangement, or similar contractual management arrangement, as a controlling financial interest:

> a. Nominee shareholder situation, presumption of control—need to evaluate more than just the terms of the contractual management agreement
>
> b. Nominee shareholder situation—need to evaluate more than just the terms of the contractual management agreement
>
> c. Binding arbitration provisions
>
> d. Powers limited by law
>
> e. Scope of service decisions
>
> f. Physician cosigning provisions.

### · > Nominee Shareholder Situation, Presumption of Control—Need to Evaluate More Than Just the Terms of the Contractual Management Agreement

**810-10-25-66** If a majority of the outstanding voting equity instruments of the physician practice is owned by a nominee shareholder of the physician practice management entity (or by the physician practice management entity itself and its nominee shareholder), then a rebuttable presumption exists that the physician practice management entity controls the physician practice. This presumption is rebutted if others (including any other physician practice shareholders and physicians employed by the physician practice) have been granted rights by the physician practice management entity (either pursuant to the management agreement or through its nominee shareholder; by the physician practice, pursuant to its provisions for corporate governance; and so forth), such that the physician practice management entity does not have exclusive decision-making authority over the decisions that constitute the control requirements. Conversely, the presumption cannot be rebutted if the physician practice management entity has exclusive decision-making authority over the decisions that constitute those control requirements, whether the physician practice management entity obtained it through the management agreement, through its nominee, or pursuant to the provisions for corporate governance of the physician practice.

### · > Nominee Shareholder Situation—Need to Evaluate More Than Just the Terms of the Contractual Management Agreement

**810-10-25-67** If less than a majority of the outstanding voting equity instruments of the physician practice is owned by a nominee shareholder of the physician practice management entity (or by the physician practice management entity itself and the nominee shareholder), then no presumption of control exists. In this circumstance, the physician practice management entity must demonstrate that by virtue of a combination of its rights under the management agreement, by the powers possessed by its nominee shareholder, and by the provisions for corporate governance of the physician practice, it has control by meeting the control requirements.

### · > Binding Arbitration Provisions

**810-10-25-68** A provision for binding arbitration to settle disagreements between the physician practice management entity and the physician practice does not necessarily indicate that the physician practice management entity lacks exclusive authority over all decision making related to the items constituting the control requirements. For example, if binding arbitration is provided only to settle disputes over the meaning of contract terms and those decisions could not have the effect of overriding the physician practice management entity's exclusive decision-making authority over the matters identified in the control requirements, then the physician practice management entity may still comply with those control requirements. Conversely, if binding arbitration is provided to decide matters for which the physician practice management entity is required to have exclusive decision-making authority, then the physician practice management entity would not comply with those control requirements.

### · > Powers Limited by Law

**810-10-25-69** If federal, state, or corresponding non-U.S. laws limit the powers or discretion of any party over a particular decision, then the physician practice management entity's exclusive decision-making authority with respect to that matter is not, by definition, precluded. For example, antidumping statutes that prohibit physicians from refusing certain types of patients do not preclude the physician practice management entity from otherwise exerting exclusive authority of decision making over patient acceptance policies and procedures within the boundaries established by law.

· > Scope of Service Decisions

**810-10-25-70** The physician practice management entity's exclusive decision-making authority over the physician practice's scope of services is not considered refuted if the range of medical disciplines in which the physician practice practices is set by mutual agreement of the physician practice management entity and the physician practice in the initial negotiation of the management agreement. Some examples of different medical disciplines are cardiology, neurology, obstetrics, ophthalmology, and radiology. Lack of physician practice management entity exclusive decision-making authority over initial and ongoing scope of service decisions within the physician practice's selected medical disciplines would, however, preclude a conclusion that the physician practice management entity controls the physician practice. Scope of service decisions within those practice disciplines are, for example, decisions about the range of cardiology services to provide, decisions about the range of neurology services to provide, and so forth.

· > Physician Cosigning Provisions

**810-10-25-71** A provision requiring that the physician or physicians cosign a customer contract of the physician practice (that is, in addition to its execution on behalf of the physician practice by the physician practice management entity) does not preclude the physician practice management entity from having exclusive decision-making authority over the execution of contracts if the requirement for the physicians' signature is perfunctory. That requirement would generally be perfunctory if the physicians' execution of contracts creates no obligations for the physicians beyond the obligations that would exist if the physician practice management entity alone executed the contracts and if either of the following conditions is met:

a. The requirement for the physicians to execute a contract arises from state law or from a request by the payor on a particular contract.

b. The physicians have no effective discretion in executing contracts negotiated by the physician practice management entity (for example, the management agreement or the employment contract states that the physicians will not unreasonably withhold approval of contracts negotiated by the physician practice management entity).

**810-10-25-72** The cosigning requirement is not considered perfunctory (and accordingly the first control requirement is not met) if any one of the following circumstances exists:

a. It arises out of authority given by the physician practice management entity to the physicians (other than to a physician who is the physician practice management entity's nominee shareholder of the physician practice and is acting in that capacity).

b. It gives rise to incremental obligations for the physician beyond the obligations that would exist if the physician practice management entity alone executed the contracts.

c. It gives the physicians discretion over which customer contracts will be executed by the physician practice management entity. This occurs, for example, if the physicians solely decide, or with the physician practice management entity they jointly decide, the boundaries for what constitutes an acceptable customer contract.

## > Financial Interest

**810-10-25-73** The following guidance applies to the evaluation of the financial interest requirement in paragraph 810-10-15-22(c) for identifying a physician practice management arrangement or similar contractual management arrangement as a controlling financial interest:

a. Nominee shareholder situation, presumption of financial interest—need to evaluate more than just the terms of the contractual management agreement

b. Nominee shareholder situation—need to evaluate more than just the terms of the contractual management agreement

c. Type and level of physician practice management entity participation

d. Level of participation

e. Substance versus form.

· > Nominee Shareholder Situation, Presumption of Financial Interest—Need to Evaluate More Than Just the Terms of the Contractual Management Agreement

**810-10-25-74** If both of the following conditions exist, then the physician practice management entity is presumed to have a significant financial interest in the physician practice without reference to its current compliance with the financial interest requirements:

a. A majority of the outstanding voting equity instruments of the physician practice is owned by a nominee shareholder of the physician practice management entity, or owned by a combination of the physician practice management entity itself and its nominee shareholder.

b. It is determined that, after considering the rights of, and the physician practice management entity's (and its nominee's) obligations to, others (including any other physician practice shareholders and physicians employed by the physician practice), the physician practice management entity (or its nominee) has the power, at will and for no or only nominal consideration, to reset the terms of the physician practice management entity's financial interest in the physician practice.

This presumption is rebutted only if the physician practice management entity is precluded from resetting the terms of its financial interest in the physician practice to a basis that would meet the financial interest requirements, a circumstance that is unlikely to exist.

· > Nominee Shareholder Situation—Need to Evaluate More Than Just the Terms of the Contractual Management Agreement

**810-10-25-75** If less than a majority of the outstanding voting equity instruments of the physician practice is owned by a nominee shareholder of the physician practice management entity, then no presumption of a significant financial interest exists. In this circumstance, the physician practice management entity must demonstrate that by virtue of a combination of its rights under the management agreement and by the powers possessed by its nominee shareholder it has a significant financial interest by meeting the financial interest requirements.

· > Type and Level of Physician Practice Management Entity Participation

**810-10-25-76**  A financial interest in a physician practice is the right to share in the change in the fair value of that physician practice. This right must be economically similar to the right a shareholder normally would possess. For purposes of the second financial interest requirement, that change in fair value is viewed as consisting of both of the following components:

  a. The portion of the change that manifests itself as current operating results

  b. The remainder, which is the portion of the change that manifests itself only upon sale or liquidation of the physician practice.

**810-10-25-77**  The second financial interest requirement requires that the physician practice management entity have rights to share in both components and that the amounts collectively derived constitute a significant portion of the total change in fair value. If the physician practice management entity's arrangement with the physician practice will end before the physician practice is sold or liquidated, the physician practice management entity would need to have the right to share in the change in the fair value of the physician practice that arose during the physician practice management entity's relationship with it in order to meet the requirement described in (b) in the preceding paragraph.

· > Level of Participation

**810-10-25-78**  The required significant level of financial interest of the physician practice management entity in the physician practice is intentionally not further prescribed. This is meant to convey that what is significant must be determined in the context of the facts and circumstances.

· > Substance versus Form

**810-10-25-79**  For purposes of determining compliance with the second financial interest requirement, the calculation of ongoing fees and the calculation of proceeds from sale are to be evaluated based on their substance as opposed to their form. Determining whether the requirement is met for a particular management fee structure will require the use of judgment.

**810-10-25-80**  Paragraph not used.

> Consideration Recorded in the Period Consideration Is Provided

**810-10-25-81**  Regardless of whether the consolidation status of the physician practice changes, consideration provided by the physician practice management entity to the physician practice in exchange for modifications to the physician practice management entity's arrangement with the physician practice shall be accounted for in the financial reporting period in which the modification is made, that is, the accounting for the consideration shall not be pushed back to a prior period. Furthermore, that consideration shall be recognized under generally accepted accounting principles (GAAP) according to the nature of the consideration.

# Securities and Exchange Commission (SEC)

**General Note:**The Recognition Section provides guidance on the required criteria, timing, and location (within the financial statements) for recording a particular item in the financial statements. Disclosure is not recognition.

## General

> Consolidated Financial Statements of the Registrant and its Subsidiaries

**810-10-S25-1**  See paragraph 810-10-S99-2 , Regulation S-X Rule 3A-02, for requirements for a registrant in deciding on a consolidation policy.

> Intercompany (Intra-entity) Items and Transactions

**810-10-S25-2**  See paragraph 810-10-S99-4 , Regulation S-X Rule 3A-04, for requirements for the elimination of intercompany (intra-entity) items and transactions.

> Accounting for Divestiture of a Subsidiary or Other Business Operations

**810-10-S25-3**  See paragraph 810-10-S99-5 , SAB Topic 5.E, for SEC Staff views on when an accounting divestiture has not occurred.

**FASB**
Authoritative

## 810-10-55 Implementation Guidance and Illustrations - Variable Interest Entities

[Click to open document in a browser](#)

# Variable Interest Entities

## > Implementation Guidance

**55-5** Paragraph superseded by Accounting Standards Update No. 2009-17 :

**55-6** Paragraph superseded by Accounting Standards Update No. 2009-17 :

**55-7** Paragraph superseded by Accounting Standards Update No. 2009-17 :

**55-8** Paragraph superseded by Accounting Standards Update No. 2009-17 :

### > > Example of a Series Mutual Fund

**55-8A** An asset management company creates a series fund structure in which there are multiple mutual funds (Fund A, Fund B, and Fund C) within one (umbrella) trust. Each mutual fund, referred to as a series fund, represents a separate structure and **legal entity** . The asset management company sells shares in each series fund to external shareholders. Each series fund is required to comply with the requirements included in the Investment Company Act of 1940 for registered mutual funds.

**55-8B** The purpose, objective, and strategy of each series fund are established at formation and agreed upon by the shareholders in accordance with the operating agreements. Returns of each series fund are allocated only to that respective fund's shareholders. There is no cross-collateralization among the individual series funds. Each series fund has its own fund management team, employed by the asset management company, which has the ability to carry out the investment strategy approved by the fund shareholders and manage the investments of the series fund. The Board of Trustees is established at the (umbrella) trust level.

**55-8C** The asset management company is compensated on the basis of an established percentage of assets under management in the respective series funds for directing the activities of each fund within its stated objectives. The fees paid to the asset management company are both of the following:

a. Compensation for services provided and commensurate with the level of effort required to provide the services

b. Part of service arrangements that include only terms, conditions, or amounts that are customarily present in arrangements for similar services negotiated at arm's length.

***Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.***
***©2023 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions:*** ***http://researchhelp.cch.com/License_Agreement.htm***
***https://www.accountingresearchmanager.com/q/1g7l3***

Case 2:22-cv-07025-SB-SBD Document 51-3 Filed 05/08/23 Page 131 of 196

**55-8D** The asset management company has sold 65 percent of the shares in Fund A to external shareholders and holds the remaining 35 percent of shares in Fund A.

**55-8E** The shareholders in each series fund have the ability through voting rights to do the following:

    a. Remove and replace the Board of Trustees

    b. Remove and replace the asset management company

    c. Vote on the compensation of the asset management company

    d. Vote on changes to the fundamental investment strategy of the fund

    e. Approve the sale of substantially all of the assets of the fund

    f. Approve a merger and/or reorganization of the fund

    g. Approve the liquidation or dissolution of the fund

    h. Approve charter and bylaw amendments

    i. Increase the authorized number of shares.

**55-8F** For this series fund structure, the voting rights in paragraph 810-10-55-8E(a) : are exercised at the (umbrella) trust level. That is, a simple majority vote of shareholders of all of the series funds (Fund A, Fund B, and Fund C) is required to exercise the voting right to remove and replace the Board of Trustees of the (umbrella) trust. However, the voting rights in paragraph 810-10-55-8E(b) through (i) : are series fund-level rights. That is, only a simple majority vote of Series Fund A's shareholders is required to exercise the voting rights in paragraph 810-10-55-8E(b) through (i) : for Series Fund A.

**55-8G** According to paragraph 810-10-15-14(b)(1) : 📄, one condition for a legal entity to be considered a VIE is that, as a group, the holders of the equity investment at risk lack the power, through voting rights or similar rights, to direct the activities of a legal entity that most significantly impact the entity's economic performance.

Paragraph 810-10-15-14(b)(1)(i) : 📄 indicates that, for legal entities other than limited partnerships, investors lack that power through voting rights or similar rights if no owners hold voting rights or similar rights (such as those of a common shareholder in a corporation).

**55-8H** The shareholders in each series fund lack the ability at a series-specific level to remove and replace the Board of Trustees of the (umbrella) trust, because the shareholders in each series fund are required to vote on an aggregate basis to exercise that right. However, based on an evaluation of the purpose and design of each series fund, the shareholders in each series fund are able to direct the activities of the funds that most significantly impact the funds' economic performance through their voting rights. For example, the activities that most significantly impact the economic performance of Fund A, which include making decisions on how to invest the assets of that fund, are carried out by the asset management company. However, the shareholders of Fund A are able to effectively direct those activities through the voting rights in paragraph 810-10-55-8E(b) through (d) : . Shareholders of Fund A lack the unilateral ability to remove and replace the Board of Trustees. However, because shareholders have the ability to directly remove and replace the asset management company, approve the compensation of the asset management company, and vote on the investment strategy of Fund A, the investors are deemed to have the power through voting rights to direct the activities of Fund A that most significantly impact the fund's economic performance in accordance with paragraph 810-10-15-14(b)

(1) : 📄. Therefore, assuming none of the other criteria in paragraph 810-10-15-14 : 📄 are met for Fund A to be considered a VIE, Fund A would be considered a voting interest entity.

**> > Accounting Alternative**

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

**55-9** In applying the guidance in paragraph 810-10-15-17AB : ⬜, the following are examples of activities that are considered to be leasing activities (including supporting leasing activities) between a private company lessee and a lessor **legal entity**⬜ :

> a. A guarantee or collateral provided by the **private company**⬜ lessee to the lender of a lessor legal entity under common control for indebtedness that is secured by the asset(s) leased by the private company lessee

> b. A joint and several liability arrangement for indebtedness of the lessor legal entity, for which the private company lessee is one of the obligors, that is secured by the asset(s) leased by the private company lessee

> c. Paying property taxes, negotiating the financing, and maintaining the asset(s) leased by the private company lessee

> d. Paying income taxes of the lessor legal entity when the only asset owned by the lessor legal entity is being leased either by only the private company or by both the private company lessee and an unrelated party.

Paying income taxes of the lessor legal entity on income generated by an asset that is not being leased by the private company lessee is not considered to be a leasing activity between the private company lessee and the lessor legal entity. A purchase commitment (other than for the acquisition of or the support of the leased asset) is not considered to be related to the leasing activity between the private company lessee and the lessor legal entity.

**Pending Content**

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020* | **Transition Guidance:** 810-10-65-9 : ⬜

| |
|---|
| **Editor's Note**: Paragraph 810-10-55-9 will be superseded upon transition, together with its heading: |
| >>**Accounting Alternative** |

> a. Paragraph superseded by Accounting Standards Update No. 2018-17 : ⬜

**55-10** Paragraph Not Used : ⬜

**55-11** Paragraph Not Used : ⬜

**55-12** Paragraph Not Used : ⬜

**55-13** Paragraph Not Used : ⬜

**55-14** Paragraph Not Used : ⬜

**55-15** Paragraph Not Used : ⬜

**> > Identifying Variable Interests**

**55-16** The Variable Interest Entities Subsections provide guidance for identifying entities for which analysis of voting interests, and the holdings of those voting interests, is not effective in determining whether a controlling financial interest exists because the holders of the equity investment at risk do not have sufficient equity at risk for the legal entity to finance its activities without additional subordinated financial support or because they lack any of the following:

> a. The power, through voting rights or similar rights, to direct the activities of a legal entity that most significantly impact the entity's economic performance

---

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

    b. The obligation to absorb the expected losses of the legal entity

    c. The right to receive the expected residual returns of the legal entity.

Those entities are called **variable interest entities** (VIEs). The Variable Interest Entities Subsections also provide guidance for determining whether a reporting entity shall consolidate a VIE. A reporting entity that consolidates a VIE is called the **primary beneficiary** of that VIE. This Subsection provides guidance for identifying variable interests in a VIE.

**55-17** The identification of variable interests requires an economic analysis of the rights and obligations of a legal entity's assets, liabilities, equity, and other contracts. Variable interests are contractual, ownership, or other pecuniary interests in a legal entity that change with changes in the **fair value** of the legal entity's net assets exclusive of variable interests. The Variable Interest Entities Subsections use the terms **expected losses and expected residual returns** to describe the **expected variability** in the fair value of a legal entity's net assets exclusive of variable interests.

**55-18** For a legal entity that is not a VIE (sometimes called a voting interest entity), all of the legal entity's assets, liabilities, and other contracts are deemed to create variability, and the equity investment is deemed to be sufficient to absorb the expected amount of that variability. In contrast, VIEs are designed so that some of the entity's assets, liabilities, and other contracts create variability and some of the entity's assets, liabilities, and other contracts (as well as its equity at risk) absorb or receive that variability.

**55-19** The identification of variable interests involves determining which assets, liabilities, or contracts create the legal entity's variability and which assets, liabilities, equity, and other contracts absorb or receive that variability. The latter are the legal entity's variable interests. The labeling of an item as an asset, liability, equity, or as a contractual arrangement does not determine whether that item is a variable interest. It is the role of the item— to absorb or receive the legal entity's variability—that distinguishes a variable interest. That role, in turn, often depends on the design of the legal entity.

**55-20** Paragraphs 810-10-55-16 through 55-41 : describe examples of variable interests in VIEs subject to the Variable Interest Entities Subsections. These paragraphs are not intended to provide a complete list of all possible variable interests. In addition, the descriptions are not intended to be exhaustive of the possible roles, and the possible variability, of the assets, liabilities, equity, and other contracts. Actual instruments may play different roles and be more or less variable than the examples discussed. Finally, these paragraphs do not analyze the relative significance of different variable interests, because the relative significance of a variable interest will be determined by the design of the VIE. The identification and analysis of variable interests must be based on all of the facts and circumstances of each entity.

**55-21** Paragraphs 810-10-55-16 through 55-41 : also do not discuss whether the variable interest is a variable interest in a specified asset of a VIE or in the VIE as a whole. Guidance for making that determination is provided in paragraphs 810-10-25-55 through 25-56 : . Paragraphs 810-10-25-57 through 25-59 : provide guidance for when a VIE shall be separated with each part evaluated to determine if it has a primary beneficiary.

**> > > Equity Investments, Beneficial Interests, and Debt Instruments**

**55-22** Equity investments in a VIE are variable interests to the extent they are at risk. (Equity investments at risk are described in paragraph 810-10-15-14 : .) Some equity investments in a VIE that are determined to be not at risk by the application of that paragraph also may be variable interests if they absorb or receive some of the VIE's variability. If a VIE has a contract with one of its equity investors (including a financial instrument such as a loan receivable), a reporting entity applying this guidance to that VIE shall consider whether that contract causes the equity investor's investment not to be at risk. If the contract with the equity investor represents the only asset of the VIE, that equity investment is not at risk.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

**55-23**Investments in subordinated beneficial interests or subordinated debt instruments issued by a VIE are likely to be variable interests. The most subordinated interest in a VIE will absorb all or part of the expected losses of the VIE. For a voting interest entity the most subordinated interest is the entity's equity; for a VIE it could be debt, beneficial interests, equity, or some other interest. The return to the most subordinated interest usually is a high rate of return (in relation to the interest rate of an instrument with similar terms that would be considered to be investment grade) or some form of participation in residual returns.

**55-24**Any of a VIE's liabilities may be variable interests because a decrease in the fair value of a VIE's assets could be so great that all of the liabilities would absorb that decrease. However, senior beneficial interests and senior debt instruments with fixed interest rates or other fixed returns normally would absorb little of the VIE's expected variability. By definition, if a senior interest exists, interests subordinated to the senior interests will absorb losses first. The variability of a senior interest with a variable interest rate is usually not caused by changes in the value of the VIE's assets and thus would usually be evaluated in the same way as a fixed-rate senior interest. Senior interests normally are not entitled to any of the residual return.

### > > > Guarantees, Written Put Options, and Similar Obligations

**55-25**Guarantees of the value of the assets or liabilities of a VIE, written put options on the assets of the VIE, or similar obligations such as some liquidity commitments or agreements (explicit or implicit) to replace impaired assets held by the VIE are variable interests if they protect holders of other interests from suffering losses. To the extent the counterparties of guarantees, written put options, or similar arrangements will be called on to perform in the event expected losses occur, those arrangements are variable interests, including fees or premiums to be paid to those counterparties. The size of the premium or fee required by the counterparty to such an arrangement is one indication of the amount of risk expected to be absorbed by that counterparty.

**55-26**If the VIE is the writer of a guarantee, written put option, or similar arrangement, the items usually would create variability. Thus, those items usually will not be a variable interest of the VIE (but may be a variable interest in the counterparty).

### > > > Forward Contracts

**55-27**Forward contracts to buy assets or to sell assets that are not owned by the VIE at a fixed price will usually expose the VIE to risks that will increase the VIE's expected variability. Thus, most forward contracts to buy assets or to sell assets that are not owned by the VIE are not variable interests in the VIE.

**55-28**A forward contract to sell assets that are owned by the VIE at a fixed price will usually absorb the variability in the fair value of the asset that is the subject of the contract. Thus, most forward contracts to sell assets that are owned by the VIE are variable interests with respect to the related assets. Because forward contracts to sell assets that are owned by the VIE relate to specific assets of the VIE, it will be necessary to apply the guidance in paragraphs 810-10-25-55 through 25-56 : to determine whether a forward contract to sell an asset owned by a VIE is a variable interest in the VIE as opposed to a variable interest in that specific asset.

### > > > Other Derivative Instruments

**55-29**Derivative instruments held or written by a VIE shall be analyzed in terms of their option-like, forward-like, or other variable characteristics. If the instrument creates variability, in the sense that it exposes the VIE to risks that will increase expected variability, the instrument is not a variable interest. If the instrument absorbs or receives variability, in the sense that it reduces the exposure of the VIE to risks that cause variability, the instrument is a variable interest.

**55-30**Derivatives, including total return swaps and similar arrangements, can be used to transfer substantially all of the risk or return (or both) related to certain assets of an VIE without actually transferring the assets. Derivative instruments with this characteristic shall be evaluated carefully.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

**55-31** Some assets and liabilities of a VIE have embedded derivatives. For the purpose of identifying variable interests, an embedded derivative that is clearly and closely related economically to its asset or liability host is not to be evaluated separately.

### > > > Assets of the Entity

**55-32** Assets held by a VIE almost always create variability and, thus, are not variable interests. However, as discussed separately in this Subsection, assets of the VIE that take the form of derivatives, guarantees, or other similar contracts may be variable interests.

**55-33** Paragraph superseded by Accounting Standards Update No. 2009-17 :

**55-34** Paragraph superseded by Accounting Standards Update No. 2009-17 :

**55-35** Paragraph superseded by Accounting Standards Update No. 2009-17 :

**55-36** Paragraph superseded by Accounting Standards Update No. 2009-17 :

### > > > Fees Paid to Decision Makers or Service Providers

**55-37** Fees paid to a legal entity's **decision maker(s)** or service provider(s) are not variable interests if all of the following conditions are met:

a. The fees are compensation for services provided and are commensurate with the level of effort required to provide those services.

b. Subparagraph superseded by Accounting Standards Update No. 2015-02 : .

c. The decision maker or service provider does not hold other interests in the VIE that individually, or in the aggregate, would absorb more than an insignificant amount of the VIE's **expected losses** or receive more than an insignificant amount of the VIE's **expected residual returns** .

d. The service arrangement includes only terms, conditions, or amounts that are customarily present in arrangements for similar services negotiated at arm's length.

e. Subparagraph superseded by Accounting Standards Update No. 2015-02 : .

f. Subparagraph superseded by Accounting Standards Update No. 2015-02 : .

**55-37A** Paragraph superseded by Accounting Standards Update No. 2015-02 :

**55-37B** Facts and circumstances should be considered when assessing the conditions in paragraph 810-10-55-37 : . An arrangement that is designed in a manner such that the fee is inconsistent with the decision maker's or service provider's role or the type of service would not meet those conditions. To assess whether a fee meets those conditions, a reporting entity may need to analyze similar arrangements among parties outside the relationship being evaluated. However, a fee would not presumptively fail those conditions if similar service arrangements did not exist in the following circumstances:

a. The fee arrangement relates to a unique or new service.

b. The fee arrangement reflects a change in what is considered customary for the services.

In addition, the magnitude of a fee, in isolation, would not cause an arrangement to fail the conditions.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

**55-37C** Fees or payments in connection with agreements that expose a reporting entity (the decision maker or the service provider) to risk of loss in the VIE would not be eligible for the evaluation in paragraph 810-10-55-37 : . Those fees include, but are not limited to, the following:

a. Those related to guarantees of the value of the assets or liabilities of a VIE

b. Obligations to fund operating losses

c. Payments associated with written put options on the assets of the VIE

d. Similar obligations, such as some liquidity commitments or agreements (explicit or implicit) that protect holders of other interests from suffering losses in the VIE.

Therefore, those fees should be considered for evaluating the characteristic in paragraph 810-10-25-38A(b) : . Examples of those variable interests are discussed in paragraphs 810-10-55-25 : and 810-10-55-29 : .

**55-37D** For purposes of evaluating the conditions in paragraph 810-10-55-37 : , any interest in an entity that

is held by a **related party** of the decision maker or service provider should be considered in the analysis. Specifically, a decision maker or service provider should include its direct economic interests in the entity and its indirect economic interests in the entity held through related parties, considered on a proportionate basis. For example, if a decision maker or service provider owns a 20 percent interest in a related party and that related party owns a 40 percent interest in the entity being evaluated, the decision maker's or service provider's interest would be considered equivalent to an 8 percent direct interest in the entity for the purposes of evaluating whether the fees paid to the decision maker(s) or the service provider(s) are not variable interests (assuming that they have no other relationships with the entity). Indirect interests held through related parties that are under common control with the decision maker should be considered the equivalent of direct interests in their entirety. The

term *related parties* in this paragraph refers to all parties as defined in paragraph 810-10-25-43 : , with the following exceptions:

a. An employee of the decision maker or service provider (and its other related parties), except if the employee is used in an effort to circumvent the provisions of the Variable Interest Entities Subsections of this Subtopic.

b. An employee benefit plan of the decision maker or service provider (and its other related parties), except if the employee benefit plan is used in an effort to circumvent the provisions of the Variable Interest Entities Subsections of this Subtopic.

For purposes of evaluating the conditions in paragraph 810-10-55-37 : , the quantitative approach described in the definitions of the terms *expected losses*, *expected residual returns*, and *expected variability* is not required and should not be the sole determinant as to whether a reporting entity meets such conditions.

### Pending Content

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020* | **Transition Guidance:** 810-10-65-9 :

For purposes of evaluating the conditions in paragraph 810-10-55-37 : , any variable interest in an entity that

is held by a **related party** of the decision maker or service provider should be considered in the analysis. Specifically, a decision maker or service provider should include its direct variable interests in the entity and its indirect variable interests in the entity held through related parties, considered on a proportionate basis. For example, if a decision maker or service provider owns a 20 percent interest in a related party and that related party owns a 40 percent interest in the entity being evaluated, the decision maker's or service provider's interest would be considered equivalent to an 8 percent direct interest in the entity for the purposes of evaluating whether the fees paid to the decision maker(s) or the service provider(s) are not variable interests (assuming that they have no other relationships with the entity). The term *related parties* in this paragraph refers to all parties as

defined in paragraph 810-10-25-43 : , with the following exceptions:

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

a. An employee of the decision maker or service provider (and its other related parties), except if the employee is used in an effort to circumvent the provisions of the Variable Interest Entities Subsections of this Subtopic.

b. An employee benefit plan of the decision maker or service provider (and its other related parties), except if the employee benefit plan is used in an effort to circumvent the provisions of the Variable Interest Entities Subsections of this Subtopic.

> For purposes of evaluating the conditions in paragraph 810-10-55-37 : , the quantitative approach described in the definitions of the terms *expected losses*, *expected residual returns*, and *expected variability* is not required and should not be the sole determinant as to whether a reporting entity meets such conditions.

**55-38** Fees paid to decision makers or service providers that do not meet all of the conditions in paragraph 810-10-55-37 : are variable interests.

### > > > Operating Leases

**55-39** Receivables under an operating lease are assets of the lessor entity and provide returns to the lessor entity with respect to the leased property during that portion of the asset's life that is covered by the lease. Most operating leases do not absorb variability in the fair value of a VIE's net assets because they are a component of that variability. Guarantees of the residual values of leased assets (or similar arrangements related to leased assets) and options to acquire leased assets at the end of the lease terms at specified prices may be variable interests in the lessor entity if they meet the conditions described in paragraphs 810-10-25-55 through 25-56 :

. Alternatively, such arrangements may be variable interests in portions of a VIE as described in paragraph 810-10-25-57 : . The guidance in paragraphs 810-10-55-23 through 55-24 : related to debt instruments applies to creditors of lessor entities.

### > > > Variable Interest of One VIE in Another VIE

**55-40** One VIE is the primary beneficiary of another VIE if it meets the conditions in paragraph 810-10-25-38A :

. A VIE that is the primary beneficiary of a second VIE will consolidate that second VIE. If another reporting entity consolidates the first VIE, that reporting entity's consolidated financial statements include the second VIE because the second VIE had already been consolidated by the first. For example, if Entity A (a VIE) is the primary beneficiary of Entity B (a VIE), Entity A consolidates Entity B. If Entity C is the primary beneficiary of Entity A, Entity C consolidates Entity A, and Entity C's consolidated financial statements include Entity B because Entity A has consolidated Entity B.

**55-41** A transferor's interests in financial assets in a VIE is a variable interest in the transferee entity but it is not a variable interest in a second VIE to which the transferee issues a beneficial interest. The following illustrates this point:

a. Entity A transfers financial assets to VIE B (a VIE that holds no other assets), retains a subordinated beneficial interest, and reports the transfer as a sale under the provisions of Topic 860 : .

b. VIE B issues all of its senior beneficial interests in the transferred assets to VIE C. VIE C issues various types of interests in return for cash and uses the cash to pay VIE B. VIE B uses the cash received from VIE C to pay Entity A.

c. Entity A's subordinated beneficial interest is a variable interest in VIE B, but neither VIE B nor Entity A has a variable interest in VIE C.

### > Illustrations

---

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

### > > Example 1: Expected Losses, Expected Residual Returns, and Expected Variability

**55-42** This Example illustrates a computation of **expected losses** , **expected residual returns** , and

**expected variability** and is intended to explain the meaning of those terms. Entities will not necessarily be able to estimate probabilities to use a precise computation of the type illustrated, but they should use their best efforts to achieve the objective described. This Example is based on a hypothetical pool of financial assets with total contractual cash flows of $1 billion and has the following assumptions:

a. A single party holds all of the beneficial interests in the VIE, and the VIE has no liabilities.

b. There is no decision maker because the VIE's activities are completely predetermined.

c. All cash flows are expected to occur in one year or not to occur at all.

d. The appropriate discount rate (the interest rate on risk-free investments) is 5 percent.

e. No other factors affect the fair value of the assets. Thus, the present value of the expected cash flows from the pool of financial assets is assumed to be equal to the fair value of the assets.

**55-43** This Example uses a simple situation intended to illustrate the concepts of expected losses, expected residual returns, and expected variability. Since it is assumed that there is only one party involved, the identity of the primary beneficiary is obvious.

**55-44** The following table shows the computation of expected cash flows using the cash flow possibilities that the variable interest holder has identified. The items to be included in expected cash flows of a VIE are described in

the definition of the terms **expected losses** , **expected residual returns** , and **expected variability** .

## (Amounts in Thousands)

| Estimated Cash Flows | Probability | Expected Cash Flows | Fair Value |
|---|---|---|---|
| $ 650,000 | 5.0% | $ 32,500 | $ 30,952 |
| 700,000 | 10.0 | 70,000 | 66,667 |
| 750,000 | 25.0 | 187,500 | 178,571 |
| 800,000 | 25.0 | 200,000 | 190,477 |
| 850,000 | 20.0 | 170,000 | 161,905 |
| 900,000 | 15.0 | 135,000 | 128,571 |
| | 100.0% | $ 795,000 | $ 757,143 |

**55-45** The expected cash flows are $795,000, and the fair value of the pool of assets is $757,143.

**55-46** The following table shows how expected losses are computed once the expected cash flows are determined. Estimated cash flows (possible outcomes) are compared with the computed expected cash flows (probability-weighted outcomes). Estimated cash flows that are less than the expected cash flows contribute to expected losses, and cash flow possibilities that exceed the expected cash flows contribute to expected residual returns.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

**(Amounts in Thousands)**

| Estimated Cash Flows (a) | Expected Cash Flows | Difference Estimated (Losses) Residual Returns | Probability | Expected Losses Based on Expected Cash Flows | Expected Losses Based on Fair Value |
|---|---|---|---|---|---|
| $  650,000 | $  795,000 | $  (145,000) | 5.0% | $  (7,250) | $  (6,905) |
| 700,000 | 795,000 | (95,000) | 10.0 | (9,500) | (9,048) |
| 750,000 | 795,000 | (45,000) | 25.0 | (11,250) | (10,714) |
| 800,000 | 795,000 | 5,000 | 25.0 | | |
| 850,000 | 795,000 | 55,000 | 20.0 | | |
| 900,000 | 795,000 | 105,000 | 15.0 | | |
| | | | 100.0% | $  (28,000) | $  (26,667) |

(a) The computation in this Example uses the probability times the difference between the estimated cash flows and expected cash flows and then discounts the result to arrive at fair value. The same result can be achieved by using the probability times the difference between the present value of the estimated cash flows and the fair value. In situations in which the timing of the cash flows varies, that alternate form may be easier to use.

**55-47** The term *expected losses* refers to the expected losses based on fair value (using fair value as the benchmark), which in this Example is $26.667 million.

**55-48** The following table shows how expected residual returns are computed for the same pool of assets.

**(Amounts in Thousands)**

| Estimated Cash Flows | Expected Cash Flows | Difference Estimated (Losses) Residual Returns | Probability | Expected Residual Return Based on Expected Cash Flows | Expected Residual Return Based on Fair Value |
|---|---|---|---|---|---|
| $  650,000 | $  795,000 | $  (145,000) | 5.0% | | |
| 700,000 | 795,000 | (95,000) | 10.0 | | |
| 750,000 | 795,000 | (45,000) | 25.0 | | |
| 800,000 | 795,000 | 5,000 | 25.0 | $  1,250 | $  1,191 |
| 850,000 | 795,000 | 55,000 | 20.0 | 11,000 | 10,476 |
| 900,000 | 795,000 | 105,000 | 15.0 | 15,750 | 15,000 |
| | | | 100.0% | $  28,000 | $  26,667 |

**55-49** The term *expected residual returns* refers to the expected residual returns based on fair value (using fair value as the benchmark), which in this Example is $26.667 million. Expected variability is a measure of total variability in either direction. It is the sum of the absolute values of the expected losses and expected residual returns.

**> > Example 2: Calculation of Expected Losses If There Is No History of, nor Future Expectation of, Net Losses**

**55-50** This Example illustrates the calculation of expected losses if a legal entity has no history of net losses and expects continued profitability. This Example has the following assumptions:

a. On January 1, 2004, Entity A is formed to purchase a building, 95 percent of which is financed by debt and 5 percent by equity. The lenders will have recourse only to the building in the event that Entity A does not make the required debt payments.

b. On the same day, Entity B enters into a five-year-market-rate lease for the building from Entity A that includes a guarantee of a portion of the building's residual value. The present value of the minimum lease payments, including the residual value guarantee, is less than 90 percent of the fair value of the building.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

c. There are no other interests in Entity A.

d. The appropriate discount rate is assumed to be 5 percent.

**Pending Content**

**Transition Date:** *(P) December 16, 2018; (N) December 16, 2021* | **Transition Guidance:** 842-10-65-1 :

This Example illustrates the calculation of expected losses if a legal entity has no history of net losses and expects continued profitability. This Example has the following assumptions:

a. On January 1, 2004, Entity A is formed to purchase a building, 95 percent of which is financed by debt and 5 percent by equity. The lenders will have recourse only to the building in the event that Entity A does not make the required debt payments.

b. On the same day, Entity B enters into a five-year-market-rate lease for the building from Entity A that includes a guarantee of a portion of the building's residual value. The sum of the present value of the **lease payments** and the residual value guarantee is less than substantially all the fair value of the building.

c. There are no other interests in Entity A.

d. The appropriate discount rate is assumed to be 5 percent.

**55-51** The estimated annual outcomes in the Example include both estimated cash flows and the estimated fair value of Entity A's assets to be distributed to variable interest holders in lieu of cash, exclusive of cash flows (or flows of other assets) to and from variable interests. The guarantee is a variable interest in Entity A because it is an interest in assets with a fair value that is more than half of the total fair value of Entity A's assets. Therefore, losses absorbed by the residual value guarantee are losses of Entity A and are included in the outcomes used to calculate expected losses. For calculation simplicity, the estimated outcomes, which include both cash flows and changes in the fair value of Entity A's net assets, and related probabilities are assumed to be the same each year of the five-year lease, and at the end of the lease, the carrying value of the building is assumed to be its fair value.

**55-52** The following table shows the January 1, 2004, calculation of the expected outcome at the inception of the guarantee identified as a variable interest. The fair value of the expected outcome is assumed to be equal to the sum of the present values of probability-weighted estimated annual outcomes for the five-year lease term, excluding the effects of the residual value guarantee. Any variation in estimated outcomes, as compared to the expected outcome, represents a change to the value of Entity A's net assets exclusive of variable interests from the calculation-date value of those net assets.

***Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.***
***©2023 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***
***https://www.accountingresearchmanager.com/q/1g7l3***

**(Amounts in Thousands)**

| Estimated Annual Outcomes [a] | | Probability | Expected Annual Outcome | | Fair Value of Expected Five-Year Outcomes [b] | |
|---|---|---|---|---|---|---|
| $ | (10,000) | 5.0% | $ | (500) | $ | (2,165) |
| | (5,000) | 10.0 | | (500) | | (2,165) |
| | - | 20.0 | | - | | - |
| | 10,000 | 50.0 | | 5,000 | | 21,648 |
| | 50,000 | 15.0 | | 7,500 | | 32,471 |
| | | 100.0% | $ | 11,500 | $ | 49,789 |

(a) Estimated outcomes include both estimated cash flows, exclusive of cash flows (or flows of other assets) to and from variable interests, and the estimated fair value of Entity A's assets to be distributed to variable interest holders in lieu of cash.

(b) The fair value is assumed to be the sum of the present values of the expected outcomes for each year of the five-year period. Because of the simplifying assumption that the annual estimated outcomes and probabilities are the same for each year of the five-year period, the expected annual outcomes are treated as level annuities in the present value calculations to determine the fair value of the five-year expected outcomes.

**55-53** The following table shows the calculation of expected losses as the negative variability from the fair value of the expected outcome. Note that the estimated annual outcomes of $0 and $10,000 contribute to expected losses although neither amount is negative. To the extent that an estimated outcome, although positive, is less than the expected outcome, the legal entity will lose value in relation to its value based on the expected outcome. The following table illustrates the calculation of this expected loss as the fair value of the probability-weighted negative variations from the expected outcome. Expected losses include all such negative variations.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

**(Amounts in Thousands)**

| Estimated Annual Outcomes | Present Value of Estimated Five-Year Outcomes [a] | Fair Value of Expected Five-Year Outcomes (from the table in the preceding paragraph) | Positive (Negative) Variation from Expected Value | Probability | Expected Losses | Residual Returns |
|---|---|---|---|---|---|---|
| $ (10,000) | $ (43,294) | $ 49,789 | $ (93,083) | 5.00% | $ (4,654) | |
| (5,000) | (21,648) | 49,789 | (71,437) | 10.0 | (7,144) | |
| - | - | 49,789 | (49,789) | 20.0 | (9,958) | |
| 10,000 | 43,294 | 49,789 | (6,495) | 50.0 | (3,247) | |
| 50,000 | 216,473 | 49,789 | 166,684 | 15.0 | - | $25,003 |
| | | | | 100.00% | $(25,003) | $25,003 |

(a) Because of the simplifying assumption that the annual estimated outcomes are the same for each year of the five-year period, the estimated annual outcomes are treated as level annuities in the calculation of the present value of estimated five-year outcomes.

**55-54** Negative variations can occur without having a net loss reflected in any of the estimated outcomes. Consequently, a profitable VIE will have expected losses, which must be considered in evaluating the sufficiency

of equity-at-risk under paragraph 810-10-25-45(c) : ⬜.

### > > Example 3: Determining the Variability to Be Considered

**55-55** The following Cases illustrate the application of the guidance in paragraphs 810-10-25-21 through 25-36 :

⬜ for determining the variability to be considered in the following situations:

a. Financial VIE primarily financed by fixed-rate debt, holding investments in longer-term fixed-rate debt (Case A)

b. Financial VIE primarily financed by fixed-rate debt, holding investments in longer-term fixed- and variable-rate debt (with a fixed-rate swap) (Case B)

c. Financial VIE primarily financed by fixed-rate debt, holding investments in foreign-currency-denominated debt (with a currency swap) (Case C)

d. Financial VIE primarily financed by floating-rate debt, holding investments in fixed-rate securities (Case D)

e. Financial VIE financed by credit-linked notes holding highly rated floating-rate investments and a credit default swap (Case E)

f. Retail-operating VIE (Case F)

g. Lessor VIE (direct financing lease) with single lessee (operating lease) (Case G)

h. VIE holding both a fixed-price forward contract to buy and a fixed-price forward contract to sell electricity (Case H).

**55-56** Cases A-H share all of the following assumptions:

a. All the entities are presumed to be VIEs.

b. All variable interests are variable interests in the VIE (as a whole) rather than variable interests in

specified assets of the VIE, based on the guidance in paragraphs 810-10-25-55 through 25-59 : ⬜.

***Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.***
***©2023 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***
***https://www.accountingresearchmanager.com/q/1g7l3***

c. A primary beneficiary has not been identified; however, the determination of the primary beneficiary should be made in accordance with the guidance in paragraphs 810-10-25-38A through 25-38G : .

**55-57** In each Case, a two-step evaluation is performed as follows:

a. Step 1: Analyze the nature of the risks in the VIE.

b. Step 2: Determine the purpose(s) for which the VIE was created and determine the variability the VIE is designed to create and pass along to its interest holders.

**55-58** In the diagrams in each Case, creators are on the left and the variable interests are on the right; the instruments that could be considered either creators or absorbers of variability are in the bottom center.

**> > > Case A: Financial VIE Primarily Financed by Fixed-Rate Debt, Holding Investments in Longer-Term Fixed-Rate Debt**

**55-59** A VIE is created and financed with $96 of 3-year fixed-rate debt and $4 of equity from investors. The VIE uses the proceeds to purchase $100 of B- and BB-rated fixed-rate securities with contractual maturities ranging from 6 to 8 years. At the end of three years, all the investments will be sold with proceeds used, first, to pay the fixed-rate debt holders and, second, to pay the equity holders to the extent proceeds remain. The transaction was marketed to potential debt investors as an investment in a portfolio of below-investment-grade, fixed-rate investments with a longer weighted-average maturity than the liabilities and credit support from the equity tranche. The equity tranche was negotiated to absorb the first dollar risk of loss related to credit risk and interest rate risk and to receive any residual reward from a favorable change in interest rates or credit risk that affects the proceeds received on the sale of the investments in the portfolio. The following diagram illustrates this situation.



**55-60** The VIE is exposed to the following risks:

a. Credit risk associated with a possible default by the issuers of the investments in the portfolio with respect to principal and interest payments

b. Interest rate risk associated with interim changes in the fair value of the fixed-rate periodic interest payments received on the fixed-rate investment portfolio

c. Interest rate risk associated with changes in cash received upon the sale of fixed-rate investments prior to maturity.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

**55-61** The following factors should be considered in the determination of the purpose(s) for which the VIE was created and in the determination of the variability the VIE is designed to create and pass along to its interest holders:

> a. The VIE was marketed to debt investors as a VIE that will be exposed to credit risk and changes in the fair value of the investments over the three-year life of the VIE due to changes in intermediate-term interest rates, with the equity tranche negotiated to absorb the first dollar risk of loss. It has been determined that substantive subordination is present with respect to these risks.

> b. The VIE was not designed to create and pass along to its interest holders interest rate risk associated with interim changes in fair value of the periodic fixed-rate interest payments received on the investments, based on the nature and terms of the debt and equity interests issued by the VIE.

Based on this analysis, it can be determined that the VIE was designed to create and pass along the risks in (a) and (c) in the preceding paragraph to the debt and equity investors, which are the VIE's variable interest holders.

**> > > Case B: Financial VIE Primarily Financed by Fixed-Rate Debt, Holding Investments in Longer-Term Fixed- and Variable-Rate Debt (with a Fixed-Rate Swap)**

**55-62** A VIE is created and financed with $96 of 3-year fixed-rate debt and $4 of equity from investors. The VIE uses the proceeds to purchase $40 of B- and BB-rated fixed-rate securities with contractual maturities ranging from 6 to 8 years and $60 of B- and BB-rated floating-rate securities with contractual maturities ranging from 6 to 8 years (average maturity of 7 years). In addition, the VIE enters into a $60 notional 7-year pay floating and receive fixed interest rate swap with a bank. The swap economically converts the $60 of floating-rate investments to fixed-rate investments of the same average maturity. At the end of three years, all the investments will be sold, and the swap settled in cash, with the net proceeds used, first, to pay the fixed-rate debt holders and, second, to pay the equity holders to the extent proceeds remain. Net amounts payable to the swap counterparty periodically and at the end of three years (if required) take priority over payments made to the debt and equity investors. The transaction was marketed to potential debt investors as an investment in a portfolio of below-investment-grade fixed-rate and floating-rate investments (with the floating rate swapped for fixed) with a longer weighted-average maturity (including the effect of the swap) than the liabilities and credit support from the equity tranche. The equity tranche was negotiated to absorb the first dollar risk of loss related to credit risk and interest rate risk, and to receive any residual benefit from a favorable change in interest rates or credit risk that affects the proceeds received on the sale of the investments in the portfolio (including settlement of the swap prior to its contractual maturity). The following diagram illustrates this situation.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*



CREATORS OF VARIABILITY | VARIABLE INTERESTS

6-8 Year Investments — Fixed Rate — $40 — VIE — $96 — Fixed Rate — 3-Year Debt

6-8 Year Investments — $60 — Floating Rate — VIE — $4 — Residual Return — Equity Investors

Entity Receives Fixed Rate | Entity Pays Floating Rate

See Evaluation (paragraphs 810-10-55-63 through 55-64) — $60 Notional 7-Year Swap

**55-63** The VIE is exposed to the following risks:

a. Credit risk associated with a possible default by the issuers of the investments in the portfolio with respect to principal or interest payments

b. Credit risk associated with a possible default by the swap counterparty with respect to interest payments and the settlement amount, if any, due to the VIE at the end of three years

c. Interest rate risk associated with changes in the fair value of the fixed-rate periodic interest payments received on the fixed-rate investment portfolio and on the fixed leg of the swap

d. Interest rate risk associated with changes in the periodic interest payments received on the floating-rate investment portfolio

e. Interest rate risk associated with changes in cash received upon the sale of fixed-rate investments before maturity

f. Interest rate risk associated with the amount received or paid upon settlement of the swap at the end of three years.

**55-64** The following factors should be considered in the determination of the purpose(s) for which the VIE was created and in the determination of the variability the VIE is designed to create and pass along to its interest holders:

a. The VIE was marketed to debt investors as a VIE that will be exposed to credit risk and changes in the fair value of a portfolio of intermediate-term fixed-rate investments (including floating-rate investments effectively converted to fixed-rate investments by the swap) over the three-year life of the VIE due to changes in intermediate-term interest rates, with the equity tranche negotiated to absorb the first dollar risk of loss. It has been determined that substantive subordination is present with respect to these risks.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

b. The swap counterparty is senior to the debt and equity investors, and the debt and equity investors understand that they are also exposed to the credit risk from possible default by the swap counterparty to the extent the swap is an asset to the VIE.

c. The interest rate swap is strongly indicated as a creator of variability because its underlying is based on observable market rates and it is senior in priority to other interest holders. Although the notional amount of the swap relates to a majority of the assets of the VIE, changes in the cash flows or fair value of the swap are not expected to offset all, or essentially all, of the risk or return (or both) related to those investments because the fair value and cash flows of the VIE's investments are expected to be affected by risk factors other than changes in market interest rates (that is, credit risk).

d. The VIE was not designed to create and pass along to its interest holders interest rate risk associated with changes in the fair value of the fixed-rate periodic interest payments received on the fixed-rate investment portfolio and on the fixed leg of the swap, based on the nature and terms of the other contracts the VIE has entered into.

e. The VIE was not designed to create and pass along to its interest holders interest rate risk associated with changes in the periodic interest payments received on the floating-rate investment portfolio, based on the nature and terms of the debt and equity interests issued by the VIE.

Based on this analysis, it can be determined that the VIE was designed to create and pass along the risks in (a), (b), (e), and (f) in the preceding paragraph to the debt and equity investors, which are the VIE's variable interest holders. The interest rate swap is considered a creator of the VIE's variability based on the design of the VIE and

the guidance in paragraphs 810-10-25-35 through 25-36 : .

### > > > Case C: Financial VIE Primarily Financed by Fixed-Rate Debt, Holding Investments in Foreign-Currency-Denominated Debt (with a Currency Swap)

**55-65** A VIE is created and financed with $96 of 5-year fixed-rate debt and $4 of equity from investors. The VIE uses the proceeds to purchase $100 of B- and BB-rated fixed-rate securities denominated in Japanese Yen (JPY) with contractual maturities of 5 years. In addition, the VIE enters into a $100 notional 5-year pay-fixed JPY and receive-fixed U.S. dollars (USD) cross-currency swap with a bank. The swap economically converts the fixed-rate JPY-denominated investments to fixed-rate USD investments, effectively offsetting the foreign exchange risk from both periodic interest payments and the amount due upon maturity for the JPY-denominated investments. At the end of five years, all the investments will mature and a final settlement will be paid or received by the VIE on the swap, with the net proceeds used, first, to pay the fixed-rate debt holders and, second, to pay the equity holders to the extent proceeds remain. The transaction was marketed to debt investors as an investment in a portfolio of below-investment-grade, JPY fixed-rate investments (with a third-party swap designed to offset the JPY exchange risk associated with interest and principal repayment on the investments) and credit support from the equity tranche. The equity tranche was negotiated to absorb the first dollar risk of loss.The following diagram illustrates this situation.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*



CREATORS OF VARIABILITY                                    VARIABLE INTERESTS

5-Year JPY-
Denominated
Investments

$100

Fixed Rate

VIE

$96

Fixed Rate

5-Year
Debt

Residual Return

$4

Equity
Investors

USD Principal
and Fixed
Interest

JPY Principal
and Fixed
Interest

$100, 5-Year
Currency
Swap

See Evaluation
(paragraphs 810-10-55-66 through 55-67)

**55-66** The VIE is exposed to the following risks:

a. Credit risk associated with a possible default by the issuers of the investments in the portfolio with respect to principal and interest payments

b. Credit risk associated with a possible default by the cross-currency swap counterparty with respect to interest payments and the settlement amount, if any, due to the VIE at the end of five years

c. Interest rate risk associated with changes in the fair value of the fixed-rate periodic interest payments received on the fixed-rate investment portfolio and on the receive leg of the cross-currency swap

d. Foreign currency exchange risk associated with the periodic interest payments received on the fixed-rate JPY-denominated investments and the final receipt of principal at maturity

e. Foreign currency exchange risk associated with the periodic interest payments or receipts and the amount received or paid upon final settlement of the cross-currency swap at the end of five years.

**55-67** The following factors should be considered in the determination of the purpose(s) for which the VIE was created and in the determination of the variability the VIE is designed to create and pass along to its interest holders:

a. The VIE was marketed to debt investors as a VIE that will be exposed to credit risk from possible default by the issuers of the JPY-denominated investments (principal and interest) as well as credit risk from possible default by the cross-currency swap counterparty, with the equity tranche negotiated to absorb the

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

first dollar risk of loss related to these risks. It has been determined that substantive subordination is present with respect to these risks.

b. The VIE was created to provide an investment vehicle for debt and equity investors to be exposed to the credit risk of entities whose securities are denominated in JPY.

c. The swap counterparty is senior to the debt and equity investors, and the debt and equity investors are also exposed to the credit risk from possible default by the swap counterparty to the extent the swap is an asset to the VIE.

d. The currency swap is strongly indicated as a creator of variability because its underlying is based on observable market rates and it is senior in priority to other interest holders. Although the notional amount of the swap relates to a majority of the assets of the VIE, changes in the cash flows or fair value of the swap are not expected to offset all, or essentially all, of the risk or return (or both) related to those investments because the fair value and cash flows of the VIE's investments are expected to be affected by risk factors other than changes in foreign currency exchange rates (that is, credit risk).

e. The VIE was not designed to create and pass along to its interest holders interest rate risk associated with changes in the fair value of the fixed-rate periodic interest payments received on the fixed-rate investment portfolio and on the receive leg of the cross-currency swap, based on the nature and terms of the debt and equity contracts issued by the VIE.

Based on this analysis, it can be determined that the VIE was designed to create the risks in (a), (b), (d), and (e) in the preceding paragraph, and pass along the risks in (a) and (b) in the preceding paragraph to the debt and equity investors, which are the VIE's variable interest holders. The cross-currency swap is considered a creator of the VIE's variability based on the design of the VIE and the guidance in paragraphs 810-10-25-35 through 25-36 : .

### > > > Case D: Financial VIE Primarily Financed by Floating-Rate Debt, Holding Investments in Fixed-Rate Securities

**55-68** A VIE is created and financed with $90 of 3-year floating-rate debt and $10 of equity from investors. The VIE uses the proceeds to purchase $100 of AAA-rated fixed-rate securities, which mature in 3 years. The fixed periodic interest payments received on the investments are used to pay the floating-rate interest to the debt holders with the remainder used to provide a return to the equity investor. At the end of three years, all the investments will mature with proceeds used, first, to pay the floating-rate debt holders and, second, to pay the equity holder to the extent proceeds remain. The VIE is not actively managed. The transaction was marketed to potential debt investors as an investment in a portfolio of high-quality fixed-rate investments with the equity tranche negotiated to provide support in the event of a credit default on the investments or in the event the fixed-rate return on the investments is not sufficient to pay the floating-rate coupon on the debt. The equity tranche was negotiated to absorb the first dollar risk of loss. The following diagram illustrates this situation.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*



CREATORS OF VARIABILITY                                                        VARIABLE INTERESTS

**55-69** The VIE is exposed to the following risks:

  a. Credit risk associated with a possible default by the issuers of the investments in the portfolio with respect to principal or interest payments

  b. Interest rate risk associated with changes in the fair value of the fixed-rate periodic interest payments received on the fixed-rate investment portfolio.

**55-70** The following factors should be considered in the determination of the purpose(s) for which the VIE was created and in the determination of the variability the VIE is designed to create and pass along to its interest holders:

  a. The VIE was marketed to debt investors as an entity that will be exposed to changes in the fair value of periodic interest payments received on the investments due to changes in interest rates and credit risk associated with the investment portfolio, with the equity tranche negotiated to absorb the first dollar risk of loss. It has been determined that substantive subordination is present with respect to these risks.

  b. The equity investor has implicitly issued a $90 notional interest rate swap to the VIE in which that investor agrees to pay the VIE a floating rate and receive a fixed rate. However, the maximum amount payable to the VIE is limited to the equity investment. The debt holders will absorb the remaining variability caused by changes in interest rates.

  c. The VIE was created to provide an investment vehicle for debt and equity investors to be exposed to the credit risk and interest rate risk associated with a mismatch between the assets (fixed-rate) and liabilities (floating-rate).

  d. The VIE was designed to create and pass along to its interest holders interest rate risk associated with changes in fair value of the periodic fixed-rate interest payments received on the investments, based on the nature and terms of debt and equity interests issued by the VIE.

Based on this analysis, it can be determined that the VIE was designed to create and pass along the risks in (a) and (b) in the preceding paragraph to the debt and equity investors, which are the VIE's variable interest holders.

**> > > Case E: Financial VIE Financed by Credit-Linked Notes Holding Highly Rated Floating-Rate Investments and a Credit Default Swap**
**55-71** Bank A holds a $100 investment in bonds issued by ABC Entity and enters into a credit default swap with a newly established VIE that has no equity investors and no decision-making ability. The VIE issues $100 of credit-linked notes to investors. The credit-linked notes pay a return equal to the London Interbank Offered Rate

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

(LIBOR) + 90 basis points and mature in 5 years. The proceeds from the issuance of the credit-linked notes are invested in floating-rate AAA-rated investments. The terms of the credit default swap require Bank A to pay quarterly a swap premium of 100 basis points to the VIE. If a credit event occurs, as defined in the agreement, the VIE pays Bank A the notional amount of $100, and receives from Bank A the bonds issued by ABC Entity. The VIE then settles its five-year notes by delivering to the note holder the defaulted ABC Entity bonds or by selling the bonds and delivering cash.

**55-72** The coupon on the floating-rate AAA-rated investments, plus the premium received on the credit default swap, will fund the coupon payment on the credit-linked notes. The VIE was marketed to potential investors as a floating-rate investment with an enhanced yield due to the assumption of credit risk of the referenced entity (in this case, ABC Entity).The following diagram illustrates this situation.



**55-73**The VIE is exposed to the following risks:

    a. Credit risk associated with ABC Entity

    b. Credit risk associated with the AAA-rated investments

    c. Credit risk associated with possible default by Bank A with respect to premium payments made to the VIE

    d. Interest rate risk associated with changes in the cash flows from the interest payments received on the floating-rate investments.

**55-74**The following factors should be considered in the determinationof the purpose(s) for which the VIE was created and in the determination of the variability the VIE is designed to create and pass along to its interest holders:

    a. The VIE was marketed to the note holders as a VIE that will be exposed to credit risk associated with ABC Entity through the credit default swap, with a small amount of credit risk from Bank A, because the notes, if there is no credit event that triggers settlement of the credit default swap, are fully collateralized by AAA-rated investments.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

b. The VIE has sold credit protection on ABC Entity to Bank A and has purchased credit protection on ABC Entity from the note holders, who are expected to receive an enhanced return over the AAA floating rate investment for assuming the credit risk of ABC Entity and (to a lesser extent) the credit risk of Bank A.

c. The written credit default swap is strongly indicated as a creator of variability because its underlying is based on observable market variables and it is senior in priority to other interest holders.

d. The VIE was not designed to create and pass along to its interest holders interest rate risk associated with changes in cash flows from the periodic interest payments received on the floating-rate investments, based on the nature and terms of the credit-linked notes issued by the VIE.

Based on this analysis, it can be determined that the VIE was designed to create and pass along the risks in (a), (b), and (c) in the preceding paragraph to the note holders, which are the VIE's variable interest holders. The written credit default swap is considered a creator of the VIE's variability based on the design of the VIE and

considering the guidance in paragraphs 810-10-25-35 through 25-36 : .

### > > > Case F: Retail-Operating VIE

**55-75** A VIE is created by a furniture manufacturer and a strategic investor to sell wood furniture to retail customers in a particular geographic region of the country that has no viable distribution channel. The VIE is established with $100 of equity contributed by the furniture manufacturer and $3 million of 10-year fixed-rate debt financed by the strategic investor. Interest is paid to the fixed-rate debt holder from operations before funds are available to the equity holder. The furniture manufacturer has guaranteed the fixed-rate debt to the strategic investor. The following diagram illustrates this situation.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*



CREATORS OF VARIABILITY | VARIABLE INTERESTS

**55-76** The VIE is exposed to the following risks (collectively, operating risks):

    a. Sales volume risk

    b. Retail furniture price risk

    c. Inventory price risk

    d. Other operating cost risk.

**55-77** The following factors should be considered in the determination of the purpose(s) for which the VIE was created and in the determination of the variability the VIE is designed to create and pass along to its interest holders:

    a. The VIE was created to enable the furniture manufacturer to extend its existing business line into a particular geographic region that lacked a viable distribution channel.

    b. The furniture manufacturer is absorbing variability from the operations of the VIE through its guarantee of the debt.

    c. The debt interest was negotiated as a fixed-rate investment in a retail operating VIE, supported by the furniture manufacturer.

Based on this analysis, it can be determined that the VIE was designed to create and pass along the risks in (a), (b), (c), and (d) in the preceding paragraph to the debt and equity investors (the strategic investor and furniture manufacturer, respectively), which are the VIE's variable interest holders. The furniture manufacturer also holds

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

a variable interest with respect to its guarantee of the debt of the VIE because that contract, by design, absorbs a portion of the VIE's variability due to operating risks.

### > > > Case G: Lessor VIE (Direct Financing Lease) with Single Lessee (Operating Lease)

**55-78** A VIE is created and financed with $950 of 5-year fixed-rate debt and $50 of equity. The VIE uses the proceeds from the issuance to purchase property to be leased to a lessee with a AA credit rating. The equity provides protection (up to $50) to the debt related to both credit risk and interest rate risk because the debt is paid before any cash flows are available to the equity investors. The lease has a five-year term and is classified as a direct finance lease by the lessor and as an operating lease by the lessee. The lessee is required to provide a first-loss residual value guarantee for the expected future value of the leased property at the end of five years, and it has a fixed-price purchase option to acquire the property for the same amount. A third-party residual value guarantor provides a very small additional residual value guarantee to the lessor. The governing documents for the VIE do not permit the VIE to buy additional assets or sell existing assets during the five-year holding period. The VIE was formed so that the lessee will have rights to occupy and use the property under an operating lease and retain substantially all of the risks and rewards from appreciation or depreciation in value of the leased property. The transaction was marketed to potential investors as an investment in a portfolio of AA-rated assets collateralized by leased property that would provide a fixed-rate return to debt holders equivalent to AA-rated assets. The return to equity investors is expected to be slightly greater than the return provided to the debt investors because the equity is subordinated with respect to the obligation of the lessee to the VIE.The following diagram illustrates this situation.



### Pending Content

**Transition Date:** *(P) December 16, 2018; (N) December 16, 2021* | **Transition Guidance:**842-10-65-1 :

A VIE is created and financed with $950 of 5-year fixed-rate debt and $50 of equity. The VIE uses the proceeds from the issuance to purchase an **underlying asset** to be leased to a **lessee** with a AA credit rating. The

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

equity provides protection (up to $50) to the debt related to both credit risk and interest rate risk because the debt is paid before any cash flows are available to the equity investors. The **lease** has a five-year term and is classified as a **direct financing lease** by the **lessor** and as an **operating lease** by the lessee. The lessee is required to provide a first-loss residual value guarantee for the expected future value of the underlying asset at the end of five years, and it has a fixed-price purchase option to acquire the underlying asset for the same amount. A third-party residual value guarantor provides a very small additional residual value guarantee to the lessor. The governing documents for the VIE do not permit the VIE to buy additional assets or sell existing assets during the five-year holding period. The VIE was formed so that the lessee will have rights to occupy and use the underlying asset under an operating lease and retain substantially all of the risks and rewards from appreciation or depreciation in value of the underlying asset. The transaction was marketed to potential investors as an investment in a portfolio of AA-rated assets collateralized by an underlying asset that would provide a fixed-rate return to debt holders equivalent to AA-rated assets. The return to equity investors is expected to be slightly greater than the return provided to the debt investors because the equity is subordinated with respect to the obligation of the lessee to the VIE. The following diagram illustrates this situation.



**55-79** The VIE is exposed to the following risks:

    a. Price risk with respect to changes in fair value of the underlying property

    b. Credit risk associated with possible default by the lessee of the property with respect to the lease payments

    c. Interest rate risk associated with changes in the fair value of the future lease payments.

**Pending Content**

**Transition Date:** *(P) December 16, 2018; (N) December 16, 2021* | **Transition Guidance:** 842-10-65-1 :

The VIE is exposed to the following risks:

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

a. Price risk with respect to changes in fair value of the underlying asset

b. Credit risk associated with possible default by the lessee of the underlying asset with respect to the lease payments

c. Interest rate risk associated with changes in the fair value of the future lease payments.

**55-80** The following factors should be considered in the determination of the purpose(s) for which the VIE was created and in the determination of the variability the VIE is designed to create and pass along to its interest holders:

a. Although the lease payments are fixed, the VIE was not designed to be exposed to interim changes in fair value of those lease payments due to interest rate risk because the VIE is not expected to sell the property before maturity of the fixed-rate debt.

b. The primary purpose for which the VIE was created was to provide the lessee with use of the property for five years with substantially all of the rights and obligations of ownership.

c. The residual value guarantee effectively transfers substantially all of the risk associated with the underlying property (that is, declines in value) to the lessee. Therefore, the variability that is transferred to that interest holder is strongly indicated as variability that the VIE is designed to create and pass along to its interest holders.

d. The fixed-price purchase option effectively transfers substantially all of the rewards from the underlying property (that is, increases in value) to the lessee.

e. The VIE is designed to be exposed to the risks associated with a cumulative change in fair value of the leased property at the end of five years as well as credit risk from possible default by the lessee with regard to minimum lease payments.

f. The VIE was marketed to potential investors as an investment in a portfolio of AA-rated assets collateralized by leased property that would provide a fixed-rate return to debt holders equivalent to AA-rated assets.

g. The role of the residual value guarantee and fixed-price purchase option in the design of the VIE, regardless of their legal form or accounting classification, dictates whether those interests shall be treated as creating risk for the VIE or absorbing risk from the VIE. Therefore, price risk with respect to changes in fair value of the underlying property is a relevant risk for the VIE, even though the lessor VIE records a direct financing lease receivable, rather than the property itself, on its balance sheet for accounting purposes.

Based on this analysis, it can be determined that the VIE was designed to create and pass along the risk in (a) in the preceding paragraph to the third-party guarantor and the lessee (with respect to the residual value guarantee and fixed-price purchase option) and the risk in (b) in the preceding paragraph to the note and equity holders, all of which are the VIE's variable interest holders.

**Pending Content**

**Transition Date:** *(P) December 16, 2018; (N) December 16, 2021* | **Transition Guidance:** 842-10-65-1 : 🗋

The following factors should be considered in the determination of the purpose(s) for which the VIE was created and in the determination of the variability the VIE is designed to create and pass along to its interest holders:

a. Although the lease payments are fixed, the VIE was not designed to be exposed to interim changes in fair value of those lease payments due to interest rate risk because the VIE is not expected to sell the underlying asset before maturity of the fixed-rate debt.

b. The primary purpose for which the VIE was created was to provide the lessee with use of the underlying asset for five years with substantially all of the rights and obligations of ownership.

c. The residual value guarantee effectively transfers substantially all of the risk associated with the underlying asset (that is, declines in value) to the lessee. Therefore, the variability that is transferred to that

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

interest holder is strongly indicated as variability that the VIE is designed to create and pass along to its interest holders.

d. The fixed-price purchase option effectively transfers substantially all of the rewards from the underlying asset (that is, increases in value) to the lessee.

e. The VIE is designed to be exposed to the risks associated with a cumulative change in fair value of the underlying asset at the end of five years as well as credit risk from possible default by the lessee with regard to lease payments.

f. The VIE was marketed to potential investors as an investment in a portfolio of AA-rated assets collateralized by an underlying asset that would provide a fixed-rate return to debt holders equivalent to AA-rated assets.

g. The role of the residual value guarantee and fixed-price purchase option in the design of the VIE, regardless of their legal form or accounting classification, dictates whether those interests shall be treated as creating risk for the VIE or absorbing risk from the VIE. Therefore, price risk with respect to changes in fair value of the underlying asset is a relevant risk for the VIE, even though the lessor VIE records a net investment in the direct financing lease, rather than the underlying asset itself, on its balance sheet for accounting purposes.

> Based on this analysis, it can be determined that the VIE was designed to create and pass along the risk in (a) in paragraph 810-10-55-79 : to the third-party guarantor and the lessee (with respect to the residual value guarantee and fixed-price purchase option) and the risk in (b) in paragraph 810-10-55-79 to the note and equity holders, all of which are the VIE's variable interest holders.

### > > > Case H: VIE Holding Both a Fixed-Price Forward Contract to Buy and a Fixed-Price Forward Contract to Sell Electricity

**55-81** A financially distressed electricity producer wishes to monetize some of its in-the-money forward positions. One such contract is a physically settled forward contract to sell electricity to Party A at a fixed price one year in the future. A VIE is created and financed with $100 of 1-year fixed-rate debt from investors for the purpose of monetizing the value of the forward contract to sell for the electricity producer. The VIE uses the proceeds from issuance to purchase the physically settled forward contract to sell (from the VIE's perspective) electricity to Party A at a fixed price one year in the future. This contract is in-the-money by $100. After the electricity producer has received its $100, it has no further involvement with the VIE. The VIE enters into a separate at-market forward contract to buy (from the VIE's perspective) electricity at a lower fixed price from Party B on the same future date. Both forward contracts will be physically settled, and all other critical terms (except the fixed settlement price) of the two forward contracts are the same. Both forward contracts have rights senior to those of the investors and are derivatives whose underlying is a market observable price. The VIE is not actively managed. The debt was marketed to the investors as a fixed-rate one-year investment with an enhanced yield due to risk of possible default by either Party A or Party B with respect to their forward contracts with the VIE.The following diagram illustrates this situation.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

CREATORS OF VARIABILITY                                               VARIABLE INTERESTS



**55-82**The VIE is exposed to the following risks:

a. Electricity price risk, which affects the fair values of the fixed-price forward purchase contract and the fixed-price forward sales contract

b. Credit risk associated with possible default by the counterparty to the forward purchase contract

c. Credit risk associated with possible default by the counterparty to the forward sales contract.

**55-83**The following factors should be considered in the determinationof the purpose(s) for which the VIE was created and in the determination of the variability the VIE is designed to create and pass along to its interest holders:

a. The VIE was designed to hold offsetting positions with respect to electricity price risk through a forward purchase contract and a forward sales contract with terms that are the same (except for fixed settlement price).

b. The debt was marketed to the investors as a fixed-rate one-year investment with an enhanced yield due to risk of possible default by either Party A or Party B with respect to their forward contracts with the VIE.

c. To the extent electricity prices rise and the forward purchase contract (with Party B) increases in value (from the VIE's perspective), the debt investors will be exposed to credit risk to the extent that Party B defaults on its obligation.

d. To the extent electricity prices drop and the forward sales contract increases in value (from the VIE's perspective), the debt investors will be exposed to credit risk to the extent that Party A defaults on its obligation.

e. The forward to buy electricity at a fixed price is strongly indicated as a creator of variability because its underlying is based on observable market prices and it is senior in priority to the debt holders.

f. The forward to sell electricity at a fixed price is strongly indicated as a creator of variability because its underlying is based on observable market prices and is senior in priority to the debt holders.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

g. Changes in fair value of each forward contract are expected to offset all, or essentially all, of the risk and return related to the other forward contract, so a further analysis of the design of the VIE is necessary in order to conclude whether each forward contract is a creator of variability or a variable interest.

**55-84**A further analysis of the design of the VIE is necessary to conclude whether each fixed-price forward contract is a creator of variability or a variable interest because changes in the fair value of each contract are expected to offset all, or essentially all, of the risk and return related to the other contract. That analysis should consider the following factors:

a. The debt interests in this VIE were marketed on behalf of the electricity producer as fixed-rate debt exposed to the credit risk of the counterparties to the forward agreements.

b. The counterparties to the forward agreements did not participate significantly in the design of the VIE.

**55-85**In these circumstances, because they meet the characteristics described in paragraph 810-10-25-35(a) through (b) : and based on the further analysis of the design of the VIE, the two forward contracts are creators of the VIE's variability. Based on this analysis, it can be determined that the VIE was designed to create and pass along the risks in paragraph 810-10-55-82(a) through (c) : to the debt investors, which are the VIE's variable interest holders.

**55-86**If, instead of executing the transaction described in this Case, the electricity producer sold the fixed-price forward sales contract for $100 to an entity that physically owned a power plant and produced electricity, an analysis of the design of that entity would be required, which would involve developing a complete understanding of the purpose for which that entity was created. In this case, the electricity producer also has no further involvement with the entity after receiving its $100. Provided the fixed-priced forward contract to sell is senior in priority to other interest holders, that contract would be strongly indicated as a creator of variability because its underlying is based on observable market rates. In addition, changes in the cash flows or fair value of the fixed-price forward contract typically would not be expected to offset all, or essentially all, of the risk or return (or both) related to the power plant because the risk or return (or both) of the power plant would be affected by factors other than changes in electricity prices (for example, operating costs).

**55-87** Paragraph superseded by Accounting Standards Update No. 2014-07 :

**55-88** Paragraph superseded by Accounting Standards Update No. 2014-07 :

**55-89** Paragraph superseded by Accounting Standards Update No. 2014-07 :

**55-90** Paragraph moved to 810-10-55-206 : .

**55-90A** Paragraph moved to 810-10-55-207 : .

**55-91** Paragraph moved to 810-10-55-208 : .

**55-92** Paragraph moved to 810-10-55-209 : .

**> > Example 5: Identifying a Primary Beneficiary**
**55-93**The following cases are provided solely to illustrate the application of the guidance in paragraphs

810-10-25-38A through 25-38J : related to the identification of a primary beneficiary:

a. Commercial mortgage-backed securitization (Case A)

b. Asset-backed collateralized debt obligation (Case B)

c. Structured investment vehicle (Case C)

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

    d. Commercial paper conduit (Case D)

    e. Guaranteed mortgage-backed securitization (Case E)

    f. Residential mortgage-backed securitization (Case F)

    g. Property lease entity (Case G)

    h. Collaboration—Joint venture arrangement (Case H)

    i. Furniture manufacturing entity (Case I)

    j. Investment fund 1—Annual and performance-based fees and additional interests (Case J)

    k. Investment fund 2—Annual and performance-based fees and no additional interests (Case K)

    l. eCommerce Entity (Case L).

**Pending Content**

**Transition Date:** *(P) December 16, 2018; (N) December 16, 2021* | **Transition Guidance:** 842-10-65-1 :

The following cases are provided solely to illustrate the application of the guidance in paragraphs 810-10-25-38A

through 25-38J : related to the identification of a primary beneficiary:

    a. Commercial mortgage-backed securitization (Case A)

    b. Asset-backed collateralized debt obligation (Case B)

    c. Structured investment vehicle (Case C)

    d. Commercial paper conduit (Case D)

    e. Guaranteed mortgage-backed securitization (Case E)

    f. Residential mortgage-backed securitization (Case F)

    g. Lease entity (Case G)

    h. Collaboration—Joint venture arrangement (Case H)

    i. Furniture manufacturing entity (Case I)

    j. Investment fund 1—Annual and performance-based fees and additional interests (Case J)

    k. Investment fund 2—Annual and performance-based fees and no additional interests (Case K)

    l. eCommerce Entity (Case L).

**55-94** The identification of a primary beneficiary, if any, in Cases A-L is based solely on the specific facts and circumstances presented. These Cases are hypothetical and are not meant to represent actual transactions in the marketplace. Although certain aspects of the Cases may be present in actual fact patterns, relevant facts and circumstances of a specific fact pattern or structure would need to be evaluated to reach an accounting conclusion. The Cases share the following assumptions:

    a. The legal entities in Cases A–I and Case L are presumed to be VIEs. These presumptions should be understood as fact and not as conclusions based on the other facts and circumstances in each case. Case J provides an explanation as to why the legal entity is a VIE. Case K does not indicate whether the legal entity is a VIE because the decision maker does not have a variable interest in the legal entity.

    b. All variable interests are presumed to be variable interests in the VIE as a whole, rather than variable interests in specified assets of the VIE, on the basis of the guidance in paragraphs 810-10-25-55 through

    25-59 : .

**55-95** In some Cases, certain fees are described as representing, or not representing, a variable interest on the basis of paragraphs 810-10-55-37 through 55-38 : . However, the Cases were not meant to illustrate the

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

application of the guidance in those paragraphs, and additional facts would be necessary to determine which condition(s) resulted in the fee representing a variable interest.Specifically, certain Cases state whether certain fees are commensurate with the level of effort required to provide the related services and whether they are part of a service arrangement that includes only terms, conditions, or amounts that are customarily present in similar arrangements negotiated at arm's length. Those presumptions should be understood as fact for purposes of reading each related Case and not as conclusions based on the other facts and circumstances described in each case.Finally, determining the primary beneficiary in accordance with the guidance in the Variable Interest Entities Subsections requires judgment and is on the basis of individual facts and circumstances of the VIE and the reporting entity with the variable interest or interests.

### > > > Case A: Commercial Mortgage-Backed Securitization

**55-96**A VIE is created and financed with $94 of investment grade 7-year fixed-rate bonds (issued in 3 tranches) and $6 of equity. All of the bonds are held by third-party investors. The equity is held by a third party, who is also the special servicer. The equity tranche was designed to absorb the first dollar risk of loss and to receive any residual return from the VIE. The VIE uses the proceeds to purchase $100 of BB-rated fixed-rate commercial mortgage loans with contractual maturities of 7 years from a transferor. The commercial mortgage loans contain provisions that require each borrower to pay the full scheduled interest and principal if the loan is extinguished prior to maturity. The transaction was marketed to potential bondholders as an investment in a portfolio of commercial mortgage loans with exposure to the credit risk associated with the possible default by the borrowers.

**55-97**Each month, interest received from all of the pooled loans is paid to the investors in the fixed-rate bonds, in order of seniority, until all accrued interest on those bonds is paid. The same distribution occurs when principal payments are received.

**55-98**If there is a shortfall in contractual payments from the borrowers or if the loan collateral is liquidated and does not generate sufficient proceeds to meet payments on all bond classes, the equity tranche and then the most subordinate bond class will incur losses, with further losses impacting more senior bond classes in reverse order of priority.

**55-99**The transferor retains the primary servicing responsibilities. The primary servicing activities performed are administrative in nature and include remittance of payments on the loans, administration of escrow accounts, and collections of insurance claims. Upon delinquency or default by the borrower, the responsibility for administration of the loan is transferred from the transferor as the primary servicer to the special servicer. Furthermore, the special servicer, as the equity holder, has the approval rights for budgets, leases, and property managers of foreclosed properties.

**55-100**The special servicer is involved in the creation of the VIE and required at the creation date that certain loans, which it deemed to be of high risk, be removed from the initial pool of loans that were going to be purchased by the VIE from the transferor. The special servicer also reviewed the VIE's governing documents to ensure that the special servicer would be allowed to act quickly and effectively in situations in which a loan becomes delinquent. The special servicer concluded the VIE's governing documents allowed the special servicer to adequately monitor and direct the performance of the underlying loans.

**55-101**For its services as primary servicer, the transferor earns a fixed fee, calculated as a percentage of the unpaid principal balance on the underlying loans. The special servicer also earns a fixed fee, calculated as a percentage of the unpaid principal balance on the underlying loans.The fees paid to the primary and special servicer are both of the following:

　　a. Compensation for services provided and commensurate with the level of effort required to provide the services

　　b. Part of a service arrangement that includes only terms, conditions, or amounts that are customarily present in arrangements for similar services negotiated at arm's length.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

No party has the ability to remove the primary servicer or the special servicer.

**55-102**To evaluate the facts and circumstances and determine which reporting entity, if any, is the primary

beneficiary of a VIE, paragraph 810-10-25-38A : requires that a reporting entity determine the purpose and design of the VIE, including the risks that the VIE was designed to create and pass through to its variable interest holders. In making this assessment, the variable interest holders of the VIE determined the following:

    a. The primary purposes for which the VIE was created were to provide liquidity to the transferor to originate additional loans and to provide investors with the ability to invest in a pool of commercial mortgage loans.

    b. The VIE was marketed to debt investors as a VIE that would be exposed to the credit risk associated with the possible default by the borrowers with respect to principal and interest payments, with the equity tranche designed to absorb the first dollar risk of loss. Additionally, the marketing of the transaction indicated that such risks would be mitigated by subordination of the equity tranche.

    c. The VIE is not exposed to prepayment risk because the commercial mortgage loans contain provisions that require the borrower to pay the full scheduled interest and principal if the loan is extinguished prior to maturity.

**55-103**The special servicer and the bondholders are the variable interest holders in the VIE. The fees paid to the transferor do not represent a variable interest on the basis of a consideration of the conditions in paragraphs 810-10-55-37 through 55-38 : . The fees paid to the special servicer represent a variable interest on the basis of a consideration of the conditions in those paragraphs,specifically paragraph 810-10-55-37(c) : , because of the special servicer holding the equity tranche. If the special servicer was only receiving fees and did not hold the equity tranche and if its related parties did not hold any variable interests in the VIE, then the fees would not be a variable interest.

**55-104**Paragraph 810-10-25-38B : requires that a reporting entity identify which activities most significantly impact the VIE's economic performance and determine whether it has the power to direct those activities. The economic performance of the VIE is most significantly impacted by the performance of its underlying assets. Thus, the activities that most significantly impact the VIE's economic performance are the activities that most significantly impact the performance of the underlying assets. The special servicer has the ability to manage the VIE's assets that are delinquent or in default to improve the economic performance of the VIE. Additionally, the special servicer, as the equity holder, can approve budgets, leases, and property managers on foreclosed property. The special servicing activities are performed only upon delinquency or default of the underlying assets. However, a reporting entity's ability to direct the activities of a VIE when circumstances arise or events happen constitutes power if that ability relates to the activities that most significantly impact the economic performance of the VIE. A reporting entity does not have to exercise its power in order to have power to direct the activities of a VIE. The special servicer's involvement in the design of the VIE does not, in isolation, result in the special servicer being the primary beneficiary of the VIE. However, in this situation, that involvement indicated that the special servicer had the opportunity and the incentive to establish arrangements that result in the special servicer being the variable interest holder with the power to direct the activities that most significantly impact the VIE's economic performance.

**55-105**The bondholders of the VIE have no voting rights and no other rights that provide them with the power to direct the activities that most significantly impact the VIE's economic performance.

**55-106**The activities that the primary servicer has the power to direct are administrative in nature and do not most significantly impact the VIE's economic performance. In addition, the primary servicer, and its related parties, do not hold a variable interest in the VIE. Thus, the primary servicer cannot be the primary beneficiary of the VIE.

**55-107**If a reporting entity has the power to direct the activities of a VIE that most significantly impact the VIE's

economic performance, then under the requirements of paragraph 810-10-25-38A : , that reporting entity

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

also is required to determine whether it has the obligation to absorb losses of the VIE that could potentially be significant to the VIE or the right to receive benefits from the VIE that could potentially be significant to the VIE.

**55-108**The special servicer, for its servicing activities, receives a fixed fee that provides it with the right to receive benefits of the VIE.The fees paid to the special servicer are both of the following:

a. Compensation for services provided and commensurate with the level of effort required to provide the services

b. Part of a service arrangement that includes only terms, conditions, or amounts that are customarily present in arrangements for similar services negotiated at arm's length.

Therefore, the fees meet the criteria in paragraph 810-10-25-38H : 📄, and they should not be considered

for purposes of evaluating the characteristic in paragraph 810-10-25-38A(b) : 📄.The special servicer, as the equity tranche holder, has the obligation to absorb losses and the right to receive benefits, either of which could potentially be significant to the VIE. As equity tranche holder, the special servicer is the most subordinate tranche and therefore absorbs the first dollar risk of loss and has the right to receive benefits, including the VIE's actual residual returns, if any.

**55-109**On the basis of the specific facts and circumstances presented in this Case and the analysis performed, the special servicer would be deemed to be the primary beneficiary of the VIE because:

a. It is the variable interest holder with the power to direct the activities of the VIE that most significantly impact the VIE's economic performance.

b. As the equity tranche holder, it has the obligation to absorb losses of the VIE and the right to receive benefits from the VIE, either of which could potentially be significant to the VIE.

**> > > Case B: Asset-Backed Collateralized Debt Obligation**

**55-110**A VIE is created and financed with $90 of AAA-rated fixed-rate debt securities, $6 of BB-rated fixed-rate debt securities, and $4 of equity. All debt securities issued by the VIE are held by third-party investors. The equity tranche is held 35 percent by the manager of the VIE and 65 percent by a third-party investor. The VIE uses the proceeds to purchase a portfolio of asset-backed securities with varying tenors and interest rates.

**55-111**The transaction was marketed to potential debt investors as an investment in a portfolio of asset-backed securities with exposure to the credit risk associated with the possible default by the issuers of the asset-backed securities in the portfolio and to the interest rate risk associated with the management of the portfolio. The equity tranche was designed to absorb the first dollar risk of loss related to credit risk and interest rate risk and to receive any residual returns from a favorable change in interest rates or credit risk that affects the proceeds received on the sale of investments in the portfolio.

**55-112**The assets of the VIE are managed within the parameters established by the underlying trust documents. The parameters provide the manager with the latitude to manage the VIE's assets while maintaining an average portfolio rating of single B-plus or higher. If the average rating of the portfolio declines, the VIE's governing documents require that the manager's discretion in managing the portfolio be curtailed.

**55-113**For its services, the manager earns a base, fixed fee, and a performance fee in which it receives a portion of the VIE's profit above a targeted return.The fees paid to the manager are both of the following:

a. Compensation for services provided and commensurate with the level of effort required to provide the services

b. Part of a service arrangement that includes only terms, conditions, or amounts that are customarily present in arrangements for similar services negotiated at arm's length.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

The manager can be removed, **without cause** (as distinguished from **with cause** ), by a simple majority decision of the AAA-rated debt holders. As the debt of the entity is widely dispersed, no one party has the ability to unilaterally remove the manager. If removal of the manager occurs, the manager will continue to hold a 35 percent equity interest in the VIE.

**55-114**The third-party equity investor has rights that are limited to administrative matters.

**55-115**To evaluate the facts and circumstances and determine which reporting entity, if any, is the primary beneficiary of a VIE, paragraph 810-10-25-38A : requires that a reporting entity determine the purpose and design of the VIE, including the risks that the VIE was designed to create and pass through to its variable interest holders. In making this assessment, the variable interest holders of the VIE determined the following:

a. The primary purposes for which the VIE was created were to provide investors with the ability to invest in a pool of asset-backed securities, to earn a positive spread between the interest that the VIE earns on its portfolio and the interest paid to the debt investors, and to generate management fees for the manager.

b. The transaction was marketed to potential debt investors as an investment in a portfolio of asset-backed securities with exposure to the credit risk associated with the possible default by the issuers of the asset-backed securities in the portfolio and to the interest rate risk associated with the management of the portfolio. Additionally, the marketing of the transaction indicated that such risks would be mitigated by the support from the equity tranche.

c. The equity tranche was designed to absorb the first dollar risk of loss related to credit risk and interest rate risk and to receive any residual returns from a favorable change in interest rates or credit risk that affects the proceeds received on the sale of asset-backed securities in the portfolio.

**55-116**The third-party debt investors, the third-party equity investor, and the manager are the variable interest holders in the VIE. The fees paid to the manager also represent a variable interest on the basis of a consideration of the conditions in paragraphs 810-10-55-37 through 55-38 : ,specifically paragraph 810-10-55-37(c) : , because of the manager holding the equity tranche. If the manager was only receiving fees and did not hold the equity tranche and if its related parties did not hold any variable interests in the VIE, then the fees would not be a variable interest.

**55-117**Paragraph 810-10-25-38B : requires that a reporting entity identify which activities most significantly impact the VIE's economic performance and determine whether it has the power to direct those activities. The economic performance of the VIE is most significantly impacted by the performance of the VIE's portfolio of assets. Thus, the activities that most significantly impact the VIE's economic performance are the activities that most significantly impact the performance of the portfolio of assets. The manager has the ability to manage the VIE's assets within the parameters of the trust documents. If the average rating of the portfolio declines, the VIE's governing documents require that the manager's discretion in managing the portfolio be curtailed. Although the AAA-rated debt holders can remove the manager without cause, no one party has the unilateral ability to exercise the kick-out rights over the manager. Therefore, such kick-out rights would not be considered in this primary beneficiary analysis.

**55-118**The debt holders of the VIE do not have voting rights or other rights that provide them with the power to direct activities that most significantly impact the VIE's economic performance. Although the AAA-rated debt holders can remove the manager without cause, no one party has the unilateral ability to exercise the kick-out rights over the manager.

**55-119**The third-party equity investor has the power to direct certain activities. However, the activities that the third-party equity investor has the power to direct are administrative and do not most significantly impact the VIE's economic performance.

**55-120**If a reporting entity has the power to direct the activities of a VIE that most significantly impact the VIE's economic performance, then under the requirements of paragraph 810-10-25-38A : , that reporting entity

***Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.***
***©2023 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***
***https://www.accountingresearchmanager.com/q/1g7l3***

also is required to determine whether it has the obligation to absorb losses of the VIE that could potentially be significant to the VIE or the right to receive benefits from the VIE that could potentially be significant to the VIE. The manager, as the 35 percent equity tranche holder, has the obligation to absorb losses and the right to receive benefits. As equity tranche holder, the manager has the most subordinate tranche and therefore absorbs 35 percent of the first dollar risk of loss and has the right to receive 35 percent of any residual benefits.The fees paid to the manager are both of the following:

a. Compensation for services provided and commensurate with the level of effort required to provide the services

b. Part of a service arrangement that includes only terms, conditions, or amounts that are customarily present in arrangements for similar services negotiated at arm's length.

Therefore, the fees meet the criteria in paragraph 810-10-25-38H : , and they should not be considered for

purposes of evaluating the characteristic in paragraph 810-10-25-38A(b) : .Through the equity interest, the manager has the obligation to absorb losses of the VIE that could potentially be significant to the VIE and the right to receive benefits from the VIE that could potentially be significant to the VIE.

**55-121**On the basis of the specific facts and circumstances presented in this Case and the analysis performed, the manager would be deemed to be the primary beneficiary of the VIE because:

a. It is the variable interest holder with the power to direct the activities of the VIE that most significantly impact the VIE's economic performance (and no single entity has the unilateral ability to exercise kick-out rights).

b. Through its equity interest, it has the obligation to absorb losses of the VIE that could potentially be significant to the VIE and the right to receive benefits from the VIE that could potentially be significant to the VIE.

### > > > Case C: Structured Investment Vehicle

**55-122**A VIE is created and financed with $94 of AAA-rated fixed-rate short-term debt with a 6-month maturity and $6 of equity. The VIE uses the proceeds to purchase a portfolio of floating-rate debt with an average life of four years and varying interest rates and short-term deposits with highly rated banks. The short-term debt securities and equity are held by multiple third-party investors. Upon maturity of the short-term debt, the VIE will either refinance the debt with existing investors or reissue the debt to new investors at existing market rates.

**55-123**The primary purpose of the VIE is to generate profits by maximizing the spread it earns on its asset portfolio and its weighted-average cost of funding. The transaction was marketed to potential debt investors as an investment in a portfolio of high-quality debt with exposure to the credit risk associated with the possible default by the issuers of the debt in the portfolio. The equity tranche is designed to absorb the first dollar risk of loss related to credit, liquidity, changes in fair value, and interest rate risk and to receive any benefit from a favorable change in credit, changes in fair value, and interest rates.

**55-124**The VIE is exposed to liquidity risk because the average tenor of the assets is greater than its liabilities. To mitigate liquidity risk, the VIE maintains a certain portion of its assets in short-term deposits with highly rated banks. The VIE has not entered into a liquidity facility to further mitigate liquidity risk.

**55-125**The sponsor of the VIE was significantly involved with the creation of the VIE. The sponsor performs various functions to manage the operations of the VIE, which include:

a. Investment management—This management must adhere to the investment guidelines established at inception of the VIE. These guidelines include descriptions of eligible investments and requirements regarding the composition of the credit portfolio (including limits on country risk exposures, diversification limits, and ratings requirements).

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

b. Funding management—This function provides funding management and operational support in relation to the debt issued and the equity with the objective of minimizing the cost of borrowing, managing interest rate and liquidity risks, and managing the capital adequacy of the VIE.

c. Defeasance management—An event of defeasance occurs upon the failure of the rating agencies to maintain the ratings of the debt securities issued by the VIE at or above certain specified levels. In the event of defeasance, the sponsor is responsible for overseeing the orderly liquidation of the investment portfolio and the orderly discharge of the VIE's obligations. This includes managing the market and credit risks of the portfolio.

**55-126**For its services, the sponsor receives a fixed fee, calculated as an annual percentage of the aggregate equity outstanding, and a performance-based fee, calculated as a percentage of the VIE's profit above a targeted return.The fees paid to the sponsor are both of the following:

a. Compensation for services provided and commensurate with the level of effort required to provide the services

b. Part of a service arrangement that includes only terms, conditions, or amounts that are customarily present in arrangements for similar services negotiated at arm's length.

**55-127**The debt security holders of the VIE have no voting rights. The equity holders have limited voting rights that are typically limited to voting on amendments to the constitutional documents of the VIE.

**55-128**To evaluate the facts and circumstances and determine which reporting entity, if any, is the primary

beneficiary of a VIE, paragraph 810-10-25-38A : requires that a reporting entity determine the purpose and design of the VIE, including the risks that the VIE was designed to create and pass through to its variable interest holders. In making this assessment, the variable interest holders of the VIE determined the following:

a. The primary purposes for which the VIE was created were to provide investors with the ability to invest in a pool of high-quality debt, to maximize the spread it earns on its asset portfolio over its weighted-average cost of funding, and to generate management fees for the sponsor.

b. The transaction was marketed to potential debt investors as an investment in a portfolio of high-quality debt with exposure to the credit risk associated with the possible default by the issuers of the debt in the portfolio.

c. The equity tranche is negotiated to absorb the first dollar risk of loss related to credit, liquidity, fair value, and interest rate risk and to receive a portion of the benefit from a favorable change in credit, fair value, and interest rates.

d. The principal risks to which the VIE is exposed include credit, interest rate, and liquidity risk.

**55-129**The third-party debt investors, the third-party equity investors, and the sponsor are the variable interest holders in the VIE. The fees paid to the sponsor represent a variable interest on the basis of a consideration of the conditions in paragraphs 810-10-55-37 through 55-38 : ,specifically paragraph 810-10-55-37(c) : , because of the sponsor having an implicit variable interest in the VIE as discussed in paragraph 810-10-55-132 : . If the sponsor was only receiving fees and did not have the implicit variable interest and if its related parties did not hold any variable interests in the VIE, then the fees would not be a variable interest.

**55-130**Paragraph 810-10-25-38B : requires that a reporting entity identify which activities most significantly impact the VIE's economic performance and determine whether it has the power to direct those activities. The economic performance of the VIE is significantly impacted by the performance of the VIE's portfolio of assets and by the terms of the short-term debt. Thus, the activities that significantly impact the VIE's economic performance are the activities that significantly impact the performance of the portfolio of assets and the terms of the short-term debt (when the debt is refinanced or reissued). The sponsor manages the VIE's investment, funding, and defeasance activities. The fact that the sponsor was significantly involved with the creation of the VIE does not, in isolation, result in the sponsor being the primary beneficiary of the VIE. However, the fact that

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

the sponsor was involved with the creation of the VIE indicated that the sponsor had the opportunity and the incentive to establish arrangements that result in the sponsor being the variable interest holder with the power to direct the activities that most significantly impact the VIE's economic performance.

**55-131**The debt security holders of the VIE have no voting rights and no other rights that provide them with the power to direct the activities that most significantly impact the VIE's economic performance. Although the equity holders have voting rights, they are limited to voting on amendments to the constitutional documents of the VIE, and those rights do not provide the equity holders with the power to direct the activities that most significantly impact the VIE's economic performance.

**55-132**If a reporting entity has the power to direct the activities of a VIE that most significantly impact the VIE's economic performance, then under the requirements of paragraph 810-10-25-38A : , that reporting entity also is required to determine whether it has the obligation to absorb losses of the VIE that could potentially be significant to the VIE or the right to receive benefits from the VIE that could potentially be significant to the VIE. The sponsor considered whether it had an implicit financial responsibility to ensure that the VIE operates as designed. Based on paragraphs 810-10-25-51 : and 810-10-25-54 : , the sponsor determined that it has an implicit financial responsibility and that such obligationrequires the sponsor to absorb losses thatcould potentially be significant to the VIE. This determination was influenced by the sponsor's concern regarding the risk to its reputation in the marketplace if the VIE did not operate as designed.The fees paid to the sponsor are both of the following:

a. Compensation for services provided and commensurate with the level of effort required to provide the services

b. Part of a service arrangement that includes only terms, conditions, or amounts that are customarily present in arrangements for similar services negotiated at arm's length.

Therefore, the fees meet the criteria in paragraph 810-10-25-38H : , and they should not be considered for purposes of evaluating the characteristic in paragraph 810-10-25-38A(b) : .

**55-133**On the basis of the specific facts and circumstances presented in this Case and the analysis performed, the sponsor would be deemed to be the primary beneficiary of the VIE because:

a. It is the variable interest holder with the power to direct the activities of the VIE that most significantly impact the VIE's economic performance.

b. Through its implicit financial responsibility to ensure that the VIE operates as designed, it has the obligation to absorb losses of the VIE that could potentially be significant to the VIE.

### > > > Case D: Commercial Paper Conduit

**55-134**A VIE is created by a reporting entity (the sponsor) and financed with $98 of AAA-rated fixed-rate short-term debt with a 3-month maturity and $2 of subordinated notes. The VIE uses the proceeds to purchase a portfolio of medium-term assets with average tenors of three years. The asset portfolio is obtained from multiple sellers. The short-term debt and subordinated notes are held by multiple third-party investors. Upon maturity of the short-term debt, the VIE will either refinance the debt with existing investors or reissue the debt to new investors.

**55-135**The sponsor of the VIE provides credit enhancement in the form of a letter of credit equal to 5 percent of the VIE's assets and it provides a liquidity facility to fund the cash flow shortfalls on 100 percent of the short-term debt. Cash flow shortfalls could arise due to a mismatch between collections on the underlying assets of the VIE and payments due to the short-term debt holders or to the inability of the VIE to refinance or reissue the short-term debt upon maturity.

**55-136**A credit default of the VIE's assets resulting in deficient cash flows is absorbed as follows:

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

a. First by the subordinated note holders

b. Second by the sponsor's letter of credit

c. Third by the short-term debt holders.

The sponsor's liquidity facility does not advance against defaulted assets.

**55-137**The VIE is exposed to liquidity risk because the average life of the assets is greater than that of its liabilities. The VIE enters into a liquidity facility with the sponsor to mitigate liquidity risk.

**55-138**The transaction was marketed to potential debt investors as an investment in a portfolio of highly rated medium-term assets with minimal exposure to the credit risk associated with the possible default by the issuers of the assets in the portfolio. The subordinated notes were designed to absorb the first dollar risk of loss related to credit. The VIE is marketed to all investors as having a low probability of credit exposure due to the nature of the assets obtained. Furthermore, the VIE is marketed to the short-term debt holders as having protection from liquidity risk due to the liquidity facility provided by the sponsor.

**55-139**The sponsor of the VIE performs various functions to manage the operations of the VIE. Specifically, the sponsor:

a. Establishes the terms of the VIE

b. Approves the sellers permitted to sell to the VIE

c. Approves the assets to be purchased by the VIE

d. Makes decisions regarding the funding of the VIE including determining the tenor and other features of the short-term debt issued

e. Administers the VIE by monitoring the assets, arranging for debt placement, compiling monthly reports, and ensuring compliance with the VIE's credit and investment policies.

**55-140**For providing the letter of credit, liquidity facility, and management services, the sponsor receives fixed fees that are calculated as an annual percentage of the asset value.The short-term debt holders and subordinated note holders have no voting rights.The fees paid to the sponsor for its management services are both of the following:

a. Compensation for services provided and commensurate with the level of effort required to provide the services

b. Part of a service arrangement that includes only terms, conditions, or amounts that are customarily present in arrangements for similar services negotiated at arm's length.

**55-141**To evaluate the facts and circumstances and determine which reporting entity, if any, is the primary beneficiary of a VIE, paragraph 810-10-25-38A : requires that a reporting entity determine the purpose and design of the VIE, including the risks that the VIE was designed to create and pass through to its variable interest holders. In making this assessment, the variable interest holders of the VIE determined the following:

a. The primary purposes for which the VIE was created were to provide investors with the ability to invest in a pool of highly rated medium-term assets, to provide the multiple sellers to the VIE with access to lower-cost funding, to earn a positive spread between the interest that the VIE earns on its asset portfolio and its weighted-average cost of funding, and to generate fees for the sponsor.

b. The transaction was marketed to potential debt investors as an investment in a portfolio of highly rated medium-term assets with minimal exposure to the credit risk associated with the possible default by the issuers of the assets in the portfolio. The subordinated debt is designed to absorb the first dollar risk of loss related to credit and interest rate risk. The VIE is marketed to all investors as having a low probability of credit loss due to the nature of the assets obtained. Furthermore, the VIE is marketed to the short-term debt holders as having protection from liquidity risk due to the liquidity facility provided by the sponsor.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

c. The principal risks to which the VIE is exposed include credit, interest rate, and liquidity.

**55-142**The short-term debt holders, the third-party subordinated note holders, and the sponsor are the variable interest holders in the VIE.The letter of credit and liquidity facility provided by the sponsor protect holders of other variable interests from suffering losses of the VIE. Therefore, the sponsor's fees for the letter of credit and liquidity facility are not eligible for the evaluation in paragraph 810-10-55-37 : and are variable interests in the VIE.The fees paid to the sponsor for its management services represent a variable interest on the basis of a consideration of the conditions in paragraphs 810-10-55-37 through 55-38 : , specifically paragraph 810-10-55-37(c) : , because of the sponsor providing the letter of credit and liquidity facility and the fees for the letter of credit and liquidity facility. If the sponsor was only receiving management fees, did not provide the letter of credit and liquidity facility, and did not receive fees for the letter of credit and liquidity facility and if its related parties did not hold any variable interests in the VIE, then the management fees would not be a variable interest.

**55-143**Paragraph 810-10-25-38B : requires that a reporting entity identify which activities most significantly impact the VIE's economic performance and determine whether it has the power to direct those activities. The economic performance of the VIE is significantly impacted by the performance of the VIE's portfolio of assets and by the terms of the short-term debt. Thus, the activities that significantly impact the VIE's economic performance are the activities that significantly impact the performance of the portfolio of assets and the terms of the short-term debt (when the debt is refinanced or reissued). The sponsor manages the operations of the VIE. Specifically, the sponsor establishes the terms of the VIE, approves the sellers permitted to sell to the VIE, approves the assets to be purchased by the VIE, makes decisions about the funding of the VIE including determining the tenor and other features of the short-term debt issued, and administers the VIE by monitoring the assets, arranging for debt placement, and ensuring compliance with the VIE's credit and investment policies. The fact that the sponsor was significantly involved with the creation of the VIE does not, in isolation, result in the sponsor being the primary beneficiary of the VIE. However, the fact that the sponsor was involved with the creation of the VIE may indicate that the sponsor had the opportunity and the incentive to establish arrangements that result in the sponsor being the variable interest holder with the power to direct the activities that most significantly impact the VIE's economic performance.

**55-144**The short-term debt holders and subordinated note holders of the VIE have no voting rights and no other rights that provide them with power to direct the activities that most significantly impact the VIE's economic performance.

**55-145**If a reporting entity has the power to direct the activities of a VIE that most significantly impact the VIE's economic performance, then under the requirements of paragraph 810-10-25-38A : , that reporting entity also is required to determine whether it has the obligation to absorb losses of the VIE that could potentially be significant to the VIE or the right to receive benefits from the VIE that could potentially be significant to the VIE.The fees paid to the sponsor for its management services are both of the following:

a. Compensation for services provided and commensurate with the level of effort required to provide the services

b. Part of a service arrangement that includes only terms, conditions, or amounts that are customarily present in arrangements for similar services negotiated at arm's length.

Therefore, the management fees meet the criteria in paragraph 810-10-25-38H : , and they should not be considered for purposes of evaluating the characteristic in paragraph 810-10-25-38A(b) : . However, thesponsor still, through its letter of credit and liquidity facility fees, receives benefits from the VIE that could potentially be significant to the VIE. The sponsor, through its letter of credit and liquidity facility, also has the obligation to absorb losses of the VIE that could potentially be significant to the VIE.

**55-146**On the basis of the specific facts and circumstances presented in this Case and the analysis performed, the sponsor would be deemed to be the primary beneficiary of the VIE because:

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

a. It is the variable interest holder with the power to direct the activities of the VIE that most significantly impact the VIE's economic performance.

b. Through its letter of credit and liquidity facility, the sponsor has the obligation to absorb losses that could potentially be significant to the VIE, and, through itsfees for the letter of credit and liquidity facility,the sponsor has the right to receive benefits that could potentially be significant to the VIE.

### > > > Case E: Guaranteed Mortgage-Backed Securitization

**55-147**A VIE is created and financed with $100 of a single class of investment-grade 30-year fixed-rate debt securities. The VIE uses the proceeds to purchase $100 of 30-year fixed-rate residential mortgage loans from the transferor. The VIE enters into a guarantee facility that absorbs 100 percent of the credit losses incurred on the VIE's assets. The assets acquired by the VIE are underwritten by the transferor in accordance with the parameters established by the guarantor. Additionally, all activities of the VIE are prespecified by the trust agreement and servicing guide, which are both established by the guarantor. No critical decisions are generally required for the VIE unless default of an underlying asset is reasonably foreseeable or occurs.

**55-148**The transaction was marketed to potential debt security holders as an investment in a portfolio of residential mortgage loans with exposure to the credit risk of the guarantor and to the prepayment risk associated with the underlying loans of the VIE. Each month, the security holders receive interest and principal payments in proportion to their percentage ownership of the underlying loans.

**55-149**If there is a shortfall in contractually required loan payments from the borrowers or if the loan is foreclosed on and the liquidation of the underlying property does not generate sufficient proceeds to meet the required payments on all securities, the guarantor will make payments to the debt securities holders to ensure timely payment of principal and accrued interest on the debt securities.

**55-150**The guarantor also serves as the master servicer for the VIE. As master servicer, the guarantor services the securities issued by the VIE. Generally, if a mortgage loan is 120 days (or 4 consecutive months) delinquent, and if other circumstances are met, the guarantor has the right to buy the loan from the VIE. The master servicer can only be removed for a material breach in its obligations. As compensation for the guarantee and services provided, the guarantor receives a fee that is calculated monthly as a percentage of the unpaid principal balance on the underlying loans.

**55-151**As master servicer, the guarantor also is responsible for supervising and monitoring the servicing of the residential mortgage loans (primary servicing). The VIE's governing documents provide that the guarantor is responsible for the primary servicing of the loans; however, the guarantor is allowed to, and does, hire the transferor to perform primary servicing activities that are conducted under the supervision of the guarantor. The guarantor monitors the primary servicer's performance and has the right to remove the primary servicer at any time it considers such a removal to be in the best interest of the security holders.

**55-152**The primary servicing activities are performed under the servicing guide established by the guarantor. Examples of the primary servicing activities include collecting and remitting principal and interest payments, administering escrow accounts, and managing default. When a loan becomes delinquent or it is reasonably foreseeable of becoming delinquent, the primary servicer can propose a default mitigation strategy in which the guarantor can approve, reject, or require another course of action if it considers such action is in the best interest of the security holders. As compensation for servicing the underlying loans, the transferor receives a fee that is calculated monthly as a percentage of the unpaid principal balance on the underlying loans.

**55-153**To evaluate the facts and circumstances and determine which reporting entity, if any, is the primary beneficiary of a VIE, paragraph 810-10-25-38A : requires that a reporting entity determine the purpose and design of the VIE, including the risks that the VIE was designed to create and pass through to its variable interest holders. In making this assessment, the variable interest holders of the VIE determined the following:

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

a. The primary purposes for which the VIE was created were to provide investors with the ability to invest in a pool of residential mortgage loans with a third-party guarantee for 100 percent of the principal and interest payments due on the mortgage loans in the VIE, to provide the transferor to the VIE with access to liquidity for its originated loans and an ongoing servicing fee, and to generate fees for the guarantor.

b. The transaction was marketed to potential debt security holders as an investment in a portfolio of residential mortgage loans with exposure to the credit risk of the guarantor and prepayment risk associated with the underlying assets of the VIE.

c. The principal risks to which the VIE is exposed include credit risk of the underlying assets, prepayment risk, and the risk of fluctuations in the value of the underlying real estate. The credit risk of the underlying assets and the risk of fluctuations in the value of the underlying real estate are fully absorbed by the guarantor.

**55-154** The debt securities holders and the guarantor are the variable interest holders in the VIE. The fees paid to the transferor do not represent a variable interest on the basis of a consideration of the conditions in paragraphs 810-10-55-37 through 55-38 : .The guarantee arrangement protects holders of other variable interests from suffering losses in the VIE because the guarantor is required to fully absorb the credit risk of the underlying assets of the VIE and the risk of fluctuations in the value of the underlying real estate. Therefore, the guarantor's fees are not eligible for the evaluation in paragraph 810-10-55-37 : .

**55-155** Paragraph 810-10-25-38B : requires that a reporting entity identify which activities most significantly impact the VIE's economic performance and determine whether it has the power to direct those activities. The economic performance of the VIE is most significantly impacted by the performance of its underlying assets. Thus, the activities that most significantly impact the VIE's economic performance are the activities that most significantly impact the performance of the underlying assets. The guarantor, who is also the master servicer, has the ability (through establishment of the servicing terms, to appoint and remove the primary servicer, to direct default mitigation, and to purchase defaulted assets) to manage the VIE's assets that become delinquent (or may become delinquent in the reasonably foreseeable future) to improve the economic performance of the VIE.

**55-156** Prepayment risk is also a risk that the VIE was designed to create and pass through. However, no variable interest holder has the power to direct activities related to such risk.

**55-157** Because the guarantor is able to appoint and replace the primary servicer and direct default mitigation, the primary servicer does not have the power to direct the activities that most significantly impact the VIE's economic performance. In addition, the primary servicer and its related parties do not hold a variable interest in the VIE. Thus, the primary servicer cannot be the primary beneficiary of the VIE. Furthermore, the security holders have no voting rights and, thus, no power to direct the activities that most significantly impact the VIE's economic performance.

**55-158** If a reporting entity has the power to direct the activities of a VIE that most significantly impact the VIE's

economic performance, then under the requirements of paragraph 810-10-25-38A : , that reporting entity also is required to determine whether it has the obligation to absorb losses of the VIE that could potentially be significant to the VIE or the right to receive benefits from the VIE that could potentially be significant to the VIE. The guarantor, through its fee arrangement, receives benefits, which may or may not potentially be significant under this analysis; however, the guarantor has the obligation to absorb losses of the VIE that could potentially be significant through its guarantee obligation.Therefore, the fees are not eligible for the evaluation in paragraph

810-10-25-38H : , and they should be considered for purposes of evaluating the characteristic in paragraph

810-10-25-38A(b) : .

**55-159** On the basis of the specific facts and circumstances presented in this Case and the analysis performed, the guarantor would be deemed to be the primary beneficiary of the VIE because:

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

a. It is the variable interest holder with the power to direct the activities of the VIE that most significantly impact the VIE's economic performance.

b. Through its guarantee, it has the obligation to absorb losses of the VIE that could potentially be significant to the VIE.

### > > > Case F: Residential Mortgage-Backed Securitization

**55-160**A VIE is created and financed with $100 of 30-year fixed-rate debt securities. The securities are issued in 2 tranches (a $90 senior tranche and a $10 residual tranche). The senior tranche securities are investment grade and are widely dispersed among third-party investors. The residual tranche securities are held by the transferor. The VIE uses the proceeds to purchase $100 of 30-year fixed-rate residential mortgage loans from a transferor. A default on the underlying loans is absorbed first by the residual tranche held by the transferor. All activities of the VIE are prespecified by a pooling and servicing agreement for the transaction. No critical decisions are generally required for the VIE unless default of an underlying asset is reasonably foreseeable or occurs.

**55-161**The transaction was marketed to potential senior debt security holders as an investment in a portfolio of residential mortgage loans with exposure to the credit risk of the underlying loan borrowers and to the prepayment risk associated with the underlying loans of the VIE. Each month the security holders receive interest and principal payments in proportion to their percentage of ownership of the underlying loans. The residual tranche was designed to provide a credit enhancement to the transaction and to absorb the first dollar risk of loss related to credit.

**55-162**The primary servicing responsibilities are retained by the transferor. No party has the ability to remove the transferor as servicer.

**55-163**The servicing activities are performed in accordance with the pooling and servicing agreement. Examples of the servicing activities include collecting and remitting principal and interest payments, administering escrow accounts, monitoring overdue payments, and overall default management. Default management includes evaluating the borrower's financial condition to determine which loss mitigation strategy (specified in the pooling and servicing agreement) will maximize recoveries on a particular loan. The acceptable default management strategies are limited to the actions specified in the pooling and servicing agreement and include all of the following:

a. Modifying the terms of loans when default is reasonably foreseeable

b. Temporary forbearance on collections of principal and interest (such amounts would be added to the unpaid balance on the loan)

c. Short sales in which the servicer allows the underlying borrower to sell the mortgaged property even if the anticipated sale price will not permit full recovery of the contractual loan amounts.

**55-164**As compensation for servicing the underlying loans, the transferor receives a fee, calculated monthly as a percentage of the unpaid principal balance on the underlying loans. Although the servicing activities, particularly managing default, are required to be performed in accordance with the pooling and servicing agreement, the transferor, as servicer, has discretion in determining which strategies within the pooling and servicing agreement to utilize to attempt to maximize the VIE's economic performance.The fees paid to the transferor are both of the following:

a. Compensation for services provided and commensurate with the level of effort required to provide those services

b. Part of a service arrangement that includes only terms, conditions, or amounts that are customarily present in arrangements for similar services negotiated at arm's length.

**55-165**To evaluate the facts and circumstances and determine which reporting entity, if any, is the primary beneficiary of a VIE, paragraph 810-10-25-38A : requires that a reporting entity determine the purpose and

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

design of the VIE, including the risks that the VIE was designed to create and pass through to its variable interest holders. In making this assessment, the variable interest holders of the VIE determined the following:

a. The primary purposes for which the VIE was created were to provide investors with the ability to invest in a pool of residential mortgage loans and to provide the transferor to the VIE with access to liquidity for its originated loans and an ongoing servicing fee and potential residual returns.

b. The transaction was marketed to potential senior debt security holders as an investment in a portfolio of residential mortgage loans with credit enhancement provided by the residual tranche and prepayment risk associated with the underlying assets of the VIE. The marketing of the transaction indicated that credit risk would be mitigated by the subordination of the residual tranche.

c. The principal risks to which the VIE is exposed include credit of the underlying assets, prepayment risk, and the risk of fluctuations in the value of the underlying real estate.

**55-166**The debt security holders and the transferor are the variable interest holders in the VIE. The fee paid to the transferor (in its role as servicer) represents a variable interest on the basis of a consideration of the conditions in paragraphs 810-10-55-37 through 55-38 : ,specifically paragraph 810-10-55-37(c) : , because of the transferor holding the residual tranche. If the transferor was only receiving fees and did not hold the residual tranche and if its related parties did not hold any variable interests in the VIE, then the fees would not be a variable interest.

**55-167**Paragraph 810-10-25-38B : requires that a reporting entity identify which activities most significantly impact the VIE's economic performance and determine whether it has the power to direct those activities. The economic performance of the VIE is most significantly impacted by the performance of its underlying assets. Thus, the activities that most significantly impact the VIE's economic performance are the activities that most significantly impact the performance of the underlying assets. The transferor, as servicer, has the ability to manage the VIE's assets that become delinquent (or are reasonably foreseeable of becoming delinquent) to improve the economic performance of the VIE. Additionally, no party can remove the transferor in its role as servicer. The default management activities are performed only after default of the underlying assets or when default is reasonably foreseeable. However, a reporting entity's ability to direct the activities of a VIE when circumstances arise or events happen constitutes power if that ability relates to the activities that most significantly impact the economic performance of the VIE. A reporting entity does not have to exercise its power in order to have power to direct the activities of a VIE.

**55-168**Prepayment risk is also a risk that the VIE was designed to create and pass through. However, no variable interest holder has the power to direct matters related to such risk.

**55-169**The senior security holders have no voting rights and, thus, no power to direct the activities that most significantly impact the VIE's economic performance.

**55-170**If a reporting entity has the power to direct the activities of a VIE that most significantly impact the VIE's

economic performance, then under the requirements of paragraph 810-10-25-38A : , that reporting entity also is required to determine whether it has the obligation to absorb losses of the VIE that could potentially be significant to the VIE or the right to receive benefits from the VIE that could potentially be significant to the VIE. The transferor, through its residual tranche ownership, has the obligation to absorb losses and the right to receive benefits, either of which could potentially be significant to the VIE.The fees paid to the transferor are both of the following:

a. Compensation for services provided and commensurate with the level of effort required to provide those services

b. Part of a service arrangement that includes only terms, conditions, or amounts that are customarily present in arrangements for similar services negotiated at arm's length.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

Therefore, the fees meet the criteria in paragraph 810-10-25-38H : and should not be considered for purposes of evaluating the characteristic in paragraph 810-10-25-38A(b) : .

**55-171**On the basis of the specific facts and circumstances presented in this Case and the analysis performed, the transferor would be deemed to be the primary beneficiary of the VIE because:

    a. It is the variable interest holder with the power to direct the activities of the VIE that most significantly impact the VIE's economic performance.

    b. Through its residual tranche ownership, it has the obligation to absorb losses and the right to receive benefits, either of which could potentially be significant to the VIE.

### > > > Case G: Property Lease Entity

**55-172**A VIE is created and financed with $950 of 5-year fixed-rate debt and $50 of equity. The VIE uses the proceeds from the issuance to purchase property to be leased to a lessee with an AA credit rating. The equity is subordinate to the debt because the debt is paid before any cash flows are available to the equity investors. The lease has a five-year term and is classified as a direct finance lease by the lessor and as an operating lease by the lessee. The lessee, however, is considered the owner of the property for tax purposes and, thus, receives tax depreciation benefits.

**Pending Content**

**Transition Date:** *(P) December 16, 2018; (N) December 16, 2021* | **Transition Guidance:**842-10-65-1 :

> **Editor's Note**: The content of paragraph 810-10-55-172 will change upon transition, together with a change in its heading noted below.
>
> >>>**Case G: Lease Entity**

A VIE is created and financed with $950 of 5-year fixed-rate debt and $50 of equity. The VIE uses the proceeds from the issuance to purchase an asset to be leased to a lessee with an AA credit rating. The equity is subordinate to the debt because the debt is paid before any cash flows are available to the equity investors. The lease has a five-year term and is classified as a direct financing lease by the lessor and as an operating lease by the lessee. The lessee, however, is considered the owner of the underlying asset for tax purposes and, thus, receives tax depreciation benefits.

**55-173**The lessee is required to provide a first-loss residual value guarantee for the expected future value of the leased property at the end of five years (the option price) up to a specified percentage of the option price, and it has a fixed-price purchase option to acquire the property for the option price. If the lessee does not exercise the fixed-price purchase option at the end of the lease term, the lessee is required to remarket the property on behalf of the VIE. If the property is sold for an amount less than the option price, the lessee is required to pay the VIE the difference between the option price and the sales proceeds, which is not to exceed a specified percentage of the option price. If the property is sold for an amount greater than the option price, the lessee is entitled to the excess of the sales proceeds over the option price. A third-party residual value guarantor provides a very small additional residual value guarantee to the lessor VIE, which allows the lessor to achieve direct financing lease treatment.

**Pending Content**

**Transition Date:** *(P) December 16, 2018; (N) December 16, 2021* | **Transition Guidance:**842-10-65-1 :

The lessee is required to provide a first-loss residual value guarantee for the expected future value of the underlying asset at the end of five years (the option price) up to a specified percentage of the option price, and it has a fixed-price purchase option to acquire the underlying asset for the option price. If the lessee does not exercise the fixed-price purchase option at the end of the lease term, the lessee is required to remarket the

---

***Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.***
***©2023 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***
***https://www.accountingresearchmanager.com/q/1g7l3***

underlying asset on behalf of the VIE. If the underlying asset is sold for an amount less than the option price, the lessee is required to pay the VIE the difference between the option price and the sales proceeds, which is not to exceed a specified percentage of the option price. If the underlying asset is sold for an amount greater than the option price, the lessee is entitled to the excess of the sales proceeds over the option price. A third-party residual value guarantor provides a very small additional residual value guarantee to the lessor VIE, which allows the lessor to achieve direct financing lease treatment.

**55-174**The governing documents for the VIE do not permit the VIE to buy additional assets or sell existing assets during the five-year holding period, and the terms of the lease agreement and the governing documents for the VIE do not provide the equity holders with the power to direct any activities of the VIE. The VIE was formed so that the lessee would have rights to use the property under an operating lease and would retain substantially all of the risks and rewards from appreciation or depreciation in value of the leased property.

**Pending Content**

**Transition Date:** *(P) December 16, 2018; (N) December 16, 2021* | **Transition Guidance:**842-10-65-1 :

The governing documents for the VIE do not permit the VIE to buy additional assets or sell existing assets during the five-year holding period, and the terms of the lease agreement and the governing documents for the VIE do not provide the equity holders with the power to direct any activities of the VIE. The VIE was formed so that the lessee would have rights to use the underlying asset under an operating lease and would retain substantially all of the risks and rewards from appreciation or depreciation in value of the underlying asset.

**55-175**The transaction was marketed to potential investors as an investment in a portfolio of AA-rated assets collateralized by leased property that would provide a fixed-rate return to debt holders equivalent to AA-rated assets. The return to equity investors is expected to be slightly greater than the return to the debt investors because the equity is subordinated to the debt.

**Pending Content**

**Transition Date:** *(P) December 16, 2018; (N) December 16, 2021* | **Transition Guidance:**842-10-65-1 :

The transaction was marketed to potential investors as an investment in a portfolio of AA-rated assets collateralized by an underlying asset that is leased that would provide a fixed-rate return to debt holders equivalent to AA-rated assets. The return to equity investors is expected to be slightly greater than the return to the debt investors because the equity is subordinated to the debt.

**55-176**To evaluate the facts and circumstances and determine which reporting entity, if any, is the primary

beneficiary of a VIE, paragraph 810-10-25-38A : requires that a reporting entity determine the purpose and design of the VIE, including the risks that the VIE was designed to create and pass through to its variable interest holders. In making this assessment, the variable interest holders of the VIE determined the following:

a. The primary purpose for which the VIE was created was to provide the lessee with use of the property for five years with substantially all of the rights and obligations of ownership, including tax benefits.

b. The VIE was marketed to potential investors as an investment in a portfolio of AA-rated assets collateralized by leased property that would provide a fixed-rate return to debt holders equivalent to AA-rated assets. The return to equity investors is expected to be slightly greater than the return to the debt investors because the equity is subordinated to the debt.

c. The residual value guarantee effectively transfers substantially all of the risk associated with the underlying property (that is, decreases in value) to the lessee and the fixed-price purchase option effectively transfers substantially all of the rewards from the underlying property (that is, increases in value) to the lessee.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

d. The VIE is designed to be exposed to the risks associated with a cumulative change in fair value of the leased property at the end of five years as well as credit risk related to the potential default by the lessee of its contractually required lease payments.

**Pending Content**

**Transition Date:** *(P) December 16, 2018; (N) December 16, 2021* | **Transition Guidance:** 842-10-65-1 :

To evaluate the facts and circumstances and determine which reporting entity, if any, is the primary beneficiary of a VIE, paragraph 810-10-25-38A : requires that a reporting entity determine the purpose and design of the VIE, including the risks that the VIE was designed to create and pass through to its variable interest holders. In making this assessment, the variable interest holders of the VIE determined the following:

a. The primary purpose for which the VIE was created was to provide the lessee with use of the underlying asset for five years with substantially all of the rights and obligations of ownership, including tax benefits.

b. The VIE was marketed to potential investors as an investment in a portfolio of AA-rated assets collateralized by an underlying asset that is leased that would provide a fixed-rate return to debt holders equivalent to AA-rated assets. The return to equity investors is expected to be slightly greater than the return to the debt investors because the equity is subordinated to the debt.

c. The residual value guarantee effectively transfers substantially all of the risk associated with the underlying asset (that is, decreases in value) to the lessee and the fixed-price purchase option effectively transfers substantially all of the rewards from the underlying asset (that is, increases in value) to the lessee.

d. The VIE is designed to be exposed to the risks associated with a cumulative change in fair value of the underlying asset at the end of five years as well as credit risk related to the potential default by the lessee of its contractually required lease payments.

**55-177** The debt investors, the equity investors, and the lessee are the variable interest holders in the VIE.

**55-178** Paragraph 810-10-25-38B : requires that a reporting entity identify which activities most significantly impact the VIE's economic performance and determine whether it has the power to direct those activities. The economic performance of the VIE is significantly impacted by the fair value of the underlying property and the credit of the lessee. The lessee's maintenance and operation of the leased property has a direct effect on the fair value of the underlying property, and the lessee directs the remarketing of the property. The lessee also has the ability to increase the benefits it can receive and limit the losses it can suffer by the manner in which it uses the property and how it remarkets the property.

**Pending Content**

**Transition Date:** *(P) December 16, 2018; (N) December 16, 2021* | **Transition Guidance:** 842-10-65-1 :

Paragraph 810-10-25-38B : requires that a reporting entity identify which activities most significantly impact the VIE's economic performance and determine whether it has the power to direct those activities. The economic performance of the VIE is significantly impacted by the fair value of the underlying asset and the credit of the lessee. The lessee's maintenance and operation of the underlying asset has a direct effect on the fair value of the underlying asset, and the lessee directs the remarketing of the underlying asset. The lessee also has the ability to increase the benefits it can receive and limit the losses it can suffer by the manner in which it uses the underlying asset and how it remarkets the underlying asset.

**55-179** The debt holders do not have the power to direct activities that most significantly impact the VIE's economic performance. Although the equity holders establish the terms of the lease agreement, the terms of the lease agreement do not provide the equity holders with the power to direct activities that most significantly impact the VIE's economic performance.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

**55-180**If a reporting entity has the power to direct the activities of a VIE that most significantly impact the VIE's economic performance, then under the requirements of paragraph 810-10-25-38A : ⬜, that reporting entity also is required to determine whether it has the obligation to absorb losses of the VIE that could potentially be significant to the VIE or the right to receive benefits from the VIE that could potentially be significant to the VIE. The lessee has both the obligation to absorb losses that could potentially be significant to the VIE and the right to receive benefits that could potentially be significant to the VIE through the residual value guarantee and the purchase option, respectively.

**55-181**On the basis of the specific facts and circumstances presented in this Case and the analysis performed, the lessee would be deemed the primary beneficiary of the VIE because:

a. It is the variable interest holder with the power to direct the activities of the VIE that most significantly impact the VIE's economic performance.

b. Through its residual value guarantee and purchase option, it has the obligation to absorb losses of the VIE that could potentially be significant to the VIE and the right to receive benefits from the VIE that could potentially be significant to the VIE.

### > > > Case H: Collaboration—Joint Venture Arrangement

**55-182** The following Cases illustrate the application of the guidance in paragraphs 810-10-25-38A through

25-38J : ⬜ related to the determination of the entity that has the power to direct the activities of the VIE that most significantly impact the VIE's economic performance.

a. Joint decision making, different activities (Case H1)

b. Separate decision making, different activities (Case H2)

c. Separate decision making, same activities (Case H3)

d. Separate decision making, similar and different activities (Case H4).

**55-183** Each of the Cases share the following assumptions:

a. Reporting Entity A and Reporting Entity B form a VIE to manufacture, distribute, and sell a beverage. The VIE is funded with $95 million of 20-year fixed-rate debt and $5 million of equity. The debt is widely dispersed among third-party investors. The equity is held by Reporting Entity A and Reporting Entity B. Reporting Entity A and Reporting Entity B are not related parties.

b. Reporting Entity A and Reporting Entity B each have 50 percent of the voting rights and each represents 50 percent of the board of directors.

c. Reporting Entity A is a beverage manufacturer and distributor. Reporting Entity B is also a beverage manufacturer and distributor.

### > > > > Case H1: Joint Decision Making, Different Activities

**55-184**Reporting Entity A is responsible for manufacturing the beverage. Reporting Entity B is responsible for distributing and selling the beverage. Decisions about the manufacturing, distributing, and selling of the beverage require the consent of both Reporting Entity A and Reporting Entity B. All other decisions about the VIE are jointly decided by Reporting Entity A and Reporting Entity B through their voting interests and equal board representation. Any matters that cannot be resolved or agreed upon must be resolved through a third-party arbitration process.

**55-185**To evaluate the facts and circumstances and determine which reporting entity, if any, is the primary beneficiary of a VIE, paragraph 810-10-25-38A : ⬜ requires that a reporting entity determine the purpose and design of the VIE, including the risks that the VIE was designed to create and pass through to its variable interest

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

holders. In making this assessment, the variable interest holders of the VIE determined that the primary purpose for which the VIE was created was to provide Reporting Entity A with access to Reporting Entity B's distribution and sales network and for Reporting Entity B to gain access to Reporting Entity A's manufacturing process and technology.

**55-186**Reporting Entity A and Reporting Entity B (through their equity investment) and the debt investors are the variable interest holders in the VIE.

**55-187**Paragraph 810-10-25-38B : requires that a reporting entity identify which activities most significantly impact the VIE's economic performance and determine whether it has the power to direct those activities. The economic performance of the VIE is significantly impacted by the manufacturing of the beverage and by the selling and distributing of the beverage. Thus, the activities that significantly impact the VIE's economic performance are the activities that significantly impact the manufacturing of the beverage and the selling and distributing of the beverage.

**55-188**Paragraph 810-10-25-38D : provides that if a reporting entity determines that power is, in fact, shared among multiple parties such that no one party has the power to direct the activities of a VIE that most significantly impact the VIE's economic performance, then no party is the primary beneficiary. Power is shared if two or more unrelated parties together have the power to direct the activities of a VIE that most significantly impact the VIE's economic performance, and if decisions about those activities require the consent of each of the parties sharing power.

**55-189**Reporting Entity A and Reporting Entity B share the power to direct the activities that will most significantly impact the economic performance of the VIE through their ability to make decisions about the manufacturing, distributing, and selling of the beverage and because of the fact that those decisions require each party's consent.

**55-190**The debt holders of the VIE have no voting rights and no other rights that provide them with the power to direct the activities that most significantly impact the VIE's economic performance.

**55-191**If a reporting entity has the power to direct the activities of a VIE that most significantly impact the VIE's

economic performance, then under the requirements of paragraph 810-10-25-38A : , that reporting entity also is required to determine whether it has the obligation to absorb losses of the VIE that could potentially be significant to the VIE or the right to receive benefits from the VIE that could potentially be significant to the VIE. Reporting Entity A and Reporting Entity B both have the obligation to absorb losses and the right to receive benefits that could potentially be significant to the VIE through their equity interests.

**55-192**On the basis of the specific facts and circumstances presented in this Case and the analysis performed, the VIE does not have a primary beneficiary because the power to direct the activities of the VIE that most significantly impact the VIE's economic performance, is, in fact, shared among multiple parties (Reporting Entity A and Reporting Entity B) such that no one party has the power to direct the activities of the VIE that most significantly impact the VIE's economic performance.

### > > > Case H2: Separate Decision Making, Different Activities

**55-193**Assume that decisions about the manufacturing, distributing, and selling of the beverage do not require the consent of both Reporting Entity A and Reporting Entity B. Each reporting entity would be required to identify which activities most significantly impact the VIE's economic performance and determine whether it has the power to direct those activities. The party with the power to direct those activities would be the primary beneficiary of the VIE. Because decisions about these activities do not require the consent of both Reporting Entity A and Reporting Entity B, power would not be considered shared, and either Reporting Entity A or Reporting Entity B would be the primary beneficiary of the VIE, on the basis of which party has the power to direct the activities of the VIE that most significantly impact the VIE's economic performance.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

### > > > > Case H3: Separate Decision Making, Same Activities

**55-194**Assume that Reporting Entity A and Reporting Entity B each manufacture, distribute, and sell the beverage in different locations, but decisions about these activities do not require the consent of both Reporting Entity A and Reporting Entity B. That is, each reporting entity is responsible for the same activities. Because decisions about these activities do not require the consent of both Reporting Entity A and Reporting Entity B, power would not be considered shared.

**55-195**If a reporting entity concludes that power is not shared but the activities that most significantly impact the VIE's economic performance are directed by multiple unrelated parties and the nature of the activities that each party is directing is the same, the party, if any, with the power over the majority of those activities shall be considered to have the power to direct the activities of a VIE that most significantly impact the VIE's economic performance. If no party directs the majority of those activities, the VIE does not have a primary beneficiary.

**55-196**If Reporting Entity A or Reporting Entity B has power over the majority of those activities, then that party would be the primary beneficiary of the VIE.

### > > > > Case H4: Separate Decision Making, Similar and Different Activities

**55-197**Assume that Reporting Entity A and Reporting Entity B are each responsible for manufacturing the beverage, but Reporting Entity B is also responsible for all of the distributing and selling of the beverage, and decisions about the manufacturing, distributing, and selling of the beverage do not require the consent of both Reporting Entity A and Reporting Entity B. Each reporting entity would be required to identify which activities most significantly impact the VIE's economic performance and determine whether it has the power to direct those activities. The party with the power to direct those activities would be the primary beneficiary of the VIE. That is, power would not be considered shared, and either Reporting Entity A or Reporting Entity B would be the primary beneficiary of the VIE. However, if a reporting entity concludes that power is not shared but the activities that most significantly impact the VIE's economic performance are directed by multiple unrelated parties and the nature of the activities that each party is directing is the same, the party, if any, with the power over the majority of those activities shall be considered to have the power to direct the activities of a VIE that most significantly impact the VIE's economic performance. If no party directs the majority of those activities, the VIE does not have a primary beneficiary.

**55-198**Reporting Entity B may conclude that its power over some of the manufacturing of the beverage, combined with its power over all of the distributing and selling of the beverage, results in its being the party with the power to direct the activities that most significantly impact the VIE's economic performance. However, if Reporting Entity B were to conclude that the distributing and selling of the beverage did not significantly impact the economic performance of the VIE, then the primary beneficiary of the VIE would be the party, if any, with the power over the majority of the manufacturing of the beverage.

### > > > Case I: Furniture Manufacturing Entity

**55-199**A VIE is created by a furniture manufacturer and a financial investor to manufacture and sell wood furniture to retail customers in a particular geographic region. The VIE was created because the furniture manufacturer has no viable distribution channel in that particular geographic region. The VIE is established with $100 of equity, contributed by the furniture manufacturer, and $3 million of 10-year fixed-rate debt, provided by a financial investor. The furniture manufacturer establishes the sales and marketing strategy of the VIE, manages the day-to-day activities of the VIE, and is responsible for preparing and implementing the annual budget for the VIE. The VIE has a distribution contract with a third party that does not represent a variable interest in the VIE. Interest is paid to the fixed-rate debt holder (the financial investor) from operations before funds are available to the equity holder. The furniture manufacturer has guaranteed the fixed-rate debt to the financial investor. The debt agreement includes a clause such that if there is a materially adverse change that materially impairs the

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

ability of the VIE and the furniture manufacturer to pay the debt, then the financial investor can take possession of all the assets of the VIE. An independent third party must objectively determine whether a materially adverse change has occurred on the basis of the terms of the debt agreement (an example of a materially adverse change under the debt agreement is the bankruptcy of the VIE).

**55-200** To evaluate the facts and circumstances and determine which reporting entity, if any, is the primary

beneficiary of a VIE, paragraph 810-10-25-38A : requires that a reporting entity determine the purpose and design of the VIE, including the risks that the VIE was designed to create and pass through to its variable interest holders. In making this assessment, the variable interest holders of the VIE determined the following:

a. The primary purpose for which the VIE was created was to enable the furniture manufacturer to extend its existing business line into a particular geographic region that lacked a viable distribution channel.

b. The VIE was marketed to the financial investor as a fixed-rate investment in a retail operating entity, supported by the furniture manufacturer's expertise and guarantee.

c. The furniture manufacturer's guarantee of the debt effectively transfers all of the operating risk of the VIE to the furniture manufacturer.

**55-201** The furniture manufacturer and the financial investor (debt holder) are the variable interest holders in the VIE.

**55-202** Paragraph 810-10-25-38B : requires that a reporting entity identify which activities most significantly impact the VIE's economic performance and determine whether it has the power to direct those activities. The economic performance of the VIE is most significantly impacted by the operations of the VIE because the operating cash flows of the VIE are used to repay the financial investor. Thus, the activities that most significantly impact the VIE's economic performance are the operating activities of the VIE. The furniture manufacturer has the ability to establish the sales and marketing strategy of the VIE and manage the day-to-day activities of the VIE.

**55-203** The debt holder has the power to take possession of all of the assets of the VIE if there is a materially adverse change under the debt agreement. However, the debt holder's rights under the materially adverse

change clause represent **protective rights** . Protective rights held by other parties do not preclude a reporting entity from having the power to direct the activities of a VIE that most significantly impact the VIE's economic performance. Protective rights are designed to protect the interests of the party holding those rights without giving that party a controlling financial interest in the VIE to which they relate. The debt holder's rights protect the interests of the debt holder; however, the VIE's economic performance is most significantly impacted by the activities over which the furniture manufacturer has power. The debt holder's protective rights do not prevent the furniture manufacturer from having the power to direct the activities of the VIE that most significantly impact the VIE's economic performance.

**55-204** If a reporting entity has the power to direct the activities of a VIE that most significantly impact the VIE's

economic performance, then under the requirements of paragraph 810-10-25-38A : , that reporting entity also is required to determine whether it has the obligation to absorb losses of the VIE that could potentially be significant to the VIE or the right to receive benefits that could potentially be significant to the VIE. The furniture manufacturer has the obligation to absorb losses that could potentially be significant through its equity interest and debt guarantee and the right to receive benefits that could potentially be significant through its equity interest.

**55-205** On the basis of the specific facts and circumstances presented in this Case and the analysis performed, the furniture manufacturer would be the primary beneficiary of the VIE because:

a. It is the variable interest holder with the power to direct the activities of the VIE that most significantly impact the VIE's economic performance.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

b. Through its equity interest and debt guarantee, it has the obligation to absorb losses of the VIE that could potentially be significant to the VIE and the right to receive benefits from the VIE that could potentially be significant to the VIE.

**55-205A** Paragraph moved to 810-10-55-205AJ : .

**55-205B** Paragraph moved to 810-10-55-205AK : .

**55-205C** Paragraph moved to 810-10-55-205AL : .

**55-205D** Paragraph moved to 810-10-55-205AM : .

**55-205E** Paragraph moved to 810-10-55-205AN : .

**55-205F** Paragraph moved to 810-10-55-205AO : .

**55-205G** Paragraph moved to 810-10-55-205AP : .

**55-205H** Paragraph moved to 810-10-55-205AQ : .

**55-205I** Paragraph moved to 810-10-55-205AR : .

**55-205J** Paragraph moved to 810-10-55-205AS : .

**55-205K** Paragraph moved to 810-10-55-205AT : .

**> > > Case J: Investment Fund 1—Annual and Performance-Based Fees and Additional Interests**
**55-205L**A fund manager (general partner) creates and sells partnership interests in an investment fund (limited partnership) to external investors (limited partners). The partnership interests were marketed to the limited partners as an opportunity to generate returns by allowing the general partner to have discretion to determine how to invest the fund's assets provided that the investments are consistent with the defined parameters and objectives set forth in the limited partnership agreement. The general partner is not liable for any losses beyond the interest that the general partner owns in the fund. The general partner's ownership interests in the fund are expected to absorb more than an insignificant amount of the fund's expected losses and receive more than an insignificant amount of the fund's expected residual returns.

**55-205M** The individual limited partners do not hold any substantive rights that would affect the **decision-making authority** of the general partner, but they can redeem their interests within particular limits set forth by the fund. The limited partners do not have either of the following abilities:

a. The ability to remove the general partner from its decision-making authority or to dissolve (liquidate) the fund **without cause** (as distinguished from **with cause** )

b. The ability to block or participate in certain significant financial and operating decisions of the limited partnership that are made in the **ordinary course of business** .

**55-205N**The at-risk equity holders (as a group) do not have the ability to direct the activities that most significantly impact the economic performance of the fund on the basis of paragraph 810-10-55-205M(a) through

(b) : . Therefore, the fund is a VIE because the condition in paragraph 810-10-15-14(b)(1)(ii) : is met.

**55-205O**The general partner is paid an annual fixed fee for the assets under management and a performance-based fee based on the fund's profits if it achieves a specified annual profit level. The annual and performance-based fees paid to the general partner are both of the following:

a. Compensation for services provided and commensurate with the level of effort required to provide those services

b. Part of a compensation arrangement that includes only terms, conditions, or amounts that are customarily present in arrangements for similar services negotiated at arm's length.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

**55-205P** To evaluate the facts and circumstances and determine which reporting entity, if any, is the primary beneficiary of a VIE, paragraph 810-10-25-38A : requires that a reporting entity determine the purpose and design of the VIE, including the risks that the VIE was designed to create and pass through to its variable interest holders. In making this assessment, the variable interest holders of the VIE determined all of the following:

   a. The fund is designed to provide limited partners with exposure to the risks and returns of the fund.

   b. The fund was marketed to potential investors as an investment in a pool of securities with exposure to specific enterprise risks, market liquidity, and general market volatility of the investments. The limited partners have granted the general partner power to direct the activities that most significantly impact the VIE's economic performance, which include management of their invested capital, on the basis of the prior performance of the general partner.

   c. The fee structure is designed to provide greater compensation to the general partner if the fund generates returns for the third-party limited partners that are above the specified profit level. The specified profit level is based on the activities of the fund and the nature of the fund's assets. While the general partner's fee structure may provide an incentive for the general partner to take additional risk to realize its performance-based fee, the annual and performance-based fees are designed to do all of the following:

      1. Provide compensation to the general partner for its services that is commensurate with the level of effort required to provide the services

      2. Include only terms, conditions, or amounts that are customarily present in arrangements for similar services negotiated at arm's length.

**55-205Q** The general partner and the limited partners are the variable interest holders in the VIE. The fees paid to the general partner (in its role as fund manager) represent a variable interest on the basis of a consideration of the conditions in paragraphs 810-10-55-37 through 55-38 : , specifically paragraph 810-10-55-37(c) : , because of the general partner holding ownership interests that are expected to absorb more than an insignificant amount of the fund's expected losses and receive more than an insignificant amount of the fund's expected residual returns. If the general partner was only receiving fees and did not hold ownership interests and if its related parties did not hold any variable interests in the VIE, then the fees would not be a variable interest.

**55-205R** Paragraph 810-10-25-38B : requires that a reporting entity identify which activities most significantly impact the VIE's economic performance and determine whether it has the power to direct those activities. The economic performance of the VIE is most significantly impacted by the performance of the VIE's managed securities portfolio. Thus, the activities that most significantly impact the VIE's economic performance are the activities that significantly impact the performance of the managed securities portfolio.

**55-205S** The general partner manages the operations of the VIE. Specifically, the general partner establishes the terms of the VIE, approves the assets to be purchased and sold by the VIE, and administers the VIE by monitoring the assets and ensuring compliance with the VIE's investment policies. The fact that the general partner was significantly involved with the creation of the VIE does not, in isolation, result in the general partner being the primary beneficiary of the VIE. However, the fact that the general partner was involved with the creation of the VIE may indicate that the general partner had the opportunity and the incentive to establish arrangements that result in the general partner being the variable interest holder with the power to direct the activities that most significantly impact the VIE's economic performance.

**55-205T** The limited partners of the VIE have no voting rights and no other rights that provide them with the power to direct the activities that most significantly impact the VIE's economic performance.

**55-205U** If a reporting entity has the power to direct the activities of a VIE that most significantly impact the VIE's economic performance, then under the requirements of paragraph 810-10-25-38A : , that reporting entity also is required to determine whether it has the obligation to absorb losses of the VIE that could potentially be

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

significant to the VIE or the right to receive benefits from the VIE that could potentially be significant to the VIE. The annual and performance-based fees paid to the general partner are both of the following:

a. Compensation for services provided and commensurate with the level of effort required to provide those services

b. Part of a compensation arrangement that includes only terms, conditions, or amounts that are customarily present in arrangements for similar services negotiated at arm's length.

Therefore, the annual and performance-based fees meet the criteria in paragraph 810-10-25-38H : and should

not be considered for purposes of evaluating the characteristic in paragraph 810-10-25-38A(b) : . Additionally, the general partner, through its investment in the fund, has the obligation to absorb losses of the VIE that could potentially be significant to the VIE and the right to receive benefits from the VIE that could potentially be significant to the VIE.

**55-205V** On the basis of the specific facts and circumstances presented in this Case and the analysis performed, the general partner would be the primary beneficiary of the VIE because:

a. It is the variable interest holder with the power to direct the activities of the VIE that most significantly impact the VIE's economic performance.

b. Through its investment in the fund, it has the obligation to absorb losses of the VIE that could potentially be significant to the VIE and the right to receive benefits from the VIE that could potentially be significant to the VIE.

### > > > Case K: Investment Fund 2—Annual and Performance-Based Fees and No Additional Interests

**55-205W** A fund manager (general partner) creates and sells partnership interests in an investment fund (limited partnership) to external investors (limited partners). The partnership interests were marketed to the investors as an opportunity to generate significant returns by allowing the general partner to have discretion to determine how to invest the fund's assets provided that the investments are consistent with the defined parameters and objectives set forth in the limited partnership agreement. None of the limited partners are related parties of the general partner. The general partner does not hold any interests in the fund, and the general partner is not liable for any losses in the fund. Several employees of the general partner have interests in the fund. These employees chose to purchase interests in the fund and financed the purchases themselves.

**55-205X** The annual and performance-based fees paid to the general partner are both of the following:

a. Compensation for services provided and commensurate with the level of effort required to provide those services

b. Part of a service arrangement that includes only terms, conditions, or amounts that are customarily present in arrangements for similar services negotiated at arm's length.

Additionally, the general partner has no related parties with interests in the fund that individually, or in the aggregate, would absorb more than an insignificant amount of the fund's expected losses or receive more than an insignificant amount of the fund's expected residual returns. For purposes of this assessment, the general partner did not include its employees' interests in the fund because the general partner did not finance those interests; therefore, the general partner has neither a direct nor an indirect economic interest in the fund. The general partner's annual and performance-based fees do not represent a variable interest on the basis of a consideration of the conditions in paragraphs 810-10-55-37 through 55-38 : .

**55-205Y** On the basis of the specific facts and circumstances presented in this Case and the analysis performed, the general partner does not have a variable interest in the fund. The general partner has no further consolidation analysis to perform.

### > > > Case L: eCommerce Entity

---

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

**55-205Z**Company B, an affiliate of Company A, owns certain intellectual property related to eCommerce activities. Company A establishes a VIE to which Company A provides an exclusive services and asset licensing agreement. The VIE obtains access to the intellectual property owned by Company B. Company A agrees to provide strategic and technical services to the VIE and contracts with Company B to perform these services. Company B, Company A, and the VIE share the same senior management.

**55-205AA**Because of regulatory restrictions, Company A and its investors are precluded from owning equity in the VIE. The VIE is domiciled in a different country, which prohibits foreign investment through equity.

**55-205AB**The equity investors in the VIE, who are the senior management of Company A, have rights that are limited to only administrative matters.

**55-205AC**Company A's compensation for the services and asset licensing agreement is the net income of the VIE, but not the VIE's net losses. The fees paid to Company A are both of the following:

a. Compensation for services provided but not commensurate with the level of effort required to provide those services

b. Part of a service arrangement that does not include only terms, conditions, or amounts that are customarily present in arrangements for similar services negotiated at arm's length.

**55-205AD**To evaluate the facts and circumstances and determine which reporting entity, if any, is the primary

beneficiary of a VIE, paragraph 810-10-25-38A : requires that a reporting entity determine the purpose and design of the VIE, including the risks that the VIE was designed to create and pass through to its variable interest holders. In making this assessment, the variable interest holders of the VIE determined the following:

a. The primary purpose for the creation of the VIE was to bypass foreign investment restrictions and enable foreign investors (through their ownership of Company A) to participate indirectly in restricted sectors in which Company B operates through a series of contractual arrangements.

b. Company A will receive all of the net income but none of the net losses of the VIE.

c. The equity investors, the senior management of Company A, are exposed to the net losses of the VIE through their equity investments.

**55-205AE**Company A and the equity investors of the VIE are the variable interest holders in the VIE. The fees paid to Company A represent a variable interest on the basis of consideration of the conditions in paragraphs 810-10-55-37 through 55-38 : , specifically paragraph 810-10-55-37(a) and (d) : .

**55-205AF**Paragraph 810-10-25-38B : requires that a reporting entity identify which activities most significantly impact the VIE's economic performance and determine whether it has the power to direct those activities. The economic performance of the VIE is significantly impacted by the performance of Company B. Company A, through its contractual arrangements, has the power to direct the activities that most significantly impact the VIE's economic performance.

**55-205AG**The equity investors of the VIE have no voting rights and no other rights that provide them with the power to direct the activities that most significantly impact the VIE's economic performance.

**55-205AH**If a reporting entity has the power to direct the activities of a VIE that most significantly impact the

VIE's economic performance, then under the requirements of paragraph 810-10-25-38A : , that reporting entity also is required to determine whether it has the obligation to absorb losses of the VIE that could potentially be significant to the VIE or the right to receive benefits from the VIE that could potentially be significant to the VIE. Company A, through its fee arrangements, receives benefits that could potentially be significant to the VIE. The fees paid to Company A are both of the following:

a. Compensation for services provided but not commensurate with the level of effort required to provide those services

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

b. Part of a service arrangement that does not include only terms, conditions, or amounts that are customarily present in arrangements for similar services negotiated at arm's length.

Therefore, the fees do not meet the criteria in paragraph 810-10-25-38H : 🗋, and they should be considered for purposes of paragraph 810-10-25-38A(b) : 🗋.

**55-205AI**On the basis of the specific facts and circumstances presented in this Case and the analysis performed, Company A would be deemed to be the primary beneficiary of the VIE because:

a. It is the variable interest holder with the power to direct the activities of the VIE that most significantly impact the VIE's economic performance.

b. Through fee arrangements, it has the right to receive benefits from the VIE that could potentially be significant to the VIE.

**> > Accounting Alternative**
**> > > Private Company Accounting Alternative for Leasing Arrangements under Common Control**

**55-205AJ**The following Examples illustrate the application of the guidance in paragraph 810-10-15-17AB : 🗋 on determining whether a reporting entity that is a private company can elect the accounting alternative not to apply VIE guidance to a legal entity under common control:

a. Common control leasing arrangement with no leasing or other activities with unrelated parties (Example 6)

b. Common control leasing arrangement with additional leasing activities with unrelated parties (Example 7)

c. Common control leasing arrangement with additional activities other than leasing or for the support of leasing (Example 8).

**Pending Content**

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020* | **Transition Guidance:**810-10-65-9 : 🗋

| |
|---|
| **Editor's Note**: Paragraph 810-10-55-205AJ will be superseded upon transition, together with its headings: |
| >>**Accounting Alternative** |
| >>>**Private Company Accounting Alternative for Leasing Arrangements under Common Control** |

a. Paragraph superseded by Accounting Standards Update No. 2018-17 : 🗋

**55-205AK**Examples 6 through 8 share all of the following assumptions:

a. The sole owner of Manufacturing Entity (a private company) is also the sole owner of Lessor Entity.

b. Manufacturing Entity has pledged its assets as collateral for Lessor Entity's mortgage.

c. The common owner of both entities has provided a guarantee of Lessor Entity's mortgage as required by the lender.

d. Manufacturing Entity leases its manufacturing facility from Lessor Entity.

e. The value of the manufacturing facility leased by Manufacturing Entity exceeds the principal amount of Lessor Entity's mortgage at inception of the mortgage.

f. Manufacturing Entity has elected to apply the accounting alternative described in paragraph

810-10-15-17AB : 🗋.

**Pending Content**

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020* | **Transition Guidance:**810-10-65-9 :

Paragraph superseded by Accounting Standards Update No. 2018-17 :

### > > > > Example 6: Common Control Leasing Arrangement with No Leasing or Other Activities with Unrelated Parties

**55-205AL**Lessor Entity owns no assets other than the manufacturing facility being leased to Manufacturing Entity. Manufacturing Entity pays property taxes on behalf of Lessor Entity and maintains the manufacturing

facility. Therefore, Manufacturing Entity meets all four criteria in paragraph 810-10-15-17AB : and, as a result of its elected accounting policy, would apply the accounting alternative to Lessor Entity based on the following:

a. Manufacturing Entity and Lessor Entity are under common control.

b. Manufacturing Entity has a lease arrangement with Lessor Entity.

c. Substantially all the activities between Manufacturing Entity and Lessor Entity are related to the lease of the manufacturing facility to Manufacturing Entity. Providing collateral, paying property taxes, and maintaining the manufacturing facility are considered to be leasing activities between Manufacturing Entity and Lessor Entity as described in paragraph 810-10-55-9 : .

d. The value of the manufacturing facility leased by Manufacturing Entity exceeds the principal amount of Lessor Entity's mortgage at inception of the mortgage.

### Pending Content

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020* | **Transition Guidance:**810-10-65-9 :

| |
|---|
| **Editor's Note**: Paragraph 810-10-55-205AL will be superseded upon transition, together with its heading: |
| >>>>**Example 6: Common Control Leasing Arrangement with No Leasing or Other Activities with Unrelated Parties** |

a. Paragraph superseded by Accounting Standards Update No. 2018-17 :

**55-205AM**If in two years the value of the manufacturing facility declines below the principal amount of the mortgage, Manufacturing Entity would continue to apply this accounting alternative (assuming no other changes

have occurred) because the manufacturing facility met criterion (d) in paragraph 810-10-15-17AB : at inception of the arrangement.

### Pending Content

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020* | **Transition Guidance:**810-10-65-9 :

Paragraph superseded by Accounting Standards Update No. 2018-17 :

**55-205AN**If Lessor Entity refinances or enters into a new obligation that requires collateralization or a guarantee by Manufacturing Entity, then Manufacturing Entity would be required to reassess whether criterion (d) in

paragraph 810-10-15-17AB : is met at the inception of the new obligation. For example, if Lessor Entity refinances the mortgage (collateralized by assets of Manufacturing Entity) and the new principal balance of the mortgage exceeds the value of the manufacturing facility, then the arrangement would no longer meet criterion (d). Not meeting the criteria to qualify for the accounting alternative does not automatically result in consolidation. Instead, Lessor Entity will need to be evaluated under this Topic, including VIE guidance, for consolidation and related disclosure requirements.

### Pending Content

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020* | **Transition Guidance:** 810-10-65-9 :

Paragraph superseded by Accounting Standards Update No. 2018-17 :

**> > > > Example 7: Common Control Leasing Arrangement with Additional Leasing Activities with Unrelated Parties**

**55-205AO** Manufacturing Entity leases 3 of the 10 floors of the manufacturing facility from Lessor Entity. Lessor Entity leases the remaining seven floors of the same manufacturing facility to unrelated parties. Manufacturing Entity continues to pledge its assets as collateral for the mortgage that financed the purchase of the entire manufacturing facility (that is, all 10 floors). In this Example, Manufacturing Entity meets all four criteria in

paragraph 810-10-15-17AB : and, as a result of its elected accounting policy, would apply the accounting alternative to Lessor Entity based on the following:

a. Manufacturing Entity and Lessor Entity are under common control.

b. Manufacturing Entity has a lease arrangement with Lessor Entity.

c. Substantially all the activities between Manufacturing Entity and Lessor Entity are related to the lease of the manufacturing facility to Manufacturing Entity, even though part of the manufacturing facility is also leased to unrelated parties.

d. The value of the manufacturing facility leased by Manufacturing Entity exceeds the principal amount of Lessor Entity's mortgage at inception of the mortgage.

**Pending Content**

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020* | **Transition Guidance:** 810-10-65-9 :

| |
|---|
| **Editor's Note**: Paragraph 810-10-55-205AO will be superseded upon transition, together with its heading: |
| >>>>**Example 7: Common Control Leasing Arrangement with Additional Leasing Activities with Unrelated Parties** |

a. Paragraph superseded by Accounting Standards Update No. 2018-17 :

**55-205AP** Subsequently, Lessor Entity purchases an additional facility that is leased only to unrelated parties. The value of the new facility is significant to Lessor Entity, and the mortgage on the additional facility requires a guarantee by Manufacturing Entity. Under these circumstances, Manufacturing Entity failed to meet criterion

(c) in paragraph 810-10-15-17AB : to qualify for the accounting alternative when the guarantee is executed and leasing activity with unrelated parties commenced. Manufacturing Entity is engaging in substantial activity outside its leasing activity with Lessor Entity by providing a guarantee on a mortgage secured by an asset that is not being leased by Manufacturing Entity. Not meeting the criteria to qualify for the accounting alternative does not automatically result in consolidation. Instead, Lessor Entity will need to be evaluated under this Topic, including VIE guidance, for consolidation and related disclosure requirements.

**Pending Content**

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020* | **Transition Guidance:** 810-10-65-9 :

Paragraph superseded by Accounting Standards Update No. 2018-17 :

**> > > > Example 8: Common Control Leasing Arrangement with Additional Activities Other Than Leasing or for the Support of Leasing**

**55-205AQ** Lessor Entity manufactures cosmetics products in another facility that is unrelated to the operations of Manufacturing Entity. There is no mortgage associated with this additional facility, and Manufacturing Entity

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

does not provide collateral or guarantee any obligations related to the cosmetics business. In this Example, Manufacturing Entity meets all four criteria in paragraph 810-10-15-17AB : and, as a result of its elected accounting policy, would apply the accounting alternative to Lessor Entity based on the following:

a. Manufacturing Entity and Lessor Entity are under common control.

b. Manufacturing Entity has a lease arrangement with Lessor Entity.

c. Substantially all the activities between Manufacturing Entity and Lessor Entity are related to the lease of the manufacturing facility to Manufacturing Entity.

d. The value of the manufacturing facility leased by Manufacturing Entity exceeds the principal amount of Lessor Entity's mortgage at inception of the mortgage. There is no obligation associated with the purchase of the cosmetic facility.

**Pending Content**

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020* | **Transition Guidance:** 810-10-65-9 :

| |
|---|
| **Editor's Note**: Paragraph 810-10-55-205AQ will be superseded upon transition, together with its heading: |
| >>>>**Example 8: Common Control Leasing Arrangement with Additional Activities Other Than Leasing or for the Support of Leasing** |

a. Paragraph superseded by Accounting Standards Update No. 2018-17 :

**55-205AR** If there is a mortgage on Lessor Entity's cosmetics facility that requires Manufacturing Entity to provide collateral and/or a guarantee, then Manufacturing Entity may not apply this accounting alternative to the Lessor Entity because it would not meet criterion (c) in paragraph 810-10-15-17AB : . A purchase of cosmetics from Lessor Entity by Manufacturing Entity also would require an evaluation of whether criterion (c) of paragraph 810-10-15-17AB : is met. Not meeting the criteria to qualify for the accounting alternative does not automatically result in consolidation. Instead, Lessor Entity will need to be evaluated under this Topic, including VIE guidance, for consolidation and related disclosure requirements.

**Pending Content**

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020* | **Transition Guidance:** 810-10-65-9 :

Paragraph superseded by Accounting Standards Update No. 2018-17 :

**> > Example 9: Collateralized Financing Entities—Application of the Measurement Alternative to the Financial Liabilities When the Fair Value of the Financial Assets Is More Observable**

**55-205AS** A reporting entity has determined that it must consolidate a **collateralized financing entity** under this Topic and is eligible to and has elected to apply the measurement alternative in paragraphs 810-10-30-10 through 30-15 : and 810-10-35-6 through 35-8 : . The reporting entity retains certain **beneficial interests** in the collateralized financing entity as compensation for its services and also retains other beneficial interests. Since initial consolidation, the collateralized financing entity has not settled any of the outstanding beneficial interests related to compensation for services. The collateralized financing entity's only assets are corporate debt obligations, and its only liabilities (the beneficial interests issued by the collateralized financing entity) are thinly traded. The reporting entity determines that the fair value of the collateralized financing entity's financial assets is more observable than the fair value of its financial liabilities. Because the fair value of the financial assets is more observable, the reporting entity determines the amount of the financial liabilities of the collateralized financing entity (other than those beneficial interests retained by the reporting entity) as follows.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

| | June 20, 20X4 (Measurement upon Initial Consolidation) | December 31, 20X4 |
|---|---|---|
| Fair value of the financial assets[(a)] | $ 100 | $ 105 |
| Plus: Carrying value of the nonfinancial assets[(b)] | 5 | 5 |
| Total value of the assets of the collateralized financing entity | 105 | 110 |
| Less: Fair value of the beneficial interests retained by the reporting entity (other than those that represent compensation for services)[(c)] | 10 | 12 |
| Less: Carrying value of the beneficial interests related to compensation for services[(d)] | 6 | 8 |
| Financial liabilities related to the collateralized financing entity in consolidation | 89 | 90 |
| Net assets related to the collateralized financing entity[(e)] | $ 16 | $ 20 |
| Change in the net assets related to the collateralized financing entity[(f)] | | $ 4 |
| Changes in the beneficial interests attributable to the reporting entity[(f)] | | $ 4 |

(a) The financial assets include $5 and $10 at June 20, 20X4, and December 31, 20X4, respectively, of cash held by the collateralized financing entity. The carrying value of the cash and cash equivalents is equal to the fair value.

(b) To determine the financial liabilities of the collateralized financing entity, the reporting entity uses the sum of the fair value of the financial assets and the carrying value of the nonfinancial assets. The nonfinancial assets of the collateralized financing entity are measured in accordance with other Topics.

(c) This amount represents the fair value of the beneficial interests retained by the reporting entity (other than those that represent compensation for services) determined in accordance with Topic 820. This amount is not included in the financial liabilities of the consolidated reporting entity because it does not represent an amount due to third-party beneficial interest holders.

(d) The reporting entity has rights to a portion of the beneficial interests through its compensation arrangement. That amount is measured in accordance with other Topics. That amount is not included in the financial liabilities of the consolidated reporting entity because it does not represent an amount due to third-party beneficial interest holders.

(e) The net assets related to the collateralized financing entity equal the reporting entity's beneficial interests (that is, the sum of the fair value of the beneficial interests retained [other than those that represent compensation] and the carrying value of beneficial interests that represent compensation for services). The change in the net assets is included in the reporting entity's consolidated net income (loss).

(f) The change in the net assets related to the collateralized financing entity equals the change in the value of the beneficial interests retained by the reporting entity, including the change in the carrying value of the beneficial interests representing compensation for services.

> > **Example 10: Collateralized Financing Entities—Application of the Measurement Alternative to the Financial Assets When the Fair Value of the Financial Liabilities Is More Observable**

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

**55-205AT** A reporting entity has determined that it must consolidate a **collateralized financing entity** under this Topic and is eligible to and has elected to apply the measurement alternative in paragraphs 810-10-30-10 through 30-15 : and 810-10-35-6 through 35-8 : . The reporting entity retains certain **beneficial interests** in the collateralized financing entity as compensation for its services and also retains other beneficial interests. Since initial consolidation, the collateralized financing entity has not settled any of the outstanding beneficial interests related to compensation for services. The collateralized financing entity's only assets are mortgages with primarily unobservable inputs, and its only liabilities are beneficial interests issued in those assets. The beneficial interests of the collateralized financing entity are frequently traded, although not in an active market. Because the fair value of the financial liabilities is more observable, the reporting entity determines the amount of the financial assets of the collateralized financing entity as follows.

***Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.***
***©2023 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***
***https://www.accountingresearchmanager.com/q/1g7l3***

| | June 20, 20X4 (Measurement upon Initial Consolidation) | December 31, 20X4 |
|---|---|---|
| Fair value of the financial liabilities (other than beneficial interests retained by the reporting entity)[a] | $ 90 | $ 95 |
| Plus: Fair value of the beneficial interests retained by the reporting entity (other than those that represent compensation for services)[b] | 10 | 12 |
| Plus: Carrying value of the beneficial interests related to compensation for services[c] | 6 | 8 |
| Total value of the financial liabilities of the collateralized financing entity[d] | 106 | 115 |
| Less: Carrying value of the nonfinancial assets[e] | 5 | 5 |
| Financial assets of the collateralized financing entity | 101 | 110 |
| Net assets related to the collateralized financing entity[f] | $ 16 | $ 20 |
| Change in the net assets related to the collateralized financing entity[g] | | $ 4 |
| Changes in the beneficial interests attributable to the reporting entity[g] | | $ 4 |

(a)  This amount reflects the fair value of the beneficial interests held by third parties in the consolidated financial statements. While any beneficial interests retained by the reporting entity are financial liabilities of the collateralized financing entity, such amounts are eliminated in consolidation because they do not represent amounts due to third-party beneficial interest holders. This amount also includes $6 and $8 at June 20, 20X4, and December 31, 20X4, respectively, of payables held by the collateralized financing entity for securities purchased but not yet settled. The carrying amount of those payables approximates fair value.

(b)  This amount represents the fair value of the beneficial interests retained by the reporting entity (other than those that represent compensation for services).

(c)  The reporting entity holds beneficial interests that represent compensation for services. This amount is measured in accordance with other Topics.

(d)  The total liabilities of the collateralized financing entity include the beneficial interests held by third parties, the beneficial interests retained by the reporting entity, and any beneficial interests related to compensation. The reporting entity's beneficial interests (including those related to compensation) are financial liabilities of the collateralized financial entity that are eliminated in consolidation.

(e)  The nonfinancial assets of the collateralized financing entity are measured in accordance with other Topics.

(f)  The net assets related to the collateralized financing entity equal the reporting entity's beneficial interests (that is, the sum of the fair value of the beneficial interests retained [other than those that represent compensation] and the carrying value of beneficial interests that represent compensation for services). The change in the net assets is included in the reporting entity's consolidated net income (loss).

(g)  The change in the net assets related to the collateralized financing entity equals the change in the value of the beneficial interests attributable to the reporting entity, including the change in the carrying value of the beneficial interests representing compensation for services.

**> > Accounting Alternative for Entities under Common Control**
**> > > Accounting Alternative—Determining Whether Common Control Exists**

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

**55-205AU**

**Pending Content**

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020* | **Transition Guidance:**810-10-65-9 :

The following Examples illustrate the application of the guidance in paragraphs 810-10-15-17AD(a) : and

810-10-15-17AE : on determining whether common control exists solely for purposes of applying the accounting alternative:

>    a. Accounting Alternative—Common Control Exists (Example 11)

>    b. Accounting Alternative—Common Control Does Not Exist (Example 12).

**> > > > Example 11: Accounting Alternative—Common Control Exists**
**55-205AV**

**Pending Content**

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020* | **Transition Guidance:**810-10-65-9 :

Assume the following:

>    a. Entities A (Parent), B (the reporting entity), C (a legal entity), and E (a legal entity) are all private companies.

>    b. Entity A holds a majority of the voting shares of Entities B and C.

>    c. Entity C holds a majority of the voting shares of Entity E.

**55-205AW**

**Pending Content**

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020* | **Transition Guidance:**810-10-65-9 :

Based on the guidance in paragraph 810-10-25-1 : , Entity A has a controlling financial interest in Entities B and C because it directly holds a majority of the voting shares in those entities and no circumstances indicate that control does not rest with the majority owner. Entity C also has a controlling financial interest in Entity E because it directly holds a majority of the voting shares in this entity. Therefore, Entity A controls Entity E through Entity C's controlling financial interest in Entity E. For the purposes of applying paragraph 810-10-15-17AD(a) :

, Entities B, C, and E are under common control of Entity A. Assuming the other criteria in paragraph

810-10-15-17AD : are met, Entity B (the reporting entity) is eligible to apply the accounting alternative to Entity C and Entity E.

**55-205AX**

**Pending Content**

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020* | **Transition Guidance:**810-10-65-9 :

If Entity B directly holds a majority of the voting shares of Entity E and no circumstances indicate that control does not rest with the majority owner, Entity B would not be able to apply the accounting alternative to Entity E

because paragraph 810-10-15-17AD(d) : would not be met. In other words, Entity B would conclude that it holds a controlling financial interest in Entity E when considering only the General Subsections of this Topic (and not the Variable Interest Entities Subsections).

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

### > > > > Example 12: Accounting Alternative—Common Control Does Not Exist
**55-205AY**

**Pending Content**

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020* | **Transition Guidance:** 810-10-65-9 :

Assume the following:

   a. Entities A (Parent), B (the reporting entity), C (a legal entity), and E (a legal entity) are all private companies.

   b. Entity A holds a majority of the voting shares of Entities B and C.

   c. Entities A, B, and C do not hold any voting shares of Entity E (directly or indirectly). However, Entity A has extended subordinated financial support (in the form of debt) to Entity E.

**55-205AZ**

**Pending Content**

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020* | **Transition Guidance:** 810-10-65-9 :

Based on the guidance in paragraph 810-10-25-1 : , Entity A has a controlling financial interest in Entities B and C because it directly holds a majority of the voting shares in those entities and no circumstances indicate that control does not rest with the majority owner. Therefore, Entities B and C are under common control of Entity A. However, Entity E is not considered to be under common control of Entity A for the purposes of

applying paragraph 810-10-15-17AD(a) : because Entity A does not directly or indirectly hold a majority of Entity E's voting shares. Moreover, even if Entity E is a VIE and Entity A is its primary beneficiary, Entity E is not considered to be under common control of Entity A for purposes of applying the guidance in paragraph

810-10-15-17AD(a) : . Accordingly, Entity B (the reporting entity) is precluded from applying the accounting alternative to Entity E.

### > > > Application of the Accounting Alternative
**55-205BA**

**Pending Content**

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020* | **Transition Guidance:** 810-10-65-9 :

The following Examples illustrate the application of the guidance in paragraph 810-10-15-17AD : on determining whether a reporting entity that is a private company can elect the accounting alternative not to apply VIE guidance to a legal entity under common control:

   a. Common control leasing arrangement (Example 13)

   b. Car Company (reporting entity) under common control with Engine Company, Tire Company, and Purse Company (Example 14).

### > > > > Example 13: Common Control Leasing Arrangement
**55-205BB**

**Pending Content**

***Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.***
***©2023 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions:*** ***http://researchhelp.cch.com/License_Agreement.htm***
***https://www.accountingresearchmanager.com/q/1g7l3***

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020 |* **Transition Guidance:**810-10-65-9 :

Assume the following:

> a. The sole owner (not a public business entity) of Manufacturing Entity (a private company) also is the sole owner of Lessor Entity (a private company).

> b. The reporting entity is Manufacturing Entity.

> c. Manufacturing Entity leases its manufacturing facility from Lessor Entity.

> d. Lessor Entity owns no assets other than the manufacturing facility being leased to Manufacturing Entity.

> e. Manufacturing Entity pays property taxes on behalf of Lessor Entity and maintains the manufacturing facility.

> f. The sole owner of both entities has provided a guarantee of Lessor Entity's mortgage as required by the external lender.

> g. Manufacturing Entity has elected to apply the accounting alternative described in paragraph

> 810-10-15-17AD : .

**55-205BC**

**Pending Content**

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020 |* **Transition Guidance:**810-10-65-9 :

Manufacturing Entity meets all the criteria in paragraph 810-10-15-17AD : , and, as a result of its elected accounting policy, Manufacturing Entity would apply the accounting alternative to Lessor Entity on the basis of the following:

> a. Manufacturing Entity (a private company) and Lessor Entity are under common control.

> b. Manufacturing Entity and Lessor Entity are under common control of an individual that is not a public business entity.

> c. Lessor Entity is not a public business entity.

> d. Manufacturing Entity does not directly or indirectly hold a controlling financial interest in Lessor Entity when considering only the General Subsections of this Topic.

> > Manufacturing Entity should disclose the required information specified in paragraphs

> > 810-10-50-2AG through 50-2AI : unless Lessor Entity is consolidated through accounting guidance other than VIE guidance.

**> > > > Example 14: Car Company (Reporting Entity) under Common Control with Engine Company, Tire Company, and Purse Company**
**55-205BD**

**Pending Content**

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020 |* **Transition Guidance:**810-10-65-9 :

Assume the following:

> a. Reporting entity Car Company (Car Co.), a private company, produces vehicles for sale.

> b. Car Co. has elected to apply the accounting alternative described in paragraph 810-10-15-17AD : .

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

c. The sole owner (not a public business entity) of Car Co. also is the sole owner of Engine Company (Engine Co.), Tire Company (Tire Co.), and Purse Company (Purse Co.). Therefore, Car Co., Engine Co., Tire Co., and Purse Co. are considered to be under common control. Only Purse Co. meets the definition of a public business entity.

d. All companies under common control have third-party debt, and each respective company has pledged its assets as collateral for that debt. The third-party debt on each respective company is personally guaranteed by the owner.

e. Engine Co. assumptions:

1. Engine Co. was created by the owner to vertically integrate the supply chain for Car Co.'s production of vehicles.

2. Engine Co. produces engines based on Car Co.'s design specifications.

3. Engine Co. is the sole engine supplier for Car Co., and substantially all of Engine Co.'s production is sold to Car Co.

4. No other engines on the market could replace the engines supplied by Engine Co.

5. During 20XX, Car Co. charged Engine Co. $225,684 for management and other services rendered.

6. During 20XX, Car Co. purchased $9,482,513 in engines from Engine Co.

7. Engine Co. has an outstanding loan for $600,000 due to Car Co. that is unsecured and accrues interest at 6 percent. This loan is subordinated to all other debt, and there are no specific repayment terms.

8. Historically, Car Co. has provided funding to Engine Co. at the request of the owner even though there is no existing contractual requirement to do so.

9. Total book value of Engine Co.'s liabilities is $2,459,127 as of December 31, 20XX.

f. Tire Co. assumptions:

1. Tire Co. was created by the owner to vertically integrate the supply chain for the Car Co.'s production of vehicles.

2. Tire Co. sells a majority of its tires to Car Co.

3. Many substitutes on the market could replace the tires provided by Tire Co.

4. During 20XX, Car Co. charged Tire Co. $74,568 for management and other services rendered.

5. During 20XX, Car Co. purchased $3,792,929 of tires from Tire Co.

6. Tire Co. has an outstanding loan for $200,000 due to Car Co. that is unsecured and accrues interest at 6 percent. This loan is subordinated to all other debt, and there are no specific repayment terms.

7. Other than the $200,000 loan, Car Co. has never provided any other additional funding to Tire Co. and is not contractually obligated to do so.

8. Total book value of Tire Co.'s liabilities is $1,250,000 as of December 31, 20XX.

g. Purse Co. assumptions:

1. Purse Co. sells high-end designer purses.

2. No significant transactions or arrangements exist between Purse Co. and the other entities under common control.

3. Car Co. did not provide any management services to Purse Co.

4. Car Co. has never provided any additional funding to Purse Co. and is not contractually obligated to do so.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

5. Total book value of Purse Co.'s liabilities is $1,000,000 as of December 31, 20XX.

**55-205BE**

**Pending Content**

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020 |* **Transition Guidance:** 810-10-65-9 :

Car Co. meets all the criteria in paragraph 810-10-15-17AD : for Engine Co. and Tire Co. and can elect the accounting alternative. As a result of its elected accounting policy, Car Co. would apply the accounting alternative to Engine Co. and Tire Co. on the basis of the following:

a. Car Co. (a private company), Engine Co., and Tire Co. are under common control.

b. Car Co., Engine Co., and Tire Co. are under common control of an individual that is not a public business entity.

c. Neither Engine Co. nor Tire Co. is a public business entity.

d. Car Co. does not directly or indirectly hold a controlling financial interest in Engine Co. or Tire Co. when considering only the General Subsections of this Topic.

> Although Purse Co. would not qualify for the accounting alternative because it is a public business entity, Car Co. does not consider Purse Co. to be a legal entity that needs to be assessed for consolidation because Car Co. has no variable interest in Purse Co. Therefore, Car Co. would not provide any disclosures related to Purse Co. under this accounting alternative.

**55-205BF**

**Pending Content**

**Transition Date:** *(P) December 16, 2019; (N) December 16, 2020 |* **Transition Guidance:** 810-10-65-9 :

Based on the fact pattern described in paragraphs 810-10-55-205BD through 55-205BE : , the following

disclosures may satisfy the provisions in paragraphs 810-10-50-2AG through 50-2AI : :

a. Engine Company, Inc. (Engine Co.): Engine Co. and Car Company, Inc. (the Company) are under common control. Engine Co. was created by the owner to vertically integrate the supply chain for the Company's production of vehicles. The Company's ability to generate profits depends largely on Engine Co. Engine Co. produces engines for the Company's vehicles in accordance with the Company's design specifications for those engines. Substantially all of Engine Co.'s production is sold to the Company, and Engine Co. is the sole supplier of engines to the Company. No other engines on the market could replace the engines supplied by Engine Co. The Company provides Engine Co. with management and other services (including, but not limited to, accounting, billing, and administrative duties) for which it charged a management fee of $225,684 in 20XX. The Company purchased $9,482,513 of engines during 20XX from Engine Co. Engine Co. has an outstanding loan in the amount of $600,000 due to the Company that is unsecured and accrues interest at 6 percent. The loan is subordinated to all other debt, and no specific repayment terms exist.

b. Tire Company, Inc. (Tire Co.): Tire Co. and the Company are under common control. Tire Co. was created by the owner to vertically integrate the supply chain for the Company's production of vehicles. Tire Co. produces tires for the Company's vehicles and sells a majority of those tires to the Company. The Company provides no design specifications for the tires, and many substitutes on the market could replace the tires that Tire Co. provides. The Company provides Tire Co. with management and other services (including, but not limited to, accounting, billing, and administrative duties) for which it charged a management fee of $74,568 in 20XX. Car Co. purchased $3,792,929 of tires during 20XX from Tire Co. Tire Co. has an outstanding loan in the amount of $200,000 due to the Company that is unsecured and accrues interest at 6 percent. The loan is subordinated to all other debt, and no specific repayment terms exist.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions:* *http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*

c. Both Engine Co. and Tire Co. have third-party debt, and both companies have their assets pledged as collateral for that debt. The owner of the Company, Engine Co., and Tire Co. has personally guaranteed the third-party debt of the Company, Engine Co., and Tire Co.

d. In addition to the $600,000 loan, the Company historically has been required to provide funds to Engine Co. at the request of the common owner. The Company believes that its maximum financial exposure to loss related to Engine Co. could equal all of Engine Co.'s liabilities. The book value of Engine Co.'s liabilities is $2,459,127 as of December 31, 20XX.

e. Other than the $200,000 loan, the Company has never provided any other additional funding to Tire Co. and is not contractually obligated to do so. The Company believes that its maximum financial exposure related to Tire Co. is limited to the $200,000 loan outstanding and any accrued interest as of December 31, 20XX.

Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.

*Copyright 2005-2020 by Financial Accounting Foundation, Norwalk, Connecticut.*
*©2023 Wolters Kluwer. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
*https://www.accountingresearchmanager.com/q/1g7l3*