# Exhibit B

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

---

**FORM 20-F**

---

**(Mark One)**

☐      **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**
**OR**

☒      **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2020.**
**OR**

☐      **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from to .**
**OR**

☐      **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**Date of event requiring this shell company report. . . . . . . . . . . . . . . . . . .**
**Commission file number: 001-38638**

---

# NIO Inc.

(Exact Name of Registrant as Specified in Its Charter)

---

**N/A**
(Translation of Registrant's Name Into English)

---

**Cayman Islands**
(Jurisdiction of Incorporation or Organization)

---

**Building 20, No. 56 AnTuo Road, Anting Town, Jiading District**
**Shanghai 201804, People's Republic of China**
(Address of Principal Executive Offices)

**Wei Feng, Chief Financial Officer**
**Building 20, No. 56 AnTuo Road, Anting Town, Jiading District**
**Shanghai 201804, People's Republic of China**
**Telephone: +8621-6908 2018**
**Email: ir@nio.com**
(Name, Telephone, Email and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol | Name of Each Exchange On Which Registered |
|---|---|---|
| American depositary shares (each representing one Class A ordinary share, par value US$0.00025 per share) | NIO | New York Stock Exchange |
| Class A ordinary shares, par value US$0.00025 per share* | | |
| *Not for trading, but only in connection with the listing on the New York Stock Exchange of American depositary shares. | | |

Securities registered or to be registered pursuant to Section 12(g) of the Act:
**None**

Table of Contents

(Title of Class)
Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:
**None**
(Title of Class)

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

As of December 31, 2020, there were (i) 1,292,312,288 Class A ordinary shares outstanding, par value US$0.00025 per share, (ii) 128,293,932 Class B ordinary shares outstanding, par value US$0.00025 per share and (iii) 148,500,000 Class C ordinary shares outstanding, par value US$0.00025 per share.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
 Yes  No

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  Yes  No

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes  No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).  Yes  No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer | Accelerated filer |
| Non-accelerated filer | Emerging growth company ☐ |

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act.

†The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. § 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

| | | |
|---|---|---|
| U.S. GAAP | International Financial Reporting Standards as issued by the International Accounting Standards Board | Other |

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.  Item 17  Item 18

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐ Yes ☒ No

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.  Yes  No

Table of Contents

**TABLE OF CONTENTS**

| | |
|---|---:|
| INTRODUCTION | 1 |
| FORWARD-LOOKING INFORMATION | 2 |
| PART I. | 3 |
| ITEM 1. IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS | 3 |
| ITEM 2. OFFER STATISTICS AND EXPECTED TIMETABLE | 3 |
| ITEM 3. KEY INFORMATION | 3 |
| ITEM 4. INFORMATION ON THE COMPANY | 59 |
| ITEM 4.A. UNRESOLVED STAFF COMMENTS | 98 |
| ITEM 5. OPERATING AND FINANCIAL REVIEW AND PROSPECTS | 98 |
| ITEM 6. DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES | 117 |
| ITEM 7. MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS | 127 |
| ITEM 8. FINANCIAL INFORMATION | 130 |
| ITEM 9. THE OFFER AND LISTING | 132 |
| ITEM 10. ADDITIONAL INFORMATION | 132 |
| ITEM 11. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 144 |
| ITEM 12. DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES | 145 |
| PART II. | 147 |
| ITEM 13. DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES | 147 |
| ITEM 14. MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS | 147 |
| ITEM 15. CONTROLS AND PROCEDURES | 148 |
| ITEM 16. A. AUDIT COMMITTEE FINANCIAL EXPERT | 149 |
| ITEM 16. B. CODE OF ETHICS | 149 |
| ITEM 16. C. PRINCIPAL ACCOUNTANT FEES AND SERVICES | 149 |
| ITEM 16. D. EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES | 150 |
| ITEM 16. E. PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS | 150 |
| ITEM 16. F. CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT | 150 |
| ITEM 16. G. CORPORATE GOVERNANCE | 150 |
| ITEM 16. H. MINE SAFETY DISCLOSURE | 150 |
| PART III. | 150 |
| ITEM 17. FINANCIAL STATEMENTS | 150 |
| ITEM 18. FINANCIAL STATEMENTS | 150 |
| ITEM 19. EXHIBITS | 151 |

Table of Contents

**INTRODUCTION**

In this annual report on Form 20-F, or this annual report, except where the context otherwise requires and for purposes of this annual report only:

- "AD" refers to autonomous driving.

- "ADAS" refers to advanced driver assistance system;

- "ADRs" refer to the American depositary receipts that evidence the ADSs;

- "ADSs" refer to our American depositary shares, each of which represents one Class A ordinary share;

- "AI" refers to artificial intelligence;

- "BEVs" refer to battery electric passenger vehicles;

- "China" or the "PRC" refers to the People's Republic of China, excluding, for the purpose of this annual report only, Hong Kong, Macau and Taiwan;

- "Class A ordinary shares" refer to our Class A ordinary shares, par value US$0.00025 per share;

- "Class B ordinary shares" refer to our Class B ordinary shares, par value US$0.00025 per share;

- "Class C ordinary shares" refer to our Class C ordinary shares, par value US$0.00025 per share;

- "EVs" refer to electric passenger vehicles;

- "FOTA" refers to firmware over-the-air;

- "ICE" refers to internal combustion engine;

- "NEVs" refer to new energy passenger vehicles;

- "NIO," "we," "us," "our company," and "our" refer to NIO Inc., our Cayman Islands holding company and its subsidiaries, and its consolidated variable interest entity as of the date of this annual report, and depending on the context, may also refer to Shanghai Anbin Technology Co., Ltd., which is no longer our consolidated variable interest entity as of March 31, 2021, and its subsidiaries;

- "Ordinary shares" refer to our Class A ordinary shares, Class B ordinary shares and Class C ordinary shares, each of par value US$0.00025 per share;

- "RMB" or "Renminbi" refers to the legal currency of China; and

- "US$," "dollars" or "U.S. dollars" refer to the legal currency of the United States.

Unless otherwise noted, all translations from Renminbi to U.S. dollars and from U.S. dollars to Renminbi in this annual report are made at a rate of RMB6.5250 to US$1.00, the exchange rate in effect as of December 31, 2020 as set forth in the H.10 statistical release of the Board of Governors of the Federal Reserve System. We make no representation that any Renminbi or U.S. dollar amounts could have been, or could be, converted into U.S. dollars or Renminbi, as the case may be, at any particular rate, or at all.

1

Table of Contents

**FORWARD-LOOKING INFORMATION**

This annual report contains forward-looking statements that reflect our current expectations and views of future events. These forward looking statements are made under the "safe-harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. Known and unknown risks, uncertainties and other factors, including those listed under "Item 3. Key Information-D. Risk Factors," may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements. These statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements.

You can identify these forward-looking statements by words or phrases such as "may," "will," "expect," "anticipate," "aim," "estimate," "intend," "plan," "believe," "likely to," "potential," "continue" or other similar expressions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements include, but are not limited to, statements about:

- our goals and growth strategies;

- the impact of the COVID-19 pandemic;

- our future business development, financial condition and results of operations;

- the expected growth of the electric vehicles industry in China;

- our expectations regarding demand for and market acceptance of our products and services;

- our expectations regarding our relationships with customers, contract manufacturers, component suppliers, third-party service providers, strategic partners and other stakeholders;

- competition in our industry;

- relevant government policies and regulations relating to our industry; and

- assumptions underlying or related to any of the foregoing.

These forward-looking statements involve various risks and uncertainties. Although we believe that our expectations expressed in these forward-looking statements are reasonable, our expectations may later be found to be incorrect. Our actual results could be materially different from our expectations. Other sections of this annual report include additional factors that could adversely impact our business and financial performance. Moreover, we operate in an evolving environment. New risk factors and uncertainties emerge from time to time and it is not possible for our management to predict all risk factors and uncertainties, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. You should read thoroughly this annual report and the documents that we refer to with the understanding that our actual future results may be materially different from, or worse than, what we expect. We qualify all of our forward-looking statements by these cautionary statements.

This annual report contains certain data and information that we obtained from various government and private publications. Statistical data in these publications also include projections based on a number of assumptions. The electric vehicles industry may not grow at the rate projected by market data, or at all. Failure of this market to grow at the projected rate may have a material adverse effect on our business and the market price of our ADSs. In addition, the rapidly evolving nature of the electric vehicles industry results in significant uncertainties for any projections or estimates relating to the growth prospects or future condition of our market. Furthermore, if any one or more of the assumptions underlying the market data are later found to be incorrect, actual results may differ from the projections based on these assumptions. You should not place undue reliance on these forward-looking statements.

The forward-looking statements made in this annual report relate only to events or information as of the date on which the statements are made in this annual report. Except as required by law, we undertake no obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise, after the date on which the statements are made or to reflect the occurrence of unanticipated events. You should read this annual report and the documents that we refer to in this annual report and exhibits to this annual report completely and with the understanding that our actual future results may be materially different from what we expect.

2

Table of Contents

**PART I.**

**ITEM 1. IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS**

Not applicable.

**ITEM 2. OFFER STATISTICS AND EXPECTED TIMETABLE**

Not applicable.

**ITEM 3. KEY INFORMATION**

**A. Selected Financial Data**

**Selected Consolidated Financial Data**

The following selected consolidated statements of comprehensive loss data for the years ended December 31, 2018, 2019 and 2020, selected consolidated balance sheet data as of December 31, 2019 and 2020 and selected consolidated cash flow data for the years ended December 31, 2018, 2019 and 2020 have been derived from our audited consolidated financial statements included elsewhere in this annual report. The following selected consolidated statements of comprehensive loss data for the year ended December 31, 2016 and 2017, the selected consolidated balance sheet data as of December 31, 2016, 2017 and 2018, and the selected consolidated cash flow data for the year ended December 31, 2016 and 2017 have been derived from our audited consolidated financial statements that are not included in this annual report. Our historical results do not necessarily indicate results expected for any future periods. The selected consolidated financial data should be read in conjunction with, and are qualified in their entirety by reference to, our audited consolidated financial statements and related notes and "Item 5. Operating and Financial Review and Prospects" below. Our consolidated financial statements are prepared and presented in accordance with accounting principles generally accepted in the United States of America, or U.S. GAAP.

Table of Contents

| | For the Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2016 | 2017 | 2018 | 2019 | 2020 | |
| | RMB | RMB | RMB | RMB | RMB | US$ |
| | (in thousands, except for per share data) | | | | | |
| **Selected Consolidated Statements of Comprehensive Loss:** | | | | | | |
| **Revenues[1]** | | | | | | |
| Vehicle sales | - | - | 4,852,470 | 7,367,113 | 15,182,522 | 2,326,823 |
| Other sales | - | - | 98,701 | 457,791 | 1,075,411 | 164,814 |
| **Total revenues** | - | - | 4,951,171 | 7,824,904 | 16,257,933 | 2,491,637 |
| **Cost of sales:[2]** | | | | | | |
| Vehicle sales | - | - | (4,930,135) | (8,096,035) | (13,255,770) | (2,031,536) |
| Other sales | - | - | (276,912) | (927,691) | (1,128,744) | (172,988) |
| **Total cost of sales** | - | - | (5,207,047) | (9,023,726) | (14,384,514) | (2,204,524) |
| **Gross (loss)/profit** | - | - | (255,876) | (1,198,822) | 1,873,419 | 287,113 |
| Operating expenses: | | | | | | |
| Research and development[2] | (1,465,353) | (2,602,889) | (3,997,942) | (4,428,580) | (2,487,770) | (381,267) |
| Selling, general and administrative[2] | (1,137,187) | (2,350,707) | (5,341,790) | (5,451,787) | (3,932,271) | (602,647) |
| Other operating loss | - | - | - | - | (61,023) | (9,352) |
| **Total operating expenses** | (2,602,540) | (4,953,596) | (9,339,732) | (9,880,367) | (6,481,064) | (993,266) |
| **Loss from operations** | (2,602,540) | (4,953,596) | (9,595,608) | (11,079,189) | (4,607,645) | (706,153) |
| Interest income | 27,556 | 18,970 | 133,384 | 160,279 | 166,904 | 25,579 |
| Interest expenses | (55) | (18,084) | (123,643) | (370,536) | (426,015) | (65,290) |
| Shares of losses of equity investee | - | (5,375) | (9,722) | (64,478) | (66,030) | (10,120) |
| Investment income | 2,670 | 3,498 | - | - | - | - |
| Other income/(loss), net | 3,429 | (58,681) | (21,346) | 66,160 | (364,928) | (55,928) |
| **Loss before income tax expenses** | (2,568,940) | (5,013,268) | (9,616,935) | (11,287,764) | (5,297,714) | (811,912) |
| Income tax expenses | (4,314) | (7,906) | (22,044) | (7,888) | (6,368) | (976) |
| **Net loss** | (2,573,254) | (5,021,174) | (9,638,979) | (11,295,652) | (5,304,082) | (812,888) |
| Accretion on convertible redeemable preferred value | (981,233) | (2,576,935) | (13,667,291) | - | - | - |
| Accretion on redeemable non-controlling interests to redemption value | - | - | (63,297) | (126,590) | (311,670) | (47,766) |
| Net loss attributable to non-controlling interests | 36,938 | 36,440 | 41,705 | 9,141 | 4,962 | 760 |
| **Net loss attributable to ordinary shareholders of NIO Inc.** | (3,517,549) | (7,561,669) | (23,327,862) | (11,413,101) | (5,610,790) | (859,894) |
| **Net loss** | (2,573,254) | (5,021,174) | (9,638,979) | (11,295,652) | (5,304,082) | (812,888) |
| Other comprehensive (loss)/income | | | | | | |
| Foreign currency translation adjustments, net of nil tax | 55,493 | (124,374) | (20,786) | (168,340) | 137,596 | 21,088 |
| **Total other comprehensive (loss)/income** | 55,493 | (124,374) | (20,786) | (168,340) | 137,596 | 21,088 |
| **Total comprehensive loss** | (2,517,761) | (5,145,548) | (9,659,765) | (11,463,922) | (5,166,486) | (791,800) |
| Accretion on convertible redeemable preferred shares to redemption value | (981,233) | (2,576,935) | (13,667,291) | - | - | - |
| Accretion on redeemable non-controlling interests to redemption value | - | - | (63,297) | (126,590) | (311,670) | (47,766) |
| Net loss attributable to non-controlling interests | 36,938 | 36,440 | 41,705 | 9,141 | 4,962 | 760 |
| **Comprehensive loss attributable to ordinary shareholders of NIO Inc.** | (3,462,056) | (7,686,043) | (23,348,648) | (11,581,441) | (5,473,194) | (838,806) |
| **Weighted average number of ordinary shares used in computing net loss per share** | | | | | | |
| Basic and diluted | 16,697,527 | 21,801,525 | 332,153,211 | 1,029,931,705 | 1,182,660,948 | 1,182,660,948 |
| **Net loss per share attributable to ordinary shareholders** | | | | | | |
| Basic and diluted | (210.66) | (346.84) | (70.23) | (11.08) | (4.74) | (0.73) |

Notes:

(1)  We began generating revenues in June 2018, when we began making deliveries and sales of the ES8. We currently generate revenues from vehicle sales and other sales.

(2)  Share-based compensation expenses were allocated in cost of sales and operating expenses as follows:

| | For the Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2016 | 2017 | 2018 | 2019 | 2020 | |
| | RMB | RMB | RMB | RMB | RMB | US$ |
| | (in thousands) | | | | | |
| Cost of sales | - | - | 9,289 | 9,763 | 5,564 | 853 |
| Research and development expenses | 14,484 | 23,210 | 109,124 | 82,680 | 51,024 | 7,820 |
| Selling, general and administrative expenses | 62,200 | 67,086 | 561,055 | 241,052 | 130,506 | 20,001 |
| Total | 76,684 | 90,296 | 679,468 | 333,495 | 187,094 | 28,674 |

4

Table of Contents

The following table presents our selected consolidated balance sheet data as of the dates indicated.

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | |
| | **RMB** | **RMB** | **RMB** | **RMB** | **RMB** | **US$** |
| | *(in thousands, except for share data)* | | | | | |
| **Selected Consolidated Balance Sheet Data:** | | | | | | |
| Cash and cash equivalents | 581,296 | 7,505,954 | 3,133,847 | 862,839 | 38,425,541 | 5,888,972 |
| Restricted cash | - | 10,606 | 57,012 | 82,507 | 78,010 | 11,956 |
| Long-term restricted cash | 15,335 | 14,293 | 33,528 | 44,523 | 41,547 | 6,367 |
| Property, plant and equipment, net | 833,004 | 1,911,013 | 4,853,157 | 5,533,064 | 4,996,228 | 765,705 |
| Total assets | 1,770,478 | 10,468,034 | 18,842,552 | 14,582,029 | 54,641,929 | 8,374,243 |
| Total liabilities | 825,264 | 2,402,028 | 10,692,210 | 19,403,841 | 22,779,686 | 3,491,140 |
| Total mezzanine equity | 4,861,574 | 19,657,786 | 1,329,197 | 1,455,787 | 4,691,287 | 718,971 |
| Ordinary shares | 52 | 60 | 1,809 | 1,827 | 2,679 | 411 |
| Total shareholders' (deficit)/equity | (3,916,360) | (11,591,780) | 6,821,145 | (6,277,599) | 27,170,956 | 4,164,132 |
| Total shares outstanding | 17,773,459 | 23,850,343 | 1,050,799,032 | 1,064,472,660 | 1,526,539,388 | 1,526,539,388 |

The following table presents our selected consolidated cash flow data for the years indicated.

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | |
| | **RMB** | **RMB** | **RMB** | **RMB** | **RMB** | **US$** |
| | *(in thousands)* | | | | | |
| **Selected Consolidated Cash Flow Data:** | | | | | | |
| Net cash (used in)/provided by operating activities | (2,201,564) | (4,574,719) | (7,911,768) | (8,721,706) | 1,950,894 | 298,985 |
| Net cash provided by/(used in) investing activities | 117,843 | (1,190,273) | (7,940,843) | 3,382,069 | (5,071,060) | (777,174) |
| Net cash provided by financing activities | 2,292,704 | 12,867,334 | 11,603,092 | 3,094,953 | 41,357,435 | 6,338,307 |
| Effects of exchange rate changes on cash, cash equivalents and restricted cash | 40,539 | (168,120) | (56,947) | 10,166 | (682,040) | (104,527) |
| Net increase/(decrease) in cash, cash equivalents and restricted cash | 249,522 | 6,934,222 | (4,306,466) | (2,234,518) | 37,555,229 | 5,755,591 |
| Cash and cash equivalents and restricted cash at the beginning of year | 347,109 | 596,631 | 7,530,853 | 3,224,387 | 989,869 | 151,704 |
| Cash and cash equivalents and restricted cash at the end of year | 596,631 | 7,530,853 | 3,224,387 | 989,869 | 38,545,098 | 5,907,295 |

**B. Capitalization and Indebtedness**

Not applicable.

**C. Reasons for the Offer and Use of Proceeds**

Not applicable.

5

Table of Contents

**D. Risk Factors**

**Risks Related to Our Business and Industry**

*Our ability to develop and manufacture a car of sufficient quality and appeal to customers on schedule and on a large scale is still evolving.*

Our future business depends in large part on our ability to execute on our plans to develop, manufacture, market and sell our electric vehicles. We plan to manufacture our vehicles in higher volumes than our present production capabilities.

Our continued development and manufacturing of our vehicles, the ES8, the ES6, the EC6, and the ET7, and our future vehicles are and will be subject to risks, including with respect to:

- our ability to secure necessary funding;

- the equipment we use being able to accurately manufacture the vehicle within specified design tolerances;

- compliance with environmental, workplace safety and similar regulations;

- securing necessary components on acceptable terms and in a timely manner;

- delays in delivery of final component designs to our suppliers, or delays in the development and delivery of our core technologies and new vehicle models, such as our NIO Autonomous Driving, or NAD, and technologies for battery packs;

- our ability to attract, recruit, hire and train skilled employees;

- quality controls;

- delays or disruptions in our supply chain;

- our ability to maintain solid partnership with our manufacturing partners and suppliers; and

- other delays in manufacturing and production capacity expansion, and cost overruns.

We began making deliveries of the seven-seater ES8 in June 2018, the six-seater ES8 in March 2019 and the ES6 in June 2019. In December 2019, we launched our third volume manufactured electric vehicle, the EC6, and the all-new ES8 with more than 180 product improvements. We began making deliveries of the all- new ES8 in April 2020, and making deliveries of the EC6 in September 2020. In January 2021, we launched our fourth volume manufactured electric vehicle, the ET7, and we estimated to start delivery of our flagship smart electric sedan NIO ET7 in the first quarter of 2022. Our vehicles may not meet customer expectations and our future models may not be commercially viable.

Historically, automobile customers have expected car manufacturers to periodically introduce new and improved vehicle models. In order to meet these expectations, we may be required to introduce new vehicle models and enhanced versions of existing vehicle models. To date we have limited experience designing, testing, manufacturing, marketing and selling our electric vehicles and therefore cannot assure you that we will be able to meet customer expectations.

Any of the foregoing could have a material adverse effect on our results of operations and growth prospects.

6

Table of Contents

***We have not been profitable, and have only recently started to generate positive cash flows from operation.***

We have not been profitable since our inception, and have only recently started to generate positive cash flows from operation. We incurred net losses of RMB9,639.0 million, RMB11,295.7 million and RMB5,304.1 million (US$812.9 million) in 2018, 2019 and 2020, respectively. In addition, although we generated positive cash flows from operation in 2020, we had negative cash flows from operating activities of RMB7,911.8 million and RMB8,721.7 million in 2018 and 2019, respectively. We have made significant up-front investments in research and development, service network and sales and marketing to rapidly develop and expand our business. We expect to continue to invest significantly in research and development and sales and marketing, and potentially in production capacity expansion, to further develop and expand our business, and these investments may not result in an increase in revenue or positive cash flow on a timely basis, or at all.

We may not generate sufficient revenues or we may incur substantial losses for a number of reasons, including lack of demand for our vehicles and services, increasing competition, challenging macro-economic environment due to the COVID-19 pandemic, as well as other risks discussed herein, and we may incur unforeseen expenses, or encounter difficulties, complications and delays in generating revenue or achieving profitability. If we are unable to achieve profitability, we may have to reduce the scale of our operations, which may impact our business growth and adversely affect our financial condition and results of operations. In addition, our continuous operation depends on our capability to improve operating cash flows as well as our capacity to obtain sufficient external equity or debt financing. If we do not succeed in doing so, we may have to limit the scale of our operations, which may limit our business growth and adversely affect our financial condition and results of operations.

***Our business, financial condition and results of operations may be adversely affected by the COVID-19 pandemic.***

Since the beginning of 2020, the COVID-19 pandemic has resulted in temporary closure of many corporate offices, retail stores, manufacturing facilities and factories across China and the world. In early 2020, in response to intensifying efforts to contain the spread of COVID-19, the Chinese government took a number of actions, which included, among others, extending the Chinese New Year holiday, quarantining and otherwise treating individuals in China who had contracted COVID-19, asking residents to remain at home and to avoid gathering in public. While such restrictive measures have been gradually lifted, our business has been and could continue to be adversely impacted by the effects of the COVID-19 pandemic. Although COVID-19 has been largely controlled in China, there have been occasional outbreaks in several cities. To the extent we have service centers and vehicle delivery centers in these locations, we are susceptible to factors adversely affecting one or more of these locations as a result of COVID-19. Our results of operations have been and could continue to be adversely affected to the extent the COVID-19 pandemic or any other epidemic harms the Chinese economy in general. We have experienced and may continue to experience impacts to certain of our customers and/or suppliers as a result of the COVID-19 pandemic occurring in one or more of these locations, which have materially and adversely affected our business, financial condition, results of operations and cash flows. In addition, our operations have experienced and may continue to experience disruptions, such as temporary closure of our offices and/or those of our customers or suppliers and suspension of services, resulting in a reduction of vehicles manufactured and in turn fewer vehicles delivered, which have and may continue to materially and adversely affected our business, financial condition, results of operations and cash flow. Further, to the extent the COVID-19 pandemic adversely affects our business and financial results, it has and may continue to have the effect of heightening many of the other risks described in this annual report, such as those relating to our level of indebtedness, our need to generate sufficient cash flows to service our indebtedness and our ability to comply with the covenants contained in the agreements that govern our indebtedness.

As a result of COVID-19, normal economic life throughout China was sharply curtailed and there were disruptions to normal operation of businesses in various areas, including the manufacturing and sales of vehicles in China. In addition, the ongoing global pandemic may adversely affect the supply chains, which in turn may materially and adversely affect our business and results of operations. The global pandemic, especially the situation in Europe, may also delay the execution of our overseas market expansion plan. Currently, the vaccines are not widely accessible to the public. Relaxation of restrictions on economic and social life may lead to new cases which may lead to the re-imposition of restrictions. As a result, the duration of such business disruption and the resulting financial and operational impact on us cannot be reasonably estimated at this time. The extent to which the COVID-19 pandemic may further impact our business and financial performance will depend on future developments, which are highly uncertain and largely beyond our control. Even if the economic impact of COVID-19 gradually recedes, the pandemic will have a lingering, long-term effect on business activities and consumption behavior. There is no assurance that we will be able to adjust our business operations to adapt to these changes and the increasingly complex environment in which we operate.

Table of Contents

*We have a limited operating history and face significant challenges as a new entrant into our industry.*

We were formed in 2014 and began making deliveries to the public of our first volume manufactured vehicle, the seven-seater ES8, in June 2018. We began making deliveries of our second volume manufactured electric vehicle, the ES6, in June 2019. We began making deliveries of the all-new ES8 in April 2020, and our third volume manufactured vehicle, the EC6, in September 2020. In January 2021, we launched our fourth volume manufactured electric vehicle, the ET7, and we estimate to start delivery of our flagship smart electric sedan NIO ET7 in the first quarter of 2022.

You should consider our business and prospects in light of the risks and challenges we face as a new entrant into our industry, including, among other things, with respect to our ability to:

- design and produce safe, reliable and quality vehicles on an ongoing basis;

- build a well-recognized and respected brand;

- establish and expand our customer base;

- successfully market not just our vehicles but also our other services, including our service package, energy package and other services we provide;

- properly price our services, including our power solutions and service package and successfully anticipate the take-rate and usage of such services by users;

- improve and maintain our operational efficiency;

- maintain a reliable, secure, high-performance and scalable technology infrastructure;

- attract, retain and motivate talented employees;

- anticipate and adapt to changing market conditions, including technological developments and changes in competitive landscape; and

- navigate an evolving and complex regulatory environment.

If we fail to address any or all of these risks and challenges, our business may be materially and adversely affected.

We have limited experience to date in high volume manufacturing of our electric vehicles. We cannot assure you that we will be able to develop efficient, automated, cost-efficient manufacturing capability and processes, and reliable sources of component supply that will enable us to meet the quality, price, engineering, design and production standards, as well as the production volumes required to successfully mass market the ES8, the ES6, the EC6, the ET7, and future vehicles.

Furthermore, our vehicles are highly technical products that will require maintenance and support. If we were to cease or cut back operations, even years from now, buyers of our vehicles from years earlier might encounter difficulties in maintaining their vehicles and obtaining satisfactory support. We also believe that our service offerings, including user confidence in our ability to provide our power solutions and honor our obligations under our service package will be key factors in marketing our vehicles. As a result, consumers will be less likely to purchase our vehicles now if they are not convinced that our business will succeed or that our operations will continue for many years. Similarly, suppliers and other third parties will be less likely to invest time and resources in developing business relationships with us if they are not convinced that our business will succeed.

8

Table of Contents

***Manufacturing in collaboration with partners is subject to risks.***

We have entered into an arrangement with Jianghuai Automobile Group Co., Ltd., or JAC, for the manufacturing of our vehicles, initially the ES8, for five years starting from May 2016. In April 2019 and March 2020, we entered into manufacturing cooperation agreements with JAC for the manufacturing of the ES6 and the EC6, respectively. The ES8, ES6 and EC6 are manufactured in partnership with JAC at its Hefei manufacturing plant. As of the date of this annual report, we are in the process of negotiating with JAC for the manufacturing arrangements of the ET7. JAC is a major state-owned automobile manufacturer in China and it constructed such Hefei manufacturing plant for the production of the ES8 (with a modified production line for the ES6 and EC6) and potentially ET7 and other future vehicles with us. Pursuant to our arrangement with JAC with respect to the ES8, ES6 and EC6, we pay JAC for each vehicle produced on a per-vehicle basis monthly for the first three years. Collaboration with third parties for the manufacturing of vehicles is subject to risks with respect to operations that are outside our control. We could experience delays to the extent our partners do not meet agreed upon timelines or experience capacity constraints. There is risk of potential disputes with partners, and we could be affected by adverse publicity related to our partners whether or not such publicity is related to their collaboration with us. Our ability to successfully build a premium brand could also be adversely affected by perceptions about the quality of our partners' vehicles. In addition, although we are involved in each step of the supply chain and manufacturing process, given that we also rely on our partners to meet our quality standards, there can be no assurance that we will successfully maintain quality standards.

In addition, for the first 36 months after the start of production, which commenced on April 10, 2018, to the extent the Hefei manufacturing plant incurs any operating losses, we have agreed to compensate JAC for such operating losses. Cooperation after the first 36 months will be subject to further negotiation between the parties. As of December 31, 2020, we had paid JAC a total of RMB1,233.9 million, including RMB455.5 million as compensation for losses incurred since 2018 and RMB778.4 million for manufacturing and processing fees. If we continue to be obligated to compensate JAC for any losses, our results of operations and financial condition may be materially and adversely affected, particularly if such losses are incurred as a result of lower than anticipated sales volume.

We are currently in the process of renewing our overall arrangement with JAC for the manufacturing of our vehicles, which original arrangement is currently set to expire in May 2021. We may be unable to enter into new agreements or extend existing agreements with JAC and other third-party manufacturing partners on terms and conditions acceptable to us and therefore may need to contract with other third parties or significantly add to our own production capacity. There can be no assurance that in such event we would be able to partner with other third parties or establish or expand our own production capacity to meet our needs on acceptable terms or at all. The expense and time required to complete any transition, and to assure that vehicles manufactured at facilities of new third-party partners comply with our quality standards and regulatory requirements, may be greater than anticipated. Any of the foregoing could adversely affect our business, results of operations, financial condition and prospects.

***The unavailability, reduction or elimination of government and economic incentives or government policies which are favorable for electric vehicles and domestically produced vehicles could have a material adverse effect on our business, financial condition, operating results and prospects.***

Our growth depends significantly on the availability and amounts of government subsidies, economic incentives and government policies that support the growth of new energy vehicles. Favorable government incentives and subsidies in China include one-time government subsidies, exemption from vehicle purchase tax, exemption from license plate restrictions in certain cities, preferential utility rates for charging facilities and more. Changes in government subsidies, economic incentives and government policies to support NEVs could adversely affect our results of our operations.

China's central government provides subsidies for purchasers of certain NEVs until 2022 and reviews and further adjusts the subsidy standard on an annual basis. The 2019 subsidy standard, effective from March 26, 2019, reduced the amount of national subsidies and canceled local subsidies, resulting in a significant reduction in the total subsidy amount applicable to the ES8 and ES6 as compared to 2018. The 2020 subsidy standard, effective from April 23, 2020, reduces the base subsidy amount in general by 10% for each NEV, sets subsidies for 2 million vehicles as the upper limit of annual subsidy scale; and provides that national subsidy shall only apply to an NEV with the sale price under RMB300,000 or compatible with battery swapping. We believe that our sales performance of ES8, ES6 and EC6 in 2019 and 2020 was negatively affected by the reduction in the subsidy standard to some extent. The current 2021 subsidy standard, effective from January 1, 2021, reduced by 20% as compared to the 2020 subsidy standard. Further, the 2022 subsidy standard are expected to be reduced by 30% as compared to the standard of 2021.

9

Table of Contents

Our vehicles sales may also be impacted by government policies such as tariffs on imported cars and foreign investment restrictions in the industry. The tariff in China on imported passenger vehicles (other than those originating in the United States of America) was reduced to 15% starting from July 1, 2018. As a result, pricing advantage of domestically manufactured vehicles could be diminished. There used to be certain limit on foreign ownership of automakers in China, but for automakers of NEVs, such limit was lifted in 2018. Further, pursuant to the currently effectively Special Administrative Measures for Market Access of Foreign Investment (2020 Version), or the 2020 Negative List, which came into effect on July 23, 2020, the limit on foreign ownership of automakers for ICE passenger vehicles will be lifted by 2022. As a result, foreign NEV competitors could build wholly-owned facilities in China without the need for a domestic joint venture partner. These changes could affect the competitive landscape of the NEV industry and reduce our pricing advantage, which may adversely affect our business, results of operations and financial condition.

Such negative influence and our undermined sales performance resulted therefrom could continue. Furthermore, China's central government provides certain local governments with funds and subsidies to support the roll-out of a charging infrastructure. See "Item 4. Information on the Company-B. Business Overview-Regulation-Favorable Government Policies Relating to New Energy Vehicles in the PRC." These policies are subject to change and beyond our control. We cannot assure you that any changes would be favorable to our business. Furthermore, any reduction, elimination, delayed payment or discriminatory application of government subsidies and economic incentives because of policy changes, the reduced need for such subsidies and incentives due to the perceived success of electric vehicles, fiscal tightening or other factors may result in the diminished competitiveness of the alternative fuel vehicle industry generally or our electric vehicles in particular. Any of the foregoing could materially and adversely affect our business, results of operations, financial condition and prospects.

### *Our vehicles may not perform in line with customer expectations.*

Our vehicles, including the ES8, ES6, EC6 and ET7, may not perform in line with customers' expectations. For example, our vehicles may not have the durability or longevity of other vehicles in the market, and may not be as easy and convenient to repair as other vehicles in the market. Any product defects or any other failure of our vehicles to perform as expected could harm our reputation and result in adverse publicity, lost revenue, delivery delays, product recalls, product liability claims, harm to our brand and reputation, and significant warranty and other expenses, and could have a material adverse impact on our business, financial condition, operating results and prospects.

In addition, the range of our vehicles on a single charge declines principally as a function of usage, time and charging patterns as well as other factors. For example, a customer's use of his or her electric vehicle as well as the frequency with which he or she charges the battery can result in additional deterioration of the battery's ability to hold a charge.

Furthermore, our vehicles may contain defects in design and manufacture that may cause them not to perform as expected or that may require repair. We have delivered our vehicles with certain features of our NIO Pilot ADAS system initially disabled, and subsequently turned on some of these features. We activated most of the announced functions of the NIO Pilot in 2019 and 2020, and plan to continue to explore more features of the NIO Pilot system in 2021. We cannot assure you that our NIO Pilot system will ultimately perform in line with expectations. Our vehicles use a substantial amount of software code to operate and software products are inherently complex and often contain defects and errors when first introduced. While we have performed extensive internal testing on our vehicles' software and hardware systems, we have a limited frame of reference by which to evaluate the long-term performance of our systems and vehicles. There can be no assurance that we will be able to detect and fix any defects in the vehicles prior to their sale to consumers. If any of our vehicles fail to perform as expected, we may need to delay deliveries, initiate product recalls and provide servicing or updates under warranty at our expense, which could adversely affect our brand in our target markets and could adversely affect our business, prospects and results of operations.

10

Table of Contents

***Any delays in the manufacturing and launch of the commercial production vehicles in our pipeline could have a material adverse effect on our business.***

We generally target to launch a new model every year in the near future as we ramp up our business. Automobile manufacturers often experience delays in the design, manufacture and commercial release of new vehicle models. We are planning to target a broader market with our future vehicles, and to the extent we need to delay the launch of our vehicles, our growth prospects could be adversely affected as we may fail to grow our market share. We also plan to periodically perform facelifts or refresh existing models, which could also be subject to delays. Furthermore, we rely on third-party suppliers for the provision and development of many of the key components and materials used in our vehicles. To the extent our suppliers experience any delays in providing us with or developing necessary components, we could experience delays in delivering on our timelines. Any delay in the manufacture or launch of the ES8, the ES6, the EC6, the ET7, or future models, including in the build out of the manufacturing facilities in China for these models or due to any other factors, or in refreshing or performing facelifts to existing models, could subject us to customer complaints and materially and adversely affect our reputation, demand for our vehicles, results of operations and growth prospects.

In addition, to the extent the Hefei manufacturing plant incurs any operating losses, we have agreed to compensate JAC for such operating losses. As of December 31, 2020, we had paid JAC a total of RMB1,233.9 million, including RMB455.5 million as compensation for losses incurred since 2018 and RMB778.4 million for manufacturing and processing fees. If we are obligated to compensate JAC for any losses, our results of operations and financial condition may be materially and adversely affected, particularly if such losses are incurred as a result of lower than anticipated sales volume. We expect that our sales volume and the ability of the Hefei manufacturing plant to achieve profitability will be significantly affected by our ability to timely bring new vehicles to market.

***We may face challenges providing our power solutions.***

We provide our users with comprehensive power solutions. We install home chargers for users where practicable, and provide other solutions including battery swapping, supercharging, charging through publicly accessible charging infrastructure and charging using our fast-charging vans. Our users are able to use our NIO One Click for Power valet charging service where their vehicles are picked up, charged and then returned.

We have very limited experience in the actual provision of our power solutions to users and providing these services is subject to challenges, including the challenges associated with sorting out the logistics of rolling out our network and teams in appropriate areas, inadequate capacity or over capacity of our services in certain areas, security risks or risk of damage to vehicles during One Click for Power valet services and the potential for lack of user acceptance of our services. In addition, although the Chinese government has supported the roll-out of a public charging network, the current number of charging infrastructures is generally considered to be insufficient. We also face uncertainties with regard to governmental support and public infrastructure as we roll out our power solutions, including whether we can obtain and maintain access to sufficient charging infrastructure, whether we can obtain any required permits and land use rights and complete any required filings, and whether the government support in this area may discontinue.

Furthermore, given our limited experience in providing power solutions, there could be unanticipated challenges which may hinder our ability to provide our solutions or make the provision of our solutions costlier than anticipated. To the extent we are unable to meet user expectations or experience difficulties in providing our power solutions, our reputation and business may be materially and adversely affected.

***We may face challenges providing the Battery as a Service.***

On August 20, 2020, we introduced the Battery as a Service, or BaaS, which allows users to purchase electric vehicles and subscribe the usage of battery packs separately. If users opt to purchase an ES8, ES6, EC6 or ET7 model and subscribe to use the 70kWh battery pack under the BaaS, they can enjoy an RMB70,000 deduction off the original vehicle purchase price and pay a monthly subscription fee of RMB980 for the battery pack. On November 6, 2020, we launched the 100kWh battery pack with battery update plans. If users opt to purchase an ES8, ES6, EC6 or ET7 and subscribe for the 100kWh battery pack under the BaaS, they can purchase the vehicle without the battery pack while paying a monthly subscription fee of RMB1,480. Users who currently apply the 70kWh battery pack with the intention to upgrade their batteries can choose to either purchase a 100kWh battery pack for permanent upgrades or pay a monthly subscription fee of RMB880 for a flexible upgrade package.

11

Table of Contents

Under the BaaS, we sell a battery pack to the Battery Asset Company, and the user subscribes to the usage of the battery pack from the Battery Asset Company. The service we provide to our users under the BaaS relies, in part, on the smooth operation of and stability and quality of service delivered by the Battery Asset Company, which we cannot guarantee. We invested in the Battery Asset Company with Contemporary Amperex Technology Co., Limited, or CATL, Hubei Science Technology Investment Group Co., Ltd. and a subsidiary of Guotai Junan International Holdings Limited, which we refer to as the Battery Asset Company Investors in this annual report. As a result, we only have limited control over the business operations of the Battery Asset Company. If it fails in providing high-quality services to our users, we will suffer from negative customer reviews and even returns of products or services. If the Battery Asset Company is unable to obtain future financings from the Battery Asset Company Investors or other third parties to meet its operational needs, it may not be able to continue purchasing batteries from us and leasing them to our users, or otherwise maintain its healthy and sustainable operations. On the other hand, if the Battery Asset Company bears a significant rate of customer default on its payment obligations, its results of operations and financial performance may be materially impacted, which will in turn reduce the value of our and the Battery Asset Company Investors' investments in the Battery Asset Company. In addition, in furtherance of the BaaS, we agreed to provide guarantee to the Battery Asset Company for the default in payment of monthly subscription fees from users, while the maximum amount of guarantee that can be claimed shall not be higher than the accumulated service fees we receive from the Battery Asset Company. As the BaaS user base is expanding, if an increased number of default occurs, our results of operations and financial performance will be negatively affected.

### *Our services may not be generally accepted by our users. If we are unable to provide good customer service, our business and reputation may be materially and adversely affected.*

We aim to provide users with a good customer service experience, including by providing our users with access to a full suite of services conveniently through our mobile application and vehicle applications. In addition, we seek to engage with our users on an ongoing basis using online and offline channels, in ways which are non-traditional for automakers. We are also expanding our service scope to meet our users' evolving demands. For example, in January 2021, we launched NIO Certified, our official used car business, where our users can sell their NIO vehicles to us and we will resell them for value. We have established a nationwide used vehicle business network, covering services including vehicle inspection, evaluation, acquisition and sales. In addition, we have also recently started to offer auto financing arrangements to our users directly through our subsidiaries. New service offerings will subject us to unknown risks. We cannot assure you that our services, including our energy package and service package, our used car service, our auto financing services or our efforts to engage with our users using both our online and offline channels, will be successful, which could impact our revenues as well as our customer satisfaction and marketing.

Our servicing will partially be carried out through third parties certified by us. Although such servicing partners may have experience in servicing other vehicles, we and such partners have very limited experience in servicing our vehicles. Servicing electric vehicles is different from servicing ICE vehicles and requires specialized skills, including high voltage training and servicing techniques. There can be no assurance that our service arrangements will adequately address the service requirements of our users to their satisfaction, or that we and our partners will have sufficient resources to meet these service requirements in a timely manner as the volume of vehicles we deliver increases.

In addition, if we are unable to roll out and establish a widespread service network, user satisfaction could be adversely affected, which in turn could materially and adversely affect our sales, results of operations and prospects.

### *We have received only a limited number of reservations for the ES8, the ES6, the EC6 and the ET7, all of which are subject to cancellation.*

Intention orders and reservations for our vehicles are subject to cancellation by the customer until delivery of the vehicle. We have experienced cancellations in the past. Notwithstanding the non-refundable deposits we charge for the reservations, our users may still cancel their reservations for many reasons outside of our control. The potentially long wait from the time a reservation is made until the time the vehicle is delivered could also impact user decisions on whether to ultimately make a purchase, due to potential changes in preferences, competitive developments and other factors. If we encounter delays in the delivery of the ES8, ES6, EC6, ET7, or future vehicles, we believe that a significant number of reservations may be cancelled. As a result, no assurance can be made that reservations will not be cancelled and will ultimately result in the final purchase, delivery, and sale of the vehicle. Such cancellations could harm our financial condition, business, prospects and operating results.

12

Table of Contents

***The automotive market is highly competitive, and we may not be successful in competing in this industry.***

The China automotive market is highly competitive. We have strategically entered into this market in the premium EV segment and we expect this segment will become more competitive in the future as additional players enter into this segment. We compete with international competitors, including Tesla. Our vehicles also compete with ICE vehicles in the premium segment. Many of our current and potential competitors, particularly international competitors, have significantly greater financial, technical, manufacturing, marketing and other resources than we do and may be able to devote greater resources to the design, development, manufacturing, distribution, promotion, sale and support of their products. We expect competition in our industry to intensify in the future in light of increased demand and regulatory push for alternative fuel vehicles, continuing globalization and consolidation in the worldwide automotive industry. Factors affecting competition include, among others, product quality and features, innovation and development time, pricing, reliability, safety, fuel economy, customer service and financing terms. Increased competition may lead to lower vehicle unit sales and increased inventory, which may result in downward price pressure and adversely affect our business, financial condition, operating results and prospects. Our ability to successfully compete in our industry will be fundamental to our future success in existing and new markets and our market share. There can be no assurance that we will be able to compete successfully in our markets. If our competitors introduce new cars or services that successfully compete with or surpass the quality or performance of our cars or services at more competitive prices, we may be unable to satisfy existing customers or attract new customers at the prices and levels that would allow us to generate attractive rates of return on our investment.

Furthermore, our competitive advantage as the company with the first-to-market and leading premium EV volume-manufactured domestically in China will be severely compromised if our competitors begin making deliveries earlier than expected, or offer more favorable price than we do.

We may also be affected by the growth of the overall China automotive market. While sales of the premium segment of the passenger vehicles in China increased in 2020, overall automobile sales in China declined 6.8% during the year. If demand for automobiles in China continues to decrease, our business, results of operations and financial condition could be materially adversely affected.

***We may face challenges in expanding our business and operations internationally and our ability to conduct business in international markets may be adversely affected by legal, regulatory, political and economic risks.***

We face challenges and risks associated with expanding our business and operations globally into new geographic markets. New geographic markets may have competitive conditions, user preferences, and discretionary spending patterns that are more difficult to predict or satisfy than our existing markets. In certain markets, we have relatively little operating experience and may not benefit from any first-to-market advantages or otherwise succeed. We may also face protectionist policies that could, among other things, hinder our ability to execute our business strategies and put us at a competitive disadvantage relative to domestic companies. Local companies may have a substantial competitive advantage because of their greater understanding of, and focus on, the local users, as well as their more established local brand names, requiring us to build brand awareness in that market through greater investments in advertising and promotional activity. International expansion may also require significant capital investment, which could strain our resources and adversely impact current performance, while adding complexity to our current operations. We are subject to PRC law in addition to the laws of the foreign countries in which we operate. If any of our overseas operations, or our associates or agents, violate such laws, we could become subject to sanctions or other penalties, which could negatively affect our reputation, business and operating results.

In addition, we may face operational issues that could have a material adverse effect on our reputation, business and results of operations, if we fail to address certain factors including, but not limited to, the following:

- lack of acceptance of our products and services, and challenges of localizing our offerings to appeal to local tastes;

- conforming our products to regulatory and safety requirements and charging and other electric infrastructures;

- failure to attract and retain capable talents with international perspectives who can effectively manage and operate local businesses;

- challenges in identifying appropriate local business partners and establishing and maintaining good working relationships with them;

- availability, reliability and security of international payment systems and logistics infrastructure;

13

Table of Contents

- challenges of maintaining efficient and consolidated internal systems, including technology infrastructure, and of achieving customization and integration of these systems with the other parts of our technology platform;

- challenges in replicating or adapting our company policies and procedures to operating environments different from that of China;

- national security policies that restrict our ability to utilize technologies that are deemed by local governmental regulators to pose a threat to their national security;

- the need for increased resources to manage regulatory compliance across our international businesses;

- compliance with privacy laws and data security laws and compliance costs across different legal systems;

- heightened restrictions and barriers on the transfer of data between different jurisdictions;

- differing, complex and potentially adverse customs, import/export laws, tax rules and regulations or other trade barriers or restrictions related compliance obligations and consequences of non-compliance, and any new developments in these areas;

- business licensing or certification requirements of the local markets;

- challenges in the implementation of BaaS and other innovative business models in countries and regions outside of China;

- exchange rate fluctuations; and

- political instability and general economic or political conditions in particular countries or regions, including territorial or trade disputes, war and terrorism.

Failure to manage these risks and challenges could negatively affect our ability to expand our business and operations overseas as well as materially and adversely affect our business, financial condition and results of operations.

***Our industry and its technology are rapidly evolving and may be subject to unforeseen changes. Developments in alternative technologies or improvements in the internal combustion engine may materially and adversely affect the demand for our electric vehicles.***

We operate in China's electric vehicle market, which is rapidly evolving and may not develop as we anticipate. The regulatory framework governing the industry is currently uncertain and may remain uncertain for the foreseeable future. As our industry and our business develop, we may need to modify our business model or change our services and solutions. These changes may not achieve expected results, which could have a material adverse effect on our results of operations and prospects.

Furthermore, we may be unable to keep up with changes in electric vehicle technology and, as a result, our competitiveness may suffer. Our research and development efforts may not be sufficient to adapt to changes in electric vehicle technology. As technologies change, we plan to upgrade or adapt our vehicles and introduce new models in order to provide vehicles with the latest technology, in particular digital technologies, which could involve substantial costs and lower our return on investment for existing vehicles. There can be no assurance that we will be able to compete effectively with alternative vehicles or source and integrate the latest technology into our vehicles, against the backdrop of our rapidly evolving industry. Even if we are able to keep pace with changes in technology and develop new models, our prior models could become obsolete more quickly than expected, potentially reducing our return on investment.

Developments in alternative technologies, such as advanced diesel, ethanol, fuel cells or compressed natural gas, or improvements in the fuel economy of the internal combustion engine, may materially and adversely affect our business and prospects in ways we do not currently anticipate. For example, fuel which is abundant and relatively inexpensive in China, such as compressed natural gas, may emerge as consumers' preferred alternative to petroleum based propulsion. Any failure by us to successfully react to changes in existing technologies could materially harm our competitive position and growth prospects.

14

Table of Contents

***We may be unable to adequately control the costs associated with our operations.***

We have required significant capital to develop and grow our business, including developing the ES8, the ES6, the EC6, and the ET7, as well as building our brand. We expect to incur significant costs which will impact our profitability, including research and development expenses as we roll out new models and improve existing models, raw material procurement costs and selling and distribution expenses as we build our brand and market our vehicles. In addition, we may incur significant costs in connection with our services, including providing power solutions and honoring our commitments under our service package. Our ability to become profitable in the future will not only depend on our ability to successfully market our vehicles and other products and services but also to control our costs. If we are unable to cost efficiently design, manufacture, market, sell and distribute and service our vehicles and services, our margins, profitability and prospects will be materially and adversely affected.

***We could experience cost increases or disruptions in supply of raw materials or other components used in our vehicles.***

We incur significant costs related to procuring raw materials required to manufacture and assemble our vehicles. We use various raw materials in our vehicles including aluminum, steel, carbon fiber, non-ferrous metals such as copper, lithium, nickel as well as cobalt. The prices for these raw materials fluctuate depending on factors beyond our control, including market conditions and global demand for these materials, and could adversely affect our business and operating results. Our business also depends on the continued supply of battery cells for our vehicles. Battery cell manufacturers may refuse to supply electric vehicle manufacturers to the extent they determine that the vehicles are not sufficiently safe. We are exposed to multiple risks relating to availability and pricing of quality lithium-ion battery cells. These risks include:

- the inability or unwillingness of current battery cell manufacturers to build or operate battery cell manufacturing plants to supply the numbers of lithium-ion cells required to support the growth of the electric or plug-in hybrid vehicle industry as demand for such cells increases;

- disruption in the supply of cells due to quality issues or recalls by the battery cell manufacturers; and

- an increase in the cost of raw materials, such as lithium, nickel and cobalt, used in lithium-ion cells.

Furthermore, currency fluctuations, tariffs or shortages in petroleum and other economic or political conditions may result in significant increases in freight charges and raw material costs. Substantial increases in the prices for our raw materials or components would increase our operating costs, and could reduce our margins. In addition, a growth in popularity of electric vehicles without a significant expansion in battery cell production capacity could result in shortages which would result in increased costs in raw materials to us or impact of prospects.

***We are dependent on our suppliers, many of whom are our single source suppliers for the components they supply.***

The ES8, ES6, EC6 and ET7 each uses a great amount of purchased parts from suppliers, many of whom are currently our single source suppliers for these components, and we expect that this will be similar for any future vehicle we may produce. The supply chain exposes us to multiple potential sources of delivery failure or component shortages. While we obtain components from multiple sources whenever possible, similar to other automobile manufacturers, many of the components used in our vehicles are purchased by us from a single source. To date, we have not qualified alternative sources for most of the single sourced components used in our vehicles and we generally do not maintain long-term agreements with our single source suppliers. For example, while several sources of the battery cell we have selected for the ES8 are available, we have fully qualified only one supplier for these cells.

15

Table of Contents

Furthermore, qualifying alternative suppliers or developing our own replacements for certain highly customized components of the ES8, the ES6, the EC6, and the ET7, such as the air suspension system and the steering system, may be time-consuming and costly. Any disruption in the supply of components, whether or not from a single source supplier, could temporarily disrupt production of our vehicles until an alternative supplier is fully qualified by us or is otherwise able to supply us the required material. There can be no assurance that we would be able to successfully retain alternative suppliers or supplies on a timely basis, on acceptable terms or at all. Changes in business conditions, force majeure, governmental changes and other factors beyond our control or which we do not presently anticipate, could also affect our suppliers' ability to deliver components to us on a timely basis. For example, the current global supply constraint of semiconductors has negatively impacted our production activity and volume, as a result of which, we temporarily suspended the vehicle production activity in the JAC-NIO manufacturing plant in Hefei for five working days starting from March 29, 2021 and we produced fewer vehicles in March 2021 than we had previously anticipated without the impact of semiconductor shortage. Our production activity and results of operations may be further impacted should the semiconductor shortage continue. Any of the foregoing could materially and adversely affect our results of operations, financial condition and prospects.

> ***Our business and prospects depend significantly on our ability to build our NIO brand. We may not succeed in continuing to establish, maintain and strengthen the NIO brand, and our brand and reputation could be harmed by negative publicity regarding our company or products.***

Our business and prospects are heavily dependent on our ability to develop, maintain and strengthen the "NIO" brand. If we do not continue to establish, maintain and strengthen our brand, we may lose the opportunity to build a critical mass of customers. Promoting and positioning our brand will likely depend significantly on our ability to provide high quality vehicles and services and engage with our customers as intended and we have limited experience in these areas. In addition, we expect that our ability to develop, maintain and strengthen the NIO brand will depend heavily on the success of our user development and branding efforts. Such efforts mainly include building a community of online and offline users engaged with us through our mobile application, NIO Houses, NIO Spaces as well as other branding initiatives such as our annual NIO Day, Formula E team sponsorship, and other automotive shows and events. Such efforts may be non-traditional and may not achieve the desired results. To promote our brand, we may be required to change our user development and branding practices, which could result in substantially increased expenses, including the need to use traditional media such as television, radio and print. If we do not develop and maintain a strong brand, our business, prospects, financial condition and operating results will be materially and adversely impacted.

In addition, if incidents occur or are perceived to have occurred, whether or not such incidents are our fault, we could be subject to adverse publicity. In particular, given the popularity of social media, including WeChat/Weixin in China, any negative publicity, whether true or not, could quickly proliferate and harm consumer perceptions and confidence in our brand. Furthermore, there is the risk of potential adverse publicity related to our manufacturing or other partners, whether or not such publicity related to their collaboration with us. Our ability to successfully position our brand could also be adversely affected by perceptions about the quality of our partners' vehicles.

In addition, from time to time, our vehicles are evaluated and reviewed by third parties. Any negative reviews or reviews which compare us unfavorably to competitors could adversely affect consumer perception about our vehicles.

> ***Our business depends substantially on the continuing efforts of our executive officers, key employees and qualified personnel, and our operations may be severely disrupted if we lose their services.***

Our success depends substantially on the continued efforts of our executive officers and key employees. If one or more of our executive officers or key employees were unable or unwilling to continue their services with us, we might not be able to replace them easily, in a timely manner, or at all. As we build our brand and become more well-known, the risk that competitors or other companies may poach our talent increases. Our industry is characterized by high demand and intense competition for talent and therefore we cannot assure you that we will be able to attract or retain qualified staff or other highly skilled employees. In addition, because our electric vehicles are based on a different technology platform than traditional ICE vehicles, individuals with sufficient training in electric vehicles may not be available to hire, and we will need to expend significant time and expense training the employees we hire. We also require sufficient talent in areas such as software development. Furthermore, as our company is relatively young, our ability to train and integrate new employees into our operations may not meet the growing demands of our business, which may materially and adversely affect our ability to grow our business and our results of operations.

16

Table of Contents

If any of our executive officers and key employees terminates his or her services with us, our business may be severely disrupted, our financial condition and results of operations may be materially and adversely affected and we may incur additional expenses to recruit, train and retain qualified personnel. We have not obtained any "key person" insurance on our key personnel. If any of our executive officers or key employees joins a competitor or forms a competing company, we may lose customers, know-how and key professionals and staff members. To the extent permitted by laws, each of our executive officers and key employees has entered into an employment agreement and a non-compete agreement with us. However, if any dispute arises between our executive officers or key employees and us, the non-competition provisions contained in their non-compete agreements may not be enforceable, especially in China, where these executive officers reside, on the ground that we have not provided adequate compensation to them for their non-competition obligations, which is required under relevant PRC laws.

*Our future growth is dependent on the demand for, and upon consumers' willingness to adopt, electric vehicles.*

Demand for automobile sales depends to a large extent on general, economic, political and social conditions in a given market and the introduction of new vehicles and technologies. As our business grows, economic conditions and trends will impact our business, prospects and operating results as well.

Demand for our electric vehicles may also be affected by factors directly impacting automobile prices or the cost of purchasing and operating automobiles, such as sales and financing incentives, prices of raw materials and parts and components, cost of fuel and governmental regulations, including tariffs, import regulation and other taxes. Volatility in demand may lead to lower vehicle unit sales, which may result in further downward price pressure and adversely affect our business, prospects, financial condition and operating results.

In addition, the demand for our vehicles and services will highly depend upon the adoption by consumers of new energy vehicles in general and electric vehicles in particular. The market for new energy vehicles is still rapidly evolving, characterized by rapidly changing technologies, competitive pricing and competitive factors, evolving government regulation and industry standards and changing consumer demands and behaviors.

Other factors that may influence the adoption of alternative fuel vehicles, and specifically electric vehicles, include:

- perceptions about electric vehicle quality, safety, design, performance and cost, especially if adverse events or accidents occur that are linked to the quality or safety of electric vehicles, whether or not such vehicles are produced by us or other manufacturers;

- perceptions about vehicle safety in general, in particular safety issues that may be attributed to the use of advanced technology, including electric vehicle and regenerative braking systems;

- the limited range over which electric vehicles may be driven on a single battery charge and the speed at which batteries can be recharged;

- the decline of an electric vehicle's range resulting from deterioration over time in the battery's ability to hold a charge;

- concerns about electric grid capacity and reliability;

- the availability of new energy vehicles, including plug-in hybrid electric vehicles;

- improvements in the fuel economy of the internal combustion engine;

- the availability of service for electric vehicles;

- the environmental consciousness of consumers;

- access to charging stations, standardization of electric vehicle charging systems and consumers' perceptions about convenience and cost to charge an electric vehicle;

17

Table of Contents

- the availability of tax and other governmental incentives to purchase and operate electric vehicles or future regulation requiring increased use of nonpolluting vehicles;

- perceptions about and the actual cost of alternative fuel; and

- macroeconomic factors.

Any of the factors described above may cause current or potential customers not to purchase our electric vehicles and use our services. If the market for electric vehicles does not develop as we expect or develops more slowly than we expect, our business, prospects, financial condition and operating results will be affected.

> *We depend on revenue generated from a limited number of models and in the foreseeable future will be significantly dependent on a limited number of models.*

Our business currently depends substantially on the sales and success of a limited number of models that we have launched. Historically, automobile customers have come to expect a variety of vehicle models offered in a manufacturer's fleet and new and improved vehicle models to be introduced frequently. In order to meet these expectations, we plan in the future to introduce on a regular basis new vehicle models as well as enhance versions of existing vehicle models. To the extent our product variety and cycles do not meet consumer expectations, or cannot be produced on our projected timelines and cost and volume targets, our future sales may be adversely affected. Given that for the foreseeable future our business will depend on a single or limited number of models, to the extent a particular model is not well-received by the market, our sales volume could be materially and adversely affected. This could have a material adverse effect on our business, prospects, financial condition and operating results.

> *We are subject to risks related to customer credit.*

We provided our users with the option of a battery payment arrangement, where users can make battery payments in installments. For the ES8 ordered before January 15, 2019, there is an RMB100,000 deduction in the purchase price and users adopting this arrangement pay RMB1,280 per month, payable over 78 months. For the ES8, ES6 and EC6 ordered between January 16, 2019 and August 19, 2020, there is an RMB100,000 deduction in the purchase price and users adopting this arrangement pay RMB1,660 per month, payable over 60 months. We are exposed to the creditworthiness of our users since we expect them to make monthly payments for vehicle batteries under the battery payment arrangement. To the extent our users fail to make payments on-time, our results of operations may be adversely affected.

> *We may become subject to product liability claims, which could harm our financial condition and liquidity if we are not able to successfully defend or insure against such claims.*

We may become subject to product liability claims, which could harm our business, prospects, operating results and financial condition. The automotive industry experiences significant product liability claims and we face inherent risk of exposure to claims in the event our vehicles do not perform as expected or malfunction resulting in property damage, personal injury or death. Our risks in this area are particularly pronounced given we have limited field experience of our vehicles. A successful product liability claim against us could require us to pay a substantial monetary award. Moreover, a product liability claim could generate substantial negative publicity about our vehicles and business and inhibit or prevent commercialization of our future vehicle candidates which would have a material adverse effect on our brand, business, prospects and operating results. Any insurance coverage might not be sufficient to cover all potential product liability claims. Any lawsuit seeking significant monetary damages may have a material adverse effect on our reputation, business and financial condition.

18

Table of Contents

***Our vehicles are subject to motor vehicle standards and the failure to satisfy such mandated safety standards would have a material adverse effect on our business and operating results.***

All vehicles sold must comply with various standards of the market where the vehicles were sold. In China vehicles must meet or exceed all mandated safety standards. Rigorous testing and the use of approved materials and equipment are among the requirements for achieving such standards. Vehicles must pass various tests and undergo a certification process and be affixed with the CCC certification, before receiving delivery from the factory, being sold, or being used in any commercial activity, and such certification is also subject to periodic renewal. The seven-seater ES8 and the six-seater ES8 received the CCC certification in December 2017 and January 2019, respectively. The ES6, the new-ES8 and the EC6 received the CCC certification in April 2019, December 2019 and August 2020, respectively. The ET7 has not yet undergone the CCC certification but must be certified prior to mass production. The process of obtaining the CCC certification typically requires four to five months. We plan to complete this process and obtain the CCC certification for the ET7 before delivery, which is estimated to commence in the first quarter of 2022. Furthermore, the government carries out the supervision and scheduled and unscheduled inspection of certified vehicles on a regular basis. In the event that our certifications fail to be renewed upon expiry, a certified vehicle has a defect resulting in quality or safety accidents, or consistent failure of certified vehicles comply with certification requirements is discovered during follow-up inspections, the CCC may be suspended or even revoked. With effect from the date of revocation or during suspension of the CCC, any vehicle that fails to satisfy the requirements for certification may not continue to be delivered, sold, imported or used in any commercial activity. Failure by us to have the ES8, the ES6, the EC6, the ET7 or any future model electric vehicle satisfy motor vehicle standards would have a material adverse effect on our business and operating results.

***We may be subject to risks associated with autonomous driving technology.***

Through NIO Pilot and NAD, we provide enhanced ADAS and plan to offer higher level of autonomous driving functionalities, and through our research and development, we continually update and improve our autonomous driving technology. Autonomous driving technologies are subject to risks and from time to time there have been accidents associated with such technologies. The safety of such technologies depends in part on user interaction and users may not be accustomed to using such technologies. To the extent accidents associated with our autonomous driving systems occur, we could be subject to liability, government scrutiny and further regulation. Any of the foregoing could materially and adversely affect our results of operations, financial condition and growth prospects.

***We may be compelled to undertake product recalls or take other actions, which could adversely affect our brand image and financial performance.***

Recalls of our vehicles can cause adverse publicity, damage to our brand and liability for costs. In June 2019, we identified problems with certain battery packs on ES8 vehicles following safety incidents occurred in Shanghai and other locations in China. We then voluntarily recalled 4,803 ES8s, and replaced the batteries in the NIO battery swap network equipped with the malfunctioned modules. We undertook to compensate all users who had incurred property losses as a result of incidents caused by battery quality issues. In the future, we may at various times, voluntarily or involuntarily, initiate a recall if any of our vehicles, including any systems or parts sourced from our suppliers, prove to be defective or non-compliant with applicable laws and regulations. Such recalls, whether voluntary or involuntary or caused by systems or components engineered or manufactured by us or our suppliers, could involve significant expense and could adversely affect our brand image in our target markets, as well as our business, prospects, financial condition and results of operations.

***Our distribution model is different from the predominant current distribution model for automobile manufacturers, which makes evaluating our business, operating results and future prospects difficult.***

Our distribution model is not common in the automotive industry today. We plan to conduct vehicle sales directly to users rather than through dealerships, primarily through our mobile application, NIO Houses and NIO Spaces. Furthermore, generally all vehicles are made to order. This model of vehicle distribution is relatively new and unproven, and subjects us to substantial risk as it requires, in the aggregate, significant expenditures and provides for slower expansion of our distribution and sales systems than may be possible by utilizing the traditional dealer franchise system. For example, we will not be able to utilize long established sales channels developed through a franchise system to increase our sales volume. Moreover, we will be competing with companies with well established distribution channels. Our success will depend in large part on our ability to effectively develop our own sales channels and marketing strategies. Implementing our business model is subject to numerous significant challenges, including obtaining permits and approvals from government authorities, and we may not be successful in addressing these challenges.

19

Table of Contents

The lead time in fulfilling our orders could lead to cancelled orders. Our aim for the fulfilling speed is 21 to 28 days from the order placement date to delivery to users. If we are unable to achieve this target, our customer satisfaction could be adversely affected, harming our business and reputation.

***Our financial results may vary significantly from period-to-period due to the seasonality of our business and fluctuations in our operating costs.***

Our operating results may vary significantly from period-to-period due to many factors, including seasonal factors that may have an effect on the demand for our electric vehicles. Demand for new cars in the automotive industry in general typically declines over the summer season, while sales are generally higher in the fourth quarter and spring time, especially from October to December and from March to April each year. Our limited operating history makes it difficult for us to judge the exact nature or extent of the seasonality of our business. Also, any unusually severe weather conditions in some markets may impact demand for our vehicles. Our operating results could also suffer if we do not achieve revenue consistent with our expectations for this seasonal demand because many of our expenses are based on anticipated levels of annual revenue.

We also expect our period-to-period operating results to vary based on our operating costs which we anticipate will increase significantly in future periods as we, among other things, design, develop and manufacture our electric vehicles and electric powertrain components, build and equip new manufacturing facilities to produce such components, open new NIO Houses and NIO Spaces, increase our sales and marketing activities, and increase our general and administrative functions to support our growing operations.

As a result of these factors, we believe that period-to-period comparisons of our operating results are not necessarily meaningful and that these comparisons cannot be relied upon as indicators of future performance. Moreover, our operating results may not meet expectations of equity research analysts or investors. If this occurs, the trading price of our ADSs could fall substantially either suddenly or over time.

***If our vehicle owners customize our vehicles or change the charging infrastructure with aftermarket products, the vehicle may not operate properly, which may create negative publicity and could harm our business.***

Automobile enthusiasts may seek to "hack" our vehicles to modify their performance which could compromise vehicle safety systems. Also, customers may customize their vehicles with after-market parts that can compromise driver safety. We do not test, nor do we endorse, such changes or products. In addition, the use of improper external cabling or unsafe charging outlets can expose our customers to injury from high voltage electricity. Such unauthorized modifications could reduce the safety of our vehicles and any injuries resulting from such modifications could result in adverse publicity which would negatively affect our brand and harm our business, prospects, financial condition and operating results.

***We are subject to risks related to the investment in NIO China.***

In February 2020, we entered into a collaboration framework agreement with the municipal government of Hefei, Anhui province, where our main manufacturing hub is located. Subsequently from April to June 2020, we entered into definitive agreements, as amended and supplemented, or the Hefei Agreements, for investments in NIO China with a group of investors, which we refer to as the Hefei Strategic Investors in this annual report. Under the Hefei Agreements, the Hefei Strategic Investors agreed to invest an aggregate of RMB7 billion in cash into NIO Holding Co., Ltd. (previously known as NIO (Anhui) Holding Co., Ltd.), or NIO China, a legal entity wholly owned by us pre-investment. We agreed to inject our core businesses and assets in China, including vehicle research and development, supply chain, sales and services and NIO Power, or together as the Asset Consideration, valued at RMB17.77 billion in total, into NIO China, and invest RMB4.26 billion in cash into NIO China. For more information, see "Item 4. Information on the Company-B. Business Overview-Certain Other Cooperation Arrangements-Hefei Strategic Investors" included elsewhere in this annual report. For more information on the provisions of the Hefei Agreements, please refer to exhibits 4.30 to 4.38 of this annual report.

Pursuant to the Hefei Agreements, NIO China will establish its headquarters in the Hefei Economic and Technological Development Area, or HETA, where our main manufacturing hub is located, for its business operations, research and development, sales and services, supply chain and manufacturing functions. We will collaborate with the Hefei Strategic Investors and HETA to develop NIO China's business and to support the accelerated development of the smart electric vehicle sectors in Hefei in the future.

20

Table of Contents

Subsequent to the entry into the Hefei Agreements, the cash contribution obligations of us and the Hefei Strategic Partners have all been fulfilled and we have exercised the agreed-upon redemption right and capital increase right. In addition, in February 2021, we, through one of our wholly-owned subsidiaries, also purchased from two of the Hefei Strategic Investors an aggregate of 3.305% equity interests in NIO China for a total consideration of RMB5.5 billion and subscribed for newly increased registered capital of NIO China at a subscription price of RMB10.0 billion. As a result of these transactions, as of the date of this annual report, the registered capital of NIO China is approximately RMB6.167 billion, and we hold 90.360% controlling equity interests in NIO China. We are fulfilling our other obligations, including injecting the Asset Consideration into NIO China, in accordance with the Hefei Agreements.

Our collaboration with the Hefei Strategic Investors and HETA and our investment in NIO China are subject to a number of other risks, many of which are beyond our control. If any of the risks materializes, the business of NIO China and our business, results of operations and financial condition may be materially and adversely affected, which could adversely affect the price of our ADSs. For example, we may not be able to perform our contractual obligations under the Hefei Agreements due to reasons beyond our control. As a result, we may be subject to liabilities and obligations under the Hefei Agreements and may not be able to achieve the expected benefits of the investment. We may need to obtain additional financing to fund our contractual obligations under the Hefei Agreements and such financing may not be available in the amounts or on terms acceptable to us, if at all.

In connection with this investment, NIO China granted certain minority shareholders' rights to the Hefei Strategic Investors, including, among others, the right of first refusal, co-sale right, preemptive right, anti-dilution right, redemption right, liquidation preference and conditional drag-along right. You would not enjoy these preferential rights or treatment through investing in our ADSs and the underlying ordinary shares. Exercise of these preferential rights by the Hefei Strategic Investors may also adversely affect your investment in our Company.

In particular, the Hefei Strategic Investors may require us to redeem the shares of NIO China they hold under various circumstances, at a redemption price equal to the total amount of the investment price of the Hefei Strategic Investors plus an investment income calculated at a compound rate of 8.5% per annum upon the occurrence of certain events. If any of the triggering events of redemption occurs, we will need substantial capital to redeem the shares of NIO China held by the Hefei Strategic Investors. If we do not have adequate cash available or cannot obtain additional financing, or our use of cash is restricted by applicable law, regulations or agreements governing our current or future indebtedness, we may not be able to redeem shares of NIO China when required under the Hefei Shareholders Agreement, which would constitute an event of default under the Hefei Shareholders Agreement and subject us to liabilities.

In addition, before NIO China completes its potential qualified initial public offering, without the prior written consent of the Hefei Strategic Investors, we may not directly or indirectly transfer, pledge or otherwise dispose of NIO China's shares to a third party that may result in our shareholding in NIO China falling below 60%. Without the prior written consent of the Hefei Strategic Investors, we have the right to directly or indirectly transfer, pledge or otherwise dispose of no more than 15% of NIO China's shares.

Because we will inject the core businesses and assets into NIO China, the Hefei Strategic Investors will have senior claims over the assets of NIO China compared to NIO China's other shareholders (i.e., our other subsidiaries) when a liquidation event of NIO China occurs. As a result, holders of our ADSs will be structurally subordinated to the Hefei Strategic Investors, which may negatively affect the value of the investment of ADS holders in our company. We may not have sufficient funding to repay our existing debts. Furthermore, the Hefei Strategic Investors will have voting rights with respect to various significant corporate matters of NIO China and its consolidated entities, such as change in NIO China's corporate structure, change of its core business and amendment to its articles of association, which may significantly limit our ability to make certain major corporate decisions with regard to NIO China. Any of the foregoing could materially adversely affect your investment in our ADSs.

21

Table of Contents

***Our business plans require a significant amount of capital. In addition, our future capital needs may require us to issue additional equity or debt securities that may dilute our shareholders or introduce covenants that may restrict our operations or our ability to pay dividends.***

We will need significant capital to, among other things, conduct research and development and expand our production capacity as well as roll out our power and servicing network and our NIO Houses and NIO Spaces. As we ramp up our production capacity and operations we may also require significant capital to maintain our property, plant and equipment and such costs may be greater than anticipated. We expect our capital expenditures to continue to be significant in the foreseeable future as we expand our business, and that our level of capital expenditures will be significantly affected by user demand for our products and services. The fact that we have a limited operating history means we have limited historical data on the demand for our products and services. As a result, our future capital requirements may be uncertain and actual capital requirements may be different from those we currently anticipate. We plan to seek equity or debt financing to finance a portion of our capital expenditures. Such financing might not be available to us in a timely manner or on terms that are acceptable, or at all. Our substantial amount of currently outstanding indebtedness may also affect our ability to obtain financing in a timely manner and on reasonable terms.

Our ability to obtain the necessary financing to carry out our business plan is subject to a number of factors, including general market conditions and investor acceptance of our business plan. These factors may make the timing, amount, terms and conditions of such financing unattractive or unavailable to us. If we are unable to raise sufficient funds, we will have to significantly reduce our spending, delay or cancel our planned activities or substantially change our corporate structure. We might not be able to obtain any funding, and we might not have sufficient resources to conduct our business as projected, both of which could mean that we would be forced to curtail or discontinue our operations.

In addition, our future capital needs and other business reasons could require us to issue additional equity or debt securities or obtain a credit facility. The sale of additional equity or equity-linked securities could dilute our shareholders. The incurrence of indebtedness would result in increased debt service obligations and could result in operating and financing covenants that would restrict our operations or our ability to pay dividends to our shareholders.

***We retain certain information about our users and may be subject to various privacy and consumer protection laws.***

We use our vehicles' electronic systems to log information about each vehicle's use, such as charge time, battery usage, mileage and driving behavior, in order to aid us in vehicle diagnostics, repair and maintenance, as well as to help us customize and optimize the driving and riding experience. Our users may object to the use of this data, which may harm our business. Possession and use of our user's driving behavior and data in conducting our business may subject us to legislative and regulatory burdens in China and other jurisdictions that could require notification of any data breach, restrict our use of such information and hinder our ability to acquire new customers or market to existing customers. If users allege that we have improperly released or disclosed their personal information, we could face legal claims and reputational damage. We may incur significant expenses to comply with privacy, consumer protection and security standards and protocols imposed by laws, regulations, industry standards or contractual obligations. If third parties improperly obtain and use the personal information of our users, we may be required to expend significant resources to resolve these problems.

***Failure of information security and privacy concerns could subject us to penalties, damage our reputation and brand, and harm our business and results of operations.***

We face significant challenges with respect to information security and privacy, including the storage, transmission and sharing of confidential information. We transmit and store confidential and private information of our car buyers, such as personal information, including names, accounts, user IDs and passwords, and payment or transaction related information.

We are required by PRC law to ensure the confidentiality, integrity, availability and authenticity of the information of our users, customers and distributors, which is also essential to maintaining their confidence in our vehicles and services. We have adopted strict information security policies and deployed advanced measures to implement the policies, including, among others, advanced encryption technologies. However, advances in technology, an increased level of sophistication and diversity of our products and services, an increased level of expertise of hackers, new discoveries in the field of cryptography or others can still result in a compromise or breach of the measures that we use. If we are unable to protect our systems, and hence the information stored in our systems, from unauthorized access, use, disclosure, disruption, modification or destruction, such problems or security breaches could cause a loss, give rise to our liabilities to the owners of confidential information or even subject us to fines and penalties. In addition, complying with various laws and regulations could cause us to incur substantial costs or require us to change our business practices, including our data practices, in a manner adverse to our business.

Table of Contents

In addition, we may need to comply with increasingly complex and rigorous regulatory standards enacted to protect business and personal data in the U.S., Europe and elsewhere. For example, the European Union adopted the General Data Protection Regulation, or the GDPR, which became effective on May 25, 2018. The GDPR imposes additional obligations on companies regarding the handling of personal data and provides certain individual privacy rights to persons whose data is stored. Compliance with existing, proposed and recently enacted laws (including implementation of the privacy and process enhancements called for under GDPR) and regulations can be costly; any failure to comply with these regulatory standards could subject us to legal and reputational risks.

We generally comply with industry standards and are subject to the terms of our own privacy policies. Compliance with any additional laws could be expensive, and may place restrictions on the conduct of our business and the manner in which we interact with our customers. Any failure to comply with applicable regulations could also result in regulatory enforcement actions against us, and misuse of or failure to secure personal information could also result in violation of data privacy laws and regulations, proceedings against us by governmental entities or others, damage to our reputation and credibility and could have a negative impact on revenues and profits.

Significant capital and other resources may be required to protect against information security breaches or to alleviate problems caused by such breaches or to comply with our privacy policies or privacy-related legal obligations. The resources required may increase over time as the methods used by hackers and others engaged in online criminal activities are increasingly sophisticated and constantly evolving. Any failure or perceived failure by us to prevent information security breaches or to comply with privacy policies or privacy-related legal obligations, or any compromise of security that results in the unauthorized release or transfer of personally identifiable information or other customer data, could cause our customers to lose trust in us and could expose us to legal claims. Any perception by the public that online transactions or the privacy of user information are becoming increasingly unsafe or vulnerable to attacks could inhibit the growth of online retail and other online services generally, which may reduce the number of orders we receive.

### *Our warranty reserves may be insufficient to cover future warranty claims which could adversely affect our financial performance.*

For the initial owner of the ES8, the ES6, the EC6, and the ET7, we provide an extended warranty, subject to certain conditions. In addition to the warranty required under the relevant PRC law, we also provide (i) a bumper-to-bumper three-year or 120,000-kilometer warranty, (ii) for critical EV components (battery pack, electrical motors, power electrical unit and vehicle control unit) an eight-year or 120,000-kilometer warranty, and (iii) a two-year or 50,000 kilometer warranty covering vehicle repair, replacement and refund. Our warranty program is similar to other vehicle manufacturer's warranty programs intended to cover all parts and labor to repair defects in material or workmanship in the body, chassis, suspension, interior, electric systems, battery, electric powertrain and brake system. We plan to record and adjust warranty reserves based on changes in estimated costs and actual warranty costs. However, because we did not start making delivery of the ES8 until June 2018, of the ES6 until June 2019 and of the EC6 until September of 2020, and will not start making deliveries of the ET7 until the first quarter in 2022, we have little experience with warranty claims regarding our vehicles or with estimating warranty reserves. As of December 31, 2020, we had warranty reserves in respect of our vehicles of RMB952.9 million (US$146.0 million). We cannot assure you that such reserves will be sufficient to cover future claims. We could, in the future, become subject to a significant and unexpected warranty claims, resulting in significant expenses, which would in turn materially and adversely affect our results of operations, financial condition and prospects.

### *We may need to defend ourselves against patent or trademark infringement claims, which may be time-consuming and would cause us to incur substantial costs.*

Companies, organizations or individuals, including our competitors, may hold or obtain patents, trademarks or other proprietary rights that would prevent, limit or interfere with our ability to make, use, develop, sell or market our vehicles or components, which could make it more difficult for us to operate our business. From time to time, we may receive communications from holders of patents or trademarks regarding their proprietary rights. Companies holding patents or other intellectual property rights may bring suits alleging infringement of such rights or otherwise assert their rights and urge us to take licenses. Our applications and uses of trademarks relating to our design, software or artificial intelligence technologies could be found to infringe upon existing trademark ownership and rights. In addition, if we are determined to have infringed upon a third party's intellectual property rights, we may be required to do one or more of the following:

- cease selling, incorporating certain components into, or using vehicles or offering goods or services that incorporate or use the challenged intellectual property;

- pay substantial damages;

23

Table of Contents

- seek a license from the holder of the infringed intellectual property right, which license may not be available on reasonable terms or at all;

- redesign our vehicles or other goods or services; or

- establish and maintain alternative branding for our products and services.

In the event of a successful claim of infringement against us and our failure or inability to obtain a license to the infringed technology or other intellectual property right, our business, prospects, operating results and financial condition could be materially and adversely affected. In addition, any litigation or claims, whether or not valid, could result in substantial costs, negative publicity and diversion of resources and management attention.

***We may not be able to prevent others from unauthorized use of our intellectual property, which could harm our business and competitive position.***

We regard our trademarks, service marks, patents, domain names, trade secrets, proprietary technologies and similar intellectual property as critical to our success. We rely on trademark and patent law, trade secret protection and confidentiality and license agreements with our employees and others to protect our proprietary rights.

We have invested significant resources to develop our own intellectual property. Failure to maintain or protect these rights could harm our business. In addition, any unauthorized use of our intellectual property by third parties may adversely affect our current and future revenues and our reputation.

Implementation and enforcement of PRC intellectual property-related laws have historically been deficient and ineffective. Accordingly, protection of intellectual property rights in China may not be as effective as in the United States or other countries with more developed intellectual property laws. Furthermore, policing unauthorized use of proprietary technology is difficult and expensive. We rely on a combination of patent, copyright, trademark and trade secret laws and restrictions on disclosure to protect our intellectual property rights. Despite our efforts to protect our proprietary rights, third parties may attempt to copy or otherwise obtain and use our intellectual property or seek court declarations that they do not infringe upon our intellectual property rights. Monitoring unauthorized use of our intellectual property is difficult and costly, and we cannot assure you that the steps we have taken or will take will prevent misappropriation of our intellectual property. From time to time, we may have to resort to litigation to enforce our intellectual property rights, which could result in substantial costs and diversion of our resources.

***As our patents may expire and may not be extended, our patent applications may not be granted and our patent rights may be contested, circumvented, invalidated or limited in scope, our patent rights may not protect us effectively. In particular, we may not be able to prevent others from developing or exploiting competing technologies, which could have a material and adverse effect on our business operations, financial condition and results of operations.***

As of December 31, 2020, we had 2,654 issued patents and 1,397 patent applications pending. For our pending application, we cannot assure you that we will be granted patents pursuant to our pending applications. Even if our patent applications succeed and we are issued patents in accordance with them, it is still uncertain whether these patents will be contested, circumvented or invalidated in the future. In addition, the rights granted under any issued patents may not provide us with meaningful protection or competitive advantages. The claims under any patents that issue from our patent applications may not be broad enough to prevent others from developing technologies that are similar or that achieve results similar to ours. The intellectual property rights of others could also bar us from licensing and exploiting any patents that issue from our pending applications. Numerous patents and pending patent applications owned by others exist in the fields in which we have developed and are developing our technology. These patents and patent applications might have priority over our patent applications and could subject our patent applications to invalidation. Finally, in addition to those who may claim priority, any of our existing or pending patents may also be challenged by others on the basis that they are otherwise invalid or unenforceable.

***We have limited insurance coverage, which could expose us to significant costs and business disruption.***

We have limited liability insurance coverage for our products and business operations. A successful liability claim against us due to injuries suffered by our users could materially and adversely affect our financial condition, results of operations and reputation. In addition, we do not have any business disruption insurance. Any business disruption event could result in substantial cost to us and diversion of our resources.

24

Table of Contents

***We have a significant amount of debt, including our convertible senior notes, that are senior in capital structure and cash flow, respectively, to our shareholders. Satisfying the obligations relating to our debt could adversely affect the amount or timing of distributions to our shareholders or result in dilution.***

As of December 31, 2020, we had RMB5,938.3 million (US$910.1 million) in total long-term borrowings outstanding, consisting primarily of (i) our 4.50% convertible senior notes due 2024; (ii) our convertible senior notes due 2022 issued in September 2019 to an affiliate of Tencent Holdings Limited; and (iii) our long-term bank debt, excluding the current portions of (iii) that are due within one year from December 31, 2020. Meanwhile, as of December 31, 2020, we had RMB1,550.0 million (US$237.5 million) in total short-term borrowings. In January 2021, we also issued US$750 million aggregate principal amount of 0.00% convertible senior notes due 2026, or the 2026 Notes, and US$750 million aggregate principal amount of 0.50% convertible senior notes due 2027, or the 2027 Notes.

In February 2019, we issued US$750 million aggregate principal amount of 4.50% convertible senior notes due 2024, or the 2024 Notes. The 2024 Notes are unsecured debt and are not redeemable by us prior to the maturity date except for certain changes in tax law. In accordance with the indenture governing the 2024 Notes, or the 2024 Notes Indenture, holders of the 2024 Notes may require us to purchase all or any portion of their notes on February 1, 2022 at a repurchase price equal to 100% of the principal amount of the 2024 Notes to be repurchased, plus accrued and unpaid interest. Holders of the 2024 Notes may also require us, upon a fundamental change (as defined in the 2024 Notes Indenture), to repurchase for cash all or part of their 2024 Notes at a fundamental change repurchase price equal to 100% of the principal amount of the 2024 Notes to be repurchased, plus accrued and unpaid interest. In connection with the issuance of the 2024 Notes, we entered into capped call transactions and zero-strike call option transactions. Shortly after the pricing of the 2026 Notes and the 2027 Notes in January 2021, we entered into separate and individually privately negotiated agreements with certain holders of the 2024 Notes to exchange approximately US$581.7 million principal amount of the outstanding 2024 Notes for ADSs (each, a "2024 Notes Exchange" and collectively, the "2024 Notes Exchanges"). The 2024 Notes Exchanges closed on January 15, 2021. In connection with the 2024 Notes Exchanges, we also entered into agreements with certain financial institutions that are parties to our existing capped call transactions (which we had entered into in February 2019 in connection with the issuance of the 2024 Notes) shortly after the pricing of the 2026 Notes and the 2027 Notes to terminate a portion of the relevant existing capped call transactions in a notional amount corresponding to the portion of the principal amount of such 2024 Notes exchanged. In connection with such terminations of the existing capped call transactions, we received deliveries of ADSs in such amounts as specified pursuant to such termination agreements on January 15, 2021.

In September 2019, each of an affiliate of Tencent Holdings Limited and Mr. Bin Li, our chairman of the board of directors and chief executive officer, subscribed for US$100 million principal amount of convertible notes, each in two equally split tranches, collectively the Affiliate Notes. The Affiliate Notes issued in the first tranche matured in 360 days from the issuance date, bore no interest, and required us to pay a premium at 2% of the principal amount at maturity. The Affiliate Notes issued in the second tranche will mature in three years from the issuance date, bear no interest, and require us to pay a premium at 6% of the principal amount at maturity. The 360-day Affiliate Notes are convertible into our Class A ordinary shares (or ADSs) at a conversion price of US$2.98 per ADS at the holder's option from the 15th day immediately prior to maturity, and the three-year Affiliate Notes are convertible into our Class A ordinary shares (or ADSs) at a conversion price of US$3.12 per ADS at the holder's option from the first anniversary of the issuance date. The holders of the three-year Affiliate Notes will have the right to require us to repurchase for cash all of the convertible notes or any portion thereof on February 1, 2022. As of December 31, 2020, the 360-day Affiliate Notes issued to each of an affiliate of Tencent Holdings Limited and Mr. Bin Li have been converted to Class A ordinary shares and the three-year Affiliate Notes issued to the wholly owned company of Mr. Bin Li have been converted to ADSs.

In February and March 2020, we issued and sold convertible notes in an aggregate principal amount of US$435 million due 2021, or the 2021 Notes, to several unaffiliated Asia based investment funds. The 2021 Notes bore zero interest. The holders of the 2021 Notes issued in February 2020 have the right to convert either all or part of the principal amount of the 2021 Notes into our Class A ordinary shares (or ADSs), prior to maturity and (a) from the date that is six months after the issuance date, at a conversion price of US$3.07 per ADS, or (b) upon the completion of a bona fide issuance of equity securities of our company for fundraising purposes, at the conversion price derived from such equity financing. The holders of the 2021 Notes issued in March 2020 have the right to convert either all or part of the principal amount of the 2021 Notes into our Class A ordinary shares (or ADSs), prior to maturity and from September 5, 2020, at a conversion price of US$3.50 per ADS, subject to certain adjustments. As of December 31, 2020, all of the 2021 Notes have been converted to ADSs.

25

Table of Contents

In January 2021, we issued US$750 million aggregate principal amount of 0.00% convertible senior notes due 2026, or the 2026 Notes, and US$750 million aggregate principal amount of 0.50% convertible senior notes due 2027, or the 2027 Notes. The 2026 Notes and the 2027 Notes are unsecured debt. Prior to August 1, 2025, in the case of the 2026 Notes, and August 1, 2026, in the case of the 2027 Notes, the 2026 Notes and the 2027 Notes, as applicable, will be convertible at the option of the holders only upon satisfaction of certain conditions and during certain periods. Holders may convert their 2026 Notes or 2027 Notes, as applicable, at their option at any time on or after August 1, 2025, in the case of the 2026 Notes, or August 1, 2026, in the case of the 2027 Notes, until the close of business on the second scheduled trading day immediately preceding the relevant maturity date. Upon conversion, we will pay or deliver to such converting holders, as the case may be, cash, ADSs, or a combination of cash and ADSs, at our election. The initial conversion rate of the 2026 Notes is 10.7458 ADSs per US$1,000 principal amount of such 2026 Notes. The initial conversion rate of the 2027 Notes is 10.7458 ADSs per US$1,000 principal amount of such 2027 Notes. The relevant conversion rate for such series of the 2026 Notes and the 2027 Notes is subject to adjustment upon the occurrence of certain events. Holders of the 2026 Notes and the 2027 Notes may require us to repurchase all or part of their 2026 Notes and 2027 Notes for cash on February 1, 2024, in the case of the 2026 Notes, and February 1, 2025, in the case of the 2027 Notes, or in the event of certain fundamental changes, at a repurchase price equal to 100% of the principal amount of the 2026 Notes or the 2027 Notes to be repurchased, plus accrued and unpaid interest, if any, to, but excluding, the relevant repurchase date. In addition, on or after February 6, 2024, in the case of the 2026 Notes, and February 6, 2025, in the case of the 2027 Notes, until the 20th scheduled trading day immediately prior to the relevant maturity date, we may redeem the 2026 Notes or the 2027 Notes, as applicable for cash subject to certain conditions, at a redemption price equal to 100% of the principal amount of the 2026 Notes or the 2027 Notes to be redeemed, plus accrued and unpaid interest, if any, to, but excluding, the relevant optional redemption date. Furthermore, we may redeem all but not part of the 2026 Notes or the 2027 Notes in the event of certain changes in the tax laws.

Satisfying the obligations of all these indebtedness and interest liabilities could adversely affect the amount or timing of any distributions to our shareholders. We may choose to satisfy, repurchase, or refinance any of these liabilities through public or private equity or debt financings if we deem such financings available on favorable terms. If we do not have adequate cash available or cannot obtain additional financing, or our use of cash is restricted by applicable law, regulations or agreements governing our current or future indebtedness, we may not be able to repurchase any of these notes when required under the respective transaction documents, which would constitute an event of default under the respective transaction documents. An event of default could also lead to a default under other agreements governing our current and future indebtedness, and if the repayment of such other indebtedness were accelerated, we may not have sufficient funds to repay the indebtedness and repurchase any of these notes or make cash payments upon conversion of any of these notes. In addition, the holders of any of these notes may convert their notes to a number of our ADSs in accordance with the respective transaction documents. Any conversion will result in immediate dilution to the ownership interests of existing shareholders and such dilution could be material. Lastly, we are exposed to interest rate risk related to our portfolio of investments in debt securities and the debt that we have issued. Among other things, some of our bank loans carry floating interest, and increases in interest rates would result in a decrease in the fair value of our outstanding debt. In the event that we incur a decrease in the fair value of our outstanding debt, our financial performance will be adversely affected.

***We may seek to obtain future financing through the issuance of debt or equity, which may have an adverse effect on our shareholders or may otherwise adversely affect our business.***

If we raise funds through the issuance of additional equity or debt, including convertible debt or debt secured by some or all of our assets, holders of any debt securities or preferred shares issued will have rights, preferences and privileges senior to those of holders of our ordinary shares in the event of liquidation. The terms of the convertible notes we issued do not restrict our ability to issue additional debt. If additional debt is issued, there is a possibility that once all senior claims are settled, there may be no assets remaining to pay out to the holders of ordinary shares. In addition, if we raise funds through the issuance of additional equity, whether through private placements or public offerings, such an issuance would dilute ownership of our current shareholders that do not participate in the issuance. If we are unable to obtain any needed additional funding, we may be required to reduce the scope of, delay, or eliminate some or all of, our planned research, development, manufacturing and marketing activities, any of which could materially harm our business.

Furthermore, the terms of any additional debt securities we may issue in the future may impose restrictions on our operations, which may include limiting our ability to incur additional indebtedness, pay dividends on or repurchase our share capital, or make certain acquisitions or investments. In addition, we may be subject to covenants requiring us to satisfy certain financial tests and ratios, and our ability to satisfy such covenants may be affected by events outside of our control.

26

Table of Contents

***The terms of the convertible notes we issued could delay or prevent an attempt to take over our company.***

The terms of the 2024 Notes, Affiliate Notes, 2026 Notes and 2027 Notes require us to repurchase the respective Notes in the event of a fundamental change. A takeover of our company would constitute a fundamental change. This could have the effect of delaying or preventing a takeover of our company that may otherwise be beneficial to our shareholders.

***We are or may be subject to risks associated with strategic alliances or acquisitions.***

We have entered into and may in the future enter into strategic alliances, including joint ventures or minority equity investments, with various third parties to further our business purpose from time to time. These alliances could subject us to a number of risks, including risks associated with sharing proprietary information, non-performance by the third party and increased expenses in establishing new strategic alliances, any of which may materially and adversely affect our business. We may have limited ability to monitor or control the actions of these third parties and, to the extent any of these strategic third parties suffers negative publicity or harm to their reputation from events relating to their business, we may also suffer negative publicity or harm to our reputation by virtue of our association with any such third party.

In addition, we may acquire additional assets, products, technologies or businesses that are complementary to our existing business. In addition to possible shareholder approval, we may have to obtain approvals and licenses from relevant government authorities for the acquisitions and to comply with any applicable PRC laws and regulations, which could result in increased delay and costs, and may derail our business strategy if we fail to do so. Furthermore, past and future acquisitions and the subsequent integration of new assets and businesses into our own require significant attention from our management and could result in a diversion of resources from our existing business, which in turn could have an adverse effect on our operations. Acquired assets or businesses may not generate the financial results we expect. Acquisitions could result in the use of substantial amounts of cash, potentially dilutive issuances of equity securities, the occurrence of significant goodwill impairment charges, amortization expenses for other intangible assets and exposure to potential unknown liabilities of the acquired business. Moreover, the costs of identifying and consummating acquisitions may be significant.

***If we fail to manage our growth effectively, we may not be able to market and sell our vehicles successfully.***

We have expanded our operations, and as we ramp up our production, further significant expansion will be required, especially in connection with potential increased sales, providing our users with high-quality servicing, providing power solutions, expansion of our NIO House and NIO Space network and managing different models of vehicles. Our future operating results depend to a large extent on our ability to manage this expansion and growth successfully. Risks that we face in undertaking this expansion include, among others:

- managing a larger organization with a greater number of employees in different divisions;

- controlling expenses and investments in anticipation of expanded operations;

- establishing or expanding design, manufacturing, sales and service facilities;

- implementing and enhancing administrative infrastructure, systems and processes; and

- addressing new markets and potentially unforeseen challenges as they arise.

Any failure to manage our growth effectively could materially and adversely affect our business, prospects, results of operations and financial condition.

27

Table of Contents

***We have granted, and may continue to grant options and other types of awards under our share incentive plan, which may result in increased share-based compensation expenses.***

We adopted share incentive plans in 2015, 2016, 2017 and 2018, which we refer to as the 2015 Plan, the 2016 Plan, the 2017 Plan and the 2018 Plan, respectively, in this annual report, for the purpose of granting share-based compensation awards to employees, directors and consultants to incentivize their performance and align their interests with ours. The 2018 Plan became effective as of January 1, 2019. We recognize expenses in our consolidated statement of income in accordance with U.S. GAAP. Under our share incentive plans, we are authorized to grant options and other types of awards. Under the 2015 Plan, the 2016 Plan and the 2017 Plan, the maximum numbers of Class A ordinary shares which may be issued pursuant to all awards are 46,264,378, 18,000,000 and 33,000,000, respectively. Under the 2018 Plan, a maximum number of 23,000,000 Class A ordinary shares may be issued pursuant to all awards. This amount should automatically increase each year by the number of shares representing 1.5% of the then total issued and outstanding share capital of our company as of the end of each preceding year. As of December 31, 2020, awards to purchase an aggregate amount of 79,318,499 Class A ordinary shares under the 2015 Plan, the 2016 Plan, the 2017 Plan and the 2018 Plan had been granted and were outstanding, excluding awards that were forfeited or cancelled after the relevant grant dates. As of December 31, 2020, our unrecognized share-based compensation expenses amounted to RMB1,013.0 million (US$155.2 million).

We believe the granting of share-based awards is of significant importance to our ability to attract and retain key personnel and employees, and we will continue to grant share-based compensation to employees in the future. As a result, our expenses associated with share-based compensation may increase, which may have an adverse effect on our results of operations.

Furthermore, perspective candidates and existing employees often consider the value of the equity awards they receive in connection with their employment. Thus, our ability to attract or retain highly skilled employees may be adversely affected by declines in the perceived value of our equity or equity awards. Furthermore, there are no assurances that the number of shares reserved for issuance under our share incentive plans will be sufficient to grant equity awards adequate to recruit new employees and to compensate existing employees.

***If we do not appropriately maintain effective internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002, we may be unable to accurately report our financial results and the market price of our ADSs may be adversely affected.***

We are subject to reporting obligations under the U.S. securities laws. The SEC, as required under Section 404 of the Sarbanes-Oxley Act of 2002, adopted rules requiring every public company to include a management report on such company's internal control over financial reporting in its annual report, which contains management's assessment of the effectiveness of the company's internal control over financial reporting. We were subject to such requirement starting from fiscal year 2019. In addition, an independent registered public accounting firm must attest to and report on the effectiveness of the company's internal control over financial reporting.

In connection with the preparation and external audit of our consolidated financial statements as of and for the year ended December 31, 2019, we and our independent registered public accounting firm identified one material weakness in our internal control over financial reporting and concluded that our internal control over financial reporting was ineffective as of December 31, 2019. The material weakness identified was that we do not have sufficient competent financial reporting and accounting personnel with an appropriate understanding of U.S. GAAP to (i) design and implement formal period-end financial reporting policies and procedures to address complex U.S. GAAP technical accounting issues and (ii) prepare and review our consolidated financial statements and related disclosures in accordance with U.S. GAAP and the financial reporting requirements set forth by the SEC.

Following the identification of the material weakness, we have taken measures to remedy the material weakness. Our management has concluded that our internal control over financial reporting was effective as of December 31, 2020 after the remediation. For details on these initiatives, please see "Item 15. Controls and Procedures-Management's Annual Report on Internal Control over Financial Reporting." In addition, our independent registered public accounting firm has audited the effectiveness of our internal control over financial reporting as of December 31, 2020, as stated in its report, which appears on page F-2 of this annual report on Form 20-F.

In the future, our management may conclude that our internal control over financial reporting is not effective. Moreover, even if our management concludes that our internal control over financial reporting is effective, our independent registered public accounting firm, after conducting its own independent testing, may issue a report with adverse opinion if it is not satisfied with our internal controls or the level at which our controls are documented, designed, operated or reviewed, or if it interprets the relevant requirements differently from us.

28

Table of Contents

If we fail to implement and maintain an effective internal control environment, we could suffer material misstatements in our consolidated financial statements and fail to meet our reporting obligations, which would likely cause investors to lose confidence in our reported financial information. This could in turn limit our access to capital markets, harm our results of operations, and lead to a decline in the trading price of our listed securities. Furthermore, we may need to incur additional costs and use additional management and other resources as our business and operations further expand or in an effort to remediate any significant control deficiencies that may be identified in the future. Additionally, ineffective internal control over financial reporting could expose us to increased risk of fraud or misuse of corporate assets and subject us to potential delisting from the stock exchange on which we list, regulatory investigations and civil or criminal sanctions.

> ***If our suppliers fail to use ethical business practices and comply with applicable laws and regulations, our brand image could be harmed due to negative publicity.***

Our core values, which include developing high quality electric vehicles while operating with integrity, are an important component of our brand image, which makes our reputation sensitive to allegations of unethical business practices. We do not control our independent suppliers or their business practices. Accordingly, we cannot guarantee their compliance with ethical business practices, such as environmental responsibilities, fair wage practices, and compliance with child labor laws, among others. A lack of demonstrated compliance could lead us to seek alternative suppliers, which could increase our costs and result in delayed delivery of our products, product shortages or other disruptions of our operations.

Violation of labor or other laws by our suppliers or the divergence of an independent supplier's labor or other practices from those generally accepted as ethical in the markets in which we do business could also attract negative publicity for us and our brand. This could diminish the value of our brand image and reduce demand for our electric vehicles if, as a result of such violation, we were to attract negative publicity. If we, or other manufacturers in our industry, encounter similar problems in the future, it could harm our brand image, business, prospects, results of operations and financial condition.

> ***If we update our manufacturing equipment more quickly than expected, we may have to shorten the useful lives of any equipment to be retired as a result of any such update, and the resulting acceleration in our depreciation could negatively affect our financial results.***

We and JAC have invested and expect to continue to invest significantly in what we believe is state of the art tooling, machinery and other manufacturing equipment for the product lines where the vehicles are manufactured, and we depreciate the cost of such equipment over their expected useful lives. However, manufacturing technology may evolve rapidly, and we or JAC may decide to update our manufacturing process with cutting-edge equipment more quickly than expected. Moreover, as our engineering and manufacturing expertise and efficiency increase, we or JAC may be able to manufacture our products using less of our installed equipment. The useful life of any equipment that would be retired early as a result would be shortened, causing the depreciation on such equipment to be accelerated, and to the extent we own such equipment, our results of operations could be negatively impacted.

> ***The construction and operation of our manufacturing facilities are subject to regulatory approvals or filings and may be subject to changes, delays, cost overruns or may not produce expected benefits.***

In 2017, we signed a framework agreement with the Shanghai Jiading government and its authorized investment entity to build and develop our own manufacturing facility in Jiading, Shanghai. In 2019, we agreed with the related contractual parties to cease construction of this planned manufacturing facility and terminate this development project, due to government policies that allow collaborative manufacturing between traditional automotive manufacturers and companies with a focus on research, development and design of new energy vehicles.

In February 2020, we entered into a collaboration framework agreement with the municipal government of Hefei, Anhui province, where our main manufacturing hub is located. Subsequently from April to June 2020, we entered into definitive agreements, as amended and supplemented, for investments in NIO China. Pursuant to the definitive agreements, we will collaborate with the Hefei Strategic Investors and HETA to develop NIO China's business and to support the accelerated development of the smart electric vehicle sectors in Hefei in the future. In February 2021, we, through NIO China, entered into a further collaboration framework agreement with the municipal government of Hefei, Anhui province, pursuant to which Hefei government and NIO China agreed in principle to jointly build a world-class industrial campus to support the development and innovations of the smart electric vehicle industry and related supply chains led by NIO China. In addition, Hefei government and its associated parties plan to re-invest their returns from the equity investments in NIO China to support the further cooperation in Hefei.

Table of Contents

Under PRC law, construction projects are subject to broad and strict government supervision and approval procedures, including but not limited to project approvals and filings, construction land and project planning approvals, environment protection approvals, pollution discharge permits, work safety approvals, fire protection approvals, and the completion of inspection and acceptance by relevant authorities. Some of the construction projects being carried out by us are undergoing necessary approval procedures as required by law. As a result, the relevant entities operating such construction projects may be subject to administrative uncertainty, and construction projects in question may be subject to fines or the suspension of use of such projects. Failure to complete the construction projects on schedule and within budget, and failure to obtain necessary approvals or any incompliance with relevant government supervision could have a material adverse impact on our operations, and we may not be able to find commercially reasonable alternatives.

### *Our vehicles make use of lithium-ion battery cells, which have been observed to catch fire or vent smoke and flame.*

The battery packs that we produce make use of lithium-ion cells. On rare occasions, lithium-ion cells can rapidly release the energy they contain by venting smoke and flames in a manner that can ignite nearby materials as well as other lithium-ion cells. In June 2019, certain safety incidents resulting from the battery packs on ES8 vehicles occurred in Shanghai and other locations in China. We then voluntarily recalled 4,803 ES8s, and replaced the batteries in the NIO battery swap network equipped with the malfunctioned modules. While we have designed the battery pack to passively contain any single cell's release of energy without spreading to neighboring cells, and have taken measures to enhance the safety of our battery designs, a field or testing failure of our vehicles or other battery packs that we produce could occur in the future, which could subject us to lawsuits, product recalls, or redesign efforts, all of which would be time-consuming and expensive. Also, negative public perceptions regarding the suitability of lithium-ion cells for automotive applications or any future incident involving lithium-ion cells such as a vehicle or other fire, even if such incident does not involve our vehicles, could seriously harm our business.

In addition, we store a significant number of lithium-ion cells at our facilities. Any mishandling of battery cells may cause disruption to the operation of our facilities. While we have implemented safety procedures related to the handling of the cells, a safety issue or fire related to the cells could disrupt our operations. Such damage or injury could lead to adverse publicity and potentially a safety recall. Moreover, any failure of a competitor's electric vehicle or energy storage product may cause indirect adverse publicity for us and our products. Such adverse publicity could negatively affect our brand and harm our business, prospects, financial condition and operating results.

### *Interruption or failure of our information technology and communications systems could impact our ability to effectively provide our services.*

We aim to provide our users with an innovative suite of services through our mobile application. In addition, our in-car services depend, to a certain extent, on connectivity. The availability and effectiveness of our services depend on the continued operation of our information technology and communications systems. Our systems are vulnerable to damage or interruption from, among other adverse effects, fire, terrorist attacks, natural disasters, power loss, telecommunications failures, computer viruses, computer denial of service attacks or other attempts to harm our systems. Our data centers are also subject to break-ins, sabotage, and intentional acts of vandalism, and to potential disruptions. Some of our systems are not fully redundant, and our disaster recovery planning cannot account for all eventualities. Any problems at our data centers could result in lengthy interruptions in our service. In addition, our products and services are highly technical and complex and may contain errors or vulnerabilities, which could result in interruptions in our services or the failure of our systems.

### *We are subject to anti-corruption, anti-bribery, anti-money laundering, financial and economic sanctions and similar laws, and non-compliance with such laws can subject us to administrative, civil and criminal fines and penalties, collateral consequences, remedial measures and legal expenses, all of which could adversely affect our business, results of operations, financial condition and reputation.*

We are subject to anti-corruption, anti-bribery, anti-money laundering, financial and economic sanctions and similar laws and regulations in various jurisdictions in which we conduct activities, including the U.S. Foreign Corrupt Practices Act, or FCPA, the U.K. Bribery Act 2010, and other anti-corruption laws and regulations. The FCPA and the U.K. Bribery Act 2010 prohibit us and our officers, directors, employees and business partners acting on our behalf, including agents, from corruptly offering, promising, authorizing or providing anything of value to a "foreign official" for the purposes of influencing official decisions or obtaining or retaining business or otherwise obtaining favorable treatment. The FCPA also requires companies to make and keep books, records and accounts that accurately reflect transactions and dispositions of assets and to maintain a system of adequate internal accounting controls. The U.K. Bribery Act also prohibits non-governmental "commercial" bribery and soliciting or accepting bribes. A violation of these laws or regulations could adversely affect our business, results of operations, financial condition and reputation.

30

Table of Contents

We have direct or indirect interactions with officials and employees of government agencies and state-owned affiliated entities in the ordinary course of business. We have also entered into joint ventures and/or other business partnerships with government agencies and state-owned or affiliated entities. These interactions subject us to an increased level of compliance-related concerns. We are in the process of implementing policies and procedures designed to ensure compliance by us and our directors, officers, employees, representatives, consultants, agents and business partners with applicable anti-corruption, anti-bribery, anti-money laundering, financial and economic sanctions and similar laws and regulations. However, our policies and procedures may not be sufficient and our directors, officers, employees, representatives, consultants, agents, and business partners could engage in improper conduct for which we may be held responsible.

Non-compliance with anti-corruption, anti-bribery, anti-money laundering or financial and economic sanctions laws could subject us to whistleblower complaints, adverse media coverage, investigations, and severe administrative, civil and criminal sanctions, collateral consequences, remedial measures and legal expenses, all of which could materially and adversely affect our business, results of operations, financial condition and reputation. In addition, changes in economic sanctions laws in the future could adversely impact our business and investments in our shares.

### *Any unauthorized control or manipulation of our vehicles' systems could result in loss of confidence in us and our vehicles and harm our business.*

Our vehicles contain complex information technology systems. For example, our vehicles are designed with built-in data connectivity to accept and install periodic remote updates from us to improve or update the functionality of our vehicles. We have designed, implemented and tested security measures intended to prevent unauthorized access to our information technology networks, our vehicles and their systems. However, hackers may attempt in the future, to gain unauthorized access to modify, alter and use such networks, vehicles and systems to gain control of, or to change, our vehicles' functionality, user interface and performance characteristics, or to gain access to data stored in or generated by the vehicle. Vulnerabilities could be identified in the future and our remediation efforts may not be successful. Any unauthorized access to or control of our vehicles or their systems or any loss of data could result in legal claims or proceedings. In addition, regardless of their veracity, reports of unauthorized access to our vehicles, their systems or data, as well as other factors that may result in the perception that our vehicles, their systems or data are capable of being "hacked," could negatively affect our brand and harm our business, prospects, financial condition and operating results.

### *We face risks related to natural disasters, health epidemics and other outbreaks, which could significantly disrupt our operations.*

Our business could be adversely affected by the effects of epidemics. In recent years, there have been outbreaks of epidemics in China and globally. In recent years, there have been outbreaks of epidemics in China and globally. Our business operations could be disrupted if any of our employees are suspected of having epidemics, since it could require our employees to be quarantined and/or our offices to be disinfected. In addition, our results of operations could be adversely affected to the extent that the outbreak harms the Chinese economy in general.

We are also vulnerable to natural disasters and other calamities. Although we have servers that are hosted in an offsite location, our backup system does not capture data on a real-time basis and we may be unable to recover certain data in the event of a server failure. We cannot assure you that any backup systems will be adequate to protect us from the effects of fire, floods, typhoons, earthquakes, power loss, telecommunications failures, break-ins, war, riots, terrorist attacks or similar events. Any of the foregoing events may give rise to interruptions, breakdowns, system failures, technology platform failures or internet failures, which could cause the loss or corruption of data or malfunctions of software or hardware as well as adversely affect our ability to provide services on our platform.

31

Table of Contents

***Our revenues and financial results may be adversely affected by any economic slowdown in China as well as globally.***

The success of our business ultimately depends on consumer spending. We derive substantially all of our revenues from China. As a result, our revenues and financial results are impacted to a significant extent by economic conditions in China and globally. The global macroeconomic environment is facing numerous challenges. The growth rate of the Chinese economy has gradually slowed down since 2010 and the trend may continue. Any slowdown could significantly reduce domestic commerce in China, including through the internet generally and through us. In addition, there is considerable uncertainty over the long-term effects of the expansionary monetary and fiscal policies adopted by the central banks and financial authorities of some of the world's leading economies, including the United States and China. Unrest, terrorist threats and the potential for war in the Middle East and elsewhere may increase market volatility across the globe. There have also been concerns about the relationship between China and other countries, including the surrounding Asian countries, which may potentially have economic effects. In particular, there is significant uncertainty about the future relationship between the United States and China with respect to trade policies, treaties, government regulations and tariffs. In addition, the COVID-19 pandemic has negatively impacted the economies of China, the United States and numerous other countries around the world, and is expected to result in a severe global recession. Economic conditions in China are sensitive to global economic conditions, as well as changes in domestic economic and political policies and the expected or perceived overall economic growth rate in China. Any severe or prolonged slowdown in the global or Chinese economy may materially and adversely affect our business, results of operations and financial condition.

Sales of high-end and luxury consumer products, such as our performance electric vehicles, depend in part on discretionary consumer spending and are even more exposed to adverse changes in general economic conditions. In response to their perceived uncertainty in economic conditions, consumers might delay, reduce or cancel purchases of our electric vehicles and our results of operations may be materially and adversely affected.

***Shutdowns of the U.S. federal government could materially impair our business and financial condition.***

Development of our product candidates and/or regulatory approval may be delayed for reasons beyond our control. For example, over the last several years the U.S. government has shut down several times and certain regulatory agencies, such as the SEC, have had to furlough critical SEC and other government employees and stop critical activities. In our operations as a public company, future government shutdowns could impact our ability to access the public markets, such as through delaying the declaration of effectiveness of registration statements, and obtain necessary capital in order to properly capitalize and continue our operations.

***Rising international political tension, including changes in U.S. and international trade policies, particularly with regard to China, may adversely impact our business and operating results.***

The U.S. government has made statements and taken certain actions that may lead to potential changes to U.S. and international trade policies towards China. In January 2020, the "Phase One" agreement was signed between the United States and China on trade matters. However, it remains unclear what additional actions, if any, will be taken by the U.S. or other governments with respect to international trade agreements, the imposition of tariffs on goods imported into the U.S., tax policy related to international commerce, or other trade matters. While cross-border business may not currently be an area of our focus, any unfavorable government policies on international trade, such as capital controls or tariffs, may affect the demand for our products and services, impact the competitive position of our products or prevent us from selling products in certain countries. Moreover, many of the recent policy updates in the U.S., including the Clean Network project initiated by the U.S. Department of State in August 2020 and the Entity List regime maintained and regularly updated by the U.S. Bureau of Industry and Security, may have unforeseen implications for our business. If any new tariffs, legislation and/or regulations are implemented, or if existing trade agreements are renegotiated or, in particular, if the U.S. government takes retaliatory trade actions due to the recent U.S.-China trade tension, such changes could have an adverse effect on our business, financial condition and results of operations.

Additionally, the United States and various foreign governments have imposed controls, export license requirements and restrictions on the import or export of technologies and products (or voiced the intention to do so), especially related to semiconductor, AI and other high-tech areas, which may have a negative impact on our business, financial condition and results of operations. For instance, India has banned a large number of apps in 2020 out of national security concerns, many of which are China-based apps, escalating regional political and trade tensions.

Table of Contents

*Recent disruptions in the financial markets and economic conditions could affect our ability to raise capital.*

In recent years, the United States and global economies suffered dramatic downturns as the result of a deterioration in the credit markets and related financial crisis as well as a variety of other factors including, among other things, extreme volatility in security prices, severely diminished liquidity and credit availability, ratings downgrades of certain investments and declining valuations of others. The United States and certain foreign governments have taken unprecedented actions in an attempt to address and rectify these extreme market and economic conditions by providing liquidity and stability to the financial markets. If the actions taken by these governments are not successful, the return of adverse economic conditions may cause a significant impact on our ability to raise capital, if needed, on a timely basis and on acceptable terms or at all.

*There are uncertainties relating to our users trust arrangement involving a portion of our chairman's shareholding in our company.*

In conjunction with our pursuit of being a user enterprise and with the goal of building a deeper connection between NIO and our users, Mr. Bin Li, our chairman of the board of directors and chief executive officer, transferred certain of his ordinary shares to NIO Users Trust after the completion of the initial public offering of our ADSs on the New York Stock Exchange in September 2018. Currently, NIO Users Trust holds 12,189,253 Class A ordinary shares and 37,810,747 Class C ordinary shares through a holding company controlled by it. Mr. Li continues to retain the voting rights of these shares. In 2019, our user committee adopted the NIO Users Trust Charter by way of voting, and established a User Council to generally manage the operation of NIO Users Trust. In this way, our users have the opportunity to discuss and manage the use of the economic benefits from the shares in NIO Users Trust through the User Council consisting of members of our user community elected by our users. The User Council helps coordinate user activity in our community, and the current second User Council has decided to focus their work on user care, industry sub-communities, public welfare and environmental protection in 2021.

The current NIO Users Trust Charter provides certain mechanisms for the User Council to manage and supervise the operations of NIO Users Trust. There is no assurance that such current mechanisms for managing the operations of NIO Users Trust we have adopted are to the satisfaction of all of our users, or that such mechanisms will be carried out in the way it was intended. The User Council may not be able to achieve its intended work focus or carry out their work effectively and efficiently. Furthermore, the accounting implications to us of the arrangement of NIO Users Trust cannot presently be ascertained.

*We and certain of our directors and officers have been named as defendants in several shareholder class action lawsuits, which could have a material adverse impact on our business, financial condition, results of operation, cash flows and reputation.*

Several putative shareholder class action lawsuits have been filed against us and certain of our directors and officers. See "Item 8. Financial Information-A. Consolidated Statements and Other Financial Information-Legal Proceedings" for more details. We are currently unable to estimate the potential loss, if any, associated with the resolution of such lawsuits, if they proceed. We anticipate that we will continue to be a target for lawsuits in the future, including putative class action lawsuits brought by shareholders. There can be no assurance that we will be able to prevail in our defense or reverse any unfavorable judgment on appeal, and we may decide to settle lawsuits on unfavorable terms. Any adverse outcome of these cases, including any plaintiffs' appeal of the judgment in these cases, could result in payments of substantial monetary damages or fines, or changes to our business practices, and thus have a material adverse effect on our business, financial condition, results of operation, cash flows and reputation. In addition, there can be no assurance that our insurance carriers will cover all or part of the defense costs, or any liabilities that may arise from these matters. The litigation process may utilize a significant portion of our cash resources and divert management's attention from the day-to-day operations of our company, all of which could harm our business. We also may be subject to claims for indemnification related to these matters, and we cannot predict the impact that indemnification claims may have on our business or financial results.

33

Table of Contents

**Risks Related to Our Corporate Structure**

*If the PRC government deems that our contractual arrangements with our variable interest entity do not comply with PRC regulatory restrictions on foreign investment in the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations.*

Foreign ownership of certain areas of businesses is subject to restrictions under current PRC laws and regulations. For example, foreign investors are not allowed to own more than 50% of the equity interests in a value-added telecommunication service provider (except e-commerce) or in a vehicle manufacturer which manufactures the whole vehicle pursuant to the 2020 Negative List.

We are a Cayman Islands exempted company and our PRC subsidiaries are considered foreign-invested enterprises. To comply with the applicable PRC laws and regulations, we had planned to conduct certain operations that were then subject to restrictions on foreign investment in China through Shanghai NIO Energy Automobile Co., Ltd., or NIO New Energy. NIO Co., Ltd. owns 50% equity interests in NIO New Energy. Our founders Bin Li and Lihong Qin, through holding equity interests in Shanghai Anbin Technology Co., Ltd. indirectly own 40% and 10%, respectively, of the equity interests in NIO New Energy. With respect to the 50% equity interests of NIO New Energy indirectly held by the founders, we had entered into a series of contractual arrangements with Shanghai Anbin Technology Co., Ltd., or Shanghai Anbin, and its shareholders, which enabled us to (i) ultimately exercise effective control over such 50% equity interests of NIO New Energy, (ii) receive 50% of substantially all of the economic benefits and bear the obligation to absorb 50% of substantially all of the losses of NIO New Energy, and (iii) have an exclusive option to purchase all or part of the equity interests in Shanghai Anbin when and to the extent permitted by PRC laws, as a result of which we indirectly owned all or part of such 50% equity interests in NIO New Energy. Because of the ownership of 50% equity interests of NIO New Energy and these contractual arrangements, we were the primary beneficiary of NIO New Energy and hence consolidated its financial results as our variable interest entity under U.S. GAAP. On March 31, 2021, NIO Co., Ltd., or NIO WFOE, and Shanghai Anbin Technology Co., Ltd., or Shanghai Anbin, and each shareholder of Shanghai Anbin entered into a termination agreement pursuant to which each of the contractual agreements among NIO WFOE, Shanghai Anbin and its shareholders terminated as of the date of the agreement. In addition, we have also entered into a series of contractual arrangements with Beijing NIO Network Technology Co., Ltd., or Beijing NIO, and its shareholders that enable us to hold all the required Internet content provision service, or the ICP, and related licenses in China. For a detailed description of these contractual arrangements, see "Item 4. Information on the Company-C. Organizational Structure-Contractual Agreements with the VIE and Its Shareholders."

In the opinion of Han Kun Law Offices, our PRC legal counsel, (i) the ownership structures of NIO Co., Ltd. and our variable interest entity in China do not result in any violation of PRC laws and regulations currently in effect; and (ii) the contractual arrangements between our wholly-owned subsidiary NIO Co., Ltd., our variable interest entity and its shareholders governed by PRC laws will not result in any violation of PRC laws or regulations currently in effect. However, we have been advised by our PRC legal counsel that there are substantial uncertainties regarding the interpretation and application of current and future PRC laws, regulations and rules, and there can be no assurance that the PRC regulatory authorities will take a view that is consistent with the opinion of our PRC legal counsel. See "Item 4. Information on the Company-B. Business Overview-Regulation-Regulations on Foreign Investment in China" and "Item 3. Key Information-D. Risk Factors-Risks Related to Doing Business in China-Our business may be significantly affected by the newly enacted Foreign Investment Law." It is uncertain whether any new PRC laws or regulations relating to variable interest entity structures will be adopted or if adopted, what they would provide.

If the ownership structure, contractual arrangements and businesses of our PRC subsidiaries or our variable interest entity are found to be in violation of any existing or future PRC laws or regulations, or our PRC subsidiaries or our variable interest entity fail to obtain or maintain any of the required permits or approvals, the relevant PRC regulatory authorities would have broad discretion to take action in dealing with such violations or failures, including:

- revoking the business licenses and/or operating licenses of such entities;

- shutting down our servers or blocking our website, or discontinuing or placing restrictions or onerous conditions on our operation through any transactions between our PRC subsidiaries and variable interest entity;

- imposing fines, confiscating the income from our PRC subsidiaries or our variable interest entity, or imposing other requirements with which we or our variable interest entity may not be able to comply;

34

Table of Contents

- requiring us to restructure our ownership structure or operations, including terminating the contractual arrangements with our variable interest entity and deregistering the equity pledge of our variable interest entity, which in turn would affect our ability to consolidate, derive economic interests from, or exert effective control over our variable interest entity; or

- restricting or prohibiting our use of the proceeds of any financing outside China to finance our business and operations in China, and taking other regulatory or enforcement actions that could be harmful to our business.

Any of these actions could cause significant disruption to our business operations and severely damage our reputation, which would in turn materially and adversely affect our business, financial condition and results of operations. If any of these occurrences results in our inability to direct the activities of our variable interest entity that most significantly impact their economic performance, and/or our failure to receive the economic benefits from our variable interest entity, we may not be able to consolidate the entities in our consolidated financial statements in accordance with U.S. GAAP.

> *We rely on contractual arrangements with our variable interest entity and its shareholders to exercise control over our business, which may not be as effective as direct ownership in providing operational control.*

We have relied on contractual arrangements with Shanghai Anbin and its shareholders to conduct a portion of our operations in China. On March 31, 2021, the contractual agreements with Shanghai Anbin and its shareholders were terminated. See "Item 4. Information on the Company-C. Organizational Structure-Contractual Agreements with the VIE and Its Shareholders" for more information. We have relied and expect to continue to rely on contractual arrangements with Beijing NIO and its shareholders to conduct a portion of our operations in China. For a description of these contractual arrangements, see "Item 4. Information on the Company-C. Organizational Structure-Contractual Agreements with the VIE and Its Shareholders." The shareholders of Beijing NIO may not act in the best interests of our company or may not perform their obligations under these contracts. If we had direct ownership of our variable interest entity, or VIE, we would be able to exercise our rights as a shareholder to control our VIE to exercise rights of shareholders to effect changes in the board of directors of our VIE, which in turn could implement changes, subject to any applicable fiduciary obligations, at the management and operational level. However, under the contractual arrangements, we would rely on legal remedies under PRC law for breach of contract in the event that Beijing NIO and its shareholders did not perform their obligations under the contracts. These legal remedies may not be as effective as direct ownership in providing us with control over Beijing NIO.

If Beijing NIO or its shareholders fail to perform their obligations under the contractual arrangements, we may have to incur substantial costs and expend additional resources to enforce such arrangements, and rely on legal remedies under PRC laws, including contractual remedies, which may not be sufficient or effective. All of the agreements under our contractual arrangements are governed by and interpreted in accordance with PRC laws, and disputes arising from these contractual arrangements will be resolved through arbitration in China. However, the legal framework and system in China, in particularly those relating to arbitration proceedings, are not as developed as in some other jurisdictions, such as the United States. As a result, uncertainties in the PRC legal system could limit our ability to enforce these contractual arrangements. Meanwhile, there are very few precedents and little formal guidance as to how contractual arrangements in the context of a variable interest entity should be interpreted or enforced under PRC law. There remain significant uncertainties regarding the ultimate outcome of such arbitration should legal action become necessary. In addition, under PRC laws, rulings by arbitrators are final, parties cannot appeal the arbitration results in courts, and if the losing parties fail to carry out the arbitration awards within a prescribed time limit, the prevailing parties may only enforce the arbitration awards in the PRC courts through arbitration award recognition proceedings, which would require additional expenses and delay. If we are unable to enforce these contractual arrangements, or if we suffer significant delay or face other obstacles in the process of enforcing these contractual arrangements, we may not be able to exert effective control over our variable interest entity, and our ability to conduct our business may be negatively affected. See "Item 3. Key Information-D. Risk Factors-Risks Related to Doing Business in China-Uncertainties in the interpretation and enforcement of PRC laws and regulations could limit the legal protections available to you and us."

35

Table of Contents

***Our ability to enforce the equity pledge agreements between us and our PRC variable interest entity' shareholders may be subject to limitations based on PRC laws and regulations.***

Pursuant to the equity interest pledge agreements between Shanghai Anbin and Beijing NIO, our current and past variable interest entities, and NIO Co., Ltd., our wholly owned PRC subsidiary, and the respective shareholders of Shanghai Anbin and Beijing NIO, each shareholder of Shanghai Anbin and Beijing NIO agrees to pledge its equity interests in Shanghai Anbin and Beijing NIO to our subsidiary to secure Shanghai Anbin and Beijing NIO's performance of its obligations under the relevant contractual arrangements. The equity interest pledges of shareholders of each of Beijing NIO and Shanghai Anbin under its equity interests pledge agreement have been registered with the relevant local branch of State Administration for Market Regulation, or the SAMR. In addition, in the registration forms of the local branch of the SAMR for the pledges over the equity interests under the equity interest pledge agreements, the aggregate amount of registered equity interests pledged to NIO Co., Ltd. represents 100% of the registered capital of Shanghai Anbin and Beijing NIO. On March 31, 2021, equity interest pledge agreement among NIO WFOE, Shanghai Anbin and its shareholders were terminated, and the deregistration of the equity interest pledges of shareholders of Shanghai Anbin under its equity interests pledge agreement that were previously registered with the relevant local branch of the SAMR was completed. See "Item 4. Information on the Company-C. Organizational Structure-Contractual Agreements with the VIE and Its Shareholders" for more information.

The equity interest pledge agreements with our variable interest entity's shareholders provide that the pledged equity interests shall constitute continuing security for any and all of the indebtedness, obligations and liabilities under all of the principal service agreements and the scope of pledge shall not be limited by the amount of the registered capital of that variable interest entity. However, a PRC court may take the position that the amount listed on the equity pledge registration forms represents the full amount of the collateral that has been registered and perfected. If this is the case, the obligations that are supposed to be secured in the equity interest pledge agreements in excess of the amount listed on the equity pledge registration forms could be determined by the PRC court as unsecured debt, which typically takes last priority among creditors.

***The shareholders of our variable interest entity may have potential conflicts of interest with us, which may materially and adversely affect our business and financial condition.***

Our founders, Bin Li and Lihong Qin, own 80% and 20%, respectively, of the equity interests in our variable interest entities, Shanghai Anbin and Beijing NIO. On March 31, 2021, the contractual agreements with Shanghai Anbin and its shareholders were terminated. See "Item 4. Information on the Company-C. Organizational Structure-Contractual Agreements with the VIE and Its Shareholders" for more information. As shareholders of Beijing NIO, they may have potential conflicts of interest with us. These shareholders may breach, or cause our variable interest entity to breach, or refuse to renew, the existing contractual arrangements we have with them and our variable interest entity, which would have a material and adverse effect on our ability to effectively control our variable interest entity and receive economic benefits from it. For example, the shareholders may be able to cause our agreements with Beijing NIO to be performed in a manner adverse to us by, among other things, failing to remit payments due under the contractual arrangements to us on a timely basis. We cannot assure you that when conflicts of interest arise, any or all of these shareholders will act in the best interests of our company or such conflicts will be resolved in our favor.

Currently, we do not have any arrangements to address potential conflicts of interest between these shareholders and our company. Each of Bin Li and Lihong Qin is also a director and executive officer of our company. We rely on Bin Li and Lihong Qin to abide by the laws of the Cayman Islands and China, which provide that directors owe a fiduciary duty to the company that requires them to act in good faith and in what they believe to be the best interests of the company and not to use their position for personal gain. There is currently no specific and clear guidance under PRC laws that addresses any conflict between PRC laws and the laws of Cayman Islands in respect of any conflict relating to corporate governance. If we cannot resolve any conflict of interest or dispute between us and the shareholders of Beijing NIO, we would have to rely on legal proceedings, which could result in disruption of our business and subject us to substantial uncertainty as to the outcome of any such legal proceedings.

Table of Contents

*Our contractual arrangements with our current and past variable interest entities may be subject to scrutiny by the PRC tax authorities and they may determine that we or our current or past variable interest entities owe additional taxes, which could negatively affect our financial condition.*

Under applicable PRC laws and regulations, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities within ten years after the taxable year when the transactions are conducted. The PRC Enterprise Income Tax Law requires every enterprise in China to submit its annual enterprise income tax return together with a report on transactions with its related parties to the relevant tax authorities. The tax authorities may impose reasonable adjustments on taxation if they have identified any related party transactions that are inconsistent with arm's length principles. We may face material and adverse tax consequences if the PRC tax authorities determine that the contractual arrangements between NIO Co., Ltd., our wholly-owned subsidiary in China, Shanghai Anbin and Beijing NIO, our current and past variable interest entities in China, and Shanghai Anbin and Beijing NIO's shareholders were not entered into on an arm's length basis in such a way as to result in an impermissible reduction in taxes under applicable PRC laws, rules and regulations, and adjust Shanghai Anbin and Beijing NIO's income in the form of a transfer pricing adjustment. A transfer pricing adjustment could, among other things, result in a reduction of expense deductions recorded by Shanghai Anbin and Beijing NIO for PRC tax purposes, which could in turn increase their tax liabilities without reducing NIO Co., Ltd.'s tax expenses. On March 31, 2021, the contractual agreements with Shanghai Anbin and its shareholders were terminated. See "Item 4. Information on the Company-C. Organizational Structure-Contractual Agreements with the VIE and Its Shareholders" for more information. However, we may face the material and adverse tax consequences described above with respect to our contractual agreements with Shanghai Anbin and its shareholders when such agreements were effective. In addition, if NIO Co., Ltd. requests the shareholders of Beijing NIO to transfer their equity interests in NIO Co., Ltd. at nominal or no value pursuant to the contractual agreements, such transfer could be viewed as a gift and subject NIO Co., Ltd. to PRC income tax. Furthermore, the PRC tax authorities may impose late payment fees and other penalties on Beijing NIO for the adjusted but unpaid taxes according to the applicable regulations. Our financial position could be materially and adversely affected if either of our current and past variable interest entities' tax liabilities increase or if either is required to pay late payment fees and other penalties.

*We may lose the ability to use and benefit from assets held by our variable interest entity that are material to the operation of our business if our variable interest entity goes bankrupt or becomes subject to dissolution or liquidation proceedings.*

As part of our contractual arrangements with our variable interest entity, the entity may in the future hold certain assets that are material to the operation of our business. If our variable interest entity goes bankrupt and all or part of its assets become subject to liens or rights of third-party creditors, we may be unable to continue some or all of our business activities, which could materially and adversely affect our business, financial condition and results of operations. Under the contractual arrangements, our variable interest entity may not, in any manner, sell, transfer, mortgage or dispose of their assets or legal or beneficial interests in the business without our prior consent. If our variable interest entity undergoes voluntary or involuntary liquidation proceedings, unrelated third-party creditors may claim rights to some or all of these assets, thereby hindering our ability to operate our business, which could materially and adversely affect our business, financial condition and results of operations.

**Risks Related to Doing Business in China**

*Our ADSs may be delisted under the Holding Foreign Companies Accountable Act if the PCAOB is unable to inspect auditors who are located in China. The delisting of our ADSs, or the threat of their being delisted, may materially and adversely affect the value of your investment. Additionally, the inability of the PCAOB to conduct inspections deprives our investors with the benefits of such inspections.*

The Holding Foreign Companies Accountable Act, or the HFCA Act, was enacted on December 18, 2020. The HFCA Act states if the SEC determines that we have filed audit reports issued by a registered public accounting firm that has not been subject to inspection by the PCAOB for three consecutive years beginning in 2021, the SEC shall prohibit our shares or ADSs from being traded on a national securities exchange or in the "over-the-counter" trading market in the U.S.

Our auditor, the independent registered public accounting firm that issues the audit report included elsewhere in this annual report, as an auditor of companies that are traded publicly in the United States and a firm registered with the PCAOB, is subject to laws in the United States pursuant to which the PCAOB conducts regular inspections to assess its compliance with the applicable professional standards. Since our auditor is located in China, a jurisdiction where the PCAOB has been unable to conduct inspections without the approval of the Chinese authorities, our auditor is currently not inspected by the PCAOB.

37

Table of Contents

On March 24, 2021, the SEC adopted interim final rules relating to the implementation of certain disclosure and documentation requirements of the HFCA Act. We will be required to comply with these rules if the SEC identifies us as having a "non-inspection" year under a process to be subsequently established by the SEC. The SEC is assessing how to implement other requirements of the HFCA Act, including the listing and trading prohibition requirements described above.

The SEC may propose additional rules or guidance that could impact us if our auditor is not subject to PCAOB inspection. For example, on August 6, 2020, the President's Working Group on Financial Markets, or the PWG, issued the Report on Protecting United States Investors from Significant Risks from Chinese Companies to the then President of the United States. This report recommended the SEC implement five recommendations to address companies from jurisdictions that do not provide the PCAOB with sufficient access to fulfil its statutory mandate. Some of the concepts of these recommendations were implemented with the enactment of the HFCA Act. However, some of the recommendations were more stringent than the HFCA Act. For example, if a company was not subject to PCAOB inspection, the report recommended that the transition period before a company would be delisted would end on January 1, 2022.

The SEC has announced that the SEC staff is preparing a consolidated proposal for the rules regarding the implementation of the HFCA Act and to address the recommendations in the PWG report. It is unclear when the SEC will complete its rulemaking and when such rules will become effective and what, if any, of the PWG recommendations will be adopted. The implications of this possible regulation in addition the requirements of the HFCA Act are uncertain. Such uncertainty could cause the market price of our ADSs to be materially and adversely affected, and our securities could be delisted or prohibited from being traded "over-the-counter" earlier than would be required by the HFCA Act. If our securities are unable to be listed on another securities exchange by then, such a delisting would substantially impair your ability to sell or purchase our ADSs when you wish to do so, and the risk and uncertainty associated with a potential delisting would have a negative impact on the price of our ADSs.

The PCAOB's inability to conduct inspections in China prevents it from fully evaluating the audits and quality control procedures of our independent registered public accounting firm. As a result, we and investors in our ordinary shares are deprived of the benefits of such PCAOB inspections. The inability of the PCAOB to conduct inspections of auditors in China makes it more difficult to evaluate the effectiveness of our independent registered public accounting firm's audit procedures or quality control procedures as compared to auditors outside of China that are subject to the PCAOB inspections, which could cause investors and potential investors in our stock to lose confidence in our audit procedures and reported financial information and the quality of our financial statements.

In May 2013, the PCAOB announced that it had entered into a Memorandum of Understanding on Enforcement Cooperation with the CSRC and the PRC Ministry of Finance, which establishes a cooperative framework between the parties for the production and exchange of audit documents relevant to investigations undertaken by the PCAOB in the PRC or by the CSRC or the PRC Ministry of Finance in the United States. The PCAOB continues to be in discussions with the CSRC and the PRC Ministry of Finance to permit joint inspections in the PRC of audit firms that are registered with the PCAOB and audit Chinese companies that trade on U.S. exchanges.

> ***Proceedings instituted by the SEC against the "big four" PRC-based accounting firms, including our independent registered public accounting firm, could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act.***

In late 2012, the SEC commenced administrative proceedings under Rule 102(e) of its Rules of Practice and also under the Sarbanes-Oxley Act against the Chinese affiliates of the "big four" accounting firms (including our auditors). The Rule 102(e) proceedings initiated by the SEC relate to these firms' inability to produce documents, including audit work papers, in response to the request of the SEC pursuant to Section 106 of the Sarbanes-Oxley Act, as the auditors located in the PRC are not in a position lawfully to produce documents directly to the SEC because of restrictions under PRC law and specific directives issued by the China Securities Regulatory Commission, or the CSRC. The issues raised by the proceedings are not specific to our auditors or to us, but affect equally all audit firms based in China and all China-based businesses with securities listed in the United States.

In January 2014, the administrative judge reached an initial decision, or the Initial Decision, that the Chinese affiliates of "big four" accounting firms should be barred from practicing before the SEC for six months. Thereafter, the accounting firms filed a petition for review of the Initial Decision, prompting the SEC commissioners to review the Initial Decision, determine whether there had been any violation and, if so, determine the appropriate remedy to be placed on these audit firms.

38

Table of Contents

In February 2015, the Chinese affiliates of the "big four" accounting firms (including our auditors) each agreed to censure and pay a fine to the SEC to settle the dispute and avoid suspension of their ability to practice before the SEC and audit U.S. listed companies. The settlement requires the firms to follow detailed procedures and to seek to provide the SEC with access to the Chinese firms' audit documents via the CSRC. If they failed to meet the specified criteria during a period of four years starting from the settlement date, the SEC retained authority to impose a variety of additional remedial measures on the firms depending on the nature of the failure. Under the terms of the settlement, the underlying proceeding against the four China-based accounting firms was deemed dismissed with prejudice four years after entry of the settlement. The four-year mark occurred on February 6, 2019. While we cannot predict if the SEC will further challenge the four China-based accounting firms' compliance with U.S. law in connection with U.S. regulatory requests for audit work papers or if the results of such a challenge would result in the SEC imposing penalties such as suspensions. If additional remedial measures are imposed on the Chinese affiliates of the "big four" accounting firms, we could be unable to timely file future financial statements in compliance with the requirements of the Exchange Act.

In the event the Chinese affiliates of the "big four" become subject to additional legal challenges by the SEC or PCAOB, depending upon the final outcome, listed companies in the United States with major PRC operations may find it difficult or impossible to retain auditors in respect of their operations in the PRC, which could result in financial statements being determined to not be in compliance with the requirements of the Securities Exchange Act of 1934, as amended, or the Securities Exchange Act, and could result in delisting. Moreover, any negative news about the proceedings against these audit firms may cause investor uncertainty regarding China-based, United States-listed companies and the market price of our shares may be adversely affected. If our independent registered public accounting firm were denied, temporarily, the ability to practice before the SEC and we were unable to timely find another registered public accounting firm to audit and issue an opinion on our financial statements, our financial statements could be determined to not be in compliance with the requirements of the Exchange Act.

***Changes in China's political or social conditions or government policies could have a material and adverse effect on our business and results of operations.***

Substantially all of our revenues are expected to be derived in China in the near future and most of our operations, including all of our manufacturing, is conducted in China. Accordingly, our results of operations, financial condition and prospects are influenced by economic, political and legal developments in China. China's economy differs from the economies of most developed countries in many respects, including with respect to the amount of government involvement, level of development, growth rate, control of foreign exchange and allocation of resources. The PRC government exercises significant control over China's economic growth through strategically allocating resources, controlling the payment of foreign currency-denominated obligations, setting monetary policy and providing preferential treatment to particular industries or companies. While the PRC economy has experienced significant growth over the past decades, that growth has been uneven across different regions and between economic sectors and may not continue, as evidenced by the slowing of the growth of the Chinese economy since 2012. Any adverse changes in economic conditions in China, in the policies of the Chinese government or in the laws and regulations in China could have a material adverse effect on the overall economic growth of China. Such developments could adversely affect our business and operating results, leading to reduction in demand for our services and solutions and adversely affect our competitive position.

***Uncertainties in the interpretation and enforcement of PRC laws and regulations could limit the legal protections available to you and us.***

The PRC legal system is a civil law system based on written statutes. Unlike the common law system, prior court decisions may be cited for reference but have limited precedential value.

Our PRC subsidiaries are foreign-invested enterprises and are subject to laws and regulations applicable to foreign-invested enterprises as well as various Chinese laws and regulations generally applicable to companies incorporated in China. However, since these laws and regulations are relatively new and the PRC legal system continues to rapidly evolve, the interpretations of many laws, regulations and rules are not always uniform and enforcement of these laws, regulations and rules involves uncertainties.

Table of Contents

From time to time, we may have to resort to administrative and court proceedings to enforce our legal rights. However, since PRC administrative and court authorities have significant discretion in interpreting and implementing statutory and contractual terms, it may be more difficult to evaluate the outcome of administrative and court proceedings and the level of protection we enjoy than in more developed legal systems. Furthermore, the PRC legal system is based in part on government policies and internal rules, some of which are not published on a timely basis or at all, and which may have a retroactive effect. As a result, we may not be aware of our violation of any of these policies and rules until sometime after the violation. Such uncertainties, including uncertainty over the scope and effect of our contractual, property (including intellectual property) and procedural rights, and any failure to respond to changes in the regulatory environment in China could materially and adversely affect our business and impede our ability to continue our operations.

### *Our business may be significantly affected by the newly enacted Foreign Investment Law.*

On March 15, 2019, the National People's Congress promulgated the Foreign Investment Law, which has become effective on January 1, 2020 and replaced the trio of existing laws regulating foreign investment in China, namely, the PRC Equity Joint Venture Law, the PRC Cooperative Joint Venture Law and the Wholly Foreign-owned Enterprise Law, together with their implementation rules and ancillary regulations. Since the Foreign Investment Law is newly enacted, uncertainties still exist in relation to its interpretation and implementation. The Foreign Investment Law does not explicitly classify whether variable interest entities that are controlled via contractual arrangements would be deemed as foreign invested enterprises if they are ultimately "controlled" by foreign investors. However, it has a catch-all provision under definition of "foreign investment" to include investments made by foreign investors in China through means stipulated by laws or administrative regulations or other methods prescribed by the State Council. Therefore, it still leaves leeway for future laws, administrative regulations or provisions to provide for contractual arrangements as a form of foreign investment. There can be no assurance that our contractual arrangements will not be deemed to be in violation of the market access requirements for foreign investment under the PRC laws and regulations.

The Foreign Investment Law grants national treatment to foreign invested entities, except for those foreign invested entities that operate in industries deemed to be either "restricted" or "prohibited" in the "negative list" to be published. Because the "negative list" has yet been published, it is unclear as to whether it will differ from the 2020 Negative List currently in effect. The Foreign Investment Law provides that only foreign invested entities operating in foreign restricted or prohibited industries will require entry clearance and other approvals that are not required by PRC domestic entities or foreign invested entities operating in other industries. In the event that our variable interest entity through which we operate our business is not treated as domestic investment and our operations carried out through such variable interest entity are classified in the "restricted" or "prohibited" industry in the "negative list" under the Foreign Investment Law, such contractual arrangements may be deemed as invalid and illegal, and we may be required to unwind such contractual arrangements and/or dispose of such business.

Furthermore, if future laws, administrative regulations or provisions mandate further actions to be taken by companies with respect to existing contractual arrangements, we may face substantial uncertainties as to whether we can complete such actions in a timely manner, or at all. In addition, the Foreign Investment Law provides that existing foreign invested enterprises established according to the existing laws regulating foreign investment may maintain their structure and corporate governance within five years after the implementation of the Foreign Investment Law, which means that we may be required to adjust the structure and corporate governance of certain of our PRC entities then. Failure to take timely and appropriate measures to cope with any of these or similar regulatory compliance challenges could materially and adversely affect our current corporate structure, corporate governance and business operations.

### *We may be adversely affected by the complexity, uncertainties and changes in PRC regulations on internet-related business, automotive businesses and other business carried out by our PRC subsidiaries.*

We operate in the automotive and internet industry, both of which are extensively regulated by the PRC government. For example, the PRC government imposes foreign ownership restrictions and licensing and permit requirements for companies in the internet industry. See "Item 4. Information on the Company-B. Business Overview-Regulation-Regulations on Foreign Investment in China" and "Item 4. Information on the Company-B. Business Overview-Regulation-Regulations on Value-added Telecommunications Services." Manufacturing of our vehicles is subject to extensive regulations in China. See "Item 4. Information on the Company-B. Business Overview-Regulation-Regulations and Approvals Covering the Manufacturing of Pure Battery Electric Passenger Vehicles." These laws and regulations are relatively new and evolving, and their interpretation and enforcement involve significant uncertainties. As a result, in certain circumstances it may be difficult to determine what actions or omissions may be deemed to be in violation of applicable laws and regulations and furthermore, we cannot assure you that we have complied or will be able to comply with all applicable laws at all times. Consequently, we could face the risks of being subject to governmental investigations, orders by the competent authorities for rectification, administrative penalties or other legal proceedings.

40

Table of Contents

Currently we rely on the contractual arrangements with Beijing NIO, our variable interest entity, to hold an ICP license, and separately own the relevant domain names and trademarks in connection with our internet services and operate our website and mobile application through NIO Co., Ltd. Our internet services may be treated as a value-added telecommunications business. If so, we may be required to transfer the domain names, trademark and the operations of the internet services from NIO Co., Ltd. to Beijing NIO, and we may also be subject to administrative penalties. Further, any challenge to the validity of these arrangements may significantly disrupt our business, subject us to sanctions, compromise enforceability of our contractual arrangements, or have other harmful effects on us. It is uncertain if Beijing NIO or NIO Co., Ltd. will be required to obtain a separate operating license for certain services carried out by us through our mobile application in addition to the valued-added telecommunications business operating licenses for internet content provision services, and if Beijing NIO will be required to supplement our current ICP license in the future.

In addition, our mobile applications are also regulated by the Administrative Provisions on Mobile Internet Applications Information Services, or the APP Provisions, promulgated by the Cyberspace Administration of China, or the CAC, on June 28, 2016 and effective on August 1, 2016. According to the APP Provisions, the providers of mobile applications shall not create, copy, publish or distribute information and content that is prohibited by laws and regulations. However, we cannot assure that all the information or content displayed on, retrieved from or linked to our mobile applications complies with the requirements of the APP Provisions at all times. If our mobile applications were found to be violating the APP Provisions, we may be subject to administrative penalties, including warning, service suspension or removal of our mobile applications from the relevant mobile application store, which may materially and adversely affect our business and operating results.

The interpretation and application of existing PRC laws, regulations and policies and possible new laws, regulations or policies relating to the internet industry, particularly the policies relating to value-added telecommunications services, have created substantial uncertainties regarding the legality of existing and future foreign investments in the businesses and activities of internet businesses in China, including our business.

Several PRC regulatory authorities, such as the SAMR, the NDRC, the Ministry of Industry and Information Technology, or the MIIT, and the MOFCOM, oversee different aspects of our operations, and we are required to obtain a wide range of government approvals, licenses, permits and registrations in connection with our operations. For example, certain filings must be made by automobile dealers through the information system for the national automobile circulation operated by the relevant commerce department within 90 days after the receipt of a business license. Furthermore, the NEV industry is relatively new in China, and the PRC government has not adopted a clear regulatory framework to regulate the industry. As some of the laws, rules and regulations that we may be subject to were primarily enacted with a view toward application to ICE vehicles, or are relatively new, there is significant uncertainty regarding their interpretation and application with respect to our business. For example, it remains unclear under PRC laws whether our charging vans need to be registered with related local traffic management authorities or obtain transportation operation licenses for their services, and whether we would be required to obtain any particular permit or license to be qualified to provide our charging services in cooperation with third-party charging stations. In addition, the PRC government may enact new laws and regulations that require additional licenses, permits, approvals and/or registrations for the operation of any of our existing or future business. As a result. We cannot assure you that we have all the permits, licenses, registrations, approvals and/or business license covering the sufficient scope of business required for our business or that we will be able to obtain, maintain or renew permits, licenses, registrations, approvals and/or business license covering sufficient scope of business in a timely manner or at all.

41

Table of Contents

***We may rely on dividends and other distributions on equity paid by our PRC subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiaries to make payments to us could have a material and adverse effect on our ability to conduct our business.***

We are a holding company, and we may rely on dividends and other distributions on equity paid by our PRC subsidiaries for our cash and financing requirements, including the funds necessary to pay dividends and other cash distributions to our shareholders and service any debt we may incur. Current PRC regulations permit our PRC subsidiaries to pay dividends to us only out of their accumulated after-tax profits upon satisfaction of relevant statutory conditions and procedures, if any, determined in accordance with Chinese accounting standards and regulations. In addition, each of our PRC subsidiaries is required to set aside at least 10% of its after-tax profits each year, if any, to fund certain reserve funds until the total amount set aside reaches 50% of its registered capital. As of December 31, 2020, most of our PRC subsidiaries and our variable interest entities at that time had not made appropriations to statutory reserves as our PRC subsidiaries and our variable interest entities at that time reported accumulated loss. For a detailed discussion of applicable PRC regulations governing distribution of dividends, see "Item 4. Information on the Company-B. Business Overview-Regulation-Regulations on Dividend Distribution." Additionally, if our PRC subsidiaries incur debt on their own behalf in the future, the instruments governing their debt may restrict their ability to pay dividends or make other distributions to us. Furthermore, the PRC tax authorities may require our subsidiaries to adjust their taxable income under the contractual arrangements they currently have in place with our variable interest entity in a manner that would materially and adversely affect their ability to pay dividends and other distributions to us. See "-Risks Related to Our Corporate Structure-Our contractual arrangements with our current and past variable interest entities may be subject to scrutiny by the PRC tax authorities and they may determine that we or our current and past variable interest entities owe additional taxes, which could negatively affect our financial condition." In addition, the incurrence of indebtedness by our PRC subsidiaries could result in operating and financing covenants and undertakings to creditors that would restrict the ability of our PRC subsidiaries to pay dividends to us.

Any limitation on the ability of our PRC subsidiaries to pay dividends or make other distributions to us could materially and adversely limit our ability to grow, make investments or acquisitions that could be beneficial to our business, pay dividends, or otherwise fund and conduct our business. See "-If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders."

***Increases in labor costs and enforcement of stricter labor laws and regulations in the PRC may adversely affect our business and our profitability.***

China's overall economy and the average wage in China have increased in recent years and are expected to grow. The average wage level for our employees has also increased in recent years. We expect that our labor costs, including wages and employee benefits, will increase. Unless we are able to pass on these increased labor costs to those who pay for our services, our profitability and results of operations may be materially and adversely affected.

In addition, we have been subject to stricter regulatory requirements in terms of entering into labor contracts with our employees, limitation with respect to utilization of labor dispatching, applying for foreigner work permits, labor protection and labor condition and paying various statutory employee benefits, including pensions, housing fund, medical insurance, work-related injury insurance, unemployment insurance and maternity insurance to designated government agencies for the benefit of our employees. Pursuant to the PRC Labor Contract Law and its implementation rules, employers are subject to stricter requirements in terms of signing labor contracts, minimum wages, paying remuneration, determining the term of employee's probation and unilaterally terminating labor contracts. In the event that we decide to terminate some of our employees or otherwise change our employment or labor practices, the PRC Labor Contract Law and its implementation rules may limit our ability to effect those changes in a desirable or cost-effective manner, which could adversely affect our business and results of operations.

Companies registered and operating in China are required under the PRC Social Insurance Law (latest amended in 2018) and the Regulations on the Administration of Housing Funds (latest amended in 2019) to, apply for social insurance registration and housing fund deposit registration within 30 days of their establishment, and to pay for their employees different social insurance including pension insurance, medical insurance, work-related injury insurance, unemployment insurance and maternity insurance to the extent required by law. However, certain of our PRC subsidiaries and VIE that do not hire any employees and are not a party to any employment agreement, have not applied for and obtained such registration, and instead of paying the social insurance payment on their own for their employees, certain of our PRC subsidiaries and VIE use third-party agencies to pay in the name of such agency. We could be subject to orders by the competent labor authorities for rectification and failure to comply with the orders may further subject us to administrative fines.

42

Table of Contents

As the interpretation and implementation of labor-related laws and regulations are still evolving, our employment practices may violate labor-related laws and regulations in China, which may subject us to labor disputes or government investigations. We cannot assure you that we have complied or will be able to comply with all labor-related law and regulations including those relating to obligations to make social insurance payments and contribute to the housing provident funds. If we are deemed to have violated relevant labor laws and regulations, we could be required to provide additional compensation to our employees and our business, financial condition and results of operations will be adversely affected.

Furthermore, in order to control labor costs, we conducted a series of organizational restructuring to cut headcount in 2019, which we believe has negatively affected our reputation, brand image and our ability to retain the remaining qualified staff and skilled employees. We could undertake an organizational restructuring again in the future, the occurrence of which will pose negative implications on our competitive position, cost us qualified employees and subject us to potential employment lawsuits. Any of the above would negatively affect our business, financial condition and results of operations.

*Fluctuations in exchange rates could have a material and adverse effect on our results of operations.*

The conversion of RMB into foreign currencies, including U.S. dollars, is based on rates set by the People's Bank of China. The RMB has fluctuated against the U.S. dollar, at times significantly and unpredictably. The value of RMB against the U.S. dollar and other currencies is affected by changes in China's political and economic conditions and by China's foreign exchange policies, among other things. We cannot assure you that RMB will not appreciate or depreciate significantly in value against the U.S. dollar in the future. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between RMB and the U.S. dollar in the future.

Any significant appreciation or depreciation of RMB may materially and adversely affect our revenues, earnings and financial position, and the value of, and any dividends payable on, our ADSs in U.S. dollars. For example, to the extent that we need to convert U.S. dollars we receive into RMB to pay our operating expenses, appreciation of RMB against the U.S. dollar would have an adverse effect on the RMB amount we would receive from the conversion. Conversely, a significant depreciation of RMB against the U.S. dollar may significantly reduce the U.S. dollar equivalent of our earnings, which in turn could adversely affect the price of our ADSs.

Very limited hedging options are available in China to reduce our exposure to exchange rate fluctuations. To date, we have not entered into any hedging transactions in an effort to reduce our exposure to foreign currency exchange risk. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedges may be limited and we may not be able to adequately hedge our exposure or at all. In addition, our currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert RMB into foreign currency. As a result, fluctuations in exchange rates may have a material adverse effect on your investment.

*PRC regulation of loans to and direct investment in PRC entities by offshore holding companies and governmental control of currency conversion may delay or prevent us from using the proceeds of our offshore equity offerings to make loans to or make additional capital contributions to our PRC subsidiaries, which could materially and adversely affect our liquidity and our ability to fund and expand our business.*

Under PRC laws and regulations, we are permitted to utilize the proceeds of any financing outside China to fund our PRC subsidiaries by making loans to or additional capital contributions to our PRC subsidiaries, subject to applicable government registration, statutory limitations on amount and approval requirements. For more details, see "Item 4. Information on the Company-B. Business Overview-Regulation-Regulations on Foreign Exchange." These PRC laws and regulations may significantly limit our ability to use Renminbi converted from the net proceeds of any financing outside China to fund the establishment of new entities in China by our PRC subsidiaries, to invest in or acquire any other PRC companies through our PRC subsidiaries, or to establish new variable interest entities in China. Moreover, we cannot assure you that we will be able to complete the necessary registrations or obtain the necessary government approvals on a timely basis, if at all, with respect to future loans to our PRC subsidiaries or future capital contributions by us to our PRC subsidiaries. If we fail to complete such registrations or obtain such approvals, our ability to use the proceeds we received or expect to receive from our offshore offerings and to capitalize or otherwise fund our PRC operations may be negatively affected, which could materially and adversely affect our liquidity and our ability to fund and expand our business.

43

Table of Contents

On December 26, 2017, the NDRC issued the *Management Rules for Overseas Investment by Enterprises*, or Order 11. On February 11, 2018, the *Catalog on Overseas Investment in Sensitive Industries (2018 Edition)*, or the Sensitive Industries List was promulgated. Overseas investment governed by Order 11 refers to the investment activities conducted by an enterprise located in the territory of China either directly or via an overseas enterprise under its control through making investment with assets and equities or providing financing or guarantees in order to obtain overseas ownership, control, management rights and other related interests, and overseas investment by a PRC individual through overseas enterprises under his/her control is also subject to Order 11. According to Order 11, before being conducted, any overseas investment in a sensitive industry or any direct investment by a Chinese enterprise in a non-sensitive industry but with an investment amount over US$300 million requires approval from, or filing with, the NDRC, and for those non-sensitive investments indirectly by Chinese investors (including PRC individuals) with investment amounts over US$300 million need to be reported. However, uncertainties remain with respect to the interpretation and application of Order 11, we are not sure whether our using of proceeds will be subject to Order 11. If we fail to obtain the approval, complete the filing or report our overseas investment with our proceeds (as the case may be) in a timely manner provided that Order 11 is applicable, we may be forced to suspend or cease our investment, or be subject to penalties or other liabilities, which could materially and adversely affect our business, financial condition and prospects.

### *Governmental control of currency conversion may limit our ability to utilize our revenues effectively.*

The PRC government imposes controls on the convertibility of Renminbi into foreign currencies and, in certain cases, the remittance of currency out of China. Under existing PRC foreign exchange regulations, payments of current account items, such as profit distributions and trade and service-related foreign exchange transactions, can be made in foreign currencies without prior approval from the State Administration of Foreign Exchange, or SAFE, by complying with certain procedural requirements. However, approval from or registration with appropriate governmental authorities is required where Renminbi is to be converted into a foreign currency and remitted out of China to pay capital expenses, such as the repayment of loans denominated in foreign currencies. See "Item 4. Information on the Company-B. Business Overview-Regulation-Regulations on Foreign Exchange."

Since 2016, the PRC government has tightened its foreign exchange policies again and stepped up scrutiny of major outbound capital movement. More restrictions and a substantial vetting process have been put in place by SAFE to regulate cross-border transactions falling under the capital account. The PRC government may also restrict access in the future to foreign currencies for current account transactions, at its discretion. We receive substantially all of our revenues in RMB. If the foreign exchange control system prevents us from obtaining sufficient foreign currencies to satisfy our foreign currency demands, we may not be able to pay dividends in foreign currencies to our shareholders, including holders of our ADSs.

### *PRC regulations relating to offshore investment activities by PRC residents may limit our PRC subsidiaries' ability to increase their registered capital or distribute profits to us or otherwise expose us or our PRC resident beneficial owners to liability and penalties under PRC law.*

SAFE requires PRC residents or entities to register with SAFE or its local branch in connection with their establishment or control of an offshore entity established for the purpose of overseas investment or financing. In addition, such PRC residents or entities must update their SAFE registrations when the offshore special purpose vehicle undergoes certain material events. See "Item 4. Information on the Company-B. Business Overview-Regulation-Regulations on Foreign Exchange-Offshore Investment."

If our shareholders who are PRC residents or entities do not complete their registration with the local SAFE branches, our PRC subsidiaries may be prohibited from distributing their profits and any proceeds from any reduction in capital, share transfer or liquidation to us, and we may be restricted in our ability to contribute additional capital to our PRC subsidiaries. Moreover, failure to comply with SAFE registration requirements could result in liability under PRC laws for evasion of applicable foreign exchange restrictions.

However, we may not be informed of the identities of all the PRC residents or entities holding direct or indirect interests in our company, nor can we compel our beneficial owners to comply with SAFE registration requirements. As a result, we cannot assure you that all of our shareholders or beneficial owners who are PRC residents or entities have complied with, and will in the future make or obtain any applicable registrations or approvals required by, SAFE regulations. Failure by such shareholders or beneficial owners to comply with SAFE regulations, or failure by us to amend the foreign exchange registrations of our PRC subsidiaries, could subject us to fines or legal sanctions, restrict our overseas or cross-border investment activities, limit our PRC subsidiaries' ability to make distributions or pay dividends to us or affect our ownership structure, which could adversely affect our business and prospects.

44

Table of Contents

***China's M&A Rules and certain other PRC regulations establish complex procedures for certain acquisitions of PRC companies by foreign investors, which could make it more difficult for us to pursue growth through acquisitions in China.***

A number of PRC laws and regulations have established procedures and requirements that could make merger and acquisition activities in China by foreign investors more time-consuming and complex. In addition to the Anti-Monopoly Law itself, these include the Rules on Acquisition of Domestic Enterprises by Foreign Investors, or the M&A Rules, adopted by six PRC governmental and regulatory agencies in 2006 and amended in 2009, and the Rules of the Ministry of Commerce on Implementation of Security Review System of Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, or the Security Review Rules, promulgated in 2011. These laws and regulations impose requirements in some instances that the MOFCOM be notified in advance of any change-of-control transaction in which a foreign investor takes control of a PRC domestic enterprise. In addition, the Anti-Monopoly Law requires that the MOFCOM be notified in advance of any concentration of undertaking if certain thresholds are triggered. Moreover, the Security Review Rules specify that mergers and acquisitions by foreign investors that raise "national defense and security" concerns and mergers and acquisitions through which foreign investors may acquire de facto control over domestic enterprises that raise "national security" concerns are subject to strict review by the MOFCOM, and prohibit any attempt to bypass a security review, including by structuring the transaction through a proxy or contractual control arrangement. In the future, we may grow our business by acquiring complementary businesses. Complying with the requirements of the relevant regulations to complete such transactions could be time-consuming, and any required approval processes, including approval from the MOFCOM, may delay or inhibit our ability to complete such transactions, which could affect our ability to expand our business or maintain our market share.

***Any failure to comply with PRC regulations regarding the registration requirements for employee stock incentive plans may subject the PRC plan participants or us to fines and other legal or administrative sanctions.***

Under SAFE regulations, PRC residents who participate in a stock incentive plan in an overseas publicly listed company are required to register with SAFE or its local branches and complete certain other procedures. See "Item 4. Information on the Company-B. Business Overview-Regulation-Regulations on Employment and Social Welfare-Employee Stock Incentive Plan." We and our PRC resident employees who participate in our share incentive plans are subject to these regulations since we became a public company listed in the United States. If we or any of these PRC resident employees fail to comply with these regulations, we or such employees may be subject to fines and other legal or administrative sanctions. We also face regulatory uncertainties that could restrict our ability to adopt additional incentive plans for our directors, executive officers and employees under PRC law.

***Discontinuation of any of the preferential tax treatments and government subsidies or imposition of any additional taxes and surcharges could adversely affect our financial condition and results of operations.***

Our PRC subsidiaries currently benefit from a number of preferential tax treatments. For example, our subsidiary, NIO Co., Ltd., is entitled to enjoy, after completing certain application formalities, a 15% preferential enterprise income tax from 2018 as it has been qualified as a "High New Technology Enterprise" under the PRC Enterprise Income Tax Law and related regulations. The discontinuation of any of the preferential income tax treatment that we currently enjoy could have a material and adverse effect on our result of operations and financial condition. We cannot assure you that we will be able to maintain or lower our current effective tax rate in the future.

In addition, our PRC subsidiaries have received various financial subsidies from PRC local government authorities. The financial subsidies result from discretionary incentives and policies adopted by PRC local government authorities. For example, our subsidiary, XPT (Nanjing) E-Powertrain Technology Co., Ltd., has received subsidies of an aggregate of RMB7.49 million for the phase I construction of the Nanjing Advanced Manufacturing Engineering Center as of December 31, 2020. Local governments may decide to change or discontinue such financial subsidies at any time. The discontinuation of such financial subsidies or imposition of any additional taxes could adversely affect our financial condition and results of operations.

Table of Contents

***If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders.***

Under the PRC Enterprise Income Tax Law and its implementation rules, an enterprise established outside of the PRC with a "de facto management body" within the PRC is considered a PRC resident enterprise. The implementation rules define the term "de facto management body" as the body that exercises full and substantial control over and overall management of the business, productions, personnel, accounts and properties of an enterprise. In 2009, the State Administration of Taxation issued a circular, known as Circular 82, which provides certain specific criteria for determining whether the "de facto management body" of a PRC-controlled enterprise that is incorporated offshore is located in China. Although Circular 82 only applies to offshore enterprises controlled by PRC enterprises or PRC enterprise groups, not those controlled by PRC individuals or foreigners like us, the criteria set forth in the circular may reflect the State Administration of Taxation's general position on how the "de facto management body" test should be applied in determining the tax resident status of all offshore enterprises. According to Circular 82, an offshore incorporated enterprise controlled by a PRC enterprise or a PRC enterprise group will be regarded as a PRC tax resident by virtue of having its "de facto management body" in China and will be subject to PRC enterprise income tax on its global income only if all of the following conditions are met: (i) the primary location of the day-to-day operational management is in the PRC; (ii) decisions relating to the enterprise's financial and human resource matters are made or are subject to approval by organizations or personnel in the PRC; (iii) the enterprise's primary assets, accounting books and records, company seals, and board and shareholder resolutions, are located or maintained in the PRC; and (iv) at least 50% of voting board members or senior executives habitually reside in the PRC.

We believe that none of our entities outside of China is a PRC resident enterprise for PRC tax purposes. However, the tax resident status of an enterprise is subject to determination by the PRC tax authorities and uncertainties remain with respect to the interpretation of the term "de facto management body." If the PRC tax authorities determine that we are a PRC resident enterprise for enterprise income tax purposes, we will be subject to the enterprise income tax on our global income at the rate of 25% and we will be required to comply with PRC enterprise income tax reporting obligations. In addition, we may be required to withhold a 10% withholding tax from interest or dividends we pay to our shareholders that are non-PRC resident enterprises, including the holders of our ADSs. In addition, non-PRC resident enterprise shareholders (including our ADS holders) may be subject to PRC tax at a rate of 10% on gains realized on the sale or other disposition of our ADSs or ordinary shares, if such income is treated as sourced from within the PRC. Furthermore, if PRC tax authorities determine that we are a PRC resident enterprise for enterprise income tax purposes, interest or dividends paid to our non-PRC individual shareholders (including our ADS holders) and any gain realized on the transfer of the ADSs or ordinary shares by such holders may be subject to PRC tax at a rate of 20% (which, in the case of interest or dividends, may be withheld at source by us), if such gains are deemed to be from PRC sources. These rates may be reduced by an applicable tax treaty, but it is unclear whether our non-PRC shareholders would be able to claim the benefits of any tax treaties between their country of tax residence and the PRC in the event that we are treated as a PRC resident enterprise.

Table of Contents

***We may not be able to obtain certain benefits under relevant tax treaty on dividends paid by our PRC subsidiaries to us through our Hong Kong subsidiary.***

We are a holding company incorporated under the laws of the Cayman Islands and as such rely on dividends and other distributions on equity from our PRC subsidiaries to satisfy part of our liquidity requirements. Pursuant to the PRC Enterprise Income Tax Law, a withholding tax rate of 10% currently applies to dividends paid by a PRC "resident enterprise" to a foreign enterprise investor, unless any such foreign investor's jurisdiction of incorporation has a tax treaty with China that provides for preferential tax treatment. Pursuant to the *Arrangement between Mainland China and the Hong Kong Special Administrative Region for the Avoidance of Double Taxation and Tax Evasion on Income*, such withholding tax rate may be lowered to 5% if a Hong Kong resident enterprise owns no less than 25% of a PRC enterprise. Furthermore, the Administrative Measures for Non-Resident Enterprises to Enjoy Treatments under Treaties, which became effective in January 2020, require non-resident enterprises to determine whether they are qualified to enjoy the preferential tax treatment under the tax treaties and file relevant report and materials with the tax authorities. There are also other conditions for enjoying the reduced withholding tax rate according to other relevant tax rules and regulations. See "Item 10. Additional Information-E. Taxation-People's Republic of China Taxation." As of December 31, 2020, most of our subsidiaries and variable interest entities at that time located in the PRC reported accumulated loss and therefore they had no retained earnings for offshore distribution. In the future, we intend to re-invest all earnings, if any, generated from our PRC subsidiaries for the operation and expansion of our business in China. Should our tax policy change to allow for offshore distribution of our earnings, we would be subject to a significant withholding tax. Our determination regarding our qualification to enjoy the preferential tax treatment could be challenged by the relevant tax authority and we may not be able to complete the necessary filings with the relevant tax authority and enjoy the preferential withholding tax rate of 5% under the arrangement with respect to dividends to be paid by our PRC subsidiaries to our Hong Kong subsidiary.

***We face uncertainty with respect to indirect transfers of equity interests in PRC resident enterprises by their non-PRC holding companies.***

In February 2015, the State Administration of Taxation, or the SAT, issued the *Circular on Issues of Enterprise Income Tax on Indirect Transfers of Assets by Non-PRC Resident Enterprises*, or Circular 7. Circular 7 extends its tax jurisdiction to not only indirect transfers but also transactions involving transfer of other taxable assets, through the offshore transfer of a foreign intermediate holding company. In addition, Circular 7 provides certain criteria on how to assess reasonable commercial purposes and has introduced safe harbors for internal group restructurings and the purchase and sale of equity through a public securities market. Circular 7 also brings challenges to both the foreign transferor and transferee (or other person who is obligated to pay for the transfer) of the taxable assets. Where a non-resident enterprise conducts an "indirect transfer" by transferring the taxable assets indirectly by disposing of the equity interests of an overseas holding company, the non-resident enterprise being the transferor, or the transferee, or the PRC entity which directly owned the taxable assets may report to the relevant tax authority such indirect transfer. Using a "substance over form" principle, the PRC tax authority may disregard the existence of the overseas holding company if it lacks a reasonable commercial purpose and was established for the purpose of reducing, avoiding or deferring PRC tax. As a result, gains derived from such indirect transfer may be subject to PRC enterprise income tax, and the transferee or other person who is obligated to pay for the transfer is obligated to withhold the applicable taxes, currently at a rate of 10% for the transfer of equity interests in a PRC resident enterprise. On October 17, 2017, the SAT issued *Circular on Issues of Tax Withholding regarding Non-PRC Resident Enterprise Income Tax*, or Circular 37, which came into effect on December 1, 2017 and was amended on June 15, 2018. Circular 37 further clarifies the practice and procedure of the withholding of nonresident enterprise income tax.

We face uncertainties on the reporting and consequences of future private equity financing transactions, share exchanges or other transactions involving the transfer of shares in our company by investors that are non-PRC resident enterprises. The PRC tax authorities may pursue such non-PRC resident enterprises with respect to a filing or the transferees with respect to withholding obligations, and request our PRC subsidiaries to assist in the filing. As a result, we and non-PRC resident enterprises in such transactions may become at risk of being subject to filing obligations or being taxed under Circular 7 and Circular 37, and may be required to expend valuable resources to comply with them or to establish that we and our non-PRC resident enterprises should not be taxed under these regulations, which may have a material adverse effect on our financial condition and results of operations.

***If the custodians or authorized users of controlling non-tangible assets of our company, including our corporate chops and seals, fail to fulfill their responsibilities, or misappropriate or misuse these assets, our business and operations could be materially and adversely affected.***

Under PRC law, legal documents for corporate transactions are executed using the chops or seal of the signing entity or with the signature of a legal representative whose designation is registered and filed with the relevant branch of the SAMR.

47

Table of Contents

Although we usually utilize chops to enter into contracts, the designated legal representatives of each of our PRC subsidiaries and variable interest entity have the apparent authority to enter into contracts on behalf of such entities without chops and bind such entities. All designated legal representatives of our PRC subsidiaries and variable interest entity are members of our senior management team who have signed employment agreements with us or our PRC subsidiaries and variable interest entity under which they agree to abide by various duties they owe to us. In order to maintain the physical security of our chops and chops of our PRC entities, we generally store these items in secured locations accessible only by the authorized personnel in the legal or finance department of each of our subsidiaries and variable interest entity. Although we monitor such authorized personnel, there is no assurance such procedures will prevent all instances of abuse or negligence. Accordingly, if any of our authorized personnel misuse or misappropriate our corporate chops or seals, we could encounter difficulties in maintaining control over the relevant entities and experience significant disruption to our operations. If a designated legal representative obtains control of the chops in an effort to obtain control over any of our PRC subsidiaries or variable interest entity, we or our PRC subsidiaries or variable interest entity would need to pass a new shareholders or board resolution to designate a new legal representative and we would need to take legal action to seek the return of the chops, apply for new chops with the relevant authorities, or otherwise seek legal redress for the violation of the representative's fiduciary duties to us, which could involve significant time and resources and divert management attention away from our regular business. In addition, the affected entity may not be able to recover corporate assets that are sold or transferred out of our control in the event of such a misappropriation if a transferee relies on the apparent authority of the representative and acts in good faith.

> ***Our leased property interest or entitlement to other facilities or assets may be defective or subject to lien and our right to lease, own or use the properties affected by such defects or lien challenged, which could cause significant disruption to our business.***

Under PRC laws, all lease agreements are required to be registered with the local housing authorities. We presently lease several premises in China, some of which have not completed the registration of the ownership rights or the registration of our leases with the relevant authorities. Failure to complete these required registrations may expose our landlords, lessors and us to potential monetary fines. If these registrations are not obtained in a timely manner or at all, we may be subject to monetary fines or may have to relocate our offices and incur the associated losses.

Some of the ownership certificates or other similar proof of certain leased properties have not been provided to us by the relevant lessors. Therefore, we cannot assure you that such lessors are entitled to lease the relevant real properties to us. If the lessors are not entitled to lease the real properties to us and the owners of such real properties decline to ratify the lease agreements between us and the respective lessors, we may not be able to enforce our rights to lease such properties under the respective lease agreements against the owners. If our lease agreements are claimed as null and void by third parties who are the real owners of such leased real properties, we could be required to vacate the properties, in the event of which we could only initiate the claim against the lessors under relevant lease agreements for indemnities for their breach of the relevant leasing agreements. In addition, we may not be able to renew our existing lease agreements before their expiration dates, in which case we may be required to vacate the properties. We cannot assure you that suitable alternative locations are readily available on commercially reasonable terms, or at all, and if we are unable to relocate our operations in a timely manner, our operations may be adversely affected.

Some of our PRC subsidiaries have incurred or will incur indebtedness and may, in connection therewith, create mortgage, pledge or other lien over substantive operating assets, facilities or equity interests of certain PRC subsidiaries as guarantee to their repayment of indebtedness or as counter guarantee to third-party guarantors which provide guarantee to our PRC subsidiaries' repayment of indebtedness. In the event that the relevant PRC subsidiaries fail to perform their repayment obligations or such guarantors perform their guarantee obligations, claims may be raised to our substantive operating assets, facilities or equity interests of the PRC subsidiaries in question. If we cannot continue to own or use such assets, facilities or equity interests, our operation may be adversely affected.

**Risks Related to Our ADSs and Our Trading Market**

***The trading prices of our ADSs have fluctuated and may be volatile, which could result in substantial losses to investors.***

The trading price of our ADSs has been volatile and has ranged from a low of US$2.11 to a high of US$57.20 between January 1, 2020 and December 31, 2020. The market price for our ADSs may continue to be volatile and subject to wide fluctuations in response to factors including, but not limited to, the following:

- actual or anticipated fluctuations in our quarterly results of operations and cash flows;

- changes in financial estimates by securities research analysts;

Table of Contents

- conditions in automotive markets;

- changes in the operating performance or market valuations of other automotive companies;

- announcements by us or our competitors of new products, acquisitions, strategic partnerships, joint ventures or capital commitments;

- addition or departure of key personnel;

- fluctuations of exchange rates between RMB and the U.S. dollar;

- litigation, government investigation or other legal or regulatory proceeding;

- release of lock-up and other transfer restrictions on our ADSs, issuance of ADSs or ordinary shares upon conversion of the convertible notes we issued, or any ordinary shares or sales of additional ADSs;

- any actual or alleged illegal acts of our shareholders or management;

- any share repurchase program; and

- general economic or political conditions in China or elsewhere in the world.

Any of these factors may result in large and sudden changes in the volume and price at which our ADSs will trade.

In addition, the stock market in general, and the market prices for companies with operations in China in particular, have experienced volatility that often has been unrelated to the operating performance of such companies. The securities of some China-based companies that have listed their securities in the United States have experienced significant volatility since their initial public offerings in recent years, including, in some cases, substantial declines in the trading prices of their securities. The trading performances of these companies' securities after their offerings may affect the attitudes of investors towards Chinese companies listed in the United States in general, which consequently may impact the trading performance of our ADSs, regardless of our actual operating performance. In addition, any negative news or perceptions about inadequate corporate governance practices or fraudulent accounting, corporate structure or other matters of other Chinese companies may also negatively affect the attitudes of investors towards Chinese companies in general, including us, regardless of whether we have engaged in any inappropriate activities. In particular, the global financial crisis and the ensuing economic recessions in many countries have contributed and may continue to contribute to extreme volatility in the global stock markets. These broad market and industry fluctuations may adversely affect the market price of our ADSs. Volatility or a lack of positive performance in our ADS price may also adversely affect our ability to retain key employees, most of whom have been granted options or other equity incentives.

*If securities or industry analysts do not publish research or reports about our business, or if they adversely change their recommendations regarding our ADSs, the market price for our ADSs and trading volume could decline.*

The trading market for our ADSs will be influenced by research or reports that industry or securities analysts publish about our business. If one or more analysts who cover us downgrade our ADSs, the market price for our ADSs would likely decline. If one or more of these analysts cease to cover us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause the market price or trading volume for our ADSs to decline.

Table of Contents

***Our triple-class voting structure will limit the holders of our Class A ordinary shares and ADSs to influence corporate matters, provide certain shareholders of ours with substantial influence and could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial.***

We have adopted a triple-class voting structure such that our ordinary shares consist of Class A ordinary shares, Class B ordinary shares and Class C ordinary shares. Holders of Class A ordinary shares, Class B ordinary shares and Class C ordinary shares have the same rights other than voting and conversion rights. Each holder of our Class A ordinary shares is entitled to one vote per share, each holder of our Class B ordinary shares is entitled to four votes per share and each holder of our Class C ordinary shares is entitled to eight votes per share on all matters submitted to them for a vote. Our Class A ordinary shares, Class B ordinary shares and Class C ordinary shares vote together as a single class on all matters submitted to a vote of our shareholders, except as may otherwise be required by law. Each Class B ordinary share or Class C ordinary share is convertible into one Class A ordinary share, whereas Class A ordinary shares are not convertible into Class B ordinary shares or Class C ordinary shares under any circumstances. Upon any transfer of Class B ordinary shares or Class C ordinary shares by a holder thereof to any person or entity which is not an affiliate of such holder, such Class B ordinary shares or Class C ordinary shares are automatically and immediately converted into the equal number of Class A ordinary shares.

As of the date of this annual report, Mr. Bin Li, our chairman and chief executive officer, together with his affiliates, beneficially own all of our issued Class C ordinary shares. The Tencent entities beneficially owned all of our issued Class B ordinary shares. Due to the disparate voting powers associated with our triple classes of ordinary shares, Mr. Li has considerable influence over important corporate matters. As of February 28, 2021, Mr. Li beneficially owned 39.3% of the aggregate voting power of our company through mobike Global Ltd. and Originalwish Limited, companies wholly owned by Mr. Li, and through NIO Users Limited, a holding company ultimately controlled by Mr. Li, whereas Tencent entities beneficially owned 17.5% of the aggregate voting power of our company through Mount Putuo Investment Limited, Image Frame Investment (HK) Limited, Huang River Investment Limited and a wholly-owned subsidiary of Tencent Holding limited. Mr. Li has considerable influence over matters requiring shareholder approval, including electing directors and approving material mergers, acquisitions or other business combination transactions. This concentrated control will limit the ability of the holders of our Class A ordinary shares and ADSs to influence corporate matters and could also discourage others from pursuing any potential merger, takeover or other change of control transaction, which could have the effect of depriving the holders of our Class A ordinary shares and our ADSs of the opportunity to sell their shares at a premium over the prevailing market price. Moreover, Mr. Li may increase the concentration of his voting power and/or share ownership in the future, which may, among other consequences, decrease the liquidity in our ADSs.

***Techniques employed by short sellers may drive down the market price of our ADSs.***

Short selling is the practice of selling securities that the seller does not own but rather has borrowed from a third party with the intention of buying identical securities back at a later date to return to the lender. The short seller hopes to profit from a decline in the value of the securities between the sale of the borrowed securities and the purchase of the replacement shares, as the short seller expects to pay less in that purchase than it received in the sale. As it is in the short seller's interest for the price of the security to decline, many short sellers publish, or arrange for the publication of, negative opinions regarding the relevant issuer and its business prospects in order to create negative market momentum and generate profits for themselves after selling a security short. These short attacks have, in the past, led to selling of shares in the market.

Public companies listed in the United States that have a substantial majority of their operations in China have been the subject of short selling. Much of the scrutiny and negative publicity has centered on allegations of a lack of effective internal control over financial reporting resulting in financial and accounting irregularities and mistakes, inadequate corporate governance policies or a lack of adherence thereto and, in many cases, allegations of fraud. As a result, many of these companies are now conducting internal and external investigations into the allegations and, in the interim, are subject to shareholder lawsuits and/or SEC enforcement actions.

We may be the subject of unfavorable allegations made by short sellers in the future. Any such allegations may be followed by periods of instability in the market price of our common shares and ADSs and negative publicity. If and when we become the subject of any unfavorable allegations, whether such allegations are proven to be true or untrue, we could have to expend a significant amount of resources to investigate such allegations and/or defend ourselves. While we would strongly defend against any such short seller attacks, we may be constrained in the manner in which we can proceed against the relevant short seller by principles of freedom of speech, applicable federal or state law or issues of commercial confidentiality. Such a situation could be costly and time-consuming and could distract our management from growing our business. Even if such allegations are ultimately proven to be groundless, allegations against us could severely impact our business operations and shareholders' equity, and the value of any investment in our ADSs could be greatly reduced or rendered worthless.

50

Table of Contents

***The sale or availability for sale of substantial amounts of our ADSs could adversely affect their market price.***

Sales of substantial amounts of our ADSs in the public market, or the perception that these sales could occur, could adversely affect the market price of our ADSs and could materially impair our ability to raise capital through equity offerings in the future. We cannot predict what effect, if any, market sales of securities held by our significant shareholders or any other shareholder or the availability of these securities for future sale will have on the market price of our ADSs. In addition, certain holders of our existing shareholders are entitled to certain registration rights, including demand registration rights, piggyback registration rights, and Form F-3 or Form S-3 registration rights. Registration of these shares under the Securities Act of 1933, or the Securities Act, would result in these shares becoming freely tradable without restriction under the Securities Act immediately upon the effectiveness of the registration. Sales of these registered shares in the public market, or the perception that such sales could occur, could cause the price of our ADSs to decline.

***Because we do not expect to pay dividends in the foreseeable future, the holders of our ADSs must rely on price appreciation of our ADSs for return on their investment.***

We currently intend to retain most, if not all, of our available funds and any future earnings to fund the development and growth of our business. As a result, we do not expect to pay any cash dividends in the foreseeable future. Therefore, you should not rely on an investment in our ADSs as a source for any future dividend income.

Our board of directors has complete discretion as to whether to distribute dividends. Even if our board of directors decides to declare and pay dividends, the timing, amount and form of future dividends, if any, will depend on our future results of operations and cash flow, our capital requirements and surplus, the amount of distributions, if any, received by us from our subsidiaries, our financial condition, contractual restrictions and other factors deemed relevant by our board of directors. Accordingly, the return to ADS holders will likely depend entirely upon any future price appreciation of our ADSs. There is no guarantee that our ADSs will appreciate in value or even maintain the price at which ADS holders purchased the ADSs. Our ADS holders may not realize a return on their investment in our ADSs and they may even lose their entire investment in our ADSs.

***The capped call and zero-strike call transactions may affect the value of our ADSs.***

On January 30, 2019, in connection with the pricing of the 2024 Notes, we entered into capped call transactions with one or more of the initial purchasers and/or their respective affiliates and/or other financial institutions, or the Capped Call Option Counterparties. We entered into additional capped call transactions with the Capped Call Option Counterparties on February 15, 2019 and February 26, 2019, respectively. We used a portion of the net proceeds of the 2024 Notes to pay the cost of such transactions. The cap price of these capped call transactions is initially US$14.92 per ADS, representing a premium of approximately 100% to the closing price on the New York Stock Exchange, or NYSE, of our ADSs on January 30, 2019, which was US$7.46 per ADS, and is subject to adjustment under the terms of the capped call transactions. As part of establishing their initial hedges of the capped call transactions, the Capped Call Option Counterparties or their respective affiliates expect to trade the ADSs and/or enter into various derivative transactions with respect to our ADSs concurrently with, or shortly after, the pricing of the 2024 Notes. This activity could increase (or reduce the size of any decrease in) the market price of the ADSs or the 2024 Notes at that time. However, if any such capped call transactions fail to become effective, the Capped Call Option Counterparties may unwind their hedge positions with respect to the ADSs, which could adversely affect the market price of the ADSs. In addition, the Capped Call Option Counterparties or their respective affiliates may modify their hedge positions by entering into or unwinding various derivative transactions with respect to the ADSs, the 2024 Notes or our other securities and/or by purchasing or selling the ADSs, the 2024 Notes or our other securities in secondary market transactions following the pricing of the 2024 Notes and prior to the maturity of the 2024 Notes (and are likely to do so following any conversion of the 2024 Notes, if we exercise the relevant election under the capped call transactions, or repurchase of the 2024 Notes by us). This activity could also cause or avoid an increase or a decrease in the market price of our ADSs.

51

Table of Contents

On January 30, 2019, in connection with the pricing of the 2024 Notes, we also entered into privately negotiated zero-strike call option transactions with one or more of the initial purchasers or their respective affiliates, or the Zero-Strike Call Option Counterparties, and used a portion of the net proceeds of the 2024 Notes to pay the aggregate premium under such transactions. Pursuant to the zero-strike call option transactions, we purchased, in the aggregate, approximately 26.8 million ADSs, with delivery thereof (subject to adjustment) by the respective Zero-Strike Call Option Counterparties at settlement shortly after the scheduled maturity date of the 2024 Notes, subject to the ability of each Zero-Strike Call Option Counterparty to elect to settle all or a portion of the respective zero-strike option transaction early. Facilitating investors' hedge positions by entering into the zero-strike call option transactions, particularly if investors purchase the ADSs on or around the day of the pricing of the 2024 Notes, could increase (or reduce the size of any decrease in) the market price of the ADSs. However, if any zero-strike call option transactions fail to become effective, the respective Zero-Strike Call Option Counterparties may unwind their hedge positions with respect to the ADSs, which could adversely affect the market price of the ADSs. In addition, the Zero-Strike Call Option Counterparties or their respective affiliates may modify their respective hedge positions by entering into or unwinding one or more derivative transactions with respect to the ADSs, the 2024 Notes or our other securities and/or by purchasing or selling the ADSs, the 2024 Notes or our other securities in secondary market transactions at any time, including following the pricing of the 2024 Notes and prior to the maturity of the 2024 Notes. This activity could also cause or avoid an increase or a decrease in the market price of the ADSs.

Shortly after the pricing of the 2026 Notes and 2027 Notes in January 2021, we entered into separate and individually privately negotiated agreements with certain holders of our outstanding 2024 Notes to exchange approximately US$581.7 million principal amount of the outstanding 2024 Notes for our ADSs (each, a "2024 Notes Exchange" and collectively, the "2024 Notes Exchanges"). The 2024 Notes Exchanges closed on January 15, 2021. In connection with the 2024 Notes Exchanges, we also entered into agreements with certain financial institutions that are parties to our existing capped call transactions we entered into in connection with the issuance of the 2024 Notes shortly after the pricing of the 2026 Notes and 2027 Notes to terminate a portion of the relevant existing capped call transactions in a notional amount corresponding to the portion of the principal amount of such 2024 Notes exchanged. In connection with such terminations of the existing capped call transactions, we received deliveries of the ADSs in such amounts as specified pursuant to such termination agreements on January 15, 2021. The remaining capped call transactions are subject to the same risks as described above. Shortly after the consummation of the 2024 Notes Exchanges, we also terminated a portion of the zero-strike call option transactions (which we had entered into in February 2019 in connection with the issuance of the 2024 Notes).

***We are subject to counterparty risk with respect to the capped call and the zero-strike call transactions.***

The counterparties to the capped call transactions and the zero-strike call transactions we entered into in connection with the issuance of the 2024 Notes are financial institutions or affiliates of financial institutions, and we are subject to the risk that each of these counterparties may default or otherwise fail to perform, or may exercise certain rights to terminate, their obligations under the capped call transactions or the zero-strike call transactions, as the case may be. Our exposure to the credit risk of the counterparties under the capped call transactions and the zero-strike call transactions will not be secured by any collateral. If any such counterparty becomes subject to bankruptcy or other insolvency proceedings, we will become an unsecured creditor in those proceedings with a claim equal to our exposure at that time under our transactions with them. In each case, our exposure will depend on many factors. Generally, the increase in our exposure will be positively correlated to the increase in the market price and in the volatility of our ADSs. In addition, as a result of a default or other failure to perform, or a termination of obligations, by any counterparty to the capped call transactions or zero-strike call transactions, we may suffer more dilution than we currently anticipate with respect to our ADSs and the underlying Class A ordinary shares. We can provide no assurances as to the financial stability or viability of any option counterparty under the capped call transactions or the zero-strike call transactions.

***There can be no assurance that we will not be classified as a passive foreign investment company, or PFIC, for U.S. federal income tax purposes for any taxable year, which could result in adverse U.S. federal income tax consequences to U.S. holders of our ADSs or Class A ordinary shares.***

A non-U.S. corporation, such as our company, will be classified as a passive foreign investment company, or PFIC, for U.S. federal income tax purposes for any taxable year if either (i) 75% or more of its gross income for such year consists of certain types of "passive" income; or (ii) 50% or more of the value of its assets (generally determined on the basis of a quarterly average) during such year is attributable to assets that produce or are held for the production of passive income.

52

Table of Contents

Although the law in this regard is not entirely clear, we treat our VIEs as being owned by us for U.S. federal income tax purposes because we control their management decisions and are entitled to substantially all of the economic benefits associated with these entities, and as a result, we consolidate their results of operations in our consolidated U.S. GAAP financial statements. If it were determined, however, that we do not own the VIEs for U.S. federal income tax purposes, we may be treated as a PFIC for the current taxable year and any subsequent taxable year.

Assuming that we are the owner of our VIEs for U.S. federal income tax purposes, and based upon our current and expected income and assets, we do not believe that we were a PFIC for the taxable year ended December 31, 2020 and we do not expect to be a PFIC for the current taxable year or the foreseeable future. While we do not expect to be or become a PFIC in the current or foreseeable taxable years, no assurance can be given in this regard because the determination of whether we will be or become a PFIC is a factual determination made annually that will depend, in part, upon the nature and composition of our income and assets. Fluctuations in the market price of our ADSs may cause us to be classified as a PFIC for the current or future taxable years because the value of our assets for purposes of the asset test, including the value of our goodwill and other unbooked intangibles, may be determined by reference to the market price of our ADSs, which may be volatile. Furthermore, the composition of our income and assets may also be affected by how, and how quickly, we use our liquid assets.

If we were to be or become a PFIC for any taxable year during which a U.S. Holder (as defined in "Item 10-Additional Information-E. Taxation--United States Federal Income Taxation") holds our ADSs or Class A ordinary shares, certain adverse U.S. federal income tax consequences could apply to such U.S. Holder. See "Item 10-Additional Information--E. Taxation--United States Federal Income Taxation."

### Our memorandum and articles of association contain anti-takeover provisions that could have a material adverse effect on the rights of holders of our Class A ordinary shares and ADSs.

Our eleventh amended and restated memorandum and articles of association contain provisions that have the potential to limit the ability of others to acquire control of our company or cause us to engage in change-of-control transactions. These provisions could have the effect of depriving our shareholders of an opportunity to sell their shares at a premium over prevailing market prices by discouraging third parties from seeking to obtain control of our company in a tender offer or similar transaction. Our board of directors has the authority, without further action by our shareholders, to issue preferred shares in one or more series and to fix their designations, powers, preferences, privileges, and relative participating, optional or special rights and the qualifications, limitations or restrictions, including dividend rights, conversion rights, voting rights, rights and terms of redemption and liquidation preferences, any or all of which may be greater than the rights associated with our ordinary shares, in the form of ADS or otherwise. Preferred shares could be issued quickly with terms calculated to delay or prevent a change in control of our company or make removal of management more difficult. If our board of directors decides to issue preferred shares, the price of our ADSs may fall and the voting and other rights of the holders of our Class A ordinary shares and ADSs may be materially and adversely affected.

### Our shareholders may face difficulties in protecting their interests, and ability to protect their rights through U.S. courts may be limited, because we are incorporated under Cayman Islands law.

We are an exempted company incorporated under the laws of the Cayman Islands. Our corporate affairs are governed by our eleventh amended and restated memorandum and articles of association, the Companies Act (As Revised) of the Cayman Islands and the common law of the Cayman Islands. The rights of shareholders to take action against the directors, actions by minority shareholders and the fiduciary responsibilities of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from the common law of England, the decisions of whose courts are of persuasive authority, but are not binding, on a court in the Cayman Islands. The rights of our shareholders and the fiduciary responsibilities of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands has a less developed body of securities laws than the United States. Some U.S. states, such as Delaware, have more fully developed and judicially interpreted bodies of corporate law than the Cayman Islands. In addition, Cayman Islands companies may not have standing to initiate a shareholder derivative action in a federal court of the United States.

53

Table of Contents

Shareholders of Cayman Islands exempted companies like us have no general rights under Cayman Islands law to inspect corporate records (except for our memorandum and articles of association and our register of mortgages and charges) or to obtain copies of lists of shareholders of these companies. Our directors have discretion under our articles of association to determine whether or not, and under what conditions, our corporate records may be inspected by our shareholders, but are not obliged to make them available to our shareholders. This may make it more difficult for our shareholders to obtain the information needed to establish any facts necessary for a shareholder motion or to solicit proxies from other shareholders in connection with a proxy contest.

As a Cayman Islands company listed on the New York Stock Exchange, we are subject to the NYSE corporate governance listing standards. However, the NYSE corporate governance listing standards permit a foreign private issuer like us to follow the corporate governance practices of its home country. Certain corporate governance practices in the Cayman Islands, which is our home country, may differ significantly from the NYSE corporate governance listing standards.

Pursuant to Sections 303A.01, 303A.04, 303A.05, 303A.07 and 302.00 of the New York Stock Exchange Listed Company Manual, a company listed on the New York Stock Exchange must have a majority of independent directors, a nominating and corporate governance committee composed entirely of independent directors, a compensation committee composed entirely of independent directors and an audit committee with a minimum of three members, and must hold an annual shareholders' meeting during each fiscal year. We currently follow our home country practice in lieu of these requirements. We may also continue to rely on these and other exemptions available to foreign private issuers in the future, and to the extent that we choose to do so in the future, our shareholders may be afforded less protection than they otherwise would under the NYSE corporate governance listing standards applicable to U.S. domestic issuers. As a result, you may not be afforded the same protections or information, which would be made available to you, were you investing in a United States domestic issuer.

*It may be difficult for overseas regulators to conduct investigations or collect evidence within China.*

Shareholder claims or regulatory investigation that are common in the United States generally are difficult to pursue as a matter of law or practicality in China. For example, in China, there are significant legal and other obstacles to providing information needed for regulatory investigations or litigation initiated outside China. Although the authorities in China may establish a regulatory cooperation mechanism with the securities regulatory authorities of another country or region to implement cross-border supervision and administration, such cooperation with the securities regulatory authorities in the Unities States may not be efficient in the absence of mutual and practical cooperation mechanism. Furthermore, according to Article 177 of the PRC Securities Law, or Article 177, which became effective in March 2020, no overseas securities regulator is allowed to directly conduct investigations or evidence collection activities within the territory of the PRC. While detailed interpretation of or implementation rules under Article 177 have yet to be promulgated, the inability for an overseas securities regulator to directly conduct investigations or evidence collection activities within China may further increase difficulties faced by you in protecting your interests.

*ADS holders may not be entitled to a jury trial with respect to claims arising under the deposit agreements, which could result in less favorable outcomes to the plaintiff(s) in any such action.*

The deposit agreement governing the ADSs representing our Class A ordinary shares provides that, subject to the depositary's right to require a claim to be submitted to arbitration, the federal or state courts in the City of New York have exclusive jurisdiction to hear and determine claims arising under the deposit agreement and in that regard, to the fullest extent permitted by law, ADS holders waive the right to a jury trial of any claim they may have against us or the depositary arising out of or relating to our Class A ordinary shares, the ADSs or the deposit agreement, including any claim under the U.S. federal securities laws.

If we or the depositary opposed a jury trial demand based on the waiver, the court would determine whether the waiver was enforceable based on the facts and circumstances of that case in accordance with the applicable state and federal law. To our knowledge, the enforceability of a contractual pre-dispute jury trial waiver in connection with claims arising under the federal securities laws has not been finally adjudicated by the United States Supreme Court. However, we believe that a contractual pre-dispute jury trial waiver provision is generally enforceable, including under the laws of the State of New York, which govern the deposit agreement. In determining whether to enforce a contractual pre-dispute jury trial waiver provision, courts will generally consider whether a party knowingly, intelligently and voluntarily waived the right to a jury trial. We believe that this is the case with respect to the deposit agreement and the ADSs. It is advisable that you consult legal counsel regarding the jury waiver provision before investing in the ADSs.

Table of Contents

If any of the holders or beneficial owners of ADSs bring a claim against us or the depositary in connection with matters arising under the deposit agreement or the ADSs, including claims under federal securities laws, such holder or beneficial owner may not be entitled to a jury trial with respect to such claims, which may have the effect of limiting and discouraging lawsuits against us and/or the depositary, lead to increased costs to bring a claim, limited access to information and other imbalances of resources between such holder and us, or limit such holder's ability to bring a claim in a judicial forum that such holder finds favorable. If a lawsuit is brought against us and/or the depositary under the deposit agreement, it may be heard only by a judge or justice of the applicable trial court, which would be conducted according to different civil procedures and may result in different outcomes than a trial by jury would have had, including results that could be less favorable to the plaintiff(s) in any such action.

Nevertheless, if this jury trial waiver provision is not enforced, to the extent a court action proceeds, it would proceed under the terms of the deposit agreement with a jury trial. No condition, stipulation or provision of the deposit agreement or ADSs shall relieve us or the depositary from our respective obligations to comply with the Securities Act and the Exchange Act nor serve as a waiver by any holder or beneficial owner of ADSs of compliance with the U.S. federal securities laws and the rules and regulations promulgated thereunder.

### *Certain judgments obtained against us by our shareholders may not be enforceable.*

We are a Cayman Islands exempted company and the majority of our assets are located outside of the United States. The most significant portion of our operations are conducted in China. In addition, a majority of our current directors and officers are nationals and residents of countries other than the United States. Substantially all of the assets of these persons may be located outside the United States. As a result, it may be difficult or impossible for our shareholders to bring an action against us or against these individuals in the United States in the event that such shareholders believe that their rights have been infringed under the U.S. federal securities laws or otherwise. Even if such shareholders are successful in bringing an action of this kind, the laws of the Cayman Islands and of China may render them unable to enforce a judgment against our assets or the assets of our directors and officers.

### *We are a foreign private issuer within the meaning of the rules under the Exchange Act, and as such we are exempt from certain provisions applicable to United States domestic public companies.*

Because we are a foreign private issuer under the Exchange Act, we are exempt from certain provisions of the securities rules and regulations in the United States that are applicable to U.S. domestic issuers, including:

- the rules under the Exchange Act requiring the filing of quarterly reports on Form 10-Q or current reports on Form 8-K with the SEC;

- the sections of the Exchange Act regulating the solicitation of proxies, consents, or authorizations in respect of a security registered under the Exchange Act;

- the sections of the Exchange Act requiring insiders to file public reports of their stock ownership and trading activities and liability for insiders who profit from trades made in a short period of time; and

- the selective disclosure rules by issuers of material nonpublic information under Regulation FD.

We are required to file an annual report on Form 20-F within four months of the end of each fiscal year. In addition, we intend to publish our results on a quarterly basis through press releases, distributed pursuant to the rules and regulations of the New York Stock Exchange. Press releases relating to financial results and material events will also be furnished to the SEC on Form 6-K. However, the information we are required to file with or furnish to the SEC will be less extensive and less timely than that required to be filed with the SEC by U.S. domestic issuers. As a result, you may not be afforded the same protections or information that would be made available to you were you investing in a U.S. domestic issuer.

55

Table of Contents

***The voting rights of holders of ADSs are limited by the terms of the deposit agreement, and they may not be able to exercise their right to vote their Class A ordinary shares.***

Holders of our ADSs will only be able to exercise the voting rights with respect to the underlying Class A ordinary shares in accordance with the provisions of the deposit agreement, dated as of September 11, 2018 by and among NIO Inc., Deutsche Bank Trust Company Americas, as ADS depositary, and the holders and beneficial owners of the ADSs issued thereunder and the deposit agreement for restricted securities, dated as of February 4, 2019 by and among NIO Inc., Deutsche Bank Trust Company Americas, as depositary, and the holders and beneficial owners of the restricted ADSs issued thereunder (each, as the context requires and applicable to a particular ADS holder, the "deposit agreement"). Under the deposit agreement, ADS holders must vote by giving voting instructions to the depositary. If we ask for instructions of ADS holders, then upon receipt of such voting instructions, the depositary will try to vote the underlying Class A ordinary shares in accordance with these instructions. If we do not instruct the depositary to ask for instructions of ADS holders, the depositary may still vote in accordance with instructions given by holders of ADSs, but it is not required to do so. ADS holders will not be able to directly exercise their right to vote with respect to the underlying shares unless they withdraw the shares. When a general meeting is convened, an ADS holder may not receive sufficient advance notice to withdraw the shares underlying his or her ADSs to allow such holder to vote with respect to any specific matter. If we ask for instructions of holders of ADSs, the depositary will notify ADS holders of the upcoming vote and will arrange to deliver our voting materials to ADS holders. We have agreed to give the depositary at least 30 days' prior notice of shareholders' meetings. Nevertheless, we cannot assure you that ADS holders will receive the voting materials in time to ensure that ADS holders can instruct the depositary to vote their shares. In addition, the depositary and its agents are not responsible for failing to carry out voting instructions or for their manner of carrying out ADS holders' voting instructions. This means that an ADS holder may not be able to exercise the right to vote and may have no legal remedy if the shares underlying his or her ADSs are not voted as such holder requested.

***The depositary for our ADSs will give us a discretionary proxy to vote our Class A ordinary shares underlying the ADSs if the holders of such ADSs do not vote at shareholders' meetings, except in limited circumstances, which could adversely affect the interests of our ADS holders.***

Under the deposit agreement for the ADSs, if any holder of the ADSs does not vote, the depositary will give us a discretionary proxy to vote our Class A ordinary shares underlying such ADSs at shareholders' meetings unless:

- we have failed to timely provide the depositary with notice of meeting and related voting materials;

- we have instructed the depositary that we do not wish a discretionary proxy to be given;

- we have informed the depositary that there is substantial opposition as to a matter to be voted on at the meeting;

- a matter to be voted on at the meeting would have a material adverse impact on shareholders; or

- the voting at the meeting is to be made on a show of hands.

The effect of this discretionary proxy is that if any such holder of the ADSs does not vote at shareholders' meetings, such holder cannot prevent our Class A ordinary shares underlying such ADSs from being voted, except under the circumstances described above. This may make it more difficult for shareholders to influence the management of our company. Holders of our Class A ordinary shares are not subject to this discretionary proxy.

***An ADS holder's right to pursue claims against the depositary is limited by the terms of the deposit agreement.***

Under the deposit agreement, any action or proceeding against or involving the depositary, arising out of or based upon the deposit agreement or the transactions contemplated thereby or by virtue of owning the ADSs may only be instituted in a state or federal court in New York, New York, and a holder of our ADSs, will have irrevocably waived any objection which such holder may have to the laying of venue of any such proceeding, and irrevocably submitted to the exclusive jurisdiction of such courts in any such action or proceeding. However, there is uncertainty as to whether a court would enforce this exclusive jurisdiction provision. Furthermore, investors cannot waive compliance with the U.S. federal securities laws and rules and regulations promulgated thereunder.

56

Table of Contents

The depositary may, in its sole discretion, require that any dispute or difference arising from the relationship created by the deposit agreement be referred to and finally settled by an arbitration conducted under the terms described in the deposit agreement, although the arbitration provisions do not preclude an ADS holder from pursuing claims under the Securities Act or the Exchange Act in state or federal courts. Furthermore, if an ADS holder is unsuccessful in such arbitration, such holder may be responsible for the fees of the arbitrator and other costs incurred by the parties in connection with such arbitration pursuant to the deposit agreement. Also, we may amend or terminate the deposit agreement without the consent of any ADS holder. If an ADS holder continues to hold its ADSs after an amendment to the deposit agreement, such holder agrees to be bound by the deposit agreement as amended.

### *Our ADS holders may not receive dividends or other distributions on our Class A ordinary shares and the ADS holders may not receive any value for them, if it is illegal or impractical to make them available to the ADS holders.*

The depositary of our ADSs has agreed to pay the ADS holders the cash dividends or other distributions it or the custodian receives on Class A ordinary shares or other deposited securities underlying our ADSs, after deducting its fees and expenses. Our ADS holders will receive these distributions in proportion to the number of Class A ordinary shares the underlying ADSs represent. However, the depositary is not responsible if it decides that it is unlawful or impractical to make a distribution available to any holders of ADSs. For example, it would be unlawful to make a distribution to a holder of ADSs if it consists of securities that require registration under the Securities Act but that are not properly registered or distributed under an applicable exemption from registration. The depositary may also determine that it is not feasible to distribute certain property through the mail. Additionally, the value of certain distributions may be less than the cost of mailing them. In these cases, the depositary may determine not to distribute such property. We have no obligation to register under U.S. securities laws any ADSs, Class A ordinary shares, rights or other securities received through such distributions. We also have no obligation to take any other action to permit the distribution of ADSs, Class A ordinary shares, rights or anything else to holders of ADSs. This means that our ADS holders may not receive distributions we make on our Class A ordinary shares or any value for them if it is illegal or impractical for us to make them available to the ADS holders. These restrictions may cause a material decline in the value of our ADSs.

### *Our ADS holders may experience dilution of their holdings due to inability to participate in rights offerings.*

We may, from time to time, distribute rights to our shareholders, including rights to acquire securities. Under the deposit agreement, the depositary will not distribute rights to holders of ADSs unless the distribution and sale of rights and the securities to which these rights relate are either exempt from registration under the Securities Act with respect to all holders of ADSs or are registered under the provisions of the Securities Act. The depositary may, but is not required to, attempt to sell these undistributed rights to third parties, and may allow the rights to lapse. We may be unable to establish an exemption from registration under the Securities Act, and we are under no obligation to file a registration statement with respect to these rights or underlying securities or to endeavor to have a registration statement declared effective. Accordingly, holders of ADSs may be unable to participate in our rights offerings and may experience dilution of their holdings as a result.

### *We may need additional capital, and the sale of additional ADSs or other equity securities could result in additional dilution to our shareholders, and the incurrence of additional indebtedness could increase our debt service obligations.*

We may require additional cash resources due to changed business conditions, strategic acquisitions or other future developments. If these resources are insufficient to satisfy our cash requirements, we may seek to sell additional equity or debt securities or obtain additional credit facilities. The sale of additional equity and equity-linked securities could result in additional dilution to our shareholders. The sale of substantial amounts of our ADSs (including upon conversion of our convertible notes) could dilute the interests of our shareholders and ADS holders and adversely impact the market price of our ADSs. The incurrence of indebtedness would result in increased debt service obligations and could result in operating and financing covenants that would restrict our operations. We cannot assure you that financing will be available in amounts or on terms acceptable to us, if at all.

57

Table of Contents

***Future sales or issuances, or perceived future sales or issuances, of substantial amounts of our ordinary shares or ADSs could adversely affect the price of our ADS.***

If our existing shareholders sell, or are perceived as intending to sell, substantial amounts of our ordinary shares or ADSs, including those issued upon the exercise of our outstanding stock options, the market price of our ADSs could fall. Such sales, or perceived potential sales, by our existing shareholders might make it more difficult for us to issue new equity or equity-related securities in the future at a time and place we deem appropriate. Shares held by our existing shareholders may be sold in the public market in the future subject to the restrictions contained in Rule 144 and Rule 701 under the Securities Act and the applicable lock-up agreements. If any existing shareholder or shareholders sell a substantial amount of ordinary shares after the expiration of the applicable lock-up periods, the prevailing market price for our ADSs could be adversely affected.

In addition, certain of our shareholders or their transferees and assignees will have the right to cause us to register the sale of their shares under the Securities Act upon the occurrence of certain circumstances. Registration of these shares under the Securities Act would result in these shares becoming freely tradable without restriction under the Securities Act immediately upon the effectiveness of the registration.

***Our ADS holders may be subject to limitations on transfer of their ADSs.***

Our ADSs are transferable on the books of the depositary. However, the depositary may close its books at any time or from time to time when it deems expedient in connection with the performance of its duties. The depositary may close its books from time to time for a number of reasons, including in connection with corporate events such as a rights offering, during which time the depositary needs to maintain an exact number of ADS holders on its books for a specified period. The depositary may also close its books in emergencies, and on weekends and public holidays. The depositary may refuse to deliver, transfer or register transfers of our ADSs generally when our share register or the books of the depositary are closed, or at any time if we or the depositary thinks it is advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

***We incur increased costs as a result of being a public company.***

As a public company, we incur significant accounting, legal and other expenses that we did not incur as a private company. The Sarbanes-Oxley Act, as well as rules subsequently implemented by the SEC and the New York Stock Exchange, have detailed requirements concerning corporate governance practices of public companies, including Section 404 of the Sarbanes-Oxley Act relating to internal controls over financial reporting. We expect these rules and regulations applicable to public companies to increase our accounting, legal and financial compliance costs and to make certain corporate activities more time-consuming and costly. Our management will be required to devote substantial time and attention to our public company reporting obligations and other compliance matters. We are currently evaluating and monitoring developments with respect to these rules and regulations, and we cannot predict or estimate the amount of additional costs we may incur or the timing of such costs. Our reporting and other compliance obligations as a public company may place a strain on our management, operational and financial resources and systems for the foreseeable future.

In the past, shareholders of a public company often brought securities class action suits against the company following periods of instability in the market price of that company's securities. If we were involved in a class action suit, it could divert a significant amount of our management's attention and other resources from our business and operations, which could harm our results of operations and require us to incur significant expenses to defend the suit. Any such class action suit, whether or not successful, could harm our reputation and restrict our ability to raise capital in the future. In addition, if a claim is successfully made against us, we may be required to pay significant damages, which could have a material and adverse effect on our financial condition and results of operations.

Table of Contents

**ITEM 4. INFORMATION ON THE COMPANY**

**A. History and Development of the Company**

We were founded in November 2014, as Nextev Inc., which was changed to our current name NIO Inc. in July 2017. Significant milestones in our development in 2020 and 2021 include the following:

- In February and March 2020, we issued and sold convertible notes in an aggregate principal amount of US$435 million due 2021, or the 2021 Notes, to several unaffiliated Asia based investment funds. The 2021 Notes bear zero interest. The holders of the 2021 Notes issued in February 2020 have the right to convert either all or part of the principal amount of the 2021 Notes into Class A ordinary shares (or ADSs) of our company, prior to maturity, (a) from the date that is six months after the issuance date, at a conversion price of US$3.07 per ADS, or (b) upon the completion of a bona fide issuance of equity securities of our company for fundraising purposes, at the conversion price derived from such equity financing. The holders of the 2021 Notes issued in March 2020 have the right to convert either all or part of the principal amount of the 2021 Notes into Class A ordinary shares (or ADSs) of our company, prior to maturity and from September 5, 2020, at a conversion price of US$3.50 per ADS, subject to certain adjustments. As of December 31, 2020, all of the 2021 Notes have been converted to ADSs.

- In February 2020, we entered into a collaboration framework agreement with the municipal government of Hefei, Anhui province, where our main manufacturing hub is located. Subsequently from April to June 2020, we entered into the Hefei Agreements with the Hefei Strategic Investors for investments in NIO China. Under the Hefei Agreements, the Hefei Strategic Investors agreed to invest an aggregate of RMB7 billion in cash into NIO China. We agreed to inject the Asset Consideration, valued at RMB17.77 billion in total, into NIO China, and invest RMB4.26 billion in cash into NIO China. Subsequent to the entry into the Hefei Agreements, the cash contribution obligations of us and the Hefei Strategic Partners have all been fulfilled and we have exercised our redemption right and capital increase right, pursuant to which in September 2020, we, through one of our wholly-owned subsidiaries, redeemed 8.612% equity interests in NIO China from one of the Hefei Strategic Investors and subscribed for certain newly increased registered capital to increase our shareholding in NIO China. In addition, in February 2021, we, through one of our wholly-owned subsidiaries, purchased from two of the Hefei Strategic Investors an aggregate of 3.305% equity interests in NIO China and subscribed for certain newly increased registered capital of NIO China. As a result of these transactions, as of the date of this annual report, the registered capital of NIO China is approximately RMB6.167 billion, and we hold 90.360% controlling equity interests in NIO China. We are fulfilling our other obligations, including injecting the Asset Consideration into NIO China, in accordance with the Hefei Agreements. For more information, see "Item 4. Information on the Company-B. Business Overview-Certain Other Cooperation Arrangements-Hefei Strategic Investors" included elsewhere in this annual report.

- In March 2020, we entered into a manufacturing cooperation agreement with JAC for the manufacture of EC6. Pursuant to the agreement, we pay JAC manufacturing fees on a per-vehicle basis monthly. We are responsible for investment in new technical equipment and ancillary facilities necessary for satisfactory production of the EC6 in the new energy automobile manufacturing plant established by JAC. If such manufacturing plant incurs any loss, we will make up such loss to JAC on a monthly basis.

- In June 2020, we completed a registered follow-on offering of 82,800,000 ADSs at a public offering price of US$5.95 per ADS, which included the full exercise by the underwriters of their option to purchase additional ADSs, and raised US$475.1 million in net proceeds after deducting underwriting commissions and discounts and the offering expenses payable by us.

59

Table of Contents

- In August 2020, joined by Contemporary Amperex Technology Co., Limited, or CATL, Hubei Science Technology Investment Group Co., Ltd. and a subsidiary of Guotai Junan International Holdings Limited (collectively referred to as the Battery Asset Company Investors in this annual report), we established Wuhan Weineng Battery Asset Co., Ltd., or the Battery Asset Company. We and the Battery Asset Company Investors each invested RMB200 million and held 25% equity interests in the Battery Asset Company. The Battery Asset Company is dedicated to purchasing and owning the battery assets, and leasing the battery packs to users who subscribe to the BaaS. In December 2020, the Battery Asset Company entered into a definitive agreement with certain third-party investors in connection with their additional RMB640 million investment in the Battery Asset Company. Upon the consummation of this transaction, our equity interests in the Battery Asset Company would be diluted to approximately 13.9%.

- In September 2020, we completed a registered follow-on offering of 101,775,000 ADSs at a public offering price of US$17.00 per ADS, which included the full exercise by the underwriters of their option to purchase additional ADSs, and raised US$1,690.0 million in net proceeds after deducting underwriting commissions and discounts and the offering expenses payable by us.

- In December 2020, we completed a registered follow-on offering of 78,200,000 ADSs at a public offering price of US$39.00 per ADS, which included the full exercise by the underwriters of their option to purchase additional ADSs, and raised US$3,007.6 million in net proceeds after deducting underwriting commissions and discounts and the offering expenses payable by us.

60

Table of Contents

- In January 2021, we issued US$750 million aggregate principal amount of 0.00% convertible senior notes due 2026, or the 2026 Notes, and US$750 million aggregate principal amount of 0.50% convertible senior notes due 2027, or the 2027 Notes. The 2026 Notes and the 2027 Notes are unsecured debt. Prior to August 1, 2025, in the case of the 2026 Notes, and August 1, 2026, in the case of the 2027 Notes, the 2026 Notes and the 2027 Notes, as applicable, will be convertible at the option of the holders only upon satisfaction of certain conditions and during certain periods. Holders may convert their 2026 Notes or 2027 Notes, as applicable, at their option at any time on or after August 1, 2025, in the case of the 2026 Notes, or August 1, 2026, in the case of the 2027 Notes, until the close of business on the second scheduled trading day immediately preceding the relevant maturity date. Upon conversion, we will pay or deliver to such converting holders, as the case may be, cash, ADSs, or a combination of cash and ADSs, at our election. The initial conversion rate of the 2026 Notes is 10.7458 ADSs per US$1,000 principal amount of such 2026 Notes. The initial conversion rate of the 2027 Notes is 10.7458 ADSs per US$1,000 principal amount of such 2027 Notes. The relevant conversion rate for such series of the 2026 Notes and the 2027 Notes is subject to adjustment upon the occurrence of certain events. Holders of the 2026 Notes and the 2027 Notes may require us to repurchase all or part of their 2026 Notes and 2027 Notes for cash on February 1, 2024, in the case of the 2026 Notes, and February 1, 2025, in the case of the 2027 Notes, or in the event of certain fundamental changes, at a repurchase price equal to 100% of the principal amount of the 2026 Notes or the 2027 Notes to be repurchased, plus accrued and unpaid interest, if any, to, but excluding, the relevant repurchase date. In addition, on or after February 6, 2024, in the case of the 2026 Notes, and February 6, 2025, in the case of the 2027 Notes, until the 20th scheduled trading day immediately prior to the relevant maturity date, we may redeem the 2026 Notes or the 2027 Notes, as applicable for cash subject to certain conditions, at a redemption price equal to 100% of the principal amount of the 2026 Notes or the 2027 Notes to be redeemed, plus accrued and unpaid interest, if any, to, but excluding, the relevant optional redemption date. Furthermore, we may redeem all but not part of the 2026 Notes or the 2027 Notes in the event of certain changes in the tax laws. Shortly after the pricing of the 2026 Notes and the 2027 Notes, we entered into separate and individually privately negotiated agreements with certain holders of our outstanding 2024 Notes to exchange approximately US$581.7 million principal amount of the outstanding 2024 Notes for ADSs (each, a "2024 Notes Exchange" and collectively, the "2024 Notes Exchanges"). The 2024 Notes Exchanges closed on January 15, 2021. In connection with the 2024 Notes Exchanges, we also entered into agreements with certain financial institutions that are parties to our existing capped call transactions (which we had entered into in February 2019 in connection with the issuance of the 2024 Notes) shortly after the pricing of the 2026 Notes and the 2027 Notes to terminate a portion of the relevant existing capped call transactions in a notional amount corresponding to the portion of the principal amount of such 2024 Notes exchanged. In connection with such terminations of the existing capped call transactions, we received deliveries of ADSs in such amounts as specified pursuant to such termination agreements on January 15, 2021. Shortly after the consummation of the 2024 Notes Exchanges, we also terminated a portion of the zero-strike call option transactions (which we had entered into in February 2019 in connection with the issuance of the 2024 Notes).

Our principal executive offices are located at Building 20, No. 56 AnTuo Road, Jiading District, Shanghai 201804, PRC. Our telephone number at this address is +86-21-6908-2018. Our registered office in the Cayman Islands is located at the offices of Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. Our agent for service of process in the United States is Puglisi & Associates, located at 850 Library Avenue, Suite 204, Newark, Delaware 19711. We maintain our website at http://ir.nio.com/. The information contained on, or linked from, our website is not a part of this annual report.

The SEC maintains a web site at www.sec.gov that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC using its EDGAR system.

See "Item 5. Operating and Financial Review and Prospects-B. Liquidity and Capital Resources-Capital Expenditures" for a discussion of our capital expenditures.

**B. Business Overview**

Our Chinese name, *Weilai* (蔚来), which means Blue Sky Coming, reflects our commitment to a more environmentally friendly future.

Table of Contents

We are a pioneer and a leading manufacturer of premium smart electric vehicles. We design, develop, manufacture and sell premium smart electric vehicles, driving innovations in autonomous driving, digital technologies, electric powertrains and batteries. We differentiate ourselves through our continuous technological breakthroughs and innovations, such as our industry-leading battery swapping technologies, Battery as a Service, or BaaS, as well as our proprietary autonomous driving technologies and Autonomous Driving as a Service, or ADaaS.

We launched the EP9, an electric supercar, in 2016. The EP9 set a world record as the then fastest all-electric car at the Nürburgring Nordschleife "Green Hell" track in Germany in May 2017, finishing a lap in 6 minutes and 45.90 seconds. Combined with an attractive design and strong driving performance, the EP9 delivers extraordinary acceleration and best-in-class electric powertrain technologies, helping position us as a premium brand.

We launched the ES8, a seven-seater flagship premium smart electric SUV, at our first NIO Day on December 16, 2017, and began making deliveries to users in June 2018. In December 2018, we launched its variant, the six-seater ES8, and began making deliveries to users in March 2019. We launched the all-new ES8 at our third NIO Day on December 28, 2019, and began making deliveries of the all-new ES8 in April 2020. According to JD Power's 2019 China New Energy Vehicle Experience Index Study published in July 2019, NIO ranked the highest in quality among all electric vehicle brands, and the ES8 ranked the highest in quality among all mid-large battery electric vehicles.

We launched the ES6, a high-performance premium smart electric SUV, at our second NIO Day on December 15, 2018, and began making deliveries to users in June 2019. According to JD Power's 2020 China New Energy Vehicle Experience Index Study published in September 2020, NIO ranked the highest in quality among all battery electric vehicle brands, and the ES6 ranked the highest in quality among all midsize battery electric vehicles.

We launched the EC6, a premium smart electric coupe SUV, at our third NIO Day on December 28, 2019, and began making deliveries in September 2020. Based on the results released by C-IASI (China Insurance Automotive Safety Index) in January 2021, the EC6 achieved the best safety rating among all models tested by C-IASI in 2020.

As of December 31, 2020, we had delivered a total of 75,641 vehicles cumulatively.

We launched the ET7, a flagship premium smart electric sedan, at our fourth NIO Day on January 9, 2021. The ET7 features NIO's latest NAD (NIO Autonomous Driving) technology including NIO Adam, a super computing platform, and NIO Aquila, a super sensing system. We will begin making deliveries of ET7 in the first quarter of 2022.

**Vehicles**

We design, develop, manufacture and sell our vehicles in the premium smart electric vehicle market. We currently sell our vehicles in China and plan to expand into international markets in the near future to capture the fast-growing EV demand.

### *ES8*

The ES8 is a six-seater or seven-seater flagship premium smart electric SUV.

In December 2017, we launched the ES8, which is equipped with our proprietary electric powertrain featuring two 240 kW induction motors. The ES8 can accelerate from zero to 100 kph in 4.4 seconds and brake from 100 kph to a complete stop in 33.8 meters. The ES8 is engineered to meet the five-star C-NCAP (Chinese New Car Assessment Program) safety standards developed by the China Automotive Technology Research Center. With the 70 kWh battery pack, the ES8's NEDC range reaches up to 355 km.

In December 2019, we launched the all-new ES8 with more than 180 product improvements. With a combination of a 160 kW permanent magnet motor and a 240 kW induction motor, it can accelerate from zero to 100 kph in 4.9 seconds. With the 70 kWh and 100 kWh battery packs, the all-new ES8's NEDC range reaches up to 415 km and 580 km, respectively.

The all-new ES8 offers the seven-seater version and the six-seater version with pre-subsidy starting prices of RMB468,000 and RMB476,000, respectively.

62

Table of Contents

### *ES6*

The ES6 is a five-seater high-performance premium smart electric SUV.

The ES6 is the world's first SUV equipped with a combination of a permanent magnet motor (160 kW) and an induction motor (240 kW). It can accelerate from zero to 100 kph in 4.7 seconds and brake from 100 kph to a complete stop in 33.9 meters. With the 70 kWh and 100 kWh battery packs, the ES6's NEDC range reaches up to 430 km and 610 km, respectively.

The ES6 offers the Sporty version, the Performance version and the Signature edition with pre-subsidy starting prices of RMB358,000, RMB398,000, and RMB468,000, respectively.

### *EC6*

The EC6 is a premium smart electric coupe SUV.

Powered by an electric powertrain of a 160 kW permanent magnet motor and a 240 kW induction motor and a 0.26 drag coefficient driven by its dynamic fastback silhouette, the EC6 is capable of accelerating from zero to 100 kph in 4.5 seconds. It also features a 2.1 square meter panoramic all-glass roof. With the 70 kWh and 100 kWh battery packs, the EC6's NEDC range reaches up to 440 km and 615 km, respectively.

The EC6 offers the Sporty version, the Performance version, and the Signature edition with pre-subsidy prices of RMB368,000, RMB408,000 and RMB468,000, respectively.

### *ET7*

The ET7 is a flagship premium smart electric sedan.

Boasting the third-generation high-efficiency electric powertrain with SiC power modules featuring a front 180 kW permanent magnet motor and a rear 300 kW induction motor, together with a 0.23 ultra-low drag coefficient, the ET7 is designed to further improve its energy efficiency and accelerate from zero to 100 kph in 3.9 seconds and brake from 100 kph to a complete stop in 33.5 meters. The ET7 is engineered to meet both five-star Chinese and European New Car Assessment Program safety standards. It applies Karuun® renewable rattan for a green and natural experience. The ET7 features NIO's latest NAD including NIO Adam, our super computing platform, and NIO Aquila, our super sensing system. With the 150 kWh battery pack to be delivered in the fourth quarter of 2022, we expect the ET7 to deliver a NEDC range of up to 1,000 km on a single charge at the set configuration. The ET7 is currently available for pre-order on the NIO app, and we estimate to start delivery of the ET7 in the first quarter of 2022.

**Our Key Innovations and Breakthroughs**

Since our inception, we have continued to innovate with the goal of consistently creating the most worry-free and convenient experience for our users. We are an industry leader in battery swapping technologies and autonomous driving technologies. Our innovations and breakthroughs differentiate us from our peers, create better user experience, and enhance our users' confidence in us.

*Battery Swapping and BaaS*

Since our introduction of the ES8 in 2017, all of our smart electric vehicles have been equipped with proprietary battery swapping technologies, providing our users a "chargeable, swappable, upgradable" experience. In 2020, we launched Battery as a Service, or BaaS, an innovative model which allows users to purchase electric vehicles and subscribe for the usage of battery packs separately. BaaS enables our users to benefit from lower vehicle purchase prices, flexible battery upgrade options and assurance of battery performance.

63

Table of Contents

*Battery Swapping*

Supported by over 1,200 patented technologies, all of our vehicles support battery swapping. It provides our users with best-in-class "recharging" convenience by simply swapping the user's battery for another one. In addition, it enables users to enjoy the benefits of battery technology advancements with upgrade options. Our Power Swap station 2.0, which is scheduled to be rolled out in the second quarter of 2021, will significantly increase our service capacity by shortening the battery swapping time to under three minutes and carrying up to 13 battery packs. As of December 31, 2020, we had 172 Power Swap stations covering urban areas and expressways across 74 cities, through which we have completed over 1.4 million battery swaps cumulatively.

*BaaS*

Enabled by vehicle-battery separation and battery subscription, BaaS offers a chargeable, swappable, upgradable battery usage experience to users. BaaS users enjoy a lower upfront purchase price and flexible subscription options for battery packs of various capacities according to their needs on a monthly or yearly basis, as well as flexibility for battery upgrades in the future. For the quarter ended March 31, 2021, over half of the new orders we received chose BaaS subscriptions.

If users opt to purchase a NIO vehicle and subscribe for the 70 kWh battery pack under BaaS, they can enjoy an RMB70,000 deduction off the original vehicle purchase price while paying a monthly subscription fee of RMB980 for the battery pack. On November 6, 2020, we launched the 100 kWh battery pack with battery upgrade plans. If users opt to purchase a NIO vehicle and subscribe for the 100 kWh battery pack under BaaS, they can enjoy an RMB128,000 deduction off the original vehicle purchase price while paying a monthly subscription fee of RMB1,480. Users who currently have the 70 kWh battery pack with the intention to upgrade their batteries can choose to either purchase a 100 kWh battery pack for a permanent upgrade or pay a monthly subscription fee of RMB880 for a flexible upgrade. Meanwhile, users will continue to enjoy the existing favorable policies such as purchase tax exemption and government subsidies for electric vehicles. In January 2021, we launched our 150 kWh battery pack with cutting-edge technologies. Under BaaS, users will be able to enjoy flexible upgrades to 150 kWh battery pack or other future battery options as the battery technologies evolve.

**Autonomous Driving and ADaaS**

We believe that autonomous driving is the core of smart electric vehicles and it has been our focus from day one. We have gradually built up our full stack in-house autonomous driving capabilities and successfully delivered competitive products including NIO Pilot, our enhanced ADAS. We are also about to roll out our industry-leading NIO Autonomous Driving, or NAD, to our users.

We are one of the first auto companies in China to offer enhanced ADAS capabilities. The NIO Pilot hardware consists of 23 sensors, including a front-facing trifocal camera, four exterior surround cameras, five millimeter-wave radars, 12 ultrasonic sensors, and an interior driver monitoring camera. NIO Pilot has a built-in algorithm that leverages data across the entire vehicle fleet for fleet learning and crowd AI analysis, and runs new features under the shadow mode without materially impacting driver safety or vehicle operation. This allows us to fully test and validate the features before releasing them to the users. Our smart data management system can enable us to validate and improve algorithms using millions of miles of empirical data.

As of December 31, 2020, we have successfully rolled out many industry-leading features for NIO Pilot, including NOP (Navigate on Pilot), shiftless automatic parking assist with fusion, nearby summon, forward collision warning, automatic emergency braking, automatic high beam, auto lane change, lane departure warning, blind spot detection, front and rear cross-traffic alert, side door opening warning, and side distance indication. We plan to improve the existing features and roll out more features of the NIO Pilot going forward.

In January 2021, we announced NIO Autonomous Driving, or NAD, our next generation, proprietary full stack autonomous driving technology. We have built up the NAD capability with in-house developed perception algorithms, localization and control strategy and platform software. The technology comprises a super computing platform called NIO Adam and a super sensing system called NIO Aquila. NIO Adam's core is made up of four NVIDIA DRIVE Orin system-on-chips, or SoCs, while NIO Aquila features 33 high-performance sensing units, including 11 high-resolution cameras, one ultra-long-range high-resolution LiDAR, five millimeter-wave radars and 12 ultrasonic sensors. NAD is expected to gradually cover use cases from expressways, urban roads, parking, battery swapping to other domains to deliver a safer and more relaxing autonomous driving experience for our users and is first available on the ET7. We plan to roll out the NAD through a RMB680 monthly subscription under ADaaS in early 2022.

64

Table of Contents

**Research and Development**

We have strategically focused on building in-house capabilities in software and hardware development to control the design and development of the vehicle software and hardware architecture and the critical components that go into our products and services to deliver an optimal experience for our users. Our proprietary technologies, including battery swapping, autonomous driving, digital technologies, electric powertrain, battery and software-driven technologies, among others, are cutting-edge and differentiate us from our competitors. Our capabilities have given us greater flexibility to continually improve our current products and allow us to launch new products more rapidly. By integrating these industry-leading technologies, all our vehicles can create a relaxing, interactive, intelligent and immersive experience for our users.

### Digital Technologies

#### Digital Cockpit

Our digital cockpit has an AI-driven, scalable and flexible architecture that presents users with an intelligent and immersive digital experience. The ES8, ES6, EC6 adopts NVIDIA PARKER SoC and the ET7 uses the 3rd Generation Qualcomm® Snapdragon™ Automotive Cockpit Platform for in-car digital cockpit. Inside our digital cockpit, NOMI, our in-car AI companion, can listen to, communicate and interact with users to build a strong emotional connection between vehicles and users. We have built flexibility into our digital cockpit, so that we can continue to update the NIO Operating System, or NIO OS, with new features and applications through software-over-the-air, or SOTA, updates.

At our third NIO Day, we launched our second-generation NOMI with a AMOLED full-circular display. At our fourth NIO Day, we launched our second-generation smart cockpit, boosting capabilities such as AI computing and image and media processing by a large margin.

We plan to introduce NIO OS for European users in the second half of 2021, which will provide customizations and upgrades appropriate for a broader user base.

#### Digital System

Digital system is the foundation for us to achieve continuous upgrade, the digital platform for building our own proprietary software and algorithms and the security system for deep reassurance.

We are one of the first automobile manufacturers in China that have both FOTA and SOTA capabilities. FOTA updates enable us to upgrade the operating firmware down to the individual programmable Electronic Control Unit level across the vehicle's core systems, such as digital cockpit, autonomous driving domain controller and electric powertrain. FOTA and SOTA technologies allow us to fix bugs and remotely install new features and services after a vehicle has already been delivered to users, reduce the cost and time of marketing new feature roll-outs and continuously improve the user experience throughout the lifecycle.

On top of our proprietary software architecture and cloud data platform, NVOS (NIO Vehicle Operating System), our vehicle digital system, has what we believe to be the industry-leading connectivity and remote service capabilities with an end-to-end security framework. It features comprehensive connectivity capabilities, including smart antenna, 5G, UWB, Wi-Fi 6, 5.2 Bluetooth and V2X, and offers 360-degree and multi-dimensional cyber security capabilities to protect user privacy and safety. It enables a superior driver and passenger experience by syncing vehicle settings, user preferences and user accounts and offering instant remote vehicle diagnostics with respect to faults, alerts and logs to our service and maintenance team.

Utilizing our NIO Technology Platform 2.0, the NVOS will boast a common SOA (service-oriented architecture) middleware across multiple MCUs (micro-controller unit) and the gateway, providing flexibility and efficiency for vehicle software development and achieving great feature competitiveness and AI-driven user experiences.

With our globalization efforts to expand to more markets, we plan to localize connectivity services in line with different laws and regulations in various regions, including the General Data Protection Regulation.

Table of Contents

***Electric Powertrain and Battery***

*Electric Powertrain*

Starting from our first product, we have designed, developed and manufactured our own proprietary electric powertrains in-house.

Our electric powertrains are designed specifically for NIO's vehicles, and through FOTA, we are able to continue to improve and update, and adjust according to our users' driving behavior. Our dual-motor configuration offers a 240 kW induction motor both in the front and rear on the first-generation electric powertrain, a 160 kW permanent magnet motor and a 240 kW induction motor on the second-generation electric powertrain and a 180 kW permanent magnet motor and a 300 kW induction motor on the third-generation electric powertrain.

The third-generation electric powertrain will feature Silicon Carbide power modules which can minimize the switching loss compared with Insulated Gate Bipolar Transistor. It can improve supply efficiency with simpler cooling measures and reduce the size of peripheral components due to higher frequency operation.

*Battery*

We are committed to the research, development and innovations in battery technologies. Our battery packs are based on high energy density battery cells, self-developed liquid-cooled battery packaging, a state-of-the-art battery management system and swapping mechanism. In particular, our battery management system provides real-time monitoring of the vehicle insulation status and features a comprehensive fault diagnosis mechanism to ensure the safety and reliability of battery pack use.

Currently, we offer two battery options: 70 kWh and 100 kWh. The 70 kWh battery pack is designed, developed and manufactured in-house. It comprises cutting-edge NCM (nickel-cobalt-manganese) prismatic cells, liquid cooling thermal system and intelligent battery management system. With proprietary patents, the 100 kWh CTP (cell-to-pack) battery features thermal propagation prevention, highly integrated design, all climate thermal management and bi-directional cloud BMS. In January 2021, we announced the 150 kWh battery pack with the next generation battery technology. We plan to start delivering the 150 kWh battery pack in the fourth quarter of 2022.

***Design Capabilities and Software-driven Vehicle Technologies***

We have significant in-house vehicle design and engineering capabilities, which cover all major areas of vehicle development starting from concept to completion with a special focus on software-driven technologies.

Our global design team has comprehensive design capabilities across the board, from brand, vehicles, user interface/user experience, lifestyle products to accessories. Besides having best-in-class engineering capabilities in the field of aerodynamics, handling, comfort and efficient thermal management, our team has also developed in-house software-driven vehicle technologies, such as the NIO 4D Dynamics. Utilizing NAD, HD mapping and vehicle sensing system, NIO 4D Dynamics, which is an advanced smart suspension application, achieves uncompromised comfort by proactively orchestrating the response of vehicle actuators (springs, dampers, steering and brakes) to road events and smoothening the primary and secondary body motions.

**Worldwide Research and Development Footprint**

We have strategically located our offices in locations where we believe we will have access to the best talent. Our global engineering center is located in Shanghai, our design center is in Munich and our software and autonomous driving technology center is located in San Jose.

***Shanghai***

We have vehicle engineering, smart hardware, autonomous driving, digital cockpit, digital system, product planning, NIO app, design, electric powertrain and battery teams in Shanghai. They coordinate our global R&D efforts across different regions and integrate all the technologies into our products. More than half of the patents obtained globally by us originated from our teams in Shanghai.

Table of Contents

### Beijing

We have digital cockpit, digital system, digital development and autonomous driving teams in Beijing. The focus of our Beijing research and development teams is on full stack AI technologies to power NOMI and engineering efforts to enable continuous upgrade of digital experience through FOTA. The teams are also responsible for the Internet of Vehicles including design, implementation, maintenance and support of the system.

### Hefei

Our teams in Hefei mainly focus on vehicle engineering, manufacturing engineering, test and quality.

### Silicon Valley

Our teams in San Jose focus on innovations in the areas of autonomous driving, smart hardware, digital cockpit, and digital system, including vehicle operating system and digital security.

### Munich

Our Munich office is primarily responsible for our product and brand design, focusing on vehicle interior and exterior design, user interface design, brand design and other product design.

### United Kingdom

Our engineering teams in Oxford focus on computer-aided engineering and advanced vehicle engineering.

**User Development and User Community**

We reach out to and engage with our users directly through our own online and offline platforms, including NIO app, NIO Houses and NIO Spaces, and aim to build a community where we share joy and grow together with our users.

### NIO App

NIO app, our mobile application, is designed to be a portal not only for selling cars where users can place orders for and configure all NIO vehicles, but also for vehicle control, service access and NIO Life product purchase, and most importantly, an online platform for our community.

Our NIO app had over 1,600,000 registered users as of December 31, 2020, and approximately 168,000 daily active users on peak days in 2020.

### NIO House and NIO Space

NIO Houses and NIO Spaces serve as the offline channels for us to reach out to and serve our users, as well as the offline platforms for NIO user community.

NIO Houses have showroom functions while serve as a clubhouse for our users and their friends. We opened our first NIO House in Beijing in November 2017. As of December 31, 2020, we had 23 NIO Houses in total, mainly in tier-one and tier-two cities in China.

NIO Spaces are mainly showrooms for our brand, vehicles and services. Compared with NIO Houses, NIO Spaces are generally smaller in scale, more delicate and sales-focused. We opened our first NIO Space in Shanghai in August 2019. As of December 31, 2020, we had 181 NIO Spaces in 113 cities.

### NIO Day and NIO Events

Our annual NIO Day is an event jointly hosted by NIO and our users where we launch our new products and technologies and celebrate the user community.

67

Table of Contents

In December 2017 in Beijing, we held our first NIO Day and launched the ES8. In December 2018 in Shanghai, we held our second NIO Day and launched the ES6. In December 2019 in Shenzhen, we held the third NIO Day and launched the EC6 and the all-new ES8. In January 2021 in Chengdu, we held the fourth NIO Day and launched the ET7. Our users have taken the lead in the planning and organization of the recent two NIO Days. We believe that NIO Day gives us an opportunity to interact with our current and prospective users while providing us with more publicity and brand awareness. In addition, we organized various online and offline activities in the NIO user community, such as EP Club, NIO Summer, NIO User Volunteers and NIO User Clubs.

### NIO Life

We have established our lifestyle brand NIO Life, which has an online store on NIO app where users can purchase NIO lifestyle products. The product categories include apparels, home and living, travel and bags, consumer electronics, car life, food and wines. Since we launched our online store in December 2016, over 2,600,000 NIO Life items have been delivered to our users through online and offline channels as of December 31, 2020.

### NIO Points

We provide users with NIO Points to encourage user engagement and positive user behavior, such as to keep a safe driving record. NIO Points are earned, among other things, through the welcome packages upon the purchase of NIO vehicles, referrals for test drives and vehicle purchases, and active engagement in the user community. NIO Points can be used, both at our online store and at our NIO Houses and some of the NIO Spaces. In addition, we have set up the Blue Point Plan, under which we help users to certify emission reductions and trade carbon credits and reward them with NIO Points in return.

### NIO User Trust

In conjunction with our pursuit of being a user enterprise and with the goal of building a deeper connection between NIO and our users, Mr. Bin Li, our chairman of the board of directors and chief executive officer, transferred a certain amount of his ordinary shares to NIO User Trust in January 2019. Our users have the opportunity to discuss and propose the use of the economic benefits from the shares in NIO User Trust through a User Council consisting of members of our user community elected by our users. The User Council helps coordinate user activities in our community. The current second User Council has decided to focus their work on user care, industry sub-communities, public welfare and environmental protection in 2021.

### Formula E

We sponsor a Formula E team currently named as NIO 333, which is a racing team that competes in the Fédération Internationale de l'Automobile, or FIA, Formula E championship electric racing series. The team, previously operated by us under other names, has participated in the FIA Formula E Championship ever since its inaugural season (2014) and had won the first FIA Formula E Drivers' Championship. NIO 333 Formula E team currently competes in the 2021 racing season with our company as its primary sponsor.

### Formula E Student China

We are the sponsor of the Formula E Student China, a competition event where college students design and race electric racing vehicles, allowing us to nurture the young talent for the future of the automotive industry.

**Power Solutions**

We offer a comprehensive and innovative suite of power solutions to address the charging and swapping needs of our users. Our power solutions include home charging called Power Home, battery swapping called Power Swap, supercharging called Power Charger, and mobile charging called Power Mobile, all of which are connected to cloud-enabled Power Cloud, which synchronizes users' power consumption information and our power network, and intelligently suggests the appropriate services, according to the users' locations and power consumption patterns. Our users not only get to check the availability of charging and swapping resources of NIO's own network, but also have access to a network of public chargers and their real-time information through the Power Map on our NIO app. In addition, we offer our users our One Click for Power valet service where we pick up, charge and then return the vehicle. Our goal is to provide the most convenient power solutions to our users.

Table of Contents

***Power Home***

Through Power Home, we install home chargers at our users' homes whenever the installation is feasible. Currently we are offering our users standard 7 kW and high-speed 20 kW smart home chargers. The first 7 kW Power Home and basic installation are included in the price of the vehicle though there may be charges in certain circumstances. The high-speed 20 kW Power Home Plus can reduce the charging time to one-third and is provided at an additional cost.

***Power Swap***

All of our vehicles support battery swapping. Our Power Swap station 1.0 has a typical size of approximately three parking spaces and accommodates 5 battery packs. Once a vehicle is parked in the swap station and the swap function is activated, battery swapping will take place within minutes. The Power Swap station 2.0 is designed to accommodate up to 13 battery packs to substantially boost the daily service capacity of the battery swap stations, and we estimate we will start the deployment of the Power Swap station 2.0 from the second quarter of 2021.

We plan to further enhance the efficiency of the battery swap stations and to strategically deploy more swap stations in selected geographical areas to ensure consistent optimal battery swap experience for our users as the number of our vehicles sold grows.

***Power Charger***

Through Power Charger, our supercharging piles, we provide our users a fast and reliable power solution. Users are able to locate, use and pay for the charging through our NIO app. Our Power Chargers are of a slim design and are located in parking lots and other locations easily accessible to our users, with a maximum output power of 105 kW and 250 ampere.

As of December 31, 2020, we had 792 Power Chargers in operation, covering 53 major cities. We plan to further enhance the efficiency and expand the deployment of our Power Chargers to cater to the growing user demand.

***Power Mobile***

Through Power Mobile, we provide charging services through fast charging vans with our proprietary fast-charging technologies, supplementing our charging and swapping network. Users are able to book Power Mobile services in advance through our NIO app.

As of December 31, 2020, we had 318 Power Mobile vans in operation. We regularly adjust the deployment of Power Mobile vans in China based on our user distribution and user needs and plan to improve the efficiency of these NIO Power Mobile vans to create better experiences for users.

***Power Map***

In addition to our own charging and swapping network, our users have access to a network of public chargers and their real-time information through the Power Map on our NIO app, which consisted of over 380,000 publicly accessible charging piles as of December 31, 2020. In order to further improve user experience, we have been working to increase the number of chargers with data synchronized to our Power Cloud.

***One Click for Power***

We offer our users our One Click for Power valet service. Through our NIO app, a user can have our team pick up his or her vehicle at the user's designated parking location for valet charging or swapping. One Click for Power service is available to users through our energy package or on a pay-per-use basis.

**Service and Warranty**

Our users can access a full suite of innovative services on our NIO app, as part of our strategy of redefining the user experience. In addition to our battery swapping services, BaaS and NIO Power solutions described above, we offer our users NIO Service, primarily through our worry-free service package and worry-free insurance package. We believe our service capability is among the core competitiveness we possess.

69

Table of Contents

### Service

*Service Network*

We currently provide servicing both through NIO service centers and authorized third-party service centers, both of which provide repair, maintenance and bodywork services.

For our NIO service centers, we have dedicated qualified technicians who receive regular professional trainings and skill tests, which ensures high-quality user services. As of December 31, 2020, we had 28 NIO service centers across 21 cities. For authorized third-party service centers, we have a devoted management team to carefully select and bring authorized service centers into our network, most with experience servicing high-end branded vehicles. As of December 31, 2020, we had 159 authorized service centers across 120 cities.

In addition to our service centers, we have deployed 220 service vans serving users' needs in different regions as of December 31, 2020.

*Service Package*

We offer our users a worry-free service package, which provides statutory and third-party liability and vehicle damage insurance through third-party insurers, repair and routine maintenance services, courtesy cars, roadside assistances and enhanced data packages, among other services with a starting price of RMB11,600 per year for new vehicles.

Users are able to arrange for vehicle services using our NIO app. At the user's request, we pick up the car, arrange for maintenance and repair services, and then return the car to the user once the services are done. We will also assist the user in engaging with the insurance company and provide necessary support when it is needed.

In addition to the worry-free service package, we have also started to offer a worry-free insurance package since March 1, 2020. Users can supplement their insurance with designated insurance providers, and pay RMB1,680 per year for NIO's competitive maintenance and paint-repair services, courtesy cars, roadside assistances, enhanced data packages and other additional services.

*Auto Financing*

We currently have agreements with several commercial banks in China, pursuant to which we assist users across China in acquiring financing when they purchase our vehicles. We also offer auto financing arrangements to users directly through our subsidiaries.

### NIO Certified (Used Vehicle Service)

In January 2021, we launched NIO Certified, our used vehicle service, to provide high-quality services for used NIO vehicle transactions. We have developed the capabilities in the major cities in China to cover services including vehicle inspection, evaluation, acquisition and sales. If users are interested in purchasing used NIO vehicles, they can directly find the product information and place orders on our NIO app.

### Warranty Policy

For an initial retail purchaser of a new NIO vehicle, we provide an extended warranty in China subject to certain conditions, including, among others, that the extended warranty only applies for the initial retail purchaser of the new vehicle and not for any subsequent buyers of the vehicle; the user must service the vehicle only with us or one of our authorized service centers; and the vehicle must not have experienced any major accident. As required under relevant PRC law, we also provide (i) a bumper-to-bumper three-year or 120,000-km warranty, (ii) for critical EV components (battery packs, electric motors, power electric units and vehicle control units), an eight-year or 120,000-km warranty, and (iii) a two-year or 50,000-km warranty covering vehicle repair, replacement and refund. See "Item 3. Key Information-D. Risk Factors-Risks Related to Our Business and Industry-Our warranty reserves may be insufficient to cover future warranty claims which could adversely affect our financial performance."

70

Table of Contents

**Supply Chain, Manufacturing and Quality Assurance**

We view the suppliers and manufacturers we work with as key partners in our vehicle development process. We aim to leverage our partners' industry expertise to ensure that each vehicle we produce meets our strict quality standards.

*Supply Chain*

We work with global and local supply chain partners while the majority of our supply base is located in China, which enables us to acquire supplies more quickly and reduces the overall logistics-related cost.

We obtain systems, components, raw materials, parts, manufacturing equipment and other supplies and services from suppliers which we believe to be reputable and reliable. We follow our internal process to source suppliers taking into account quality, cost and timing. We continuously innovate our supply chain in order to establish a more effective and diverse supply chain system. We actively cultivate partnerships with suppliers that have innovative technological capabilities and cost advantages, thereby increasing the competitiveness and innovativeness of our supply chain.

While we obtain components from multiple sources whenever possible, many of the components used in our vehicles are purchased from a single source. Eventually we plan to implement a multi-source volume purchasing strategy in order to reduce our reliance on sole source suppliers.

We hold our suppliers to high ethical standards of code of conducts in areas such as human rights, labor conventions, environmental protection and anti-corruption, and incorporate these standards in our cooperation agreements with our suppliers.

*Manufacturing*

*Partnership with JAC*

We entered into an arrangement with Jianghuai Automobile Group Co., Ltd., or JAC, a major state-owned automobile manufacturer in China, for manufacturing the ES8 for five years starting from May 2016, which may be renewed as agreed by JAC and us. In April 2019 and March 2020, we entered into supplemental manufacturing cooperation agreements with JAC for the manufacture of the ES6 and the EC6, respectively. In March 2021, we entered into definitive agreements with JAC to establish a joint venture for manufacturing management and operations with a registered capital of RMB500 million where we hold 49% equity interests.

JAC has a 50-year history in automotive manufacturing of passenger and commercial vehicles. JAC has in-house development, manufacturing, and testing capabilities for new energy vehicles, and is an established player in China's new energy vehicle market. JAC has built a brand-new world-class factory with an annual production capacity of 120,000 units for the production of the ES8, ES6 and EC6, and potentially for ET7 and other future vehicles with us. Pursuant to the current agreements with JAC, we pay JAC on a per-vehicle basis.

The factory has state-of-the-art production facilities and techniques, and also applies environmentally friendly techniques and uses renewable energy. We exercise significant control in the manufacturing partnership with JAC in order to ensure high quality standards. We conduct product development, provide supply chain systems, set production technique standards, and put in place quality management systems. We developed a manufacturing process development and simulation platform to reduce defects in process development to the extent possible. We apply the NIO lean manufacturing system in the JAC-NIO plant to improve execution efficiency and quality.

We place great emphasis on the environment, health and safety, or EHS, management of the factory at JAC. We have worked with JAC to establish a set of factory safety guidelines and provide EHS trainings to ensure that the factory is operating in accordance with safety regulations. In addition, we are partnering with various suppliers and academic institutions to standardize the scrap and recycle process at the factory, aiming to maximize the lifetime value of all used vehicle components and parts.

71

Table of Contents

*Advanced Manufacturing Technology and Engineering Center*

We have established our Advanced Manufacturing Technology and Engineering Center, or AMTEC, in Nanjing for the production of electric powertrains and 70 kWh battery packs, and a joint venture with Zhengli Investment Co., Ltd. in Changshu for the production of 70 kWh battery packs. Nanjing AMTEC Phase I was completed in August 2016, and Phase II was completed in 2019. The plant and ancillary facilities of Nanjing AMTEC Phase I have a building area of 64,000 square meters and mainly produce electric motors and electric drive components with a planned capacity of up to 300,000 electric motors annually. The Nanjing AMTEC Phase II has a building area of 42,800 square meters and production facilities for both electric motors and 70 kWh battery packs. Its production lines are highly automated and flexible with advanced MES systems and AGVs, and were put into operation in June 2019.

### *Quality Assurance*

We aim to deliver high-quality products and services to our users in line with our core values and commitments. We believe that our quality assurance systems are the key to ensuring the delivery of high-quality products and services, and to minimize waste and to maximize efficiency. We strongly emphasize quality management across all business functions, including product development, manufacturing, partner quality management, procurement, power solutions, user experience, service and logistics. Our quality management groups are responsible for our overall quality strategy, quality systems and processes, quality culture, and general quality management implementation.

### Certain Other Cooperation Arrangements

### *Hefei Strategic Investors*

On April 29, 2020, we entered into an investment agreement, or the initial investment agreement, and a shareholders agreement, or the initial shareholders agreement (collectively, the initial agreements), for investments into NIO Holding Co., Ltd. (previously known as NIO (Anhui) Holding Co., Ltd.), or NIO China, a legal entity wholly owned by us pre-investment, with Hefei City Construction and Investment Holding (Group) Co., Ltd. ("Hefei Construction Co."), CMG-SDIC Capital Co., Ltd. ("SDIC") and Anhui Provincial Emerging Industry Investment Co., Ltd. ("Anhui High-tech Co.").

Pursuant to the initial agreements, each investor may designate a fund managed by it or a third party, as applicable, to perform the investment obligations and assume other rights and obligations under the initial agreements. Accordingly, on May 30, 2020, we entered into respective supplemental agreements I to the initial agreements with the investors and their respective designated funds, Jianheng New Energy Fund, Advanced Manufacturing Industry Investment Fund and New Energy Automobile Fund. Under the supplemental agreements I, (i) Hefei Construction Co. designated Jianheng New Energy Fund to assume all of its rights and obligations under the initial agreements, (ii) SDIC designated Advanced Manufacturing Industry Investment Fund to assume all of its rights and obligations under the initial agreements, (iii) Anhui High-tech Co. designated New Energy Automobile Fund to perform a portion of its investment obligations under the investment agreement and assume the corresponding rights and obligations under the initial agreements, and (iv) Anhui High-tech Co. will continue to perform the remaining of its investment and other obligations not assigned to New Energy Automobile Fund and enjoy its rights under the initial agreements. On June 5, 2020, NIO China updated its Industrial and Commercial Registration to reflect, among others, Jianheng New Energy Fund, Advanced Manufacturing Industry Investment Fund, Anhui High-tech Co. and New Energy Automobile Fund as NIO China's investors. On June 18, 2020, we entered into respective supplemental agreements II with the parties to the supplemental agreements I and Anhui Provincial Sanzhong Yichuang Industry Development Fund Co., Ltd., another designated fund of Anhui High-tech Co. Under the supplemental agreements II, Anhui High-tech Co. designated Anhui Provincial Sanzhong Yichuang Industry Development Fund Co., Ltd. to assume its remaining rights and obligations under the initial agreements that had not been assigned to New Energy Automobile Fund pursuant to the supplemental agreements I.

The initial investment agreement, as amended and supplemented, is referred to as the Hefei Investment Agreement, and the initial shareholders agreement, as amended and supplemented, is referred to as the Hefei Shareholders Agreement in this annual report. The Hefei Investment Agreement and the Hefei Shareholders Agreement are collective referred to as Hefei Agreements in this annual report, and the group of investors with whom we entered into the Hefei Agreements are referred to as the Hefei Strategic Investors in this annual report.

Table of Contents

Under the Hefei Investment Agreement, the Hefei Strategic Investors agreed to invest an aggregate of RMB7 billion in cash into NIO China. We agreed to inject our core businesses and assets in China, including vehicle research and development, supply chain, sales and services and NIO Power, or together as the Asset Consideration, into NIO China. The Asset Consideration is valued at RMB17.77 billion, as calculated based on 85% of the market value of our company (calculated based on our average ADS trading price over the thirty public trading days preceding April 21, 2020). Further, we agreed to invest RMB4.26 billion in cash into NIO China. Pursuant to the Hefei Shareholders Agreement, upon the completion of the investments, we would hold 75.885% of controlling equity interests in NIO China, and the Hefei Strategic Investors would collectively hold the remaining 24.115%.

Pursuant to the Hefei Investment Agreement, the Hefei Strategic Investors and we agreed to each inject cash into NIO China in five installments. Moreover, the Asset Consideration will be injected into NIO China in several phases, with the last phase to be injected within one year of closing, subject to certain post-closing price adjustment mechanism.

Pursuant to the Hefei Agreements, NIO China will establish its headquarters in the Hefei Economic and Technological Development Area, or the HETA, where our main manufacturing hub is located, for its business operation, research and development, sales and services, supply chain and manufacturing functions. We will collaborate with the Hefei Strategic Investors and HETA to develop NIO China's business and to support the accelerated development of the smart electric vehicle sectors in Hefei in the future. In addition, NIO China could enjoy a series of subsidies and support from HETA, including rent subsidies, financial support and preferential tax treatment, when NIO China meets certain performance criteria, such as targets for manufacturing capacity, procurement amount and vehicle sales.

Pursuant to the Hefei Shareholders Agreement, the Hefei Strategic Investors have certain minority shareholder rights, including, among others, the right of first refusal, co-sale right, preemptive right, anti-dilution right, redemption right, liquidation preference and conditional drag-along right. In particular, the following rights, among others, directly relate to obligations of NIO Inc.:

*Redemption right*. The Hefei Strategic Investors may require us or our Hong Kong holding vehicles to redeem all or a portion of the shares of NIO China held by the Hefei Strategic Investors at a redemption price of the total amount of the investment price equal to the Hefei Strategic Investors *plus* an investment income calculated at a compound rate of 8.5% per annum upon the occurrence of certain events.

*Share transfer restriction*. Before NIO China completes its potential qualified initial public offering, without the prior written consent of the Hefei Strategic Investors, we may not directly or indirectly transfer, pledge or otherwise dispose of NIO China's shares to a third party that may result in our shareholding in NIO China fall below 60%. Without the prior written consent of the Hefei Strategic Investors, we have the right to directly or indirectly transfer, pledge or otherwise dispose of no more than 15% of NIO China's shares. A qualified initial public offering refers to an initial public offering approved, registered or filed with the China Securities Regulatory Commission, Shanghai Stock Exchange, Shenzhen Stock Exchange or other overseas securities issuance review agencies jointly approved by all shareholders of NIO China, and NIO China's shares are issued and listed on the stock exchange market recognized by all shareholders of NIO China.

*NIO Parties' Redemption Right*. Before NIO China is converted into a company limited by shares for the purpose of its qualified initial public offering, we and/or our designated third party have the right to redeem half of the shares Jianheng New Energy Fund acquired through this investment. The redemption price will be the higher of the following (a) the amount of the total paid-in capital increase price in respect of the equity interests to be purchased by us or our designated parties, *plus* investment income calculated at a simple interest rate of 10% per annum; and (b) the value of the equity interests to be redeemed by us or our designated parties determined based on the valuation of NIO China in the most recent round of financing.

*NIO's Capital Increase right*. Before December 31, 2021, we and our affiliates designated by us have the right to unilaterally subscribe for up to US$600 million purchase price of the then newly increased registered capital of NIO China, at the same subscription price at which the Hefei Strategic Investors invested in NIO China pursuant to the Hefei Agreements.

73

Table of Contents

Subsequent to the entry into the Hefei Agreements, the cash contribution obligations of us and the Hefei Strategic Partners have all been fulfilled and we have exercised our redemption right and capital increase right described above. In particular, in connection with our exercise of our redemption right, we, through one of our wholly-owned subsidiaries, redeemed from Jianheng New Energy Fund 50% of the equity interests in NIO China then held by the Jianheng New Energy Fund in September 2020, which accounted for 8.612% equity interests in NIO China, and the total consideration we paid for such redemption was RMB511.5 million, consisting of the actual capital increase payment Jianheng New Energy Fund had made plus prorated interest accrued at an interest rate of 10% per annum. In addition, we assumed Jianheng New Energy Fund's remaining cash contribution obligation of RMB2.0 billion. In connection with our exercise of our capital increase right, we, through one of our wholly-owned subsidiaries, subscribed for newly increased registered capital of NIO China at a consideration of US$600 million. In addition, in February 2021, we, through one of our wholly-owned subsidiaries, also purchased from two of the Hefei Strategic Investors an aggregate of 3.305% equity interests in NIO China for a total consideration of RMB5.5 billion and subscribed for newly increased registered capital of NIO China at a subscription price of RMB10.0 billion.

As a result of these transactions, as of the date of this annual report, the registered capital of NIO China is approximately RMB6.167 billion, and we hold 90.360% controlling equity interests in NIO China. We are fulfilling our other obligations, including injecting the Asset Consideration into NIO China, in accordance with the Hefei Agreements.

For more information on the provisions of the Hefei Agreements, please refer to exhibits 4.30 to 4.38 of this annual report.

### Hefei Government

On February 4, 2021, NIO China entered into a further collaboration framework agreement with the municipal government of Hefei, Anhui province, where NIO China's headquarters is located. Under the framework agreement, among other things, Hefei government and NIO China agreed in principle to jointly build a world-class industrial campus to support the development and innovations of the smart electric vehicle industry and related supply chains led by NIO China. In addition, Hefei government and its associated parties plan to re-invest their returns from the equity investments in NIO China to support the further cooperation in Hefei. The framework agreement is preliminary in nature, and its implementation will be subject to legally binding definitive transaction documents to be discussed and entered into further.

### Battery Asset Company

On August 18, 2020, we and the Battery Asset Company Investors jointly established Wuhan Weineng Battery Asset Co., Ltd., or the Battery Asset Company. We and the Battery Asset Company Investors each invested RMB200 million and held 25% equity interests in the Battery Asset Company. The Battery Asset Company is dedicated to purchasing and owning the assets of battery packs which are subscribed by users under BaaS. We and the Battery Asset Company Investors will jointly provide comprehensive support to the development of the Battery Asset Company in user operations, technologies, funding and infrastructure. In December 2020, the Battery Asset Company entered into a definitive agreement with certain third-party investors in connection with their additional RMB640 million investment in the Battery Asset Company. Upon the consummation of this transaction, our equity interests in the Battery Asset Company would be diluted to approximately 13.9%.

### GAC

In April 2018, we and other partners, including GAC, jointly established a joint venture company, GAC-NIO New Energy Vehicle Technology Co., Ltd., or GAC JV. We currently hold approximately 4.5% equity interests in GAC JV. The joint venture mainly engages in electric vehicles and parts development, sales and services under its own brand Hycan He Chuang.

### Changan

In January 2018, we and Changan set up a joint venture, Changan NIO Renewable Automobile Co., Ltd., or the Changan JV. We currently hold 4.62% equity interests in the Changan JV. The joint venture may provide services, such as design or development of vehicles or components, sales and after-sale service, sales of automotive parts and EV-related technology services.

74

Table of Contents

*Mobileye*

In November 2019, we entered into a strategic collaboration with Mobileye on the development of highly automated and autonomous vehicles (AV) for consumer markets and driverless ride-hailing services in China and other major territories. Upon the expiration of the previous strategic collaboration, in January 2021, we entered into another strategic collaboration arrangement with Mobileye, pursuant to which we will provide Mobileye with customized smart electric vehicles for Mobileye's driverless ride-hailing services in certain overseas jurisdictions.

**Competition**

Competition in the automotive industry is intense and evolving. We believe the impact of shifting user needs and expectations, favorable government policies towards new energy vehicles, expanding charging infrastructure, and technological advances in electric components are causing the industry to evolve in the direction of electric-based vehicles. We believe the primary competitive factors in our markets are:

• pricing;

• technological innovation;

• vehicle performance, quality and safety;

• service and charging options;

• user experience;

• design and styling; and

• manufacturing efficiency.

The China automotive market is generally competitive. We have strategically entered into this market in the premium smart EV segment in which there is limited competition relative to other segments. However, we expect this segment will become more competitive in the future. We also expect that we will compete with international competitors, including Tesla. Our vehicles also compete with ICE vehicles in the premium segment. Given the quality and performance of the ES8, the ES6, the EC6 and the ET7, and their attractive pricing, we believe that we are strategically positioned in China's premium smart electric vehicle market.

**Intellectual Property**

We have significant capabilities in the areas of vehicle engineering, development and design. As a result, we have developed a number of proprietary systems and technologies. As a result, our success depends, at least in part, on our ability to protect our core technology and intellectual property. To accomplish this, we rely on a combination of patents, patent applications and trade secrets, including employee and third-party nondisclosure agreements, copyright laws, trademarks, intellectual property licenses and other contractual rights to establish and protect our proprietary rights in our technology. As of December 31, 2020, we had 2,654 issued patents and 1,397 pending patent applications, 3,373 registered trademarks and 804 pending trademark applications in the United States, China, Europe and other jurisdictions. As of December 31, 2020, we also held or otherwise had the legal right to use 133 registered copyrights for software or works of art and 686 registered domain names, including www.nio.io. We intend to continue to file additional patent applications with respect to our technology.

**Regulation**

This section sets forth a summary of the most significant rules and regulations that affect our business activities in China.

75

Table of Contents

**Regulations and Approvals Covering the Manufacturing of Pure Battery Electric Passenger Vehicles**

The NDRC promulgated the *Provisions on Administration of Investment in Automobile Industry,* or the Investment Provisions, which became effective on January 10, 2019. According to the Investment Provisions, enterprises are encouraged to, through equity investment and cooperation in production capacity, enter into strategic cooperation relationship, carry out joint research and development of products, organize manufacturing activities jointly and increase industrial concentration. The advantageous resources in production, high learning, research, application and other areas shall be integrated and core enterprises in automobile industry shall be propelled to form industrial alliance and industrial consortium.

According to the *Regulations on the Administration of Newly Established Pure Electric Passenger Vehicle Enterprises*, or the New Electric Passenger Vehicle Enterprise Regulations, which became effective on July 10, 2015, before our vehicles (including our current vehicles manufactured in cooperation with JAC) can be added to the *Announcement of Vehicle Manufacturers and Products*, or the Manufacturers and Products Announcement, issued by the MIIT, a procedure that is required in order for our vehicles to be approved for manufacture and sale in China, our vehicles must meet the applicable requirements set forth in relevant laws and regulations. Such relevant laws and regulations include, among others, the *Administrative Rules on the Admission of New Energy Vehicle Manufacturers and Products*, or the MIIT Admission Rules, which became effective on July 1, 2017 and were amended on July 24, 2020, and the *Administrative Rules on the Admission of Passenger Vehicles Manufacturer and Products*, which became effective on January 1, 2012, and pass the review by the MIIT. NEVs that have entered into the Manufacturers and Products Announcement are required to undergo regular inspection every three years by the MIIT so that the MIIT may determine whether the vehicles remain qualified to stay in the Manufacturers and Products Announcement.

According to the MIIT Admission Rules, in order for our vehicles to enter into the Manufacturers and Products Announcement, our vehicles must satisfy certain conditions, including, among others, meeting certain standards set out therein, meeting other safety and technical requirements specified by the MIIT, and passing inspections conducted by a state-recognized testing institution. Once such conditions for vehicles are met and the application has been approved by the MIIT, the qualified vehicles are published in the Manufacturers and Products Announcement by the MIIT. Where any new energy vehicle manufacturer manufactures or sells any model of a new energy vehicle without the prior approval of the competent authorities, including being published in the Manufacturers and Products Announcement by the MIIT, it may be subject to penalties, including fines, forfeiture of any illegally manufactured and sold vehicles and spare parts and revocation of its business licenses.

**Regulations on Compulsory Product Certification**

Under the *Administrative Regulations on Compulsory Product Certification* which was promulgated by the General Administration of Quality Supervision, Inspection and Quarantine, or the QSIQ (which has been merged into the SAMR), on July 3, 2009 and became effective on September 1, 2009, and the *List of the First Batch of Products Subject to Compulsory Product Certification* which was promulgated by the QSIQ in association with the State Certification and Accreditation Administration Committee on December 3, 2001 and became effective on May 1, 2002, the QSIQ is responsible for the regulation and quality certification of automobiles. Automobiles and parts and components must not be sold, exported or used in operating activities until they are certified by designated certification authorities of the PRC as qualified products and granted certification marks.

**Regulations on Electric Vehicle Charging Infrastructure**

Pursuant to the *Guidance Opinions of the General Office of the State Council on Accelerating the Promotion and Application of the New Energy Vehicles*, which became effective on July 14, 2014, the *Guidance Opinions of the General Office of the State Council on Accelerating the Development of Charging Infrastructures of the Electric Vehicle*, which became effective on September 29, 2015, the *Guidance on the Development of Electric Vehicle Charging Infrastructure (2015-2020),* which became effective on October 9, 2015, and the *Development Plan for the New-energy Vehicle Industry (2021-2035)*, which became effective on October 20, 2020, the PRC government encourages the construction and development of charging infrastructure for electric vehicles, such as charging stations and battery swap stations, and only centralized charging and battery replacement power stations are required to obtain approvals for construction, permits from the relevant authorities. The *Circular on Accelerating the Development of Electric Vehicle Charging Infrastructures in Residential Areas* promulgated on July 25, 2016 further provides that the operators of electric vehicle charging and battery swap infrastructure are required to be covered under liability insurance policies to protect the purchasers of electric vehicles, covering the safety of electric vehicle charging.

76

Table of Contents

**Regulations on Automobile Sales**

Pursuant to the *Administrative Measures on Automobile Sales* promulgated by the MOFCOM, April 5, 2017, which became effective on July 1, 2017, automobile suppliers and dealers are required to file with relevant authorities through the information system for the national automobile circulation operated by the competent commerce department within 90 days after the receipt of a business license. Where there is any change to the information concerned, automobile suppliers and dealers must update such information within 30 days after such change.

**Regulations on the Recall of Defective Automobiles**

On October 22, 2012, the State Council promulgated the *Administrative Provisions on Defective Automotive Product Recalls*, which became effective on January 1, 2013 and were amended on March 3, 2019. The product quality supervision department of the State Council is responsible for the supervision and administration of recalls of defective automotive products nationwide. Pursuant to the administrative provisions, manufacturers of automobile products are required to take measures to eliminate defects in products they sell. A manufacturer must recall all defective automobile products. Failure to recall such products may result in an order to recall the defective products from the quality supervisory authority of the State Council. If any operator conducting sales, leasing, or repair of vehicles discovers any defect in automobile products, it must cease to sell, lease or use the defective products and must assist manufacturers in the recall of those products. Manufacturers must recall their products through publicly available channels and publicly announce the defects. Manufacturers must take measures to eliminate or cure defects, including rectification, identification, modification, replacement or return of the products. Manufacturers that attempt to conceal defects or do not recall defective automobile products in accordance with relevant regulations will be subject to penalties, including fines, forfeiture of any income earned in violation of law and revocation of licenses.

Pursuant to the *Implementation Rules on the Administrative Provisions on Defective Automotive Product Recalls*, which became effective on January 1, 2016 and was latest amended on October 23, 2020, if a manufacturer is aware of any potential defect in its automobiles, it must investigate in a timely manner and report the results of such investigation to the QSIQ. Where any defect is found during the investigations, the manufacturer must cease to manufacture, sell, or import the relevant automobile products and recall such products in accordance with applicable laws and regulations.

On November 25, 2020, the SAMR issued the *Circular on Further Improving the Regulation of Recall of Automobile with Over-the-Air (OTA) Technology*, pursuant to which automobiles manufacturers that provide technical services through OTA are required to complete filing with the SAMR and those who have provided such services through OTA must complete such filing before December 31, 2020. In addition, if an automaker uses OTA technology to eliminate defects and recalls their defective products, it must make a recall plan and completes a filing with the SAMR.

**Regulations on Product Liability**

Pursuant to the Product Quality Law of the PRC, promulgated on February 22, 1993 and latest amended on December 29, 2018, a manufacturer is prohibited from producing or selling products that do not meet applicable standards and requirements for safeguarding human health and ensuring human and property safety. Products must be free from unreasonable dangers threatening human and property safety. Where a defective product causes physical injury to a person or property damage, the aggrieved party may make a claim for compensation from the producer or the seller of the product. Producers and sellers of non-compliant products may be ordered to cease the production or sale of the products and could be subject to confiscation of the products and/or fines. Earnings from sales in contravention of such standards or requirements may also be confiscated, and in severe cases, an offender's business license may be revoked.

77

Table of Contents

**Favorable Government Policies Relating to New Energy Vehicles in the PRC**

*Government Subsidies for Purchasers of New Energy Vehicles*

On April 22, 2015, the Ministry of Finance, or the MOF, the Ministry of Science and Technology, or the MOST, the MIIT and the NDRC jointly issued the *Circular on the Financial Support Policies on the Promotion and Application of New Energy Vehicles in 2016-2020*, or the Financial Support Circular, which took effect on the same day. The Financial Support Circular provides that those who purchase new energy vehicles specified in the *Catalogue of Recommended New Energy Vehicle Models for Promotion and Application* by the MIIT, or the Recommended NEV Catalogue, may obtain subsidies from the PRC national government. Pursuant to the Financial Support Circular, a purchaser may purchase a new energy vehicle from a seller by paying the original price minus the subsidy amount, and the seller may obtain the subsidy amount from the government after such new energy vehicle is sold to the purchaser. The ES8, the ES6 and the EC6 are eligible for such subsidies. The Financial Support Circular also provided a preliminary phase-out schedule for the provision of subsidies.

On December 29, 2016, the MOF, the MOST, the MIIT and the NDRC jointly issued the *Circular on Adjusting the Subsidy Policy for the Promotion and Application of New Energy Vehicles*, or the Circular on Adjusting the Subsidy Policy, which took effect on January 1, 2017, to adjust the existing subsidy standard for purchasers of new energy vehicles. The Circular on Adjusting the Subsidy Policy capped the local subsidies at 50% of the national subsidy amount, and further specified that national subsidies for purchasers purchasing certain new energy vehicles (except for fuel cell vehicles) from 2019 to 2020 will be reduced by 20% as compared to 2017 subsidy standards.

The subsidy standard is reviewed and updated on an annual basis. The 2019 subsidy standard as provided in the Circular on Further Improving the Subsidy Policies for the Promotion and Application of New Energy Vehicles, which was jointly promulgated by the MOF, the MOST, the MIIT and the NDRC on March 26, 2019, reduced the amount of national subsidies and canceled local subsidies, resulting in a significant reduction in the total subsidy amount applicable to the ES8 and the ES6 as compared to 2018.

The 2020 subsidy standard, effective from April 23, 2020, was provided in the Circular on Improving the Subsidy Policies for the Promotion and Application of New Energy Vehicles jointly promulgated by the MOF, the MOST, the MIIT and the NDRC on the same day. The 2020 subsidy standard reduces the base subsidy amount by 10% for each NEV, sets subsidies for 2 million vehicles as the upper limit of annual subsidy scale, and provides that national subsidy shall only apply to an NEV with the sale price under RMB300,000 or equipped with battery swapping module. The current 2021 subsidy standard, effective from January 1, 2021, was provided in the *Circular on Further Improving the Subsidy Policies for the Promotion and Application of New Energy Vehicles* jointly promulgated by the MOF, the MOST, the MIIT and the NDRC on December 31, 2020. The current 2021 subsidy standard reduces the base subsidy amount by 20% for each NEV on the basis of that for the previous year. Further, the 2022 subsidy standard is expected to be reduced by 30% as compared to the standard of the immediate preceding year.

*Exemption of Vehicle Purchase Tax*

On December 26, 2017, the MOF, the SAT, the MIIT and the MOST jointly issued the *Announcement on Exemption of Vehicle Purchase Tax for New Energy Vehicle*, or the Announcement on Exemption of Vehicle Purchase Tax. On June 28, 2019, the MOF and the SAT jointly issued the *Renewal of Preferential Policies on Vehicle Purchase Tax,* or the Renewal Announcement. Pursuant to the two announcements, from January 1, 2018 to December 31, 2020, the vehicle purchase tax which is applicable for ICE vehicles is not imposed on purchases of qualified new energy vehicles listed in the *Catalogue of New Energy Vehicle Models Exempt from Vehicle Purchase Tax*, or the NEV Catalogue, issued by the MIIT. Such announcement provides that the policy on exemption of vehicle purchase tax is also applicable to new energy vehicles added to the Catalogue prior to December 31, 2017. The ES8 was added into the NEV Catalogue (15th batch) on December 19, 2017, and the ES6 was added into the NEV Catalogue (26th batch) on December 9, 2019. Therefore, purchasers of ES8 and ES6 may enjoy such tax exemption. On April 16, 2020, the MOF, the SAT and the MIIT jointly issued the *Announcement on Exemption of Vehicle Purchase Tax for New Energy Vehicle*, with effect from January 1, 2021, which extends the vehicle purchase tax exemption period provided under the above two announcements till December 31, 2022.

*Non-imposition of Vehicle and Vessel Tax*

The *Preferential Vehicle and Vessel Tax Policies for Energy-saving and New Energy Vehicles and Vessels*, which was jointly promulgated by the MOF, the Ministry of Transport, the SAT and the MIIT on July 10, 2018, clarifies that NEVs are not subject to vehicle and vessel tax.

78

Table of Contents

*New Energy Vehicle License Plate*

In recent years, in order to control the number of motor vehicles on the road, certain local governments have issued restrictions on the issuance of vehicle license plates. These restrictions generally do not apply to the issuance of license plates for new energy vehicles, which makes it easier for purchasers of new energy vehicles to obtain automobile license plates. For example, pursuant to the *Implementation Measures on Encouraging Purchase and Use of New Energy Vehicles in Shanghai*, local authorities will issue new automobile license plates to qualified purchasers of new energy vehicles without requiring such qualified purchasers to go through certain license-plate bidding processes and to pay license-plate purchase fees as compared with purchasers of ICE vehicles.

*Policies Relating to Incentives for Electric Vehicle Charging Infrastructure*

On January 11, 2016, the MOF, the MOST, the MIIT, the NDRC and the National Energy Administration, or the NEA, jointly promulgated the Circular on Incentive Policies on the Charging Infrastructures of New Energy Vehicles and Strengthening the Promotion and Application of New Energy Vehicles during the 13th Five-year Plan Period, which became effective on January 1, 2016. Pursuant to such circular, the central finance department is expected to provide certain local governments with funds and subsidies for the construction and operation of charging facilities and other relevant charging infrastructure.

Certain local governments have also implemented incentive policies for the construction and operation of charging infrastructure. For example, pursuant to the Supporting Measures on Encouraging the Development of Charging Infrastructures of the Electric Vehicles in Shanghai, which took effect on May 5, 2016, builders of certain non-self-use charging infrastructure may be eligible for subsidies for up to 30% of their investment cost, and the operator of certain non-self-use charging infrastructure may be eligible for subsidies calculated based on electricity output.

All the above incentives are expected to facilitate acceleration of development of public charging infrastructure, which will consequently offer more accessible and convenient EV power solutions to purchasers of electric vehicles.

79

Table of Contents

*Incentives in Certain Major Cities*

Government incentives to purchase electric vehicles exist at both the national and local level in China. As an example, the table below sets forth a summary of preferential policies in eight cities.

| | Beijing | Shanghai | Guangzhou | Shenzhen | Chengdu | Nanjing | Hangzhou | Wuhan |
|---|---|---|---|---|---|---|---|---|
| Restrictions on ICE vehicles purchases | ✓ | ✓ | ✓ | ✓ | | | ✓ | |
| Quantity of NEV car plates | 60,000[1] | Unlimited | Unlimited | Unlimited | Unlimited | Unlimited | Unlimited | Unlimited |
| Subsidies and Preferential Policies to NEVs | All NEVs have specific pool of license plates and have no traffic restrictions | Subsidies and preferential electricity rate for public charging facilities | Subsidies for construction cost and preferential electricity rate for public charging facilities in 2019 and 2020 | Subsidies for construction cost of qualified operators of public charging facilities | Subsidies and preferential electricity rate for public and self-use charging facilities | Subsidies for construction cost of qualified operators of public charging facilities and preferential electricity rate for public charging facilities | Subsidies for public charging facilities at 30% of total investment from June 26, 2019 to December 31, 2020 and subsidies for public and self-use charging facilities | Preferential electricity rate for NEV charging facilities, peak time rates and off-peak time rates are applied |
| Favorable Policies on driving restrictions to NEVs | No restriction on BEVs. ICE vehicles, PHEVs and HEVs are restricted by the last digit of the car plate on workdays | No restriction on NEVs. Non-local ICE vehicles are not allowed to pass through main viaducts[2] from 7:00 a.m. to 8:00 p.m. on workdays. Non-local ICE vehicles will prohibited to pass through the roads in the inner ring from 7:00 a.m. to 10:00 a.m. and from 4:00 p.m. to 7:00 p.m. from May 2021 | No restriction on NEVs. Non-local ICE vehicles are not permitted to drive in the city center for over four consecutive days, and shall wait four days before entering the city center again | Non-local ICE trucks are not allowed to enter the city from 7:00 a.m. to 10:00 a.m. and from 3:00 p.m. to 8:00 p.m. on workdays. No restriction on non-local NEV trucks | No restriction on NEVs. ICE vehicles are not permitted to drive in the city center from 7:30 a.m. to 8:00 p.m. on workdays by the last digit of the car plate | No restriction on NEVs. Non-local ICE light vehicles are not allowed to pass through the tunnel of Yangtze River | No restriction on NEVs. ICE vehicles are restricted by the last digit of the car plate from 7:00 a.m. and from 4:30 p.m. to 6:30 p.m. on workdays | No restriction on NEVs. ICE vehicles are restricted on designated bridges and tunnels from 7:00 a.m. to 10:00 p.m. every day by odd / even number of the car license plate |

\* References in this table to (i) HEVs are to hybrid electric vehicles and (ii) PHEVs are to plug-in hybrid electric vehicles.

(1) The number of NEV licenses issued by the Beijing local government for 2019 is 60,000 while total new car licenses in Beijing for 2019 is 100,000. The number of NEV licenses issued by the Beijing local government for 2020 is 60,000 while total new car licenses in Beijing for 2020 is 100,000. The number of NEV licenses issued by the Beijing local government for 2021 is 60,000.

(2) Including eleven viaducts, two bridges and two tunnels.

Table of Contents

**Regulations on Value-added Telecommunications Services**

In 2000, the State Council promulgated the Telecommunications Regulations of the PRC, or the Telecommunications Regulations, which was most recently amended in February 2016 and provides a regulatory framework for telecommunications services providers in the PRC. The Telecommunications Regulations categorize all telecommunications businesses in China as either basic or value-added. Value-added telecommunications services are defined as telecommunications and information services provided through public network infrastructure. Pursuant to the Classified Catalogue of Telecommunications Services, an attachment to the Telecommunications Regulations, which was most recently updated in June 2019 by the MIIT, internet information services, or ICP services, are classified as value-added telecommunications services. Under the Telecommunications Regulations and relevant administrative measures, commercial operators of value-added telecommunications services must first obtain a license for conducting Internet content provision services, or an ICP license, from the MIIT or its provincial level counterparts. Otherwise, such operator might be subject to sanctions, including corrective orders and warnings, imposition of fines and confiscation of illegal gains and, in the case of significant infringement, orders to close the website.

Pursuant to the Administrative Measures on Internet Information Services, promulgated by the State Council in 2000 and amended in 2011, "internet information services" refer to the provision of information through the internet to online users, and are divided into "commercial internet information services" and "non-commercial internet information services." A commercial ICP service operator must obtain an ICP license before engaging in any commercial ICP service within China, while the ICP license is not required if the operator will only provide internet information on a non-commercial basis.

In addition to the regulations and measures above, the provision of commercial internet information services on mobile internet applications are regulated by the Administrative Provisions on Information Services of Mobile Internet Applications, promulgated by the State Internet Information Office in June 2016. Information services providers of mobile internet applications are subject to these provisions, including acquiring relevant qualifications and being responsible for management of information security.

**Regulations on Consumer Rights Protection**

Our business is subject to a variety of consumer protection laws, including the PRC Consumer Rights and Interests Protection Law, as amended in 2013 and became effective on March 15, 2014, which imposes stringent requirements and obligations on business operators. Failure to comply with these consumer protection laws could subject us to administrative sanctions, such as the issuance of a warning, confiscation of illegal income, imposition of fines, an order to cease business operations, revocation of business licenses, as well as potential civil or criminal liabilities.

**Regulations on Internet Information Security and Privacy Protection**

In November 2016, the Standing Committee of the National People's Congress, or the SCNPC, promulgated the Cyber Security Law of the PRC, or the Cyber Security Law, which became effective on June 1, 2017. The Cyber Security Law requires that a network operator, which includes, among others, internet information services providers, take technical measures and other necessary measures in accordance with applicable laws and regulations and the compulsory requirements of the national and industrial standards to safeguard the safe and stable operation of its networks. We are subject to such requirements as we are operating a website and mobile application and providing certain internet services mainly through our mobile application. The Cyber Security Law further requires internet information services providers to formulate contingency plans for network security incidents, report to the competent departments immediately upon the occurrence of any incident endangering cyber security and take corresponding remedial measures.

Internet information services providers are also required to maintain the integrity, confidentiality and availability of network data. The Cyber Security Law reaffirms the basic principles and requirements specified in other existing laws and regulations on personal data protection, such as the requirements on the collection, use, processing, storage and disclosure of personal data, and internet information services providers being required to take technical and other necessary measures to ensure the security of the personal information they have collected and prevent the personal information from being divulged, damaged or lost. Any violation of the Cyber Security Law may subject the internet information services provider to warnings, fines, confiscation of illegal gains, revocation of licenses, cancellation of filings, shutdown of websites or criminal liabilities.

Table of Contents

The General Administration of Quality Supervision, Inspection and Quarantine and Standardization Administration issued the *Standard of Information Security Technology - Personal Information Security Specification (2017 edition)*, which took effect in May 2018, and the *Standard of Information Security Technology - Personal Information Security Specification (2020 edition)*, which took effect in October 2020. Pursuant to these standards, any entity or person who has the authority or right to determine the purposes for and methods of using or processing personal information is deemed as a personal data controller. Such personal data controller is required to collect information in accordance with applicable laws, and prior to collecting such data, the information provider's consent is required.

On November 28, 2019, the Secretary Bureau of the Cyberspace Administration of China, the General Office of the MIIT, the General Office of the Ministry of Public Security and the General Office of the SAMR jointly issued the Notice on the Measures for Determining the Illegal Collection and Use of Personal Information through Mobile Applications, which aims to provide reference for supervision and administration departments and provide guidance for mobile applications operators' self-examination and self-correction and social supervision by netizens, and further elaborates the forms of behavior constituting illegal collection and use of the personal information through mobile applications including: (i) failing to publish the rules on the collection and use of personal information; (ii) failing to explicitly explain the purposes, methods and scope of the collection and use of personal information; (iii) collecting and using personal information without the users' consent; (iv) collecting personal information unrelated to the services they provide and beyond the necessary principle; (v) providing personal information to others without the users' consent; (vi) failing to provide the function of deleting or correcting the personal information according to the laws or failing to publish information such as ways of filing complaints and reports.

In addition, on May 28, 2020, the National People's Congress of the PRC approved the PRC Civil Code, which came into effect on January 1, 2021. Pursuant to the PRC Civil Code, the collection, storage, use, process, transmission, provision and disclosure of personal information should follow the principles of legitimacy, properness and necessity.

**Regulations on E-commerce**

On August 31, 2018, the SCNPC promulgated the E- Commerce Law of the People's Republic of China, or the E-Commerce Law, which became effective as of January 1, 2019. The E-Commerce Law establishes the regulatory framework for the e-commerce sector in the PRC for the first time by laying out certain requirements on e-commerce platform operators. According to the E-Commerce Law, the e-commerce platform operators shall prepare a contingency plan for cybersecurity events and take technological measures and other measures to prevent online illegal and criminal activities. The E-Commerce Law also expressly requires e-commerce platform operators to take necessary actions to ensure fair dealing on their platforms to safeguard the legitimate rights and interests of consumers, including to prepare platform service agreements and transaction information record-keeping and transaction rules, to prominently display such documents on the platform's website, and to keep such information for no less than three years following the completion of a transaction. Where the e-commerce platform operators conduct self-operated business on their platforms, they shall distinguish and mark their self-operated business from the businesses of the business operators using the platform in a prominent manner, and shall not mislead consumers. The e-commerce platform operators shall bear civil liability of a commodity seller or service provider for the business marked as self-operated, pursuant to the law.

**Regulations on Land and the Development of Construction Projects**

*Regulations on Land Grants*

Under the Interim Regulations on Assignment and Transfer of the Rights to the Use of the State-owned Urban Land, promulgated by the State Council on May 19, 1990 and latest amended on November 29, 2020, a system of assignment and transfer of the right to use state-owned land was adopted. A land user must pay land premiums to the state as consideration for the assignment of the right to use a land site within a certain term, and the land user who obtained the right to use the land may transfer, lease out, mortgage or otherwise commercially exploit the land within the term of use. Under the Interim Regulations on Assignment and Transfer of the Rights to the Use of the State-owned Urban Land and the Law of the PRC on Urban Real Estate Administration, the local land administration authority may enter into an assignment contract with the land user for the assignment of land use rights. The land user is required to pay the land premium as provided in the assignment contract. After the full payment of the land premium, the land user must register with the land administration authority and obtain a land use rights certificate which evidences the acquisition of land use rights.

82

Table of Contents

*Regulations on Planning of a Construction Project*

Pursuant to the Regulations on Planning Administration regarding Assignment and Transfer of the Rights to Use of the State-Owned Land in Urban Area promulgated by the Ministry of Construction in December 1992 and amended in January 2011, a construction land planning permit shall be obtained from the municipal planning authority with respect to the planning and use of land. According to the Urban and Rural Planning Law of the PRC promulgated by the SCNPC on October 28, 2007 and latest amended on April 23, 2019, a construction work planning permit must be obtained from the competent urban and rural planning government authority for the construction of any structure, fixture, road, pipeline or other engineering project within an urban or rural planning area.

After obtaining a construction work planning permit, subject to certain exceptions, a construction enterprise must apply for a construction work commencement permit from the construction authority under the local people's government at the county level or above in accordance with the Administrative Provisions on Construction Permit of Construction Projects promulgated by the Ministry of Housing and Urban-Rural Development, or the MOHURD, on June 25, 2014 and implemented on October 25, 2014 and amended on September 28, 2018.

Pursuant to the Administrative Measures for Reporting Details Regarding Acceptance Examination upon Completion of Buildings and Municipal Infrastructure promulgated by the Ministry of Construction on April 4, 2000 and amended on October 19, 2009 and the Provisions on Acceptance Examination upon Completion of Buildings and Municipal Infrastructure promulgated and implemented by the MOHURD on December 2, 2013, upon the completion of a construction project, the construction enterprise must submit an application to the competent department in the people's government at or above county level where the project is located, for examination upon completion of building and for filing purpose; and to obtain the filing form for acceptance and examination upon completion of construction project.

**Regulations on Environmental Protection and Work Safety**

*Regulations on Environmental Protection*

Pursuant to the Environmental Protection Law of the PRC promulgated by the SCNPC, on December 26, 1989, amended on April 24, 2014 and effective on January 1, 2015, any entity which discharges or will discharge pollutants during the course of operations or other activities must implement effective environmental protection safeguards and procedures to control and properly treat waste gas, waste water, waste residue, dust, malodorous gases, radioactive substances, noise vibrations, electromagnetic radiation and other hazards produced during such activities.

Environmental protection authorities impose various administrative penalties on persons or enterprises in violation of the Environmental Protection Law. Such penalties include warnings, fines, orders to rectify within the prescribed period, orders to cease construction, orders to restrict or suspend production, orders to make recovery, orders to disclose relevant information or make an announcement, imposition of administrative action against relevant responsible persons, and orders to shut down enterprises. Any person or entity that pollutes the environment resulting in damage could also be held liable under the PRC Civil Code. In addition, environmental organizations may also bring lawsuits against any entity that discharges pollutants detrimental to the public welfare.

*Regulations on Work Safety*

Under relevant construction safety laws and regulations, including the Work Safety Law of the PRC which was promulgated by the SCNPC on June 29, 2002 and latest amended in 2014, production and operating business entities must establish objectives and measures for work safety and improve the working environment and conditions for workers in a planned and systematic way. A work safety protection scheme must also be set up to implement the work safety job responsibility system. In addition, production and operating business entities must arrange work safety training and provide the employees with protective equipment that meets the national standards or industrial standards. Automobile and components manufacturers are subject to the above-mentioned environment protection and work safety requirements.

Table of Contents

**Regulations on Fire Control**

Pursuant to the Fire Safety Law of the PRC promulgated by the SCNPC on April 29, 1998 and most recently amended on April 23, 2019, for special construction projects stipulated by the housing and urban-rural development authority of the State Council, the developer shall submit the fire safety design documents to the housing and urban-rural development authority for examination, while for construction projects other than those stipulated as special development projects, the developer shall, at the time of applying for the construction permit or approval for work commencement report, provide the fire safety design drawings and technical materials that satisfy the construction needs. According to Interim Regulations on Administration of Examination and Acceptance of Fire Control Design of Construction Projects promulgated on April 1, 2020 and effective on June 1, 2020, an examination system for fire prevention design and acceptance only applies to special construction projects, and for other projects, a record-filing and spot check system would be applied.

**Regulations on Intellectual Property Rights**

*Patent Law*

According to the Patent Law of the PRC (Revised in 2008), the State Intellectual Property Office is responsible for administering patent law in the PRC. The patent administration departments of provincial, autonomous region or municipal governments are responsible for administering patent law within their respective jurisdictions. The Chinese patent system adopts a first-to-file principle, which means that when more than one person files different patent applications for the same invention, only the person who files the application first is entitled to obtain a patent of the invention. To be patentable, an invention or a utility model must meet three criteria: novelty, inventiveness and practicability. A patent is valid for twenty years in the case of an invention and ten years in the case of utility models and designs. On October 17, 2020, the Standing Committee of the National People's Congress promulgated the Amendment to the Patent Law of the PRC, which will be effective from June 1, 2021, which provides, among others, that the protection period for a design patent will become 15 years.

*Regulations on Copyright*

The Copyright Law of the PRC, or the Copyright Law, which took effect on June 1, 1991 and was latest amended in 2020 and will be effective on June 1, 2021, provides that Chinese citizens, legal persons, or other organizations shall, whether published or not, own copyright in their copyrightable works, which include, among others, works of literature, art, natural science, social science, engineering technology and computer software. Copyright owners enjoy certain legal rights, including right of publication, right of authorship and right of reproduction. The Copyright Law extends copyright protection to Internet activities, products disseminated over the Internet and software products. In addition, the Copyright Law provides for a voluntary registration system administered by the China Copyright Protection Center, or the CPCC. According to the Copyright Law, an infringer of the copyrights shall be subject to various civil liabilities, which include ceasing infringement activities, apologizing to the copyright owners and compensating the loss of the copyright owner. Infringers of a copyright may also be subject to fines and/or administrative or criminal liabilities in severe situations.

Pursuant to the Computer Software Copyright Protection Regulations promulgated by the State Council on December 20, 2001 and amended on January 30, 2013, the software copyright owner may go through the registration formalities with a software registration authority recognized by the State Council's copyright administrative department. The software copyright owner may authorize others to exercise that copyright, and is entitled to receive remuneration.

84

Table of Contents

*Trademark Law*

Trademarks are protected by the Trademark Law of the PRC which was adopted on August 23, 1982 and latest amended in 2019, as well as by the Implementation Regulations of the PRC Trademark Law adopted by the State Council in 2002 and as most recently amended on April 29, 2014. The Trademark Office under the State Administration for Industry and Commerce, handles trademark registrations. The Trademark Office grants a ten-year term to registered trademarks and the term may be renewed for another ten-year period upon request by the trademark owner. A trademark registrant may license its registered trademarks to another party by entering into trademark license agreements, which must be filed with the Trademark Office for its record. As with patents, the Trademark Law has adopted a first-to-file principle with respect to trademark registration. If a trademark applied for is identical or similar to another trademark which has already been registered or subject to a preliminary examination and approval for use on the same or similar kinds of products or services, such trademark application may be rejected. Any person applying for the registration of a trademark may not injure existing trademark rights first obtained by others, nor may any person register in advance a trademark that has already been used by another party and has already gained a "sufficient degree of reputation" through such party's use.

*Regulations on Domain Names*

The MIIT promulgated the Measures on Administration of Internet Domain Names, or the Domain Name Measures, on August 24, 2017, which took effect on November 1, 2017 and replaced the Administrative Measures on China Internet Domain Name promulgated by the MIIT on November 5, 2004. According to the Domain Name Measures, the MIIT is in charge of the administration of PRC internet domain names. The domain name registration follows a first-to-file principle. Applicants for registration of domain names must provide the true, accurate and complete information of their identities to domain name registration service institutions. The applicants will become the holder of such domain names upon the completion of the registration procedure.

**Regulations on Foreign Investment in China**

*Guidance Catalogue of Industries for Foreign Investment*

Investments in the PRC by foreign investors and foreign-invested enterprises were regulated by the Guidance Catalogue of Industries for Foreign Investment, or the Foreign Investment Catalogue, jointly promulgated by the MOFCOM and NDRC on June 28, 1995 and amended from time to time. The Foreign Investment Catalogue was last repealed by the Special Management Measures (Negative List) for the Access of Foreign Investment (2020 Version), or the 2020 Negative List, which was jointly promulgated by the MOFCOM and the NDRC on June 23, 2020 and came into effect on July 23, 2020, and the Catalogue of Industries for Encouraging Foreign Investment (2020 Version), or the 2020 Encouraging Catalogue, which was jointly promulgated by the MOFCOM and the NDRC on December 27, 2020 and became effective on January 27, 2021. The 2020 Encouraging Catalogue and the 2020 Negative List set out the industries and economic activities in which foreign investment in the PRC is encouraged, restricted or prohibited. Pursuant to the 2020 Encouraging Catalogue and the 2020 Negative List, the manufacture of the NEVs fall within the permitted catalogue, and the manufacture and the development of key parts and components of NEVs fall within the encouraged catalogue. However, the 2020 Negative List also provides that foreign investors shall hold no more than 50% of the equity interests in a service provider operating certain value-added telecommunications services (other than for e-commerce, domestic multi-party communications, storage and forwarding categories, call centers).

The establishment, operation and management of corporate entities in the PRC is governed by the *PRC Company Law*, which was latest amended on October 26, 2018. The *PRC Company Law* generally governs two types of companies-limited liability companies and joint stock limited companies. The *PRC Company Law* shall also apply to foreign-invested companies. Where laws on foreign investment have other stipulations, such stipulations shall prevail. The establishment procedures, approval or record-filing procedures, registered capital requirements, foreign exchange matters, accounting practices, taxation and labor matters of a wholly foreign-owned enterprise are regulated by the Foreign Investment Law, which became effective on January 1, 2020 and replaced three existing laws on foreign investments in China, namely, the PRC Equity Joint Venture Law, the PRC Cooperative Joint Venture Law and the Wholly Foreign-owned Enterprise Law, together with their implementation rules and ancillary regulations.

85

Table of Contents

*Foreign Investment Law*

On March 15, 2019, the National People's Congress promulgated the Foreign Investment Law, which has become effective on January 1, 2020 and replaced three existing laws on foreign investments in China, namely, the PRC Equity Joint Venture Law, the PRC Cooperative Joint Venture Law and the Wholly Foreign-owned Enterprise Law, together with their implementation rules and ancillary regulations. The Foreign Investment Law embodies an expected PRC regulatory trend to rationalize its foreign investment regulatory regime in line with prevailing international practice and the legislative efforts to unify the corporate legal requirements for both foreign and domestic invested enterprises in China. The Foreign Investment Law establishes the basic framework for the access to, and the promotion, protection and administration of foreign investments in view of investment protection and fair competition.

According to the Foreign Investment Law, "foreign investment" refers to investment activities directly or indirectly conducted by one or more natural persons, business entities, or otherwise organizations of a foreign country (collectively referred to as "foreign investor") within China, and the investment activities include the following situations: (i) a foreign investor, individually or collectively with other investors, establishes a foreign-invested enterprise within China; (ii) a foreign investor acquires stock shares, equity shares, shares in assets, or other similar rights and interests of an enterprise within China; (iii) a foreign investor, individually or collectively with other investors, invests in a new project within China; and (iv) investments in other means as provided by laws, administrative regulations, or the State Council.

According to the Foreign Investment Law, the State Council will publish or approve to publish a catalogue for special administrative measures, or the "negative list." The Foreign Investment Law grants national treatment to foreign invested entities, except for those foreign invested entities that operate in industries deemed to be either "restricted" or "prohibited" in the "negative list." Because the "negative list" has yet been published, it is unclear whether it will differ from the current 2020 Negative List. The Foreign Investment Law provides that foreign invested entities operating in foreign restricted or prohibited industries will require market entry clearance and other approvals from relevant PRC governmental authorities.

Furthermore, the Foreign Investment Law provides that foreign invested enterprises established according to the existing laws regulating foreign investment may maintain their structure and corporate governance within five years after the implementation of the Foreign Investment Law.

In addition, the Foreign Investment Law also provides several protective rules and principles for foreign investors and their investments in the PRC, including, among others, that local governments shall abide by their commitments to the foreign investors; foreign-invested enterprises are allowed to issue stocks and corporate bonds; except for special circumstances, in which case statutory procedures shall be followed and fair and reasonable compensation shall be made in a timely manner, expropriation or requisition of the investment of foreign investors is prohibited; mandatory technology transfer is prohibited; and the capital contributions, profits, capital gains, proceeds out of asset disposal, licensing fees of intellectual property rights, indemnity or compensation legally obtained, or proceeds received upon settlement by foreign investors within China, may be freely remitted inward and outward in RMB or a foreign currency. Also, foreign investors or the foreign investment enterprise should be imposed legal liabilities for failing to report investment information in accordance with the requirements.

On December 26, 2019, the State Council promulgated the Implementation Regulations on the Foreign Investment Law, effective on January 1, 2020, which further requires that foreign-invested enterprises and domestic enterprises shall be treated equally with respect to policy making and implementation. Pursuant to the Implementation Regulations on the Foreign Investment Law, if the existing foreign-invested enterprises fail to change their original forms as of January 1, 2025, the relevant market regulation departments will not process other registration matters for the enterprises, and may disclose their relevant information to the public.

On December 30, 2019, the MOFCOM and the SAMR jointly issued the Measures for Reporting of Foreign Investment Information, or the Foreign Investment Information Measures, which became effective on January 1, 2020 and replaced the Interim Administrative Measures for the Record-filing of the Establishment and Modification of Foreign-invested Enterprises. Since January 1, 2020, for foreign investors carrying out investment activities directly or indirectly in the PRC, foreign investors or foreign-invested enterprises shall submit investment information through the Enterprise Registration System and the National Enterprise Credit Information Publicity System operated by the State Administration for Market Regulation. Foreign investors or foreign-invested enterprises shall disclose their investment information by submitting reports for their establishments, modifications and cancellations and their annual reports in accordance with the Foreign Investment Information Measures. If a foreign-invested enterprise investing in the PRC has finished submitting its reports for its establishment, modifications and cancellation and its annual reports, the relevant information will be shared by the competent market regulation department to the competent commercial department, and such foreign-invested enterprise is not required to submit the reports to the two departments separately.

86

Table of Contents

**Regulations on Foreign Exchange**

*General Administration of Foreign Exchange*

Under the *PRC Foreign Currency Administration Rules* promulgated on January 29, 1996 and most recently amended on August 5, 2008 and various regulations issued by the State Administration of Foreign Exchange of the PRC, or the SAFE, and other relevant PRC government authorities, Renminbi is convertible into other currencies for current account items, such as trade-related receipts and payments and payment of interest and dividends. The conversion of Renminbi into other currencies and remittance of the converted foreign currency outside the PRC of capital account items, such as direct equity investments, loans and repatriation of investment, requires the prior approval from the SAFE or its local office.

Payments for transactions that take place within the PRC must be made in Renminbi. Unless otherwise approved, PRC companies may not repatriate foreign currency payments received from abroad or retain the same abroad. Foreign-invested enterprises may retain foreign exchange in accounts with designated foreign exchange banks under the current account items subject to a cap set by the SAFE or its local branch. Foreign exchange proceeds under the current accounts may be either retained or sold to a financial institution engaged in settlement and sale of foreign exchange pursuant to relevant SAFE rules and regulations. For foreign exchange proceeds under the capital accounts, approval from the SAFE is generally required for the retention or sale of such proceeds to a financial institution engaged in settlement and sale of foreign exchange.

Pursuant to the *Circular of the SAFE on Further Improving and Adjusting Foreign Exchange Administration Policies for Direct Investment*, or the SAFE Circular No. 59, promulgated by SAFE on November 19, 2012, which became effective on December 17, 2012 and was further amended on May 4, 2015 and October 10, 2018, approval of SAFE is not required for opening a foreign exchange account and depositing foreign exchange into the accounts relating to the direct investments. The SAFE Circular No. 59 also simplified foreign exchange-related registration required for the foreign investors to acquire the equity interests of Chinese companies and further improve the administration on foreign exchange settlement for foreign-invested enterprises.

The *Circular on Further Simplifying and Improving the Foreign Currency Management Policy on Direct Investment*, or SAFE Circular No. 13, effective from June 1, 2015, cancels the administrative approvals of foreign exchange registration of direct domestic investment and direct overseas investment and simplifies the procedure of foreign exchange-related registration. Pursuant to SAFE Circular No. 13, the investors shall register with banks for direct domestic investment and direct overseas investment.

The *Circular on Reforming the Management Approach regarding the Settlement of Foreign Capital of Foreign-invested Enterprise*, or SAFE Circular No. 19, which was promulgated by the SAFE on March 30, 2015 and became effective on June 1, 2015, provides that a foreign-invested enterprise may, according to its actual business needs, settle with a bank the portion of the foreign exchange capital in its capital account for which the relevant foreign exchange administration has confirmed monetary capital contribution rights and interests (or for which the bank has registered the injection of the monetary capital contribution into the account). Pursuant to SAFE Circular No. 19, for the time being, foreign-invested enterprises are allowed to settle 100% of their foreign exchange capital on a discretionary basis; a foreign-invested enterprise shall truthfully use its capital for its own operational purposes within the scope of business; where an ordinary foreign-invested enterprise makes domestic equity investment with the amount of foreign exchanges settled, the foreign-invested enterprise must first go through domestic re-investment registration and open a corresponding account for foreign exchange settlement pending payment with the foreign exchange administration or the bank at the place where it is registered.

The *Circular on Reforming and Regulating Policies on the Control over Foreign Exchange Settlement of Capital Accounts*, or SAFE Circular No. 16, which was promulgated by the SAFE and became effective on June 9, 2016, provides that enterprises registered in the PRC may also convert their foreign debts from foreign currency into Renminbi on a self-discretionary basis. SAFE Circular No. 16 also provides an integrated standard for conversion of foreign exchange under capital account items (including, but not limited to, foreign currency capital and foreign debts) on a self-discretionary basis, which applies to all enterprises registered in the PRC.

According to the *Administrative Rules on the Company Registration*, which were promulgated by the State Council on June 24, 1994, became effective on July 1, 1994 and were amended on February 6, 2016, and other laws and regulations governing the foreign-invested enterprises and company registrations, the establishment of a foreign-invested enterprise and any capital increase and other major changes in a foreign-invested enterprise shall be registered with the SAMR or its local counterparts, and shall be filed via the foreign investment comprehensive administrative system, or the FICMIS, if such foreign-invested enterprise does not involve special access administrative measures prescribed by the PRC government.

87

Table of Contents

On October 23, 2019, SAFE issued the *Circular on Further Promoting Cross-border Trade and Investment Facilitation*. This circular allows the foreign-invested enterprises without equity investment as in their approved business scope to use their capital obtained from foreign exchange settlement to make domestic equity investment as long as the investments are real and in compliance with the foreign investment-related laws and regulations. In addition, this circular stipulates that qualified enterprises in certain pilot areas may use their capital income from registered capital, foreign debt and overseas listing, for the purpose of domestic payments without providing authenticity certifications to the relevant banks in advance for those domestic payments. Payments for transactions that take place within the PRC must be made in Renminbi. Foreign currency revenues received by PRC companies may be repatriated into the PRC or retained outside of the PRC in accordance with requirements and terms specified by SAFE.

Pursuant to SAFE Circular No. 13 and other laws and regulations relating to foreign exchange, when setting up a new foreign-invested enterprise, the foreign-invested enterprise shall register with the bank located at its registered place after obtaining the business license, and if there is any change in capital or other changes relating to the basic information of the foreign-invested enterprise, including, without limitation, any increase in its registered capital or total investment, the foreign-invested enterprise must register such changes with the bank located at its registered place after obtaining approval from or completing the filing with competent authorities. Pursuant to the relevant foreign exchange laws and regulations, the above-mentioned foreign exchange registration with the banks will typically take less than four weeks upon the acceptance of the registration application.

Based on the foregoing, if we intend to provide funding to our wholly foreign-owned subsidiaries through capital injection at or after their establishment, we must register the establishment of and any follow-on capital increase in our wholly foreign-owned subsidiaries with the SAMR or its local counterparts, file such via the FICMIS and register such with the local banks for the foreign exchange related matters.

### Loans by the Foreign Companies to their PRC Subsidiaries

A loan made by foreign investors as shareholders in a foreign-invested enterprise is considered to be foreign debt in China and is regulated by various laws and regulations, including the *Regulation of the People's Republic of China on Foreign Exchange Administration*, the *Interim Provisions on the Management of Foreign Debts*, the *Statistical Monitoring of Foreign Debts Tentative Provisions (Revised in 2020)*, the *Detailed Rules for the Implementation of Provisional Regulations on Statistics and Supervision of External Debt*, and the *Administrative Measures for Registration of Foreign Debts*. Under these rules and regulations, a shareholder loan in the form of foreign debt made to a PRC entity does not require the prior approval of the SAFE. However, such foreign debt must be registered with and recorded by the SAFE or its local branches within fifteen (15) business days after entering into the foreign debt contract. Pursuant to these rules and regulations, the balance of the foreign debts of a foreign-invested enterprise shall not exceed the difference between the total investment and the registered capital of the foreign-invested enterprise, or Total Investment and Registered Capital Balance.

On January 12, 2017, the People's Bank of China, or the PBOC, promulgated the *Notice of the People's Bank of China on Matters concerning the Macro-Prudential Management of Full-Covered Cross-Border Financing*, or PBOC Notice No. 9. Pursuant to PBOC Notice No. 9, within a transition period of one year from January 12, 2017, the foreign-invested enterprises may adopt the currently valid foreign debt management mechanism, or Current Foreign Debt Mechanism, or the mechanism as provided in PBOC Notice No. 9, or Notice No. 9 Foreign Debt Mechanism, at their own discretions. PBOC Notice No. 9 provides that enterprises may conduct independent cross-border financing in RMB or foreign currencies as required. Pursuant to PBOC Notice No. 9, the outstanding cross-border financing of an enterprise (the outstanding balance drawn, here and below) shall be calculated using a risk-weighted approach, or Risk-Weighted Approach, and shall not exceed certain specified upper limits. PBOC Notice No. 9 further provides that the upper limit of risk-weighted outstanding cross-border financing for enterprises shall be equal to 200% of its net assets multiplied by macro-prudential regulation parameter, or Net Asset Limits. The macro-prudential regulation parameter was initially 1 and has been adjusted to 1.25 from March 2020. Enterprises shall file with the SAFE in its capital item information system after entering into the relevant cross-border financing contracts and prior to three business days before drawing any money from the foreign debts.

88

Table of Contents

Based on the foregoing, if we provide funding to our wholly foreign-owned subsidiaries through shareholder loans, the balance of such loans shall not exceed the Total Investment and Registered Capital Balance and we will need to register such loans with the SAFE or its local branches in the event that the Current Foreign Debt Mechanism applies, or the balance of such loans shall be subject to the Risk-Weighted Approach and the Net Asset Limits and we will need to file the loans with the SAFE in its information system in the event that the Notice No. 9 Foreign Debt Mechanism applies. According to PBOC Notice No. 9, after a transition period of one year from January 11, 2017, the PBOC and the SAFE will determine the cross-border financing administration mechanism for the foreign-invested enterprises after evaluating the overall implementation of PBOC Notice No. 9. As of the date hereof, neither the PBOC nor the SAFE has promulgated and made public any further rules, regulations, notices or circulars in this regard. It is uncertain which mechanism will be adopted by the PBOC and the SAFE in the future and what statutory limits will be imposed on us when providing loans to our PRC subsidiaries.

*Offshore Investment*

Under the *Circular of the State Administration of Foreign Exchange on Issues Concerning the Foreign Exchange Administration over the Overseas Investment and Financing and Round-trip Investment by Domestic Residents via Special Purpose Vehicles*, or SAFE Circular 37, issued by the SAFE and effective on July 4, 2014, PRC residents are required to register with the local SAFE branch prior to the establishment or control of an offshore special purpose vehicle, or SPV, which is defined as an offshore enterprise directly established or indirectly controlled by PRC residents for investment and financing purposes, with the enterprise assets or interests PRC residents hold in China or overseas. The term "control" means to obtain the operation rights, right to proceeds or decision-making power of an SPV through acquisition, trust, holding shares on behalf of others, voting rights, repurchase, convertible bonds or other means. An amendment to registration or subsequent filing with the local SAFE branch by such PRC resident is also required if there is any change in basic information of the offshore company or any material change with respect to the capital of the offshore company. At the same time, the SAFE has issued the *Operation Guidance for the Issues Concerning Foreign Exchange Administration over Round-trip Investment* regarding the procedures for SAFE registration under SAFE Circular 37, which became effective on July 4, 2014 as an attachment of Circular 37.

Under the relevant rules, failure to comply with the registration procedures set forth in the SAFE Circular 37 may result in bans on the foreign exchange activities of the relevant onshore company, including the payment of dividends and other distributions to its offshore parent or affiliates, and may also subject relevant PRC residents to penalties under PRC foreign exchange administration regulations.

**Regulations on Dividend Distribution**

Wholly foreign-owned enterprises and Sino-foreign equity joint ventures in the PRC may pay dividends only out of their accumulated profits, if any, as determined in accordance with PRC accounting standards and regulations. Additionally, these foreign-invested enterprises may not pay dividends unless they set aside at least 10% of their respective accumulated profits after tax each year, if any, to fund certain reserve funds, until such time as the accumulative amount of such fund reaches 50% of the enterprise's registered capital. In addition, these companies also may allocate a portion of their after-tax profits based on PRC accounting standards to employee welfare and bonus funds at their discretion. These reserves are not distributable as cash dividends.

Regulations governing abovementioned dividend distribution arrangements have been replaced by the Foreign Investment Law of PRC and its implantation rules, which do not provide specific dividend distribution rules for foreign invested enterprises. The Foreign Investment Law and its implementation rules also provide that after the conversion from a wholly foreign-owned enterprise or sino-foreign equity joint venture to a foreign invested enterprise under the Foreign Investment Law, distribution method of gains agreed in the joint venture agreements may continue to apply.

Table of Contents

**Regulations on Taxation**

*Enterprise Income Tax*

On March 16, 2007, the SCNPC promulgated the *PRC Enterprise Income Tax Law* which was amended on February 24, 2017 and December 29, 2018. On December 6, 2007, the State Council enacted the *Regulations for the Implementation of the Enterprise Income Tax Law*, or collectively, the EIT Law. The EIT Law came into effect on January 1, 2008. Under the EIT Law, both resident enterprises and non-resident enterprises are subject to tax in the PRC. Resident enterprises are defined as enterprises that are established in China in accordance with PRC laws, or that are established in accordance with the laws of foreign countries but are actually or in effect controlled from within the PRC. Non-resident enterprises are defined as enterprises that are organized under the laws of foreign countries and whose actual management is conducted outside the PRC, but have established institutions or premises in the PRC, or have no such established institutions or premises but have income generated from inside the PRC. Under the EIT Law and relevant implementing regulations, a uniform corporate income tax rate of 25% is applied. However, if non-resident enterprises have not formed permanent establishments or premises in the PRC, or if they have formed permanent establishment or premises in the PRC but there is no actual relationship between the relevant income derived in the PRC and the established institutions or premises set up by them, enterprise income tax is set at the rate of 10% with respect to their income sourced from inside the PRC.

*Value-added Tax*

The *Provisional Regulations of the PRC on Value-added Tax* were promulgated by the State Council on December 13, 1993, came into effect on January 1, 1994 and were subsequently amended from time to time; and the *Detailed Rules for the Implementation of the Provisional Regulations of the PRC on Value-added Tax* (Revised in 2011) was promulgated by the MOF on December 25, 1993 and subsequently amended on December 15, 2008 and October 28, 2011, or collectively, the VAT Law. On November 19, 2017, the State Council promulgated the *Decisions on Abolishing the Provisional Regulations of the PRC on Business Tax and Amending the Provisional Regulations of the PRC on Value-added Tax*, or the Order 691. On March 21, 2019, the MOF, the SAT and the General Administration of Customs jointly issued the *Announcement on Relevant Policies on Deepen the Reform of Value-added Tax*, or the Announcement 39. According to the VAT Law and the Order 691, all enterprises and individuals engaged in the sale of goods, the provision of processing, repair and replacement services, sales of services, intangible assets, real property and the importation of goods within the territory of the PRC are the taxpayers of value-added tax, or VAT. According to the Announcement 39, the VAT tax rates generally applicable are simplified as 13%, 9%, 6% and 0%, which will become effective on April 1, 2019, and the VAT tax rate applicable to the small-scale taxpayers is 3%.

*Dividend Withholding Tax*

The EIT Law provides that since January 1, 2008, an income tax rate of 10% will normally be applicable to dividends declared to non-PRC resident investors that do not have an establishment or place of business in the PRC, or that have such establishment or place of business but the relevant income is not effectively connected with the establishment or place of business, to the extent such dividends are derived from sources within the PRC.

90

Table of Contents

Pursuant to the Arrangement Between the Mainland of China and the Hong Kong Special Administrative Region for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital, or the Double Taxation Avoidance Arrangement, and other applicable PRC laws, if a Hong Kong resident enterprise is determined by the competent PRC tax authority to have satisfied the relevant conditions and requirements under such Double Taxation Avoidance Arrangement and other applicable laws, the 10% withholding tax on the dividends the Hong Kong resident enterprise receives from a PRC resident enterprise may be reduced to 5%. However, based on the Circular on Certain Issues with Respect to the Enforcement of Dividend Provisions in Tax Treaties, or SAT Circular 81, issued on February 20, 2009 by the SAT, if the relevant PRC tax authorities determine, in their discretions, that a company benefits from such reduced income tax rate due to a structure or arrangement that is primarily tax-driven, such PRC tax authorities may adjust the preferential tax treatment. According to the Circular on Several Questions regarding the "Beneficial Owner" in Tax Treaties, which was issued on February 3, 2018 by the SAT and took effect on April 1, 2018, when determining the applicant's status as the "beneficial owner" regarding tax treatments in connection with dividends, interests or royalties in the tax treaties, several factors, including, without limitation, whether the applicant is obligated to pay more than 50% of his or her income in twelve months to residents in third country or region, whether the business operated by the applicant constitutes the actual business activities, and whether the counterparty country or region to the tax treaties does not levy any tax or grant any tax exemption on relevant incomes or levy tax at an extremely low rate, will be taken into account, and such factors will be analyzed according to the actual circumstances of the specific cases. This circular further provides that an applicant who intends to prove his or her status as the "beneficial owner" shall submit the relevant documents to the relevant tax bureau according to the Announcement on Issuing the Measures for the Administration of Non-Resident Taxpayers' Enjoyment of the Treatment under Agreements.

*Tax on Indirect Transfer*

On February 3, 2015, the SAT issued the Circular on Issues of Enterprise Income Tax on Indirect Transfers of Assets by Non-PRC Resident Enterprises, or Circular 7. Pursuant to Circular 7, an "indirect transfer" of assets, including equity interests in a PRC resident enterprise, by non-PRC resident enterprises, may be recharacterized and treated as a direct transfer of PRC taxable assets, if such arrangement does not have a reasonable commercial purpose and was established for the purpose of avoiding payment of PRC enterprise income tax. As a result, gains derived from such indirect transfer may be subject to PRC enterprise income tax. When determining whether there is a "reasonable commercial purpose" of the transaction arrangement, features to be taken into consideration include, inter alia, whether the main value of the equity interest of the relevant offshore enterprise derives directly or indirectly from PRC taxable assets; whether the assets of the relevant offshore enterprise mainly consists of direct or indirect investment in China or if its income is mainly derived from China; and whether the offshore enterprise and its subsidiaries directly or indirectly holding PRC taxable assets have a real commercial nature which is evidenced by their actual function and risk exposure. According to Circular 7, where the payer fails to withhold any or sufficient tax, the transferor shall declare and pay such tax to the tax authority by itself within the statutory time limit. Late payment of applicable tax will subject the transferor to default interest. Circular 7 does not apply to transactions of sale of shares by investors through a public stock exchange where such shares were acquired on a public stock exchange. On October 17, 2017, the SAT issued the Circular on Issues of Tax Withholding regarding Non-PRC Resident Enterprise Income Tax, or SAT Circular 37, which was amended by the Announcement of the State Administration of Taxation on Revising Certain Taxation Normative Documents issued on June 15, 2018 by the SAT. The SAT Circular 37 further elaborates the relevant implemental rules regarding the calculation, reporting and payment obligations of the withholding tax by the non-resident enterprises. Nonetheless, there remain uncertainties as to the interpretation and application of Circular 7. Circular 7 may be determined by the tax authorities to be applicable to our offshore transactions or sale of our shares or those of our offshore subsidiaries where non-resident enterprises, being the transferors, were involved.

**Regulations on Employment and Social Welfare**

*Labor Contract Law*

The Labor Contract Law of the PRC, or the Labor Contract Law, which was promulgated on January 1, 2008 and amended on December 28, 2012, is primarily aimed at regulating rights and obligations of employer and employee relationships, including the establishment, performance and termination of labor contracts. Pursuant to the Labor Contract Law, labor contracts shall be concluded in writing if labor relationships are to be or have been established between employers and employees. Employers are prohibited from forcing employees to work above certain time limits and employers shall pay employees for overtime work in accordance with national regulations. In addition, employee wages shall be no lower than local standards on minimum wages and must be paid to employees in a timely manner.

91

Table of Contents

*Interim Provisions on Labor Dispatch*

Pursuant to the Interim Provisions on Labor Dispatch promulgated by the Ministry of Human Resources and Social Security on January 24, 2014, which became effective on March 1, 2014, dispatched workers are entitled to equal pay with full-time employees for equal work. Employers are allowed to use dispatched workers for temporary, auxiliary or substitutive positions, and the number of dispatched workers may not exceed 10% of the total number of employees.

*Social Insurance and Housing Fund*

As required under the Regulation of Insurance for Labor Injury implemented on January 1, 2004 and amended in 2010, the Provisional Measures for Maternity Insurance of Employees of Corporations implemented on January 1, 1995, the Decisions on the Establishment of a Unified Program for Old-Aged Pension Insurance of the State Council issued on July 16, 1997, the Decisions on the Establishment of the Medical Insurance Program for Urban Workers of the State Council promulgated on December 14, 1998, the Unemployment Insurance Measures promulgated on January 22, 1999 and the Social Insurance Law of the PRC implemented on July 1, 2011 and amended on December 29, 2018, employers are required to provide their employees in the PRC with welfare benefits covering pension insurance, unemployment insurance, maternity insurance, work-related injury insurance and medical insurance. These payments are made to local administrative authorities. Any employer that fails to make social insurance contributions may be order to rectify the non-compliance and pay the required contributions within a prescribed time limit and be subject to a late fee. If the employer still fails to rectify the failure to make the relevant contributions within the prescribed time, it may be subject to a fine ranging from one to three times the amount overdue.

In accordance with the Regulations on the Administration of Housing Funds which was promulgated by the State Council in 1999 and latest amended in 2019, employers must register at the designated administrative centers and open bank accounts for depositing employees' housing funds. Employer and employee are also required to pay and deposit housing funds, with an amount no less than 5% of the monthly average salary of the employee in the preceding year in full and on time. See "Item 3. Key Information-D. Risk Factors-Risks Related to Doing Business in China-Increases in labor costs and enforcement of stricter labor laws and regulations in the PRC may adversely affect our business and our profitability."

*Employee Stock Incentive Plan*

Pursuant to the Notice of Issues Related to the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Listed Company, which was issued by the SAFE on February 15, 2012, employees, directors, supervisors, and other senior management who participate in any stock incentive plan of a publicly listed overseas company and who are PRC citizens or non-PRC citizens residing in China for a continuous period of no less than one year, subject to a few exceptions, are required to register with the SAFE through a qualified domestic agent, which may be a PRC subsidiary of such overseas listed company, and complete certain other procedures.

In addition, the SAT has issued certain circulars concerning employee stock options and restricted shares. Under these circulars, employees working in the PRC who exercise stock options or are granted restricted shares will be subject to PRC individual income tax. The PRC subsidiaries of an overseas listed company are required to file documents related to employee stock options and restricted shares with relevant tax authorities and to withhold individual income taxes of employees who exercise their stock options or purchase restricted shares. If the employees fail to pay or the PRC subsidiaries fail to withhold income tax in accordance with relevant laws and regulations, the PRC subsidiaries may face sanctions imposed by the tax authorities or other PRC governmental authorities.

**M&A Rules and Overseas Listing**

On August 8, 2006, six PRC governmental and regulatory agencies, including the MOFCOM and the CSRC, promulgated the Rules on Acquisition of Domestic Enterprises by Foreign Investors, or the M&A Rules, governing the mergers and acquisitions of domestic enterprises by foreign investors that became effective on September 8, 2006 and was revised on June 22, 2009. The M&A Rules, among other things, require that if an overseas company established or controlled by PRC companies or individuals, or PRC Citizens, intends to acquire equity interests or assets of any other PRC domestic company affiliated with the PRC Citizens, such acquisition must be submitted to the MOFCOM for approval. The M&A Rules also require that an offshore special vehicle, or a special purpose vehicle formed for overseas listing purposes and controlled directly or indirectly by the PRC companies or individuals, shall obtain the approval of the CSRC prior to overseas listing and trading of such special purpose vehicle's securities on an overseas stock exchange.

92

Table of Contents

**C. Organizational Structure**

The following diagram illustrates our current corporate structure, which includes our significant subsidiaries and consolidated affiliated entities as of the date of this annual report:



**Contractual Agreements with the VIE and Its Shareholders**

Historically, we had two sets of contractual agreements with two VIEs, Beijing NIO and Shanghai Anbin, and their respective shareholders. On March 31, 2021, NIO WFOE, Shanghai Anbin and each shareholder of Shanghai Anbin entered into a termination agreement pursuant to which each of the contractual agreements among NIO WFOE, Shanghai Anbin and its shareholders terminated as of the date of the agreement and after which date we no longer have effective control over Shanghai Anbin, no longer receive any economic benefits of Shanghai Anbin, no longer have an exclusive option to purchase all or part of the equity interests in Shanghai Anbin when and to the extent permitted by the PRC law, and no longer consolidate the financial results of Shanghai Anbin and its subsidiaries as our variable interest entity under U.S. GAAP. We had originally established Shanghai Anbin and its subsidiaries, including NIO New Energy, with the plan to build our own manufacturing plant in Shanghai. We have since decided not to carry out this plan. We decided to terminate the contractual agreements with Shanghai Anbin and its shareholders and wind down NIO New Energy as none of Shanghai Anbin or its subsidiaries currently engage in any material business activities or carry any material assets.

93

Table of Contents

The following is a summary of the contractual agreements with NIO WFOE and Beijing NIO.

*Agreements that provide us with effective control over Beijing NIO*

**Power of Attorney.** On April 19, 2018, each shareholder of Beijing NIO, Beijing NIO and NIO WFOE entered into powers of attorney. The terms contained in the respective powers of attorney are substantially similar. Pursuant to the powers of attorney, each shareholder of Beijing NIO irrevocably authorized NIO WFOE to act on the behalf of such shareholder with respect to all matters concerning the shareholding of the shares in Beijing NIO, including without limitation, attending shareholders' meetings of Beijing NIO, exercising all the shareholders' rights and shareholders' voting rights, and designating and appointing the legal representative, directors, supervisors, chief executive officer and other senior management members of Beijing NIO.

**Loan Agreement.** On April 19, 2018, each shareholder of Beijing NIO, Beijing NIO and NIO WFOE entered into loan agreements. The terms contained in the respective loan agreements are substantially similar. Pursuant to the loan agreement, NIO WFOE should provide the shareholders of Beijing NIO with a loan in aggregate amount of RMB10 million for the purpose of contribution of the registered capital of Beijing NIO or increase of the working capital of Beijing NIO. The shareholders agree that the proceeds from the transfer of the equity interest of the shareholders in Beijing NIO or for the working capital of Beijing NIO, pursuant to the exercise of the right to acquire such equity interest under the exclusive option agreement, should be used by the shareholders to repay the loan to the extent permissible. The loan agreements should become effective upon execution by the parties, and should expire upon the date of full performance by the parties of their respective obligations under the loan agreements.

**Equity Interest Pledge Agreement.** On April 19, 2018, each shareholder of Beijing NIO, Beijing NIO, and NIO WFOE entered into equity interest pledge agreements. The terms contained in the respective equity interest pledge agreements are substantially similar. Pursuant to the equity interest pledge agreements, those shareholders should pledge 100% equity interest in Beijing NIO to NIO WFOE to guarantee the performance by Beijing NIO and its shareholders of their obligations under the loan agreement, the exclusive option agreement, the exclusive business cooperation agreement and the power of attorney. If events of default defined therein occur, upon giving written notice to the shareholders, as pledgee, NIO WFOE to the extent permitted by PRC laws may exercise the right to enforce the pledge, unless the event of default has been successfully resolved to the satisfaction of NIO WFOE within twenty days after the delivery of the written notice. Those shareholders agree that, without NIO WFOE's prior written consent, during the term of the equity interest pledge agreement, they will not place or permit the existence of any security interest or other encumbrance on the equity interest in Beijing NIO or any portion thereof. We have completed registering the equity pledge with the relevant office of the SAMR in accordance with the PRC Property Rights Law.

*Agreements that allow us to receive economic benefits from Beijing NIO*

**Exclusive Business Cooperation Agreement.** On April 19, 2018, Beijing NIO and NIO WFOE entered into an exclusive business cooperation agreement. Pursuant to the exclusive business cooperation agreement, NIO WFOE has the exclusive right to provide Beijing NIO with comprehensive technical support, consulting services and other services. Without prior written consent of NIO WFOE, Beijing NIO should not directly or indirectly accept the same or any similar services provided by any third party regarding the matters contemplated by this agreement. During the term of this agreement where necessary, Beijing NIO may enter into further service agreements with NIO WFOE or any other party designated by NIO WFOE, which shall provide the specific contents, methods, personnel, and fees for specific services. Beijing NIO should pay NIO WFOE service fees, which should be determined by NIO WFOE after considering, among other things, the operation conditions of Beijing NIO, contents and value of the services provided by NIO WFOE. NIO WFOE will have exclusive and proprietary ownership, rights and interests in any and all intellectual property arising out of or developed during the performance of this agreement. Unless terminated in accordance with the provisions of this agreement or terminated in writing by NIO WFOE, the agreement shall remain effective.

94

Table of Contents

*Agreements that provide us with the option to purchase the equity interests in Beijing NIO*

**Exclusive Option Agreement.** On April 19, 2018, each shareholder of Beijing NIO, Beijing NIO and NIO WFOE entered into exclusive option agreements. The terms contained in the respective exclusive option agreements are substantially similar. Pursuant to the exclusive option agreement, the shareholders of Beijing NIO irrevocably granted NIO WFOE an irrevocable and exclusive right to purchase, or designate one or more persons to purchase the equity interests in Beijing NIO held by the shareholders at a price equal to the amount of registered capital contributed by the shareholders in Beijing NIO or any portion thereof, or at a price mutually agreed by NIO WFOE and the shareholders. Those shareholders further undertake that, without the prior written consent of NIO WFOE, Beijing NIO should not sell, transfer, mortgage or dispose of in any other manner any legal or equity interest in Beijing NIO held by its shareholders, or allow the encumbrance thereon, except for the interest placed in accordance with the equity interest pledge agreement, power of attorney and this agreement. Without the prior written consent of NIO WFOE, shareholders shall cause the shareholders' meeting or the directors (or the executive director) of Beijing NIO not to approve the merger or consolidation with any person, or acquisition of or investment in any person. This agreement will remain effective until all equity interests held by those shareholders in Beijing NIO have been transferred or assigned to NIO WFOE and/or any other person designated by NIO WFOE in accordance with this agreement.

In the opinion of Han Kun Law Offices, our PRC legal counsel:

- the ownership structures of our VIE in China and NIO WFOE comply with all existing PRC laws and regulations; and

- the contractual arrangements between NIO WFOE, our VIE and its shareholders governed by PRC laws are valid, binding and enforceable, and will not result in any violation of PRC laws or regulations currently in effect.

However, there are substantial uncertainties regarding the interpretation and application of current and future PRC laws, regulations and rules. On March 15, 2019, the National People's Congress approved the Foreign Investment Law, which has become effective on January 1, 2020. Since the law is relatively new, uncertainties exist in relation to its interpretation and implementation. The Foreign Investment Law does not explicitly classify whether variable interest entities that are controlled through contractual arrangements would be deemed as foreign invested enterprises if they are ultimately "controlled" by foreign investors. However, it has a catch-all provision under definition of "foreign investment" that includes investments made by foreign investors in China through other means as provided by laws, administrative regulations or the State Council. Therefore, it still leaves leeway for future laws, administrative regulations or provisions of the State Council to provide for contractual arrangements as a form of foreign investment. Accordingly, the PRC regulatory authorities may in the future take a view that is contrary to the above opinion of our PRC counsel. If the PRC government finds that the agreements that establish the structure for operating our business do not comply with PRC government restrictions on foreign investment, we may be required to unwind such agreements and/or dispose of such business. For a description of the risks related to our corporate structure, please see "Item 3. Key Information-D. Risk Factors-Risks Related to Our Corporate Structure."

Table of Contents

**D. Property, Plants and Equipment**

Currently, we own land use rights with respect to a parcel of land in Nanjing of approximately 325,217.57 square meters and the ownership with respect to the plant thereon for a term ending on March 10, 2063, which are used for the manufacture of our e-propulsion system, battery pack and engine driving system. We also leased a number of our facilities. The following table sets forth the location, approximate size, primary use and lease term of our major leased facilities as of December 31, 2020:

| Location[1] | Approximate Size (Building) in Square Meters/Feet[2] | Primary Use | Lease Expiration Date |
|---|---|---|---|
| Shanghai | 69,671.69 | Global headquarters and office | April 9, 2021 - June 19, 2025 |
| | 19,515.97 | User center (sales, marketing, and customer service) | September 9, 2021 -August 31, 2025 |
| | 24,566 | Integrated vehicle research and development | April 9, 2021 - June 19, 2025 |
| | 1,112.58 | Power management | March 31, 2022 - December 31, 2025 |
| | 444,60 | Warehouse | January 15, 2020 - March 31, 2024 |
| Shenzhen | 7,602.58 | Sales, marketing, and customer service | September 30, 2022 - November 30, 2023 |
| | 862.96 | Power management | August 31, 2021 - August 25, 2026 |
| Chengdu | 8,976.75 | Sales, marketing, and customer service | October 31, 2022 -March 31, 2028 |
| | 576.5 | Power management | October 30, 2021 - November 30, 2025 |
| | 178 | Office | November 8, 2019-January 7, 2021 |
| Hangzhou | 12,537.24 | Sales, marketing, and customer service | July 31, 2022 -December 31, 2023 |
| | 225 | Power management | June 30, 2022 - December 31, 2024 |
| Nanjing | 5,702 | Sales, marketing, and customer service | November 30, 2022 -March 31, 2028 |
| | 264.25 | Power management | June 30, 2022 - June 30, 2028 |
| Suzhou | 354.52 | Office | May 31, 2021 |
| | 8,995 | Sales, marketing, and customer service | June 30, 2023 -August 31, 2024 |
| | 451 | Power management | September 20, 2021 - October 30, 2025 |
| Beijing | 2,945.86 | Office | December 19, 2021 |
| | 24 | Office | November 1, 2021 |
| | 17,819.3 | Sales, marketing, and customer service | May 31, 2021 -June 30, 2027 |
| | 35.27 | Warehouse | October 14, 2020 |
| | 1,381.75 | Power management | July 31, 2021 - November 30, 2028 |
| Hefei | 315 | Power management | February 28, 2023 - September 24, 2030 |
| | 1927.66 | Sales, marketing, and customer service | December 31, 2020-April 29, 2023 |
| | 4787.18 | China headquarter and office | July 31, 2022 |
| Kunming | 165 | Sales, marketing, and customer service | April 30, 2021 |
| | 500 | Sales, marketing, and customer service | April 24, 2021 |
| | 40 | Power management | May 14, 2030 |
| Jinan | 85.51 | Office | October 31, 2021 |
| | 266 | Sales, marketing, and customer service | September 30, 2022 |
| | 105 | Power management | November 30, 2021 - April 30, 2025 |
| Guangzhou | 2,194.45 | Sales, marketing, and customer service | July 31, 2022 - December 31, 2025 |
| | 1,327.7 | Power management | July 31, 2021 - September 30, 2023 |
| Wuhan | 393.52 | Office | May 14, 2021 |
| | 7,830.33 | Sales, marketing, and customer service | October 31, 2021 - December 31 2028 |
| | 304.73 | Power management | September 30, 2021 - November 14, 2025 |
| Xi'an | 2,940.8 | Sales, marketing, and customer service | December 31, 2021 - September 30, 2024 |
| | 135 | Power management | September 30, 2024 - March 31, 2025 |
| Chongqing | 14,980.08 | Sales, marketing, and customer service | April 30 2022 -August 31, 2025 |
| | 205 | Power management | July 31, 2023 - August 28, 2025 |
| Ningbo | 667.93 | Sales, marketing, and customer service | August 16, 2020 -August 15, 2023 |
| | 260 | Power management | August 15, 2023 - November 14, 2025 |

96

Table of Contents

| Location[1] | Approximate Size (Building) in Square Meters/Feet[2] | Primary Use | Lease Expiration Date |
|---|---|---|---|
| Jiaxing | 115 | Office | November 30, 2021 |
| | 137 | Sales, marketing, and customer service | December 31, 2021 |
| Dalian | 82.68 | Office | January 31, 2022 |
| | 149 | Sales, marketing, and customer service | April 30, 2022 |
| | 43 | Power management | November 2, 2025 |
| Xiamen | 94.43 | Office | August 31, 2022 |
| | 9,774.55 | Sales, marketing, and customer service | February 28, 2022-November 30, 2028 |
| | 120 | Power management | July 31, 2025 |
| Dongguan | 1602.53 | Sales, marketing, and customer service | October 31, 2023-September 30, 2024 |
| | 209 | Power management | June 30, 2023 - September 30, 2025 |
| Fuzhou | 190 | Sales, marketing, and customer service | September 30, 2023 |
| | 50 | Power management | March 31, 2024 |
| Guiyang | 221 | Sales, marketing, and customer service | February 28, 2023 |
| | 50 | Power management | April 10, 2024 |
| Haikou | 351 | Sales, marketing, and customer service | March 31, 2023-October 31, 2023 |
| | 145 | Power management | November 9, 2023 - December 31, 2023 |
| Huhhot | 249 | Sales, marketing, and customer service | August 31, 2022 |
| | 38.25 | Power management | August 31, 2025 |
| Yiwu | 410 | Sales, marketing, and customer service | December 31, 2022 |
| Nanchang | 285 | Sales, marketing, and customer service | August 31, 2021-July 30, 2022 |
| | 47 | Power management | March 31, 2025 |
| Nanning | 412 | Sales, marketing, and customer service | October 29, 2022-December 14, 2022 |
| | 100 | Power management | May 31, 2025 |
| Qingdao | 3420 | Sales, marketing, and customer service | March 31, 2024 |
| | 48 | Power management | October 19, 2021 |
| Shenyang | 170 | Sales, marketing, and customer service | December 23, 2023 |
| | 43 | Power management | May 31, 2023 |
| Shijiazhuang | 3,002.67 | Sales, marketing, and customer service | October 31, 2023- July 31, 2026 |
| | 134 | Power management | September 29, 2021 - September 24, 2023 |
| Taiyuan | 236 | Sales, marketing, and customer service | June 30, 2022 |
| | 48 | Power management | December 24, 2022 |
| Tianjin | 5,343.37 | Sales, marketing, and customer service | August 31, 2021- September 9, 2028 |
| | 171 | Power management | July 31, 2023 - June 25, 2025 |
| Wenzhou | 606.07 | Sales, marketing, and customer service | February 29, 2024 |
| | 217.25 | Power management | March 20, 2022 - September 17, 2026 |
| Wuxi | 6,123 | Sales, marketing, and customer service | September 30, 2023-December 31, 2028 |
| | 325 | Power management | December 31, 2021 - October 17, 2025 |
| Xuzhou | 91 | Sales, marketing, and customer service | October 14, 2023 |
| | 129 | Power management | December 14, 2021 - May 31, 2025 |
| Changsha | 3,518 | Sales, marketing, and customer service | August 9, 2021-December 9, 2028 |
| | 370 | Power management | August 14, 2022 - November 31, 2023 |
| Zhengzhou | 5,175 | Sales, marketing, and customer service | November 30, 2023-October 31, 2024 |
| | 153 | Power management | October 31, 2024- November 30, 2025 |
| Huzhou | 148 | Sales, marketing, and customer service | August 31, 2022 |
| | 56 | Power management | December 31, 2024 |
| Yangzhou | 150 | Sales, marketing, and customer service | November 30, 2022 |
| Nantong | 555 | Sales, marketing, and customer service | April 30, 2024 |
| | 50 | Power management | October 14, 2025 |
| Kunshan | 150 | Sales, marketing, and customer service | November 1, 2021 |
| Changzhou | 868.85 | Sales, marketing, and customer service | July 31, 2022 |
| | 66 | Power management | November 13, 2025 |
| Changshu | 200.834 | Sales, marketing, and customer service | November 30, 2023 |
| Yichang | 161 | Sales, marketing, and customer service | Jun 30, 2023 |
| Xinxiang | 199 | Sales, marketing, and customer service | November 30, 2022 |
| | 43 | Power management | September 9, 2021 |
| Taizhou | 266 | Sales, marketing, and customer service | December 31, 2022 |
| | 60 | Power management | April 30, 2025 |
| Quanzhou | 137.8 | Sales, marketing, and customer service | April 30, 2022 |
| Jinjiang | 188 | Sales, marketing, and customer service | September 30, 2022 |
| | 45 | Power management | September 30, 2023 |
| Zhangzhou | 207.85 | Sales, marketing, and customer service | January 22, 2023 |
| | 45 | Power management | October 31, 2023 |
| Foshan | 3,443 | Sales, marketing, and customer service | July 31, 2028 |
| | 123 | Power management | August 31, 2023 - September 30, 2023 |
| Lanzhou | 735.81 | Sales, marketing, and customer service | October 1, 2022 |

97

Table of Contents

We have implemented a number of remedial measures to address the material weakness, including (1) establishing clear roles and responsibilities for accounting and financial reporting staff to address accounting and financial reporting issues; (2) strengthening our financial reporting team by hiring additional personnel with experience in U.S. GAAP and SEC reporting from reputable accounting firms; (3) further increasing the accounting and SEC reporting acumen and accountability of our finance organization employees through training programs designed to enhance these employees' competency with respect to U.S. GAAP and SEC reporting; (4) enhancing our monitoring controls over financial reporting, including additional review by our chief financial officer, financial vice president, and other senior finance staff over the application of U.S. GAAP accounting requirements, the selection and evaluation of U.S. GAAP accounting policies, critical accounting judgments and estimates, reporting and disclosures; (5) establishing related policies and procedures to support the operation of internal controls at the entity level and process level; and (6) strengthening our internal audit function by hiring additional personnel with industry internal audit experience and experience in compliance with the requirements of Section 404 of the Sarbanes-Oxley Act.

Other than as described above, there were no changes in our internal controls over financial reporting that occurred during the period covered by this annual report on Form 20-F that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Attestation Report of the Registered Public Accounting Firm**

Our independent registered public accounting firm, PricewaterhouseCoopers Zhong Tian LLP, has audited the effectiveness of our company's internal control over financial reporting as of December 31, 2020, as stated in its report, which appears on page F-2 of this annual report on Form 20-F.

**ITEM 16.A. AUDIT COMMITTEE FINANCIAL EXPERT**

Our board of directors has determined that Mr. Denny Ting Bun Lee, a member of our audit committee and independent director (under the standards set forth in Section 303A of the Corporate Governance Rules of the NYSE and Rule 10A-3 under the Securities Exchange Act of 1934), is an audit committee financial expert.

**ITEM 16.B. CODE OF ETHICS**

Our board of directors has adopted a code of ethics that applies to all of the directors, officers and employees of us and our subsidiaries, whether they work for us on a full-time, part-time, consultative, or temporary basis. Certain provisions of the code apply specifically to our chief executive officer, chief financial officer, senior finance officer, controller, senior vice presidents, vice presidents and any other persons who perform similar functions for us. We have posted a copy of our code of business conduct and ethics on our website at https://www.nio.io/code-of-business-conduct-and-ethics.

**ITEM 16.C. PRINCIPAL ACCOUNTANT FEES AND SERVICES**

The following table sets forth the aggregate fees by the categories specified below in connection with certain professional services rendered by PricewaterhouseCoopers Zhong Tian LLP and its affiliates, our principal external auditors, for the years indicated. We did not pay any other fees to our principal external auditors during the years indicated below.

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2019 | 2020 |
| | (in thousands of RMB) | |
| Audit fees[1] | 8,500 | 10,300 |
| Tax fees[2] | 1,747 | 2,338 |
| Other fees[3] | 1,608 | 5,636 |
| **Total** | **11,855** | **18,274** |

Note:

(1)  "Audit fees" means the aggregate fees billed for professional services rendered by our principal external auditors for the audits of our annual financial statements and the quarterly reviews of our condensed consolidated financial information.

149

Table of Contents

(2)  "Tax fees" means the aggregate fees billed in each of the fiscal years listed for professional services rendered by our principal external auditors for tax compliance, tax advice, and tax planning.

(3)  "All other fees" means the aggregate fees billed for professional services rendered by our principal external auditors associated with other advisory services.

The policy of our audit committee is to pre-approve all audit and other service provided by PricewaterhouseCoopers Zhong Tian LLP and its affiliates, including audit services, tax services and other services described above, other than those for *de minimis* services which are approved by the Audit Committee prior to the completion of the audit.

**ITEM 16.D. EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES**

Not applicable.

**ITEM 16.E. PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS**

None.

**ITEM 16.F. CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT**

Not applicable.

**ITEM 16.G. CORPORATE GOVERNANCE**

As a Cayman Islands company listed on the New York Stock Exchange, we are subject to the NYSE corporate governance listing standards. However, NYSE rules permit a foreign private issuer like us to follow the corporate governance practices of its home country. Certain corporate governance practices in the Cayman Islands, which is our home country, may differ significantly from the NYSE corporate governance listing standards.

Pursuant to Sections 303A.01, 303A.04, 303A.05, 303A.07 and 302.00 of the New York Stock Exchange Listed Company Manual, a company listed on the New York Stock Exchange must have a majority of independent directors, a nominating and corporate governance committee composed entirely of independent directors, a compensation committee composed entirely of independent directors and an audit committee with a minimum of three members, and must hold an annual shareholders' meeting during each fiscal year. We currently follow our home country practice in lieu of these requirements. We may also continue to rely on these and other exemptions available to foreign private issuers in the future. See "Item 3. Key Information-D. Risk Factors-Risks relating to our ADSs and Trading Market-Our shareholders may face difficulties in protecting their interests, and ability to protect their rights through U.S. courts may be limited, because we are incorporated under Cayman Islands law."

Other than the home country practice described above, we are not aware of any significant differences between our corporate governance practices and those followed by U.S. domestic companies under the NYSE corporate governance listing standards.Click or tap here to enter text.

**ITEM 16.H. MINE SAFETY DISCLOSURE**

Not applicable.

**PART III.**

**ITEM 17. FINANCIAL STATEMENTS**

We have elected to provide financial statements pursuant to "Item 18. Financial Statements."

**ITEM 18. FINANCIAL STATEMENTS**

The consolidated financial statements of NIO Inc. and its subsidiaries and the related notes are included at the end of this annual report.

150

Table of Contents

**ITEM 19. EXHIBITS**

| Exhibit Number | Description of Document |
| --- | --- |
| 1.1 | Eleventh Amended and Restated Memorandum and Articles of Association of the Registrant (incorporated herein by reference to Exhibit 3.2 to the registration statement on Form F-1 (File No. 333-226822), as amended, initially filed with the SEC on August 13, 2018) |
| 2.1 | Registrant's Specimen American Depositary Receipt (included in Exhibit 2.3) |
| 2.2 | Registrant's Specimen Certificate for Class A ordinary shares (incorporated herein by reference to Exhibit 4.2 to the registration statement on Form F-1 (File No. 333-226822), as amended, initially filed with the SEC on August 13, 2018) |
| 2.3 | Deposit Agreement, dated as of September 11, 2018, among the Registrant, Deutsche Bank Trust Company Americas, as the depositary, and all holders and beneficial owners of the American Depositary Shares issued thereunder (incorporated herein by reference to Exhibit 4.3 to the registration statement on Form S-8 (File No. 333-229952), filed with the SEC on February 28, 2019) |
| 2.4 | Fifth Amended and Restated Shareholders' Agreement, dated as of November 10, 2017, among the Registrant and the other signatories thereto (incorporated herein by reference to Exhibit 4.4 to the registration statement on Form F-1 (File No. 333-226822), as amended, initially filed with the SEC on August 13, 2018) |
| 2.5 | Description of American Depositary Shares of the Registrant (incorporated herein by reference to Exhibit 2.5 to the Company's Report on Form 20-F (File No. 001-38638), filed with the SEC on May 14, 2020) |
| 2.6 | Description of Class A ordinary shares of the Registrant (incorporated herein by reference to Exhibit 2.6 to the Company's Report on Form 20-F (File No. 001-38638), filed with the SEC on May 14, 2020) |
| 4.1 | 2015 Share Incentive Plan (incorporated herein by reference to Exhibit 10.1 to the registration statement on Form F-1 (File No. 333-226822), as amended, initially filed with the SEC on August 13, 2018) |
| 4.2 | 2016 Share Incentive Plan (incorporated herein by reference to Exhibit 10.2 to the registration statement on Form F-1 (File No. 333-226822), as amended, initially filed with the SEC on August 13, 2018) |
| 4.3 | 2017 Share Incentive Plan (incorporated herein by reference to Exhibit 10.3 to the registration statement on Form F-1 (File No. 333-226822), as amended, initially filed with the SEC on August 13, 2018) |
| 4.4 | 2018 Share Incentive Plan (incorporated herein by reference to Exhibit 10.4 to the registration statement on Form F-1 (File No. 333-226822), as amended, initially filed with the SEC on August 13, 2018) |
| 4.5 | Form of Indemnification Agreement, between the Registrant and its directors and executive officers (incorporated herein by reference to Exhibit 10.5 to the registration statement on Form F-1 (File No. 333-226822), as amended, initially filed with the SEC on August 13, 2018) |
| 4.6† | English translation of Manufacture Cooperation Agreement, dated as of May 23, 2016, between the registrant and Anhui Jianghuai Automobile Co., Ltd. (incorporated herein by reference to Exhibit 10.6 to the registration statement on Form F-1 (File No. 333-226822), as amended, initially filed with the SEC on August 13, 2018) |
| 4.7 | Form of Employment Agreement, between the Registrant and its executive officers (Non-PRC citizens) (incorporated herein by reference to Exhibit 10.7 to the registration statement on Form F-1 (File No. 333-226822), as amended, initially filed with the SEC on August 13, 2018) |
| 4.8 | Form of Employment Agreement, between the Registrant and its executive officers (PRC citizens) (incorporated herein by reference to Exhibit 10.8 to the registration statement on Form F-1 (File No. 333-226822), as amended, initially filed with the SEC on August 13, 2018) |
| 4.9 | Employment Agreement and Severance Agreement, between the Registrant and Padmasree Warrior, dated as of November 23, 2015 and December 16, 2015, respectively (incorporated herein by reference to Exhibit 10.10 to the registration statement on Form F-1 (File No. 333-226822), as amended, initially filed with the SEC on August 13, 2018) |
| 4.10 | English translation of Power of Attorney, dated as of April 19, 2018, among shareholders of Beijing NIO, Beijing NIO and NIO Co., Ltd. (incorporated herein by reference to Exhibit 10.16 to the registration statement on Form F-1 (File No. 333-226822), as amended, initially filed with the SEC on August 13, 2018) |
| 4.11 | English translation of Loan Agreements, dated April 19, 2018, among shareholders of Beijing NIO, Beijing NIO and NIO Co., Ltd. (incorporated herein by reference to Exhibit 10.17 to the registration statement on Form F-1 (File No. 333-226822), as amended, initially filed with the SEC on August 13, 2018) |
| 4.12 | English translation of Equity Interest Pledge Agreements, dated as of April 19, 2018, among shareholders of Beijing NIO, Beijing NIO and NIO Co., Ltd. (incorporated herein by reference to Exhibit 10.18 to the registration statement on Form F-1 (File No. 333-226822), as amended, initially filed with the SEC on August 13, 2018) |

151

Table of Contents

| | |
|---|---|
| 4.13 | English translation of Exclusive Business Cooperation Agreements, dated as of April 19, 2018, among shareholders of Beijing NIO, Beijing NIO and NIO Co., Ltd. (incorporated herein by reference to Exhibit 10.19 to the registration statement on Form F-1 (File No. 333-226822), as amended, initially filed with the SEC on August 13, 2018) |
| 4.14 | English translation of Exclusive Option Agreements, dated as of April 19, 2018, among shareholders of Beijing NIO, Beijing NIO and NIO Co., Ltd. (incorporated herein by reference to Exhibit 10.20 to the registration statement on Form F-1 (File No. 333-226822), as amended, initially filed with the SEC on August 13, 2018) |
| 4.15 | Indenture, dated as of February 4, 2019, by and between the Registrant, as issuer, and The Bank of New York Mellon, as trustee (incorporated herein by reference to Exhibit 4.22 to the Company's Report on Form 20-F (File No. 001-38638), filed with the SEC on April 2, 2019) |
| 4.16 | Form of 4.50% Convertible Senior Notes due 2024 (included in Exhibit 4.20) (incorporated herein by reference to Exhibit 4.22 to the Company's Report on Form 20-F (File No. 001-38638), filed with the SEC on April 2, 2019) |
| 4.17 | Deposit Agreement for Restricted Securities, dated as of February 4, 2019, among the Registrant, Deutsche Bank Trust Company Americas, as the depositary, and all holders and beneficial owners of the American Depositary Shares issued thereunder (incorporated herein by reference to Exhibit 4.24 to the Company's Report on Form 20-F (File No. 001-38638), filed with the SEC on April 2, 2019) |
| 4.18† | English translation of NIO ES6 Manufacture Cooperation Agreement, dated as of April 30, 2019, between the registrant and Anhui Jianghuai Automobile Co., Ltd. (incorporated herein by reference to Exhibit 4.23 to the Company's Report on Form 20-F (File No. 001-38638), filed with the SEC on May 14, 2020) |
| 4.19† | English translation of NIO Fury (EC6) Manufacture Cooperation Agreement, dated as of March 10, 2020, between the registrant and Anhui Jianghuai Automobile Co., Ltd. (incorporated herein by reference to Exhibit 4.24 to the Company's Report on Form 20-F (File No. 001-38638), filed with the SEC on May 14, 2020) |
| 4.20 | Convertible Notes Subscription Agreement, dated September 4, 2019, between the Registrant and Huang River Investment Limited (incorporated herein by reference to Exhibit 4.25 to the Company's Report on Form 20-F (File No. 001-38638), filed with the SEC on May 14, 2020) |
| 4.21 | Convertible Notes Subscription Agreement, dated September 4, 2019, between the Registrant and Serene View Investment Limited (incorporated herein by reference to Exhibit 4.26 to the Company's Report on Form 20-F (File No. 001-38638), filed with the SEC on May 14, 2020) |
| 4.22 | Form of 0% Convertible Senior Notes due 2020 (included in Exhibit 4.25) (incorporated herein by reference to Exhibit 4.25 to the Company's Report on Form 20-F (File No. 001-38638), filed with the SEC on May 14, 2020) |
| 4.23 | Form of 0% Convertible Senior Notes due 2022 (included in Exhibit 4.25) (incorporated herein by reference to Exhibit 4.25 to the Company's Report on Form 20-F (File No. 001-38638), filed with the SEC on May 14, 2020) |
| 4.24 | Indenture, dated as of February 10, 2020, among the Registrant, The Bank of New York Mellon, London Branch, as trustee, The Bank of New York Mellon, London Branch, as paying agent and conversion agent, and The Bank of New York Mellon SA/NV, Luxembourg Branch, as registrar and transfer agent (incorporated herein by reference to Exhibit 4.29 to the Company's Report on Form 20-F (File No. 001-38638), filed with the SEC on May 14, 2020) |
| 4.25 | Form of 0% Convertible Senior Notes due 2021 (included in Exhibit 4.29) (incorporated herein by reference to Exhibit 4.29 to the Company's Report on Form 20-F (File No. 001-38638), filed with the SEC on May 14, 2020) |
| 4.26 | Indenture, dated as of February 19, 2020, among the Registrant, The Bank of New York Mellon, London Branch, as trustee, The Bank of New York Mellon, London Branch, as paying agent and conversion agent, and The Bank of New York Mellon SA/NV, Luxembourg Branch, as registrar and transfer agent (incorporated herein by reference to Exhibit 4.31 to the Company's Report on Form 20-F (File No. 001-38638), filed with the SEC on May 14, 2020) |
| 4.27 | Form of 0% Convertible Senior Notes due 2021 (included in Exhibit 4.31) (incorporated herein by reference to Exhibit 4.31 to the Company's Report on Form 20-F (File No. 001-38638), filed with the SEC on May 14, 2020) |
| 4.28 | Indenture, dated as of March 11, 2020, among the Registrant, The Bank of New York Mellon, London Branch, as trustee, The Bank of New York Mellon, London Branch, as paying agent and conversion agent, and The Bank of New York Mellon SA/NV, Luxembourg Branch, as registrar and transfer agent (incorporated herein by reference to Exhibit 4.33 to the Company's Report on Form 20-F (File No. 001-38638), filed with the SEC on May 14, 2020) |

Table of Contents

| | |
|---|---|
| 4.29 | Form of 0% Convertible Senior Notes due 2021 (included in Exhibit 4.33) (incorporated herein by reference to Exhibit 4.33 to the Company's Report on Form 20-F (File No. 001-38638), filed with the SEC on May 14, 2020) |
| 4.30 | English translation of Investment Agreement, dated April 29, 2020, among Hefei Construction Investment Holdings (Group) Co., Ltd., the Registrant, NIO Nextev Limited, NIO Power Express Limited, NIO (Anhui) Holding Co., Ltd. and other parties thereto (incorporated herein by reference to Exhibit 4.35 to the Company's Report on Form 20-F (File No. 001-38638), filed with the SEC on May 14, 2020) |
| 4.31 | English translation of Shareholders' Agreement, dated April 29, 2020, among Hefei Construction Investment Holdings (Group) Co., Ltd., the Registrant, NIO Nextev Limited, NIO Power Express Limited, NIO (Anhui) Holding Co., Ltd. and other parties thereto (incorporated herein by reference to Exhibit 4.36 to the Company's Report on Form 20-F (File No. 001-38638), filed with the SEC on May 14, 2020) |
| 4.32 | English translation of Amendment and Supplementary Agreement to Investment Agreement, dated May 29, 2020, among Hefei Construction Investment Holdings (Group) Co., Ltd., the Registrant, NIO Nextev Limited, NIO Power Express Limited, NIO (Anhui) Holding Co., Ltd. and other parties thereto (incorporated herein by reference to Exhibit 99.1 to the Company's Current Report on Form 6-K (File No. 001-38638), filed with the SEC on June 9, 2020) |
| 4.33 | English translation of Amendment and Supplementary Agreement to Shareholders' Agreement, dated May 29, 2020, among Hefei Construction Investment Holdings (Group) Co., Ltd., the Registrant, NIO Nextev Limited, NIO Power Express Limited, NIO (Anhui) Holding Co., Ltd. and other parties thereto (incorporated herein by reference to Exhibit 99.2 to the Company's Current Report on Form 6-K (File No. 001-38638), filed with the SEC on June 9, 2020) |
| 4.34 | English translation of Amendment and Supplementary Agreement II to Investment Agreement, dated June 18, 2020, among Hefei Construction Investment Holdings (Group) Co., Ltd., the Registrant, NIO Nextev Limited, NIO Power Express Limited, NIO (Anhui) Holding Co., Ltd. and other parties thereto (incorporated herein by reference to Exhibit 99.1 to the Company's Current Report on Form 6-K (File No. 001-38638), filed with the SEC on June 30, 2020) |
| 4.35 | English translation of Amendment and Supplementary Agreement II to Shareholders' Agreement, dated June 18, 2020, among Hefei Construction Investment Holdings (Group) Co., Ltd., the Registrant, NIO Nextev Limited, NIO Power Express Limited, NIO (Anhui) Holding Co., Ltd. and other parties thereto (incorporated herein by reference to Exhibit 99.2 to the Company's Current Report on Form 6-K (File No. 001-38638), filed with the SEC on June 30, 2020) |
| 4.36* | English translation of Amendment and Supplementary Agreement III to the NIO China Shareholders Agreement, dated September 16, 2020, among Hefei Construction Investment Holdings (Group) Co., Ltd., the Registrant, NIO Nextev Limited, NIO Power Express Limited, NIO (Anhui) Holding Co., Ltd. and other parties thereto |
| 4.37* | English translation of Amendment and Supplementary Agreement IV to the NIO China Shareholders Agreement, dated September 25, 2020, among Hefei Construction Investment Holdings (Group) Co., Ltd., the Registrant, NIO Nextev Limited, NIO Power Express Limited, NIO (Anhui) Holding Co., Ltd. and other parties thereto |
| 4.38* | English translation of Amendment and Supplementary Agreement V to the NIO China Shareholders Agreement, dated January 26, 2021, among Hefei Construction Investment Holdings (Group) Co., Ltd., the Registrant, NIO Nextev Limited, NIO Power Express Limited, NIO (Anhui) Holding Co., Ltd. and other parties thereto |
| 4.39* | Indenture, dated as of January 15, 2021, by and between the Registrant, as issuer, and Deutsche Bank Trust Company Americas, as trustee, constituting US$750 million 0.00% Convertible Senior Notes due 2026 |
| 4.40* | Form of 0.00% Convertible Senior Notes due 2026 (included in Exhibit 4.39) |
| 4.41* | Indenture, dated as of January 15, 2021, by and between the Registrant, as issuer, and Deutsche Bank Trust Company Americas, as trustee, constituting US$750 million 0.50% Convertible Senior Notes due 2027 |
| 4.42* | Form of 0.50% Convertible Senior Notes due 2027 (included in Exhibit 4.41) |
| 8.1* | List of Principal Subsidiaries and Consolidated Variable Interest Entities |
| 11.1 | Code of Business Conduct and Ethics of the Registrant (incorporated herein by reference to Exhibit 99.1 to the registration statement on Form F-1 (File No. 333-226822), as amended, initially filed with the SEC on August 13, 2018) |
| 12.1* | CEO Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 12.2* | CFO Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 13.1** | CEO Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 13.2** | CFO Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

Table of Contents

| | |
|---|---|
| 15.1* | Consent of PricewaterhouseCoopers Zhong Tian LLP |
| 15.2* | Consent of Han Kun Law Offices |
| 101.INS* | Inline XBRL Instance Document-this instance document does not appear in the Interactive Data File because its XBRL tags are not embedded within the Inline XBRL document |
| 101.SCH* | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

\* Filed herewith.

\*\* Furnished herewith.

† Confidential treatment has been requested for certain portions of this exhibit pursuant to Rule 406 under the Securities Act and Division of Corporation Finance Staff Legal Bulletin No. 1. In accordance with Rule 406 and Staff Legal Bulletin No. 1, these confidential portions have been omitted and filed separately with the SEC.

154

Table of Contents

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing its annual report on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

NIO Inc.

By: /s/ Bin Li

Name: Bin Li

Title: Chairman of the Board of Directors and Chief Executive Officer

Date: April 6, 2021

155

Table of Contents

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| **Consolidated Financial Statements** | |
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets as of December 31, 2019 and 2020 | F-4 |
| Consolidated Statements of Comprehensive Loss for the Years Ended December 31, 2018, 2019 and 2020 | F-6 |
| Consolidated Statements of Shareholders' (Deficit)/Equity for the Years Ended December 31, 2018, 2019 and 2020 | F-7 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2018, 2019 and 2020 | F-10 |
| Notes to Consolidated Financial Statements | F-11 |

F-1

**NIO INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(All amounts in thousands, except for share and per share data)**

**1. Organization and Nature of Operations**

NIO Inc. ("NIO", or "the Company") was incorporated under the laws of the Cayman Islands in November 2014, as an exempted company with limited liability. The Company was formerly known as NextCar Inc.. It changed its name to NextEV Inc. in December 2014, and then changed to NIO Inc. in July 2017. The Company, its subsidiaries and consolidated variable interest entities ("VIEs") are collectively referred to as the "Group".

The Group designs and develops high-performance fully electric vehicles. It launched the first volume manufactured electric vehicle, the ES8, to the public in December 2017. The Group jointly manufactures its vehicles through strategic collaboration with other Chinese vehicle manufacturers. The Group also offers Energy and Service Packages to its users. As of December 31, 2019 and 2020, its primary operations are conducted in the People's Republic of China ("PRC"). The Group began to sell its first vehicles in June 2018. As of December 31, 2020, the Company's principal subsidiaries and VIEs are as follows:

| Subsidiaries | Equity interest held | Place and date of incorporation or date of acquisition | Principal activities |
|---|---|---|---|
| NIO NextEV Limited ("NIO HK") (formerly known as NextEV Limited) | 100% | Hong Kong, February 2015 | Investment holding |
| NIO GmbH (formerly known as NextEV GmbH) | 100% | Germany, May 2015 | Design and technology development |
| NIO Holding Co., Ltd. ("NIO Holding") (formerly named NIO (Anhui) Holding Co., Ltd.) | 100% | Anhui, PRC, November 2017 | Headquarter and technology development |
| NIO Co., Ltd. ("NIO SH") (formerly known as NextEV Co., Ltd.) | 100% | Shanghai, PRC, May 2015 | Headquarter and technology development |
| NIO USA, Inc. ("NIO US") (formerly known as NextEV USA, Inc.) | 100% | United States, November 2015 | Technology development |
| XPT Limited ("XPT") | 100% | Hong Kong, December 2015 | Investment holding |
| NIO Performance Engineering Limited ("NPE") | 100% | United Kingdom, July 2019 | Marketing and technology development |
| NIO Sport Limited ("NIO Sport") (formerly known as NextEV NIO Sport Limited) | 100% | Hong Kong, April 2016 | Racing management |
| XPT Technology Limited ("XPT Technology") | 100% | Hong Kong, April 2016 | Investment holding |
| XPT Inc. ("XPT US") | 100% | United States, April 2016 | Technology development |
| XPT (Jiangsu) Investment Co., Ltd. ("XPT Jiangsu") | 100% | Jiangsu, PRC, May 2016 | Investment holding |
| Shanghai XPT Technology Limited | 100% | Shanghai, PRC, May 2016 | Technology development |
| XPT (Nanjing) E-Powertrain Technology Co., Ltd. ("XPT NJEP") | 100% | Nanjing, PRC, July 2016 | Manufacturing of E-Powertrain |
| XPT (Nanjing) Energy Storage System Co., Ltd. ("XPT NJES") | 100% | Nanjing, PRC, October 2016 | Manufacturing of battery pack |
| NIO Power Express Limited ("PE HK") | 100% | Hong Kong, January 2017 | Investment holding |
| NextEV User Enterprise Limited ("UE HK") | 100% | Hong Kong, February 2017 | Investment holding |
| Shanghai NIO Sales and Services Co., Ltd. ("UE CNHC") | 100% | Shanghai, PRC, March 2017 | Investment holding and sales and after sales management |
| NIO Energy Investment (Hubei) Co., Ltd. ("PE CNHC") | 100% | Wuhan PRC, April 2017 | Investment holding |
| Wuhan NIO Energy Co., Ltd. ("PE WHJV") | 100% | Wuhan, PRC, May 2017 | Investment holding |
| XTRONICS (Nanjing) Automotive Intelligent Technologies Co. Ltd. ("XPT NJWL") | 50% | Nanjing, PRC, June 2017 | Manufacturing of components |
| XPT (Jiangsu) Automotive Technology Co., Ltd. ("XPT AUTO") | 100% | Nanjing, PRC, May 2018 | Investment holding |

| VIE and VIE's subsidiaries | Economic interest held | Place and Date of incorporation or date of acquisition |
|---|---|---|
| Prime Hubs Limited ("Prime Hubs") | 100% | BVI, October 2014 |
| NIO Technology Co., Ltd. ("NIO SHTECH") (formerly known as Shanghai NextEV Technology Co., Ltd.) | 100% | Shanghai, PRC, November 2014 |
| Beijing NIO Network Technology Co., Ltd. ("NIO BJTECH") | 100% | Beijing, PRC, July 2017 |
| Shanghai Anbin Technology Co., Ltd. ("NIO ABTECH") | 100% | Shanghai, PRC, April 2018 |

As of December 31, 2020, the Company indirectly held 86.476% of total paid-in capital of NIO Holding. In accordance with NIO Holding's share purchase agreement, the redemption of the non-controlling interests is at the holders' option and is upon the occurrence of the events that are not solely within the control of the Company. Therefore, these redeemable non-controlling interests in NIO Holding were classified as mezzanine equity and are subsequently accreted to the redemption price using the agreed interest rate as a reduction of additional paid in capital (Note 22). Excluding the redeemable non-controlling interests, the Company indirectly held 100% of the equity interests of NIO Holding as of December 31, 2020.

As of December 31, 2020, the Company indirectly held 51% of total paid-in capital of PE WHJV. In accordance with the joint investment agreement, the investment by Wuhan Donghu is accounted for as a loan because it is only entitled to fixed interests and subject to repayment within five years or upon the financial covenant violation (Note 13(iv)). Excluding the interests held by Wuhan Donghu, the Company indirectly held 100% of the equity interests of PE WHJV as of December 31, 2020.

F-11

**NIO INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(All amounts in thousands, except for share and per share data)**

Full valuation allowances have been provided where, based on all available evidence, management determined that deferred tax assets are not more likely than not to be realizable in future tax years. Movement of valuation allowance is as follow:

| | As of December 31, | | |
|---|---|---|---|
| | **2018** | **2019** | **2020** |
| **Valuation allowance** | | | |
| Balance at beginning of the year | 1,878,643 | 4,369,687 | 6,879,030 |
| Additions | 2,491,044 | 2,509,343 | 1,140,489 |
| Balance at end of the year | 4,369,687 | 6,879,030 | 8,019,519 |

The Group has tax losses arising in Mainland China of RMB21,494,377, that will expire in one to nine years for deduction against future taxable profit.

| | |
|---|---|
| Loss expiring in 2021 | 38,471 |
| Loss expiring in 2022 | 57,986 |
| Loss expiring in 2023 | 2,361,845 |
| Loss expiring in 2024 | 3,439,013 |
| Loss expiring in 2025 | 3,529,613 |
| Loss expiring in 2026 | 547,984 |
| Loss expiring in 2027 | 2,799,057 |
| Loss expiring in 2028 | 3,386,670 |
| Loss expiring in 2029 | 5,333,738 |
| Total | 21,494,377 |

The Group has tax losses arising in Hong Kong of RMB2,601,564 for which could be carried forward indefinitely against future taxable income.

The Group has tax losses arising in United States of RMB22,927, RMB232,098, RMB813,638 and RMB2,394,621 that will expire in sixteen, seventeen, eighteen and infinite years for deduction against future taxable income.

*Uncertain Tax Position*

The Group did not identify any significant unrecognized tax benefits for each of the periods presented. The Group did not incur any interest related to unrecognized tax benefits, did not recognize any penalties as income tax expense and also does not anticipate any significant change in unrecognized tax benefits within 12 months from December 31, 2020.

**26. Loss Per Share**

Basic loss per share and diluted loss per share have been calculated in accordance with ASC 260 on computation of earnings per share for the years ended December 31, 2018, 2019 and 2020 as follows:

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2019** | **2020** |
| **Numerator:** | | | |
| Net loss | (9,638,979) | (11,295,652) | (5,304,082) |
| Accretion on convertible redeemable preferred shares to redemption value | (13,667,291) | - | - |
| Accretion on redeemable non-controlling interests to redemption value | (63,297) | (126,590) | (311,670) |
| Net loss attributable to non-controlling interests | 41,705 | 9,141 | 4,962 |
| Net loss attributable to ordinary shareholders of NIO Inc. for basic/dilutive net loss per share | (23,327,862) | (11,413,101) | (5,610,790) |
| **Denominator:** | | | |
| Weighted-average number of ordinary shares outstanding - basic and diluted | 332,153,211 | 1,029,931,705 | 1,182,660,948 |
| Basic and diluted net loss per share attributable to ordinary shareholders of NIO Inc. | (70.23) | (11.08) | (4.74) |

F-49

**NIO INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(All amounts in thousands, except for share and per share data)**

For the years ended December 31, 2018, 2019 and 2020, the Company had potential ordinary shares, including non-vested restricted shares, options granted, Convertible Notes and Preferred Shares. As the Group incurred losses for the years ended December 31, 2018, 2019 and 2020, these potential ordinary shares were anti-dilutive and excluded from the calculation of diluted net loss per share of the Company. Such weighted average numbers of ordinary shares outstanding are as following:

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2019** | **2020** |
| Non-vested restricted shares | 340,518 | 459,199 | - |
| Outstanding weighted average options granted | 72,735,288 | 31,276,979 | 52,558,756 |
| Convertible Notes | - | 92,512,382 | 183,942,782 |
| Preferred Shares | 678,614,152 | - | - |
| Total | 751,689,958 | 124,248,560 | 236,501,538 |

**27. Related Party Balances and Transactions**

The principal related parties with which the Group had transactions during the years presented are as follows:

| Name of Entity or Individual | Relationship with the Company |
| --- | --- |
| Baidu Capital L.P. | Shareholder |
| Ningbo Meishan Bonded Port Area Weilan Investment Co., Ltd. | Controlled by Principal Shareholder |
| Shanghai NIO Hongling Investment Management Co., Ltd. | Controlled by Principal Shareholder |
| NIO Capital | Controlled by Principal Shareholder |
| Suzhou Zenlead XPT New Energy Technologies Co., Ltd. | Affiliate |
| Beijing Chehui Hudong Guanggao Co., Ltd. | Controlled by Principal Shareholder |
| Beijing Xinyi Hudong Guanggao Co., Ltd. | Controlled by Principal Shareholder |
| Bite Shijie (Beijing) Keji Co., Ltd. | Controlled by Principal Shareholder |
| Kunshan Siwopu Intelligent Equipment Co., Ltd. | Affiliate |
| Nanjing Weibang Transmission Technology Co., Ltd. | Affiliate |
| Shanghai Weishang Business Consulting Co., Ltd. | Controlled by Principal Shareholder |
| Beijing Bit Ep Information Technology Co., Ltd. | Controlled by Principal Shareholder |
| Serene View Investment Limited | Controlled by Principal Shareholder |
| Huang River Investment Limited | Controlled by Principal Shareholder |
| Tianjin Boyou Information Technology Co., Ltd. | Controlled by Principal Shareholder |
| Wistron Info Comm (Kunshan) Co., Ltd. | Subsidiary's Non-controlling shareholder |
| Beijing Yiche Information Science and Technology Co., Ltd. | Controlled by Principal Shareholder |
| Beijing Yiche Interactive Advertising Co., Ltd. | Controlled by Principal Shareholder |
| Shanghai Yiju Information Technology Co., Ltd. | Controlled by Principal Shareholder |
| Beijing Changxing Information Technology Co., Ltd. | Significantly influenced by Principal Shareholder |
| Beijing Bitauto Interactive Technology Co., Ltd. | Controlled by Principal Shareholder |
| Wuhan Weineng Battery Assets Co., Ltd. | Affiliate |
| Xtronics Innovation Ltd. | Subsidiary's Non-controlling shareholder |
| Xunjie Energy (Wuhan) Co ., Ltd. | Affiliate |

In June 2018, Wenjie Wu, originally appointed by Baidu Capital L.P. to be a board director of the Company, resigned and since then, Baidu Capital L.P. ceased to have significant influence over the Company and was no longer the Group's related party.

In December 2020, Mr. Bin Li resigned as chairman of the Board in Beijing Bitauto Interactive Technology Co., Ltd.. Since then, Beijing Bitauto Interactive Technology Co., Ltd., Beijing Xinyi Hudong Guanggao Co., Ltd., Bite Shijie (Beijing) Keji Co., Ltd. and Beijing Chehui Hudong Guanggao Co., Ltd. were no longer controlled by Mr. Bin Li, and were no longer the Group's related parties.

F-50

**NIO INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(All amounts in thousands, except for share and per share data)**

*(a) The Group entered into the following significant related party transactions:*

*(i) Provision of service*

For the years ended December 31, 2018, 2019 and 2020, service income was primarily generated from property management and miscellaneous research and development services the Group provided to its related parties.

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2018 | 2019 | 2020 |
| Nanjing Weibang Transmission Technology Co., Ltd. | - | 2,417 | 1,523 |
| Wuhan Weineng Battery Assets Co., Ltd. | - | - | 38 |
| Shanghai Weishang Business Consulting Co., Ltd. | 905 | 1,806 | - |
| Shanghai NIO Hongling Investment Management Co., Ltd. | 2,707 | - | - |
| | 3,612 | 4,223 | 1,561 |

*(ii) Acceptance of advertising and IT support services*

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2018 | 2019 | 2020 |
| Beijing Chehui Hudong Guanggao Co., Ltd. | 6,915 | 29,599 | 92,356 |
| Beijing Xinyi Hudong Guanggao Co., Ltd. | 28,245 | 37,935 | 39,919 |
| Beijing Bit Ep Information Technology Co., Ltd. | - | 3,627 | 4,159 |
| Tianjin Boyou Information Technology Co., Ltd. | - | 264 | 1,594 |
| Beijing Yiche Information Science and Technology Co., Ltd. | 32 | 466 | 280 |
| Shanghai Yiju Information Technology Co., Ltd. | - | 76 | 142 |
| Bite Shijie (Beijing) Keji Co., Ltd. | 2,865 | 1,664 | 47 |
| Beijing Yiche Interactive Advertising Co., Ltd. | - | 6,132 | - |
| | 38,057 | 79,763 | 138,497 |

*(iii) Loan to related party*

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2018 | 2019 | 2020 |
| NIO Capital | 66,166 | - | - |

On January 12, 2018, the Group granted two interest free loans to NIO Capital, with principal amount of US$5,000 each. The loans mature in six months. One of the loan has been received by the Group and the other has been converted into the investment in ordinary shares of a subsidiary of NIO Capital, which was further disposed in 2019.

*(iv) Cost of manufacturing consignment*

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2018 | 2019 | 2020 |
| Suzhou Zenlead XPT New Energy Technologies Co., Ltd. | 132,152 | 132,511 | 174,680 |

*(v) Purchase of raw material, property and equipment*

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2018 | 2019 | 2020 |
| Nanjing Weibang Transmission Technology Co., Ltd. | - | 34,220 | 114,329 |
| Kunshan Siwopu Intelligent Equipment Co., Ltd. | 11,107 | 7,982 | 22,797 |
| Xunjie Energy (Wuhan) Co., Ltd. | - | - | 460 |
| | 11,107 | 42,202 | 137,586 |

**NIO INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(All amounts in thousands, except for share and per share data)**

*(vi) Interest payable on behalf of related party*

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2019** | **2020** |
| Baidu Capital L.P. | 8,065 | - | - |

*(vii) Acceptance of R&D and maintenance service*

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2019** | **2020** |
| Suzhou Zenlead XPT New Energy Technologies Co., Ltd. | 14,776 | - | 1,953 |
| Kunshan Siwopu Intelligent Equipment Co., Ltd. | 2,436 | 341 | 1,449 |
| | 17,212 | 341 | 3,402 |

*(viii) Payment on behalf of related party*

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2019** | **2020** |
| Nanjing Weibang Transmission Technology Co., Ltd. | 2,790 | - | - |

*(ix) Loan from related party*

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2019** | **2020** |
| Beijing Bitauto Interactive Technology Co., Ltd. | - | - | 260,000 |
| Beijing Changxing Information Technology Co., Ltd. | - | 25,799 | - |
| | - | 25,799 | 260,000 |

In 2019, the Company signed a loan agreement with Beijing Changxing Information Technology Co., Ltd. for a loan of RMB25,799 at an interest rate of 15%. As of December 31, 2020, the loan has been fully repaid by the Company.

In 2020, the Company signed loan agreements with Beijing Bitauto Interactive Technology Co., Ltd. for an aggregate loan amount of RMB260,000 at an interest rate of 6%. As of December 31, 2020, the loans have been fully repaid by the Company.

*(x) Sale of raw material, property and equipment*

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2019** | **2020** |
| Wistron Info Comm (Kunshan) Co., Ltd. | - | 725 | 358 |
| Wuhan Weineng Battery Assets Co., Ltd. | - | - | 120 |
| | - | 725 | 478 |

*(xi) Convertible notes issued to related parties and interest accural (Note 12)*

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2019** | **2020** |
| Serene View Investment Limited | - | 614,926 | 101,927 |
| Huang River Investment Limited | - | 920,914 | 22,018 |
| | - | 1,535,840 | 123,945 |

F-52

**NIO INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(All amounts in thousands, except for share and per share data)**

*(xii) Sales of goods*

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2018 | 2019 | 2020 |
| Wuhan Weineng Battery Assets Co., Ltd. | - | - | 290,135 |
| Beijing Bit Ep Information Technology Co., Ltd. | - | - | 4,402 |
| Beijing Bitauto Interactive Technology Co., Ltd. | - | - | 1,974 |
| Beijing Yiche Interactive Advertising Co., Ltd. | - | - | 1,453 |
| Beijing Yiche Information Science and Technology Co., Ltd. | - | - | 525 |
| | - | - | 298,489 |

**(b) The Group had the following significant related party balances:**

*(i) Amounts due from related parties*

| | As of December 31 | |
| --- | --- | --- |
| | 2019 | 2020 |
| Wuhan Weineng Battery Assets Co. Ltd. | - | 118,779 |
| Ningbo Meishan Bonded Port Area Weilan Investment Co., Ltd. | 50,000 | 50,000 |
| Kunshan Siwopu Intelligent Equipment Co., Ltd. | - | 617 |
| Nanjing Weibang Transmission Technology Co., Ltd. | 674 | 509 |
| Wistron Info Comm (Kunshan) Co., Ltd. | 109 | - |
| Total | 50,783 | 169,905 |

In 2017, the Company grant interest-free loans to Ningbo Meishen Bonded Port Area Weilan Investment Co., Ltd. As of December 31, 2020, the loans remain outstanding.

*(ii) Amounts due to related parties*

| | As of December 31 | |
| --- | --- | --- |
| | 2019 | 2020 |
| Suzhou Zenlead XPT New Energy Technologies Co., Ltd. | 180,687 | 273,982 |
| Nanjing Weibang Transmission Technology Co., Ltd. | 33,018 | 51,687 |
| Kunshan Siwopu Intelligent Equipment Co., Ltd. | 379 | 11,986 |
| Wistron Info Comm (Kunshan) Co., Ltd. | - | 3,007 |
| Beijing Bit Ep Information Technology Co., Ltd. | 2,598 | 1,768 |
| Xtronics Innovation Ltd. | - | 1,493 |
| Xunjie Energy (Wuhan) Co ., Ltd. | - | 513 |
| Beijing Yiche Information Science and Technology Co., Ltd. | 205 | 167 |
| Beijing Xinyi Hudong Guanggao Co., Ltd. | 36,714 | - |
| Beijing Changxing Information Technology Co., Ltd. | 25,799 | - |
| Beijing Chehui Hudong Guanggao Co., Ltd. | 25,170 | - |
| Beijing Yiche Interactive Advertising Co., Ltd. | 3,500 | - |
| Bite Shijie (Beijing) Keji Co., Ltd. | 1,549 | - |
| Shanghai Yiju Information Technology Co., Ltd. | 80 | - |
| Tianjin Boyou Information Technology Co., Ltd. | 30 | - |
| Total | 309,729 | 344,603 |

*(iii) Short-term borrowings and interest payable*

| | As of December 31 | |
| --- | --- | --- |
| | 2019 | |
| Huang River Investment Limited | 354,840 | 3,391 |
| Serene View Investment Limited | 350,255 | - |
| Total | 705,095 | 3,391 |

**NIO INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(All amounts in thousands, except for share and per share data)**

*(iv) Long-term borrowings*

| | As of December 31 | |
| --- | --- | --- |
| | **2019** | **2020** |
| Huang River Investment Limited | 560,325 | 531,507 |
| Serene View Investment Limited | 258,213 | - |
| Total | 818,538 | 531,507 |

**28. Commitments and Contingencies**

*(a) Capital commitments*

Capital expenditures contracted for at the balance sheet dates but not recognized in the Group's consolidated financial statements are as follows:

| | As of December 31 | |
| --- | --- | --- |
| | **2019** | **2020** |
| Property and equipment | 551,582 | 428,448 |
| Leasehold improvements | 68,652 | 54,911 |
| Total | 620,234 | 483,359 |

*(b) Contingencies*

Between March and July 2019, several putative securities class action lawsuits were filed against the Company, certain of the Company's directors and officers, the underwriters in the IPO and the process agent, alleging, in sum and substance, that the Company's statements in the Registration Statement and/or other public statements were false or misleading and in violation of the U.S. federal securities laws. Some of these actions have been withdrawn, transferred or consolidated. Currently, three securities class actions remain pending in the U.S. District Court for the Eastern District of New York (E.D.N.Y.), Supreme Court of the State of New York, New York County (N.Y. County), and Supreme Court of the State of New York, County of Kings (Kings County) respectively. In the E.D.N.Y. action, the Company and other defendants filed their Motion to Dismiss on October 19, 2020 and briefing on the Motion to Dismiss was completed on December 4, 2020. The Court's decision on the Motion to Dismiss is pending. In the New York county action, by an order dated March 23, 2021, the Court granted the plaintiffs' motion to lift the stay in favor of the federal action. In the Kings County action, the judge has yet to be assigned and there has not been any major development. These actions remain in their preliminary stages. The Company is currently unable to determine any estimate of the amount or range of any potential loss, if any, associated with the resolution of such lawsuits, if they proceed.

The Group is subject to legal proceedings and regulatory actions in the ordinary course of business, such as disputes with landlords, suppliers, employees, etc. The results of such proceedings cannot be predicted with certainty, but the Group does not anticipate that the final outcome arising out of any of such matters will have a material adverse effect on the consolidated balance sheets, comprehensive loss or cash flows on an individual basis or in the aggregate. As of December 31, 2019 and 2020, the Group is not a party to any material legal or administrative proceedings.

F-54